## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF AMERICA, INC.
1140 19th St. NW, Suite 600,
Washington, D.C. 20036, and

THE ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.,
1140 19th St. NW, Suite 600,
Washington, D.C. 20036,

                    Plaintiffs,

v.

GERARD L. CAFESJIAN, INDIVIDUALLY and as
TRUSTEE and PRESIDENT (former) of THE ARMENIAN
GENOCIDE MUSEUM AND MEMORIAL, INC., and
PRESIDENT and DIRECTOR OF THE CAFESJIAN
FAMILY FOUNDATION, INC.,
4001 Tamiami Trail, Suite 425,
Naples, Florida, 34103

JOHN J. WATERS, JR., INDIVIDUALLY and as
SECRETARY/TREASURER OF THE ARMENIAN
GENOCIDE MUSEUM AND MEMORIAL, INC.,
PRESIDENT OF THE TOMKAT LIMITED
PARTNERSHIP, and SECRETARY and DIRECTOR OF
THE CAFESJIAN FAMILY FOUNDATION, INC.,
15 S. 5th Street #900,
Minneapolis, MN 55402,

THE CAFESJIAN FAMILY FOUNDATION, INC.,
4001 Tamiami Trail, Suite 425,
Naples, Florida, 34103;

and
THE TOMKAT LIMITED PARTNERSHIP,
15 S. 5th Street #900,
Minneapolis, MN 55402,

                    Defendants.

Civil File No. _____

COMPLAINT
**JURY TRIAL DEMANDED**

The Armenian Assembly of America, Inc. ("the Assembly"), and the Armenian Genocide

Museum and Memorial, Inc. ("AGM&M") (hereinafter collectively "Plaintiffs"), by and through

their undersigned counsel, hereby complain against Gerard L. Cafesjian, Individually and as

(former) President and Trustee of AGM&M, Trustee and Board of Trustees member of the

Assembly (currently suspended), and current President and Director of the Cafesjian Family

Foundation, Inc. ("CFF") and affiliated entities; John J. Waters, Jr. Individually and as Trustee

and (former) acting Secretary/Treasurer of AGM&M, Trustee and Board of Trustees member of

the Assembly (currently suspended), Secretary and Director of CFF and affiliated entities, and

President of The TomKat Limited Partnership ("TomKat"), as follows:

I.      **PARTIES**

1.      The Assembly is a District of Columbia non-profit corporation with its principal

place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036. The Assembly is

classified by the Internal Revenue Service (IRS) as a public charity. The Assembly is the

premier Armenian-American advocacy group in the United States and has several missions

including, but not limited to, acting as a sponsor for Armenian-American interests to public

policy makers and the public in the United States, providing resources and opportunities for

Armenian-Americans in the American democratic process, undertaking research, education and

advocacy for universal affirmation of the Armenian Genocide, and securing effective

collaboration among Armenian-American organizations to accomplish its articulated goals.

2.      The Armenian Genocide Museum and Memorial, Inc. ("AGM&M") is a District

of Columbia non-profit corporation with its principal place of business at 1140 19th St. NW,

Suite 600, Washington, D.C. 20036. The purpose of the AGM&M is to provide a dignified

location for the conduct of educational activities regarding the Armenian Genocide, including

but not limited to, housing artifacts, photos, and other educational materials from the Armenian

Genocide as well as owning, operating and maintaining a permanent museum and memorial to the victims and survivors of the Armenian Genocide.  AGM&M was founded as a public charity.

3.       Gerard L. Cafesjian ("Cafesjian") is a citizen of Florida.  He founded and is the President and Director of CFF, and formerly served as the President as well as a named Trustee (on behalf of CFF) of AGM&M.  He is also a Trustee (currently suspended) of the Assembly. Upon information and belief, he is the primary interest holder of TomKat.

4.       CFF is a Florida non-profit corporation with its principal place of business at 4001 Tamiami Trail, Suite 425, Naples, Florida, 34103.  CFF is Cafesjian's personal family foundation.

5.       John J. Waters, Jr. ("Waters") is a resident of Minnesota and upon information and belief a long time employee of Cafesjian.  He is a current Trustee (on behalf of CFF) of AGM&M, and formerly acted as the Secretary and Treasurer of AGM&M.  He is currently Secretary and a Director of CFF.  He is also a Trustee (currently suspended) of the Assembly. He is also President of TomKat, a Cafesjian owned entity further described herein.

6.       TomKat is a South Dakota limited Partnership with a business address of 15 S. 5th Street #900, Minneapolis, MN.   The sole general partner of TomKat is TomKat, Inc., a South Dakota Corporation.  Waters is the President of TomKat and TomKat Inc.  Upon information and belief, Cafesjian is the primary interest holder of TomKat, Inc.

## II.     <u>JURISDICTION</u>

7.       This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. 1332, as citizenship is diverse and the amount in controversy exceeds $75,000.00.

8.       This Court has personal jurisdiction over all of the Defendants and venue is proper.

III.    **FACTUAL BACKGROUND**

    A.    **THE INCEPTION OF THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL PROJECT**

    9.    The Assembly has been in existence since 1972. In pursuing its goal of education about, and reaffirmation of, the Armenian Genocide, which is the most elemental event in modern Armenian history, the Assembly has sought the enactment of legislation in the Congress of the United States confirming the historical fact of the Armenian Genocide, as well as seeking resolutions that United States foreign policy reflects appropriate understanding of the Armenian Genocide. In addition, the Assembly has filed an *amicus curiae* brief in U.S. District Court in Massachusetts (*Griswold v. Driscoll*) opposing attempts by Turkish interests to insert denialist opinions in the Massachusetts public schools' curriculum, and it has sponsored extensive public educational efforts about the lessons of the Armenian Genocide.

    10.    The Assembly had long investigated the idea of constructing a permanent museum where Americans and visitors to the United States could learn about the Armenian Genocide. Accordingly, in the mid-1990s, the Assembly formed the Armenian National Institute ("ANI"), which is dedicated to the reaffirmation of the Armenian Genocide.

    11.    In support of the formation of ANI, Anoush Mathevosian, an Armenian-American philanthropist, made an initial pledge of $3,500,000 to the Assembly for the purpose of constructing a permanent museum to the victims and survivors of the Armenian Genocide ("the museum").

    12.    Encouraged by Ms. Mathevosian's generosity, the Assembly began exploring possible sites for the museum in Washington, D.C. and solicited donations from the Armenian-American community for the purpose of establishing and constructing the museum.

13.    In or around late 1999, a possible site for the museum was identified at the National Bank of Washington Building at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. ("the Bank site"). In addition to being an impressive, museum quality building, the Bank site is in a highly desirable location near the White House.

14.    On February 14, 2000, the Assembly purchased the Bank site for seven million two hundred fifty thousand dollars ($7,250,000).

15.    In order to fund the purchase of of the Bank site, the Assembly sought specific major donations and pledges from various sources. In addition to the funds previously pledged by Ms. Mathevosian, it successfully raised the bulk of the remainder of the purchase price through donations from two Cafesjian charitable corporations, CFF and the Vanguard Charitable Endowment Program-Cafesjian Family Foundation Charitable Trust, which provided the project with a $3,500,000 grant and a $500,000 loan.

16.    The $500,000 loan was subsequently memorialized via a Promissory Note to CFF issued by the the Assembly on March 17, 2000 ("the Note"), attached at Exhibit 1 to Affidavit of Naoka E. Carey filed herewith ("Carey Aff."). By its terms, the Note was interest free and "payable in full on May 16, 2000." Based on conversations between Assembly leaders and Cafesjian, the Assembly subsequently came to the understanding that this Note was forgiven.

17.    Cafesjian initially conditioned his financial support for the purchase of the Bank site on the inclusion of a "Gerard L. Cafesjian Memorial" at the museum site.

**B.    CAFESJIAN DEMANDS THAT THE ASSEMBLY EXPAND AND FUND A VASTLY EXPANDED MUSEUM PROJECT**

18.    With the purchase of the Bank site, the museum project initially gained momentum. Over the following nine months, with the Assembly at the helm, a $40 million

dollar budget and timeline for the project was established (with a goal of opening in 2002), a project manager was selected, and a request for proposals for development plans was issued.

19.    During the same time period, Cafesjian, through his company, TomKat, acquired several properties adjacent to the Bank site.  Upon information and belief, Cafesjian originally intended to use these properties to build a "Cafesjian Art Museum" that would dwarf the proposed genocide museum.

20.    In early 2001, Ross Vartian ("Vartian"), who had been the Assembly's Executive Director from 1979 through 2000, became the Director of Planning for the museum project.  In response to requests by Vartian for operating funds for the project, two donors, Hirair Hovnanian ("Hovnanian") and Cafesjian, pledged to provide the project with funds.

21.    While Hovnanian followed through on his pledge, Cafesjian never actually provided the funds he had promised.

22.    By the end of 2001, progress on the museum project had been stymied, in part because of inconsistent messages from Cafesjian regarding the use of the adjoining sites and also because of Cafesjian's ongoing delay in providing the pledged operating funds, which were required to fund certain aspects of the developmental planning.

23.    During 2001, Cafesjian apparently lost interest in the creation of an art museum on the site, and, by the end of 2001, instead proposed to donate all of the adjacent lots he had acquired to the museum project, in exchange for being released from the monetary pledges he had made to the Assembly to fund operating costs for the project.

24.    At a special meeting held in January, 2002, Cafesjian was invited to join a distinct "Consultative Group" to the Assembly at large.  At that meeting, Cafesjian proposed that the "vision" for the museum project be broadened to a one hundred million dollar project.  Together,

Waters and Vartian proposed that the Assembly engage a project planner, Concord Partners, to develop a revised development plan for the project.

25.     Recognizing that the acquisition of the additional lots would require the Assembly to significantly expand the financial scope of the project, as well as to revise all of the planning and development work that had been completed, various members of the Assembly's leadership raised concerns regarding Cafesjian's proposal.  In response, Cafesjian repeatedly assured the Assembly that he would either secure the funding from others through donations or personally fund the proposed expanded project.

26.     On the basis of, and in reliance on, these assurances, the Assembly authorized Waters and Vartian to develop an organizational structure for the museum project and to develop a revised business plan.

27.     Cafesjian eventually insisted that not the Assembly, but a new non-profit organization that he would effectively control – AGM&M – be created to handle the construction, development, and operation of the museum and memorial.

28.     In late 2002, again in response to concerns raised by the Assembly leadership regarding the potential costs of the newly expanded project and the various conditions on Cafesjian's grants and pledges being discussed, Cafesjian, via his agent Waters, again confirmed that "he had full confidence in the community's ability and willingness to fully fund the AGM&M initiative and, if need be, he would complete the project himself."  Although Waters later clarified that Cafesjian's commitment was not a guarantee, the group agreed to move the project forward on the basis of Cafesjian's assurances.

C.      **INCORPORATION OF AGM&M**

29.     In late October of 2003, AGM&M was incorporated as a District of Columbia not-for-profit corporation.

30.    Pursuant to the Articles of Incorporation (<u>Exhibit 2</u> to Carey Aff.) and the By-Laws, the purpose of AGM&M is as follows:

> [AGM&M] will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

31.    The Articles of Incorporation and By-Laws of AGM&M (<u>Exhibit 3</u> to Carey Aff.) were ratified and adopted, respectively, pursuant to a Unanimous Written Consent of the Initial Trustees of AGM&M (hereinafter "Consent") executed on October 30, 2003.

32.    The By-Laws, Articles of Incorporation, and Consent (<u>Exhibit 4</u> to Carey Aff.), together, constitute the operative organizational documents of AGM&M.

33.    Pursuant to the By-Laws and Articles, AGM&M has no members. Articles § V, By-Laws § 2.1. The Board of Trustees serves as the Board of Directors for purposes of the D.C. Non-Profit Corporations Act. By-Laws § 2.2.

34.    Pursuant to the Articles of Incorporation, the initial Trustees of AGM&M were Cafesjian, Mathevosian, Hovnanian, and Robert A. Kaloosdian ("Kaloosdian"). Articles at IX. As noted in the Consent, Cafesjian and Kaloosdian were appointed as Trustees on behalf of CFF and the Assembly respectively, which were two of the four named "Initial Donors" of the Corporation (the other two Initial Donors are Mathevosian and Hovnanian). Consent at 2. The Consent also identified the initial officers of AGM&M: Cafesjian (President), Hovnanian (Vice-President), and Waters (Secretary and Treasurer).

35.    Under AGM&M's By-Laws, only Trustees can hold office as Secretary or Treasurer.  At Cafesjian's insistence, Waters, a long time employee and agent of Cafesjian, was appointed as Secretary and Treasurer even though it was contrary to AGM&M's By-Laws.

36.    Under AGM&M's By-Laws, each Initial Trustee is entitled to exercise one trustee vote.  By-Laws § 2.4.   In addition, for each additional $5,000,000.00 contributed to AGM&M, initial or subsequent Donors are entitled to elect an additional Trustee, or to confer an additional vote to their existing Trustee.  Id. § 2.5.  Importantly, the election of additional Trustees (or votes for Trustees) is contingent upon each $5,000,000.00 contribution being accepted by the Board of Trustees "on behalf of [AGM&M] by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  Id.  Absent a ratification of a purported contribution, none of the initial Trustees is entitled to have more than one vote.

37.    In light of Cafesjian's requests to recover all of his donations and extract a profit from his involvement with AGM&M, discussed *infra*, AGM&M asserts that CFF, Cafesjian or any other affiliated entities must be barred from any further voting on issues in which they have any financial or other conflict of interest.

D.    **THE GRANT AND TRANSFER AGREEMENTS**

38.    On November 1, 2003, at Cafesjian's insistence, the Assembly executed with AGM&M a "Transfer Agreement" for the purpose of transferring "all of its real property, pledges, cash, and other assets acquired for the purpose of building AGM&M."  See Transfer Agreement at Exhibit 5 to Carey Aff.

39.    The Transfer Agreement was drafted per Waters' instruction and was executed by Waters on behalf of AGM&M.

40.    As discussed further, herein, the only real property held by the Assembly for the museum project at the time of the execution of the Transfer Agreement was the Bank site.  In

addition to the Bank site, the Assembly also transferred cash and pledges that it had received over the preceding six years for the support of the museum project.

41.    In addition to the real property, cash, and pledges noted above, the Assembly also agreed to transfer control of ANI, along with all of its assets, to AGM&M because, under Cafesjian's proposed terms, ANI was to become a subsidiary of AGM&M.

42.    The transfer of the control of ANI and all of its assets represented an invaluable contribution to the museum enterprise, both financially and otherwise.  Not only did ANI have an established reputation as a leading research organization dedicated to preserving and studying Armenian history and artifacts, it also owned an extensive collection of rare historical documents and other precious items that make up the "collection" of works to be displayed at the museum. In addition to holding extensive records and tangible property, ANI had an excellent reputation and enormous goodwill in the community, lending significant credibility to the enterprise.

43.    Simultaneously, on November 1, 2003, the Assembly executed a Grant Agreement with Cafesjian and CFF, which was also drafted per Waters' instruction. See Grant Agreement at Exhibit 6 to Carey Aff.  The Grant Agreement memorialized the donations made by Cafesjian for the museum project, defining them as "the Grant Property," and set forth terms for the donations, including the terms discussed below.

44.    Under the terms of the Grant Agreement, the Assembly was required to transfer the Note to AGM&M upon the execution of the Transfer Agreement (i.e. on November 1, 2003). The Grant Agreement provisions relevant to the Note state as follows:

> **5.4    Promissory Note**
>
> **(A)    The Assembly must issue a new promissory note (the "Promissory Note" to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the [Cafesjian Family] Foundation in the amount of $500,000.**

> **(B)** **The new note must be interest free and mature on December 31, 2005.**
>
> **(C)** **If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.**[1]

45.     The Grant Agreement also contains the following reversionary provision regarding "the Grant Property."

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by AGM&M's Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.     in the event any portion of the Grants has not been funded, this Agreement terminates; and**
>
> **ii.     to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.**

See Grant Agreement at Section 3.1(B).

46.     Section 3.1(B) of the Grant Agreement clearly put Cafesjian, who was in control of the operations of AGM&M for many years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees, while still enjoying the tax benefit of a "donation." Moreover, as AGM&M, and not Cafesjian or CFF, will have borne the taxes and other costs associated with the properties during the interim, and as the properties have

---

[1] On its face, the last provision of Section 5.4 of the Grant Agreement is ambiguous. While Section 5.4 explicitly calls for the Assembly to transfer the $500,000 note to AGM&M, it does not say whether AGM&M shall assume the Note as payor or as payee. In the Complaint filed by Cafesjian and CFF in Minnesota federal court, discussed further, *supra*, Cafesjian and CFF conveniently fail to take a position on this issue.

appreciated in value during the intervening time period, if the time requirement is not met, CFF will receive a significant windfall at the direct expense of AGM&M.

47.    Pursuant to the requirements of the Grant Agreement and the Transfer Agreement, the Assembly subsequently transferred all right, title and interest in the Bank site to AGM&M pursuant to the Transfer Agreement referenced herein, as well as all of its other donations, pledges, and other assets acquired for the purpose of building the museum.

**E.    TRANSFER OF PROPERTIES TO AGM&M FROM TOMKAT**

48.    As part of the formation of AGM&M, AGM&M and TomKat entered into various purchase and assignment agreements by which TomKat formally transferred to AGM&M title to the properties adjacent to the bank site or transferred to AGM&M TomKat's rights under existing purchase and sale or installment sale contracts for such properties.  As noted below, in each of these cases, Waters prepared the documents for and negotiated the transaction on behalf of both TomKat and AGM&M, and, in each case, AGM&M was obligated to pay TomKat for all of the costs it had incurred on each property since purchasing it (and, in some cases, to pay TomKat other remuneration).

*1.    TRANSFER OF PROPERTY LOCATED AT 1334-36 G STREET, N.W., WASHINGTON, DC*

49.    On September 20, 2003, TomKat entered into a Purchase & Sale Agreement to purchase the property located at 1334-36 G Street, N.W., Washington, D.C. ("1334-36 G Street") for $6,500,000.

50.    On November 4, 2003, the property and all rights and obligations of TomKat under the Purchase & Sale Agreement were transferred to AGM&M pursuant to an Assignment and Assumption Agreement by and between TomKat and AGM&M.   See Assignment and Assumption Agreement ("1334 Assignment Agreement") attached at <u>Exhibit 7</u> to Carey Aff.

51.    The 1334 Assignment Agreement and other transfer documents were drafted by attorneys for TomKat, and were reviewed by Waters and executed by Waters on behalf of both AGM&M and TomKat.  Upon information and belief, other than Waters, no representative of AGM&M reviewed or approved the terms of the 1334 Assignment Agreement or other transfer documents.

52.    Pursuant to the 1334 Assignment Agreement, AGM&M agreed to pay to TomKat all of its "expenses related to [1334-36 G Street]," see id. at ¶ 5.  The expenses were not identified or itemized in the agreement.

53.    AGM&M purchased 1334-36 G Street for a total price of $6,500,000.00 with an additional $380,933.50 in settlement charges.  A copy of the HUD Settlement Statement is attached at Exhibit 8 to Carey Aff.  Per the HUD Settlement Statement, the purchase price included $26,000.00 due from AGM&M to TomKat for "various expenses" as well as $250,000.00 to reimburse TomKat for a deposit paid on the property.

54.    Upon information and belief, the fair market value of the property has appreciated since the time of its acquisition.

2.    *TRANSFER TO AGM&M OF PROPERTY LOCATED AT 1338 G STREET, N.W., WASHINGTON, DC*

55.    On May 15, 2000, TomKat purchased the property located at 1338 G Street, N.W., Washington, D.C. ("1338 G Street") for $1,200,000.

56.    On December 15, 2003, TomKat sold 1338 G Street to AGM&M for $1,350,000 as well as settlement costs in the amount of $22,498.25.  A copy of HUD Settlement Statement is attached at Exhibit 9 to Carey Aff.   As part of the sale transaction, TomKat executed a Purchase Agreement that transferred all right, title, and interest in 1338 G Street to AGM&M ("1338 Purchase Agreement") and that stated as follows:

> **This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings.**

See Purchase Agreement attached hereto at <u>Exhibit 10</u> to Carey Aff., at 17.2.

57.     The 1338 Purchase Agreement and other sale documents were drafted by attorneys for TomKat, and were reviewed by Waters and executed by Waters on behalf of both AGM&M and TomKat.  Upon information and belief, other than Waters, no representative of AGM&M reviewed or approved the terms of the 1338 Purchase Agreement or other sale documents.

58.     Per the 1338 Purchase Agreement, the increase of $150,000 over the purchase price of the property that had been paid by TomKat was provided by AGM&M to TomKat to cover acquisition, closing and carrying costs incurred by TomKat to purchase and hold the property between May 2000 and December 2003.  See <u>id</u>.  As the attached Exhibit B shows, TomKat also received over $5,000.00 in excess funds not attributed to any costs associated with the properties.

59.     On December 15, 2003, in his capacity as President of TomKat, Waters executed a sworn Owner/Seller's Affidavit on behalf of TomKat, which confirmed that 1338 G Street was not subject to any pending proceedings, liens, mortgages or similar agreements.   See Owner/Seller's Affidavit attached at <u>Exhibit 11</u> to Carey Aff.

60.     Upon  information and belief the fair market value of the property has appreciated since the time of its acquisition.

> 3.     *TRANSFER TO AGM&M OF PROPERTY LOCATED AT 1340 G STREET, N.W., WASHINGTON, DC*

61.     On October 24, 2000, TomKat entered into an installment agreement to purchase the property located at 1340 G Street, N.W., Washington, D.C. ("1340 G Street") for $3,000,000,

payable in installments of $150,000 each year (plus interest) for a period of ten years, with a final installment of $1,500,000. A copy of the Installment Purchase and Sale Agreement is attached hereto at Exhibit 12 to Carey Aff.

62.    On December 22, 2003, the property and all rights and obligations of TomKat under the installment contract were transferred to AGM&M pursuant to an Assignment and Assumption Agreement by and between TomKat and AGM&M. See Memorandum of Assignment dated December 22, 2003 by and between TomKat and AGM&M, attached at Exhibit 13 to Carey Aff.

63.    The Memorandum of Assignment and other transfer documents were drafted by attorneys for TomKat and executed by Waters on behalf of both TomKat and AGM&M. Upon information and belief, other than Waters, no one reviewed the Memorandum of Assignment of other transfer documents on behalf of AGM&M.

*64.*    Pursuant to the terms of Memorandum of Assignment, TomKat agreed to transfer all rights under the installment contract to AGM&M, provided that AGM&M transferred to TomKat $450,000 (representing the first three payments of $150,000, which had already been made), and reimbursed TomKat for all funds advanced by TomKat for "the acquisition and holding of the property." Id. These amounts, per the attached Exhibit D, totaled $309,085.44.

65.    Upon information and belief, the fair market value of the property has appreciated since the time of its acquisition.

    *4.    TRANSFER TO AGM&M OF PROPERTY LOCATED AT 1342 G*
         *STREET, N.W., WASHINGTON, DC*

66.    On September 30, 2000, TomKat purchased the property located at 1342 G Street, N.W. for $1,200,000. A copy of the HUD Settlement Statement is attached at Exhibit 14 to Carey Aff.

67.     On December 15, 2003, TomKat entered into a Purchase Agreement with AGM&M whereby AGM&M purchased the property for $1,340,000.   A copy of the HUD Settlement Statement is attached at Exhibit 15 to Carey Aff.

68.     Per the 1342 Purchase Agreement, the increase of $140,000 over the purchase price of the property that had been paid by TomKat was provided by AGM&M to TomKat to cover the acquisition, closing and carrying costs incurred by TomKat to purchase and hold the property between September 2000 and December 2003. See id.  As the attached Exhibit B shows, TomKat also received slight less than $5,000.00 in excess funds not attributed to any costs associated with the properties.

69.     The 1342 Purchase Agreement and other sale documents were drafted by attorneys for TomKat, and were reviewed by Waters and executed by Waters on behalf of both AGM&M and TomKat.  Upon information and belief, other than Waters, no representative of AGM&M reviewed or approved the terms of the 1342 Purchase Agreement or other sale documents.

70.     Upon information and belief, the fair market value of the property has appreciated substantially since acquisition.

**F.     CAFESJIAN AND WATERS' MISMANAGEMENT OF AGM&M**

71.     Between November 1, 2003 and the fall of 2006, AGM&M was operated, managed, and in fact, controlled by Cafesjian and Waters, acting as President and acting Secretary/Treasurer, respectively.

72.     During Cafesjian and Waters' tenure managing AGM&M, virtually nothing substantive was accomplished to complete the museum project.  As discussed in more detail below, Cafesjian and Waters failed to secure a suitable architect for the project, focusing almost exclusively on one architect whose designs were neither feasible nor fundable.  Cafesjian and

Waters also failed to secure adequate additional major funding from other donors to support Cafesjian's grandiose plans, instead spending in excess of the limited amounts they received, including significant funds on a "business consultant" whom Cafesjian decided to terminate in the midst of her planning. Cafesjian and Waters also permitted the Bank site and other buildings on the proposed museum site to fall into serious disrepair and failed to either demolish the empty buildings or secure appropriate classification and/or exemptions for the properties from applicable District of Columbia real property taxes. As a result of the foregoing, the District of Columbia has declared some of the properties to be taxable as vacant buildings, resulting in a substantial tax liability. Moreover, because of the failure of Cafesjian and Waters to secure additional funding and take meaningful steps to accomplish the charitable purpose of AGM&M, AGM&M's tax status as a charitable organization is now threatened.

1.    *Hiring and Termination of Business Consultant, Deborah Devedjian*

73.    In or around March of 2005, Cafesjian and Waters retained a business consultant, Deborah Devedjian ("Devedjian"), to develop a "business plan" for AGM&M.

74.    Cafesjian did not disclose to the other Trustees what he proposed to pay Devedjian nor did he disclose that he did not intend to make any formal contract or agreement with Devedjian regarding the scope or nature of her work. Upon information and belief, Cafesjian failed to make any written contract with Devedjian to define the scope or terms of her work for AGM&M.

75.    Nevertheless, the other Trustees cooperated and assisted Devedjian as she attempted to develop a business plan for the project.

76.    Devedjian subsequently invoiced over $340,000 in fees and costs, of which $192,000 are still outstanding. See May 31, 2007 Letter from Deborah Devedjian, attached hereto at Exhibit 16 to Carey Aff.

77.     The <u>preliminary</u> business plan submitted by Devedjian to the AGM&M Trustees envisioned a budget and scope even larger than the one-hundred million dollar plan of Cafesjian.

78.     The non-Cafesjian Trustees were, understandably, deeply concerned with the feasibility of the proposed plan and expressed such concern to Cafesjian.

79.     In response to concerns raised by the AGM&M Trustees, Devedjian was requested to revise her proposal.  Additionally, Cafesjian and Waters requested that Devedjian assist in the selection of a suitable architect.  Devedjian's research did not result in her confirming Cafesjian's nomination of a particular architect favored by Cafesjian.

80.     Cafesjian and Waters subsequently terminated Devedjian.  Waters and Cafesjian failed to take the steps necessary to terminate the relationship with Devedjian in a businesslike manner.

81.     Due to the lack of a written agreement with Devedjian, there remain outstanding issues regarding her right to additional payments and reimbursements.

82.     In light of Cafesjian and Waters' failure to make a written contract with Devedjian, and Cafesjian and Waters' failure to provide adequate documentation regarding any aspect of their former management of AGM&M, AGM&M has grave concerns regarding possible written agreements (or lack thereof) with other vendors and contractors.  AGM&M therefore seeks a determination that Cafesjian and Waters be held individually liable for any contracts (or alleged breaches of contract) with any persons that were not reduced to a writing and approved by the other AGM&M Trustees or officers.

    2.  *Failure of Cafesjian and Waters to Ensure That Properties Are Given*
       *Appropriate Tax Treatment or Maintained*

83.     As noted above, in addition to the Bank site, as of January of 2004, AGM&M became the owner of four other lots adjacent to the Bank site, each of which required maintenance, upkeep, and tax treatment consideration.

18

84.    Pursuant to the development plans discussed by the AGM&M Trustees and agreed to by Cafesjian, the intention was to demolish the buildings on the lots and to include all of the lots in the overall museum development project.

85.    Both Cafesjian and Waters were on notice from the inception of their management of AGM&M of the potentially prohibitively expensive costs of maintaining the properties and the need to promptly demolish them and commence the building process.

86.    Indeed, throughout his tenure as acting Secretary and Treasurer of AGM&M, Waters received repeated notices of ever-increasing real estate tax and abandoned building liabilities, but failed to take adequate steps to remedy these issues or advise the non-Cafesjian Trustees of same.

87.    Upon information and belief, Cafesjian and Waters failed to identify any realistic development plan for the museum, instead focusing almost exclusively on the work of one architect, Edgar Papazian ("Papazian"), whose design, when finally presented, raised serious feasibility concerns.

88.    In 2005 and 2006, Cafesjian and Waters presented a potentially controversial museum design proposal by architect Edgar Papazian to the non-Cafesjian Trustees.  The design envisioned a museum that was dominated, both literally and metaphorically, by an enormous "Cafesjian Memorial" which, in the words of the architect, "violently penetrate[d]" the museum, towering over, and literally through, the rest of the museum.

89.    The non-Cafesjian Trustees inquired of Cafesjian and Waters whether the design would meet the District of Columbia's stringent zoning and permitting requirements.

90.    Upon information and belief, Cafesjian knew that the Papazian design was neither legally nor financially feasible as the bank building itself is historic and protected.  Indeed,

despite request, Cafesjian produced no confirmation that the proposed design could be permitted or financed.

91.     As a result of Cafesjian and Waters' failure to ensure that the necessary steps were taken to commence development of the museum, the District of Columbia has classified the abutting properties as vacant.

92.     Upon information and belief, in addition to the properties now being classified as vacant, the properties have also been left in substantial disrepair, as Cafesjian and Waters failed to take the necessary steps to ensure that the properties were adequately maintained.  One of the properties, for example, suffered from flooding, damaging a neighboring property in the process. As a result, AGM&M must now incur substantial cost to repair, demolish or secure the properties, which costs may make it more difficult financially to make the museum project a reality.

> 3.     *Cafesjian and Waters Spend Down AGM&M Assets and Fail to Keep Adequate Records of Their Activities*

93.     In early 2006, Cafesjian and Waters presented the non-Cafesjian Trustees with a "Financial Overview" of AGM&M's expenditures during 2005, as well as its estimated budget for 2006.  See Financial Overview attached at <u>Exhibit 17</u> to Carey Aff.

94.     The "Financial Overview" disclosed uncontrolled spending by Cafesjian and Waters in their fiduciary capacity as the officers of AGM&M.

95.     In light of the impractical and self-aggrandizing design promoted by Cafesjian, as well as the disclosure that Cafesjian and Waters had depleted the operating assets of AGM&M, the other AGM&M Trustees began scrutinizing Cafesjian and Water's management of the project.  It quickly became apparent to the other Trustees that little progress had been made on the museum's development plan and that Cafesjian had not consulted with, or even informed, the other Trustees and officers of actions he and Waters had taken on behalf of AGM&M.

96.     Subsequent to the meeting, the non-Cafesjian Trustees requested that Waters provide them with the complete records of AGM&M.

97.     Waters has failed, despite demand, to produce complete copies of all records that Waters was required to maintain as acting Secretary and Treasurer of AGM&M.  Accordingly, the precise nature and scope of Cafesjian and Waters mismanagement of AGM&M has yet to be fully determined.  In particular, Cafesjian and Waters failed to document many of their actions and have failed to produce minutes of meetings conducted, including Trustee meetings, for nearly the entirety of their tenure.

98.     Upon information and belief, assets belonging to AGM&M, including those transferred to it by the Assembly, have been dissipated or wasted as a result of Cafesjian and Waters actions and omissions.

### G.     CAFESJIAN AND WATERS CONTINUE TO BREACH THEIR FIDUCIARY DUTY TO AGM&M AND THE ASSEMBLY

99.     Faced with the problems that they themselves had created, Cafesjian and Waters essentially abandoned AGM&M, taking the position that they had no fiduciary or other responsibilities to the organization that they had insisted on creating.   Worse yet, they took action to effectively and illegally cloud the title to the land owned by AGM&M, and then initiated multiple lawsuits against the Assembly, attempting to delay the development of the museum in order to force the reversion of the Grant Properties to Cafesjian interests.

  *1.     Cafesjian, Through His Counsel, Insists on Immediate Return of His Donations or the Destruction of AGM&M*

100.     On May 24, 2006, Cafesjian's then attorney, William J. Brody ("Brody"), sent a certified letter to Hovnanian, Kaloosdian, and Mathevosian asserting, on behalf of Cafesjian, that there were two competing visions of the AGM&M among the trustees and that these visions were irreconcilable.  See Letter dated May 24, 2006, attached at <u>Exhibit 18</u> to Carey Aff.  Brody

suggested that Cafesjian proposed to end his involvement with AGM&M, resign his trustee position, and prospectively renounce his rights to appoint trustees or to serve as a trustee. Id.  In this letter, Brody referred to the $500,000 Note as a loan from CFF "to AGM&M" (not the Assembly), and stated that if Cafesjian terminated his involvement in AGM&M, he would expect the loan to be repaid. Id.  He further stated that the controlling Grant Agreement provided that if the various properties had not been developed by 2010, as contemplated in the agreement, then any obligation by Cafesjian and CFF would terminate and the properties or the funds to acquire the properties "are to be returned to CFF" and that he would expect the return of the non-bank buildings and property. Id.

101.    On August 2, 2006, Kaloosdian formally responded to the May 24, 2006 Brody letter on behalf of himself, Hovnanian, and Mathevosian.  See Letter dated August 2, 2006, attached at Exhibit 19 to Carey Aff.   Kaloosdian noted that Cafesjian had acted as the chief executive officer of the project, had unilaterally decided whom to engage as the architect, and had hired a business consultant without interference. Id.  The other Trustees, hoping to avoid further delay in the project, urged Cafesjian to continue with the project with his vision. Id.

102.    Another Brody letter, dated August 29, 2006, setting out Cafesjian's terms for terminating his involvement in AGM&M, followed.  See Letter dated August 29, 2006, attached at Exhibit 20 to Carey Aff.  This letter left no doubt that Cafesjian, faced with a challenge to his management decisions and his unilateral control of the project, intended to dissolve AGM&M and reacquire the properties.  The other Trustees realized that, because the properties had increased in value, Cafesjian could now profit by his involvement in the museum project, at the expense of AGM&M and the Assembly, and to the great detriment of the museum and memorial project.

       2.      *Waters Unilaterally Clouds Title to All of the AGM&M Properties*

103.    On September 13, 2006, Cafesjian sent a letter resigning as President and Chairman of the Board of Trustees of AGM&M (but not as a member of the Board of Trustees). In his letter, Cafesjian indicated that Waters also intended to resign as (acting) secretary and treasurer of AGM&M and to transfer all administrative functions to the Board of Trustees. <u>See</u> Letter of Gerard Cafesjian dated September 13, 2006, attached at <u>Exhibit 21</u> to Carey Aff.

104.    On October 23, 2006, without a meeting of the Board of Trustees having been properly noticed, <u>and</u> without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Waters executed, allegedly as an authorized officer of both AGM&M and CFF, a Memorandum of Agreement Reserving Rights ("October 23, 2006 Memorandum") ostensibly between AGM&M and CFF. In the October 23, 2006 Memorandum, Waters identified himself as Secretary/Treasurer of AGM&M, as well as Vice-President of CFF.

105.    On or about October 27, 2006, and again without proper notice to or authorization from the AGM&M Trustees, Waters caused the Memorandum to be filed and recorded in the official records of the Recorder of Deeds for the District of Columbia. <u>See</u> Memorandum of Agreement Reserving Rights, attached at <u>Exhibit 22</u> to Carey Aff.

106.    Through his actions, Waters encumbered the title to all the Grant Properties of AGM&M.[2] His actions were solely in the interests of Cafesjian and CFF and adverse to the interests of AGM&M and the Assembly because he had clear conflicting interests, and Waters acted in violation of his fiduciary duties to AGM&M when he signed the October 23, 2006

---

[2] On June 8, 2007, AGM&M filed suit in the District of Columbia Superior Court seeking to remove the cloud on the title of the properties. On July 16, 2007, CFF removed the case to the United States District Court, District of Columbia. The case number is 1:07 cv-01259.

Memorandum on behalf of both parties, thereby giving the impression he had the authority to act on behalf of both parties.

3.    *Cafesjian and Waters Initiate Unfounded Litigation Against the Assembly and AGM&M*

107.    Unable to force the Board of Trustees to comply with his demands to return the donated property to CFF and, in essence, eliminate the museum and memorial in its entirety, Cafesjian turned to litigation that, *inter alia*, sought immediate return of all of his donations.

108.    On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Docket No. 07 cv 2079, Exhibit 23 to Carey Aff.).  The Complaint seeks, *inter alia*, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement, on the basis of the Assembly's alleged failure to issue a new Promissory Note.

109.    Both Cafesjian and Waters were, at all times, aware that the Note had been forgiven, that the statute of limitations to enforce the Note had run, and/or that any obligation had been legally transferred to AGM&M (as either payor or payee).  Indeed, in tax returns filed on behalf of both AGM&M and CFF, and signed by Waters, Waters repeatedly confirmed that the obligation had been transferred to AGM&M.

110.    Despite their objectively confirmed knowledge that the Assembly had no obligation to pay the Note, Cafesjian and CFF nevertheless brought suit against the Assembly in the U.S. District Court in Minnesota, seeking recovery of the funds due under the Note and rescission of the Grant Agreement, including the return of the real property, incorrectly alleging that the Assembly had breached the terms of the Grant Agreement.  Cafesjian's filing of the lawsuit against the Assembly is without merit and is contrary to his fiduciary obligations to AGM&M and to the Assembly.

111.    After offers by the other Trustees to compromise were summarily rejected by Cafesjian, the Assembly moved to dismiss the Minnesota action, which request was preliminarily granted pursuant to the Report and Recommendation of Magistrate Judge Jeanne J. Graham. Despite the Assembly's likelihood of ultimate success on the action, the action was nevertheless costly, requiring counsel for the Assembly to travel to Minnesota for hearings and to file numerous pleadings with the Court.

112.    When Cafesjian's efforts to rescind the Grant Agreement through litigation began to appear unpromising, Cafesjian initiated yet another vexatious lawsuit in the District Court for the District of Columbia (Docket No. 1:07 -01746) ("Cafesjian's D.C. action") (<u>Exhibit 24</u> to Carey Aff.), this time alleging (purportedly on behalf of AGM&M) that AGM&M's Board of Trustees, by seeking to make the museum a reality, had committed ultra vires acts and/or breaches of fiduciary duty.  These allegations are specious and unsupported by the law.

113.    The true agenda behind Cafesjian's D.C. action is to to delay the development of the museum long enough to trigger the reversionary clause in the Grant Agreement, thereby compelling the return of all of the grant property to CFF or Cafesjian.  The litigation constitutes a breach of Cafesjian's fiduciary duties to AGM&M and the Assembly, as well as a breach of Cafesjian's duty of good faith and fair dealing with respect to the Grant Agreement.

## IV.    <u>CAFESJIAN AND WATERS BREACH OF FIDUCIARY DUTIES TO THE ASSEMBLY</u>

114.    The Assembly has a Conflict of Interest Policy and a Policy on Distribution of Membership List and Other Database Lists, attached at <u>Exhibit 25</u> to Carey Aff., which are binding on all officers, board members, and trustees of the Assembly, including Cafesjian and Waters.

115.    In 2006, Cafesjian formed the U.S.-Armenia Public Affairs Committee ("USAPAC"), an organization that purported to be a "partner" organization to the Assembly.

116.    Upon information and belief, Cafesjian, acting through employees and former employees of the Assembly, or by other means, improperly obtained mailing lists, congressional advocacy tools, and other proprietary information belonging to the Assembly, without the approval of the Assembly's Board and in violation of the Assembly's Conflict of Interest and Distribution of Membership List and Other Database Lists policies.

117.    On January 11, 2007, a meeting of the Board of Trustees was held at the Intercontinental Hotel in New York City at which Waters was present.  At the meeting, Anthony Barsamian (a member of the Assembly's Executive Committee) reported to the Board about a conversation he had with Congressman Frank Pallone in which he reported to him that employees of USAPAC were disparaging the Assembly.

118.    The Assembly's Conflict of Interest policy was designed to prevent and protect against situations such as the establishment of a competing entity, such as USAPAC, to the Assembly.

119.    At the January meeting, it was agreed that Gerard Cafesjian and John Waters would be suspended from the Board of Directors for non-compliance with the Conflict of Interest Policy and that they would be notified of the Assembly's action by counsel to the Assembly. Private inurement, as well as other considerations applicable to the purposes of the Assembly's Conflicts of Interest Policy, also were raised in the board's deliberations.

120.    Both Cafesjian and Waters were given written notification of their suspension in a letter dated February 6, 2007, from the Assembly's counsel to Cafesjian's counsel.  In the letter, the Assembly demanded that Cafesjian and Waters disclose all of their interests in compliance with the Assembly's Conflict of Interest policy.  Neither Cafesjian or Waters made any response to this demand.

## CLAIM I – BREACH OF FIDUCIARY DUTY TO AGM&M (CAFESJIAN AND WATERS)

121.    As a Trustee and President of AGM&M, Cafesjian has and had a fiduciary duty to AGM&M.

122.    As acting Secretary and Treasurer of AGM&M, and now designated Trustee for CFF, Waters has and had a fiduciary duty to AGM&M.

123.    As a result of their mismanagement of AGM&M, including without limitation acts of self-dealing, their failure to faithfully and diligently represent AGM&M in the real estate transactions with TomKat, their failure to secure a realistic development plan, their failure to make reasonable efforts to secure adequate funding to support AGM&M, their excessive and unjustified spending down of AGM&M assets, their failure to properly maintain or adequately address the carrying costs associated with the AGM&M real estate, their failure to secure appropriate tax exemptions for the AGM&M real estate, their hiring of a costly business consultant without a written contract, their failure to maintain adequate financial or other corporate records, their failure to provide adequate records regarding their purported donation and financial activities, and numerous ultra vires acts and acts of self-dealing, including the unilateral encumbrance of the AGM&M's real estate holdings and the filing of lawsuits that are adverse to AGM&M interests, Cafesjian and Waters have breached their fiduciary duties (including their duty of loyalty) to AGM&M.

124.    As a direct and proximate result of Cafesjian and Waters' breaches of their fiduciary duty and the duty of loyalty, AGM&M has suffered and continues to suffer damages.

## CLAIM II – BREACH OF FIDUCIARY DUTY TO THE ASSEMBLY (CAFESJIAN AND WATERS)

125.    As a Trustee and Executive Committee Member of the Assembly, Cafesjian had and has a fiduciary duty to the Assembly.

126.    As a Board Member of the Assembly, Waters has and had a fiduciary duty to the Assembly.

127.    As a result of numerous acts, including without limitation, the filing of a lawsuit against the Assembly, the founding of a competing organization to the Assembly, and misappropriation of proprietary information and other documents belonging to the Assembly, Cafesjian and Waters have breached their fiduciary duty (including their duty of loyalty) to the Assembly.

128.    As a direct and proximate result of Cafesjian and Waters' breaches of their fiduciary duty, the Assembly has suffered and continues to suffer damages.

## CLAIM III– MISAPPROPRIATION OF TRADE SECRETS (CAFESJIAN AND WATERS)

129.    As Trustees and volunteers of the Assembly, Cafesjian, Waters, and their agents had access to confidential, proprietary business information and trade secrets belonging to the Assembly.  Such information included, without limitation, mailing lists, legislative policy documents and analysis, and other documents pertaining to all aspects of the Assembly's advocacy and charitable work.

130.    This information, including the mailing lists, was developed by the Assembly over many years from multiple sources, including informal networking, and at significant cost to the Assembly.

131.    The Assembly made reasonable efforts to keep such confidential, proprietary business and trade information confidential, including, without limitation, promulgating the Policy on Distribution of Membership List and Other Database Lists, which was binding on Cafesjian and Waters.

132.    Upon information and belief, Cafesjian and Waters, individually and on behalf of the entities in which they have an interest, through improper means, misappropriated confidential, proprietary business information and trade secrets belonging to the Assembly.

133.    As a direct and proximate result of Cafesjian and Waters' misappropriation of confidential, proprietary business information and trade secrets belonging to the Assembly, the Assembly has suffered and continues to suffer damages.

## CLAIM IV– BREACH OF CONTRACT (WATERS/TOMKAT TO AGM&M)

134.    By clouding the title that was unconditionally granted to AGM&M by TomKat with respect to the properties located at 1334-36, 1338, 1340, and 1342 G Street NW, Washington, D.C. ("the adjacent lots") under various Purchase and Transfer Agreements, more specifically described herein, and attempting to reacquire the adjacent lots despite the existence of the Agreements, TomKat and Waters as President of TomKat have breached their contractual duties to AGM&M.

135.    Despite demand, Waters has refused to restore to AGM&M clear and unclouded title to the adjacent lots.

136.    As a direct and proximate result of TomKat and Waters' breach, AGM&M has suffered and will continue to suffer damages.

## CLAIM V – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING (TOMKAT AND WATERS TO AGM&M)

137.    As a party to the Purchase and Transfer Agreements executed by and between TomKat and AGM&M, TomKat and Waters in his capacity as President of TomKat has a duty to act fairly and in good faith to AGM&M.

138.    By, among other things, clouding the title that was unconditionally granted to AGM&M by TomKat with respect to the properties located at 1334-36, 1338, 1340, and 1342 G

Street NW, Washington, D.C. ("the adjacent lots") under various Purchase and Transfer Agreements, more specifically described herein, and attempting to reacquire the adjacent lots despite the existence of the Agreements, TomKat and Waters as President of TomKat have breached their duty of good faith and fair dealing to AGM&M.

139.    As a direct and proximate result of TomKat and Waters' breach, AGM&M has suffered and will continue to suffer damages.

## CLAIM VI – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING (CAFESJIAN TO THE ASSEMBLY)

140.    As a party to the Grant Agreement by and between Cafesjian and the Assembly, Cafesjian has a duty to act fairly and in good faith to the Assembly.

141.    By, among other things, spending down the donated assets of AGM&M, failing to take reasonable and necessary steps to accomplish the development goals of AGM&M, actively hindering the progress of AGM&M's development, suing the Assembly to void the Grant Agreement and avoid his obligations thereunder, and suing AGM&M in an effort to force the application of the reversionary clause, Cafesjian has breached his duty to act fairly and in good faith to the Assembly.

142.    As a direct and proximate result of Cafesjian's breach, the Assembly has suffered and will continue to suffer damages

## CLAIM VII – VIOLATION OF CONFLICT OF INTEREST PROVISIONS (CAFESJIAN AND WATERS)

143.    As a Trustee and Executive Committee Member of the Assembly, Cafesjian was and is obligated to comply with the Assembly's Conflict of Interest and the Assembly's Policy on Distribution of Membership List and Other Database Lists.

144.    As a Board Member of the Assembly, Waters was and is obligated to comply with the Assembly's Conflict of Interest and the Assembly's Policy on Distribution of Membership List and Other Database Lists.

145.    By misappropriating confidential business information belonging to the Assembly, Cafesjian and Waters violated, individually and together, the Assembly's Conflict of Interest and Distribution of Membership List and Other Database Lists policies.

146.    As a direct and proximate result of Cafesjian and Waters violations of the Assembly's Conflict of Interest and Distribution of Membership List and Other Database Lists policies, the Assembly has suffered and will continue to suffer damages.

## CLAIM VIII - REQUEST FOR DECLARATORY RELIEF: UNENFORCEABILITY OF REVERSION PROVISION IN GRANT AGREEMENT

147.    As the Grant Agreement reversionary clause creates an inherent conflict of interest for Cafesjian and CFF, which conflict of interest was duly realized by Cafesjian's actions, the reversionary clause should be declared void as a matter of law.

148.    As Cafesjian and CFF have breached their duty to act in good faith with respect to their obligations under the Grant Agreement, and have in fact breached the Grant Agreement and actively thwarted the intent and purpose of the Grant Agreement by attempting to force the reversion of the adjacent lots to Cafesjian for his own personal gain, the reversion provision of the Grant Agreement is unenforceable as a matter of law.  Accordingly, Plaintiffs seek a declaratory judgment that the reversion provision of the Grant Agreement is unenforceable as a matter of law or, in the alternative, that the time for the Assembly to perform its obligations under the Grant Agreement should be extended by an additional three years to account for the three years of mismanagement of AGM&M by Cafesjian and Waters.

## CLAIM IX – REQUEST FOR DECLARATORY RELIEF: PERMANENT REMOVAL OF CAFESJIAN FAMILY FOUNDATION (CFF) AS DONOR AUTHORIZED TO DESIGNATE TRUSTEES OF AGM&M

149.    As Cafesjian and Waters as individuals and agents for CFF have breached their fiduciary duty to AGM&M, and have persisted in acting contrary to AGM&M's interests despite repeated requests to desist in such actions, including without limitation by filing a lawsuit in federal court that is adverse to AGM&M interests, and as CFF, which is directed and controlled by Cafesjian, appears to have interests that directly and irretrievably conflict with AGM&M, AGM&M seeks a declaration permanently removing CFF as a Donor authorized to designate members of the Board of Trustees of AGM&M, as well as any other position with AGM&M.

## CLAIM X – REQUEST FOR DECLARATORY RELIEF:  CAFESJIAN AND WATERS PERSONALLY LIABLE FOR ANY CONTRACTS OR OBLIGATIONS INCURRED BY AGM&M THE TERMS OF WHICH THE OTHER TRUSTEES DID NOT APPROVE, INCLUDING OBLIGATIONS TO DEBORAH DEVEDJIAN

150.    As noted above, as a result of their failure to advise the other Trustees of the proposed terms of Deborah Devedjian's contract with AGM&M, in particular the payment terms, and as a result of their failure to make a written contract with her or conclude their relationship with her in a business-like manner, Cafesjian and Waters have left AGM&M with a potentially large debt to Devedjian.  As Cafesjian and Waters have failed to produce comprehensive financial records for the period of time during which they managed AGM&M, it is also unclear whether AGM&M is liable for any additional debts or on any other contracts, oral or otherwise. Accordingly, AGM&M seeks a determination by this Court that Cafesjian and Waters are individually liable for any contracts or other obligations that they entered into on behalf of AGM&M, the terms of which were not disclosed to and approved by the other Trustees of AGM&M.

## CLAIM XI – REQUEST FOR AN ACCOUNTING

151.    In light of the repeated failure of Cafesjian and Waters to report adequately on their fundraising and financial activities, to provide documents in support of same, and in light of their wasting and dissipation of AGM&M assets, AGM&M hereby requests that the Court order Cafesjian and Waters to produce a complete and detailed accounting of their financial activities, as well as the supporting documents for such accounting.

## PRAYERS FOR RELIEF

**WHEREFORE,** the Assembly and AGM&M respectfully request that the Court:

a.    Enter judgment in favor of the Assembly and AGM&M on Counts I through XI of the Complaint, granting the Assembly and AGM&M damages occasioned by Cafesjian, Waters, CFF and TomKat's actions and omissions;

b.    Prohibit Cafesjian, individually or through any other entity, from soliciting or contacting any of the Assembly members, donors, or other persons identified on the Assembly's confidential mailing list;

c.    Order Cafesjian, Waters and their agents to return all proprietary information and documents that they wrongfully misappropriated from the Assembly;

d.    Declare the reversion provision in the Grant Agreement "unenforceable";

e.    Declare that CFF shall be permanently removed as a Donor entitled to designate Trustees of AGM&M;

f.    Declare that AGM&M is the sole and exclusive owner of the properties located at 619 14th Street NW and 1334-36, 1338, 1340, and 1342 G Street NW and that such ownership is not subject to any conditions or reversionary interests held by TomKat, Cafesjian, CFF or any other individual or entity;

g.    Declare that Cafesjian and Waters shall be personally liable for any contracts or obligations incurred during their tenure as officers of AGM&M that were not approved or authorized by the Trustees of AGM&M, including without limitation any obligations to Deborah Devedjian;

h.    Order Cafesjian and Waters to provide an Accounting; and

i.    Award the Assembly and AGM&M damages, interest, reasonable attorneys' fees, costs and other appropriate relief.

Respectfully submitted,

Dated:  February 15, 2008

**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**

By:  _____

David T. Case (D.C. Bar No. 384062)
1601 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 778-9000
Fax:  (202) 778-9100

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

---

**I (a) PLAINTIFFS**

The Armenian Assembly of America, Inc.
The Armenian Genocide Museum and Memorial, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

See Attached Page

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David T. Case, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, NW
Washington, DC 20006-1600
(202) 778-9084

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ● 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 U.S.C. 1332 Breach of Fiduciary duty and breach of contract

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ TBD  Check YES only if demanded in complaint

JURY DEMAND:  YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE _Feb 15, 2008_  SIGNATURE OF ATTORNEY OF RECORD _Dat O'Neil_

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Gerard L. Cafesjian, Individually and as Trustee and President (former) of The Armenian Genocide Museum and Memorial, Inc., and President and Director of the Cafesjian Family Foundation, Inc.

John J. Waters, Jr., Individually and as Secretary/Treasurer of the Armenian Genocide Museum and Memorial, Inc., and President of The TomKat Limited Partnership, and Secretary and Director of the Cafesjian Family Foundation, Inc.

The Cafesjian Family Foundation, Inc.

and

The TomKat Limited Partnership

Defendants

**Exhibit 1**

## PROMISSORY NOTE

**$500,000**                                    March 17, 2000
                                                Tinton Falls, New Jersey


**FOR VALUE RECEIVED**, the undersigned, the Armenian Assembly of America, Inc., a nonprofit corporation (the "Maker"), hereby promises to pay to the order of the Cafesjian Family Foundation, Inc. (the "Payee"), which term includes any subsequent holder hereof) at 15 South 5th Street, Suite 900, Minneapolis, MINNESOTA, or at such other place as the Payee may from time to time hereafter designate to the Maker in writing, the principal sum of $500,000.

The unpaid principal balance hereof from time to time outstanding shall not bear interest prior to the maturity date of this Promissory Note ("Note").

The principal balance of this Note shall be payable in full on May 16, 2000.  This Note may be prepaid by the Maker at any time in whole or from time to time in part without premium or penalty.

Upon the occurrence of any one or more of the following events (each an "Event of Default"), the Payee may declare this Note to be, and the same shall forthwith become immediately due and payable and the Payee may exercise alal rights and remedies as may otherwise be allowed by law:

    1.  The Maker shall fail to make any payment of principal when due.

    2.  Any execution or attachment shall be issued whereby any substantial
    part of the property of the Maker shall be taken or attempted to be taken and the same shall not
    have been vacated or stayed within 10 days after the issuance thereof.

THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS NOTE SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF MINNESOTA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF.

AT THE OPTION OF THE PAYEE, THIS NOTE MAY BE ENFORCED IN ANY FEDERAL COURT OR MINNESOTA STATE COURT SITTING IN HENNEPIN COUNTY, MINNESOTA, AND THE MAKER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT THE VENUE IN SUCH FORUMS IS NOT CONVENIENT. IF THE MAKER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, THE PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR, IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

The Maker hereby waives presentment for payment, notice of dishonor, protest and notice of protest.

In the case of the occurrence of an Event of Default hereunder, the Maker shall pay all of the Payee's reasonable costs of collection including reasonable attorneys' fees and expenses.

MAKER
ARMENIAN ASSEMBLY OF AMERICA, INC.

By:

Its:  Chairman, Board of Trustees


**Exhibit A**

**Exhibit 2**

ARTICLES OF INCORPORATION

OF

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

To:   Department of Consumer and Regulatory Affairs
      Business Regulation Administration
      Corporations Division
      Washington, D.C.

THE UNDERSIGNED, all of whom are natural persons of the age of eighteen years or more, acting as incorporators of a corporation pursuant to the District of Columbia Nonprofit Corporation Act hereby adopt the following Articles of Incorporation:

## ARTICLE I. NAME

The name of the Corporation is the Armenian Genocide Museum and Memorial, Inc. (the "Corporation").

## ARTICLE II. DURATION

The period of duration of the Corporation is perpetual.

## ARTICLE III. ADDRESS

The address of the Corporation's registered office in the District of Columbia is Armenian National Institute, 122 C Street NW, Suite 360, Washington, DC 20001. The name of the Corporation's registered agent at such address is Rouben Adalian.

DOC# 190529 v4                        Page 1 of 7

## ARTICLE IV. PURPOSE

A.    The Corporation is a nonprofit organization organized and operated exclusively for charitable, educational, and other purposes beneficial to social welfare within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). All references to sections of the Code include the corresponding provision of any subsequent federal tax law. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

B.    In furtherance of these purposes, the Corporation shall have all powers granted to a corporation under the District of Columbia Nonprofit Corporation Act and the power to do all things necessary, proper, and consistent with maintaining its tax-exempt status under section 501(c)(3) of the Code.

C.    No part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation. Compensation for services actually rendered and reimbursement for expenses actually incurred in attending to the affairs of the Corporation shall be limited to reasonable amounts. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence

legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

D.    Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any activity not permitted to be carried on by (a) a corporation exempt from federal income tax under section 501(c)(3) of the Code, or (b) a corporation, contributions to which are deductible under section 170(a) and (c)(2) of the Code.

## ARTICLE V. MEMBERS

The Corporation shall have no members.

## ARTICLE VI. BOARD OF TRUSTEES

The Board of Directors of the Corporation shall be referred to as the Board of Trustees. The manner of election or appointment to the Board of Trustees shall be as provided in the By-Laws of the Corporation.

## ARTICLE VII. REGULATION OF INTERNAL AFFAIRS

A.    The affairs of the Corporation shall be managed and controlled by the Board of Trustees.

B.    The initial By-Laws shall be adopted by the Board of Trustees, which may alter, amend or repeal the By-Laws or adopt new By-Laws.

C.    In the event of the dissolution or final liquidation of the Corporation:

1.     None of the property of the Corporation nor any proceeds thereof shall be distributed to or divided among any of the trustees or officers of the Corporation or inure to the benefit of any individual.

2.     After all liabilities and obligations of the Corporation have been paid, satisfied and discharged, or adequate provision made therefor, all remaining property and assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for religious, charitable, scientific, literary, educational or social welfare purposes, provided that such organizations shall be exempt from federal income taxes by reason of section 501(c)(3) of the Code, and subject to any additional restrictions imposed by the By-Laws of the Corporation.

3.     The private property of the trustees or officers of the Corporation shall not be subject to payment of corporate debts to any extent whatever.

## ARTICLE VIII. PRIVATE FOUNDATION RULES

The Corporation shall at all times be organized and operated so as to qualify as an organization that is not a private foundation, as defined in section 509(a) of the Code. If, however, at any time, the Corporation shall be classified as a private foundation under federal tax laws, then at such time or times the Corporation shall be subject to the following restrictions:

1.     The Corporation shall not engage in any act of self-dealing as defined in section 4941(d) of the Code.

2.     The Corporation shall make distributions for each taxable year at such time and in such manner so as not to become subject to the tax on undistributed income imposed by section 4942 of the Code.

3.    The Corporation shall not retain any excess business holdings as defined in section 4943(c) of the Code.

4.    The Corporation shall not make any investments in such manner as to subject it to tax under section 4944 of the Code.

5.    The Corporation shall not make any taxable expenditures as defined in section 4945(d) of the Code.

## ARTICLE IX. TRUSTEES

The number of Trustees may be increased or decreased from time to time by the Board of Trustees, but shall in no event be less than three (3). The names and addresses of the persons who shall serve as initial Trustees until their successors are elected and qualify, are:

| NAME | ADDRESS |
|---|---|
| Gerald L. Cafesjian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Hirair S. Hovnanian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Anoush Mathevosian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Robert A. Kaloosdian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

## ARTICLE X. INCORPORATORS

The name and addresses of the incorporators are as follows:

| NAME | ADDRESS |
|------|---------|
| Kristen M. Gurdin | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Sharon P. Light | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Lloyd H. Mayer | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |

IN WITNESS WHEREOF, we, the undersigned, being the Incorporators hereinabove named, do hereby affirm under penalties of perjury that these Articles are our act and deed, and the facts herein stated are true and, accordingly, we have executed these Articles this _____ day of _____, 2003.

_____
Kristen M. Gurdin

_____
Sharon P. Light

_____
Lloyd H. Mayer

**Exhibit 3**

BY-LAWS

OF

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

ARTICLE I

EFFECT, NAME, PURPOSES, POLICY AND RELATED MATTERS

Section 1.1. **General.** These By-Laws shall become effective as of October 30, 2003.

Section 1.2. **Name and Purpose.** The Corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial. The Corporation is organized exclusively for educational purposes. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Section 1.3. **Policy.** The Corporation, its Trustees, officers, and employees shall ever be mindful of the pluralistic character of the Armenian community world-wide, and the worth of its institutions and organizations.

Section 1.4. **Location.** The principal office of the Corporation shall be located in the District of Columbia Metropolitan area. The Trustees, by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, may change the location of the principal office from time to time to any other place within the United States of America. The Trustees, by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, may open and operate other offices of the Corporation in the United States and abroad. The Corporation shall have and continuously maintain in the District of Columbia a registered office and a registered agent whose business office is identical with such registered office, as required by the District of Columbia Nonprofit Corporation Act. The address of the registered office and the identity of the registered agent may be changed from time to time by the Board of Trustees.

Section 1.5. **Fiscal Year.** The fiscal year of the Corporation shall, unless otherwise decided by the Trustees, end on December 31 of each year.

## ARTICLE II

## BOARD OF TRUSTEES

Section 2.1. **Members.** The Corporation shall have no members.

Section 2.2. **Board of Trustees.** The Board of Trustees of the Corporation shall serve as the Board of Directors of the Corporation for purposes of the District of Columbia Nonprofit Corporation Act.

Section 2.3. **Number and Election.** The Board of Trustees shall consist of not less than three (3) nor more than fifteen (15) members. At no time, however, shall the total number of votes exercised by the Board of Trustees exceed fifteen (15), even if the Board of Trustees has not reached its maximum size authorized under these By-Laws.

Section 2.4. **Initial Trustees.** The initial Trustees shall be the Trustees of the Corporation serving as such as of the date of the adoption of these By-Laws. The term of office of an initial Trustee shall be perpetual. Each donor that elected an initial Trustee (as identified by the initial Trustees in the unanimous written consent in lieu of the organization meeting of the Board of Trustees of the Corporation) (an "Initial Donor") shall appoint a successor within thirty (30) days of the adoption of these By-Laws to serve as Trustee should the initial Trustee be unable to serve for any reason. If an Initial Donor fails to appoint such a successor, the initial Trustee elected by that Initial Donor shall be automatically removed from the Board of Trustees effective thirty-one (31) days after the adoption of these By-Laws, but shall be automatically reinstated to the Board of Trustees if and when the Initial Donor appoints a successor to that Trustee. Each Initial Donor shall have the same rights as donors described in Section 2.5 of these By-Laws with respect to the initial Trustee elected by the Initial Donor and the successors to that initial Trustee, including the right, if an Initial Donor makes contributions to the Corporation in excess of $5 million, to elect an additional Trustee for each $5 million increment above the initial $5 million in contributions by that Initial Donor or to grant to the Trustee previously elected by that Initial Donor the right to exercise as many additional votes as the donor has contributed whole increments of $5 million above the initial $5 million in contributions by that Initial Donor.

Section 2.5. **Additional Trustees.** Additional Trustees shall be elected to the Board of Trustees according to the following procedure:

Each contribution of $5 million to the Corporation entitles the donor to elect one Trustee to the Board of Trustees, provided:

(1) the Board of Trustees has accepted the contribution on behalf of the Corporation by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present; and

(2) the donor has appointed a successor to the Trustee elected by the donor to serve on the Board of Trustees should that Trustee be unable to serve for any reason,

until such time as the total number of votes exercised by the Board of Trustees reaches fifteen (15).

When the Corporation has accepted multiple $5 million contributions from a single donor, the donor may either elect one Trustee for each $5 million increment or elect one Trustee who shall exercise as many votes as the donor has contributed whole increments of $5 million. The donor must appoint a successor or successors to the Trustee or Trustees at the time of election.

An individual donor may elect himself or herself as a Trustee or appoint himself or herself as a successor.

An institutional donor shall retain the right to elect Trustees and to appoint successors in perpetuity, which rights, and the right to pass these rights to successor institutions, shall pass to any institution that the governing body of the institutional donor designates as its successor. If an institutional donor dissolves or otherwise ceases to exist without having designated a successor, the institutional donor's rights shall expire. A Trustee elected by such an institutional donor before the expiration of the donor's right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor or successors appointed by such an institutional donor prior to the expiration of the donor's right to appoint one or more successors shall succeed to the Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

An individual donor may appoint an individual or an institution to succeed to the donor's right to elect one or more Trustees, to appoint one or more successors, and, if the person appointed to succeed to these rights is an individual, to appoint an individual or institution to succeed to all of these rights. If the person so appointed is an institution, the immediately preceding paragraph of this section 2.5 shall apply with respect to the donor's rights as if the appointed institution was an institutional donor. If an individual donor or an individual appointed to succeed to the donor's rights fails to appoint such an individual or institution, the donor's rights shall expire on the death of the individual holding those rights or the declaration by a court of legal incompetence of the individual holding those rights. A Trustee elected by such an individual before the expiration of the right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor to that Trustee position appointed by such an individual prior to the expiration of the right to appoint that successor shall succeed to that Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

The term of office of a Trustee shall be perpetual. However, the donor or the individual or institution that has succeeded to the donor's rights may remove the elected Trustee and elect a new Trustee or appoint a different successor at any time, with or without cause.

All elections of Trustees, appointments of successors to Trustees and appointments of successors to a donor's rights must be in writing and delivered to the Chairman, the President, the Secretary or the Executive Director of the Corporation to be effective. Any such election or appointment shall take effect on the date of receipt of such election or appointment or at any later time therein specified, and the acceptance of such election or appointment shall not be necessary to make it effective.

If the position of a successor to a Trustee becomes vacant for any reason, and the donor who has the right to appoint that successor fails to do so within thirty (30) days of that position becoming vacant, the Trustee for whom the successor position is vacant shall be automatically removed from the Board of Trustees effective thirty-one (31) days after that successor position becomes vacant but shall be automatically reinstated to the Board of Trustees if and when that donor appoints a successor to that Trustee.

If a Trustee position becomes vacant for any reason and remains vacant for a continuous period of three (3) years, then the donor who has the right to elect that Trustee and to appoint the successor to that Trustee, and, in the case of an individual donor, to appoint an individual or institution to succeed to these rights, shall lose all of his, her or its rights with respect to that Trustee position and the vote(s) associated with that Trustee position shall expire.

Section 2.6. **Quorum.** Persons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called. If less than a quorum of Trustees is present at a meeting, a majority of Trustees present may adjourn the meeting without further notice.

Section 2.7. **Action by Vote.** Unless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.

Section 2.8. **Action by Writing.** Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees. Such consents shall be treated for all purposes as votes at a meeting.

Section 2.9. **Powers and Duties.** The Board of Trustees shall meet from time to time and not less than twice yearly, shall manage and direct the Corporation's funds and investments, shall review the programs and affairs of the Corporation, and shall generally have and exercise all powers of the Trustees except such powers as are expressly prohibited to it by law, at all times in furtherance of the policy and purposes of the Corporation. Without limiting the generality of the foregoing, they shall elect their officers, expand their numbers, examine the

budget, and to the extent approved, provide and allocate funds necessary to carry out the programs reflected therein.

Section 2.10. **Committees.** The Board of Trustees may organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law. The members of any committees shall remain in office at the pleasure of the Board of Trustees.

Section 2.11. **Other Appointments.** The Board of Trustees may from time to time designate certain persons or groups of persons as benefactors, patrons, contributors, advisors, friends, or otherwise of the Corporation or with such other titles, upon such terms, for such periods and with such qualifications as they may deem appropriate. Such persons shall serve in an honorary capacity and shall in such capacity have no right to notice of or to vote at any meeting of the Trustees, shall not be considered for the purposes of establishing a quorum, and shall have only such rights or responsibilities as the Board of Trustees may designate from time to time.

Section 2.12. **Meetings.** An annual meeting of the Board of Trustees shall be held at a time to be determined by the Board of Trustees, and at such place as the Board shall determine to conduct such business as may properly come before the meeting. Regular meetings of the Board of Trustees may be held at such places and at such times as the Board shall determine. Special meetings of the Board of Trustees may be called by or at the request of the Chairman and the President and shall be called by the Secretary or his or her designee at the request of Trustees who are authorized to exercise one-half of the votes exercisable by the Trustees then in office. The person or persons authorized to call such special meetings may fix any place as the place for holding such meeting.

Section 2.13. **Telephonic Meetings.** A Trustee may participate in any meeting of the Board of Trustees or any meeting of any committee of the Board by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another, and such participation shall constitute presence in person at the meeting.

Section 2.14. **Notice.** Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated by mail, telegram, facsimile or email to each Trustee, charges prepaid, addressed to him or her at his or her address as shown by the records of the Corporation. Meeting notices, delivered by any method, shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting. Whenever any notice is required to be given to any Trustee under the provisions of these By-Laws or the Articles of Incorporation, or by the District of Columbia Nonprofit Corporation Act, a written waiver thereof signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Presence at a meeting without objection also constitutes a waiver of notice. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board need be specified in the

notice of such meeting or any waiver of notice, unless specifically required by law, the Articles of Incorporation, or these By-Laws.

Section 2.15. **Officers, Agents and Employees.** The Board of Trustees shall elect from time to time by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, from among its members, a Chairman, a President, one or more Vice Chairmen, a Treasurer and a Secretary. The Trustees may elect such other officers, if any, as they may from time to time determine, and such other officers need not be Trustees. The Trustees may also have such agents, if any, as they may appoint. Any two (2) or more offices, except those of President and Secretary, may be held by the same person at the same time. Any officer may resign at any time by giving written notice to the Board of Trustees or the President. Any such resignation shall take effect on the date of receipt of such notice unless another date is specified therein, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. Any officer elected by the Board of Trustees may be removed, with or without cause, by the Board of Trustees whenever, in its judgment, the best interests of the Corporation would be served thereby. Any such removal shall be without prejudice to the contract rights, if any, of the person so removed. The Executive Director shall be appointed by the Board of Trustees and shall be the chief executive officer of the Corporation. With the consent of the Board of Trustees, the Executive Committee, or the designee of either the Board or the Executive Committee, the Executive Director shall sign all deeds, contracts and other documents in the name of the Corporation, and shall have the general power to carry on negotiations of any and every character in the name of the Corporation. The Executive Director shall perform such other duties as assigned by the Board of Trustees or the Executive Committee. The Executive Director shall, among other things, supervise the employees and the hiring of employees. The Executive Director shall be a non-voting ex-officio member of all committees, except the Nominating Committee, if one exists.

Section 2.16. **Duties of Officers.** Each officer shall have the duties usual to his office unless otherwise prescribed by the Board of Trustees and shall serve for one year and until his or her successor is elected and qualified, unless another term is prescribed by the Board of Trustees. The Chairman or, in his or her absence, the President shall preside at all meetings of the Trustees.

Section 2.17. **Resignation and Removal.** Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.

Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote.

Any Trustee may resign his or her office at any time at any time by giving written notice to the Board of Trustees, the Chairman or the Secretary. Any such resignation shall take effect on the date of receipt of such notice or at any later time therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee. The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Upon removal by the donor, or by the individual or institution that has succeeded to an donor's rights to elect one or more Trustees and appoint one or more successors, the appointed successor to that Trustee shall become a Trustee, unless the donor, or the individual or institution that has succeeded to the donor's rights, has elected a Trustee to replace that Trustee immediately upon removal. If the appointed successor becomes the Trustee, the donor, or the individual or institution that has succeeded to the donor's rights, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Section 2.18. **Endowment Fund.** The Trustees may from time to time establish, hold, invest and administer such endowment fund or funds to be collectively designated the "Armenian Genocide Museum and Memorial Endowment Fund", upon such terms and conditions as the Board of Trustees may from time to time deem advisable. Except as otherwise required by law, only the "net income" therefrom as hereafter defined shall be applied to the programs and activities of the Corporation and the principal of such funds shall be preserved. As used herein, "net income" shall mean the fair value of the assets of the Fund over the sum of the contributions to the fund, whether such contributions are made by donors to the Corporation or by the Board of Trustees from other funds of the Corporation, with each contribution increased by any increase in the Consumer Price Index- All Urban Consumers (CPI-U), published by the Bureau of Labor Statistics, U.S. Department of Labor, or any successor to CPI-U adopted by the Bureau of Labor Statistics, from the date of its contribution to the Fund, calculated as of December 31 of each calendar year. Any such endowment fund or funds may be given such designations as the Board of Trustees may from time to time determine, including, without implied limitation, a designation which will commemorate any donor or person, place, event or entity designated by any donor.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. **Rules of Order.** Robert's Rules of Order Revised shall govern in matters of parliamentary procedure not otherwise prescribed by law, the Articles of Incorporation, or these By-Laws.

Section 3.2. **Amendments.** Unless otherwise provided herein or in the Articles of Incorporation and with reasonable prior written notice, amendments to these By-Laws or to the Articles of Incorporation shall be approved by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present. The affirmative vote of all Trustees then in office shall be required to amend the Purpose (Section 1.2) and Dissolution (Section 3.4) clauses of these By-Laws or the Purposes (Article IV) and Dissolution (Paragraph C of Article VII) clauses of the Articles of Incorporation.

Section 3.3. **Prohibited Activities.** Notwithstanding any other provision of these By-Laws, there shall not be carried on any activities or conduct not permitted to a corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law or (b) to a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law. No part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

Section 3.4. **Dissolution.** In the event this Corporation is terminated, all endowment funds and net assets of the Corporation shall be transferred to one or more corporations or entities designated by the Board of Trustees as successors to the Corporation, or such one or more Eligible Institutions (as hereinafter defined) as one or more permanent endowment funds to support such Permissible Purposes (as hereinafter defined) and upon such terms and conditions as the Trustees shall determine by a unanimous affirmative vote of all Trustees then in office. As used herein, Eligible Institutions shall mean those charitable/educational institutions located in the United States which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia. Presently such designated Eligible Institutions are the Armenian Assembly of America, the Armenian General Benevolent Union, the Cafesjian Family Foundation, the H. Hovnanian Foundation, the Robert Aram and Marianne Kaloosdian and Stephen P. & Marian Mugar Endowed Chair of Armenian Genocide Studies at Clark University, provided that each recipient must be an organization that is described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any subsequent federal tax law. As used herein, Permissible Purposes shall be the specific purposes listed in the third sentence of Section 1.2 of these By-Laws.

Section 3.5. **Interpretation.** Any ambiguity in these By-Laws or any question requiring interpretation of these By-Laws shall be resolved by the Board of Trustees, whose determination shall be binding and conclusive.

# ARTICLE IV

## INDEMNIFICATION AND INSURANCE

Section 4.1. **Indemnification and Insurance.** Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation. Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; and judgments, fines, and penalties against, and amounts paid in settlement by such Trustee, officer, person, employee or agent. The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any such Trustee, officer, person, employee or agent; provided, however, that such Trustee, officer, person, employee or agent shall undertake to repay or to reimburse such expense if it should be ultimately determined that he or she is not entitled to indemnification under this Section. The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such Trustee, officer, person, employee or agent may be entitled under any statute, By-Law, agreement, vote of the Board of Trustees or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

Section 4.2. **Insurance.** The Board of Trustees may authorize the purchase of insurance on behalf of any person against any liability asserted against or incurred by him which arises out of such person's status as a Trustee, officer, employee or agent of the Corporation or out of a person's having served at the request of the Corporation as a trustee, director or officer of another corporation or entity or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

Section 4.3. **Limitation.** In no case, however, shall the Corporation indemnify, reimburse or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of Section 509 of the Code then, during such time, no payment shall be made under this Article if

such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.

Section 4.4. **Severability.** If any part of this Article shall be found in any action, suit or proceeding to be invalid of ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

I certify that the foregoing Bylaws of ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. were approved and adopted for the Corporation by its Board of Trustees by unanimous consent effective on October 30, 2003, and that they are currently in effect.

_____
Secretary of the Corporation

_10/30/03_
Date

**Exhibit 4**

CONFIDENTIAL

# UNANIMOUS WRITTEN CONSENT
## IN LIEU OF THE
## ORGANIZATION MEETING
## OF THE
## BOARD OF TRUSTEES
## OF
## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

The undersigned, being all of the initial trustees of Armenian Genocide Museum and Memorial, Inc., a District of Columbia nonprofit corporation (the "Corporation"), named in the Articles of Incorporation, in lieu of the organization meeting, hereby adopt the following resolutions by unanimous written consent (this "Consent"), in accordance with the provisions of Section 29-301.99(a) of the District of Columbia Nonprofit Corporation Act:

### Ratification of Acts of Incorporators

RESOLVED: that the actions of the Incorporators as reflected in the Articles of Incorporation, attached to this Consent as Exhibit A, are hereby ratified and confirmed;

### By-Laws

RESOLVED, FURTHER: that the By-Laws, in the form attached to this Consent as Exhibit B, are hereby adopted as the By-Laws of the Corporation effective as of October 30, 2003;

### Donors

RESOLVED, FURTHER: that the donors who elected the initial Trustees ("Donors"), each of whom designated the Trustee shown in the parenthetical following the donor's name, are hereby acknowledged to be:

Cafesjian Family Foundation, Inc. (Gerald L. Cafesjian)
Hirair S. Hovnanian (Hirair S. Hovnanian)
Anoush Mathevosian (Anoush Mathevosian)
Armenian Assembly of America, Inc. (Robert A. Kaloosdian)

### Officers

RESOLVED, FURTHER: that each of the following individuals is hereby elected to hold the offices set forth next to his name for the term of one year and until his successor is elected and qualifies:

| Name | Office |
|------|--------|
| Gerard L. Cafesjian | Chairman and President |
| Hirair S. Hovnanian | Vice Chairman |
| John J. Waters, Jr. | Secretary and Treasurer |

### Expenses

RESOLVED, FURTHER: that the officers of the Corporation are hereby authorized and instructed to pay all of the organizational expenses of the Corporation;

### Banking

RESOLVED, FURTHER: that the Corporation may open accounts with such banks, savings and loan associations, or brokerages, as shall be determined from time to time by the President, Secretary, or Treasurer of the Corporation; and such persons shall be authorized to execute checks and other instruments drawn on any such accounts in person or by facsimile and to endorse instruments to be deposited therein as may be designated from time to time by a written instrument signed by the President, Secretary, or Treasurer; and the standard forms of banking resolutions ordinarily used by each such bank, savings and loan association, or brokerage are hereby adopted and incorporated herein by reference, and any officer of the Corporation is hereby authorized to certify to the due adoption thereof;

### Financial Services

RESOLVED, FURTHER: that the Corporation may retain the services of bank trust departments and financial services institutions for management of endowment funds and for other investment assistance, the selection of which is subject to final approval by the Board;

### Purchase of Real Estate

RESOLVED, FURTHER: that the actions of the Chairman and Secretary/Treasurer of the Corporation in negotiating the purchase of the real property located at 1334-36 G Street, 1338 G Street, 1340 G Street and 1342 G Street from The TomKat Limited Partnership, the Armenian Assembly of America, Inc., and Families U.S.A., Inc., is hereby ratified and approved, and the Secretary/Treasurer of the Corporation is hereby authorized and directed to enter into and execute any and all documents necessary to effect the purchase of the aforesaid properties from The TomKat Limited Partnership, the Armenian Assembly of America, Inc., and Families U.S.A., Inc., and to take such other action as deemed necessary or desired to effect such transactions;

### Negotiation of Grant Agreements

RESOLVED, FURTHER: that the actions of the Secretary/Treasurer of the Corporation in negotiating grant agreements with the Donors and with the Armenian Assembly of America, Inc. are hereby ratified and approved, and the Secretary/Treasurer of the Corporation is hereby authorized and directed to negotiate grant agreements that further the charitable purposes of the Corporation and are consistent with any existing grant agreements between the Donors and the Armenian Assembly of America, Inc. as long as such agreements provide no more than incidental benefits such as naming rights to the Donors, and to enter into and execute any and all related documents and to take such other action as deemed necessary or desired;

### Control of Armenian National Institute, Inc.

RESOLVED, FURTHER: that the officers of the Corporation are hereby authorized to accept from the Armenian Assembly of America, Inc. the assignment of powers of appointment and related control powers with respect to the Armenian National Institute, Inc. including the power to appoint the governing board and officers of Armenian National Institute, Inc, and to enter into and execute any and all related documents and to take such other action as they deem necessary or desirable.

### Tax Filings

RESOLVED, FURTHER: that the officers of the Corporation are hereby authorized and directed to execute and file all necessary applications and to do all things deemed by such officers necessary or desirable to secure for the Corporation appropriate exemptions from federal, state, and local taxes;

### Fiscal Year

RESOLVED, FURTHER: that the fiscal year of the Corporation ends on December 31;

### General Authority

RESOLVED, FURTHER: that the officers of the Corporation are authorized and directed to execute such other documents and take such further actions as may be necessary or advisable to carry out the purposes of the foregoing resolutions, including the filing of this Consent with the minutes of the meetings of the Board of Trustees; and

### Counterparts

RESOLVED, FURTHER: that this Consent may be executed in counterparts, each of which is deemed an original, but all of which, upon delivery, together constitute one and the same document.

*{Signatures on next page.}*

IN WITNESS WHEREOF, the undersigned initial directors have executed this Unanimous Written Consent in lieu of the Organization Meeting of the Board of Directors of Armenian Genocide Museum and Memorial, Inc., as of the 30th day of October, 2003.

INITIAL TRUSTEES

_____
Gerald L. Cafesjian


_____
Hirair S. Hovnanian


_____
Anoush Matheyosian


_____
Robert A. Kaloosdian

IN WITNESS WHEREOF, the undersigned initial directors have executed this Unanimous Written Consent in lieu of the Organization Meeting of the Board of Directors of Armenian Genocide Museum and Memorial, Inc., as of the 30th day of October, 2003.

INITIAL TRUSTEES

_____
Gerald L. Cafesjian

_____
Hirair S. Hovnanian

_____
Anoush Mathevosian

_____
Robert A. Kaloosdian

IN WITNESS WHEREOF, the undersigned initial directors have executed this Unanimous Written Consent in lieu of the Organization Meeting of the Board of Directors of Armenian Genocide Museum and Memorial, Inc., as of the 30th day of October, 2003.

INITIAL TRUSTEES

_____
Gerald L. Cafesjian

_____
Hirair S. Hovnanian

_____
Anoush Mathevosian

_____
Robert A. Kaloosdian

**Exhibit 5**

CONFIDENTIAL

## TRANSFER AGREEMENT

This Transfer Agreement (this "Agreement") is made as of November 1, 2003, by and between:

Armenian Assembly of America, Inc. (the "Grantor"), a District of Columbia nonprofit corporation; and

Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), a District of Columbia nonprofit corporation.

## BACKGROUND

In order to complete the building of the Armenian Genocide Museum and Memorial (the "AGM&M"), the Grantor desires to transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc. under the terms and conditions set out in this Agreement.

The parties, therefore, agree as follows:

## TERMS

### SECTION 1  Grant.

1.1  Nature of Grant.

    (A)  The Grantor shall contribute to AGM&M, Inc., all of its rights, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Grantor and/or held by the Grantor for the development, renovation, and construction of the AGM&M, as detailed on Schedule A (the "Grant").

    (B)  Copies of all outstanding grant-agreements between the Grantor and its donors relating to the AGM&M are attached to this Agreement as Exhibits A-X.

    (C)  The approximate aggregate value of the Grant is $27,784,901. Within this aggregate estimate the value of the real property is $7,250,000.00; the value of the pledges as of October 30, 2003, is $19,422,044; and the value of cash and other assets on hand is approximately $669,528.

1.2  Other Rights and Obligations Transferred.

    (A)  AGM&M, Inc. must honor all of the Grantor's donor requirements existing at time of transfer, or in the alternative, obtain donor consent

1

to the transfer and any modification of donor terms.

(B)   Without limiting Section 1.2(A) of this Agreement, AGM&M, Inc.
assumes and agrees to comply with the Grantor's obligations relating
the memorial commemorating the Armenian Genocide under the
agreement between Grantor and Gerard L. Cafesjian and The Cafesjian
Family Foundation attached to this Agreement as Exhibit A.

(C)   The Grantor hereby assigns to AGM&M, Inc. the Grantor's right to
appoint Trustees of the Armenian National Institute, Inc.

(D)   If at the time this Agreement is executed the promissory note executed
by Grantor in favor of the The Cafesjian Family Foundation on March
17, 2000 in the amount of $500,000 (the "Promissory Note") or any
promissory note issued to replace the Promissory Note (the
"Replacement Promissory Note") is still outstanding, the Promissory
Note or the Replacement Promissory Note, whichever is still
outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

1.3     Use of Grant.  AGM&M, Inc. shall use the Grant solely to develop, construct
and operate the AGM&M.

1.4     Transfer of Grant.

(A)   The Grantor shall begin to transfer the assets that compose the Grant
upon the execution of this Agreement.

(B)   The Grantor shall diligently undertake to complete the transfer of all
titles, obtain all consents or other permissions, and otherwise act to
effect the completion of the Grant.

SECTION 2   General Conditions and Covenants.

2.1     Use of Grant Funds.  AGM&M, Inc. shall use the Grant only for purposes
described in Section 501(c)(3) of the Internal Revenue Code of 1986, as
amended (the "Code").

2.2     Private Foundation Grants.  AGM&M, Inc. may not use any portion of the
Grant that has been received from a private foundation, as defined by Section
509(a) of the Code, to pay for an attempt to influence legislation within the
meaning of Section 4945(e) of the Code.

2.3     Financial Records.  AGM&M, Inc. shall maintain financial records regarding
the use of the Grant consistent with generally accepted accounting practices
and shall provide the Grantor access to those records upon request.

2.4     Reports and Records.

    (A)    Until completion of the AGM&M and operation of the completed facility for 12 months, AGM&M, Inc. shall provide written reports to the Grantor at least quarterly.

    (B)    Such reports shall include details on:

        (i)    the amount and nature of the expenditures made from the Grant; and

        (ii)    the progress made in acquiring, designing, renovating, and utilizing the Property and completing the AGM&M.

    (C)    In such reports, an officer of AGM&M, Inc. shall certify its compliance with the terms and conditions of this Agreement.

    (D)    AGM&M, Inc. shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the real property portion of the Grant and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

2.5    Access to Public Spaces. Upon written and reasonable notice, AGM&M, Inc. shall provide Grantor with access to the public spaces within the AGMM free of charge at least six times annually for tours, dinners or other events consistent with the nature of the AGMM in the sole judgment of the AGM&M, Inc., each not lasting longer than six hours, all costs of such events to be borne by Grantor. Grantor shall not have the right to assign, lease or otherwise transfer this right to any other entity or person. This right of access shall expire if Grantor ever ceases to be an organization described in Section 501(c)(3) of the Code.

2.6    Narrative. Grantor and AGM&M, Inc. shall use their best efforts to jointly prepare a narrative on the creation of the AGMM (the "Narrative") for approval by both Grantor and AGM&M, Inc. Upon approval by both Grantor and AGM&M, Inc. and completion of the AGMM, AGM&M, Inc. shall permanently and prominently memorialize the Narrative within the AGMM. AGM&M, Inc. shall include the Narrative or a condensed version thereof in all major publications and public presentations of AGM&M, Inc. that reference the creation of the AGMM.

2.7    No Other Rights or Obligations. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence AGM&M, Inc.'s use of the Grant provided in accordance with this Agreement.

SECTION 3  Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grant is subject to the following conditions:

3.1    Tax-Exempt Status  AGM&M, Inc. must be a tax-exempt organization described in Section 501(c)(3) of the Code, as amended, and may not be a private foundation within the meaning of Section 509(a) of the Code.

3.2    Tax Status Documentation.  AGM&M, Inc. shall deliver to the Grantor a copy of its IRS application for recognition of exemption (when prepared), its IRS determination letter (when received), and such other documentation reasonably requested by the Grantor.

3.3    Evidence of Satisfaction.  AGM&M, Inc. has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

3.4    Governance of AGM&M, Inc.

   (A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

   (B)    Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of this Agreement), except that the Grantor shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by Grantor to AGM&M, Inc.

   (C)    In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

   (D)    In recognition of its efforts in establishing the AGM&M, the Assembly is included as a Major Donor and a voting member of the AGM&M, Inc. Board of Trustees.

   (E)    Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless other wise specified in the Articles or Bylaws of the corporation.

   (F)    Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)   The initial Board of Trustees of AGM&M, Inc., consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

## SECTION 4   Representations by AGM&M, Inc.

AGM&M, Inc. hereby represents and warrants to the Grantor as follows:

4.1   Tax Status. AGM&M, Inc. is an organization described in Section 501(c)(3) of the Code and an organization that is not a private foundation within the meaning of Section 509(a) of the Code, and AGM&M, Inc. shall apply by November 30, 2003 to the Internal Revenue Service for recognition of this status.

4.2   Organization   AGM&M, Inc. is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

4.3   Power. AGM&M, Inc. has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grant.

4.4   Actions. All actions required to be taken by AGM&M, Inc. to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

4.5   Authorization. This Agreement has been duly and validly authorized by all necessary action of AGM&M, Inc. and constitutes, when executed, a valid and binding obligation of AGM&M, Inc..

4.6   Furtherance of Charitable Purposes. The receipt and use of the Grant pursuant to this Agreement is solely in furtherance of AGM&M, Inc.'s stated charitable purposes.

## SECTION 5   General Provisions.

5.1   Notice.

(A)   Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)    upon personal delivery, if delivered by hand; or

(ii)   three days after the date of deposit in the U.S. mail, postage prepaid; or

        (iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

    (B)    Notice sent in accordance with Section 5.1(A) of this Agreement must be addressed as follows:

        (i)    If to AGM&M, Inc.:

                c/o The Cafesjian Family Foundation, Inc.
                15 South Fifth Street
                Suite 900
                Minneapolis, MN 55402
                Fax: 612-359-8994

        (ii)    If to the Grantor:

                Armenian Assembly of America, Inc.
                122 C Street, NW
                Suite 350
                Washington, DC 20001
                Fax: 202-383-9012

    (C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 5.1.

5.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

5.3    Dispute Resolution. Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

5.4    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party.

5.5    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

5.6    Entire Agreement.

    (A)    This Agreement represents the entire agreement between the Grantor

and AGM&M, Inc. concerning the Grant and all previous agreements, whether written or oral, are superseded by it.

(B)     This Agreement may be modified or waived only by a written agreement between the Grantor and AGM&M, Inc.

(C)     AGM&M, Inc. acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

IN WITNESS WHEREOF, the parties hereto have caused this Transfer Agreement to be duly executed as of the day and year first above written.

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____        Date: _Nov  /  2003_
    Brian S. Hovnanian
    Chairman of the Board of Trustees

By: _____        Date: _NOV. 1, 2003_
    Peter Voskibian
    Chairman of the Board of Directors

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

By: _____        Date: _Nov 1, 2003_
    John J. Waters, Jr.
    Secretary and Treasurer

8

**Exhibit 6**

CONFIDENTIAL



# ARMENIAN ASSEMBLY OF AMERICA

50 NORTH LA CIENEGA BLVD. • SUITE 202 • BEVERLY HILLS, CA 90211 • (310) 360-0091 • FAX (310) 360-0094

November 1, 2003

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

     Re:   Grant Agreement

Dear Mr. Cafesjian:

     Thank you for your very generous grants to support the Armenian Assembly of America, Inc. (the "Assembly"). The purpose of this letter (the "Agreement") is to set forth the terms and conditions of the grants, as described below (the "Grants"), from you, Gerard L. Cafesjian ("GLC"), and The Cafesjian Family Foundation (the "Foundation"; and together with GLC, the "Grantor"), to the Assembly for the purposes of establishing the Armenian Genocide Museum and Memorial (the "AGM&M"). If this Agreement correctly sets forth your understanding with respect to the subject matter hereof, please indicate your agreement by countersigning below and returning the executed original Agreement to the Assembly. The enclosed duplicate original of the Agreement is for your records.

## SECTION 1  First Grant.

   1.1    <u>Amount of First Grant</u>. The Grantor shall grant the Assembly $4,000,000 in accordance with the terms of this Agreement (the "First Grant"). This amount is in addition to the $1,000,000 delivered to the Assembly on or about February 16, 2000 by the Vanguard Charitable Endowment Program – Cafesjian Family Foundation Charitable Trust, as directed by GLC as donor advisor to said Trust.

   1.2    <u>Use of First Grant</u>. The Assembly shall use First Grant funds solely: (i) to purchase the property at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building (the "First Grant Property"); (ii) to pay for any transaction costs related to the purchase of the First Grant Property; and (iii) for the installation of a Memorial as described in Section 3.2 of this Agreement.

1.3  Payment of First Grant.  The Foundation shall have made First Grant funds available in the following manner:

    (A)  the Foundation transmitted $1,000,000 to the Assembly on February 4, 2000;  *Per letter to DDA endorsement*

    (B)  the Foundation transmitted $1,500,000 to the Assembly on or before the closing date for the purchase of the First Grant Property, which was on or about February 16, 2000; and

    (C)  the Grantor shall transmit $1,500,000 to the Assembly at such time as mutually agreed to by the parties to fund the purchase and installation of the Memorial described in Section 3.2 of the Agreement.

**SECTION 2   Second Grant.**

2.1  Amount of Second Grant.  The Grantor shall grant the Assembly $12,850,000 in accordance with the terms of this Agreement (the "Second Grant").

2.2  Use of Second Grant.  The Assembly shall use Second Grant funds solely to purchase the four parcels of real estate located at 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant Property") and for any related transaction costs.

2.3  Payment of Second Grant.  The Grantor shall make Second Grant funds available in the following manner:

    (A)  the Grantor shall transmit $6,700,000 to the Assembly on or before the closing date for the purchase of 1334-36 G Street, which is November 4, 2003, of which the Assembly shall use approximately $6,500,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (B)  the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1338 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

    (C)  the Grantor shall transmit $800,000, to the Assembly on or before the closing date for the purchase of 1340 G Street, of which the Assembly shall use approximately $750,000 to pay the current owner of 1340 G Street an amount equal to the current owner's current cost basis in 1340 G Street and shall use the remaining amount to pay any related transaction costs;

    (D)  the Grantor shall transmit seven annual payments of $150,000 each to the Assembly on or before the March due date of each of the seven

annual payments (the "Annual Payments") of $150,000 owed or to be owed by the Assembly under the 1340 G Street contract of deed currently held by the current owner of 1340 G Street and to be assumed by the Assembly (the "Contract of Deed"), which the Assembly shall use to pay the Annual Payments;

(E)    the Grantor shall transmit $1,500,000 to the Assembly on or before the due date of the final balloon payment (the "Balloon Payment") of $1,500,000 owed or to be owed by the Assembly under the Contract of Deed, which the Assembly shall use to pay the Balloon Payment; and

(F)    the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1342 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs.

## SECTION 3    General Conditions and Covenants.

3.1    Use of the Grant Property.

(A)    The First Grant Property and the Second Grant Property (together, the "Grant Property") may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the "Plans"), and subject to any leases in place at the time of the acquisition of the Grant Property by the Assembly with respect to all or a portion of the Grant Property (and with respect to which the Assembly shall take any necessary steps to terminate such leases as soon as possible, subject to the terms of such leases and applicable law, and shall not consent to any renewals or extensions).

(B)    If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

(i)    in the event any portion of the Grants has not been funded, this Agreement terminates; and

(ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

3.2    Memorial. The Assembly shall:

3

(A) make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by the Foundation;

(B) cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;

(C) permit the Foundation to participate in all material decisions regarding the Memorial;

(D) operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by the Foundation in writing;

(E) be solely responsible for the costs of maintaining the Memorial; and

(F) name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by the Foundation in writing.

3.3    Use of Grant Funds.  The Assembly shall use Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.4    Private Foundation Grants.  The Assembly may not use any portion of the Grants that have been received from the Foundation to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

3.5    Financial Records.  The Assembly shall maintain financial records regarding the use of the Grants consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

3.6    Reports and Records.

(A) Until completion of the AGM&M and operation of the completed facility for 12 months, the Assembly shall provide written reports to the Grantor at least quarterly.

(B) Such reports shall include details on:

(i) the amount and nature of the expenditures made from the Grant; and

4

(ii)    the progress made in acquiring, designing, renovating, and utilizing the Grant Property and completing the AGM&M.

(C)    In such reports, an officer of the Assembly shall certify its compliance with the terms and conditions of this Agreement.

(D)    The Assembly shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the Grant Property and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

3.7    No Other Rights or Obligations. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence the Assembly's use of any funds provided in accordance with this Agreement.

3.8    No Further Grants Required. It is expressly understood that by making these Grants the Grantor has no obligation to provide additional funding to the Assembly for the AGM&M or for any other purpose.

3.9    Breach by the Assembly.

(A)    If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.

(B)    If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in Section 501(c)(3) of the Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)    The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

## SECTION 4  Conditions Related to the Assembly.

The Grantor's obligation to make the Grants is subject to the following conditions:

4.1    Total Grants and Pledges. On or before October 30, 2003, the Assembly must have received actual grants or firm pledges to support the AGM&M, including the Grants, totaling at least $20,000,000. Any grant or pledge that can only be used for the post opening operation or for an endowment for the future

5

operation of the AGM&M may not be considered for purposes of satisfying this condition.

4.2    <u>Tax-Exempt Status</u>.  The Assembly must be a tax-exempt organization described in Section 501(c)(3) of the Code, and may not be a private foundation within the meaning of Section 509(a) of the Code.

4.3    <u>Tax Status Documentation</u>.  The Assembly shall deliver to the Grantor a copy of its IRS determination letter and such other documentation reasonably requested by the Grantor, including without limitation evidence that the Grants and the other contributions expected in connection with the AGM&M, including those described in Section 4.1 of this Agreement, have not caused the Assembly to be treated as a private foundation.

4.4    <u>Evidence of Satisfaction</u>.  The Assembly has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

## SECTION 5  Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grants is subject to the following conditions:

5.1    <u>New Nonprofit Corporation</u>.  On or before October 30, 2003, a new, independent entity described in Section 501(c)(3) of the Code, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), must be created by the Assembly and the Foundation, with the costs borne by AGM&M, Inc.

5.2    <u>Governance of AGM&M, Inc.</u>

(A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B)    Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of the Transfer Agreement described in Section 5.3 of this Agreement), except that the Assembly shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by the Assembly to AGM&M, Inc.

(C)    In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D)    In recognition of its efforts in establishing the AGM&M, the

6

Assembly is included as a Major Donor and has the right to appoint a voting member of the AGM&M, Inc. Board of Trustees.

(E)    Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F)    Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)    The initial Board of Trustees of AGM&M, Inc. consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

5.3    Transfer Agreement.

(A)    On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

(B)    The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.

(C)    Under the Transfer Agreement, AGM&M, Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.

5.4    Promissory Note.

(A)    The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)    The new note must be interest free and mature on December 31, 2005.

(C)    If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

5.5    Armenian National Institute. On or before November 1, 2003, the Assembly

shall assign its right to appoint Trustees of the Armenian National Institute to AGM&M, Inc.

## SECTION 6  Representations by the Assembly.

The Assembly hereby represents and warrants to the Grantor as follows:

6.1    Tax Status. The status of the Assembly as an organization described in Section 501(c)(3) of the Code, and as an organization that is not a private foundation within the meaning of Section 509(a) of the Code is in full force and effect and there is, to the Assembly's knowledge, no IRS reexamination of such status pending or threatened.

6.2    Organization. The Assembly is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

6.3    Power. The Assembly has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grants.

6.4    Actions. All actions required to be taken by the Assembly to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

6.5    Authorization. This Agreement has been duly and validly authorized by all necessary action of the Assembly and constitutes, when executed, a valid and binding obligation of the Assembly.

6.6    Furtherance of Charitable Purposes. The acquisition, renovation, and utilization of the Grant Property is solely in furtherance of the Assembly's stated charitable purposes.

## SECTION 7  General Provisions.

7.1    Notice.

(A)    Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)    upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or

(iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B)    Notice sent in accordance with Section 7.1(A) of this Agreement must be addressed as follows:

(i)    If to Grantor:

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

(ii)    If to the Assembly:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax: 202-383-9012

(C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 7.1.

7.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

7.3    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and the Assembly and are not assignable or transferable to any other person, firm or corporation without the consent of the other party, except that the Assembly may assign its rights and obligations under this Agreement to any entity that succeeds to all or substantially all of the Assembly's business and assets or as set out in Section 5.3 of this Agreement.

7.4    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

7.5    Entire Agreement.

(A)    This Agreement represents the entire agreement between the Grantor and the Assembly concerning the Grants and all previous agreements, whether written or oral, are superseded by it.

(B)    This Agreement may be modified or waived only by a written agreement between the Grantor and the Assembly.

(C)    The Assembly acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

Thank you again for your generous grant to support the Armenian Assembly of America.

Sincerely,

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____
       Hirair S. Hovnanian
       Chairman of the Board of Trustees

By: _____
       Peter Voskibian
       Chairman of the Board of Directors

Accepted and agreed to as of the date of this Agreement by:

THE CAFESJIAN FAMILY FOUNDATION

By: _____      Date: _Nov. 1, 2003_
       Gerard L. Cafesjian
       President and CBO

GERARD L. CAFESJIAN

_____      Date: _Nov. 1, 2003_

11

**Exhibit 7**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Agreement") made this ___ day of November, 2003 by and among **THE TOMKAT LIMITED PARTNERSHIP**, a South Dakota Limited Partnership, (the "Assignor"), and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**, a non-profit corporation organized and existing under the laws of the District of Columbia (the "Assignee").

## RECITALS

A.    Assignor, as Buyer, has entered into that certain Purchase Agreement dated September 20, 2003, as amended (the "Contract"), pursuant to which Assignor has agreed to purchase from **FAMILIES U.S.A. FOUNDATION, INC.**, a Massachusetts non-profit corporation, certain improved real property known for tax and assessment purposes as Lot Nos. 817 and 818 in Square No. 253, situated in the District of Columbia, having a street address of 1334-36 G Street, N.W. (the "Property"), for a specified price on the terms and conditions set forth in the Contract.

B.    Pursuant to Section 20.4 of the Contract, Assignor desires to assign its right, title and interest in and to the Contract to Assignee, and Assignee desires to acquire all of Assignor's right, title and interest in and to the Contract, and is willing to perform all of the duties of Assignor under the Contract upon the terms and conditions hereinafter set forth.

C.    Capitalized terms used herein without definition shall have the same meanings herein as given in the Contract.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Assignment**.  As of the Date of Closing, as defined in Section 4.2 of the Contract, Assignor assigns to Assignee all of its right, title and interest in and to the Contract, and Assignee accepts the foregoing Assignment.

2.    **Performance of Duties.**  Effective as of the Date of Closing, Assignee assumes and agrees to perform all of Assignor's duties under the Contract, and to indemnify and hold harmless the Assignor from any and all liabilities thereunder, including reasonable attorneys' fees.

3.    <u>Further Acts</u>.  The parties shall perform all other acts and execute and deliver all other documents as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

4.    <u>Compensation of Assignor</u>.  On the Date of Closing, Assignee agrees to pay to the Assignor all of Assignor's expenses related to the Property, which expenses have been otherwise disclosed to the Assignee by the Assignor, which amount has been separately determined and agreed to by the Assignor and Assignee.

5.    <u>Governing Law</u>.  This Agreement shall be deemed to be entered into in the District of Columbia and shall be governed and interpreted by the laws of the District of Columbia.

6.    <u>No Release</u>.  Assignor expressly acknowledges that it is not released from its obligations under the Contract and remains fully liable thereunder.

7.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first above written.

ASSIGNOR:

**THE TOMKAT LIMITED PARTNERSHIP**
**By TOMKAT, INC., its General Partner**

By_____
    John J. Waters, Jr.
Its President

ASSIGNEE:

**ARMENIAN GENOCIDE MUSEUM AND**
**MEMORIAL, INC.**

By_____
    John J. Waters, Jr.
Its Secretary/Treasurer

2

**Exhibit 8**

OMB NO. 2502-0265

| A. | | B. TYPE OF LOAN: | | |
|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1 ☐ FHA    2 ☐ FmHA    3 ☐ CONV. UNINS.    4 ☐ VA    5 ☐ CONV. INS. | | |
| | | 6. FILE NUMBER:  3206 | | 7. LOAN NUMBER: |
| **SETTLEMENT STATEMENT** | | 8. MORTGAGE INS CASE NUMBER: | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*
1.0  3/98  (3206.pfd/3206/17)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| The Armenian Genocide Museum and Memorial, Inc | Families U.S.A., Foundation, Inc. 1334 G Street NW Washington, DC 20005-3117 | |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT:    52-2041581 | I. SETTLEMENT DATE: |
|---|---|---|
| 1334-1336 G Street, NW Washington, DC 20005 | Landmark Title Corporation | November 4, 2003 |
| Lots 818, 817, Square 253 | PLACE OF SETTLEMENT 730 24th Street, N.W., Suite 15 Washington, DC 20037 | |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 6,500,000.00 | 401. Contract Sales Price | 6,500,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 380,933.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes          to | | 407. County Taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.  GROSS AMOUNT DUE FROM BORROWER** | 6,880,933.50 | **420.  GROSS AMOUNT DUE TO SELLER** | 6,500,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 250,000.00 | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | | 502. Settlement Charges to Seller (Line 1400) | 97,850.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. Master Lease Security | 250,000.00 |
| 207. | | 507. (Deposit disb. as proceeds) | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes          to | | 511. County Taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. Master Lease from Seller | 100.00 | 516. Master Lease Rent from Seller | 100.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220.  TOTAL PAID BY/FOR BORROWER** | 250,100.00 | **520.  TOTAL REDUCTION AMOUNT DUE SELLER** | 347,950.00 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 6,880,933.50 | 601. Gross Amount Due To Seller (Line 420) | 6,500,000.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 250,100.00) | 602. Less Reductions Due Seller (Line 520) | ( 347,950.00) |
| **303.  CASH ( X FROM ) ( TO ) BORROWER** | 6,630,833.50 | **603.  CASH ( X TO ) ( FROM ) SELLER** | 6,152,050.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower   The Armenian Genocide Museum and Memorial, Inc

By:_____

Seller   Families U.S.A., Foundation, Inc.

By:_____

OMB NO. 2502-0265

| A. | B.  TYPE OF LOAN: |
|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | 1 ☐ FHA    2 ☐ FmHA    3 ☐ CONV. UNINS    4 ☐ VA    5 ☐ CONV. INS. |
| **SETTLEMENT STATEMENT** | 6  FILE NUMBER:          7  LOAN NUMBER:<br>3206 |
| | 8  MORTGAGE INS CASE NUMBER: |

C  NOTE:  *This form is furnished to give you a statement of actual settlement costs  Amounts paid to and by the settlement agent are shown.*
*Items marked "[POC]" were paid outside the closing, they are shown here for informational purposes and are not included in the totals*
1.0   3/98    [3206.pfd/3206/17]

| D.  NAME AND ADDRESS OF BORROWER: | E.  NAME AND ADDRESS OF SELLER: | F.  NAME AND ADDRESS OF LENDER: |
|---|---|---|
| The Armenian Genocide Museum<br>and Memorial, Inc. | Families U S A ,<br>Foundation, Inc<br>1334 G Street NW<br>Washington, DC 20005-3117 | |

| G.  PROPERTY LOCATION: | H.  SETTLEMENT AGENT:      52-2041581 | I.  SETTLEMENT DATE: |
|---|---|---|
| 1334-1336 G Street, NW<br>Washington, DC 20005<br><br>Lots 818, 817, Square 253 | Landmark Title Corporation<br><br>PLACE OF SETTLEMENT<br>730 24th Street, N W , Suite 15<br>Washington, DC 20037 | November 4, 2003 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100.  GROSS AMOUNT DUE FROM BORROWER:** | | **400.  GROSS AMOUNT DUE TO SELLER:** | |
| 101.  Contract Sales Price | 6,500,000.00 | 401.  Contract Sales Price | 6,500,000.00 |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to Borrower (Line 1400) | 380,933.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106.  City/Town Taxes          to | | 406.  City/Town Taxes          to | |
| 107.  County Taxes              to | | 407.  County Taxes              to | |
| 108.  Assessments              to | | 408.  Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| *120*  *GROSS AMOUNT DUE FROM BORROWER* | 6,880,933.50 | *420*  *GROSS AMOUNT DUE TO SELLER* | 6,500,000 00 |
| **200.  AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500.  REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201.  Deposit or earnest money | 250,000.00 | 501.  Excess Deposit (See Instructions) | |
| 202.  Principal Amount of New Loan(s) | | 502.  Settlement Charges to Seller (Line 1400) | 97,850.00 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first Mortgage | |
| 205. | | 505.  Payoff of second Mortgage | |
| 206. | | 506.  Master Lease Security | 250,000.00 |
| 207. | | 507.  (Deposit disb. as proceeds) | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210.  City/Town Taxes          to | | 510.  City/Town Taxes          to | |
| 211.  County Taxes              to | | 511.  County Taxes              to | |
| 212.  Assessments              to | | 512.  Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216.  Master Lease from Seller | 100.00 | 516.  Master Lease Rent from Seller | 100.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| *220*  *TOTAL PAID BY/FOR BORROWER* | 250,100 00 | *520*  *TOTAL REDUCTION AMOUNT DUE SELLER* | 347,950 00 |
| **300.  CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600.  CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301.  Gross Amount Due From Borrower (Line 120) | 6,880,933.50 | 601.  Gross Amount Due To Seller (Line 420) | 6,500,000.00 |
| 302.  Less Amount Paid By/For Borrower (Line 220) | ( 250,100.00 ) | 602.  Less Reductions Due Seller (Line 520) | ( 347,950.00) |
| *303.  CASH ( X FROM ) ( TO ) BORROWER* | 6,630,833 50 | *603.  CASH ( X TO ) ( FROM ) SELLER* | 6,152,050 00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower    The Armenian Genocide Museum
and Memorial, Inc
      By:_____

Seller    Families U S A , Foundation, Inc
      By:_____

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ @ % | | | |
| *Division of Commission (line 700) as Follows:* | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission Paid at Settlement | | | |
| 704. to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee to | | | |
| 804. Credit Report to | | | |
| 805. Lender's Inspection Fee to | | | |
| 806. Mortgage Ins. App. Fee to | | | |
| 807. Assumption Fee to | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From to @ $ /day ( days %) | | | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance months @ $ per month | | | |
| 1002. Mortgage Insurance months @ $ per month | | | |
| 1003. City/Town Taxes months @ $ per month | | | |
| 1004. County Taxes months @ $ per month | | | |
| 1005. Assessments months @ $ per month | | | |
| 1006. months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. months @ $ per month | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or Closing Fee to Landmark Title Corporation | | 450.00 | 250.00 |
| 1102. Abstract or Title Search to J & M Abstracts, Inc. | | | |
| 1103. Title Examination to Landmark Title Corporation | | 400.00 | |
| 1104. Title Insurance Binder to Landmark Title Corporation | | 50.00 | |
| 1105. Document Preparation to Landmark Title Corporation | | | 100.00 |
| 1106. Notary Fees to Landmark Title Corporation | | | |
| 1107. Attorney's Fees to | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance to Commonwealth Land Title Insurance Co. | | 6,500.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage $ | | | |
| 1110. Owner's Coverage $ 6,500,000.00 6,500.00 | | | |
| 1111. FAX/Wire/Fed-x/Messenger Fees Landmark Title Corporation | | | |
| 1112. | | | |
| 1113. Release Fees Landmark Title Corporation | | | |
| 1114. | | | |
| 1115. Copies Landmark Title Corporation | | | |
| 1116. | | | |
| 1117. Tax Status Check | | | |
| 1118 | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $ 33.50 ; Mortgage $ ; Releases $ | | 33.50 | |
| 1202. City/County Tax/Stamps: Deed 97,500.00; Mortgage | | 97,500.00 | 97,500.00 |
| 1203. State Tax/Stamps: Deed ; Mortgage | | | |
| 1204. | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey to Landtech Associates, Inc. | | | |
| 1302. Pest Inspection to | | | |
| 1303. Refund Earnest Dep to TomKat to - TomKat, L.P. | | 250,000.00 | |
| 1304. Various Expenses to TomKat, L.P. | | 26,000.00 | |
| 1305. | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | 380,933.50 | 97,850.00 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

Landmark Title Corporation
Settlement Agent

Certified to be a true copy

( 3206 / 3206 / 17 )

**Exhibit 9**

OMB NO. 2502-0265

| A. | B. TYPE OF LOAN: | | | | | | |
|---|---|---|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ CONV. UNINS | 4. ☐ VA | 5. ☐ CONV. INS. | | |
| | 6. FILE NUMBER: 3204-A | | | | 7. LOAN NUMBER: | | |
| SETTLEMENT STATEMENT | 8. MORTGAGE INS CASE NUMBER: | | | | | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals*
1.0   3/98   (3204-A.PFD/3204-A/16)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Armenian Genocide Museum and Memorial, Inc | The TomKat Limited Partnership 15 South Fifth Street Minneapolis, Minnesota 55402 | |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT:    52-2041581 | I. SETTLEMENT DATE: |
|---|---|---|
| 1338 G Street, N.W. Washington, DC | Landmark Title Corporation PLACE OF SETTLEMENT 730 24th Street, N.W., Suite 15 Washington, DC 20037 | December 15, 2003 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 1,350,000.00 | 401. Contract Sales Price | 1,350,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 22,498.25 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes             to | | 407. County Taxes             to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 1,372,498.25 | **420. GROSS AMOUNT DUE TO SELLER** | 1,350,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See instructions) | |
| 202. Principal Amount of New Loan(s) | | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes             to | | 511. County Taxes             to | |
| 212. Assessments              to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) -- | 1,372,498.25 | 601. Gross Amount Due To Seller (Line 420) | 1,350,000.00 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( ) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| **303. CASH ( X FROM ) ( TO ) BORROWER** | 1,372,498.25 | **603. CASH ( X TO ) ( FROM ) SELLER** | 1,350,000.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower    Armenian Genocide Memorial and Museum, Inc.

By: *[signature]*

JOHN J. WATERS, JR.
SECRETARY / TREASURER

Seller    The TomKat Limited Partnership

By: *[signature]*

JOHN J. WATERS, JR.
PRESIDENT, TOMKAT, INC.
AS SOLE GENERAL PARTNER

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price**    $          @          % | | | |
| *Division of Commission (line 700) as Follows:* | | | |
| 701. $          to | | | |
| 702. $          to | | | |
| 703. Commission Paid at Settlement | | | |
| 704. | to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee        %          to | | | |
| 802. Loan Discount        %          to | | | |
| 803. Appraisal Fee          to | | | |
| 804. Credit Report          to | | | |
| 805. Lender's Inspection Fee          to | | | |
| 806. Mortgage Ins. App. Fee          to | | | |
| 807. Assumption Fee          to | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From          to          @   $          /day   (          days          %) | | | |
| 902. Mortgage Insurance Premium for          months to | | | |
| 903. Hazard Insurance Premium for   1.0   years to | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance          months  @  $          per  month | | | |
| 1002. Mortgage Insurance          months  @  $          per  month | | | |
| 1003. City/Town Taxes          months  @  $          per  month | | | |
| 1004. County Taxes          months  @  $          per  month | | | |
| 1005. Assessments          months  @  $          per  month | | | |
| 1006.          months  @  $          per  month | | | |
| 1007.          months  @  $          per  month | | | |
| 1008.          months  @  $          per  month | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or Closing Fee          to  Landmark Title Corporation | | 500.00 | |
| 1102. Abstract or Title Search          to  J & M Abstracts, Inc. | | 120.00 | |
| 1103. Title Examination          to  Landmark Title Corporation | | 50.00 | |
| 1104. Title Insurance Binder          to  Landmark Title Corporation | | 50.00 | |
| 1105. Document Preparation          to | | | |
| 1106. Notary Fees          to  Landmark Title Corporation | | | |
| 1107. Attorney's Fees          to | | | |
| (includes above item numbers: | ) | | |
| 1108. Title Insurance          to  First American Title Insurance Co. | | 1,350.00 | |
| (includes above item numbers: | ) | | |
| 1109. Lender's Coverage          $ | | | |
| 1110. Owner's Coverage          $     1,350,000.00          1,350.00 | | | |
| 1111. FAX/Wire/Fed-x/Messenger Fees          to  Landmark Title Corporation | | 84.75 | |
| 1112. | | | |
| 1113. Release Fees          Landmark Title Corporation | | | |
| 1114. | | | |
| 1115. Copies          to  Landmark Title Corporation | | 10.00 | |
| 1116. | | | |
| 1117. Tax Status Check | | | |
| 1118. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees:  Deed  $      33.50 ; Mortgage  $          ;          Releases  $ | | 33.50 | |
| 1202. City/County Tax/Stamps:  Deed          ; Mortgage | | | |
| 1203. State Tax/Stamps:        Deed          20,250.00 ; Mortgage | | 20,250.00 | |
| 1204. | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey          to  Landtech Associates, Inc. | | | |
| 1302. Pest Inspection          to | | | |
| 1303.          -- | | | |
| 1304. Recording Fee to Recorder          to  Landmark Title Corporation | | 50.00 | |
| 1305. | | | |
| **1400. TOTAL SETTLEMENT CHARGES  (Enter on Lines 103, Section J and 502, Section K)** | | 22,498.25 | |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

*[signature]*
Landmark Title Corporation
Settlement Agent

Certified to be a true copy

*[signature]*

**Exhibit 10**

## PURCHASE AGREEMENT

**THIS AGREEMENT** is made and entered into this ___ day of December, 2003 by and between **THE TOMKAT LIMITED PARTNERSHIP**, a South Dakota limited partnership ("Seller"), and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**, a non-profit corporation organized and existing under the laws of the District of Columbia ("Buyer").

### RECITALS

A.    Seller is the fee owner of certain real property located at 1338 G Street, N.W., District of Columbia, legally described as hereinafter set forth in **Exhibit A** ("the Land") with an office building located on the Land.

B.    Buyer desires to purchase the Land and improvements thereon and other intangibles incident thereto; Seller desires to sell said property pursuant to the terms of this Agreement.

**NOW THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller agrees to sell the Property herein described, and Buyer agrees to purchase such Property, upon the following conditions:

**1.    Sale of Property**. The Property is to be conveyed and transferred to Buyer pursuant to this Agreement and the following shall be set forth in Sections 1.1 and 1.2:

**1.1    Real Property.** The real property situated at 1338 G Street, N.W., District of Columbia, as is more fully described on **Exhibit A** attached hereto and made a part hereof; any improvements situated thereon, all the right, title and interest of Seller, if any, in and to any easements, covenants and other rights appurtenant to such parcel of real property, and all right, title and interest of Seller, if any, in and to any land lying in the bed of any street, avenue, or alley, in front of, abutting or adjoining such parcel of real property (collectively, the "Property").

**1.2    Intangibles.** All of the Seller's right, title and interest, if any, to (i) architectural plans, site plans, other plans, drawings, specifications, surveys, engineering, environmental and other consulting reports relating to the Real Property and that are in Seller's possession,  (ii) all licenses, permits, authorizations, approvals, certificates of occupancy and other approvals issued to Seller or the Real Property with respect to the use and operation of the Real Property that are in effect on the Date of Closing, and (iii) all warranties and guarantees, if any, given to, assigned to or benefiting Seller or the Real Property relating to the design, construction, use, operation or maintenance of the Real Property to the extent that the same are assignable (collectively, the "Intangibles") (the Real Property and the Intangibles being hereinafter collectively referred to as "the Property").

1

2.     **Consideration**.  The consideration for the purchase of the Property shall be as follows:

    **2.1**     The purchase price for the Property to be paid to the Seller by the Buyer shall be One-million, Three-hundred-fifty-thousand dollars ($1,350,000.00) ("Purchase Price").

    **2.2**     In addition to the Purchase Price, Buyer shall pay on the Date of Closing all transaction expenses reflected on the Settlement Statement, including, but not limited to, closing fee, title examination, title insurance, recording fees, transfer and recordation taxes, as well as Seller's legal fees relative to the sale of the Property ("Transaction Expenses").

3.     **Payment of the Purchase Price**.  The Purchase Price shall be paid in full by the Buyer on the Date of Closing, as hereinafter defined.

    **3.1     Escrow and Escrowed Closing**.

        **3.1.1  Escrow**.  The closing of the transactions provided for in this Agreement on the Date of Closing shall be consummated through an Escrow Agent. Escrow Agent is authorized to close and consummate the Closing only if and when:  (i) Escrow Agent has received all items to be delivered by Seller and Buyer pursuant to Section 7,  (ii) Escrow Agent is prepared to immediately disburse the proceeds of the Purchase Price due to Seller by federal wire transfer of immediately available funds in accordance with separate disbursement instructions from Seller, and (iii) the Escrow Agent has committed to issue the Title Policy to Buyer promptly after the Closing but effective as of the Closing.

        **3.1.2  Escrow Agent's Closing Deliveries and Disbursements**.  Upon consummation of the Closing, Escrow Agent shall:

        (a)     Deliveries to Buyer.  Deliver to the Buyer (or to such other person designated by written notice to the Escrow Agent from Buyer or Buyer's legal counsel):  (i) the Deed by causing the Deed to be recorded among the land records of the District of Columbia and immediately upon recording the Deed, delivering to Buyer and to Seller a copy of the executed Deed as recorded; and (ii) two (2) originals of the Assignment of Intangibles executed by Seller.

        (b)     Deliveries to Seller.  Deliver to the Seller (or to such other person designated by written notice to the Escrow Agent from Seller or Seller's legal counsel): (i) the Purchase Price, together with the costs payable by Buyer pursuant to Section 7 of this Agreement, as shown on the Closing Statement executed by Seller and Buyer.

(c)    <u>Title Policy</u>.  Deliver the Title Policy issued by Title Company to Buyer or to such other person designated by written notice to the Escrow Agent from Buyer or Buyer's counsel.

**3.1.3  Real Estate Reporting Person**.  The Escrow Agent is designated the "real estate reporting person" for purposes of Section 6045 of Title 26 of the United States Code and Treasury Regulation 1.6045-4 and the Closing Statement shall so provide.  Upon the consummation of the transaction contemplated by this Agreement, the Escrow Agent shall file a Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.

4.    **Effective Date and Closing; Leases and Contracts.**

**4.1    Effective Date.**  The effective date of this Agreement shall be on the date set forth in the heading hereof ("Effective Date").

**4.2    The Closing.**  The Closing of the transactions contemplated by this Agreement ("Closing") shall take place on December 16, 2003 or such date as may be mutually agreed upon by the parties.

**4.3    Leases.**  The Property is free and clear of any and all leases.

**4.4    Contracts**. To the extent that Seller is a party to any contracts for the provision of services or supplies to the Property, such contracts shall not be assigned and transferred by Seller to Buyer at Closing, and Buyer shall not assume any obligations of Seller under the Contracts.

5.    **Real Estate Taxes and Special Assessments**.

**5.1    Current Year's Taxes**.  If not already paid by the Seller and reflected on **Exhibit B**, all real estate taxes for the fiscal year ended September 30, 2003 and all Downtown Business Improvement District taxes for the fiscal year ending September 30, 2003, if not already paid by the Seller and reflected on **Exhibit B**, shall be paid or assumed by the Buyer.  All real estate taxes for the fiscal year ending September 30, 2004 and all Downtown Business Improvement District taxes for the fiscal year ending September 30, 2004 shall be assumed by the Buyer.

**5.2    Assessments**.  All real estate assessments (general or special) for improvements or services already made to or which benefit the Real Property and all such real estate assessments pending or levied prior to the Date of Closing shall be assumed by the Buyer.

3

**6.** **Title Commitment**. Attached hereto as **Exhibit C** is a title commitment (No. 3204-A) (the "Title Commitment") issued by the Title Company to Buyer for the issuance of a title insurance policy ("Title Policy") in the amount of the Purchase Price and insuring Buyer's ownership of the Real Property.

**7.** **Conveyances and Closing Documents**. The parties hereby agree to execute and deliver to the Escrow Agent, on or before the Date of Closing, the Closing Documents described in this Section 7, as to the Seller, all documents shall be executed and delivered by its General Partner, as follows:

**7.1** **Deed**. Seller shall execute, acknowledge and deliver to the Escrow Agent a Special Warranty Deed conveying its interest in the Property in the form attached hereto as **Exhibit D**.

**7.3** **Assignment of Intangibles.** Seller shall execute and deliver to the Escrow Agent two originals of an Assignment of Intangibles in the form attached hereto as **Exhibit E** (the "Assignment of Intangibles") assigning to Buyer Seller's interest, if any, in the Intangibles.

**7.4** **FIRPTA Affidavit.** Seller shall execute and deliver to the Escrow Agent and to Buyer an affidavit certifying that Seller is not a "foreign person" pursuant to the United States Internal Revenue Code of 1986, as amended.

**7.5** **Corporation Resolution.** Seller shall execute and deliver to the Escrow Agent and to Buyer a certificate of an Officer of Seller certifying to the adoption of a Resolution by the Board of Directors authorizing the transactions hereunder.

**7.6** **Deed Recordation Tax and Transfer Tax Return**. Seller and Buyer shall each execute, acknowledge and deliver to the Escrow Agent an original or counterpart original copies of the Combined Real Property Recordation Tax and Real Property Transfer Tax Return (FP-7C). Seller shall pay none of the recordation and transfer taxes with respect to the Deed, and Buyer shall pay all of the recordation and transfer taxes with respect to the Deed.

**7.7** **Buyer's Payment Obligations.** Buyer shall deliver to the Escrow Agent, in immediately available Washington, D.C. funds, an amount equal to the sum of (a) the Purchase Price; and (b) the Transaction Expenses.

**7.8** **Closing Adjustments.** Any Closing Adjustments shall be reflected on the Settlement Statement.

**7.9** **Possession of the Property.** Possession of the Property shall be surrendered by the Seller to the Buyer on the Date of Closing.

4

8.    **"As Is" Sale.**    Buyer acknowledges and agrees that it is purchasing the Property in an "As Is" physical condition, that there may be defects in the condition of the Property.

9.    **Seller's Representations**.  Seller represents to Buyer, to the best of Seller's knowledge, as follows:

     **9.1**    **Tenant Leases**.  Seller represents to Buyer that there are no leases affecting the Property.

     **9.2**    **Condemnation**.  Seller has not received written notice from any governmental agency, nor is Seller aware of, any pending or contemplated annexation or condemnation proceedings, or purchase in lieu of the same, affecting or which may affect all or any part of the Property.

     **9.3**    **Title**.  Buyer shall take title pursuant to the Title Commitment, **Exhibit C** attached hereto.

     **9.4**    **Environmental Laws.**  Seller has provided to Buyer any and all documents in its possession relating to the environmental condition of the Property. Other than such documents, Seller makes no representations as to any environmental hazards affecting the Property.

     **9.5**    **Power and Authority.**  Seller represents that Seller has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Seller, enforceable and in accordance with its terms.  The execution, delivery and performance of this Agreement and all documents in connection herewith are not in contravention of or in conflict with any deed of trust, agreement, or undertaking to which Seller is a party or by which Seller or any of its property, including the Property, may be bound or affected. The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of Seller, and all such actions have been duly taken by Seller.

     **9.6**    **Litigation.**  Seller is not a party to, and does not have any actual knowledge of, any proceeding, suit, litigation or claim, either governmental or otherwise, relating to Seller or to the Property or any part thereof which might adversely affect the Property.

     **9.7**    **Mechanics' Liens.**  All bills and claims for labor performed and materials furnished to or for the benefit of the Property during the period preceding the Date of Closing have been paid, or will be paid, at or prior to Closing in full by Seller.

**9.8   No Bankruptcy.**  Seller (i) is not in receivership or dissolution; (ii) has not made any assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature; (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Seller or any of its general partner(s), if any; and (iv) to the best of its knowledge, none of the foregoing are pending or threatened.

**9.9   Foreign Investment in Real Property Tax Act.**  Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and shall deliver to Buyer at Closing an affidavit to this effect.

**9.10   Binding Commitments.**  Seller has not made and will not make any commitments or representations to the applicable governmental or quasi-governmental authorities, any adjoining or surrounding property owner, any civic association, any utility company or any other person or entity that would in any manner be binding upon Buyer or the Property.

**9.11   Property Management Agreements**.   No property management agreement has been executed by Seller that would be binding upon the Buyer or the Property after the Date of Closing.

**9.12   Seller's Acquisition Expenses.**  The purchase price and holding expenses expended by the Seller prior to negotiating this Purchase Agreement are set forth on **Exhibit B** ("Acquisition Expenses").  The Seller represents that the Acquisition Expenses shown on **Exhibit B** are true and correct.  In addition, Buyer shall pay all of Seller's Transaction Expenses at Closing.

**10.   Buyer's Representations.**  Buyer hereby represents to Seller as follows:

**10.1   Power and Authority.**  Buyer has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and all documents in connection herewith are not in contravention of or in conflict with any deed of trust, agreement, or undertaking to which Buyer is a party or by which Buyer or any of its property may be bound or affected.  The execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of Buyer, and all such actions have been duly taken by Buyer.

6

**10.2    No Bankruptcy.**  Buyer (i) is not in receivership or dissolution; (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature; (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Buyer; and (iv) to the best of Buyer's knowledge, none of the foregoing are pending or threatened.

**11.    Conditions to Closing for Buyer.**  The obligation of Buyer to purchase the Property is subject to the following conditions:

**11.1    Representations.**  The representations of Seller contained in this Agreement shall be true and correct on, and as of, the Date of Closing, in all material respects as though such representations were made on, and as of, such date; and

**11.2    Title.**  Subject to the payment by Buyer of the title insurance premium for the Title Policy, the Title Company shall be unconditionally obligated to issue the Title Policy to Buyer immediately upon recordation of the Deed.

**11.3    Compliance.**  Seller shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

**12.    Conditions to Closing for Seller.**  The obligation of the Seller to close hereunder is subject to the following conditions:

**12.1    Representations.**  The representations of Buyer contained in this Agreement shall be true and correct on, and as of, the Date of Closing, in all material respects as though such representations were made on, and as of, such date; and

**12.2    Compliance.**  Buyer shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to Closing, including payment of the Purchase Price.

**13.    Performance.**  Both parties agree to perform in accordance with the terms and conditions of this Agreement.

**14.    Risk of Loss.**  Between the date of this Agreement and the Date of Closing, the risk of ownership and loss of the Property shall belong solely to Seller.

**15.    Brokers.**  Each Party represents and warrants that there are no brokers, finder or similar agent claiming to have been employed by either Party in connection with the transaction.

7

**16.    UST Disclosure.**  Concurrent with its execution of this Agreement, in accordance with the requirements of Section 3(g) of the District of Columbia Underground Storage Act of 1990, as amended, Seller has executed and delivered to Buyer an Underground Storage Tank Real Estate Transfer Disclosure Form in the form attached to this Agreement as **Exhibit F.**

**17.    General Provisions.**

    **17.1    Notices**.

If to Buyer:

> John J. Waters, Jr., Secretary/Treasurer
> Armenian Genocide Museum and Memorial, Inc.
> 15 South Fifth Street, Suite 900
> Minneapolis, MN  55402
> Tel:  (612) 359-8991
> Fax:  (612) 359-8994

> with a copy to:

> John J. Waters, Esq.
> 1301 E. 79th Street, Suite 108
> Bloomington, MN  55425
> Tel:  (952) 883-0882
> Fax:  (952) 858-8238

If to Seller:

> THE TOMKAT LIMITED PARTNERSHIP
> 15 South Fifth Street, Suite 900
> Minneapolis, MN  55402
> ATTN:  John J. Waters, Jr., President
> Tel. 612-359-8988
> Fax. 612-359-8994

> with a copy to:

> John J. Waters, Esq.
> 1301 East 79th Street, Suite 108
> Bloomington, MN. 55425
> Tel. (952) 883-0882
> Fax. (952) 858-8238

8

17.2  **Entire Agreement**. This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings.

17.3  **Governing Law.** This Agreement shall be governed by and construed according to the laws of the District of Columbia.

17.4  **Assignment by Buyer.** Buyer may not assign this Agreement.

17.5  **Severability.** If any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement.

17.6  **Headings.** Any Section headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provision of this Agreement.

17.7  **Business Days.** If any date upon which action is required under this Agreement shall be a Saturday, Sunday or federally recognized legal holiday in the District of Columbia, the date for such action shall be extended to the first business day after such date that is not a Saturday, Sunday or legal holiday.

17.8  **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

17.9  **Soil Characteristics Disclosure.** Pursuant to the District of Columbia Code, Section 45-508(b)(1981), Seller hereby states that the soil of the Property is classified as "Urban Land" by the Soil Survey of the District of Columbia; the term is defined at Page 50 of that publication as:

> "This mapping unit consists of areas where more than 80% of the surface is covered by asphalt, buildings, or other impervious surfaces....

> "Included in mapping are large areas that are mostly miscellaneous artificial fill. In many areas, several feet of this fill have been placed over streams, swamps, floodplains and tidal marshes. These areas are now almost totally covered with roads, buildings, or other structures. Also included are a few strongly sloping and steep areas.

> "Examination and identification of soil or soil like materials in this unit are impractical. Careful on-site investigation is needed to determine the potential and limitations for any proposed use."

For further information Buyer may contact a soil testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture. Buyer hereby acknowledges that the foregoing fully satisfies the requirements of the aforesaid Section 45-508(b) of the District of Columbia Code, that the provisions of this Section 20.9 have been included solely to comply with the provisions of Section 45-508(b) of the District of Columbia Code and that, Seller makes no representation or warranty concerning the soil characteristics of the Property or the accuracy of the provisions of this Section 20.9.

**17.10  Successors and Assigns**.  The terms, conditions and covenants hereof shall extend to, be binding upon and inure to the benefit of the successors and assigns of the parties to this Agreement.

**17.12  Modifications.**  This Agreement may not be modified except by the written agreement of Seller and Buyer.

The parties have executed this Purchase Agreement as of the day and year first above written.

SELLER:                                          BUYER:

**THE TOMKAT LIMITED PARTNERSHIP**        **ARMENIAN GENOCIDE**
By:  TOMKAT, INC., General Partner        **MUSEUM AND MEMORIAL, INC.**

By_____          By_____
   John J. Waters, Jr., President          Its    JOHN J. WATERS, JR.
                                                  SECRETARY/TREASURER

10

## LIST OF EXHIBITS

**Exhibit A**    Legal Description

**Exhibit B**    Acquisition Expenses

**Exhibit C**    Title Commitment

**Exhibit D**    Deed

**Exhibit E**    Assignment of Intangibles

**Exhibit F**    Underground Storage Tank Real Estate Transfer Disclosure Form

**EXHIBIT A**
**To 1338 G Street Purchase Agreement**


**Legal Description of the Property located at 1338 G Street, District of Columbia:**


Lot numbered Fifty-five (55) in Harry Wardman and Thomas P. Bones'
(previously recorded deed incorrectly shows Thomas *F.* Bones)
Subdivision of lots in Square numbered Two Hundred and Fifty-three (253)
as per plat recorded in the Office of the Surveyor for the District of Columbia
in Liber 64 at folio 46.

## EXHIBIT B
## To 1338 G Street Purchase Agreement

## ACQUISITION EXPENSES

| | |
|---|---:|
| Purchase Price: | 1,200,000.00 |
|   Purchase Cost of Building | **1,200,000.00** |
|  Closing Costs Capitalized | |
|   Settlement Charges: | |
|    Total Settlement Charges | 41,812.25 |
| | |
|   Other Costs: | |
|    McGrath & Co: Inspection Fees other | 400.00 |
|    Legal Bills: | 4,739.93 |
| | |
| Net Property Value | **1,246,952.18** |
| | |
| Subsequent Period Costs: | |
| | |
|  Taxes | **79,972.52** |
|  Insurances | **17,888.17** |
| | |
|    **Recovery Amount Required** | **1,344,812.87** |
| | |
|    **Proposed Sale Price** | **1,350,000.00** |

--

**EXHIBIT C**
**To 1338 G Street Purchase Agreement**

**TITLE COMMITMENT**

14

EXHIBIT D
To 1338 G Street Purchase Agreement
DEED

## SPECIAL WARRANTY DEED

This Special Warranty Deed, dated this _____ day of December, 2003, is made by and between **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership, having a business address of 15 South Fifth Street, Suite 900, Minneapolis, MN 55402, *Grantor,* and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,** a non-profit corporation organized and existing under the laws of the District of Columbia, *Grantee.*

**WITNESSETH,** that for and in consideration of the sum of Ten Dollars ($10.00), receipt and sufficiency whereof is hereby acknowledged, the said Grantor does grant and convey unto the said Grantee, in fee simple, as sole owner, title to the property with the improvements, easements and appurtenances thereunto belonging, situate, lying and being in the District of Columbia and described as follows, to wit:
SEE ATTACHED EXHIBIT A

**TOGETHER WITH** all right, title and interest of the Grantor, if any, in any land lying in the bed of any street, road, avenue or alley, open or closed, in front of or adjoining the land described on the attached Exhibit A, to the center line thereof; all easements and other rights appurtenant to the land and together with all and singular the ways, easements, rights, privileges and appurtenances to the same belonging or in anywise appertaining, and all the estate, right, title, interest, and claim either at law or in equity, or otherwise however, of the said Grantor, of, in, or out of the said land and premises described on **Exhibit A**.

**TO HAVE** and to hold all of the aforesaid property unto the use and benefit of the Grantee, his successors and assigns in fee simple forever.

**AND** the said Grantor covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.

**IN WITNESS WHEREOF, THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership, has caused this Special Warranty Deed to be executed in its limited partnership name by John J. Waters, Jr., as President of **TOMKAT, INC.,** the General Partner of said limited partnership, attested to by its proper Officers, duly authorized and does hereby constitute and appoint John J. Waters, Jr., President of **TOMKAT, INC.,** General Partner, as its true and lawful attorney-in-fact for and in its name to acknowledge and deliver these presence as its act and deed.

|  |  |
|---|---|
| | GRANTOR: |
| | **THE TOMKAT LIMITED PARTNERSHIP** |
| | By TOMKAT, INC., Its General Partner |
| ATTEST: | |
| | |
| _____ | By_____ |
| | John J. Waters, Jr., President |

15

STATE OF MINNESOTA          )
                            ) ss
COUNTY OF HENNEPIN          )

      Before me, a notary public in and for the jurisdiction aforesaid, personally appeared this date, John J. Waters, Jr., personally well known (or satisfactorily proven) to me to be the President of TOMKAT, INC., a South Dakota corporation, the General Partner of THE TOMKAT LIMITED PARTNERSHIP, executed the foregoing and annexed instrument dated December _____, 2003, for and on behalf of THE TOMKAT LIMITED PARTNERSHIP, Grantor, and as attorney-in-fact and by virtue and authority vested in him by said deed, acknowledged the same to be the act and deed of the Grantor herein, THE TOMKAT LIMITED PARTNERSHIP, and he delivered the same for the uses and purposes therein contained.

Witness my hand and official seal this _____ day of December, 2003.


_____
Notary Public

My commission expires:

_____

Return to:

Landmark Title Corporation
730 24th Street, N.W.
Washington, D.C.  20037

16

**EXHIBIT A**
**To 1338 G Street**
**DEED**

**SPECIAL WARRANTY DEED**

**Legal Description of the Property located at 1338 G Street, District of Columbia:**

Lot numbered Fifty-five (55) in Harry Wardman and Thomas P. Bones'
(previously recorded deed incorrectly shows Thomas *F.* Bones)
Subdivision of lots in Square numbered Two Hundred and Fifty-three
(253) as per plat recorded in the Office of the Surveyor for the District
of Columbia in Liber 64 at folio 46.

17

**EXHIBIT E**
**To 1338 G Street Purchase Agreement**

**ASSIGNMENT OF INTANGIBLES**


**THIS ASSIGNMENT OF INTANGIBLES** is made effective as of December ____, 2003 by **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership ("Seller"), and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**, a non-profit corporation organized and existing under the laws of the District of Columbia ("Buyer").

**RECITALS:**

A.     Seller and Buyer have executed a Purchase Agreement dated as of December ____, 2003 (the "Purchase Agreement") relating to the sale of certain real property located at 1338 G Street, N.W., in the District of Columbia (the Real Property"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

B.     Pursuant to the Purchase Agreement, Seller has agreed to assign and transfer to Buyer all of Seller's right, title and interest (if any) in and to the Intangibles.

**NOW, THEREFORE**, in consideration of the purchase by Buyer of the Real Property, Seller hereby assigns and transfers to Buyer, without representation or warranty, all of Seller's right, title and interest (if any) in and to the Intangibles.

The parties have executed this Assignment as of the day and year first above written.


**SELLER:**

**THE TOMKAT LIMITED PARTNERSHIP, INC.**
By TOMKAT, INC., General Partner


By_____
    John J. Waters, Jr.
Its President

18

**EXHIBIT F**
**To 1338 G Street Purchase Agreement**

**UNDERGROUND STORAGE TANK**
**REAL ESTATE TRANSFER DISCLOSURE FORM**

**Exhibit 11**

# OWNER'S / SELLER'S AFFIDAVIT

STATE OF MINNESOTA    )
                                ) ss:
COUNTY OF HENNEPIN    )

THIS AFFIDAVIT, being made to induce purchase by Armenian Genocide Museum and Memorial, Inc., and Title Insurance by First American Title Insurance Co.

1.    The undersigned being first duly sworn on oath, depose(s) and say(s), that he is an officer of the Tomkat, Inc., the general partner of The Tomkat Limited Partnership ("Owner"), the Owner of property known and described as 1338 G Street, NW and 1342 G Street, NW, Washington, DC in the District of Columbia (the "Premises") and further described in First American Title Insurance Company's Commitments No. 3204-A and 3204-C;

2.    That, as an officer of Tomkat, Inc., the general partner of Owner, the undersigned has personal knowledge of the facts sworn to in this Affidavit and has the power and authority to execute this Affidavit on behalf of Owner.

3.    That, if the Owner is a Limited Partnership, said Partnership is in Good Standing in the District of Columbia and qualified to conduct business in the District of Columbia and that the Partnership is still in full force and effect with no changes to the original partnership agreement except by amendments already disclosed in writing to this Company.

4.    That all license, state franchise, and city and corporation taxes, if applicable, due and payable by Owner have been paid in full.

5.    That no proceedings in Bankruptcy or receivership have been instituted by or against Owner and the Owner has never made an assignment for the benefit of creditors.

6.    That there is no action or proceeding now pending in any state or federal court in the United States to which the Owner is a party and which affects the Premises; nor is there any state or federal court judgment, state or federal tax lien, or any other state or federal lien of any nature against Owner which may constitute a lien charge upon the Premises.

7.    That the Owner's possession of the Premises has been peaceable and undisturbed, and that title to the Premises has never been disputed or questioned.

8.    That there are no delinquent real estate taxes or unpaid current real estate taxes; nor any pending or levied assessments on the Premises, including but not limited to those for sidewalks, streets, sewers and water lines.

9.    That no time within 120 days of the date hereof has any work, services, or labor been done, or any fixtures, apparatus or material been furnished, in connection with, or to, the said Premises, except such material, fixtures, work, apparatus, labor or services as have been fully and completely paid for; that there is no claim or indebtedness to anyone for any labor,

fixtures, apparatus, material services or work done to, upon or in connection with, the said Premises; that there is no mechanics lien claim against said Premises, whether of record or otherwise.

10.     Except as set forth in the aforesaid Commitments, there are no recorded or unrecorded mortgages, improvement loans, chattel mortgages, conditional bills of sale, contracts of sale (except that in connection with which this affidavit is given), options to purchase, rights of first refusal, written leases, retention of title agreements, security agreements, agreements not to sell or encumber, financing statements or personal property leases which affect the Premises or which affect any fixtures, appliances or equipment now installed in or on the Premises.

11.     That all tenants or parties who have leasehold or tenancy rights to occupy any portion of the Premises are those listed on Exhibit A, attached hereto, and none of such parties has any right to the Premises other than its right as a tenant, nor any optional right of first refusal to purchase the Premises.

12.     That there are no pending suits or judgments whatsoever affecting the Premises including, without limitation, regarding the lines or corners of said Premises.

13.     That the Owner is not a foreign person, foreign trust or other foreign entity as these terms are defined in or contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended, and regulations promulgated pursuant thereto.

14.     That the federal taxpayer identification number of the Owner is 41-1861325.

15.     That the address of the principal place of business of the Owner is: 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

EXECUTED ON BEHALF OF: THE TOMKAT LIMITED PARTNERSHIP
By: TOMKAT, INC.
Its General Partner

By_____
    John J. Waters, President

Sworn to and subscribed before me this __15th__ day of December, 2003 by John J. Waters, President of THE TOMKAT LIMITED PARTNERSHIP.

_____
Notary Public

My Commission Expires:

_____

JOHN J. WATERS
Notary Public
Minnesota
My Commission Expires Jan 31 2005

2

**EXHIBIT A**

**Schedule of Leases**

NONE

**Exhibit 12**

G Street

## INSTALLMENT PURCHASE AND SALE AGREEMENT

THIS INSTALLMENT PURCHASE AND SALE AGREEMENT (the "Agreement") is made this 24th day of October, 2000 (the "Effective Date"), by and between **LAWRENCE SHERMAN** and **ANA SHERMAN, AS TRUSTEES OF THE ANA SHERMAN REVOCABLE TRUST** (under instrument dated _____ ) (together, "Seller") and TOMKAT, L.P., a South Dakota limited partnership and/or its assigns ("Purchaser").

### RECITALS

A.    Purchaser wishes to purchase and Seller wishes to sell, on an installment basis, certain real estate and other assets located in the District of Columbia.

B.    The parties wish to set forth the terms of the installment purchase and sale.

NOW, THEREFORE, in consideration of the premises, the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **INSTALLMENT PURCHASE AND SALE OF PROPERTY.**

Upon the terms and conditions set forth in this Agreement, Seller agrees to sell, and Purchaser agrees to purchase, the following:

A.    **Real Property.** That certain real property known among the land records of the District of Columbia as Lot 54 in Square 253, with the street address of 1340 G Street, N.W., as more fully described in **Exhibit A** attached hereto and made a part hereof, and any improvements situated on such parcel of real property and further, all of the right, title and interest of Seller in and to any easements, covenants and other rights appurtenant to such parcel of real property, and all right, title and interest of Seller in and to any land lying in the bed of any street, avenue, or alley, in front of, abutting or adjoining such parcel of real property (collectively, the "Real Property");

B.    **Personal Property.** All personal property situated on the Real Property, owned by Seller, and used in connection with the ownership, operation and management of the Real Property, including, but not limited to, all equipment and fixtures that Purchaser elects to purchase (collectively the "Personal Property"); and

C.    **Intangibles.** All intangible property now or on the Closing Date owned or held by Seller in connection with the Real Property or the Personal Property, to the extent transferrable, including, but not limited to, all of Seller's rights, if any, to (i) architectural plans, site plans, other plans, drawings, specifications, surveys, engineering, environmental and other consulting reports relating to the Real Property; (ii) all licenses, permits, authorizations, approvals, certificates or occupancy and other approvals necessary for the current use and operation of the Real Property (collectively the "Permits"); (iii) all contracts and leases in effect on the Closing date that Purchaser elects to assume; (collectively, the "Intangible Property") (the

Real Property, the Personal Property and the Intangible Property being hereinafter collectively referred to as the "Property").

### 2.    PURCHASE PRICE.

The total purchase price (the "Purchase Price") of the Property shall be Three Million Dollars ($3,000,000), payable as follows:

#### A.    Deposit.

(1) Within forty-eight (48) hours of the full execution of this Agreement, Purchaser shall deposit the sum of Fifty Thousand Dollars ($50,000) (the "Deposit") with Landmark Title Insurance Corporation (the "Escrow Agent"). The Escrow Agent shall hold the Deposit in escrow pursuant to the terms of this Agreement. The Deposit shall be placed in a federally-insured bank and held in an interest-bearing account. Any and all interest that accrues on the Deposit shall be deemed to be part of the Deposit. The Deposit shall be refundable to Purchaser until the expiration of the Study Period (as hereinafter defined in Section 3), and, during the period from the end of the Study Period to the date of Escrow Closing (defined below) the Deposit shall be refundable to the Purchaser in the event of Seller's default pursuant to Section 16.

B.    **Installment Payments.**  On the date of Escrow Closing (hereinafter defined), and after crediting Purchaser with the Deposit, Purchaser shall pay to Seller at 12413 Rivers Edge Drive, Potomac, Maryland 20854 the sum of One Hundred Fifty Thousand Dollars ($150,000). On the same date in each year thereafter, for a term of nine (9) years, Purchaser shall pay to Seller the sum of One Hundred Fifty Thousand Dollars ($150,000) per year, with a final installment of One Million Five Hundred Thousand Dollars ($1,500,000), representing the balance of the Purchase Price, due and payable on the same anniversary date in the tenth (10th) year after the Escrow Closing (all of the foregoing payments collectively, the "Installment Payments" and each an "Installment Payment"). The imputed rate of interest with respect to each Installment Payment due hereunder shall be the long-term Applicable Federal Rate (AFR) under Section 1274(d) of the Internal Revenue Code of 1986, as amended, and as published by the Internal Revenue Service for the month and year in which Escrow Closing (hereinafter defined) occurs. Each Installment Payment, including the final Installment Payment, shall be made by cashier's or certified check or federal wire transfer of current funds received and credited to the account of Seller. Promptly after receipt of each Installment Payment, Seller shall deliver to Purchaser and Escrow Agent a written receipt therefor.

C.    **Definition of Adjusted Purchase Price.**  Wherever used in this Agreement, the term "Adjusted Purchase Price" shall mean an amount equal to the sum of (i) the net present value of the final Installment Payment of One Million Five Hundred Thousand Dollars ($1,500,000) which is to be paid at Closing, plus (ii) the net present value of any remaining annual installment payments, if any, of One Hundred Fifty Thousand Dollars ($150,000) then due and payable as of the applicable measuring date, both of which sums shall be discounted at an annual interest rate equal to seven percent (7%).

3.    STUDY PERIOD.

A.    Inspection of Property.

(1)    Commencing on the Effective Date and continuing for a period of forty-five (45) days thereafter (the "Study Period"), Purchaser shall have the right to perform or have performed, at its sole option and expense, such reviews, studies and investigations of the Property as Purchaser deems desirable in order to determine the suitability of the Property for purchase. Purchaser shall use best efforts to minimize damage to the Property and disruption to the normal operation of the building thereon in conducting its studies and investigations pursuant to this Section. Purchaser shall indemnify and hold harmless Seller from and against all physical damage to the Property or injury to persons or property caused by Purchaser's or its agents' or its employees' or representatives' studies and investigations.    Notwithstanding anything to the contrary set forth in this Agreement, Purchaser's indemnity of Seller set forth in this Section 3A(1) shall survive Closing and any termination of this Agreement. Seller hereby grants to Purchaser, and its representatives, agents and employees, access to the Property at all reasonable times, during normal business hours, after reasonable advance notice to Seller and subject to the rights of tenants, to permit the proper performance of such studies and investigations.

(2)    During the Study Period, Purchaser shall cause a survey of the Real Property and an examination of title to the Real Property to be made, a copy of which shall be promptly delivered to Seller.    Purchaser shall notify Seller in writing of Purchaser's acceptance of the title as shown on such title report and survey or of all title defects disclosed on such title report and/or survey which adversely affect title to, or Purchaser's intended use of, the Real Property. If Purchaser disapproves of an item on the title report or survey, Seller shall have ten (10) days from receipt of Purchaser's notice to advise Purchaser in writing as to whether it is able to cure such exceptions. Notwithstanding the foregoing, Seller shall remove any monetary encumbrances or judgments prior to Escrow Closing. Any efforts by Seller to remove, remedy, comply with, or otherwise satisfy such defects or objections must be agreed to by Purchaser, and such agreed upon action shall thereafter be satisfied and completed prior to the date of the Escrow Closing. Should any such defects or objections exist and not be remedied by Seller as agreed upon by Seller and Purchaser, after the exercise of Seller's best efforts in accordance with this Section 3A(2), Purchaser shall have the right to elect either to (i) terminate this Agreement and receive back the Deposit, or (ii) waive the objections and proceed to Escrow Closing subject to the title objections which Seller has not been able to remove. In such case, Seller shall have no liability to Purchaser for any such defects or objections to title noted by Purchaser or for failure to cure or remove any such defects or objections prior to Escrow Closing and Purchaser's sole remedy with respect to any such defect or objection shall be the termination of this Agreement pursuant to this Section.

B.    **Delivery of Documents.**  Seller will immediately after the Effective Date deliver to Purchaser copies of the items listed in **Exhibit B** within Seller's possession and control or otherwise readily available to Seller.  Seller hereby covenants and agrees promptly to inform Purchaser in writing of any changes or information that materially affects the above items as and when received or known by Seller.  Seller will also deliver to Purchaser copies of any other documents Purchaser may request from time to time within Seller's possession and control or otherwise available to Seller.

C.    **Dissatisfaction During Study Period.** If Purchaser is dissatisfied, in its sole discretion, with the results of any of the studies or investigations conducted during the Study Period, Purchaser shall have the right, at its option, by 5:00 p.m. on the last day of the Study Period, to terminate this Agreement by giving written notice to Seller and Escrow Agent requesting delivery of the Deposit to Purchaser.   Upon termination of this Agreement in accordance with this Section 3C, the Deposit, together with any interest accrued thereon, shall be returned to Purchaser, minus a break-up fee to Seller of twenty percent (20%) of the Deposit.

4.    **ESCROW CLOSING.**

A.    **Time and Place.** If Purchaser has not elected to terminate this Agreement in accordance with Section 3C and provided that all conditions have been satisfied or waived and provided further that Seller has not failed to perform or breached any of its representations, warranties or covenants to be performed by Seller hereunder then an escrow closing shall occur within thirty (30) days after the end of the Study Period ("Escrow Closing"). Escrow Closing shall be held in the offices of the Escrow Agent at 10:00 a.m., unless otherwise agreed by Purchaser and Seller.

B.    **Seller's Obligations.** At Escrow Closing, Seller shall have delivered or shall deliver to Escrow Agent for the benefit of Purchaser, the following documents, fully executed and acknowledged where appropriate and such other items as follows:

(1)    Deed.   A special warranty deed (the "Deed"), in the form reasonably agreed upon by Purchaser and Seller, conveying title to the Property in accordance with Section 9, in fee simple, to Purchaser or any nominee or assignee of Purchaser as designated by Purchaser, subject only to the Permitted Exceptions.

(2)    Bill of Sale.  A bill of sale, in the form reasonably agreed upon by Purchaser and Seller, conveying title to the Personal Property free and clear of all liens and containing warranties of such title and right to convey.

(3)    Assignment.  A general assignment and assumption agreement (the "Assignment"), in the form reasonably agreed upon by Purchaser and Seller, covering the Intangible Property.

(4)    Contracts.  Copies of all contracts to be assigned to Purchaser, if any.

(5)    Books and Records.  Copies of all books and records necessary for the orderly transition of operation of the Property.

(6)    Seller's Certification.  A certificate by Seller stating that all of the representations and warranties made by Seller hereunder remain true, complete and correct as of the date upon which Escrow Closing occurs.

(7)     Keys.  All keys and security access keys or key cards in possession of Seller with respect to the Property.

(8)     Operating Statements.  Seller's operating statements pertaining to the Property and the ownership, operation and maintenance thereof.

(9)     Additional Documents.  Such additional documents as may be reasonably necessary to consummate the transactions contemplated hereby, including a settlement statement reflecting the transactions to be consummated as part of the Escrow Closing.

(10)    Tenant Estoppel Certificates.  A tenant estoppel certificate in a form acceptable to Purchaser with respect to each tenant at the Property as of the date of Escrow Closing.

C.      **Purchaser's Obligations.**  At Escrow Closing, Purchaser shall have delivered or shall deliver to Escrow Agent the following items or documents: (1) an amount, in immediately available funds, equal to the balance (i.e. less the Deposit) of the first Installment Payment of One Hundred Fifty Thousand Dollars ($150,000), (2) counterpart signature page to the Assignment, (3) an updated certificate of representations and warranties, and (4) such additional documents as may be reasonably necessary to consummate the transactions contemplated hereby.

D.      **Charges and Adjustments.**  As of the date of Escrow Closing, all real estate taxes, personal property taxes, assessments (general or special), utilities, rents, revenues and such other items customarily pro-rated in similar transactions in the Washington, D.C. metropolitan area shall be pro-rated between the parties.  If such taxes for the year in which Escrow Closing takes place are not then fixed, the taxes shall be adjusted on the basis of the taxes for the immediately preceding calendar year.  If there are meters on the Property measuring the consumption of water, gas or electric current, Seller shall, not more than three (3) days prior to Escrow Closing, cause such meters to be read and shall pay all utility bills for which Seller is liable promptly upon receipt of invoices therefor.  Each party shall pay its own attorneys', accountants' and consultants' fees.

E.      **Escrow Agent's Obligations.**  Upon receipt of the deliveries described in Section 4B and 4C above, Escrow Agent shall be responsible for preparing a settlement statement, for disbursing the amount of the first Installment Payment, as adjusted pursuant to Section 4D above,  and for simultaneously delivering to Purchaser all other items listed in Section 4B, with the exception of the Deed, Bill of Sale, Assignment and any title documents or affidavits necessary for recording the Deed at Closing, all of which the Escrow Agent shall hold in escrow in accordance with this Agreement pending Closing.

5.      **POSSESSION OF PROPERTY.**  Seller has informed Purchaser that the Property is currently leased to Seller's tenant(s), each of whom are identified in **Exhibit F** hereto (collectively, the "Tenants") pursuant to written lease(s) identified in **Exhibit F** (the "Leases"), the termination dates of each of which will occur as stated in **Exhibit F**  As of the date of Escrow Closing, Seller shall deliver full and complete possession of the Property to Purchaser,

subject to the Leases. Purchaser may take possession of the Property upon the date of the Escrow Closing and may continue in possession of the Property while this Agreement remains in effect.

6.   **PURCHASER'S COVENANTS PENDING CLOSING.**

A.   **Real Estate Taxes and Utilities.** From and after the date of the Escrow Closing, Purchaser shall pay, before penalty accrues, all real estate taxes, personal property taxes, assessments (general and special) utilities and water/sewer charges assessed against the Property which are due and payable after the date of the Escrow Closing and in all subsequent years while this Agreement is in effect. Seller shall, promptly upon receipt of any tax or utility bill or other special assessment relating to the Property, forward same to Purchaser for payment.

B.   **Property Insurance.** From and after the date of the Escrow Closing and continuing until immediately prior to the demolition of the existing building(s) located on the Property, Purchaser shall keep all buildings, improvements and fixtures now located on all or a part of the Property insured against loss by fire, extended coverage perils, vandalism, malicious mischief and, if applicable, steam boiler explosion for at least the amount of One Million Dollars ($1,000,000). The insurance policy shall contain a loss payable clause in favor of Seller which provides that Seller's right to recover under the insurance shall not be impaired by any acts or omissions of Purchaser or of Seller, and that Seller shall otherwise be afforded all rights and privileges customarily provided a mortgagee under a standard mortgage clause. Seller shall cooperate with Purchaser's efforts to obtain such insurance. In the event of damage to the Property by fire or other casualty, Purchaser shall promptly give notice of such damage to Seller and the insurance company. The payments paid on account of such damage shall be the property of Purchaser.

C.   **Demolition and Construction Escrow.** Prior to demolishing the existing building(s) located on the Property, Purchaser shall deliver to the Escrow Agent for the benefit of Seller an additional deposit (the "Construction Deposit") in the amount of the Adjusted Purchase Price). The foregoing Construction Deposit may be in cash or in the form of a clean irrevocable letter of credit, at Purchaser's option. Any letter of credit shall be from an issuer approved by Seller and in a form that may be drawn down by Escrow Agent on demand upon certification of Escrow Agent that Purchaser is in default under this Agreement, after notice and opportunity to cure in accordance with Section 16 hereof. At Closing, the Construction Deposit will be refunded to Purchaser, or, if in the form of a letter of credit, returned to Purchaser. The amount of the Construction Deposit (or letter of credit) may be adjusted each year by the amount of the Installment Payments paid by Purchaser.

D   **Indemnification and Builder's All-Risk Insurance.** Purchaser shall indemnify and hold Seller harmless against (1) all claims for personal injury or death arising out of the entry onto the Property by Purchaser or any agent, contractor, subcontractor or invitee of Purchaser, provided, however, that Purchaser shall have no liability or obligation to Seller for such injuries or death which are caused by the negligence or intentional wrongful acts or omissions of Seller, its agents, employees and representatives, and (2) any and all cost, expense or damage suffered by Seller as a result of damage to the Property (excluding the demolition and alteration of the Property pursuant to Section 7) arising out of the actions of Purchaser or any

agent, contractor, subcontractor or invitee of Purchaser should Purchaser fail to close on the purchase of the Property. As of the date immediately prior to the commencement of any demolition and construction work on the Property pursuant to Section 7, Purchaser shall deliver to Seller a certificate of insurance coverage evidencing that Purchaser has in full force and effect an all-risk casualty insurance policy for the full replacement value of the improvements to be located on the Property. Seller shall cooperate with Purchaser's efforts to obtain such insurance. All insurance proceeds shall be the property of Purchaser.

     E. **Mechanic's Liens.** Purchaser shall pay its bills when due for all of its contractors and materials suppliers performing services or delivering materials for Purchaser at the Property, and shall promptly cause any liens filed against the Property by said parties to be removed from the public record or bonded over to Seller's reasonable satisfaction. Any such liens not so removed by Purchaser prior to Closing shall remain the responsibility of Purchaser and title shall be conveyed subject to any such liens caused by Purchaser.

7.     **SELLER'S COVENANTS.**

     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**rmit.** Seller acknowledges that Purchaser desires to demolish▓▓▓▓▓▓▓▓▓▓▓▓▓▓ located on the Property and to redevelop the Property for use as a ▓▓▓▓▓▓▓▓▓▓▓▓▓commercial purposes. As a condition to Escrow Closing, Seller wil▓▓▓▓▓▓▓▓▓▓▓▓▓▓Purchaser's application for issuance of a demolition permit from the D.C. Government approving the demolition of the existing structure(s) located on the Property as agent of Seller.

     B    **Tenant Leases.**

     (1)    Seller represents and warrants to Purchaser as of the date hereof and as of the Escrow Closing that (i) the Tenants' Leases expire on the dates indentified in **Exhibit F**; (ii) Tenants have no option to renew such Lease(s); (iii) Seller is not in default under the Lease(s); and (iv) the Lease(s) do/does not include any right of first refusal with respect to the purchase of the Property.

     (2)    Seller, its successors, heirs and assigns, hereby indemnifies and holds harmless Purchaser, its partners, officers, directors, employees, agents, representatives, successors and assigns from and against any and all loss, claim, liability, cause of action, damages, expenses and costs arising from or relating in any manner to (i) Tenants' use and occupancy of the Property or any portion thereof; (ii) the termination of Tenants' lease(s); (iii) Seller's compliance with the provisions of such lease(s); (iv) the eviction or other removal of Tenant from the Property and/or the removal of Tenants' personal property; and (v) any lost profits, lost business opportunity or other business injury of Tenant. Notwithstanding anything else contained in the Agreement to the contrary, the aforesaid indemnification by Seller shall survive the Closing of this transaction and shall remain in full force and effect after the Closing date.

     C.    **Development Activities.** After the date of the Escrow Closing, Purchaser may pursue the following development activities with respect to the Property without Seller's prior approval: (i) the zoning or rezoning of all or any portion of the Property (including,

without limitation, the filing of an application for a special exception and/or a variance and/or a planned unit development), (ii) the subdivision of all or any portion of the Property into one (1) or more record lots; (iii) the closing of any public alley adjoining the Property; and (iv) the procurement of any governmental or quasi-governmental approval of any aspect of the development of the Property reasonably required by Purchaser (including, without limitation, large tract review approval, and conceptual and permit approval of any historic preservation agencies required in connection with the development of the Property). Purchaser may file an application for, and pursue the issuance of, one or more demolition permits and/or building permits in connection with Purchaser's proposed redevelopment of the Property, but Purchaser shall not be entitled to demolish or build in accordance with such permits until after the date of Escrow Closing and upon the posting of the Construction Deposit. Seller shall, for no additional consideration, sign off on any permit applications or other petitions within thirty (30) days of presentation by Purchaser and shall cooperate with Purchaser in connection with such matters as Purchaser reasonably may request from time to time; provided, however, such cooperation shall not expose Seller to any material liability. Purchaser shall indemnify, defend and hold Seller harmless from and against all losses, liabilities, claims, costs or expenses (including, without limitation, reasonable attorneys' fees) arising out of such development activities. Purchaser shall pay all costs and expenses of the matters described in this Section provided that Seller shall pay the fees and expenses of its legal counsel in the event that Seller's counsel reviews any such development activity.

    D. **Single Asset Trust.** As a condition to Escrow Closing, Seller will convey the Property, by special warranty deed, to a trust in a form reasonably acceptable to Purchaser, which trust instrument will incorporate the terms of this Agreement. Seller covenants and agrees that the Property will be the sole asset of this trust. Seller covenants and agrees that Purchaser shall be one of the trustees of the trust and that Purchaser shall continue to serve as trustee thereunder until Closing and may be removed as trustee only in the event of Purchaser's default under this Agreement, after notice and opportunity to cure under Section 16. Purchaser's prior consent will be necessary in order for any of the trustees to act and/or to revoke the trust.

### 8. CLOSING.

    A. **Time and Place.** Except as otherwise provided in this Agreement, the consummation of the transaction contemplated hereby and delivery of the Deed to Purchaser (the "Closing") shall take place on that date which is the tenth (10th) annual anniversary of the Escrow Closing date. The Escrow Agent shall be responsible at closing for preparing a settlement statement, causing the Deed to be recorded among the land records of the District of Columbia and all other escrowed documents to be delivered to Purchaser, disbursing all Closing proceeds and otherwise conducting Closing. Closing shall take place at the offices of the Escrow Agent at 10:00 a.m., unless otherwise agreed by Purchaser and Seller.

    B. **Seller's Obligations.** At Closing, Seller shall have delivered or shall deliver to Escrow Agent all of the items listed in Section 4B, together with an updated certificate by Seller that all of the representations and warranties made by Seller hereunder remain true, complete and correct as of the date upon which Closing occurs, together with any updated affidavits or other documents necessary or required by the Escrow Agent.

C.    **Purchaser's Obligation.**   At Closing, Purchaser shall deliver to the Escrow Agent the balance of the Purchase Price then due and other costs set forth herein and shall provide an updated certificate of representations and warranties made by Purchaser hereunder and such additional documents as may be reasonably necessary to consummate the transactions contemplated hereby.

D.    **Closing Charges and Adjustments.**   At Closing, Seller shall pay (1) the cost of releasing all liens, judgments and other encumbrances that are to be released and of recording such releases, and (2) the fees charged to Seller for services rendered by the Escrow Agent.  All other costs related to Closing, including the transfer and recordation taxes relating to the Deed, shall be paid by Purchaser  Each party shall pay its own attorneys', accountants' and consultants' fees.

**9.    TITLE.**   At Closing, Seller shall convey to Purchaser (or to such other person or entity as may be designated by Purchaser in accordance with Section 19F) fee simple title to the Real Property, marketable and good of record and in fact, and insurable as such in an amount equal to the Purchase Price by a reputable title insurance company, at regular rates, on a current ALTA Form B Owner's Policy, free and clear of any and all liens, defects, encumbrances, easements, covenants, restrictions or other matters whatsoever, whether recorded or unrecorded, except for the following: (i) the lien of real estate taxes, vault rents and water and sewer charges not yet due and payable; (ii) the Tenants' leases that Purchaser has elected to assume; and (iii) any Permitted Exceptions (as hereinafter defined). All exceptions shown on the title report and survey commissioned by Purchaser during the Study Period, and accepted in writing by Purchaser are hereinafter referred to as the "Permitted Exceptions".  At least two (2) weeks prior to Closing, Purchaser shall have the right to update title and any other earlier studies of the Property.  Seller shall be responsible, at its sole cost and expense, for removing any encumbrances on the Property that appear following the expiration of the Study Period, such encumbrances to be removed at or prior to Closing.

**10.    INDEMNIFICATION.**

A.    **Seller's Indemnification.**   Seller hereby agrees to indemnify Purchaser, to defend (at Seller's expense and with legal counsel acceptable to Purchaser), and to hold Purchaser harmless from, against and in respect of:

(1)    Any and all losses, costs, liabilities, expenses or damages (including, without limitation, reasonable attorneys' fees and expenses in connection with any suit, action, proceeding or Closing) resulting from any material misrepresentation or untrue statement or breach of representation, warranty, covenant or agreement by Seller made or contained in this Agreement or in any document executed and/or delivered by Seller under or in connection with this Agreement or the transaction contemplated herein or therein;

(2)    All liabilities, damages, claims and obligations of Purchaser arising out of the act or omission of Seller, its representatives, employees or agents, arising out of the possession, maintenance and/or operation of the Property prior to the Closing date; and

(3)    Any and all actions, suits, proceedings, claims, demands, judgments, costs and expenses (including reasonable attorneys' fees and costs of litigation) incident to the foregoing, but excluding tenant claims arising out of or relating to events, acts or omissions that occur after the Escrow Closing .

B.    **Purchaser's Indemnification.**  Purchaser hereby agrees to indemnify Seller, to defend (at Purchaser's expense and with legal counsel acceptable to Seller), and to hold Seller harmless, from, against and in respect of:

(1)    Any and all losses, costs, liabilities, expenses or damages (including, without limitation, reasonable attorneys' fees and expenses in connection with any suit, action, proceeding or Closing) resulting from any material misrepresentation or untrue statement or breach of representation, warranty, covenant or agreement by Purchaser made or contained in this Agreement or in any document executed and/or delivered by Purchaser under or in connection with this Agreement or the transaction contemplated herein or therein;

(2)    All liabilities, damages, claims and obligations arising out of the act or omission of Purchaser, its representatives, employees or agents, arising out of Purchaser's possession, management, operation, maintenance and repair of the Property after the Closing date; and

(3)    All liabilities, damages, claims and obligations arising out of the act or omission of Purchaser, its representatives, employees or agents, arising from their entry on the Property on or prior to the Closing date.

11.    **CONDITIONS TO CLOSING.**

A.    **Conditions of Purchaser's Obligations.**    In addition to all other conditions to Purchaser's obligations set forth in this Agreement, the obligation of Purchaser to purchase the Property is subject to the following conditions:

(1)    **Representations and Warranties.**    The representations and warranties of Seller contained in this Agreement shall be true and correct on, and as of, the Escrow Closing date and the Closing date, in all material respects as though such representations and warranties were made on, and as of, such date; and

(2)    **Title.** An examination of title to the Property made as of the time of Closing shall show that no new title exceptions, other than the Permitted Exceptions, have been filed or recorded, or otherwise affect the Property and Purchaser's title company shall be prepared to issue to Purchaser, immediately upon recordation of the Deed, an ALTA Form B Owners Policy with no exceptions other than the Permitted Exceptions; and

(3)    **Property Condition.** From the Effective Date until the Closing date, there shall not have occurred any material adverse change in the physical condition of the Property, or any part thereof, except (i) those changes caused by ordinary wear and tear or (ii) as caused directly or indirectly by any act or omission of Purchaser or its representatives, agents or employees; and

(4) **Compliance.** Seller shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to Closing; and

B. **Conditions of Seller's Obligations to Settle.** In addition to all other conditions to Seller's obligations set forth in this Agreement, the obligation of Seller to make Closing hereunder is subject to the following conditions:

(1) **Representations and Warranties.** The representations and warranties of Purchaser contained in this Agreement shall be true and correct on, and as of, the Closing date, in all material respects as though such representations and warranties were made on, and as of, such date; and

(2) **Compliance.** Purchaser shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to Closing.

12. **COVENANTS.**

A. Seller covenants and agrees with Purchaser that, without the prior written approval of Purchaser, Seller shall not (i) make or permit to be made any material changes or alterations to or upon the Property or any part thereof, (ii) enter into or extend any agreements affecting all or any part of the Property, (iii) modify any current agreements affecting all or any part of the Property, except as otherwise provided herein, (iv) permit any liens, mortgages, deeds of trust, easements, or other encumbrances to be placed against the Property or any part thereof or interest therein, except as otherwise provided herein, and to promptly remove any such encumbrance that may affect Purchaser's right of possession, (v) apply for or consent to any zoning, rezoning, demolition,, special exception, subdivision, or condemnation of the Property, or (vi) modify, alter or revoke any trust instrument affecting all or any part of the Property, or exercise any of Seller's rights or obligations as trustee thereunder, including the right to revoke the trust and/or convey or deal with the Property.

B. Seller covenants and agrees to maintain the Property in good repair and in a manner consistent in all respects with its use and to maintain the existing casualty and liability insurance relating to the Property through Closing.

13. **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller hereby represents and warrants to Purchaser as follows:

A. **Power and Authority.** Lawrence and Ana Sherman are husband and wife and comprise the sole trustees of Seller. Seller is the fee simple record title owner of the Property. Seller has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and all documents in connection herewith are not in contravention of or in conflict with any deed of trust, agreement, or undertaking to which Seller is a party or by which Seller or any of its property, including the Property, may be bound or affected. Except as otherwise provided herein, the execution and delivery of this Agreement and the performance by Seller of

its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of Seller, and all such actions have been duly taken by Seller.

        B.    **Litigation.** Except as set forth in **Exhibit C**, Seller is not aware of any controversy, investigation, complaint, protest, proceeding, suit, litigation or claim relating to the Property or Seller or any part thereof which might adversely affect either Seller's right or ability to sell all or any part of the Property free of the same, or which might adversely affect the Property.

        C.    **Compliance.** To the best of Seller's knowledge, the Property is in compliance with all applicable laws, orders, ordinances and regulations. Seller has not received notice of any violations from any governmental authority.

        D.    **Condemnation.** There is no pending, nor to the best of Seller's knowledge, threatened, condemnation or eminent domain proceeding affecting any portion of the Property.

        E.    **Permits.** Seller possesses all Permits. All of the Permits have been fully paid for and are in full force and effect. There is no pending or, to the best of Seller's knowledge, threatened, notice, order or proceeding with respect to the revocation, cancellation, suspension or nonrenewal of any such permit or license. Seller has not received notice from any governmental or quasi-governmental authority asserting the violation of the terms of any Permit, or threatening to revoke, cancel, suspend or not renew any Permit.

        F.    **Condition of Property.** The Property is in physical condition suitable for its current use and operation and Seller is aware of no latent defects in either the structural components or the electrical, plumbing, mechanical or security systems of the Property. As used herein, a "latent defect" is one that could not be discovered by reasonable and customary inspection.

        G.    **Mechanics' Liens.** All bills and claims for labor performed and materials furnished to or for the benefit of the Property during the period preceding the Closing date have been (or will at or prior to Closing) be paid in full, and there shall be no mechanics' or materialmen's liens (whether or not perfected) on or affecting the Property on the Closing date.

        H.    **Other Agreements.** **Exhibit D** represents a true and complete schedule of any and all leases, service or continuing contractual obligations affecting the Property (the "Contracts") and identifies which, if any, of the Contracts Purchaser desires to continue. Each of the Contracts is presently in full force and effect, and no party thereto is in default beyond any applicable cure period. The Property will be delivered free of any service or other continuing contractual obligations other than those contracts and agreements identified by Purchaser as contracts and agreements which Purchaser elects to assume at Closing, which contracts and agreements shall be validly assigned to Purchaser at Closing.

        I.    **No Knowledge of Government Action or Agreement.** Seller has not received any notice from any governmental or quasi-governmental authority that the Property (or

any part thereof) is in violation of any law, ordinance, rule, regulation or requirement, including, without limitation, those pertaining to zoning, building, health, safety or environmental matters.

J. **Taxes.** There are no penalties due with respect to real estate taxes, and all real estate taxes (excepting those for the current tax year which are not yet overdue, i.e., which are still payable without interest or penalty) have been paid in full.

K. **Environmental Matters.**

(1) For the purpose of this Section, the term "Hazardous Substances" shall mean substances defined as a "hazardous substance" or "toxic substance" in the Environmental Laws and any other substances considered hazardous, toxic or otherwise harmful pursuant to any other applicable laws or regulations relating to pollution or protection of human health or the environment. As used herein, "Environmental Laws" shall mean the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. 9601-9630, the Superfund Amendments and Reauthorization Act, 42 U.S.C. 9601-9630, the Resource Conservation and Recovery Act, 42 U.S.C. 6901-6992, the Clean Air Act, 42 U.S.C. 7401-7508, as any of the preceding may be amended from time to time.

(2) To the best of Seller's knowledge, there is no asbestos, radon, PCB's, or other Hazardous Substance on, in, under or about the Property, except for permitted uses in permitted quantities. There are not presently and, to the best of Seller's knowledge, there have never been any storage tanks on or under the Property. Seller and its agents and employees have not used, generated, stored, transported, manufactured, treated, released or disposed of any Hazardous Substances on, in, under, or about the Property, except for permitted uses in permitted quantities. Seller has no knowledge that the Property is in violation, or has been in violation, of any Environmental Laws. Seller has not received any notice or other communication, written or oral, from the United States Environmental Protection Agency or any other governmental authority, alleging that the Property is in violation of any Environmental Laws, and to the best of Seller's knowledge, the Property is not currently under investigation by any such agency.

L. **No Bankruptcy.** Seller (i) is not in receivership or dissolution, (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature, (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Seller or any of its general partner(s), if any, and (iv) to the best of its knowledge, none of the foregoing are pending or threatened.

M. **Foreign Investment in Real Property Tax Act.** Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and shall deliver to Purchaser at Closing an affidavit to this effect.

N. **Binding Commitments.** Seller has not made and will not make any commitments or representations to the applicable governmental or quasi-governmental authorities, any adjoining or surrounding property owner, any civic association, any utility, or any other person or entity that would in any manner be binding upon Purchaser or the Property.

To the best of Seller's knowledge, no such commitments or representations were made by any of Seller's predecessors.

O. **Historic Property Designation.** The Property is not now and is not presently contemplated or threatened to be designated as an historic property under applicable law.

The warranties set forth above will survive the conveyance of the Property for a period of two (2) years from date of Closing.

14. **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser hereby represents and warrants to Seller as follows:

A. **Organization.** Purchaser is a limited partnership validly existing under the laws of South Dakota.

B. **Power and Authority.** Purchaser has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Purchaser, enforceable in accordance with its terms.

C. **No Bankruptcy.** Purchaser (i) is not in receivership or dissolution, (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature, (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Purchaser, and (iv) to the best of Purchaser's knowledge, none of the foregoing are pending or threatened.

15. **RISK OF LOSS; CONDEMNATION.**

A. **Risk of Loss.** Until the Deed is recorded, Seller shall bear all risk of loss to the Property, provided that the same is not caused by any direct action or inaction of Purchaser.

B. **Condemnation.** In the event, at any time prior to the date upon which Closing occurs, any action or proceeding is filed under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, the Seller shall promptly give notice thereof to Purchaser. Purchaser shall have the right to terminate this Agreement by written notice to the Seller within thirty (30) days following the date upon which Purchaser receives notice of such action or proceeding from Seller and a description of the Property (or portion thereof) proposed to be taken thereunder. If the Purchaser does not elect to so terminate this Agreement within said thirty (30) day period, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be delivered or assigned to Purchaser.

### 16.   REMEDIES.

A.   In the event Seller fails to perform or breaches any of its representations or warranties or the covenants or obligations to be performed by Seller under this Agreement, provided Purchaser has provided Seller with notice and a thirty (30) day period after receipt of such notice to cure such breach and Seller fails to so cure, Purchaser's remedies, to be exercised in its sole discretion, shall be either to (i) enforce specific performance of Seller's obligation to deliver the Deed upon payment of the Adjusted Purchase Price, less any reasonable costs (including reasonable attorneys' fees) actually incurred by Purchaser in connection with any such action to enforce specific performance, or (ii) terminate this Agreement, in which event the Installment Payments made to date shall be forfeited, and pursue an action for damages.  If specific performance is an ineffective remedy, Purchaser may also pursue an action for damages.

B.   If Purchaser defaults in the performance of its obligations hereunder, provided Seller has provided Purchaser with notice and a thirty (30) day period after receipt of such notice to cure such breach and Purchaser fails to so cure, then Seller shall be entitled to receive, as full, final and total compensation, as its sole remedy (i) the Installment Payments paid by Purchaser as of the date of such breach, and in addition, (ii) Seller shall have the right, upon certification to the Escrow Agent that Purchaser is in default under this Agreement, after notice and opportunity to cure, to receive the Construction Deposit, if said default occurs after the demolition of the existing building(s) on the Property, as fixed, agreed, and liquidated damages and Seller shall not be entitled to assert or obtain any other relief from Purchaser.  Seller and Purchaser expressly agree that (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Installment Payments so paid plus, if applicable, the amount of the Construction Deposit, constitute a fair and reasonable amount to be received by Seller as agreed and liquidated damages for Purchaser's default under this Agreement, as well as a fair, reasonable and customary amount to be paid as liquidated damages to a seller in an arm's length transaction of the type contemplated by this Agreement upon any default by the purchaser thereunder.  Notwithstanding the foregoing, if the breach by its nature can not be cured within thirty (30) days, no default shall exist if Purchaser has commenced the cure within said period and thereafter diligently and continuously pursues such cure to completion.

### 17.   BROKERAGE.  Seller and Purchaser each represent and warrant to the other that, other than McGrath & Associates, which has acted as broker to Purchaser and will be compensated pursuant to separate agreement, no other broker, finder, or agent is entitled to any brokerage commission or fee arising out of this transaction, and each party hereto hereby agrees to indemnify the other against any claims resulting from a breach of the foregoing representation and warranty.  This representation and warranty shall survive Closing and delivery of the Deed to Purchaser.

### 18.   ESCROW AGENT.

A.   Escrow Agent joins in the execution of this Agreement only for the purpose of acknowledging and agreeing to the provisions of this Section 18 and Sections 2, 3, 4, 7 and 8 above.

B.     The duties of Escrow Agent shall be as follows:

(1)     From and after the delivery of the Deposit or the Construction Deposit, as the case may be, to Escrow Agent, Escrow Agent shall hold and deliver same in accordance with the terms and provisions of this Agreement.

(2)     (a)  If this Agreement is terminated by Purchaser pursuant to Section 3C, Escrow Agent shall promptly deliver the Deposit to Purchaser. If this Agreement is terminated by Purchaser pursuant to Section 16, Escrow Agent shall promptly deliver the Construction Deposit to Purchaser.

(b) If this Agreement shall be terminated by the mutual written agreement of Seller and Purchaser, or if Escrow Agent shall be unable to determine at any time to whom the Deposit, the Construction Deposit or any sums held in escrow pursuant to this Agreement should be delivered, or if a dispute shall develop between Seller and Purchaser concerning to whom the Deposit, the Construction Deposit or any escrowed sums should be delivered, then in any such event, Escrow Agent shall deliver the Deposit, the Construction Deposit and any other sums held in escrow in accordance with the joint written instructions of the Seller and Purchaser. In the event that such written instructions shall not be received by Escrow Agent within ten (10) days after Escrow Agent has served a written request for instructions upon Seller and Purchaser, Escrow Agent shall have the right to pay said sums into any court of competent jurisdiction and interplead Seller and Purchaser in respect thereof, and thereafter Escrow Agent shall be discharged of any obligations in connection with this Agreement.

(3)     If costs or expenses are incurred by Escrow Agent because of litigation or a dispute between Seller and Purchaser arising out of the holding of the Deposit, the Construction Deposit or any other sums in escrow, Seller and Purchaser shall each pay Escrow Agent one-half of such reasonable costs and expenses. Except for such costs and expenses, no fee or charge shall be due or payable to Escrow Agent for its services as escrow holder.

(4)     By joining herein, Escrow Agent undertakes only to perform the duties and obligations imposed upon it under the terms of this Agreement and expressly does not undertake to perform any of the other covenants, terms and provisions applicable to Seller and Purchaser hereunder.

(5)     Purchaser and Seller hereby agree and acknowledge that Escrow Agent assumes no liability in connection herewith except for negligence or willful misconduct; that Escrow Agent shall not be responsible for the validity, correctness or genuineness of any document or notice referred to under this Agreement; and that Escrow Agent may seek advice from its own counsel and shall be fully protected in any action taken by it in good faith in accordance with the opinion of its counsel.

### 19.   GENERAL PROVISIONS.

A.     **Notices.**  Any and all notices, requests or other communications hereunder shall be deemed to have been duly given if in writing and if transmitted by hand delivery with receipt therefor, or by registered or certified mail, return receipt requested, and first class postage

prepaid, or by Federal Express or other delivery service with guaranteed next-day delivery, with receipt therefor, as follows:

| If to Purchaser: | TomKat, L.P. |
| | 15 South Fifth Street, Suite 900 |
| | Minneapolis, MN 55402 |
| | Attention: John J. Waters, Jr. |
| | |
| with copy to: | Robins, Kaplan, Miller & Ciresi L.L.P. |
| | 1801 K Street, N.W., Suite 1200 |
| | Washington, D.C. 20006 |
| | Attention: Stacy E. Costello, Esq. |
| | |
| If to Seller: | 12413 Rivers Edge Drive |
| | Potomac, Maryland 20854 |
| | |
| with copy to: | Fisher & Hansen, P.C. |
| | 419 Seventh Street, N.W. |
| | Suite 201 |
| | Washington, D.C. 20004 |
| | Attention: Curt R. Hansen, Esquire |
| | |
| If to Escrow Agent: | Landmark Title Insurance Corporation |
| | 1707 N Street, N.W. |
| | Washington, D.C. 20036 |
| | Attention: Grant R. Berning |

B.   **Entire Agreement.**   This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings.

C.   **Modification.**  This Agreement may not be modified except by the written agreement of Seller and Purchaser.

D.   **Further Assurances.**   Each party agrees to execute such documents as shall be reasonably necessary to consummate the transactions provided for in this Agreement, and to vest title to the Property in Purchaser.

E.   **Governing Law.**  This Agreement shall be governed by and construed according to the laws of the District of Columbia.

F.   **Assignment By Purchaser.**  Prior to Closing, Purchaser may assign this Agreement, without Seller's consent, to an affiliate of Purchaser.

G.   **Binding Effect.**  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.

H.    **Survival.** Except as otherwise provided herein, the terms and provisions of this Agreement shall not survive the delivery of the deed and the transfer and conveyance of the Property to Purchaser, but shall be merged therein.

I.    **Severability.** If any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein.

J.    **Headings.** Any Section headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provision of this Agreement.

K.    **Business Days.** If any date upon which action is required under this Agreement shall be a Saturday, Sunday or federally recognized legal holiday in the District of Columbia, the date for such action shall be extended to the first business day after such date that is not a Saturday, Sunday or legal holiday.

L.    **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

M.    **Soil Characteristics Disclosure.** In accordance with the laws of the District of Columbia, Purchaser is hereby advised by Seller that the characteristic of the soil of the Real Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976, as the same may be amended from time to time, and as shown on the Soil Maps of the District of Columbia at the back of that publication, is "_____" For further information, Purchaser can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the United States Department of Agriculture.

N.    **UST Disclosure.** Concurrent with its execution of this Agreement, in accordance with the requirements of Section 3(g) of the District of Columbia Underground Storage Act of 1990, as amended, Seller has executed and delivered to Purchaser an Underground Storage Tank Real Estate Transfer Disclosure Form in the form attached to this Agreement as **Exhibit E**.

O.    **Non-Waiver.** No delay or failure by either party to exercise any right hereunder, and no partial or single exercise of any such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

P.    **Recordation of this Agreement.** Promptly after the Effective Date, Purchaser shall record this Agreement or a memorandum of same among the land records of the District of Columbia.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

WITNESS:                                    SELLER:

                                            THE ANA SHERMAN REVOCABLE TRUST

_____                 _____
                                            LAWRENCE SHERMAN, TRUSTEE

_____          BY: _____
                                            ANA SHERMAN, TRUSTEE

WITNESS/ATTEST:                             PURCHASER:

                                            TOMKAT, L.P.

                                            BY: TOMKAT, INC., ITS GENERAL PARTNER

_____          BY: _____
                                            JOHN J. WATERS, JR., PRESIDENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

WITNESS:

SELLER:
THE ANA SHERMAN REVOCABLE TRUST

BY:_____
   LAWRENCE SHERMAN, TRUSTEE

_____

BY:_____
   ANA SHERMAN, TRUSTEE

_____

WITNESS/ATTEST:

PURCHASER:

TOMKAT, L.P.
BY:  TOMKAT, INC., ITS GENERAL PARTNER

BY:_____
   JOHN J. WATERS, JR., PRESIDENT

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on this *22* day of *October*_____, 2000, before me, *Curt S. Hansen*_____, the undersigned officer, personally appeared LAWRENCE SHERMAN, who acknowledged himself to be the Trustee of THE ANA SHERMAN REVOCABLE TRUST, an unrecorded trust dated _____, which is the Seller named herein, and that he, as Trustee thereof, and being authorized so to do, executed the foregoing Installment Purchase and Sale Agreement for the purposes therein contained by signing the name of the trust by himself as Trustee.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

_____
Notary Public

My Commission expires: *9/14/05*_____

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on this *22* day of *October*_____, 2000, before me, *Curt S. Hansen*_____, the undersigned officer, personally appeared ANA SHERMAN, who acknowledged herself to be the Trustee of THE ANA SHERMAN REVOCABLE TRUST, an unrecorded trust dated _____, which is the Seller named herein, and that she, as Trustee thereof, and being authorized so to do, executed the foregoing Installment Purchase and Sale Agreement for the purposes therein contained by signing the name of the trust by herself as Trustee.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

_____
Notary Public

My Commission expires: *9/14/05*_____

COUNTY OF Hennepin )
STATE OF Minnesota )

    I HEREBY CERTIFY that on this 3 day of October , 2000, before me, Cynthia Jones , the undersigned officer, personally appeared JOHN J. WATERS, JR., who acknowledged himself to be the President of TomKat, Inc., the General Partner of TOMKAT, L.P., which is the Purchaser named herein, and that he, as President thereof, and being authorized so to do, executed the foregoing Installment Purchase and Sale Agreement for the purposes therein contained by signing the name of the limited partnership by himself as President of the General Partner.

    IN WITNESS WHEREOF I hereunto set my hand and official seal.



CYNTHIA MARIE JONES
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2005

Notary Public

My Commission expires: 1-31-2005

Word – 45612210.1

THE ESCROW AGENT JOINS IN THIS AGREEMENT FOR THE PURPOSE OF AGREEING TO PERFORM ITS OBLIGATIONS AS SET FORTH HEREIN.

LANDMARK TITLE INSURANCE CORPORATION

By: _Grant R. Berning_

NAME: _GRANT R. BERNING_

TITLE: _VICE PRESIDENT_

DISTRICT OF COLUMBIA, ss:

I HEREBY CERTIFY that on this 24 day of _Oct._, 2000, before me, _R. Vogelsohn_, the undersigned officer, personally appeared _Grant R Berning_, who acknowledged himself to be the _V.P._ of LANDMARK TITLE INSURANCE CORPORATION, which is the Escrow Agent named herein, and that he, being authorized so to do, executed the foregoing Installment Purchase and Sale Agreement for the purposes therein contained by signing the name of the said corporation by himself as _Vice President_

IN WITNESS WHEREOF I hereunto set my hand and official seal.

_____
Notary Public

My Commission expires: 3/31/02

# EXHIBIT A

## [PROPERTY DESCRIPTION]

## EXHIBIT B

### [CHECKLIST OF DOCUMENTS TO BE DELIVERED BY SELLER]

Leases

Plans and Specifications

Architectural Reports and Studies

Site Plans

Engineering Reports

Environmental Reports

Soil and Water Reports

Title Insurance policies

Surveys

Any Other Similar Studies and Reports prepared on Seller's behalf

The "Permits"

The "Contracts"

Utility and Water Bills for the last 3 months

    Real Estate Tax Bills and Assessments for the last 3 years with evidence of payment

**Exhibit 13**

## MEMORANDUM OF ASSIGNMENT

### With Regard To Transfer
### of
### 1340 G Street, Washington, D.C.

**THIS MEMORANDUM OF ASSIGNMENT** is made and entered into this 22nd day of December, 2003 by and between **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership ("TOMKAT") and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,** a nonprofit corporation organized and existing under the laws of the District of Columbia ("AGM&M").

### RECITALS

A.     TOMKAT entered into that certain Installment Purchase and Sale Agreement dated October 24, 2000, as amended (the "Contract"), a copy of which is attached hereto as **Exhibit B** pursuant to which TOMKAT has agreed to purchase from Ana Sherman and Lawrence Sherman, as trustees of the Ana Sherman Revocable Trust, certain improved real estate as hereinafter described, for a specified price, on the terms and conditions set forth in the Contract, which property is situated in the District of Columbia, having the address of 1340 G Street, N.W. (the "Property"), which Property is legally described as set forth on **Exhibit A.**

B.     A Memorandum of the Contract executed by Ana Sherman and Lawrence Sherman, individually, and as Trustees of the Ana Sherman Revocable Trust, is recorded among the Land Records of the District of Columbia as Instrument #2001026197.

C.     By Supplemental Deed dated March 19, 2001, bare legal title to the Property, was conveyed to the Trustees of the 1340 G Street Trust, an unrecorded revocable trust, which Trustees are:  Ana Sherman, Lawrence Sherman, and TOMKAT.  This Supplemental Deed is recorded among the Land Records of the District of Columbia as Instrument #2001026196.  Evidence of the ownership of the Property in 1340 G Street Trust is reflected in the Owner's Policy of Title Insurance, Policy No. Z600309 attached hereto as **Exhibit C.**

D.     By an unrecorded Assignment dated March 19, 2001, Ana Sherman and Lawrence Sherman, individually, and as Trustees of the Ana Sherman Revocable Trust assigned their rights in the Contract to 1340 G Street Trust, an unrecorded revocable trust.

E.     The Trustees of the 1340 G Street Trust have executed a Special Warranty Deed conveying title to the Property to TOMKAT (the "TOMKAT Deed"), which Special Warranty Deed is unrecorded and is held by Landmark Title Corporation ("Landmark"), in escrow, pending fulfillment of the Contract.

F.    TOMKAT entered into the Contract for the purpose of holding the Property for the benefit of an entity that was yet to be created to develop a museum and memorial commemorating the Armenian genocide ("the Museum").

G.    The entity has been formed to create the Museum, which entity has been named the Armenian Genocide Museum and Memorial, Inc., a Washington, D.C. nonprofit corporation herein referred to as "AGM&M".

H.    TOMKAT has agreed to assign its rights under the Contract to AGM&M under an arrangement by which AGM&M

(i)    assumes and agrees to pay the balance of the installments due under the Contract as summarized in the Contract; and

(ii)    transfers to TOMKAT:

(a)    funds advanced by TOMKAT for the initial down payment of One-Hundred Fifty thousand dollars ($150,000), and two additional annual payments of One-Hundred Fifty thousand dollars ($150,000) each, totaling Four-hundred Fifty thousand dollars ($450,000.00); and

(b)    funds advanced by TOMKAT for the acquisition and holding of the Property

(which funds advanced by TOMKAT are reflected on **Exhibit D** and are hereinafter referred to as "Acquisition and Holding Advances").

I.    It is the intent of the parties hereto, that the assignment of TOMKAT'S interest in the Contract be made in accordance with this Memorandum of Understanding.

**NOW, THEREFORE**, the Parties hereby set forth and confirm their understanding with respect to the assignment of TOMKAT's interest in the Contract to AGM&M, as follows:

1.    Assignment of Interest.   The Parties agree to enter an Assignment and Assumption Agreement as of the date hereof, as set forth in **Exhibit E** hereof.

2.    Special Warranty Deed.   TOMKAT represents to AGM&M that it has, as Trustee of the 1340 G Street Trust, executed a Special Warranty Deed to AGM&M, and will cause said Special Warranty Deed to be executed by Ana Sherman, the other surviving Trustee of the 1340 G Street Trust.  TOMKAT further represents and agrees to deliver said Special Warranty Deed to Landmark for the purpose of replacing the the TOMKAT Deed.  It is understood that, upon fulfillment of the Contract by AGM&M, the Special Warranty Deed executed pursuant to this paragraph 2 will be recorded, placing title to the Property in AGM&M.

2

3.    <u>Acquisition and Holding Advances</u>.  AGM&M agrees to transfer to TOMKAT the Acquisition and Holding Advances.

4.    <u>Representations</u>.  TOMKAT represents that the Acquisition and Holding Advances reflected on Exhibit D are true and correct, that there are no Tenants or parties who have any leasehold or tenancy rights to occupy the Property and the Property is unoccupied, and that title to the Property is as shown on Exhibit C.

DATED:  December __22__, 2003

THE TOMKAT LIMITED PARTNERSHIP
AMERICA, INC. by
TOMKAT, INC., it's General Partner

By_____
Its

DATED:  December __22__, 2003

ARMENIAN GENOCIDE MUSEUM
AND MEMORIAL, INC.

By_____
Its

3

EXHIBIT A

LEGAL DESCRIPTION

Legal description of the property with an address of 1340 G Street in the District of
Columbia as follows:

> Lot numbered fifty-four (54) in Harry Wardman and Thoms P. Bones'
> Subdivision of lots in Square Two-hundred Fifty-three (253) as per
> Plat recorded in the office of the Surveyor for the District of Columbia
> In Liber 64 at Folio 46.

**Exhibit 14**

OMB NO. 2502-0265

| A. | | B. TYPE OF LOAN: |
|---|---|---|

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

**SETTLEMENT STATEMENT**

1. ☐ FHA  2. ☐ FmHA  3. ☐ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS

6. FILE NUMBER: 2448
7. LOAN NUMBER:
8. MORTGAGE INS CASE NUMBER:

This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals

1.0  3/06  (2448.pfd/2448/44)

**D. NAME AND ADDRESS OF BORROWER:**
THE TOMKAT LIMITED PARTNERSHIP
15 South 5th Street, Suite 900
Minneapolis, MN 55402

**E. NAME AND ADDRESS OF SELLER:**
Mary C. Didden, Etal c/o Carry Properties
733 15th Street, N.W.
Washington, DC 20005

**F. NAME AND ADDRESS OF LENDER:**

**G. PROPERTY LOCATION:**
1342 G Street, NW
Washington, DC 20005
District of Columbia County, District of Colu
Lot 53, Square 253

**H. SETTLEMENT AGENT:** 52-2041581
Landmark Title Corporation

PLACE OF SETTLEMENT
1707 N Street. N.W  2nd Floor
Washington, DC 20036

**I. SETTLEMENT DATE:**
September 30, 2000

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 1,200,000.00 | 401. Contract Sales Price | 1,200,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 41,925.75 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes  09/30/00 to 10/01/00 | 32.39 | 406. City/Town Taxes  09/30/00 to 10/01/00 | 32.39 |
| 107. CPI Tax Adjustment  09/30/00 to 10/01/00 | 15.23 | 407. CPI Tax Adjustment  09/30/00 to 10/01/00 | 15.23 |
| 108. Bid Assessments  09/30/00 to 10/01/00 | 1.81 | 408. Bid Assessments  09/30/00 to 10/01/00 | 1.81 |
| 109. Public Vault Space 09/30/00 to 07/01/01 | 195.31 | 409. Public Vault Space 09/30/00 to 07/01/01 | 195.31 |
| 110. Bid Assesment | 328.70 | 410. Bid Assesment | 328.70 |
| 111. | | 411. | |
| 112. | | 412. | |
| **120  GROSS AMOUNT DUE FROM BORROWER** | 1,242,499.19 | **420  GROSS AMOUNT DUE TO SELLER** | 1,200,573.44 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | | 502. Settlement Charges to Seller (Line 1400) | 433,341.82 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first Mortgage | |
| | | 505. Payoff of second Mortgage | |
| | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes           to | | 510. City/Town Taxes           to | |
| 211. CPI Tax Adjustment        to | | 511. CPI Tax Adjustment        to | |
| 212. Bid Assessments           to | | 512. Bid Assessments           to | |
| 213. Rent Prorations 09/30/00 to 10/01/00 | 136.95 | 513. Rent Prorations 09/30/00 to 10/01/00 | 136.95 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. DC Unicorp Business Tax to Carry Properties/10% Ho | 118,015.10 |
| 218. | | 518. | |
| 219. | | 519. | |
| **220  TOTAL PAID BY/FOR BORROWER** | 136 95 | **520  TOTAL REDUCTION AMOUNT DUE SELLER** | 551,493.87 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 1,242,499.19 | 601. Gross Amount Due To Seller (Line 420) | 1,200,573.44 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 136.95) | 602. Less Reductions Due Seller (Line 520) | ( 551,493.87 ) |
| **303. CASH ( X FROM ) (  TO ) BORROWER** | 1,242,362.24 | **603. CASH ( X TO ) (  FROM ) SELLER** | 649,079.57 |

**ACKNOWLED[ ]ENT OF RECEIPT OF SETTLEN [ ]T STATEMENT**

| | |
|---|---|
| **Borrower:** | THE TOMKAT LIMITED PARTNERSHIP |
| **Seller:** | Mary C. Didden, Etal c/o Carry Properties |
| **Settlement Agent:** | Landmark Title Corporation |
| | 202/293-3140 |
| **Place of Settlement:** | 1707 N Street, N.W. 2nd Floor |
| | Washington, DC 20036 |
| **Settlement Date:** | September 30, 2000 |
| **Property Location:** | 1342 G Street, NW |
| | Washington, DC 20005 |
| | District of Columbia County, District of Colu |
| | Lot 53, Square 253 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

A SETTLEMENT STATEMENT ADDENDUM OF EVEN DATE IS ATTACHED HERETO.

A SETTLEMENT STATEMENT ADDENDUM OF EVEN DATE IS ATTACHED HERETO.

*Charles A. Carry Jr.*
by Charles A. Carry, Jr., in his capacities as attorney-in-fact for Marylinn B. Carry, Robert J. Carry, Shirley C. Carry, Jean C. Miller, Albert J. Didden, Adeline C. Donovan, Louise W. Becke, Herbert E. Becke, Jr., Joan Becke, Elizabeth R. Schroder, Irving L. Schroder, Marie C. Carothers, Marshall C. Carothers, Daniel M. Gillespie, Colleen A. Gillespie, Marsha J. Carry, Alan J. Carry, Barbara S. Carry and Beverly C. Marshburn

THE TOMKAT LIMITED PARTNERSHIP

BY:_____

*Charles A. Carry Jr.*
CHARLES A. CARRY, JR. Personal Rep. Of the Estate of Antoinette Carry

*Charles A. Carry Jr.*
CHARLES A. CARRY, JR

*Anne M Carry*
ANNE M. CARRY, Successor Personal Representative of Estate of Albert J. Carry

*Anne M Carry*
ANNE M. CARRY

_____
JOHN KESTER KNIGHTON, JR., Co-Trustee Under Declaration of Trust dated 7/2/91, amended 2/16/94, Devisee U/W of Marie W. Knighton

_____
JOHN R. HILL, Co-Trustee Under Declaration of Trust dated 7/21/91, amended 2/16/94, Devisee U/W of Marie W. Knighton

_____
GREGORY J. DIDDEN, Personal Representative of the Estate of Clement A. Didden

Page No. 2

_____
GEORGE A. DIDDEN, III, Co-Personal Representative
of the Estate of George A. Didden, Jr

_____
RICHARD A. DIDDEN, Co-Personal Representative of
the Estate of George A. Didden, Jr

_____
DONALD A. DIDDEN, Co-Personal Representative of
the Estate of George A. Didden, Jr

_____
GEORGE A. DIDDEN, III Successor Trustee Under Will
of Louise A. Becke

_____
GEORGE A. DIDDEN, III, Successor TRUSTEE under
Will Of Joseph C. Carry

_____
ALBERT J. DIDDEN, JR , Personal Rep. Of Estate of
Joseph R. Didden

_____
ROBERT L. TATE, Trustee under Will of Elizabeth A
Tate

_____
ROBERT L. TATE

**Exhibit 15**

## PURCHASE AGREEMENT

**THIS AGREEMENT** is made and entered into this _15th_ day of  December, 2003 by and between **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership ("Seller"), and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,** a non-profit corporation organized and existing under the laws of the District of Columbia ("Buyer").

### RECITALS

A.      Seller is the fee owner of certain real property located at 1342 G Street, N.W., District of Columbia, legally described as hereinafter set forth in **Exhibit A** ("the Land") with an office building located on the Land.

B.      Buyer desires to purchase the Land and improvements thereon and other intangibles incident thereto; Seller desires to sell said property pursuant to the terms of this Agreement.

**NOW THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller agrees to sell the Property herein described, and Buyer agrees to purchase such Property, upon the following conditions:

1.      **Sale of Property**.  The Property is to be conveyed and transferred to Buyer pursuant to this Agreement and the following shall be set forth in Sections 1.1 and 1.2:

1.1      **Real Property.** The real property situated at 1342 G Street, N.W., District of Columbia, as is more fully described on **Exhibit A** attached hereto and made a part hereof; any improvements situated thereon, all the right, title and interest of Seller, if any, in and to any easements, covenants and other rights appurtenant to such parcel of real property, and all right, title and interest of Seller, if any, in and to any land lying in the bed of any street, avenue, or alley, in front of, abutting or adjoining such parcel of real property (collectively, the "Property").

1.2      **Intangibles.**  All of the Seller's right, title and interest, if any, to (i) architectural plans, site plans, other plans, drawings, specifications, surveys, engineering, environmental and other consulting reports relating to the Real Property and that are in Seller's possession, (ii) all licenses, permits, authorizations, approvals, certificates of occupancy and other approvals issued to Seller or the Real Property with respect to the use and operation of the Real Property that are in effect on the Date of Closing, and (iii) all warranties and guarantees, if any, given to, assigned to or benefiting Seller or the Real Property relating to the design, construction, use, operation or maintenance of the Real Property to the extent that the same are assignable (collectively, the "Intangibles") (the Real Property and the Intangibles being hereinafter collectively referred to as "the Property").

1

2.    **Consideration**.  The consideration for the purchase of the Property shall be as follows:

 **2.1** The purchase price for the Property to be paid to the Seller by the Buyer shall be One-million, Three-hundred-forty-thousand dollars ($1,340,000.00) ("Purchase Price").

 **2.2** In addition to the Purchase Price, Buyer shall pay on the Date of Closing all transaction expenses reflected on the Settlement Statement, including, but not limited to, closing fee, title examination, title insurance, recording fees, transfer and recordation taxes, as well as Seller's legal fees relative to the sale of the Property ("Transaction Expenses").

3.    **Payment of the Purchase Price**.  The Purchase Price shall be paid in full by the Buyer on the Date of Closing, as hereinafter defined.

 **3.1** **Escrow and Escrowed Closing**.

  **3.1.1** **Escrow**.  The closing of the transactions provided for in this Agreement on the Date of Closing shall be consummated through an Escrow Agent. Escrow Agent is authorized to close and consummate the Closing only if and when:  (i) Escrow Agent has received all items to be delivered by Seller and Buyer pursuant to Section 7,  (ii) Escrow Agent is prepared to immediately disburse the proceeds of the Purchase Price due to Seller by federal wire transfer of immediately available funds in accordance with separate disbursement instructions from Seller, and (iii) the Escrow Agent has committed to issue the Title Policy to Buyer promptly after the Closing but effective as of the Closing.

  **3.1.2** **Escrow Agent's Closing Deliveries and Disbursements.**  Upon consummation of the Closing, Escrow Agent shall:

   (a) **Deliveries to Buyer**.  Deliver to the Buyer (or to such other person designated by written notice to the Escrow Agent from Buyer or Buyer's legal counsel): (i) the Deed by causing the Deed to be recorded among the land records of the District of Columbia and immediately upon recording the Deed, delivering to Buyer and to Seller a copy of the executed Deed as recorded; and (ii) two (2) originals of the Assignment of Intangibles executed by Seller.

   (b) **Deliveries to Seller**.  Deliver to the Seller (or to such other person designated by written notice to the Escrow Agent from Seller or Seller's legal counsel): (i) the Purchase Price, together with the costs payable by Buyer pursuant to Section 7 of this Agreement, as shown on the Closing Statement executed by Seller and Buyer.

2

(c)     <u>Title Policy</u>.  Deliver the Title Policy issued by Title Company to Buyer or to such other person designated by written notice to the Escrow Agent from Buyer or Buyer's counsel.

**3.1.3  Real Estate Reporting Person**.  The Escrow Agent is designated the "real estate reporting person" for purposes of Section 6045 of Title 26 of the United States Code and Treasury Regulation 1.6045-4 and the Closing Statement shall so provide.  Upon the consummation of the transaction contemplated by this Agreement, the Escrow Agent shall file a Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation.

4.     **Effective Date and Closing; Leases and Contracts.**

**4.1     Effective Date.**  The effective date of this Agreement shall be on the date set forth in the heading hereof ("Effective Date").

**4.2     The Closing.**  The Closing of the transactions contemplated by this Agreement ("Closing") shall take place on December 16, 2003 or such date as may be mutually agreed upon by the parties.

**4.3     Leases.**  The Property is free and clear of any and all leases.

**4.4     Contracts**. To the extent that Seller is a party to any contracts for the provision of services or supplies to the Property, such contracts shall not be assigned and transferred by Seller to Buyer at Closing, and Buyer shall not assume any obligations of Seller under the Contracts.

5.     **Real Estate Taxes and Special Assessments**.

**5.1     Current Year's Taxes**.  If not already paid by the Seller and reflected on **Exhibit B**, all real estate taxes for the fiscal year ended September 30, 2003 and all Downtown Business Improvement District taxes for the fiscal year ending September 30, 2003, if not already paid by the Seller and reflected on **Exhibit B**, shall be paid or assumed by the Buyer.  All real estate taxes for the fiscal year ending September 30, 2004 and all Downtown Business Improvement District taxes for the fiscal year ending September 30, 2004 shall be assumed by the Buyer.

**5.2     Assessments**.  All real estate assessments (general or special) for improvements or services already made to or which benefit the Real Property and all such real estate assessments pending or levied prior to the Date of Closing shall be assumed by the Buyer.

6.    <u>**Title Commitment**</u>.  Attached hereto as **Exhibit C** is a title commitment (No. 3204 C) (the "Title Commitment") issued by the Title Company to Buyer for the issuance of a title insurance policy ("Title Policy") in the amount of the Purchase Price and insuring Buyer's ownership of the Real Property.

7.    <u>**Conveyances and Closing Documents**</u>.  The parties hereby agree to execute and deliver to the Escrow Agent, on or before the Date of Closing, the Closing Documents described in this Section 7, as to the Seller, all documents shall be executed and delivered by its General Partner, as follows:

7.1    <u>**Deed**</u>.  Seller shall execute, acknowledge and deliver to the Escrow Agent a Special Warranty Deed conveying its interest in the Property in the form attached hereto as **Exhibit D**.

7.3    <u>**Assignment of Intangibles.**</u>  Seller shall execute and deliver to the Escrow Agent two originals of an Assignment of Intangibles in the form attached hereto as **Exhibit E** (the "Assignment of Intangibles") assigning to Buyer Seller's interest, if any, in the Intangibles.

7.4    <u>**FIRPTA Affidavit.**</u>  Seller shall execute and deliver to the Escrow Agent and to Buyer an affidavit certifying that Seller is not a "foreign person" pursuant to the United States Internal Revenue Code of 1986, as amended.

7.5    <u>**Corporation Resolution.**</u>  Seller shall execute and deliver to the Escrow Agent and to Buyer a certificate of an Officer of Seller certifying to the adoption of a Resolution by the Board of Directors authorizing the transactions hereunder.

7.6    <u>**Deed Recordation Tax and Transfer Tax Return**</u>.  Seller and Buyer shall each execute, acknowledge and deliver to the Escrow Agent an original or counterpart original copies of the Combined Real Property Recordation Tax and Real Property Transfer Tax Return (FP-7C).  Seller shall pay none of the recordation and transfer taxes with respect to the Deed, and Buyer shall pay all of the recordation and transfer taxes with respect to the Deed.

7.7    <u>**Buyer's Payment Obligations.**</u>  Buyer shall deliver to the Escrow Agent, in immediately available Washington, D.C. funds, an amount equal to the sum of (a) the Purchase Price; and (b) the Transaction Expenses.

7.8    <u>**Closing Adjustments.**</u>  Any Closing Adjustments shall be reflected on the Settlement Statement.

7.9    <u>**Possession of the Property.**</u>  Possession of the Property shall be surrendered by the Seller to the Buyer on the Date of Closing.

4

8.    **"As Is" Sale.**    Buyer acknowledges and agrees that it is purchasing the Property in an "As Is" physical condition, that there may be defects in the condition of the Property.

9.    **Seller's Representations**.  Seller represents to Buyer, to the best of Seller's knowledge, as follows:

   **9.1    Tenant Leases**.  Seller represents to Buyer that there are no leases affecting the Property.

   **9.2    Condemnation**.  Seller has not received written notice from any governmental agency, nor is Seller aware of, any pending or contemplated annexation or condemnation proceedings, or purchase in lieu of the same, affecting or which may affect all or any part of the Property.

   **9.3    Title**.  Buyer shall take title pursuant to the Title Commitment, **Exhibit C** attached hereto.

   **9.4    Environmental Laws.**  Seller has provided to Buyer any and all documents in its possession relating to the environmental condition of the Property. Other than such documents, Seller makes no representations as to any environmental hazards affecting the Property.

   **9.5    Power and Authority.**  Seller represents that Seller has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Seller, enforceable and in accordance with its terms.  The execution, delivery and performance of this Agreement and all documents in connection herewith are not in contravention of or in conflict with any deed of trust, agreement, or undertaking to which Seller is a party or by which Seller or any of its property, including the Property, may be bound or affected. The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of Seller, and all such actions have been duly taken by Seller.

   **9.6    Litigation.**  Seller is not a party to, and does not have any actual knowledge of, any proceeding, suit, litigation or claim, either governmental or otherwise, relating to Seller or to the Property or any part thereof which might adversely affect the Property.

   **9.7    Mechanics' Liens.**  All bills and claims for labor performed and materials furnished to or for the benefit of the Property during the period preceding the Date of Closing have been paid, or will be paid, at or prior to Closing in full by Seller.

**9.8**   **No Bankruptcy.**  Seller (i) is not in receivership or dissolution; (ii) has not made any assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature; (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Seller or any of its general partner(s), if any; and (iv) to the best of its knowledge, none of the foregoing are pending or threatened.

**9.9**   **Foreign Investment in Real Property Tax Act.**  Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and shall deliver to Buyer at Closing an affidavit to this effect.

**9.10**   **Binding Commitments.**  Seller has not made and will not make any commitments or representations to the applicable governmental or quasi-governmental authorities, any adjoining or surrounding property owner, any civic association, any utility company or any other person or entity that would in any manner be binding upon Buyer or the Property.

**9.11**   **Property Management Agreements**.   No property management agreement has been executed by Seller that would be binding upon the Buyer or the Property after the Date of Closing.

**9.12**   **Seller's Acquisition Expenses.**  The purchase price and holding expenses expended by the Seller prior to negotiating this Purchase Agreement are set forth on **Exhibit B** attached hereto ("Acquisition Expenses").  Seller represents that the Acquisition Expenses shown on **Exhibit B** are true and correct.  In addition, Buyer shall pay all of Seller's Transaction Expenses at Closing.

**10.**   **Buyer's Representations.**  Buyer hereby represents to Seller as follows:

**10.1**   **Power and Authority.**  Buyer has full legal power and authority to enter into and perform this Agreement in accordance with its terms, and this Agreement constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and all documents in connection herewith are not in contravention of or in conflict with any deed of trust, agreement, or undertaking to which Buyer is a party or by which Buyer or any of its property may be bound or affected.  The execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder require no further action or approval in order to constitute this Agreement as a binding and enforceable obligation of Buyer, and all such actions have been duly taken by Buyer.

6

**10.2  No Bankruptcy.**  Buyer (i) is not in receivership or dissolution; (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature; (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any jurisdiction and no such petition has been filed against Buyer; and (iv) to the best of Buyer's knowledge, none of the foregoing are pending or threatened.

**11.  Conditions to Closing for Buyer.**  The obligation of Buyer to purchase the Property is subject to the following conditions:

**11.1  Representations.**  The representations of Seller contained in this Agreement shall be true and correct on, and as of, the Date of Closing, in all material respects as though such representations were made on, and as of, such date; and

**11.2  Title.**  Subject to the payment by Buyer of the title insurance premium for the Title Policy, the Title Company shall be unconditionally obligated to issue the Title Policy to Buyer immediately upon recordation of the Deed.

**11.3  Compliance.**  Seller shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

**12.  Conditions to Closing for Seller.**  The obligation of the Seller to close hereunder is subject to the following conditions:

**12.1  Representations.**  The representations of Buyer contained in this Agreement shall be true and correct on, and as of, the Date of Closing, in all material respects as though such representations were made on, and as of, such date; and

**12.2  Compliance.**  Buyer shall have performed and complied with all agreements, deliveries and conditions required by this Agreement to be performed or complied with by it on or prior to Closing, including payment of the Purchase Price.

**13.  Performance.**  Both parties agree to perform in accordance with the terms and conditions of this Agreement.

**14.  Risk of Loss**.  Between the date of this Agreement and the Date of Closing, the risk of ownership and loss of the Property shall belong solely to Seller.

**15.  Brokers**.  Each Party represents and warrants that there are no brokers, finder or similar agent claiming to have been employed by either Party in connection with the transaction.

7

**16.** **UST Disclosure.** Concurrent with its execution of this Agreement, in accordance with the requirements of Section 3(g) of the District of Columbia Underground Storage Act of 1990, as amended, Seller has executed and delivered to Buyer an Underground Storage Tank Real Estate Transfer Disclosure Form in the form attached to this Agreement as **Exhibit F.**

**17.** **General Provisions.**

**17.1** **Notices**.

If to Buyer:

> John J. Waters, Jr., Secretary/Treasurer
> Armenian Genocide Museum and Memorial, Inc.
> 15 South Fifth Street, Suite 900
> Minneapolis, MN 55402
> Tel: (612) 359-8991
> Fax: (612) 359-8994

> with a copy to:

> John J. Waters, Esq.
> 1301 E. 79th Street, Suite 108
> Bloomington, MN 55425
> Tel: (952) 883-0882
> Fax: (952) 858-8238

If to Seller:

> THE TOMKAT LIMITED PARTNERSHIP
> 15 South Fifth Street, Suite 900
> Minneapolis, MN 55402
> ATTN: John J. Waters, Jr.
> Tel. 612-359-8988
> Fax. 612-359-8994

> with a copy to:

> John J. Waters, Esq.
> 1301 East 79th Street, Suite 108
> Bloomington, MN. 55425
> Tel. (952) 883-0882
> Fax. (952) 858-8238

**17.2    Entire Agreement.**  This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings.

**17.3    Governing Law.**  This Agreement shall be governed by and construed according to the laws of the District of Columbia.

**17.4    Assignment by Buyer.**  Buyer may not assign this Agreement.

**17.5    Severability.**  If any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement.

**17.6    Headings.**  Any Section headings or captions contained in this Agreement shall be for convenience of reference only and shall not affect the construction or interpretation of any provision of this Agreement.

**17.7    Business Days.**  If any date upon which action is required under this Agreement shall be a Saturday, Sunday or federally recognized legal holiday in the District of Columbia, the date for such action shall be extended to the first business day after such date that is not a Saturday, Sunday or legal holiday.

**17.8    Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

**17.9    Soil Characteristics Disclosure.**  Pursuant to the District of Columbia Code, Section 45-508(b)(1981), Seller hereby states that the soil of the Property is classified as "Urban Land" by the Soil Survey of the District of Columbia; the term is defined at Page 50 of that publication as:

> "This mapping unit consists of areas where more than 80% of the surface is covered by asphalt, buildings, or other impervious surfaces....

> "Included in mapping are large areas that are mostly miscellaneous artificial fill. In many areas, several feet of this fill have been placed over streams, swamps, floodplains and tidal marshes.  These areas are now almost totally covered with roads, buildings, or other structures.  Also included are a few strongly sloping and steep areas.

> "Examination and identification of soil or soil like materials in this unit are impractical.  Careful on-site investigation is needed to determine the potential and limitations for any proposed use."

For further information Buyer may contact a soil testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture. Buyer hereby acknowledges that the foregoing fully satisfies the requirements of the aforesaid Section 45-508(b) of the District of Columbia Code, that the provisions of this Section 20.9 have been included solely to comply with the provisions of Section 45-508(b) of the District of Columbia Code and that, Seller makes no representation or warranty concerning the soil characteristics of the Property or the accuracy of the provisions of this Section 20.9.

**17.10  Successors and Assigns**. The terms, conditions and covenants hereof shall extend to, be binding upon and inure to the benefit of the successors and assigns of the parties to this Agreement.

**17.12  Modifications.** This Agreement may not be modified except by the written agreement of Seller and Buyer.

The parties have executed this Purchase Agreement as of the day and year first above written.

SELLER:                                      BUYER:

**THE TOMKAT LIMITED PARTNERSHIP**      **ARMENIAN GENOCIDE MUSEUM**
By:  TOMKAT, INC., General Partner      **AND MEMORIAL, INC.**

By_____             By_____
   John J. Waters, Jr., President          Its   John J. Waters Jr.
                                                     Sec't y Treas

10

## LIST OF EXHIBITS

**Exhibit A**    Legal Description

**Exhibit B**    Acquisition Expenses

**Exhibit C**    Title Commitment

**Exhibit D**    Deed

**Exhibit E**    Assignment of Intangibles

**Exhibit F**    Underground Storage Tank Real Estate Transfer Disclosure Form

11

**EXHIBIT A**
**To 1342 G Street Purchase Agreement**

**Legal Description of the Property located at 1342 G Street, District of Columbia:**

Lot numbered Fifty-three (53) in Harry Wardman and Thomas P. Bones'
Subdivision of lots in Square numbered Two Hundred and Fifty-three
(253) as per plat recorded in the Office of the Surveyor for the District of
Columbia in Liber 64 at folio 46.

**EXHIBIT B**
**To 1342 G Street Purchase Agreement**

**ACQUISITION EXPENSES**

| | | |
|---|---|---:|
| Purchase Price: | | 1,200,000.00 |
| | Purchase Cost of Building | **1,200,000.00** |
| Closing Costs Capitalized | | |
| | Settlement Charges: | |
| | Total Settlement Charges | 41,925.75 |
| | | |
| | Other Costs: | |
| | McGrath & Co:  Inspection Fees other | 400.00 |
| | Legal Bills: | 21,607.33 |
| | | |
| Net Property Value | | **1,263,933.08** |
| | | |
| Subsequent Period Costs: | | |
| | | |
| Evictions Legal Costs | | **17,569.59** |
| Taxes | | **40,439.87** |
| Insurances | | **13,815.67** |
| | | |
| | **Recovery Amount Required** | **1,335,758.21** |
| | | |
| | **Proposed Sale Price** | **1,340,000.00** |

13

**EXHIBIT C**
**To 1342 G Street Purchase Agreement**

**TITLE COMMITMENT**

14

**EXHIBIT D**
**To 1342 G Street Purchase Agreement**
**DEED**

**SPECIAL WARRANTY DEED**

This Special Warranty Deed, dated this _____ day of December, 2003, is made by and between **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership, having a business address of 15 South Fifth Street, Suite 900, Minneapolis, MN 55402, *Grantor,* and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,** a non-profit corporation organized and existing under the laws of the District of Columbia, *Grantee.*

**WITNESSETH,** that for and in consideration of the sum of Ten Dollars ($10.00), receipt and sufficiency whereof is hereby acknowledged, the said Grantor does grant and convey unto the said Grantee, in fee simple, as sole owner, title to the property with the improvements, easements and appurtenances thereunto belonging, situate, lying and being in the District of Columbia and described as follows, to wit:

SEE ATTACHED EXHIBIT A

**TOGETHER WITH** all right, title and interest of the Grantor, if any, in any land lying in the bed of any street, road, avenue or alley, open or closed, in front of or adjoining the land described on the attached Exhibit A, to the center line thereof; all easements and other rights appurtenant to the land and together with all and singular the ways, easements, rights, privileges and appurtenances to the same belonging or in anywise appertaining, and all the estate, right, title, interest, and claim either at law or in equity, or otherwise however, of the said Grantor, of, in, or out of the said land and premises described on **Exhibit A.**

**TO HAVE** and to hold all of the aforesaid property unto the use and benefit of the Grantee, his successors and assigns in fee simple forever.

**AND** the said Grantor covenants that it will warrant specially the property hereby conveyed; and that it will execute such further assurances of said land as may be requisite.

**IN WITNESS WHEREOF, THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership, has caused this Special Warranty Deed to be executed in its limited partnership name by John J. Waters, Jr., as President of **TOMKAT, INC.,** the General Partner of said limited partnership, attested to by its proper Officers, duly authorized and does hereby constitute and appoint John J. Waters, Jr., President of **TOMKAT, INC.,** General Partner, as its true and lawful attorney-in-fact for and in its name to acknowledge and deliver these presence as its act and deed.

GRANTOR:
**THE TOMKAT LIMITED PARTNERSHIP**
ATTEST:                    By TOMKAT, INC., Its General Partner

_____        By_____
                               John J. Waters, Jr., President

15

STATE OF MINNESOTA    )
                         ) ss
COUNTY OF HENNEPIN    )

      Before me, a notary public in and for the jurisdiction aforesaid, personally appeared this date, John J. Waters, Jr., personally well known (or satisfactorily proven) to me to be the President of TOMKAT, INC., a South Dakota corporation, the General Partner of THE TOMKAT LIMITED PARTNERSHIP, executed the foregoing and annexed instrument dated December _____, 2003, for and on behalf of THE TOMKAT LIMITED PARTNERSHIP, Grantor, and as attorney-in-fact and by virtue and authority vested in him by said deed, acknowledged the same to be the act and deed of the Grantor herein, THE TOMKAT LIMITED PARTNERSHIP, and he delivered the same for the uses and purposes therein contained.

Witness my hand and official seal this _____ day of December, 2003.

_____
Notary Public

My commission expires:

_____

Return to:

Landmark Title Corporation
730 24th Street, N.W.
Washington, D.C.  20037

16

**EXHIBIT A**
**To 1342 G Street**
**SPECIAL WARRANTY DEED**

Legal Description of the Property located at 1342 G Street, District of Columbia:

Lot numbered Fifty-three (53) in Harry Wardman and Thomas P. Bones'
Subdivision of lots in Square numbered Two Hundred and Fifty-three
(253) as per plat recorded in the Office of the Surveyor for the District of
Columbia in Liber 64 at folio 46.

17

EXHIBIT E
To 1342 G Street Purchase Agreement

ASSIGNMENT OF INTANGIBLES

**THIS ASSIGNMENT OF INTANGIBLES** is made effective as of December ___, 2003 by **THE TOMKAT LIMITED PARTNERSHIP,** a South Dakota limited partnership ("Seller"), and **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**, a non-profit corporation organized and existing under the laws of the District of Columbia ("Buyer").

RECITALS:

A.    Seller and Buyer have executed a Purchase Agreement dated as of December ___, 2003 (the "Purchase Agreement") relating to the sale of certain real property located at 1342 G Street, N.W., in the District of Columbia (the Real Property"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

B.    Pursuant to the Purchase Agreement, Seller has agreed to assign and transfer to Buyer all of Seller's right, title and interest (if any) in and to the Intangibles.

**NOW, THEREFORE,** in consideration of the purchase by Buyer of the Real Property, Seller hereby assigns and transfers to Buyer, without representation or warranty, all of Seller's right, title and interest (if any) in and to the Intangibles.

The parties have executed this Assignment as of the day and year first above written.

**SELLER:**

**THE TOMKAT LIMITED PARTNERSHIP, INC.**
By TOMKAT, INC., General Partner

By_____
    John J. Waters, Jr.
Its President

18

**EXHIBIT F**
**To 1342 G Street Purchase Agreement**

**UNDERGROUND STORAGE TANK**
**REAL ESTATE TRANSFER DISCLOSURE FORM**

19

**Exhibit 16**

## COPERNICUS LEARNING consultants, llc

*Generating Returns on Learning[SM]*

May 31, 2007

Rouben Adalian, Ph.D.
Armenian Genocide Museum and Memorial
1140 19th Street NW, Suite 600
Washington, DC  20036

### RE:  OUTSTANDING PAYMENTS

Dear Rouben:

Payments due to Copernicus Learning Consultants, LLC for services provided to the Armenian
Genocide Museum and Memorial (AGMM) are still outstanding from 2005.

As you will recall, the AGMM contracted Copernicus to provide a business plan for the AGMM for
a monthly fee of $50,000.00 per month for four months plus expenses to be reimbursed at cost.  At
the end of the 4-month period, the AGMM requested additional services spanning two months,
which were also provided.

To date and despite repeated requests for payment, Copernicus has received only $150,000 in fees,
representing only 3 months of work; the last payment was received in 2005.

| Outstanding Payments Due For: | Dates | Amount |
|---|---|---|
| Fee:  Month 4 of 4-month strategic plan | Jun-Jul 2005 | $50,000.00 |
| Out-of-pocket expenses for travel, interviews, 6 focus groups US-wide, books, market research, etc. | Mar-Jul 2005 | $42,380.66 |
| Fee:  Additional month of services requested as follow-on, including trip to Armenia for research and interviews | Jul-Aug 2005 | $50,000.00 |
| Fee:  Additional month of services requested as follow-on, including developing a 6-month workplan with board | Aug-Sep 2005 | $50,000.00 |
| Total | | $192,380.66 |

Note that this does not include significant time spent subsequent to October 2005 on the project to
respond to numerous inquiries from the AGMM and its constituents.

Sincerely yours,

Deborah L. Devedjian
Managing Member

**Strategic planning   *   investment advisory**

250 West 50th Street ▪ Floor 25B ▪ New York, NY  10019 ▪ T 646.215.9772

**Exhibit 17**

## Exhibit F – Financial Overview 2005 and 2006

Pledges made and received:

To date, AGM&M has received cash pledges of approximately $26,200,000, and non-cash donations (carpets) with and estimated value of approximately $1,000,000. Of the cash pledges, approximately $20,475,000 has been collected, with a balance outstanding of $5,725,000.

In 2005, AGM&M received new donations of approximately $38,375, and collected $1,025,000 against outstanding pledges.

To date in 2006, AGM&M has collected $300,000 against outstanding pledges.

As of April 24, 2006, AGM&M has approximately $35,000 in its cash account and approximately $556,000 in its endowment account.

Expenditures:

To date, AGM&M has expended approximately $19,885,000. Of that, the majority of the funds, approximately $17,300,000, have been expended on the acquisition of real estate. The balance of the funds has been expended for the maintenance of the real estate – taxes, insurance, etc, and for the operations of AGM&M.

In 2005, the following expenditures were made:

| | |
|---|---:|
| Professional fees | $190,000 |
| Administration | 3,500 |
| Insurance | 37,500 |
| Property expenses | 385,000 |
| On behalf of ANI | 215,000 |
| Total | $831,000 |

To date in 2006, the following expenditures were made:

| | |
|---|---:|
| Professional fees | $100 |
| Administration | 2,500 |
| Insurance | 39,000 |
| Property expenses | 220,000 |
| On behalf of ANI | 16,500 |
| Total | $278,500 |

Estimated expenditures for the balance of 2006:

| | |
|---|---:|
| Professional fees | $20,000 |
| Administration | 2,500 |
| Insurance | 1,000 |
| Property expenses | 200,000 |
| On behalf of ANI | 200,000 |
| Total | $423,500 |

**Exhibit 18**

CONFIDENTIAL

# Fredrikson
### & BYRON, P.A.

May 24, 2006

SENT VIA CERTIFIED MAIL

Mr. Hirair Hovnanian
One Hovechild Plaza
4000 Route 66
Tinton Falls, NJ 07753

Mr. Robert Aram Kaloosdian
43 Mount Auburn Street
Watertown, MA 02472

Ms. Anoush Mathevosian
30 Candy Lane
Great Neck, NY 11023

Re:    Armenian Genocide Museum and Memorial, Inc. ("AGM&M")

Dear Trustees:

I have represented Gerry Cafesjian from the inception of his philanthropic pursuits. He has asked that I communicate with you on his behalf with respect to the current state of affairs at AGM&M.

Gerry has no doubt that all of you as well as himself as Trustees and individually are fully supportive of the purposes of AGM&M as set forth in its organizational documents. That has certainly not been the problem. Rather, it is Gerry's view that the problem has been one of two competing visions for AGM&M neither of which has commanded a consensus among the Trustees. His has been a more ambitious, more expensive and, almost certainly, a more controversial vision. It is certainly a vision more difficult to achieve. The other, and doubtless more readily attainable solution, is to confine the effort to the existing National Bank of Washington building with the view that the purposes of AGM&M are best accomplished by the opening of the Museum sooner rather than later.

Attorneys & Advisors   /  Fredrikson & Byron, P.A.
     main  612.492.7000  /  200 South Sixth Street, Suite 4000
     fax  612.492.7077   /  Minneapolis, Minnesota
     www.fredlaw.com     /  55402-1425

MEMBER OF THE WORLD SERVICES GROUP      /   OFFICES
A Worldwide Network of Professional Service Providers   /  Minneapolis, London, & Monterrey, Mexico

Mr. Hirair Hovnanian
Mr. Robert Aram Kaloosdian
Ms. Anoush Mathevosian
May 24, 2006
Page 2

This problem of competing visions has been exacerbated by the Trustee voting arrangements. An effective deadlock among the Trustees exists as a result of the requirement that there be an 80 percent affirmative vote of the Trustees in order to take action.

Given the competing visions among the Trustees and their past unsuccessful efforts to reach a resolution, Gerry has concluded that the differences are irreconcilable. In order for AGM&M to move forward in pursuit of its mission, the existing paradigm must change. Gerry believes that the best possible chance for AGM&M to move forward is for him to end his involvement with AGM&M. Without his involvement, the Trustees should be able to reach a consensus regarding the vision for AGM&M and the museum development and less demanding fundraising efforts can move forward accordingly.

If Gerry were to terminate his involvement with AGM&M, he would expect to resign from his Trustee position and would prospectively renounce his rights to appoint Trustees or to serve as Trustee.

There is a $500,000 loan from the Cafesjian Family Foundation, Inc. ("CFF") to AGM&M which is currently due and he would expect it to be repaid so that CFF could use those funds to pursue its philanthropic objectives which are focused on the Armenian cause.

The controlling Grant Agreement with Gerry and CFF provides that if the various properties have not been developed as contemplated prior to the end of 2010, any obligation on the part of Gerry and CFF terminates and the properties themselves or the funds to acquire the properties are to be returned to CFF. Gerry fully expects AGM&M to be successful with respect to the completion of the Museum in the National Bank of Washington Building at 14th and G Street N.W. prior to the end of 2010. However, if the initial vision of AGM&M, with all of the program housed in the bank building, is pursued, he would expect that, following his exit, the properties located at 1334-36 G Street, 1338 G Street, 1340 G Street and 1342 G Street ("Non-Bank Properties") would no longer be necessary for the pursuit of AGM&M's vision. Indeed, they would be more liabilities than assets in the short run given their eyesore character, cost of carry and the potential liability exposure that is always present with vacant buildings.

With respect to the Non-Bank Buildings, Gerry would expect that the return of those buildings to CFF and the elimination of any further requirement to continue to make the contract for deed payments on the 1340 G building be accelerated from the end of 2010 to his exit. This would benefit AGM&M for the reasons set forth above. It would also accelerate the ability of CFF to pursue its philanthropic objectives which are focused on the Armenian cause.

Mr. Hirair Hovnanian
Mr. Robert Aram Kaloosdian
Ms. Anoush Mathevosian
May 24, 2006
Page 3

The provisions in the controlling Grant Agreement with respect to the National Bank of Washington Building would remain unchanged. Gerry would also eliminate any obligation on the part of AGM&M with respect to the previously contemplated Memorial.

Gerry does not lightly make this proposal. He believes that it is the only way that AGM&M can effectively pursue its mission as currently conceived by its Trustees. He looks forward as I am sure all of you do as well to advancing the Armenian cause.

Gerry hopes that this proposal would be acted on at a special trustee meeting to be convened as soon as possible. He would not attend such a meeting in order to permit you to discuss the proposal candidly.

Should you have questions about any of this, please feel free to contact me.

Very truly yours,

William J. Brody
*Attorney at Law*
Direct Dial: 612.492.7026
Email: wbrody@fredlaw.com

WJB:eke

cc:    Gerard Cafesjian

4032365_1.DOC

**Exhibit 19**

CONFIDENTIAL



# ARMENIAN ASSEMBLY OF AMERICA

1140 19TH STREET, N.W. • SUITE 600 • WASHINGTON, DC 20036 • (202) 393-3434 • FAX: (202) 638-4904

www.aaainc.org

August 2, 2006

William J. Brody
Attorney at Law
Fredrikson & Bryon PA
200 South Sixth St, Suite 4000
Minneapolis, Minnesota 55402

Dear Mr. Brody:

With the concurrence of Hirair Hovnanian and Anoush Mathevosian, I am writing this letter in response to your letter of May 24, 2006 written on behalf of Gerry Cafesjian. We had hoped to have received more information from Mr. Cafesjian through you before responding. While we did receive some materials through you, we are not fully apprised of all that has taken place. While we take issue with a number of assertions in your letter, there is no useful purpose in responding to them at this time, but our failure to do so should not be construed as acquiescence. In all candor, we were quite surprised to receive the letter and Mr. Cafesjian's assertion of two competing visions for AGM&M. There have not been two competing visions.

In fact, Mr. Cafesjian has acted as the chief executive officer of the project. We encouraged that. He alone decided whom to engage as the architect. We did not object. He also decided to lean heavily upon Deborah Devedjian and worked with her both before and after he engaged her to be heavily involved in moving the project. We did not object. Although we were not kept advised or consulted before the fact in a number of instances, never received any quarterly reports as we were supposed to receive, and still do not know his financing plans, we continued to express our confidence in him and at no time stood in the way of any of his decisions. Yes we expressed some concerns about the projected cost of the project. That does not mean that we deviated from his vision. At no time did we insist on any material change from the course he charted and ran. Hence it is difficult for us to understand his statement in your letter about "two different visions". In fact, we approve his vision and we would like him to continue.

We encourage him to carry on to bring the project to fruition in accordance with his concept. There is no reason for that scenario to change. We genuinely urge that he withdraw his unexpected and untimely attempt to separate after years of effort and expense.

Western Region Office: 50 North La Cienega Blvd., Suite 202, Beverly Hills, CA 90211 (310) 360-0091 Fax (310) 360-0094
Armenia Office: 2 Republic Square, Suite 101, 375010 Yerevan, Armenia 374 (10) 52-70-52 Fax 374 (10) 52-70-32
Stepanakert Office: 28 Azatamartikneri Street, Stepanakert, NKR

If for some reason he will not change his mind and continue with the project for other reasons best known to him, then we, with Mr. Cafesjian, need to schedule a meeting so as to effect a complete separation on mutually agreeable terms which will not derogate from the successful realization of the project and which will take into account also our and Mr. Cafesjian's respective commitment/obligation to the Armenian-American community and our mutually shared heritage.

We urge that you consult with Mr. Cafesjian and get back to us at your earliest convenience.

Sincerely yours,

Robert A. Kaloosdian/mee

Robert A. Kaloosdian
Vice Chairman
Armenian Assembly of America

**Exhibit 20**

CONFIDENTIAL



# Fredrikson
### & BYRON, P.A.

August 29, 2006

**SENT VIA FEDERAL EXPRESS MAIL**

Mr. Hirair Hovnanian
One Hovechild Plaza
4000 Route 66
Tinton Falls, NJ  07753

Mr. Robert Aram Kaloosdian
43 Mount Auburn Street
Watertown, MA  02472

Ms. Anoush Mathevosian
30 Candy Lane
Great Neck, NY  11023

Re:    Armenian Genocide Museum and Memorial, Inc. ("AGM&M")

Dear Trustees:

This is in response to your correspondence of August 2 and the request for clarification that Robert made in our phone conversation of August 8.

Before proceeding with the clarification, I think it is important to note that Mr. Cafesjian does not agree in many ways with the factual descriptions and conclusions set forth in your August 8 correspondence. However, in the interests of proceeding in a manner that will hopefully lead to a satisfactory resolution for all concerned, I am making no detailed factual rebuttal at this point but certainly reserve the right to do so in the future should it become necessary.

In an effort to best serve the interests of AGM&M, my correspondence of May 24 sets forth a proposal whereby Mr. Cafesjian would terminate his involvement with AGM&M on the following terms:

1.    Mr. Cafesjian would resign his Trustee position and renounce his rights to appoint Trustees or to serve as a Trustee of AGM&M, Inc.

2.    AGM&M would repay the outstanding $500,000 loan from the Cafesjian Family Foundation, Inc. ("CFF"), so that those funds could be used by the CFF for other philanthropic efforts.

Attorneys & Advisors / Fredrikson & Byron  P.A.
main  612.492.7000 / 200 South Sixth Street, Suite 4000
fax  612.492.7077 / Minneapolis, Minnesota
www.fredlaw.com / 55402-1425

MEMBER OF THE WORLD SERVICES GROUP / OFFICES
A Worldwide Network of Professional Service Providers / Minneapolis, London  & Monterrey  Mexico

Letter to the Trustees
August 29, 2006
Page 2


3.    The Board of Trustees, acknowledging that the properties located at 1334-36, 1338, 1340 and 1342 G Street are not to be used for the development of the museum per the controlling Grant Agreement, would accelerate the reversion clause and return the properties or the funds to acquire the properties to CFF, so that those funds could be used by the CFF for other philanthropic efforts.

4.    Corresponding with the return of the properties located at 1334-36, 1338, 1340 and 1342 G Street, the ongoing obligation of Mr. Cafesjian and/or CFF to fund the outstanding grant for the payment of contact for deed payments for 1340 G Street would be terminated.

5.    The outstanding obligation of Mr. Cafesjian and/or CFF to fund up to $1,500,000 for a memorial within the AGM&M project would be terminated.

6.    All other provisions of the Grant Agreement with respect to the National Bank of Washington Building, most notably the reversion clause, would remain unchanged.

As stated during our last phone conversation, in the alternative, AGM&M could be wound down and liquidated in accordance with the provisions of its bylaws, recognizing its various obligations.

Mr. Cafesjian will accede to either of these alternatives.

In my letter of August 1, I highlighted AGM&M's current cash situation. To date, no funds have been received from the Assembly or from any other source. On Friday, August 18, the CFF again advanced $10,000 to AGM&M to meet payroll and to keep the AGM&M account from going negative. This is the last time that Mr. Cafesjian or CFF will advance funds to meet AGM&M's cash flow needs.

In order to preserve the remaining resources of AGM&M, this matter must be brought to a prompt resolution. I will call Mr. Kaloosdian later this week to discuss how best to proceed.

Very truly yours,

William J. Brody
*Attorney at Law*
Direct Dial: 612.492.7026
Email: wbrody@fredlaw.com
WJB:ekc
4076359_1.DOC

**Exhibit 21**

CONFIDENTIAL

CAFESJIAN FAMILY FOUNDATION



GERARD L CAFESJIAN, PRESIDENT / CEO

September 13, 2006

**SENT VIA FEDERAL EXPRESS MAIL**
Mr. Hirair Hovnanian
One Hovechild Plaza
4000 Route 66
Tinton Falls, NJ  07753

Mr. Robert Aram Kaloosdian
43 Mount Auburn Street
Watertown, MA  02472

Ms. Anoush Mathevosian
30 Candy Lane
Great Neck, NY  11023

Re:    Armenian Genocide Museum and Memorial, Inc. ("AGM&M")

Dear Trustees:

This is to serve as notice of my resignation as Chairman of the Board of Trustees and President of AGM&M effective immediately. I take this action only after a great deal of thought and with the hope that this change will break the current impasse and ultimately provide AGM&M with the greatest opportunity to achieve its specific purposes.

John Waters intends to resign as secretary and treasurer of AGM&M and to transfer all administrative functions as soon as the Board of Trustees identify his successor and makes alternative arrangements for the administrative functions. He would certainly appreciate prompt direction from the Board.

I intend to continue to serve directly or to have my designees serve on the Board of Trustees of AGM&M. In either case, I am prepared to work with you to assure that the affairs of AGM&M are handled in a responsible manner.

Letter to the Trustees
September 13, 2006
Page 2

In light of these changes, I expect that the Board of Trustees of AGM&M should plan to meet as soon
as practicable to develop a future course for the organization.

Very truly yours,

Gerard L. Cafesjian

4082718_1.DOC

**Exhibit 22**




MEMORANDUM OF AGREEMENT
RESERVING RIGHTS

This Memorandum of a Transfer Agreement ("Memorandum") is made and entered into as of October 23, 2006 and is executed by Armenian Genocide Museum and Memorial, Inc., a District of Columbia Nonprofit Corporation ("AGM&M") and The Cafesjian Family Foundation, Inc., a Florida Nonprofit Corporation ("CFF").

WHEREAS, pursuant to a Letter Agreement dated as of November 1, 2003 executed by the Armenian Assembly of America, Inc., a District of Columbia Nonprofit Corporation ("Assembly") in favor of the CFF (the "Letter Agreement") the Assembly agreed, among other things, to undertake the development of certain real properties situated in the District of Columbia ("Development Obligations") which properties are described in Exhibit A attached hereto and incorporated herein as if set forth herein in full (the "Properties"); and

WHEREAS, the Letter Agreement provided for the reservation of certain reversionary rights in the CFF in the event that the Assembly failed to perform the Development Obligations; and

WHEREAS, pursuant to a Transfer Agreement dated as of November 1, 2003 executed by the AGM&M and the Assembly, the AGM&M agreed, among other things, to undertake the Development Obligations of the Assembly; and

WHEREAS, the AGM&M and the CFF desire to execute this memorandum and record it among the land records of the District of Columbia, in order to provide notice of the Development Obligations contained in the Transfer Agreement.

NOW, THEREFORE, in consideration of the premises, the terms of the Transfer Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      This Memorandum is solely for recording purposes, and shall not be construed to, alter, modify, limit amend or supplement the Transfer Agreement in any respect. The recordation of this Memorandum is in lieu of, and shall have the effect of, recording the Transfer Agreement.

2.      Reference is hereby made to the Transfer Agreement for all the other terms, provisions and conditions of the Transfer Agreement.

3.      The recitals above are made apart of this Memorandum as if fully restated in this paragraph 3.

[Signature Page to Follow]

- 1 -

400375035

IN WITNESS WHEREOF, the AGM&M and the CFF have duly executed this Memorandum of Transfer Agreement on this 23rd day of October 2006.

**AGM&M**      **Armenian Genocide Museum and Memorial, Inc.**
A District of Columbia Nonprofit Corporation

By _____
   John J. Waters, Jr., Secretary/Treasurer


**CFF**       **The Cafesjian Family Foundation, Inc.**
A Florida Nonprofit Corporation

By _____
   John J. Waters, Jr., Vice President


STATE OF MINNESOTA      )
                        )   ss.
COUNTY OF HENNEPIN      )

On this 23rd day of October 2006, before me, _Don Kovacovich_ , a notary public, personally appeared **John J. Waters, Jr.** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the within instrument as Secretary/Treasurer on behalf of Armenian Genocide Museum and Memorial, Inc., a District of Columbia Nonprofit Corporation.


STATE OF MINNESOTA      )
                        )   ss.
COUNTY OF HENNEPIN      )

On this 23rd day of October 2006, before me, _Don Kovacovich_ , a notary public, personally appeared **John J. Waters, Jr.** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed Vice President on behalf of The Cafesjian Family Foundation, Inc., a Florida Nonprofit Corporation.

_____
Notary Public

DONALD ANTHONY KOVACOVICH
Notary Public-Minnesota
My Commission Expires Jan 31, 2010

My commission expires: _____

- 2 -

400375035

Doc# 2008146263 Fees:$40.50
10/27/2008    1:57PM Pages 4
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

**EXHIBIT A**

## TO MEMORANDUM OF AGREEMENT

**Legal Description of the Property located at 1334-36 G Street, District of Columbia, Property #: 0253 0817:**

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Part of Original Lot numbered Seventeen (17) in Square numbered Two Hundred Fifty-three (253), described as follows: BEGINNING at the Northwest corner of said lot; thence East on the South line of "G" Street, 36.90 feet; thence South 113 feet 8 ½ inches to a 30 foot alley; thence West on the North line of said alley 36.90 feet; thence North 113 feet 8 ½ inches to the place of beginning.

NOTE: At the date hereof the above described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lots numbered Eight Hundred Seventeen (817) and Eight Hundred Eighteen (818) in Square numbered Two Hundred Fifty-three (253).

**Legal Description of the Property located at 1342 G Street, District of Columbia, Property #: 0253 0053:**

Lot numbered Fifty-three (53) in Harry Wardman and Thomas P. Bones Subdivision of lots in Square numbered Two Hundred and Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

RECORDING
SURCHARGE

34.00
6.50

400375035

- 3 -

After Recording Return To:
John Waters
15 S. Fifth St #900
Mineapolis MN 55402

i

**Legal Description of the Property located at 1340 G Street, District of Columbia, Property #: 0253 0054:**

Lot Numbered Fifty-four (54) in Harry Wardman and Thomas P. Bones Subdivision of lots in Square Two Hundred Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

**Legal Description of the Property located at 1338 G Street, District of Columbia, Property #: 0253 0055:**

Lot numbered Fifty-five (55) in Harry Wardman and Thomas P. Bones (previously recorded deed incorrectly shows Thomas *F*. Bones) Subdivision of lots in Square numbered Two Hundred and Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

**Legal Description of the Property located at 619 14th Street NW, District of Columbia, Property #: 0253 0067:**

Lot numbered Sixty-seven (67), in Square numbered Two-Hundred Fifty-Three (253), in subdivision made by "619 14th Street, NW Limited Partnership," as per plat recorded in Liber 191 at Folio 165 of the Records of the Officer of the Surveyor for the District of Columbia.

Being all the same property as contained in that deed dated February 1, 1993 and recorded February 8, 1993 as Instrument No. 9490, wherein the property was known for assessment and taxation purposes as Lots 833 and 45 in Square 253.

- 4 -

400375035

**Exhibit 23**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian and The Cafesjian
Family Foundation, Inc.,

      Plaintiffs,

v.

Armenian Assembly of America, Inc.,

      Defendant.

Civil File No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc. (collectively "Cafesjian") complain against Armenian Assembly of America, Inc. as follows:

**PARTIES**

1.    Gerard L. Cafesjian is a citizen of Florida.

2.    The Cafesjian Family Foundation, Inc. is a Florida non-profit corporation with its principal place of business at 4001 Tamiami Trail, Suite 425, Naples, Florida, 34103.

3.    The Armenian Assembly of America, Inc. is a District of Columbia non-profit corporation, with its principal place of business at 1140 19th Street NW, Suite 600, Washington, DC, 20036.

**JURISDICTION AND VENUE**

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse; and the amount in controversy exceeds $75,000.

5.    By written consent, this Court has personal jurisdiction over the Assembly.

6.    For the same reason, venue is proper.

## FACTUAL BACKGROUND

7.    On March 17, 2000, the Assembly issued a $500,000 promissory note to Cafesjian. (Ex. A attached.)

8.    Minnesota law governs note validity, construction and enforceability. The note specifies that any federal court or state court sitting in Hennepin County, Minnesota shall have jurisdiction to enforce the note. (*Id.*)

9.    On November 1, 2003, Cafesjian and the Assembly entered into a Grant Agreement (Exhibit B attached) pursuant to which Cafesjian agreed to make significant charitable donations to the Assembly for the purpose of creating the Armenian Genocide Museum and Memorial ("AGM&M").

10.    Section 5 of the Grant Agreement conditions Cafesjian's obligation to make such grants upon performance by others, including the Assembly. In particular, Section 5.4 provides as follows:

> 5.4.    Promissory Note.
>
> (A)    The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of [Cafesjian] in the amount of $500,000.
>
> (B)    The new note must be interest free and mature on December 31, 2005.
>
> (C)    If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

(*Id.*)

11.    The March 17, 2000 promissory note has neither been paid for nor forgiven.

12.    Cafesjian performed all Grant Agreement obligations, contributing over $14,000,000 toward development of the AGM&M.

13.    The Assembly never issued a promissory note to replace the original $500,000 note as required by Section 5.4 of the Grant Agreement.

14.    The Assembly now denies the validity and enforceability of the March 17, 2000 note.

15.    The Assembly's failure to issue a new promissory note has damaged Cafesjian.

<u>COUNT I: BREACH OF CONTRACT</u>

16.    The November 1, 2003 Grant Agreement obligated the Assembly to issue a new promissory note to Cafesjian in the amount of $500,000 to replace the promissory note originally issued on March 17, 2000.

17.    The Assembly has yet to issue the replacement note.

18.    This non-performance materially breached the Grant Agreement.

19.    As a direct result of this breach, Cafesjian has been damaged in excess of $500,000.

20.    Because of the Assembly's material failure to perform, the Grant Agreement should be rescinded, and all donations made pursuant to the Grant Agreement should be restituted to Cafesjian.

## COUNT II:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

21.    The Assembly implicitly covenanted to act fairly, in good faith and in a nondiscriminatory manner towards Cafesjian and to refrain from actions and inactions that would injure Cafesjian's rights or unjustifiably hinder Cafesjian's performance of the Grant Agreement.

22.    The Assembly violated this implied duty of good faith and fair dealing by failing to issue a replacement promissory note to Cafesjian.

23.    This breach of duty interfered with Cafesjian's performance and rights under the Grant Agreement so as to deny them the benefits of the Grant Agreement. Further this inaction injured Cafesjian causing their AGM&M aspirations and hopes to be frustrated.

24.    As a direct and proximate result, Cafesjian has been damaged in excess of $500,000 and is entitled to rescission of the Grant Agreement and restitution of all donations made pursuant to that agreement.

WHEREFORE, Cafesjian requests the following relief:

25.    A declaration that the Assembly materially breached the Grant Agreement as well as the implied covenant of good faith and fair dealing;

26.    Damages in an amount in excess of $500,000;

27.    Rescission of the Grant Agreement and restitution of all donations made pursuant to that agreement; and

28.    The award of attorneys' fees, pre-judgment and post-judgment interest, costs and disbursements.

Dated: April 26, 2007                    **BRIGGS AND MORGAN, P.A.**

By: _____
Timothy R. Thornton (#109630)
Molly M. Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS
GERARD L. CAFESJIAN AND THE
CAFESJIAN FAMILY FOUNDATION**

**Exhibit 24**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| The Cafesjian Family Foundation, Inc., individually and on behalf of the Armenian Genocide Museum and Memorial, Inc. 4001 Tamiami Trial, Suite 425 Naples, Florida 34103 | Civil File No. _____ |
| Plaintiff, | COMPLAINT |
| v. | **JURY TRIAL DEMANDED** |
| Armenian Genocide Museum and Memorial, Inc. Attention: Rouben Adalian and/or REGISTERED AGENT 1140 19th Street NW, Suite 600 Washington, DC 20036 | |
| Hirair Hovnanian Hovsons, Inc. One Hovchild Plaza 4000 Route 66 Tinton Falls, NJ 07753 | |
| Anoush Mathevosian 30 Candy Lane Great Neck, NY 11023 | |
| Van Krikorian Global Gold Corporation 45 East Putnam Avenue Greenwich, CT 06830 | |
| Armenian Assembly of America, Inc., ATTENTION: REGISTERED AGENT 1140 19th Street NW, Suite 600 Washington, DC 20036 | |
| Defendants. | |

---

The Cafesjian Family Foundation, Inc. ("CFF"), individually and on behalf of the Armenian Genocide Museum and Memorial ("AGM&M"), complains against the AGM&M, Hirair Hovnanian, Anoush Mathevosian, Van Krikorian and the Armenian Assembly of America, Inc. ("Assembly") as follows:

## PARTIES

1.    The Cafesjian Family Foundation is a Florida nonprofit corporation.

2.    AGM&M is a D.C. nonprofit corporation.

3.    The Assembly is a D.C. nonprofit corporation.

4.    Hirair Hovnanian is a resident of New Jersey.

5.    Anoush Mathevosian is a resident of New York.

6.    Van Krikorian is a resident of New York.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse and the amount in controversy exceeds $75,000.

8.    This Court has personal jurisdiction over all defendants and venue is proper.

## FACTUAL BACKGROUND

### AGM&M's Corporate Structure

9.    AGM&M was incorporated pursuant to the District of Columbia Nonprofit Corporation Act.  Articles of Incorporation Art. IV (Exhibit A).

10.    AGM&M is governed by a Board of Trustees ("Trustees").  Articles of Incorporation Art. VII.  The Trustees serve as the Board of Directors of AGM&M for

2

purposes of the District of Columbia Nonprofit Corporation Act.  By-Laws § 2.2 (Exhibit B); Articles of Incorporation Art. VI.

11.    AGM&M has no members.  By-Laws § 2.1; Articles of Incorporation Art. V.

12.    The Trustees are appointed by individuals and organizations that contribute or pledge $5,000,000 or more to AGM&M.  By-Laws § 2.1; Grant Agreement § 5.2 (Exhibit C).  Currently the Trustees exercise a total of six votes.

13.    Pursuant to the charter documents, the Grant Agreement, and by virtue of significant donations and pledges for the benefit of AGM&M, CFF is entitled to appoint Trustees and controls three of the six Trustee votes.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G).  CFF has pledged in excess of $17.5 million and has contributed in excess of $14.5 million and loaned $500,000 for the benefit of AGM&M.

14.    Pursuant to the charter documents and the Grant Agreement, Hovnanian is a Trustee of AGM&M and controls one vote.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G).  Hovnanian has pledged $5 million and as of September 2006 has contributed $1.5 million for the benefit of AGM&M.

15.    Pursuant to the charter documents and the Grant Agreement, and in recognition of her important and significant early contribution to the AGM&M, Mathevosian is a Trustee of AGM&M and controls one vote.  By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(C).  Mathevosian has pledged and contributed $3.5 million for the benefit of AGM&M.

3

16.     Pursuant to the charter documents and the Grant Agreement, the Assembly is a Trustee of AGM&M and controls one vote. By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(D). Van Krikorian is the Assembly-appointed Trustee.

17.     AGM&M's By-Laws provide that "[p]ersons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called." By-Laws § 2.6. To convene the Trustees, notice of the time and place of meetings must be provided. *Id.* § 2.14.

18.     The By-Laws further require that "all [AGM&M] questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present." *Id.* § 2.7.

19.     On August 31, 2007, AGM&M announced that phase I contracts had been awarded to two design firms. The contracts are supposedly intended to initiate the development of a museum at the site of the former National Bank of Washington.

20.     The decisions to award phase I contracts and to initiate the development at the site of the former National Bank of Washington were apparently made by a planning, development and building committee that was created during a rump Trustee meeting on May 7, 2007.

21.     Notice of the May 7, 2007 meeting was provided by letter that was faxed to the CFF Trustee designee on May 1, 2007. The items listed on the agenda included (a) the chairman's report and update, (b) a financial report, (c) the authorization of a planning, development and building committee, and (d) election of officers. (Exhibit D).

4

22.   The meeting occurred on May 7, 2007.   Hovnanian, Mathevosian, and Krikorian (on behalf of the Assembly), who each control one Trustee vote, and John Waters, the CFF designated Trustee who controls three Trustee votes, attended the meeting. Waters attended by telephone.

23.   Immediately upon being convened, the meeting departed from the agenda and attacked Waters regarding the ramifications of an unrelated litigation involving CFF. Waters, without counsel present, declined to be subjected to the grilling that was being perpetrated. Notably at least two lawyers were present on behalf of the Trustees who were challenging Waters.

24.   Hovnanian, Mathevosian and Krikorian (on behalf of the Assembly) then prevented Waters, as the CFF designated Trustee, from participating in the May 7, 2007 meeting by trumping up conflict of interest charges. Waters objected to this exclusion, requested an adjournment, and ultimately departed the meeting under protest.

25.   The exclusion of the CFF designated Trustee from the May 7, 2007 meeting and the subsequent continuation of the May 7, 2007 board meeting in the absence of the CFF designated Trustee violated AGM&M by-laws and applicable law.

26.   CFF has requested the minutes and recordings from the entire May 7 meeting. AGM&M has withheld those corporate records.

27.   Following the ostracization of the CFF designated Trustee, the remaining Trustees apparently voted to create a planning, development and building committee and to delegate significant, if not plenary, authority to that committee.   This committee is

5

supposedly responsible for the planning, building management and development of the museum at the former National Bank Building site. This action taken in the absence of the CFF designated Trustee violates AGM&M by-laws and applicable law.

**AGM&M and the Grant and Transfer Agreements**

28.    From 2000 to 2003, the Assembly and CFF cooperated to promote and develop a museum and memorial to commemorate the Armenian Genocide. In 2003, an independent entity, the AGM&M, was incorporated to achieve that purpose.

29.    AGM&M was created to:

> further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Articles of Incorporation Art. IV.

30.    With contributions substantially funded by CFF's generosity, the former National Bank Building had been acquired as a site for the museum and memorial. CFF and the Assembly soon concluded that the bank building and parcel alone would not be sufficient to house the project necessary to achieve AGM&M's stated purpose. To provide the real estate necessary for a proper memorial, CFF and the Assembly then executed the Grant Agreement. Pursuant to this agreement, CFF committed to make significant charitable grants, some to the Assembly, for the purpose of providing an appropriate site. The CFF

6

grants and pledges were in excess of $15 million. The Grant Agreement obligated the Assembly to expend all CFF contributions to purchase the various properties on which the AGM&M would be developed.

31.     Pursuant to the Grant Agreement, the various properties could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc." Grant Agreement § 3.1(A). The Grant Agreement requires CFF's participation "in all material decisions regarding the Memorial." *Id.* § 3.2(C).

32.     To separate AGM&M from the Assembly, those entities entered into the Transfer Agreement. The Transfer Agreement effected a conveyance of the real property on which the AGM&M would be developed as well as other assets and liabilities, including all pledges from the Assembly to AGM&M.

33.     CFF's grant obligations were conditioned upon AGM&M's agreement to use these properties "in furtherance of AGM&M's stated charitable purpose." Transfer Agreement § 4.6. AGM&M also agreed to "honor all of the existing [CFF] donor requirements existing at the time of transfer," including the requirement that the CFF designated Trustee participate in all material decisions relating to the museum and memorial. Grant Agreement § 5.3; *see also* Transfer Agreement § 1.2 (Exhibit E).

34.     Like the By-Laws, the Transfer Agreement requires 80% Trustee approval for actions. Transfer Agreement § 3.4(E).

## COUNT I: ULTRA VIRES ACT
### (CFF individually against defendant AGM&M)

35.    CFF is entitled to appoint up to three Trustees and controls three Trustee votes. The Trustees also serve as Directors of AGM&M.

36.    The delegation of meaningful authority by the AGM&M Trustees to any committee requires an 80 percent affirmative vote of the Trustees present at a properly noticed meeting at which a quorum is present. Impeccable compliance with the super majority provision is required for this action because the AGM&M's singular purpose is the development of a museum and memorial to commemorate the Armenian Genocide.

37.    The exclusion of the CFF designated Trustee requires an 80 percent affirmative vote of the Trustees present at a properly noticed meeting where a quorum is present.

38.    On May 7, 2007, a quorum of six Trustee votes was present. Three AGM&M Trustees purported to create and to delegate authority to a planning, development and building committee. The CFF designated Trustee, who controls the other three votes, attended the May 7, 2007 meeting but was denied the opportunity to vote on the proposed building committee. After being subjected to filibustering and brow-beating, the CFF designated Trustee was driven out of the meeting, under protest.

39.    The exclusion of the CFF designated Trustee from the May 7, 2007 meeting was improper, unfair and ultra vires under common law and the District of Columbia Nonprofit Corporation Act, D.C. Code § 29-301.06.

8

40.    The creation of a planning, development and building committee and the delegation of fundamental Trustee prerogative to that committee in the absence of the CFF designated Trustee participation was improper, unfair and ultra vires under common law and the District of Columbia Nonprofit Corporation Act, D.C. Code § 29-301.06.

41.    Being in excess of the rump quorum's authority, these ultra vires actions are null and void, and AGM&M must be enjoined from pursuing any further development of the museum and memorial without proper Trustee authorization.

### COUNT II: DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (CFF on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)

42.    The District of Columbia Nonprofit Corporation Act authorizes directors of nonprofit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

43.    Hovnanian, Mathevosian, Krikorian and the Assembly, by reason of their positions as fiduciaries, owe duties to AGM&M, its directors and trustees of undivided loyalty, good faith, fair dealing, due care, candid disclosure and diligence in the management and administration of AGM&M's affairs.

44.    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their fiduciary duties to AGM&M, its directors and trustees by excluding the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank site without corporate authority, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Nonprofit Corporation Act, and by abrogating Trustee authority over

9

AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

45.    As a direct and proximate cause of this breach of fiduciary duty, AGM&M has sustained, and will continue to sustain, substantial harm.

46.    Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

47.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Kirkorian and the Assembly would continue to exclude the CFF designated Trustee from participation in the formulation of the Trustees' response.

## COUNT III:  DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS
### (CFF on behalf of AGM&M against defendants Hovnanian, Mathevosian, Kirkorian and the Assembly)

48.    The District of Columbia Nonprofit Corporation Act authorizes directors of nonprofit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

49.    Hovnanian, Mathevosian, Krikorian and the Assembly owe to AGM&M the obligation to protect AGM&M's assets from undue loss or waste and to utilize these assets as required by AGM&M's by-laws and to fulfill AGM&M's stated purpose.

50.    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their obligation to AGM&M and wasted corporate assets, by, among other things, knowingly or

10

recklessly proposing, implementing, agreeing to, approving, and ratifying the decisions to authorize the creation and delegation of authority to a planning, development and building committee and to develop the museum and memorial at the National Bank of Washington site, without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Nonprofit Corporation Act.

51.    As a direct and proximate result of this waste of corporate assets, AGM&M has sustained, and will continue to sustain, substantial harm.

52.    Hovnanian, Mathevosian, Krikorian and the Assembly are liable to the AGM&M as a result of these acts.

53.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Kirkorian and the Assembly would continue to exclude the CFF designated Trustee from participation in the formulation of the Trustees' response.

**COUNT IV: DERIVATIVE CLAIM FOR ABUSE OF CONTROL**
**(CFF on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)**

54.    The District of Columbia Nonprofit Corporation Act authorizes directors of non-profit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

55.    Hovnanian, Mathevosian, Krikorian and the Assembly have abused their control and influence over AGM&M by excluding the CFF designated Trustee from the May

11

7, 2007 meeting, by approving and implementing plans to develop the museum and memorial at the National Bank of Washington site without corporate authority to do so, without proper corporate purpose, and without regard to the requirements of AGM&M's by-laws and the District of Columbia's Nonprofit Corporation Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a planning, development and building committee with apparent accountability to no one.

56.    As a direct and proximate cause of this abuse of control, AGM&M has sustained, and will continue to sustain, substantial harm.

57.    Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

58.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Kirkorian and the Assembly would continue to exclude the CFF designated Trustee from participation in the formulation of the Trustees' response.

### COUNT V: DERIVATIVE CLAIM FOR FRUSTRATION OF PURPOSE
(CFF on behalf of AGM&M against defendants Hovnanian, Mathevosian, Krikorian and the Assembly)

59.    The District of Columbia Nonprofit Corporation Act authorizes directors of nonprofit corporations to bring derivative actions on behalf of the corporation against incumbent trustees of a corporation governed by the Act.

60.    The AGM&M was organized and operates exclusively for charitable, educational, and other beneficial purposes to, among other things, "own, operate, and

12

maintain a permanent museum and memorial to the victims and survivors of the Armenian

Genocide," secure universal affirmation of the Armenian Genocide, and establish a memorial

and public programs to further these purposes. Articles of Incorporation Art. IV.

61.    CFF made significant grants and pledges for the purpose of creating a museum

and memorial dedicated to the memory of the Armenian Genocide: a museum and memorial

developed with the broadest possible participation and support of the Armenian Community

and a museum and memorial that properly and significantly presents the tragedy of the

Armenian Genocide, that would serve as a permanent reminder in our Nation's capitol of the

horrific atrocities committed against the Armenian people. CFF's obligation to make these

grants was conditioned on AGM&M's commitment that CFF would participate in all

material decisions relating to the museum and memorial.

62.    The Grant Agreement further mandates that the grant properties be used only

as part of the AGM&M and that all plans for the AGM&M be approved by the Trustees.

63.    Hovnanian, Mathevosian, Krikorian and the Assembly have refused to allow

CFF to participate in material decisions relating to the museum and memorial by excluding

the CFF designated Trustee from the May 7, 2007 meeting, by approving and implementing

plans to develop the museum and memorial at the National Bank of Washington site without

corporate authority to do so, without proper corporate purpose, and without regard to the

requirements of AGM&M's by-laws and the District of Columbia's Nonprofit Corporation

Act and by abrogating Trustee authority over AGM&M's fundamental purpose in favor of a

planning, development and building committee with apparent accountability to no one.

64.    This interference has frustrated the corporate purpose of AGM&M.

13

65.    As a direct and proximate cause of this abuse of control, AGM&M has sustained, and will continue to sustain, substantial harm.

66.    Hovnanian, Mathevosian, Krikorian and the Assembly are liable to AGM&M as a result.

67.    The wrongs complained of were unlawful, ultra vires and not the product of a valid exercise of business judgment; any demand by CFF to the Board of Directors would have been futile because either the Trustees would be deadlocked or Hovnanian, Mathevosian, Kirkorian and the Assembly would continue to exclude the CFF designated Trustee from participation in the formulation of the Trustees' response.

WHEREFORE, CFF, on behalf of itself individually and on behalf of AGM&M, requests the following relief:

1.    Declare that:

(a)    The actions by three of the AGM&M Trustees in the absence of the CFF designated Trustee to create a planning, development and building committee and delegate fundamental Trustee prerogative to that committee are ultra vires;

(b)    Hovnanian, Mathevosian, Krikorian and the Assembly have breached their fiduciary duties to AGM&M;

(c)    Hovnanian, Mathevosian, Krikorian and the Assembly have wasted AGM&M's corporate assets;

(d)    Hovnanian, Mathevosian, Krikorian and the Assembly have abused their control of AGM&M;

14

(e)    Hovnanian, Mathevosian, Krikorian and the Assembly have frustrated the corporate purpose of AGM&M;

2.    Enjoin AGM&M from any further development of the museum and memorial without proper Trustee notice, participation and approval;

3.    Award AGM&M money damages against defendants Hovnanian, Mathevosian, Krikorian and the Assembly, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, including but not limited to disgorgement of any assets expended to pursue these ultra vires acts and transactions and reimbursement to AGM&M of costs expended to pursue these ultra vires acts and transactions; and

4.    Award to CFF and AGM&M all costs and expenses incurred to pursue this action on behalf of AGM&M.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

15

Dated:  September 28, 2007

**HOGAN AND HARTSON LLP**

By:  _____

Ty Cobb (D.C. Bar No. 270736)
Peter C. Lallas (D.C. Bar No. 495944)
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600


**BRIGGS AND MORGAN, P.A.**

Timothy R. Thornton (Minn. #109630)
Molly M. Borg (Minn. #0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFF
THE CAFESJIAN FAMILY
FOUNDATION**

16

## VERIFICATION

I, John J. Waters, Jr. am an officer and director of The Cafesjian Family Foundation, Inc. I serve as the Secretary and Treasurer and as Vice President. The factual allegations of the foregoing Complaint are true and correct to the best of my knowledge, information and belief. The basis of my knowledge, information and belief is personal knowledge, information from The Cafesjian Family Foundation business records, and reports to me from other The Cafesjian Family Foundation employees in the regular course of business.

John J. Waters, Jr.

Subscribed and sworn to before
me this 27th day of September, 2007.



Notary Public

VALERIE T. HERRING
Notary Public
Minnesota
My Commission Expires January 31, 2011

2079513v3                                        17

**Exhibit 25**

## ARMENIAN ASSEMBLY OF AMERICA, INC.

## CONFLICTS OF INTEREST POLICY

<u>Purpose</u> - Because of its public purposes, charitable (educational, research, etc.) the Armenian Assembly of America, Inc. (the "Corporation") has a special obligation to uphold the public trust. Each trustee, director, officer and employee of the Corporation, therefore, is required to conduct all the affairs of the Corporation in the best interest of the Corporation, to avoid the appearance of a conflict between his or her personal interest and the interests of the Corporation and to ensure that he or she does not benefit personally from his or her position as a director, trustee, officer or employee. This obligation also requires that the Legal Affairs Committee (the "Committee") be fully informed regarding transactions and arrangements into which the Corporation enters and with respect to which directors, trustees, officers or employees may have an interest. To ensure fairness in the Board's decision-making processes and to protect the Corporation's interests when it is contemplating entering into a transaction or arrangement that might benefit the private interest of any of its directors, officers, trustees, agents, consultants and employees, the Board has adopted the following Conflicts of Interest Policy.

<u>Definitions</u>

<u>Interested Person</u> - Any director, trustee, officer, employee, agent, consultant or member of a committee of the Board who has a direct or indirect Interest, as defined below, is an Interested Person.

<u>Interest</u> - A person has an Interest if the person or his or her family member (including a parent, sibling, spouse or child) has, or in the near future will have, directly or indirectly:

- a compensation arrangement or other interest in a transaction with the Corporation or with any entity or individual with which the Corporation has entered into a transaction or arrangement, or

- an ownership or investment interest in or affiliation with any entity with which the Corporation has entered into a transaction or arrangement, or

- an ownership or investment interest in or compensation arrangement or other affiliation with any entity or individual with which the Corporation is negotiating, or contemplating negotiating, a transaction or arrangement.

- any involvement with a project or other matter in the Corporation has an interest.

Compensation includes direct and indirect remuneration as well as gifts or favors that are substantial in nature.

Procedures

Duty to Disclose - Upon the first knowledge by an Interested Person that the Corporation, the Board or a committee thereof is considering or has considered a transaction or arrangement with an entity or individual with which the Interested Person has an Interest, the Interested Person must disclose the existence and nature of his or her Interest to the Committee.

Procedures for Addressing the Conflict - After disclosure of the Interest, the Interested Person may not participate in consideration of the proposed transaction or arrangement, shall not vote on such transaction or arrangement, and shall not be present for the consideration of or vote on such transaction unless the Committee requests information or interpretation from the Interested Person.  The Committee shall then determine (or refer to:  a) the Chairman of the Board of Trustees and Board of Directors; or b) the Board, for a determination of} whether the transaction or arrangement is in the Corporation's best interests and is fair and reasonable to the Corporation and shall make a decision whether to enter into the transaction or arrangement in accordance with such determination.  Such determination shall be made by a vote sufficient for such purpose without counting the vote of any Interested Person.

In determining whether the transaction or arrangement is in the Corporation's best interests, there shall be a review of available information regarding the cost or benefit of comparable transactions or arrangements, if any (and may investigate whether the Corporation should and is able to obtain with reasonable efforts a more advantageous transaction or arrangement that would not give rise to an Interest.)  A disinterested person or committee may be appointed to investigate alternatives to the proposed transaction or arrangement.

Interested Directors or committee members may be counted in determining the presence of a quorum at a meeting which authorizes such a transaction or arrangement.

Records of Proceedings - The minutes of the Board or the Committee considering the Interest of an Interested Person shall contain:

- the names of the Interested Person(s) who disclosed or otherwise were found to have an Interest,

- the nature of the Interest,

- a record of any determination as to whether a transaction or arrangement was in the best interests of and fair and reasonable to the Corporation, notwithstanding the Interest, and the specific reasons supporting such determination, and

- the names of the persons who were present for the discussions on the transaction or arrangement and a record of any votes taken in connection therewith.

<u>Violations of the Conflicts of Interest Policy</u> - If the Committee has reasonable cause to believe that an Interested Person has failed to disclose an actual or possible Interest, it shall inform the Interested Person of the basis for such belief and afford the Interested Person an opportunity to explain the alleged failure to disclose. If, after hearing the response of the Interested Person and making such further investigation as may be warranted in the circumstances, the Committee determines that the Interested Person has in fact failed to disclose an actual or possible Interest, it shall take appropriate disciplinary and corrective action which may include: a) reconsideration of whether the transaction or arrangement was in the best interests of and was fair and reasonable to the Corporation at the time it was undertaken; b) recommending the Interested Person's removal from the Board; and c) any other action.

<u>Compensation Committees</u> - (An Interested Person may not be a member of any committee that has the responsibility for fixing his or her compensation.) (A voting member of any committee of the Board charged with fixing the compensation of officers of the Corporation and who receives compensation for services such as an officer, may not be present for or participate in the discussions regarding, or vote on matters pertaining to, his or her own compensation.)

<u>Annual Statements</u> - Each director, officer and member of a committee of the Board shall annually sign a statement which affirms that such person: (a) has received a copy of this Conflicts of Interest Policy, and (b) has read and understands this Policy, and has agreed to comply with this Policy.

<u>Periodic Review</u> - To ensure that the Corporation operates in a manner consistent with its charitable purposes and its federal tax exemption, periodic reviews will be conducted, in appropriate cases, to determine whether compensation and benefits arrangements and other transactions are reasonable and the results of arms-length negotiations.

<u>Confidentiality</u> - Except with Board approval, and as used for the Corporation's purposes, the Committee shall maintain the confidentiality of information submitted in implementing this policy.

# CERTIFICATION

I have received, read carefully, and understand the foregoing Conflicts of Interest Policy.


_____          _____
(Date)                                          (Signature)


                                                _____
                                                Please Print Name

## ARMENIAN ASSEMBLY OF AMERICA POLICY
## DISTRIBUTION OF MEMBERSHIP LIST & OTHER DATABASE LISTS

The Armenian Assembly of America and its Trustees, Affiliates, Board members and staff will not give, sell, or exchange the organization's membership list and/or any part of its database lists without prior approval of the Executive Committee of the Board of Directors. All requests must be written. Each will be reviewed and decided individually.

Consideration by the Executive Committee may include but not be limited to enhancement to our members, benefit to the AAA, reciprocity, staff time, cost, and preservation of privacy of our members.

Passed by Executive Committee
Conference Call on 7/23/98

Revised by Board of Directors
On 11/6/98

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC., and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., <br><br>                 Plaintiffs, <br><br> v. <br><br> GERARD L. CAFESJIAN, INDIVIDUALLY and as TRUSTEE and PRESIDENT (former) of THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and PRESIDENT and DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION,  JOHN J. WATERS, JR., INDIVIDUALLY and as SECRETARY/TREASURER OF THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, PRESIDENT OF TOMKAT LP, and SECRETARY and DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION; THE CAFESJIAN FAMILY FOUNDATION, INC.; and  TOMKAT LP, <br><br>                 Defendants. | Civil File No. _____ |

### AFFIDAVIT OF NAOKA E. CAREY

I, NAOKA E. CAREY, do hereby state on oath as follows:

1.        I am a member of the Massachusetts bar; an associate of the law firm of Kirkpatrick & Lockhart Preston Gates Ellis, LLP; and counsel for the Plaintiffs in the above-captioned action (application for *pro hac vice* admission pending), the Armenian Genocide Museum and Memorial, Inc. (AGM&M) and the Armenian Assembly of America, Inc. ("the Assembly").  I make this affidavit in support of the Plaintiffs' Complaint, in order to introduce true and accurate copies of documents referenced therein.  The documents introduced herein were provided to me by the Plaintiffs in this action, and are believed to be authentic documents prepared or kept in the ordinary course of business.

2.        Exhibit 1 is a true and accurate copy of a Promissory Note to CFF dated March 17, 2000 by the Assembly in the amount of $500,000.

3.    Exhibit 2 is a true and accurate copy of the Articles of Incorporation of the Armenian Genocide Museum and Memorial, Inc. (AGM&M).

4.    Exhibit 3 is a true and accurate copy of the By-Laws of the Armenian Genocide Museum and Memorial, Inc. (AGM&M) as enacted by the Trustees of AGM&M on October 30, 2003.

5.    Exhibit 4 is a true and accurate copy of a Unanimous Consent in Lieu of the Organization Meeting of the Board of Trustees of AGM&M as enacted by the Trustees of AGM&M on October 30, 2003.

6.    Exhibit 5 is a true and accurate copy of the "Transfer Agreement" executed by and between the Assembly and AGM&M on November 1, 2003.

7.    Exhibit 6 is a true and accurate copy of the Grant Agreement executed by and between the Assembly, Gerard L. Cafesjian ("Cafesjian"), and the Cafesjian Family Foundation ("CFF") on November 1, 2003.

8.    Exhibit 7 is a true and accurate copy of the Assignment and Assumption Agreement by and between TomKat LP and the AGM&M executed on November 4, 2003.

9.    Exhibit 8 is a true and accurate copy of the HUD Settlement Statement reflecting the purchase of 1334-36 G Street, N.W., Washington, D.C. by AGM&M on or around November 4, 2003.

10.    Exhibit 9 is a a true and accurate copy of the HUD Settlement Statement reflecting the purchase of 1338 G Street, N.W. Washington, D.C. by AGM&M from TomKat LP on or around December 15, 2003.

11.     Exhibit 10 is a true and accurate copy of the Purchase Agreement pertaining to 1338 G Street, N.W. Washington, D.C. by and between TomKat LP and the AGM&M executed on December 15, 2003.

12.     Exhibit 11 is a true and accurate copy of an Owner/Seller's Affidavit pertaining to 1338 G Street, N.W. Washington, D.C. executed by John J. Waters, Jr. ("Waters") on December 15, 2003.

13.     Exhibit 12 is a true and accurate copy of the Installment Purchase and Sale Agreement pertaining to 1340 G Street, N.W. Washington, D.C. entered into by TomKat LP on or around October 24, 2000.

14.     Exhibit 13 is a true and accurate copy of a Memorandum of Assignment dated December 22, 2003 by and between TomKat LP and AGM&M pertaining to 1340 G Street, N.W. Washington, D.C.

15.     Exhibit 14 is a true and accurate copy of the HUD Settlement Statement reflecting the purchase of 1342 G Street, N.W. Washington, D.C. by TomKat LP on or around September 30, 2000.

16.     Exhibit 15 is a true and accurate copy of the Purchase Agreement by and between TomKat LP and AGM&M pertaining to 1342 G Street, N.W. Washington, D.C.

17.     Exhibit 16 is a true and accurate copy of a letter from Deborah Devedjian to the Board of Trustees of AGM&M dated May 31, 2007.

18.     Exhibit 17 is a true and accurate copy of a "Financial Overview" presented by John J. Waters at an AGM&M Board Meeting on or around April 26, 2006.

19.    Exhibit 18 is a true and accurate copy of a May 24, 2006 letter sent by William J. Brody ("Brody") to Hirair Hovnanian, Robert Kaloosdian, and Anoush Mathevosian, Trustees of the AGM&M.

20.    Exhibit 19 is a true and accurate copy of an August 2, 2006 letter sent by Robert Kaloosdian to Brody.

21.    Exhibit 20 is a true and accurate copy of an August 29, 2006 letter sent by Brody to Hirair Hovnanian, Robert Kaloosdian, and Anoush Mathevosian, Trustees of the AGM&M.

22.    Exhibit 21 is a true and accurate copy of a September 13, 2006 Letter of Gerard Cafesjian to Hirair Hovnanian, Robert Kaloosdian, and Anoush Mathevosian, Trustees of the AGM&M.

23.    Exhibit 22 is a true and accurate copy of a Memorandum of Agreement Reserving Rights dated October 23, 2006 executed by John J. Waters.

24.    Exhibit 23 is a true and accurate copy of the Complaint filed in the District Court for the District of Minnesota by Gerard Cafesjian and the Cafesjian Family Foundation against the Assembly (Docket No. 1:07 cv 2079) on April 26, 2007.

25.    Exhibit 24 is a true and accurate copy of the Complaint filed in the District Court for the District of Columbia by the Cafesjian Family Foundation against the AGM&M (Docket No. 1:07 cv 01746) on or around September 27, 2007.

26.    Exhibit 25 are true and accurate copies of the Assembly's Conflict of Interest Policy and the Assembly's Policy on Distribution of Membership List and Other Database Lists.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF FEBRUARY, 2008.

Naoka E. Carey

- 4 -