## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Armenian Assembly of America, Inc., and the Armenian Genocide Museum & Memorial, Inc., <br><br>       Plaintiffs, <br><br> v. <br><br> Gerard L. Cafesjian, individually and as Trustee and President of the Armenian Genocide Museum and Memorial, Inc. and President and Director of the Cafesjian Family Foundation, Inc.; John J. Waters, Jr., individually and as Secretary/Treasurer of the Armenian Genocide Museum and Memorial, Inc., President of the TomKat Limited Partnership, and Secretary and Director of the Cafesjian Family Foundation, Inc.; The Cafesjian Family Foundation, Inc; and the TomKat Limited Partnership, <br><br>       Defendants. | Civil File No. 1:08-cv-255 (CKK) <br><br><br><br> **DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE TO TRANSFER** <br><br> **<u>ORAL ARGUMENT REQUESTED</u>** |

Defendants move this Court for dismissal of plaintiffs' complaint pursuant to the Federal Rules of Civil Procedure. Plaintiffs' claims arise out of the same occurrences and transactions at issue in an already pending action in the District of Minnesota, *Waters et al. v. AGM&M et al.*, 08-373 (JNE/JJG) (D. Minn.). Because plaintiffs' claims are compulsory counterclaims pursuant to Rule 13(a) and Minnesota courts can acquire jurisdiction over all of the parties, the complaint should be dismissed to allow plaintiffs to re-plead their claims in the Minnesota action. *See* Fed. R. Civ. P. 13(a).

Alternatively, 28 U.S.C. § 1404(a) requires that this action be transferred to the District of Minnesota. The parties are bound by the terms of a valid and enforceable forum selection

clause which unambiguously mandates a Minnesota forum.  The convenience of the parties and witnesses and the interests of justice support the choice of the Minnesota forum.  At a minimum, the Court should stay this action pending the outcome of the Minnesota litigation.

This Motion is based on all the records and pleadings already on file with the Court, as well as the Memorandum and Points of Authorities in Support of Defendants' Motion to Dismiss, or in the Alternative to Transfer, the Affidavit of John J. Waters, Jr., the Affidavit of Molly M. Borg, and the proposed order.  Defendants request oral argument on this matter and propose that the Court set this matter for hearing as soon as possible.

Dated: April 7, 2008

**BRIGGS AND MORGAN, P.A.**


By:   s/ Molly M. Borg
     Timothy R. Thornton
     Molly M. Borg
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400
*Admitted Pro Hac Vice*
**AND**

**HOGAN AND HARTSON LLP**


By:     s/ Peter C. Lallas
     Ty Cobb (D.C. Bar No. 270736)
     Peter C. Lallas (D.C. Bar No.495944)
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

**ATTORNEYS FOR DEFENDANTS**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Armenian Assembly of America, Inc., and the Armenian Genocide Museum & Memorial, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Gerard L. Cafesjian, individually and as Trustee and President of the Armenian Genocide Museum and Memorial, Inc. and President and Director of the Cafesjian Family Foundation, Inc.; John J. Waters, Jr., individually and as Secretary/Treasurer of the Armenian Genocide Museum and Memorial, Inc., President of the TomKat Limited Partnership, and Secretary and Director of the Cafesjian Family Foundation, Inc.; The Cafesjian Family Foundation, Inc; and the TomKat Limited Partnership, <br><br> Defendants. | Civil File No. 1:08-cv-255 (CKK) <br><br><br><br> **MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE TO TRANSFER** |

## <u>INTRODUCTION</u>

On February 13, 2008, defendants (the Cafesjian interests) filed suit against plaintiffs in the District of Minnesota. The Minnesota complaint asked the court to declare that defendants were not liable for a breach of any contract, fiduciary duty, or duty of good faith and fair dealing. Rather than filing compulsory counterclaims in the Minnesota action as required by Rule 13(a), plaintiffs brought the same litigation to this Court. Plaintiffs' dilatory attempt to evade the Minnesota forum must be turned back. The Court should dismiss the complaint pursuant to Rule 13(a), transfer this lawsuit to Minnesota pursuant to 28 U.S.C. § 1404(a), or stay this action pending the outcome of the Minnesota litigation.

## BACKGROUND

### A.     Pending Actions

The parties have engaged in multifarious litigation over the past year. Currently, there are six pending lawsuits: (1) *Cafesjian v. Armenian Assembly of America, Inc.*, No. 08-1744 (8th Cir.)[1]; (2) *AGM&M, Inc. v. Cafesjian Family Foundation, Inc.*, No. 07-1259 (CKK) (D.D.C.); (3) *Cafesjian v. AGM&M, Inc.*, No. 07-1746 (RWR) (D.D.C.); (4) *Waters v. AGM&M, Inc.*, No. 07-4212 (JNE/SRN) (D. Minn.); (5) *Waters v. AGM&M, Inc.*, No. 08-373 (JNE/JJG) (D. Minn.); and (6) *AGM&M, Inc. v. Cafesjian*, No. 08-255 (CKK) (D.D.C.). These actions stem from a bitter dispute among former allies over the ownership of and control over five properties and the reversionary interest to which those properties are subject.[2]

### B.     The Parties

Gerard Cafesjian is a retired vice president of West Publishing and a former resident of Minnesota. (*See* Compl. ¶ 3.) When Thomson bought West from its employee owners, Cafesjian became a wealthy man. Cafesjian lives in Minnesota for at least 5 months out of every year. Through the Cafesjian Family Foundation (CFF), Cafesjian has dedicated his largess to the Armenian people, Armenian nation, and Armenian causes. CFF is a Florida non-profit corporation that conducts substantial business operations from Minneapolis, Minnesota. (*Id.* ¶ 4.) Cafesjian is CFF's founder, president, and director. (*Id.* ¶¶ 3-4.)

---

[1]     *Cafesjian v. Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG) (D. Minn.) was recently dismissed without prejudice on indispensable party/personal jurisdiction grounds. That disposition has been appealed to the Eighth Circuit Court of Appeals. *See Cafesjian v. Armenian Assembly of America, Inc.*, No. 08-1744 (8th Cir.).

[2]     Plaintiffs have bombarded the Courts with Rule 12 motions, objecting to jurisdiction and prematurely challenging the merits of every case. As a result of plaintiffs' aggressive motion practice, discovery has been delayed.

John J. Waters, Jr. is CFF's vice president, a Cafesjian confidante, and a long time Minnesota resident. (*Id.* ¶ 5.) Waters performs substantially all of his duties from CFF's Minneapolis office. (*See id.*; Waters Aff. ¶ 4.) Waters is the former Armenian Genocide Museum and Memorial ("AGM&M") Secretary and currently serves as the CFF designee to the AGM&M board of trustees. (Compl. ¶ 5.)

TomKat LP is a South Dakota limited partnership that handles investments for the Cafesjian family. (*Id.* ¶ 6.) Waters, as TomKat's president, runs the partnership from Minneapolis. (*Id.*)

The Armenian Assembly of America ("Assembly") is a D.C. nonprofit corporation that lobbies on Capitol Hill and purports to be committed to the advancement of Armenian issues. (*Id.* ¶ 1.) The Assembly peddles influence and begs for money across the nation, including in Minnesota. (Waters Aff. ¶ 12.) Assembly contributors and members reside in Minnesota and new members are solicited through all forms of communications directed to Minnesota. (*Id.*) Lou Ann Matossian and Aram Desteian, who provide services to CFF, do volunteer work for the Assembly in Minnesota.[3] (*Id.* ¶¶ 14-16.) Since 1998, Assembly representatives, including its chairman Hirair Hovnanian, have traveled to Minnesota to meet with Cafesjian, CFF, Waters, and other Minnesota residents. (*See id.* ¶¶ 17-23.) These visits were made to raise money, conduct business and advocate Assembly agendas. (*Id.* ¶ 17.) Over the years, the Assembly communicated with CFF, Waters, and Cafesjian in Minnesota on a daily basis. (*Id.* ¶¶ 17-23.)

AGM&M, Inc. is a D.C. nonprofit corporation, established to create a museum and memorial that would recognize and remember the Armenian Genocide. (*See* Carey Aff. Exs. 2-

---

[3]     Matossian and Desteian volunteered for the Assembly and its caucus through much of 2007. However, as a result of this litigation, the Assembly has since snubbed Matossian and Desteian's volunteer efforts.

3.)  Since being incorporated in 2003, AGM&M was to be managed and controlled by a board of

trustees.  (*See id.*)  Trustees are selected by virtue of their founding efforts or substantial

contributions.  The board currently comprises six votes.  (*See id.*)  CFF exercises three of the six

votes; the Assembly, Hirair Hovnanian, the Assembly's alter ego, and Anoush Mathevosian, an

independent patron, control the remaining three votes.  (*See* Waters Aff. ¶ 35; *see also* Carey

Aff. Ex. 6.)  From 2003 until the fall of 2006, Waters and Cafesjian managed AGM&M

operations and conducted virtually all corporate business from CFF's Minnesota office.  (*See*

Compl. ¶ 71; *see id.* ¶¶ 72-98.)

      **C.**      **The AGM&M project**

      In 1998, the Assembly first importuned Cafesjian about funding for a national museum to

commemorate the Armenian Genocide.  (Waters Aff. ¶ 17.)  Over the years, the parties

collaborated to realize the dream of a national monument to honor the struggle of the Armenian

people and the tragedy of the Armenian Genocide.  (*Id.* ¶¶ 17-18.)  In 2000, the parties finally

identified a potential site for the structure.  (Compl. ¶¶ 13-14.)  The Assembly lacked the cash

and the wherewithal for the acquisition, so Waters spearheaded the purchase of the former

National Bank of Washington property.  (*Id.* ¶¶ 14-17; Waters Aff. ¶ 21.)  Mathevosian and

Cafesjian each contributed $3.5 million to bankroll the deal.  (Compl. ¶ 15.)  Cafesjian loaned an

additional $500,000 to cover the balance of the purchase price, closing and other costs.  (*Id.*

¶¶ 15-16.)

      The $500,000 loan was memorialized by a promissory note payable on May 16, 2000.

(*Id.* ¶ 16; Carey Aff. Ex. 1.)  The note specified Minnesota as the forum for dispute resolution:

> AT THE OPTION OF THE PAYEE, THIS NOTE MAY BE
> ENFORCED    IN    ANY    FEDERAL    COURT    OR
> MINNESOTA STATE COURT SITTING IN HENNEPIN
> COUNTY, MINNESOTA, AND <u>THE MAKER CONSENTS</u>

<u>TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT THE VENUE IN SUCH FORUMS IS NOT CONVENIENT</u>. IF THE MAKER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, THE PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR, IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

(Carey Aff. Ex. 1 (emphasis added).) This note has yet to be paid.

Project planning proceeded in fits and starts over the next two years. With the benefit of expert advice, the parties soon came to realize that the bank parcel would not be sufficient to accommodate an appropriate museum and memorial. (Waters Aff. ¶ 22.) Cafesjian, through TomKat, therefore secured the four lots adjacent to the bank. (*Id.;* Compl. ¶ 19.) These acquisitions were again led by Waters from CFF's Minnesota office. (Waters Aff. ¶ 22.)

The five parcel assemblage provided the space necessary for a development that would pay just tribute to the Armenian people and the suffering they endured. Cafesjian and the Assembly affirmed their commitment to the project by incorporating the AGM&M, Inc. and empowering the new organization to take over the project assets and campaign. (*See* Carey Aff. Exs. 2-3.) To provide the AGM&M with a place to be, Cafesjian entered into the Grant Agreement with the Assembly pursuant to which $17.85 million would be contributed for the benefit of AGM&M.

### D.    Charter documents and grant agreements

Cafesjian's significant contributions were predicated on his being afforded substantial involvement in AGM&M affairs. AGM&M was created to "own, operate, and maintain a

permanent museum and memorial to the victims and survivors of the Armenian Genocide" and "to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide." (Carey Aff. Ex. 2 at Art. IV.) AGM&M's charter documents mandate that all major donors – including especially CFF and Cafesjian – have an inalienable say about AGM&M planning and operations: AGM&M affairs "shall be managed and controlled by the Board of Trustees." (*Id.* at Art. VII (A).) Six trustee votes constitute the board. Trustee franchise, with the exception of Mathevosian and the Assembly, is allocated based on each $5 million donation. (Carey Aff. Ex. 3 §§ 2.4, 2.5; *id.* Ex. 6 §§ 5.2(C)-(D).) Because of Cafesjian and CFF's significant support (*i.e.* $17.85 million), CFF has been vested with three votes. (Waters Aff. ¶ 35.)

Action by the AGM&M board requires "an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present." (Carey Aff. Ex. 3 § 2.7.) A quorum is convened by the attendance of at least one-half of the aggregate eligible votes at a validly called meeting. (*Id.* § 2.6.) Trustee resignation and removal procedures ensure that major donors will never be disenfranchised:

> Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.
>
> * * *
>
> Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote . . . <u>Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee.</u> The donor, or the individual or institution that has

> succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, <u>shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason</u>.

(*Id.* § 2.17 (emphasis added).)  Accordingly, dismissal or resignation of a specific trustee does not terminate a qualifying donor's right to board participation.  As the major benefactor, CFF retains the perpetual right to designate trustees, and those trustee votes must be counted in the requisite 80% approval for board actions.

The Grant Agreement, which tracks AGM&M governance protocol, sets forth the terms of CFF and Cafesjian's significant beneficence.  (*See* Carey Aff. Ex. 6.)  Cafesjian and CFF committed to an initial $4 million grant[4] for bank building acquisition and a conditional pledge in excess of $12.85 million for the benefit of the about to be formed AGM&M.  (*Id.*)  The Assembly agreed that these funds would be used to cause the four properties adjacent to the bank to be transferred to AGM&M.  (*Id.* § 5.3.)  The Assembly would never hold title to this real estate; rather CFF's contributions would allow the Assembly to secure the property on behalf of AGM&M.  (*See id.*)

The acquired land could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc." (*Id.* § 3.1.)  If the project was not completed prior to December 31, 2010 pursuant to trustee-approved plans or if the property was not developed in substantial compliance with such plans, then at the donors' "sole discretion," either the funds or the real estate would revert to CFF and Cafesjian.  (*Id.* § 3.1(B).)  Thus only a development that fulfilled a plan approved by 80% of the trustees could vitiate donor reversionary rights.  (*Id.* §§ 3.1(A), 5.2(E); *id.* Ex. 5 § 3.4(E); *see id.*

---

[4]     These monies were in addition to a $1 million grant already bestowed upon the Assembly by the Vanguard Endowment Program of the Cafesjian Family Foundation Charitable Trust. (*See* Carey Aff. Ex. 6 at § 1.1.)

Exs. 2-3.)  This provision leaves no doubt about the essentiality of Cafesjian's role in the planning process.

In addition to attaching reversionary conditions to the gifts, the Grant Agreement requires the Assembly to:

> (A)     make available in the Grant Property space acceptable to [CFF] for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by [CFF];
>
> (B)     cooperate with the design firms, artists and others selected by [CFF] to design and ensure the successful completion of the Memorial;
>
> (C)     permit [CFF] to participate in all material decisions regarding the Memorial;
>
> (D)     operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by [CFF] in writing;
>
> (E)     be solely responsible for the costs of maintaining the Memorial; and
>
> (F)     name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by [CFF] in writing.

(*Id.* Ex. 6 § 3.2.)

In the event the Assembly "fails to use the Grants solely for the purposes set out in [the Grant] Agreement or if the Assembly fails to satisfy any of the conditions of [the Grant] Agreement, [CFF and Cafesjian are] released from any remaining obligation under this Agreement to provide funds or property to the Assembly."  (*Id.* § 3.9(A).)  "If the Assembly uses any portion of the Grants either for a purpose other than those set out in [the Grant] Agreement . . . the Assembly shall repay the portion of the Grants so spent to [CFF and Cafesjian], plus

interest." (*Id.* § 3.9(B).) The Assembly also promised to issue a replacement promissory note confirming the $500,000 loan. (*Id.* § 5.4.) In addition to contractually stipulated rights, CFF and Cafesjian retain all other legal and equitable remedies. (*Id.* § 3.9(C).)

In consideration for Cafesjian's generosity, the Assembly committed to a transfer arrangement with the newborn AGM&M. (*See id.* Ex. 5.) The Assembly and AGM&M alone made that contract. (*See id.*) By that Transfer Agreement the Assembly covenanted to convey "all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets" that had been contributed to or held by the Assembly for the development, renovation and construction of the museum and memorial. (*Id.* § 1.1(A).) The promissory note was also supposed to be reissued and transferred to AGM&M. (*Id.* § 1.2(D); *id.* Ex. 6 § 5.54(C).) Since the promissory note was never replaced, that transfer of debt never happened.

The contract makes the reason for the transfer of assets doubly clear: "[i]n order to complete the building of the Armenian Genocide Museum and Memorial," the Assembly shall "transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc." (Carey Aff. Ex. 5 at 1.) Obviously if the adjacent non-bank properties had not been acquired "for the purpose of building the AGM&M," those assets would not have been transferred.

In accepting the transfer, AGM&M promised to honor all Grant Agreement obligations and vowed to use the grant properties "solely to develop, construct and operate the AGM&M" and "solely in furtherance of AGM&M, Inc.'s stated charitable purposes." (*Id.* §§ 1.2, 1.3, 4.6.) The transferred properties are exclusively dedicated to AGM&M purposes, and the

museum/memorial must be completed by 2010 according to a plan approved by the board – which approval perforce requires 80% trustee endorsement. (*Id.*)

### E.    Project development

From 2003 until October 2006, Cafesjian and Waters were the primary managers of AGM&M. (Compl. ¶ 71.)  Cafesjian was AGM&M president, and Waters was the corporate secretary.  (*Id.*)  All AGM&M business, including banking, accounts payable, and other functions were managed and administered from Minneapolis.  (Waters Aff. ¶¶ 25-33.)  Because AGM&M had no employees, Cafesjian's Minneapolis employees conducted most of the day-to-day operations – at no cost to AGM&M.  (*See id.*)  For all intents and purposes Waters acted as AGM&M's executive director.

During those three years, Cafesjian strived to move the project forward.  The board received various development proposals, which encompassed potential architects, design firms, executive directors and fundraising strategies.  (Waters Aff. ¶ 34.)  Each idea floated by Cafesjian was shot down by Hovnanian and his Assembly sycophant.  (*Id.*)  Recognizing that there were different visions for what AGM&M should become, in September 2006 Cafesjian stepped aside as chairman.  (*See* Carey Aff. Ex. 21.)  Cafesjian hoped that by removing his persona from project leadership, a consensus regarding AGM&M development would build. Unfortunately, rather than becoming more cooperative, relations among trustees were increasingly divisive.  Concerned that the Assembly intended to dispose of the grant properties and abrogate reversionary rights, the Grant Agreement conditions were made a matter of public record on October 23, 2006.  (See Carey Aff. Ex. 22.)

At the October 24, 2006 trustee meeting, the parties agreed to transfer AGM&M's records and routine business to the Assembly's Washington, D.C. offices.  (Waters Aff. ¶ 33.) Once the Assembly took over, ulterior motives of the Hovnanian cabal became manifest.  They

had other ideas about the project and the satisfaction of their desires was not going to be hampered by "details" such as the requirement for 80% board of trustee approval. The real estate filing, which accurately reflects the reversionary conditions place upon the gifts, sent Hovnanian and the Assembly into a rage.

### F.    CFF is banished from AGM&M

AGM&M progress was at an impasse. At a May 7, 2007 board meeting, Van Krikorian – the Assembly trustee designee and the Assembly's attorney – started grilling Waters about a CFF lawsuit against the Assembly. (Waters Aff. ¶ 39.) AGM&M had not been joined in that action. Waters, who was appearing by telephone and did not have counsel present, declined to indulge to Krikorian's interrogation about matters extraneous to the meeting agenda. (Id. ¶¶ 38-39.) Krikorian immediately declared Waters and Cafesjian to have a conflict of interest. (Id. ¶ 39.) Together with Hovnanian, Krikorian refused to allow the meeting to proceed until Waters was ejected. (Id. ¶ 40.) Effectively excluded, Waters moved to adjourn; Krikorian and Hovnanian blocked the recess. (Id.) Locked in a stalemate – Hovnanian and the Assembly trustee refused to proceed with Waters' on the line – the CFF designee hung up under protest. (Id.)

The meeting purported to continue without Waters. Krikorian and Hovnanian deputed museum development authority to a concocted planning and building committee that was answerable to no one. The delegation lacked 80% approval from trustees who remained at the meeting. Flouting the super-majority prerequisites to board action – as expressly agreed in both the charter documents and the Grant Agreement – Hovnanian and the Assembly alone trumped up the committee and banned AGM&M's largest donor from all participation. (Id. ¶ 41.)

An AGM&M and Assembly August 2007 press release heralded that museum development – without Cafesjian and CFF input and without a memorial – was imminent; Phase I planning contracts had been awarded. (Borg Aff. Ex. 1.) CFF and Cafesjian were completely

frozen out of architecture and design formulation. (Waters Aff. ¶ 41.) Mindful of the trustee responsibility to ensure that AGM&M complies with its charter documents, contractual obligations, and governing law, Waters and CFF filed suit individually and derivatively against AGM&M and the trustees who had unilaterally seized control of the organization. *See Cafesjian Family Foundation v. AGM&M*, No. 07-1746 (RWR) (D.D.C.). The lawsuit sought to confine AGM&M action to by-law procedures and to hold the rogue trustees accountable for breaching fiduciary duties and wasting corporate assets. (*Id.*)

### G.    Spurious arbitration demands and unauthorized museum development

Apparently reluctant to face a jury, AGM&M and the Assembly sought to arbitrate claims against CFF, Cafesjian, Waters and TomKat. (*See* Borg Aff. Ex. 2 ¶¶ 53-56.) The American Arbitration Association ("AAA") demand accused the Cafesjian interests of breaching the Grant Agreement, misappropriating trade secrets, and violating duties of good faith and fair dealing. (*Id.*) Having never signed an arbitration agreement, the Cafesjian interests objected to AAA jurisdiction. (*Id.* ¶ 57.) When the Assembly and AGM&M proceeded without regard to that challenge, the Cafesjian interests sued to enjoin arbitration. (*Id.; see also Waters v. AGM&M, Inc.*, No. 07-4212 (JNE/SRN) (D. Minn.).)

The Assembly and AGM&M opposed the injunction and insisted that discovery on the issues of arbitrability and jurisdiction was essential. Accordingly, the Court accelerated discovery and scheduled an early trial. (Borg Aff. Ex. 2 ¶ 57.) The parties exchanged written discovery and arranged depositions.

In the meantime, the Assembly and AGM&M continued to tout museum progress. (Borg Aff. Exs. 3-4.) The Cafesjian interests, still uninformed and unincluded, feared that the Assembly's unilateral actions – which defied AGM&M charter documents and obligations to donors – would cause irreparable harm to the bank building and adjacent properties. Cafesjian

therefore sought equitable relief. *Cafesjian Family Foundation v. AGM&M*, 07-1746 (RWR) (D.D.C.), Clerk Doc. No. 14. Although the preliminary injunction motion is still pending, Judge Roberts directed that AGM&M property could not be modified or altered until the legal issues were vetted and decided. Accordingly, the parties were required to inform the Court and each other of project developments.[5] Having put things on hold, Judge Roberts ordered the parties to mediation.

As ordered the parties engaged in mediated settlement discussions. In order to give those negotiations the best chance for success, all litigation was stayed until February 6, 2008. (Borg Aff. Exs. 5-6.) Unfortunately bargaining stalled, and the Cafesjian interests were forced to resort to discovery. Depositions were set for February 22 and 25, 2008.

On February 12, 2008, plaintiffs suddenly withdrew their arbitration demand and declared the action to enjoin arbitration moot. (Borg Aff. Ex. 7.) Because the claims that plaintiffs had sought to arbitrate were still alive, on February 13, 2008 the Cafesjian interests filed suit in Minnesota seeking to have the parties' respective rights declared and to have the Cafesjian interests absolved of any liability ("Minnesota Declaratory Action").[6] (Borg Aff. Ex. 2.) The first-filed Minnesota complaint sought a judicial declaration regarding the many claims that plaintiffs had pressed in the spurious and since abandoned arbitration demand. (*Id.*)

---

[5]    Since the December status conference, plaintiffs have sought project approval from the D.C. Historic Preservation Review Board. Plaintiffs failed to inform defendants about these developments, and, in fact, plaintiffs' agent, Van Krikorian, snuck out of the courthouse during the parties' March 27, 2008 mediation before Magistrate Judge Kay to submit this proposal to the HPRB. *See Cafesjian Family Foundation v. AGM&M*, No. 07-1746 (RWR), Clerk Doc. No. 30. Plaintiffs have flouted their commitment to advise about all project progress and disregarded their obligation to negotiate in good faith.

[6]    Defendants amended the Minnesota Declaratory Action complaint on February 14, 2008. (Borg Aff. Ex. 2.)

### H.    <u>This lawsuit</u>

Two days later, on February 15, 2008, plaintiffs filed this "me too" action.  That lawsuit is virtually identical to the claims that had been asserted in arbitration – and the complaint is a mirror image of the Minnesota Declaratory Action.  Each count of the Minnesota Declaratory Action corresponds with the claims that plaintiffs have brought before this Court.  (*Compare* Compl. *with* Borg Aff. Ex. 2.)  The two lawsuits involve the same series of agreements, the same set of facts and the same cast of characters.  (*Id.*)  The only difference is that the parties seek opposite relief:  plaintiffs want redress against defendants' purported breaches, while defendants seek a declaration that no duty has been breached.  The claims in this suit are indisputably based on the same facts, transactions and occurrences that gave rise to the Minnesota Declaratory Action.  (*Id.*)

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE COMPULSORY COUNTERCLAIMS

Rule 13(a) provides that a

pleading must state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

This procedural directive is intended "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *S. Constr. Co. v. Pickard*, 371 U.S. 57, 60 (1962). The applicability of Rule 13(a) involves a two-fold inquiry: whether the claims arise out the same transaction or occurrence; and whether the District of Minnesota can acquire jurisdiction over the parties. Both questions can only be answered "yes."

### A.    The same "transaction or occurrence"

The operative term "transaction" "is to be construed generously to avoid the unnecessary expense inherent in multiplicious litigation." *Columbia Plaza Corp. v. Security Nat'l Bank*, 525 F.2d 620, 625 (D.C. Cir. 1975); *see also Southern Constr. Co.*, 371 U.S. at 60. As the Supreme Court explained:

"Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship . . . Essential facts alleged by appellant enter into and constitute in part the cause of action set forth in the counterclaim. That they are not precisely identical, or that the counterclaim embraces additional allegations . . . does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim.

*Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926).

Thus to determine whether this later-filed lawsuit is a compulsory counterclaim the Court "must assess the degree of 'logical relationship' between the two actions." *Columbia Plaza Corp.*, 525 F.2d at 625. "Where the factual claims in two actions indicate that evidence offered in both claims is likely to be substantially identical, the claim should be adjudicated in a single forum." *Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd.*, 111 F.R.D. 359, 361 (D.D.C. 1986).

The *Pumpelly v. Cook* court assessed the compulsory counterclaim status of that action. 106 F.R.D. 238 (D.D.C. 1985). The complaint alleged common law fraud, securities fraud and breach of contract, and sought to void contracts. *Id.* at 238. By the time the plaintiff sued, however, the underlying dispute was already the subject of pending proceedings in other courts. *Id.* at 238. Since "the same series of four agreements and the same cast of characters" and the same evidence were involved, the court recognized that there was "clearly a logical relationship" between the new claims and the pending action. *Id.* at 239. The plaintiff's complaint was therefore dismissed without prejudice, with leave to file as compulsory counterclaims in the already pending action. *Id.* at 239-40.[7]

---

[7]    The *Pumpelly* court declined to transfer the action pursuant to 28 U.S.C. § 1404(a), because

> dismissal with leave to plead the complaint as a compulsory counterclaim is a better method than transfer for resolving the problem. Rule 13(a) demands only that a court be able to "acquire" jurisdiction over the parties named in the counterclaim. In contrast, transfer under 28 U.S.C. § 1404(a) might require consideration of the question of whether the Eastern District of Virginia is a venue in which the counterclaim "might have been brought" . . . It is clear that dismissal of this action offers the most effective way to consolidate the separate aspects of this dispute.

106 F.R.D. at 240.

*Columbia Plaza Corporation* read Rule 13(a) to require enjoinder of a subsequently filed action. 525 F.2d at 625. The plaintiff brought suit in D.C.; eight days later, defendants sued in New York. *Id.* at 623. The parties' respective claims were not identical, but the court observed that the "same issues, and apparently to a large extent the same evidence, will be considered in both actions, and two proceedings could duplicate discovery." *Id.* at 626. These circumstances compelled the conclusion that "two actions [that] are parts of a single controversy should lead to resolution of both in a single forum. Sound judicial administration counsels against separate proceedings, and the wasteful expenditure of energy and money incidental to separate litigation of identical issues should be avoided." *Id.* Concerns about crowded dockets and the importance of avoiding "the risk of inconsistent adjudications and races to obtain judgments" drove the result *Id.* The second-filed action was enjoined to ensure that compulsory counterclaims, which belonged in a single suit, were asserted in the first-filed action. *Id.* at 629.

Like *Pumpelly* and *Columbia Plaza Corporation*, the Assembly and AGM&M's complaint raises compulsory counterclaims that belong in the Minnesota lawsuit. Plaintiffs' causes of action are the converse of the claims in the Minnesota Declaratory Action: both involve the same accusations, the same contracts, the same facts, the same parties, and the same evidence. The two actions could not be more logically related – in fact, with the exception of the relief sought, the lawsuits are identical. (*Compare* Compl. *with* Borg Aff. Ex. 2.)

If that were not enough, plaintiffs and defendants are already parties to two Minnesota suits. *See Waters v. AGM&M*, No. 07-4212 (JNE/SRN); *Waters v. AGM&M*, No. 08-353 (JNE/JJG). The underlying claims in the Minnesota Declaratory Action address the propriety of Cafesjian, CFF and Waters' conduct that, as alleged, could have only occurred in Minnesota. Waters is a long time Minnesota resident who conducts substantial business for CFF and

TomKat in Minneapolis and who used to conduct substantial business for AGM&M from the same place. Cafesjian maintains a home in Minnesota, and many potential witnesses are Minnesota residents. Even though plaintiffs are D.C. corporations, the corporate principals – *i.e.* the trustees and the officers – hale from all over the country. No more than one or two witnesses reside in the District.

Dispositively, the Minnesota Declaratory Action was filed first. "For more than three decades the rule in this circuit has been that where two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." *Wash. Metro Area Transity Authority v. Ragonese*, 617 F.2d 828, 830 (D.D.C. 1980) (internal quotations omitted); *see also Speed Prods. Co. v. Tinnerman Prods.*, 171 F.2d 727, 729 (D.C. Cir. 1948). "There is a strong policy preference for favoring the first-filed suit." *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico, S.A. E.S.P.*, 421 F. Supp. 2d 87, 99 (D.D.C. 2006). Defendants sued in Minnesota on February 13, 2008; plaintiffs did not get to the courthouse for another two days. Neither action has progressed beyond the initial motion stage; accordingly there is no reason to deviate from the first-filed rule.

In sum, the two actions arise out of the same transaction or occurrence, and the District of Minnesota – where the suit was filed first – is the best and preferred venue for this dispute.

**B.    Jurisdiction aplenty**

The next inquiry is whether Minnesota courts have the requisite prerogative to "acquire" jurisdiction over the parties. See Fed. R. Civ. P. 13(a); *Pumpelly*, 106 F.R.D. at 240 (parties had sufficient minimum contacts for court to acquire jurisdiction). The facts – and more specifically plaintiffs' allegations – demonstrate that both the Assembly and AGM&M are answerable to a Minnesota court.

Due process allows jurisdiction to be exercised whenever a defendant has sufficient minimum contacts with the forum state so as not to offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Sufficient contacts exist when the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Being haled into a state's court must be reasonably anticipated when there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985). "[P]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (internal quotations omitted).

The reach of personal jurisdiction is a function of the nature and quality of the contacts with the forum state, the quantity of contacts with the forum, the relation between the cause of action and the contacts, the forum state's interest in providing a forum for its residents, and the convenience of the parties. *Id.* at 476; *Digi-Tel Holdings, Inc. v. Proteq Telecomms., Ltd.*, 89 F.3d 519, 522-23 (8th Cir. 1996).

1.    Jurisdiction over the Assembly

The Assembly's contacts with Minnesota have been systematic and continuous for over 10 years: that organization has actively solicited donations from Minnesota residents, traveled to Minnesota to lobby and fundraise and to meet with Cafesjian, utilized Minnesota volunteers and corresponded regularly with Minnesota residents. (Waters Aff. ¶¶ 12-23; *id.* Exs. A-G.) The Minnesota district court concluded that these substantial contacts afforded personal jurisdiction

over the Assembly.  (*See* Borg Aff. Ex. 8.)  This determination has not been appealed and is res judicata.[8]

   2. <u>Jurisdiction over AGM&M</u>

  AGM&M is also subject to suit in Minnesota.  Plaintiffs' complaint charges defendants with mismanaging AGM&M, breaching fiduciary duties and misappropriating trade secrets – misfeasance that could only have been committed in Minnesota.  Plaintiffs specifically allege that "[b]etween November 1, 2003 and the fall of 2006, AGM&M was operated, managed, and in fact, controlled by Cafesjian and Waters, acting as President and acting Secretary/Treasurer, respectively."  (Compl. ¶ 71.)

---

[8] Regardless, the Assembly's Minnesota contacts are sufficient to satisfy due process.  The Assembly solicits donations and recruits members in Minnesota.  (*Id.*)  Assembly membership comprises numerous Minnesota residents – not the least of whom are CFF principals and agents. (Waters Aff. ¶¶ 12-23.)

The Assembly's lobbying organization – ARAMAC – operated from CFF's Minnesota offices through most of 2007.  (*Id.* ¶ 15.)  ARAMAC puts the arm on Minnesota citizens and lawmakers to support Assembly causes.  (*Id.*)  ARAMAC and the Assembly organize meetings, seminars, and other activities in Minnesota.  (*Id.* ¶¶ 15-16.)  Up through most of 2007, ARAMAC's two Minnesota state chairs did work for CFF and conducted activities on behalf of the Assembly from CFF's offices.  (*Id.*)  These Minnesota contacts between the Assembly and CFF have been a continuous, almost a daily occurrence for at least the last ten years.

On top of that, Assembly officials and board members have frequently traveled to Minnesota to meet with CFF.  (*Id.* ¶¶ 17-23; *id.* Exs. A-G.)  Assembly representatives came to Minnesota to, among other things, garner Cafesjian's support.  (*Id.*)  The Assembly has repeatedly entreated CFF and Cafesjian for contributions.  (*Id.*)  The agreements and donations at issue in this litigation were in large part solicited, formulated and negotiated from Minnesota.  (*Id.*)  The contacts at issue are not fortuitous or attenuated; the Assembly's Minnesota dealings are purposeful, systematic, and continuous.

The Assembly and CFF have worked together for over a decade to develop an Armenian-American institution.  Assembly representatives – including Hovnanian and others – have dealt with CFF, Cafesjian or Waters on nearly a daily basis.  (*Id.* ¶¶ 12-23.)  These communications were specifically directed at defendants while they were in Minnesota.

These facts, in the aggregate, demonstrate that Minnesota courts have personal jurisdiction over the Assembly.

Plaintiffs further complain that defendants improperly retained a business consultant, failed to maintain the properties, jeopardized a favorable real estate tax status, spent down AGM&M assets and failed to keep proper records.  (*Id.* ¶¶ 71-98.)  If these allegations were true, Minnesota was the place of commission.  CFF does not have a D.C. office, and Waters performs substantially all of his CFF and TomKat duties from Minneapolis.  (Waters Aff. ¶¶ 2, 11.)  AGM&M has no employees, so CFF's Minneapolis staff orchestrated most of AGM&M's day to day activities from Minnesota during the 2003 to 2006 period.  (*Id.* ¶¶ 25-36.)

In fact, on AGM&M's behalf, all corporate records were maintained in Minnesota, AGM&M's books were kept in Minnesota by Minnesota residents and correspondence to and from AGM&M originated and terminated in Minnesota.  (*Id.*)  AGM&M accounting was handled by Minnesota accountants.  (*Id*. ¶¶ 28-31.)  Insurance policies for the AGM&M properties were negotiated and purchased by CFF's Minnesota operatives.  (*Id*.)  AGM&M donations were forwarded to Waters or CFF employees for recording and deposit into AGM&M's bank account.  (*Id*.)  Waters signed AGM&M's checks.  (*Id*.)  And, all of AGM&M's expenses were sent to CFF's Minnesota office for approval and disbursement.  (*Id.*)

None of the trustees objected to CFF's conduct of AGM&M's affairs – and how could they?  (*Id.* ¶ 32.)  Without Cafesjian and CFF's support and generosity, AGM&M could not have independently functioned.  From incorporation until late 2006, AGM&M's corporate existence was managed, administered, and facilitated from CFF's Minnesota offices.  (Compl. ¶ 71; Waters Aff. ¶¶ 25-36.)

Besides that, Cafesjian and Waters were AGM&M principals since entity inception.  Substantially all of Cafesjian and Waters' officer and trustee functions were performed from Minnesota.  (Waters Aff. ¶¶ 35-36.)  This execution of AGM&M's operations from Minnesota

was neither extraneous nor fortuitous. In the words of plaintiffs' complaint, Waters and Cafesjian "in fact, controlled" AGM&M. (Compl. ¶ 71.)

These facts, in the aggregate, demonstrate that AGM&M transacts business and has had continuous and systematic contacts with Minnesota. The Court need go no further than the allegations of the complaint to find the sufficient personal jurisdiction contacts. Plaintiffs cannot charge that Cafesjian and Waters "controlled" AGM&M, and then assert that AGM&M had no contacts with the place from which the corporation was controlled – Minnesota. (Compl. ¶ 71.) The controlling activities that plaintiffs have so vociferously condemned indisputably implicate Minnesota; the Land of Ten Thousand Lakes therefore is the proper forum for these disputes.[9]

Because plaintiffs' claims arise out of the same transaction and occurrence as the claims in the Minnesota Declaratory Action and because Minnesota courts have jurisdiction over both the Assembly and AGM&M, this action must be dismissed so that these compulsory counterclaims can be brought in Minnesota as Rule 13(a) requires.

---

[9]    The argument that AGM&M is not subject to personal jurisdiction in Minnesota is based upon a false premise. The allegations in this complaint distinguish this motion from the one decided in Minnesota. The recently dismissed Minnesota action, *Cafesjian v. Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG), was brought by Cafesjian and CFF against the Assembly; AGM&M was not named. The complaint, accordingly, did not allege personal jurisdiction facts regarding AGM&M. The Assembly sought dismissal on the pleadings before evidence about AGM&M's extensive contacts with Minnesota had been developed. The Cafesjian interests objected to the Magistrate's Report and Recommendation and called the district court's attention to the jurisdictional evidence. Without a written opinion, the Magistrate's R&R was rubber stamped. (Borg Aff. Ex. 9.) Cafesjian and CFF have appealed this decision to the Eighth Circuit. (*Id.* Ex. 10.)

Importantly, the facts of this case and plaintiffs' allegations establish that AGM&M had systematic and continuous Minnesota contacts sufficient to comport with due process. The gravamen of the complaint is defendants' mismanagement of AGM&M – conduct which could have only occurred in Minnesota. By their pleading, plaintiffs have admitted that AGM&M is subject to Minnesota jurisdiction. An organization cannot be "controlled" from a Minnesota situs and at the same time have no contact with that situs.

## II.    THE FORUM SELECTION CLAUSE MANDATES A MINNESOTA FORUM

28 U.S.C. § 1404(a) empowers the court to transfer this action to another district pursuant to a valid forum selection clause. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28-29 (1988); *Worldwide Network Servs., LLC v. Dyncorp Int'l*, 496 F. Supp. 2d 59, 61-62 (D.D.C. 2007). And a case can be sent to another district "[f]or the convenience of parties and witnesses, in the interest of justice[.]" 28 U.S.C. § 1404(a). District courts have the discretion to "adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart*, 487 U.S. at 27 (internal citation omitted). The exercise of this discretion calls for the balancing of several factors, including "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Worldwide Network Servs.*, *LLC*, 496 F. Supp. 2d at 62 (quoting *Moses v. Bus. Card Exp.*, *Inc.*, 929 F.2d 1131, 1137 (6th Cir. 2001)).

### A.    The forum selection clause applies

Forum selection clauses are presumptively valid. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). They are "separate contract[s] in which the parties agree to venue" and are "best understood as . . . [an] *ex ante* agreement to waive venue objections to a particular forum." *Marra v. Papandreou*, 216 F.3d 1119, 1123 (D.C. Cir. 2000). Generally, such clauses are given effect because forum selection clauses have "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended." *Worldwide Network Servs.*, *LLC*, 496 F. Supp. 2d at 62 (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991)) (broad forum selection clause applied to claims that based upon extra-contract conduct).

The promissory note that the Assembly made in favor of CFF provides that "the maker consents to the jurisdiction and venue of [any federal court or Minnesota state court sitting in Hennepin County] and waives any argument" to the contrary. (Carey Aff. Ex. 1.) This forum designation encompasses all disputes "arising directly or indirectly from the relationship created by" the undertaking that produced the note. (*Id.* (emphasis added).) In the Grant Agreement, the Assembly promised to re-issue the promissory note and transfer the instrument to AGM&M.

As assignee of the note obligation and as a party that benefited from the loan and grant transactions, AGM&M is also bound by the note's terms. *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 44, 46-49 (D.D.C. 2005) (forum selection clause applied to claims arising out of parties' relationship and therefore extended to non-signatory to contract; non-signatory was "so closely related to the dispute" that it was foreseeable that it would be bound by the forum selection clause); *see also State ex rel. Southwell v. Chamberland*, 361 N.W.2d 814, 818 (Minn. 1985) (assignee "stands in the shoes of his assignor"). Critically, in accepting the transfer of the grant properties, AGM&M committed to abide by the Grant Agreement obligations upon which the donations were conditioned – which included the note's forum selection clause.

The claims in this lawsuit unquestionably arise out of "the relationship created by" the promissory note. With the promissory note, CFF loaned the money needed for the acquisition of the National Bank Building – one of five parcels upon which the museum and memorial would be sited. (Compl. ¶¶ 15-16; Carey Aff. Ex. 1.) After TomKat secured the four adjacent properties, CFF, Cafesjian and the Assembly entered into the Grant Agreement pursuant to which CFF committed to make significant charitable contributions in order to establish and site the AGM&M. (Compl. ¶¶ 44-45.) The Grant Agreement acknowledges the $500,000

promissory note, promises re-issuance of a replacement note, mandates transfer of the note and provides remedies in the event of non-performance. (*See* Carey Aff. Ex. 6 § 5.4.)

This lawsuit challenges defendants' discharge of their fiduciary duties. (Compl. ¶¶ 71-120; *id.* ¶¶ 121-151.) Defendants are also accused of breaching the Grant Agreement. (*See id.*) The issues of defendants' compliance with the Grant Agreement and their fiduciary duties can only have arisen from the relationship created by the seminal promissory note. That involvement pre-dated all applicable written commitments, and the property acquired with the $500,000 loan became the foundation for AGM&M's creation as well as for the agreements implicated in plaintiffs' complaint: *i.e.* no promissory note, no bank building site – no bank site, no AGM&M – no AGM&M, no Grant Agreement – no Grant Agreement, no Transfer Agreement. Certainly, the property and the CFF grants – which are at the heart of this dispute – are inextricably linked with the relationship created by the promissory note. This dispute, therefore, arises from that relationship.

Because plaintiffs have opted to sue defendants in this forum, the promissory note's forum selection clause is invoked. Plaintiffs have thus waived all jurisdictional objections. (See Carey Aff. Ex. 1 ("if the maker commences any action in another jurisdiction or venue ... the payee at its option shall be entitled to a Minnesota forum"). Accordingly, the venue for the resolution of this dispute must be as specified by the promissory note.

**B.    Venue in Minnesota is proper**

Although the presence of the forum selection clause is "a significant factor" for the Court to consider, the Court should also be mindful of convenience, fairness, and interests of justice. *Worldwide Network Servs., LLC*, 496 F. Supp. 2d at 63-64. These factors support the choice of a Minnesota forum.

The complaint calls defendants on the carpet for what they did in Minnesota. (Compl. ¶ 71.) CFF, TomKat and Waters conduct substantial business operations from Minnesota. Cafesjian spends a good portion of the year in Minnesota. AGM&M has no employees. Assembly principals reside all over the country and have frequently traveled to Minnesota. The purpose of those trips was the contributions that are at issue in this case. The appropriateness of the Minnesota forum is clear.

Witness convenience similarly favors Minnesota. The underlying claims challenge entity controlling conduct that could have only have taken place in Minnesota. Cafesjian's employees and the other persons who are said to have managed and executed the AGM&M's affairs, about which plaintiffs now complain, reside in Minnesota. (Waters. Aff. ¶¶ 25-36.) The assets that were supposedly wasted were accounted for by Minnesota accountants. Most, if not all of the communications at issue were exchanged between defendants in Minnesota and plaintiffs' principals – who are located around the country. All parties would benefit from having the majority of the witnesses located where the case is venued.

Finally, judicial economy would be best served by a Minnesota venue. The Minnesota court has had significant involvement with the litigation, is familiar with the facts and the parties, and certainly has the capacity and ability to move this litigation forward without further delay. The presence of many of the parties and witnesses in Minnesota would facilitate an efficient and swift resolution of this litigation.

The costs of litigation would be more significant in the District – counsel and many of the parties and the witnesses would need to travel significant distances to appear. Neither plaintiffs nor defendants' lead lawyers office in the District; none of the principals reside in the District; and the majority of the witnesses are not located in Washington D.C. area.

Because this dispute directly and indirectly arises out of the relationship created by the promissory note, plaintiffs' are bound by the forum selection clause.  By its terms, defendants are "entitled to have the case transferred" to Minnesota, or, in the alterative, to have the case dismissed without prejudice.  (Carey Ex. 1.)  If the Court declines to dismiss this case, the purposes of 28 U.S.C. § 1404(a) would be well served by transferring this case to Minnesota.

## III.    IN THE ALTERNATIVE THE COURT SHOULD STAY THIS LITIGATION

In the alternative, the Court should stay this litigation.  "It has been suggested that when a court becomes aware that an action on its docket involves a claim that should be a compulsory counterclaim in another pending federal suit the court should stay its own proceedings or dismiss the claim."  *See Republic Precious Metals, Inc. v. Republic Precious Metals Corp.*, 575 F. Supp. 1256, 1259 (D. Minn. 1984); 6 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1418 (1971).  In staying the second-filed suit, the *Republic Precious Metals, Inc.* court was persuaded by the following reasoning:

> [I]t is not for this court, brought into the fray as a second arena, to determine the choice of forum.  That decision should and will be left to the federal court having prior jurisdiction, where the usual form of motion to transfer pursuant to 28 U.S.C. § 1404(a) may be employed to present the problem.

*Commerce & Industry Ins. Co. v. Cabelwave Ltd.*, 412 F. Supp. 204, 208 (S.D.N.Y. 1976).

Because this Court is the second forum in which these claims have been aired, as an alternative to dismissing plaintiffs' claims, a ruling on the merits should be deferred until the Minnesota district court addresses any motion to dismiss or transfer that plaintiffs might bring.

## CONCLUSION

The law in this district is clear:  the first-filed action has priority.  Plaintiffs' claims are logically related to the Minnesota Declaratory Action.  Rule 13(a) and the principles of comity and equity cry out for the dismissal of plaintiffs' complaint in order to allow this action to be consolidated in a single forum:  the District of Minnesota.  This second-filed case has no place here.  Plaintiffs' compulsory counterclaims must be sent to where they are already defendants.

Dated: April 7, 2008

**BRIGGS AND MORGAN, P.A.**

By:     /s/ Molly M. Borg
   Timothy R. Thornton (Minn. #109630)
   Molly M. Borg (Minn. #0331922)
   2200 IDS Center
   80 South Eighth Street
   Minneapolis, MN 55402-2157
   (612) 977-8400

**AND**

**HOGAN AND HARSTON LLP**

By:     /s/ Peter C. Lallas
   Ty Cobb (DC Bar No. 270736)
   Peter C. Lallas (D.C. Bar No. 384062)
   555 Thirteenth Street, N.W.
   Washington, D.C. 20004-1109
   Tel:  (202) 637-5600

**COUNSEL FOR DEFENDANTS**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Armenian Assembly of America, Inc., and the Armenian Genocide Museum & Memorial, Inc., | Civil File No. 1:08-cv-255 (CKK) |
| Plaintiffs, | |
| v. | **AFFIDAVIT OF JOHN J. WATERS, JR.** |
| Gerard L. Cafesjian, individually and as Trustee and President of the Armenian Genocide Museum and Memorial, Inc. and President and Director of the Cafesjian Family Foundation, Inc.; John J. Waters, Jr., individually and as Secretary/Treasurer of the Armenian Genocide Museum and Memorial, Inc., President of the TomKat Limited Partnership, and Secretary and Director of the Cafesjian Family Foundation, Inc.; The Cafesjian Family Foundation, Inc; and the TomKat Limited Partnership, | |
| Defendants. | |

COUNTY OF HENNEPIN    )
                       ) ss
STATE OF MINNESOTA     )

I, John J. Waters, Jr. duly sworn under oath state:

1.      I am Secretary and Treasurer of the Cafesjian Family Foundation ("CFF").  I am also a Director and a Vice President of CFF.  I have personal knowledge of the facts set forth in this affidavit.

2.      I am a Minnesota resident.

3.      I work closely with Gerard Cafesjian and have personal knowledge of his relationship with the Armenian community.

2160061v1

**A.    CFF**

4.    CFF conducts substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota, 55402.  I supervise CFF's daily activities, personnel, programs and investments.  I perform virtually all of my CFF duties from Minnesota.

5.    CFF is a non-profit corporation that engages in, assists with, and contributes to charitable, religious, scientific and educational activities and projects.  CFF is particularly dedicated to supporting the Armenian community.

6.    CFF has been a significant supporter of money and services to the Armenian Assembly of America, Inc. ("Assembly") and the Armenian Genocide Museum & Memorial, Inc. ("AGM&M").  To date, CFF is the largest financial contributor to the AGM&M.

7.    Cafesjian is President of CFF.  He is a former resident of Minnesota.  Prior to his retirement, Cafesjian worked for West Publishing Company.

8.    CFF has a six-person Board of Directors that is composed of Gerard Cafesjian, Cleo Cafesjian, Father Dennis Dease, Dennis Doyle, Megan Doyle, and me.    Father Dennis Dease, Dennis Doyle, Megan Doyle and John Waters live in  Minnesota.

9.    CFF conducts substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota, 55402.  Most correspondence to CFF is directed to this Minneapolis address.  Approximately 7 people perform work for CFF in Minnesota.

**B.    TomKat LP**

10.    TomKat LP ("TomKat") is a South Dakota limited partnership.  TomKat holds Cafesjian family assets.  TomKat performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota, 55402.

11.     TomKat, Inc. is the sole general partner of TomKat.  TomKat, Inc. is a South Dakota corporation.  TomKat, Inc. performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.  I am the sole officer and director of TomKat, Inc.  I perform almost all of my TomKat, Inc. duties from Minneapolis.

## C.    The Assembly

12.     The Assembly has members that reside all over the United States, including Minnesota.  There are at least eight Minnesota Assembly Trustees and approximately 100 Minnesota affiliate members.  Mr. and Mrs. Cafesjian are Life Trustees of the Assembly.  New members are solicited through the Assembly's website, and by telephone, U.S. Mail, and in person.

13.     Over the years, the Assembly has frequently corresponded with Cafesjian and Waters and CFF's Minnesota office about donations and other events.  These communications were by email, fax, telephone, and other written and oral correspondence.  CFF has corporate records that confirm these communications and donations.  These communications were often on a daily basis.

14.     Aram Desteian and Lou Ann Matossian perform work for CFF.  I work closely with both of them.  Both are Minnesota residents.

15.     In addition to their CFF duties, Desteian and Matossian have volunteered for the Assembly's grassroots advocacy program, the Armenian American Action Committee ("ARAMAC").  Until recently, Matossian was the state chair and Desteian was the state vice-chair.  As a result of this litigation, the Assembly has alienated Matossian and Desteian and rejected their volunteer efforts.  Prior to their exclusion, they performed their Assembly duties from CFF's Minnesota offices.

16.     As Assembly volunteers in Minnesota, Matossian and Desteian organized and attended meetings, solicited new members, and participated in phone calls and other organizational activities.  From CFF's Minnesota offices, Matossian exchanged correspondence with Assembly employees, volunteered and members from around the United States in the form of emails, letters and faxes.  Matossian has also personally met with Assembly Trustees and Directors during their visits to Minnesota.

17.     The Assembly, Cafesjian, and CFF have worked closely to further the Armenian cause.  In 1998, Assembly Trustees Hirair Hovnanian and Robert Kaloosdian traveled from Washington D.C. to Minnesota to meet with Cafesjian.  The parties discussed their organizations and their visions for a museum and memorial dedicated to the Armenian Genocide.  The Assembly sought Cafesjian's financial support for the project.

18.     The Assembly, CFF and Cafesjian explored developing an Armenian museum and memorial.  They worked together to assess potential locations, financing and other details. The Assembly communicated frequently with Cafesjian, CFF and me in Minnesota by phone and written correspondence.

19.     In 1999, Cafesjian made significant financial contributions to the Assembly to cover the cost of full page ads in the Washington Post and the Washington Times.  I communicated frequently with Assembly staff regarding this media campaign.

20.     In March 1999, Cafesjian and CFF pledged over $1 million to the Assembly in support of a $15 million endowment campaign.  The pledge was funded in three equal installments in 1999, 2000 and 2001.  Much of these undertakings were orchestrated from CFF's Minnesota office.

21.     In January 2000, the Assembly identified a potential site for the museum and memorial. The site was the former National Bank of Washington. I traveled immediately from Minnesota to Washington to evaluate the potential property. CFF ultimately provided the leadership and development team to secure the property. The price of the property was $7,250,000. Cafesjian and CFF contributed $3,500,000 and agreed to loan an additional $500,000 to the Assembly so that the site could be acquired.

22.     After the bank building was purchased, development of a museum and memorial was professionally studied. The parties concluded that more space was needed to build and develop a proper museum and memorial. Accordingly, TomKat purchased and contracted to purchase four parcels of property located adjacent to the bank building. I spearheaded TomKat's efforts and significant portions of these transactions were orchestrated from TomKat's Minneapolis office.

23.     From 1999 through 2003, the Assembly, Cafesjian and CFF worked together to solicit support and participation of Minnesota's U.S. congressional representatives in the Armenian Caucus. The parties also continued museum and memorial development efforts and frequently exchanged written and oral communications.

**D.    AGM&M**

24.     AGM&M was incorporated in October 2003.

25.     From October 2003 through September 2006, the day to day activities of AGM&M were directed or completed from its business office located in Minneapolis, located at 15 South Fifth Street, Suite 900, Minneapolis, MN 55402. For example, AGM&M mail, bills and other correspondence were forwarded to the Minneapolis office for processing and payment.

26.    During this time, Cafesjian was Chairman and President of AGM&M and performed much of his officer duties from Minnesota.

27.    As Secretary and Treasurer of AGM&M, I supervised the work performed and made decisions related to AGM&M's daily activities.  I essentially managed AGM&M.  I performed these duties from Minnesota from November 2003 through September 2006.

28.    During this time, the accounting and business needs of AGM&M were completed in Minnesota by Minnesota residents.  This included accounts payable, tax and financial preparation, and banking.  In fact, even before AGM&M was incorporated, accounting and budget work for the museum and memorial project were performed in Minnesota.

29.    Virtually all bank statements, insurance documents and accounts payable were sent to AGM&M's Minneapolis office and processed in Minnesota.  For example, AGM&M insurance policies were negotiated and purchased from Minnesota by Cafesjian's employees. AGM&M donations and other checks were forwarded to the Minneapolis office for deposit into AGM&M's bank account.  I was a signatory on AGM&M checks.  And, AGM&M expenses were forwarded to Minnesota for approval and disbursement.

30.    Mike Shapiro, Dennis Koland, myself and other Minnesotans performing work for CFF provided this organizational and administrative support to AGM&M.

31.    From November 2003 through September 2006, AGM&M had no employees. During this period, CFF provided administrative and organizational support to AGM&M.  CFF's Minnesota staff provided most of this support.  CFF provided these services at no cost to AGM&M.

32.    The Assembly, Hirair Hovnanian and Anoush Mathevosian never objected to the administrative and organizational support that was provided to AGM&M.

33.     From November 2003 through September 2006, AGM&M's corporate records were maintained and stored at AGM&M's business office located in Minnesota.  Thereafter, they were transferred to the Assembly's Washington D.C.'s offices.

34.     Cafesjian and I have worked to further AGM&M's purpose by managing, organizing and facilitating AGM&M's business activities.  During these years, Cafesjian and CFF submitted development proposals for AGM&M trustee approval; each proposal was rejected by Hovnanian and the Assembly trustee.  Most of these activities have been performed by us in Minnesota.

35.     I am currently the CFF-designated Trustee for the AGM&M.  Cafesjian is the former CFF-designated Trustee.  CFF controls half of the AGM&M Trustee votes.  As Trustee, I participate in meetings, telephone calls, and other activities.  I perform most of these AGM&M activities from Minnesota.

36.     I am the former Secretary and Treasurer and Cafesjian is the former chairman of AGM&M.  I performed most of my AGM&M officer duties from Minnesota which included participating in meetings, executing documents and performing other obligations.

**E.     The May 7, 2007 AGM&M board of trustees meeting**

37.     In May 2007, I was appointed as the CFF-elected trustee and Ross Vartian was appointed as CFF-successor trustee.

38.     On May 7, 2007, I attended the AGM&M board of trustees meeting.  I participated by telephone.

39.     During the May 7, 2007 meeting, Krikorian and Hovnanian accused the CFF interests of having a conflict of interest.  I declined to answer any questions related to this

purported conflict of interest without the presence of counsel and attempted to confine the meeting to the noticed agenda.

40.    Krikorian and Hovnanian refused to allow the meeting to proceed in my presence, voted to exclude the CFF interests from participation, and demanded that I leave the board of trustees meeting.  As a result of this unilateral exclusion and Hovnanian and Krikorian's refusal to allow the board of trustee's meeting to proceed, I understood that I had no other option but to leave the meeting under protest.  But for this exclusion, I would have participated in the remainder of the May 7, 2007 meeting.

41.    Since this exclusion, neither CFF or I have received any notice of any AGM&M board of trustees meeting.

42.    Attached as Exhibit A is a photocopy of a press release issued by the Assembly on August 12, 1998 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

43.    Attached as Exhibit B is a photocopy of a press release issued by the Assembly on November 4, 1999 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

44.    Attached as Exhibit C is a photocopy of a press release issued by the Assembly on August 30, 2001 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

45.    Attached as Exhibit D is a photocopy of a press release issued by the Assembly on September 10, 2001 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

46.     Attached as Exhibit E is a photocopy of a press release issued by the Assembly on September 13, 2001 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

47.     Attached as Exhibit F is a photocopy of a press release issued by the Assembly on October 12, 2001 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

48.     Attached as Exhibit G is a photocopy of a press release issued by the Assembly on September 13, 2005 that I printed from the Assembly's website (www.aaainc.org) on June 27, 2007.

This concludes my affidavit.

<u>s/ John J. Waters, Jr.</u>
John J. Waters, Jr.

Subscribed and sworn to before me
this 7th day of April, 2008.

<u>s/ Donald Anthony Kovacovich</u>
Notary Public
My Commission Expires: January 31, 2010

## Armenian Assembly Press Release

### Armenian Assemby Promotes Minnesota Grassroots Support
#### Local Activists Join Assembly as Full
#### Trustee and Associate Trustee

FOR IMMEDIATE RELEASE
August 12, 1998
Web: www.aaainc.org

CONTACT:
Phone: (202) 393-3434
E-mail:

WASHINGTON, DC-Minnesota activists and Assembly staff joined forces in Minnesota last week to review US relations with Armenia and Karabagh. At the invitation of local activist and businessman Gerard Cafesjian, Armenian Assembly Congressional Relations Director Bryan Ardouny traveled to Minneapolis and St. Paul for a briefing session and related community meetings.

"As a politically active Armenian-American citizen, I welcomed the opportunity to address the plight of Armenians in Armenia and Karabagh with Bryan," said Cafesjian. "I support efforts to protect the human rights and basic freedoms of Armenians in Armenia and Karabagh during a time when they risk being pushed aside by more immediate interests of exaggerated oil wealth." In a warm gesture, Cafesjian and fellow Assembly supporter John J. Waters, Jr. joined the Assembly as Full Trustee and Associate Trustee, respectively.

In his letter welcoming Cafesjian as a member of the Armenian Assembly, Armenian Assembly Board of Trustees Chairman Hirair Hovnanian said, "On a daily basis, the Assembly is the community's broad based voice in Washington. Working with friends in Congress from both parties, we have been instrumental in shaping the US-Armenia and US-Karabagh relationships."

In addition to Ardouny's meeting with Cafesjian, Ardouny participated in a community forum and attended ARAMAC-organized congressional meetings with local constituents in the offices of Congressmen Bill Luther (D-MN), Bruce Vento (D-MN) and Jim Ramstad (R-MN).

The community forum, which was organized by ARAMAC member and President of the Armenian Cultural Organization of Minnesota Lou Ann Matossian and ARAMAC Minnesota Chair Massis Yeterian, encouraged Minnesota Armenians to consider their role as members of the changing Armenian Diaspora in helping modern Armenia. Addressing an audience of approximately 25 future activists, Ardouny emphasized the importance of getting involved and the impact it can have on their representatives in Congress. "Bryan gave us a very helpful perspective from Washington," said Matossian, "Because of his visit, our community has a more concise idea of how to convey our concerns about US relations with Armenia, Nagorno Karabagh and Azerbaijan to our legislators."

Ardouny and individuals from the community forum also attended several congressional meetings with key staff. Local constituents that participated and conveyed the concerns of the Armenian-American community in Minnesota included Krikor Mokhtarian, President of the Armenian Dance Ensemble of Minnesota Nairy Digris and her husband Terry McGibbon, Martin Meketarian, local Parish Council President Vahram Cardashian and his wife Vali, Tom Keljik and Aram Charchian.

"The congressional meetings were very informative and I am confident that the Armenian-American community in Minnesota will continue to build a working relationship with their representatives in Congress," said Ardouny. The Armenian Assembly of America is a nationwide nonprofit organization which promotes public understanding and awareness of Armenian issues.

### ###

NR# 1998-075

--------------------------------------------------------------------------------
Want to get involved?
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

**EXHIBIT A**

## Armenian Assembly Press Release

### Philanthropist Supports Armenian Advocacy
### Cafesjian Donates $1,050,000 to Assembly Endowment

FOR IMMEDIATE RELEASE
November 04, 1999
Web: www.aaainc.org

CONTACT: John De Trana
Phone: (202) 393-3434
E-mail: info@aaainc.org

Washington, DC-Florida entrepreneur and philanthropist Gerard Cafesjian is well-known for his support of the arts and local causes such as his donation to save from auction and renovate the original Minnesota State Fair Carousel and his contribution to his pavilion at the Scottsdale Arts Center in Arizona. He is also a strong supporter of causes pertaining to his Armenian heritage.
His foundation is donating over a million dollars to the Armenian Assembly of America, a Washington, DC advocacy organization that promotes public understanding and awareness of Armenian issues. It has launched a campaign to increase its endowment by $15 million within three years.

Originally from Sivas, Turkey, Cafesjian's family came to the United States and thereby escaped massacre at the hands of the Ottoman Turks during the Armenian Genocide of 1915. He terms his trip to Armenia and Nagorno Karabagh in 1998 as "a life-changing experience."

"I began actively supporting the Assembly when I realized the value of its work with Congress," said Cafesjian.

"I urge all Armenian-Americans to help the Assembly broaden its base of support. The political effectiveness the Armenian Assembly has in Washington has determined and will continue to determine the help Armenia will receive from the United States," said Cafesjian. "The elected officials in the US, as in most countries, count votes."

In addition to Assembly activities, Cafesjian is underwriting production of a memorial commemorating the Armenian Genocide, and is financing economic development and alternative energy projects in Armenia.

"Gerard, through his wholehearted support of the Armenian Assembly's Endowment Campaign, understands the importance of the Assembly's work to the future of Armenia and Nagorno Karabagh," said Assembly Board of Trustees Chairman Hirair Hovnanian. "On behalf of the Assembly, I thank him for his great generosity to our cause."

The Assembly's goal is to add an additional $15 million to its Endowment Fund within three years. A third of the amount will be given to Assembly affiliate, the Armenian National Institute, for its work affirming the Armenian Genocide. The larger endowment will allow the Assembly to promote greater public awareness and understanding of the US-Armenia and US-Karabagh relationships.

The Armenian Assembly of America is a nationwide, nonprofit, membership organization that promotes public understanding and awareness of Armenian issues.

###

NR# 1999-117

--------------------------------------------------------------------------

**Want to get involved?**
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 – Armenian Assembly of America

## EXHIBIT B

# Armenian Assembly Press Release

## Minnesota Congressman Pledges to Join Congressional Caucus on Armenian Issues

FOR IMMEDIATE RELEASE
August 30, 2001
Web: www.aaainc.org

CONTACT: Angel Venable
Phone: (202) 393-3434
E-mail: info@aaainc.org

Washington - During a meeting with Armenian Assembly representatives at his district office in Rochester, Minnesota, Congressman Gil Gutknecht (R-MN) pledged to join the Congressional Caucus on Armenian Issues upon his return to Washington. The Congressman would become the first Member of Congress from Minnesota to join the Caucus.

Vice President of the Cafesjian Family Foundation John Waters, Foundation Program Officer and Minnesota Armenian-American Action Committee (ARAMAC) State Chair Lou Ann Matossian joined Assembly Grassroots Director Nancy Yerian Hiteshue to meet with the Congressman on August 27.

"Congressman Gutknecht's pledge to join the Caucus represents the effectiveness of the grassroots advocacy efforts of Minnesota Armenian-Americans," said Hiteshue. "By becoming the first Member from Minnesota to join the Caucus during this congressional session, we hope his colleagues will soon follow."

Representing the Southeast region of the state, Congressman Gutknecht's district is home to a small, yet active group of Armenian-Americans. His largely rural district includes the towns of Rochester, Mankato, Winona and Northfield.

Congressman Gutknecht and the group also discussed the development of Armenia's economy, the importance of U.S. assistance and a congressional resolution (H. Con. Res. 162) calling for Armenia's inclusion in east-west commercial and energy corridors. The resolution was introduced in June by Congressional Caucus on Armenian Issues Co-Chair Joe Knollenberg (R-MI), along with Caucus Co-Chair Frank Pallone, Jr. (D-NJ) and fellow Caucus members Congressmen Joseph Crowley (D-NY) and John Sweeney (R-NY).

Congressman Gutknecht serves on the House Agriculture, Budget and Science Committees. He is Vice Chair of the Science Committee.

In the 104th Congress, Congressman Gutknecht supported the Radanovich-Bonior Amendment that linked aid to Turkey with the country's recognition of the Armenian Genocide. He also supported the Humanitarian Aid Corridor Act.

The district meeting is part of a series of forums designed to provide Assembly and ARAMAC members an opportunity to meet their representatives, discuss issues community concerns and provide the representatives with a better understanding of the Armenian-American community in their congressional district.

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

### 

NR# 2001-112

------------------------------------------------------------------------------------------------------------------------
**Want to get inviolved?**
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

**EXHIBIT C**

## Armenian Assembly Press Release

### Assembly Activists Participate in a Series of Congressional District Advocacy Meetings

FOR IMMEDIATE RELEASE
September 10, 2001
Web: www.aaainc.org

CONTACT: Angel Venable
Phone: (202) 393-3434
E-mail: info@aaainc.org

Washington, DC - As Members of Congress return to Capitol Hill from their summer recess, many come armed with a better understanding of Armenian issues, thanks to the Armenian Assembly's grassroots advocacy meetings with elected officials across the country.

Assembly Grassroots Director Nancy Yerian Hiteshue traveled to five states to meet with local activists and their elected officials and staff. During the meetings, national and international issues were discussed, including the Armenian Genocide, Section 907 of the Freedom Support Act and the recently introduced congressional resolution that calls for Armenia's inclusion in east-west commercial and energy corridors (H. Con. Res. 162). The resolution was introduced by Congressional Caucus on Armenian Issues Co-Chair Joe Knollenberg (R-MI), along with Caucus Co-Chair Frank Pallone, Jr. (D-NJ) and fellow Caucus members Congressmen Joseph Crowley (D-NY) and John Sweeney (R-NY).

The district meetings were part of a series of forums designed to provide Assembly and Armenian-American Action Committee (ARAMAC) members an opportunity to meet their representatives, discuss community concerns and provide elected officials with information and a better understanding of the Armenian-American community in their congressional districts.

Advocacy Meeting Highlights:

Affiliate Member Harold Manoogian, ARAMAC member Naomi Davitian, and Hiteshue met with Congresswoman Ileana Ros-Lehtinen's (R-FL) long-time District Director Deborah Zimmerman in the South Miami district office. The activists thanked the Congresswoman for her strong support of the re-affirmation of the U.S. record on the Armenian Genocide, Section 907 of the Freedom Support Act and assistance to Armenia and Nagorno Karabagh.

Assembly Affiliate Member Ed Bazil and his wife Nancy joined Hiteshue in Kennett Square, PA for a district meeting with Congressman Joe Pitts (R-PA), a member of the House International Relations Committee. The Bazils thanked Congressman Pitts for his support of U.S. aid to Armenia, humanitarian assistance to Nagorno Karabagh and the maintenance of Section 907. During the meeting, they discussed H. Con. Res. 162 and urged the Congressman to join the Congressional Caucus on Armenian Issues. They also reviewed the current status of the Nagorno Karabagh peace process and urged him to support H. Con. Res. 162.

Community activist and Contributing Affiliate Member Garbis Tabourian and Assembly Grassroots Director Nancy Yerian Hiteshue met with Congressman Peter King (R-NY) at his district office in Massapequa Park. During the meeting Tabourian and Hiteshue urged the Congressman to support H. Con. Res. 162 and support increased funding to Armenia.

Fellow Trustee Michael Candan and Affiliate Member Dr. Paul Bedrossian, both ARAMAC members, joined Hiteshue for a meeting in Congressman Gregory Meeks' (D-NY) St. Albans, New York district office. The group thanked Congressman Meeks for his support of Section 907 and asked for his support of H. Con. Res. 162.

Rev. Fr. Haroutiun Dagley, Pastor of St. Gregory of Narek Armenian Church, and ARAMAC members Affiliate Member Samuel Mirakian, Sue Mirakian, ARAMAC State Chair for Ohio and Affiliate Member Anita Kazarian, activist Vladimir Arutyunov and Hiteshue met with Senator Mike Dewine's (R-OH) Regional Director Michelle Gilchrist in his Cleveland office. The activists praised Senator Dewine's support of Section 907 and aid to Armenia and urged that the Senator continue his support.

Later, Hiteshue addressed a gathering at St. Gregory of Narek Armenian Church briefing them on the meeting with Senator Dewine and underscoring the importance of their participation in the advocacy process.

While visiting Minnesota, Hiteshue met with several Members of Congress and joined Assembly activists Vice President of the Cafesjian Family Foundation John Waters and Foundation Program Officer and Minnesota ARAMAC State Chair Lou Ann Matossian in urging their elected representatives to join the Congressional Caucus on Armenian Issues.

During the weeklong visit, Hiteshue, Matossian and Waters met with Congressmen Mark Kennedy (D-2), Bill Luther (D-6) and Jim Ramstad (R-3) to discuss key Armenian issues. In addition, Matossian and Waters briefed Congresswoman Betty McCollum (D-4), Congressmen James Oberstar (D-8) and Martin Olav Sabo (D-5) on the Assembly's activities and urged them to support Armenian issues.

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

### ###

NR# 2001-106

--------------------------------------------------------------------------
Want to get involved?
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

## EXHIBIT D

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

## Armenian Assembly Press Release

### Assembly's Grassroots Activism Draws New Member to Congressional Caucus on Armenian Issues

FOR IMMEDIATE RELEASE
September 13, 2001
Web: www.aaainc.org

CONTACT: Angel Venable
Phone: (202) 393-3434
E-mail: info@aaainc.org

Washington, DC - Following a late August meeting with Armenian Assembly activists and staff in his district office, Congressman Mark Kennedy (R-MN) joined the Congressional Caucus on Armenian Issues yesterday, becoming the 105th Member of this congressional session's Caucus. He joins another new member, Congressman Gil Gutknecht (R-MN), as the first two Caucus members from Minnesota.

Assembly Grassroots Director Nancy Yerian Hiteshue, Assembly activists Vice President of the Cafesjian Family Foundation John Waters and Foundation Program Officer and Minnesota ARAMAC State Chair Lou Ann Matossian met with the freshman Congressman's District Director, Mark Matuska, in his Buffalo, MN office and urged the Congressman to join the Caucus.

The activists also discussed the importance of the U.S. re-affirmation of the Armenian Genocide, U.S. assistance to Armenia and Nagorno Karabagh and economic developments in Armenia.

"Congressman Kennedy's membership on the Congressional Caucus on Armenian Issues once again demonstrates the importance of grassroots advocacy," Hiteshue said. "We look forward to working with him on Armenian-American issues. We hope he will encourage his other Minnesota congressional colleagues to join the Caucus."

Congressman Kennedy, who represents the southwest corner of Minnesota, serves on the Agriculture Committee as well as the Transportation and Infrastructure Committee. He is the Vice Chair of the Highways and Transit Subcommittee.

During the 106th Congress, Caucus membership totaled 97 Representatives, making it one of the largest Caucuses in the U.S. House of Representatives. In recent years, the Caucus has focused on strengthening the U.S.-Armenia and U.S.-Karabagh relationships, searching for a peaceful solution to the Nagorno Karabagh conflict, ending the Turkish and Azerbaijani blockades of Armenia and Nagorno Karabagh and reaffirming the U.S. record on the Armenian Genocide.

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

### ###

NR# 2001-119

----------------------------------------------------------------

**Want to get involved?**
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

**EXHIBIT E**

# Armenian Assembly Press Release

## Assembly Welcomes Minnesota Congressman to Congressional Caucus on Armenian Issues

FOR IMMEDIATE RELEASE
October 12, 2001
Web: www.aaainc.org

CONTACT: Angel Venable
Phone: (202) 393-3434
E-mail: info@aaainc.org

Washington, DC - The Armenian Assembly today welcomed the news that Congressman Collin Peterson (D-MN) joined the Congressional Caucus on Armenian Issues becoming its 106th Member. Congressmen Gil Gutknecht (R) and Mark Kennedy (R) are also part of the Minnesota delegation on the Caucus.

As part of the Assembly's Armenian-American Action Committee (ARAMAC) drive to encourage Representatives to join the Caucus, Minnesota ARAMAC State Chair and Cafesjian Family Foundation Program Officer Lou Ann Matossian and Assembly activist and Vice President of the Cafesjian Family Foundation John Waters met with Peterson's Senior Economic Development Officer Toni Merdan at the 7th District Office in Waite Park, MN in late September.

The activists discussed the importance of the U.S. re-affirmation of the Armenian Genocide, U.S. assistance to Armenia and Nagorno Karabagh and economic developments in Armenia.

"We're delighted that Congressman Peterson has joined Congressmen Gutknecht and Kennedy," Matossian said. "We look forward to working closely with him and we hope he will encourage his other Minnesota colleagues to join the Caucus."

In the 104th Congress, Congressman Peterson supported the Radanovich-Bonior Amendment linking aid to Turkey with Turkey's recognition of the Armenian Genocide. Peterson voted for the passage of an amendment limiting the President's ability to waive the Humanitarian Aid Corridor Act, which prohibits the President from providing assistance to any country blockading or impeding delivery of U.S. humanitarian assistance to a third country. He also voted for maintaining Section 907 of the Freedom Support Act in the 105th Congress.

Congressman Peterson, who represents the northwest quadrant of the state, including the cities of Moorhead and St. Cloud, serves on the Agriculture and Veterans' Affairs Committees as well as the Permanent Select Committee on Intelligence.

During the 106th Congress, Caucus membership totaled 97 Representatives, making it one of the largest Caucuses in the U.S. House of Representatives. In recent years, the Caucus has focused on strengthening the U.S.-Armenia and U.S.-Karabagh relationships, searching for a peaceful solution to the Nagorno Karabagh conflict, ending the Turkish and Azerbaijani blockades of Armenia and Nagorno Karabagh and re-affirming the U.S. record on the Armenian Genocide.

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

### ###

NR# 2001-140

**Want to get invloved?**
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

**EXHIBIT F**

## Armenian Assembly Press Release

### ASSEMBLY ARAMAC ACTIVISTS URGE LAWMAKERS TO SUPPORT ARMENIAN ISSUES

FOR IMMEDIATE RELEASE
September 13, 2005
Web: www.aaainc.org

CONTACT: Christine Kojoian
Phone: (202) 393-3434
E-mail: ckojoian@aaainc.org

Washington, DC ~ In a push to increase House and Senate support for Armenian issues, Assembly grassroots activists met with several lawmakers in their home districts during the month-long congressional summer recess.

Assembly Grassroots Director Nancy Hiteshue and Western Office Director Lena Kaimian led community meetings in California, Colorado, Illinois, Minnesota and New York to encourage legislators there to support the pan-Armenian genocide resolution, as well as legislation that would bar U.S. funding for a railroad connecting Turkey, Georgia and Azerbaijan.

Beginning in California on August 4, activists met with Armenian Caucus Member Rep. Joseph Baca (D-CA). The Assembly delegation briefed Baca on current legislation and encouraged his future involvement on community issues. As a result of the meeting, Baca agreed to cosponsor both the Armenian Genocide resolution and the rail measure.

The following week, Kaimian had an hour-long meeting with newly-elected Rep. Dan Lungren (R-CA) to urge him to join the Caucus while Hiteshue and activists met with Armenian Caucus Member Rep. Betty McCollum (D-MN) and her staff. The group thanked the Congresswoman for backing the Armenian Genocide resolution, H. Res. 316, which would reaffirm the U.S. record on the crime against humanity.

"The Congresswoman once again pledged her support for reaffirmation of the Armenian Genocide and her desire to continue strengthening ties between the U.S. and Armenia," said ARAMAC State Chair for Minnesota Lou Ann Matossian who participated in the meeting. "Congresswoman McCollum has been a great friend of the Armenian community in our state."

Board of Directors Vice Chair Lisa Esaylan also led a community meeting with Rep. Janice Schakowsky (D-IL), who agreed to cosponsor the Armenian Genocide resolution at the group's request.

Assembly activists also met with Representatives Susan Davis (D-CA) and Gary Miller (R-CA), as well as staff members from the offices of: Senators Wayne Allard (R-CO) and Barack Obama (D-IL) and Representatives Bob Beauprez (R-CO), Tim Bishop (D-NY), Rahm Emanuel (D-IL), Jim Ramstad (R-MN), John Salazar (D-CO), Thomas Tancredo (R-CO) and Mark Udall (D-CO). Armenians of Colorado joined the Assembly delegation for meetings in their state.

In conjunction with the district meetings, ARAMAC held a Midwest Regional Issue Briefing and Advocacy Workshop on August 20 at St. Sahag Armenian Church in St. Paul, MN. Board of Directors Vice Chair Lisa Esaylan shared with participants her impressions of Armenia from her recent trip and discussed the importance of grassroots advocacy. Hiteshue also led a workshop on increasing the Assembly's outreach efforts in the Midwest. Kansas State Chair Alex Kotoyantz, along with ARAMAC State Chair for Minnesota Lou Ann Matossian and Vice Chair Aram Destelan, were among the participants.

On August 23, ARAMAC State Chair for Colorado Pamela Barsam-Brown, and her husband Stanley, hosted a reception for community activists at their Boulder, CO home. The event included a legislative update from Kaimian.

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501(c)(3) tax-exempt membership organization.

### ###

NR# 2005-088

### Photos with Captions

http://www.aaainc.org/images/press/2005-088/2005-088-1.JPG
**Caption:** L to R: ARAMAC State Chair for Minnesota Lou Ann Matossian, Assembly Grassroots Director Nancy Hiteshue, Assembly Associate Trustee Kathy Cafesjian Baradaran, Representative Betty McCollum (D-MN) and ARAMAC State Vice Chair for Minnesota Aram Destelan during their meeting in St. Paul, MN on August 17.

http://www.aaainc.org/images/press/2005-088/2005-088-2.jpg
**Caption:** L to R: Dr. Sarkis Broussalian, Western Office Director Lena Kaimian, Vasken Imasdounian, Diane Cabraloff, Congressman Gary Miller (R-CA), Rita Topalian, Vahe Charkhutian, Anoush Cabraloff and Assembly Western Office Deputy Director Nicole Shahenian during their meeting on August 8.

http://www.aaainc.org/images/press/2005-088/2005-088-3.jpg
**Caption:** L to R: Assembly Western Office Director Lena Kaimian, Betty Ohanessian, ARAMAC State Chair for Colorado Pamela Barsam-Brown, former Assembly intern Kim Christianian and Stanley Brown during a community reception hosted by the Browns.

http://www.aaainc.org/images/press/2005-088/2005-088-4.JPG
**Caption:** L to R: Board of Directors Vice Chair Lisa Esaylan, Grassroots Director Nancy Hiteshue, Assembly Supporting Affiliate Vartan Paylan, Rep. Janice Schakowsky (D-IL), Former Assembly Intern Arpi Paylan and Halganoush Paylan.

Want to get Involved?
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

**EXHIBIT G**

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c) tax-exempt membership organization.
© Copyright 2003 – Armenian Assembly of America



# ARMENIAN ASSEMBLY OF AMERICA

Search In...

*Promoting Public Understanding and Awareness of Armenian Issues*

**About the Assembly   | Issues and Information   | Advocacy   | Press Center   | Calendar   | Student Center   | Text Size: A A A**

## Press Release Tools

🖶 Print Version
📧 E-Mail to a friend

### Relevant Items

**ASSEMBLY ARAMAC ACTIVISTS URGE LAWMAKERS TO SUPPORT ARMENIAN ISSUES**

Congressman Allen Joins Lynch and Simmons as New Armenian Caucus Members

Assembly Launches Internet-Based Advocacy Program

Ambassador Bill Taylor to Address Assembly's National Advocacy Conference

Armenian Caucus Tops 121 Members As Massachusetts Congressman Signs On

**View All Relevant Items »**

### Relevant Photos

 

**View All Relevant Photos »**

### Key Issues Briefs

» Armenia's support of War on Terror
» Armenian Genocide
» US - Armenia Relations
» Nagarno-Karabagh Conflict
» Turkish Blockade of Armenia

## Armenian Assembly Press Photo



L to R: ARAMAC State Chair for Minnesota Lou Ann Matossian, Assembly Grassroots Director Nancy Hiteshue, Assembly Associate Trustee Kathy Cafesjian Baradaran, Representative Betty McCollum (D-MN) and ARAMAC State Vice Chair for Minnesota Aram Desteian during their meeting in St. Paul, MN on August 17.

**The Press Release**

[Sep.13.05] ASSEMBLY ARAMAC ACTIVISTS URGE LAWMAKERS TO SUPPORT ARMENIAN ISSUES

**Want to get involved?**
The Armenian Assembly offers many ways for you to get involved, learn about the issues, and help make a difference in the future of Armenia and Nagorno Karabakh! Click here to join

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. It is a 501 (c)(3) tax-exempt membership organization.
© Copyright 2003 - Armenian Assembly of America

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Armenian Assembly of America, Inc., and the Armenian Genocide Museum & Memorial, Inc., | Civil File No. 1:08-cv-255 (CKK) |
| Plaintiffs, | |
| v. | **AFFIDAVIT OF MOLLY M. BORG** |
| Gerard L. Cafesjian, individually and as Trustee and President of the Armenian Genocide Museum and Memorial, Inc. and President and Director of the Cafesjian Family Foundation, Inc.; John J. Waters, Jr., individually and as Secretary/Treasurer of the Armenian Genocide Museum and Memorial, Inc., President of the TomKat Limited Partnership, and Secretary and Director of the Cafesjian Family Foundation, Inc.; The Cafesjian Family Foundation, Inc; and the TomKat Limited Partnership, | |
| Defendants. | |

COUNTY OF HENNEPIN    )
                       )ss
STATE OF MINNESOTA     )


I, Molly M. Borg, under oath states as follows:

1.      I am attorney admitted to practice in the State of Minnesota and in the United States District Court for the District of Minnesota and am admitted *pro hac vice* in this matter.  I am counsel for defendants.  I have personal knowledge of the facts set forth in this affidavit.

2.      Attached as Exhibit 1 is a photocopy of a press release issued by the Armenian Genocide Museum and Memorial, Inc. on August 31, 2007.  A copy of this release can be found at www.armenianow.com/?action=viewArticle&AID=2471&CID=2455&IID=1150&lng=eng.

3.      Attached as Exhibit 2 is a photocopy of the Amended Complaint filed in *Waters et al. v. AGM&M et al.*, No. 08-373 (JNE/JJG) (D. Minn.).

4.      Attached as Exhibit 3 is a photocopy of the press release issued by the Armenian Assembly of America dated November 14, 2007, available at http://www.aaainc.org/index.php?id=491.

5.      Attached as Exhibit 4 is a photocopy of the brochure of the Armenian Genocide Museum of America published by the Armenian Genocide Museum and Memorial, Inc., available at www.armeniangenocidemuseum.org.

6.      Attached as Exhibit 5 is a photocopy of a stipulation filed in *Cafesjian v. Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG).

7.      Attached as Exhibit 6 is a photocopy of a stipulation filed in *Waters et al. v. AGM&M, Inc. et al.*, No. 07-4212 (JNE/SRN).

8.      Attached as Exhibit 7 is a photocopy of an email from Naoka Carey to me dated February 13, 2008.

9.      Attached is Exhibit 8 is a photocopy of the Report and Recommendation in *Cafesjian v. Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG) dated October 23, 2007.

10.      Attached as Exhibit 9 is a photocopy of the district court's order in *Cafesjian v. Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG), dated March 31, 2008.

11.    Attached as Exhibit 10 is a photocopy of the Notice of Appeal in *Cafesjian v.*

*Armenian Assembly of America, Inc.*, No. 07-2079 (JNE/JJG), which was filed on April 1, 2008.

This concludes my affidavit.

s/ Molly M. Borg

Molly M. Borg

Subscribed and sworn to me
this 7th day of April, 2008

s/ Barbara J. McNabb

My Commission Expires: January 31, 2010

**Armenian Genocide Museum and Memorial, Inc.**
1140 19th Street, NW, Suite 600, Washington, DC 20036
Phone: 202-362-9009, Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
August 31, 2007
CONTACT: Rouben Adalian
Phone: (202) 383-9009
E-mail: ani@agmm.org
Web: www.armenian-genocide.org

## Armenian Genocide Museum and Memorial Begins Conversion of Historic Washington, DC Sites into a New Museum



Washington, DC - The Armenian Genocide Museum and Memorial (AGMM) announced today that its Building and Operations Committee signed contracts with Washington area firms specializing in museum planning and construction to begin the development and construction of a stellar museum in the historic National Bank of Washington building and adjacent properties.

AGMM selected two firms previously invited to submit proposals for the site. The Committee awarded its phase one museum planning contract to the prestigious firm of Gallagher & Associates, www.gallagherdesign.com, which specializes in the planning, design and management of innovative, informative, and immersive experiences for museums, learning facilities and visitor centers. Based in the Washington area, this premier museum planning firm has steered to completion numerous projects ranging from exhibit and visitor centers at Jamestown Settlement in Virginia and the Gettysburg National Battlefield in Pennsylvania, to a multimedia re-creation of the 1969 Woodstock Music Festival in New York. Significantly, Gallagher & Associates was also selected by the United States National Archives to showcase its vast collection of historic documents in a new permanent exhibit on the Washington Mall. The firm also designed the Montreal Holocaust Museum and has commenced master planning for the new Woodrow Wilson Presidential Museum. The Gallagher proposal for AGMM was reviewed by leading scholars in the fields of Armenian and genocide studies.

The Committee also awarded a phase one contract to the firm of Martinez & Johnson Architecture, www.mjarchitecture.com, which is recognized in Washington for its expertise in the design of complex, multi-functional facilities, as well as the restoration of architecturally significant buildings. Most recently the firm renovated the Boston Opera House, regarded as a masterpiece of American Baroque architecture. Among many other projects in the District of Columbia, Martinez & Johnson renovated and converted the landmark Gothic Revival structure known as the Alban Towers facing the

Exhibit 1

National Cathedral. The firm will be preparing plans for the complete renovation and restoration of the onetime bank structure, whose exterior and interior are designated as landmarks on the National Register of Historic Buildings, as well as its conversion into a public space for exhibit and community use.

The two firms also have a track record of cooperation on a number of museum projects including the National Museum of Civil War Medicine in Frederick, Maryland, and the National Music Center and Museum in Washington, DC. Presently they are collaborating on The Artists Hall of Honor and Museum of the Mississippi Arts and Entertainment Center.

With their announcement the Committee thanked Hirair Hovnanian, Chairman of AGMM, who has characteristically stepped up with financial contributions to allow this phase of development to go forward, and Anoush Mathevosian, who first proposed the idea of an Armenian Genocide museum in Washington, for their continued commitment to the project, which has reached a new stage towards the goal of seeing a memorial museum in the United States become a reality.

Van Z. Krikorian, in his capacity as chairman of the AGMM Committee, which was fully authorized to proceed with all aspects of the project's development and operation, added: "Despite reports that this project might not get off the ground, I am delighted to inform opponents that their expectations will not be met. The Committee, Hirair Hovnanian, Anoush Mathevosian, the Armenian Assembly of America, and all of our friends are resolved to build this center in our nation's capital. Here the Armenian Genocide and its legacy will be properly memorialized and explained through innovative exhibits and a state-of-the-art museum facility. The future museum will be located at an exceptional site in the heart of Washington, steps from the White House, and will include special emphasis on the role of the United States in genocide prevention and punishment."

Krikorian is joined on the AGMM Committee by Denise Darmanian, Esq., Edele Hovnanian, Richard Papalian and Zaven Tachdjian, all of whom have brought their experience and strong commitment to the Armenian community to work with the two outstanding firms that will plan, design, and assemble the museum. The Committee also assigned Dr. Rouben Adalian, Director of the Armenian National Institute (ANI), to lead the exhibit planning and historical depiction process.

For more information, please contact the Armenian National Institute at 202-383-9009.

**Photo caption:** *Landmark Washington building, the former National Bank of Washington site and future Armenian Genocide Museum and Memorial.*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation and TomKat LP, | Civil File No. 08-373 (DWF/AJB) |
| Plaintiffs, | |
| v. | **AMENDED COMPLAINT FOR DECLARATORY RELIEF** |
| Armenian Genocide Museum & Memorial, Inc. and Armenian Assembly of America, Inc., | |
| Defendants. | |

John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation ("CFF"), and TomKat LP ("TomKat") complain against the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") and Armenian Assembly of America ("Assembly") (collectively, "defendants") as follows:

## PARTIES

1.    Waters is a citizen of Minnesota.

2.    Cafesjian is a citizen of Florida.

3.    CFF is a Florida non-profit corporation with a principal place of business at 4001 Tamiami Trail, Suite 425, Naples, Florida, 34103.  CFF conducts substantially all of its business operations, especially its dealings with and on behalf of AGM&M and the Assembly, at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

4.    TomKat is a South Dakota limited partnership.  TomKat performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis,

Exhibit 2

Minnesota 55402. TomKat, Inc., a South Dakota corporation, is the sole general partner of TomKat. TomKat, Inc. performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

5.     The Assembly is a District of Columbia non-profit corporation with a principal place of business at 1140 19th Street NW, Suite 600, Washington D.C., 20036.

6.     AGM&M is a District of Columbia non-profit corporation with a principal place of business at 1140 19th Street NW, Suite 600, Washington D.C., 20036. From its inception until 2006, the day to day affairs of AGM&M were conducted from 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse and the amount in controversy exceeds $75,000.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201: this is a declaratory judgment action arising out of an actual controversy among the parties.

9.     This Court has personal jurisdiction over each defendant because they have entered this state to bring claims against plaintiffs – who include Minnesota residents. Further, the claims, contracts and conduct at issue necessarily implicate contacts with and conduct in Minnesota sufficient to subject defendants to the personal jurisdiction of this Court.

10.    Venue is proper in this district under 28 U.S.C. § 1391: there is a genuine dispute regarding plaintiffs' actions or omissions, that substantially occurred in Minnesota.

## BACKGROUND

### A.    Waters, Cafesjian, CFF and TomKat

11.    Waters is an officer and director of CFF.  He also serves as CFF's Secretary and Treasurer and Vice President.  His principal duties include the supervision of the daily activities, personnel, programs, and investments of CFF.  Waters is the sole officer and director of TomKat, Inc., TomKat's general partner.  Waters performs nearly all of his CFF and TomKat duties from Minnesota.

12.    Cafesjian is a Florida resident who maintains a second residence in Minnesota.  Before retiring to Florida, Cafesjian lived in Ramsey County and worked for West Publishing Company.  The donated monies that form the substantial basis for this dispute were derived from Cafesjian's employment with West.  Cafesjian is President of CFF.

13.    CFF is a non-profit corporation that was established to engage in, assist with, and contribute to charitable, religious, scientific and educational activities and projects.  CFF is particularly dedicated to the support and promotion of the Armenian community.

14.    CFF conducts substantial business operations in Minneapolis.  Most CFF correspondence is directed to its Minnesota office.  Approximately seven people, who reside in Minnesota, perform work on behalf of CFF in Minnesota.

15.     TomKat conducts substantial business operations in Minneapolis.  TomKat holds investment assets on behalf of the Cafesjian family.

**B.      The Assembly**

16.     The Assembly is a non-profit organization whose stated purpose is the strengthening of relations between the United States and Armenia and the promotion of Armenia's democratic development and economic prosperity.   The Assembly solicits donations and other charitable contributions from around the country and drums up support among national, state and local governments, organizations, and constituents.

17.     The Assembly conducts substantial fundraising activities in Minnesota. The Assembly's contributing members reside in almost every state, including Minnesota. Currently there are at least eight Minnesota Assembly Trustees and approximately 100 Minnesota affiliate members.   New members are solicited through the Assembly's website, and by telephone, U.S. Mail, and in person.

18.     Assembly activists include Cafesjian and Waters.  Cafesjian and CFF have been significant financial supporters of the Assembly.  Besides soliciting contributions, the Assembly has conducted extensive lobbying and public relations activities in Minnesota.

19.     Cafesjian has been a long time Assembly officer and board member. Waters has also served on the Assembly board for years.  Both Cafesjian and Waters performed many of their Assembly board member duties from Minnesota.

20.     Two Minnesota residents, Aram Desteian and Lou Ann Matossian, have been the Minnesota state chairs for the Assembly's lobbying arm, the Armenian

American Action Committee.  Desteian and Matossian promote Assembly causes by organizing and attending meetings, soliciting members and participating in phone calls and other Assembly activities.  Desteian and Matossian do work for CFF and perform most of their Assembly duties from CFF's offices in Minnesota.

21.    The Assembly aggressively solicits support from Minnesota residents and has had extensive dealings with Cafesjian and CFF in Minnesota.  Assembly representatives have traveled to Minnesota to meet with and influence Cafesjian, Waters, CFF, Minnesota lawmakers, and other Assembly members.

22.    The Assembly has frequently corresponded with Cafesjian and Waters and CFF's Minnesota office about donations and other events.  These communications were by email, fax, mail, telephone, and other written and oral means.  CFF has corporate records that confirm these communications, donations and dealings.  Exchanges between the Assembly and CFF's Minnesota office were often on a daily basis.

23.    In a related transaction, the Assembly consented to jurisdiction in Minnesota for disputes relating to Cafesjian's charitable activities.

**C.    AGM&M**

24.    AGM&M is a non-profit corporation that was incorporated on October 24, 2003.  AGM&M was created to develop a museum and memorial dedicated to the Armenian Genocide.

25.    AGM&M is governed by a Board of Trustees ("Trustees").  Articles of Incorporation Art. VII (Exhibit A).  The Trustees serve as the Board of Directors of

AGM&M for purposes of the District of Columbia Nonprofit Corporation Act. By-Laws § 2.2 (Exhibit B); Articles of Incorporation Art. VI.

26.    AGM&M has no members. By-Laws § 2.1; Articles of Incorporation Art. V.

27.    The Trustees are appointed by individuals and organizations that contribute or pledge $5,000,000 or more to AGM&M. By-Laws § 2.1; Grant Agreement § 5.2 (Exhibit D). Currently the Trustees exercise a total of six votes.

28.    Pursuant to the charter documents, the Grant Agreement, and by virtue of significant donations and pledges for the benefit of AGM&M, CFF is entitled to appoint Trustees and controls three of the six Trustee votes. By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G). CFF has pledged in excess of $17.5 million and has contributed in excess of $14.5 million and loaned $500,000, which has yet to be repaid, for the benefit of AGM&M.

29.    AGM&M's By-Laws provide that "[p]ersons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called." By-Laws § 2.6. To convene the Trustees, notice of the time and place of meetings must be provided. By-Laws § 2.14.

30.    The By-Laws further require that "all [AGM&M] questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present." Id. § 2.7.

31.    Waters is currently the CFF-designated Trustee who exercises CFF's votes. From Minnesota, Waters participates in meetings, telephone calls and other AGM&M activities. He performs most of his AGM&M Trustee duties in Minnesota.

32.    Waters was also the Secretary and Treasurer of AGM&M. In that capacity, Waters essentially functioned as the executive director of AGM&M, conducting its day to day affairs and administering its business and financial functions. He performed most of his AGM&M officer duties from Minnesota.

33.    Cafesjian is the former chairman of AGM&M. Cafesjian performed many of his chairman duties from Minnesota.

34.    From October 2003 through September 2006, AGM&M's corporate records were maintained and stored at AGM&M's business office located in Minnesota. During this period, the day to day activities of AGM&M were directed or completed from its business office located in Minneapolis, located at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402. For example, AGM&M mail, bills and other correspondence were forwarded to the Minneapolis office for processing and payment. The accounting and business needs of AGM&M were completed in Minnesota by Minnesota residents. This included accounts payable, tax and financial preparation, and banking. In fact, even before AGM&M was incorporated, accounting and budget work for the museum and memorial project were performed in Minnesota.

35.    Virtually all AGM&M bank statements, insurance documents and accounts payable were sent to AGM&M's Minneapolis office and processed in Minnesota. For example, AGM&M insurance policies were negotiated and purchased from Minnesota by

Cafesjian's employees.  AGM&M donations and other checks were forwarded to the Minneapolis office for deposit into AGM&M's bank account.  Waters was a signatory on AGM&M checks.  And, AGM&M expenses were forwarded to Minnesota for approval and disbursement.

36.    Mike Shapiro, Dennis Koland, Waters and other Minnesotans performing work for CFF provided this organizational and administrative support to AGM&M.  CFF provided these services at no cost to AGM&M.  The Assembly, Hirair Hovnanian and Anoush Mathevosian ("non-CFF trustees") never objected to the administrative and organizational support that CFF representatives provided to AGM&M in Minnesota.

**D.**    **The pursuit of a project to commemorate the Armenian Genocide**

37.    In more amicable times, the Assembly and Cafesjian engaged in a series of charitable transactions to promote Armenian causes and remember the Armenian Genocide.

38.    The Assembly and Cafesjian first became acquainted in 1997 when Assembly Trustees Hirair Hovnanian and Robert Kaloosdian traveled from Washington D.C. to Minnesota.  They met at Cafesjian's Minnesota home to induce him to support the Assembly and Armenian museum and memorial.

39.    Following this meeting, the Assembly, Cafesjian and CFF began planning the development of the project.  They worked together to assess potential locations and financing strategies.

40.    In January 2000, the Assembly called Minnesota to advise Cafesjian and CFF about a potential museum site.  The property was the former National Bank of

Washington. To secure the land, Cafesjian, through CFF, contributed $3,500,000 and loaned an additional $500,000; with these donations, the Assembly acquired the property. In the $500,000 promissory note, the Assembly consented to the jurisdiction of this Court. (Exhibit C.)

41.    After this parcel was acquired, the museum project was professionally studied. The parties realized that the bank building site alone would not be sufficient for a museum and memorial appropriate to recognize the atrocities the Armenian people endured. In order to acquire the real estate necessary for a proper development, TomKat purchased and contracted to purchase four parcels near the bank building. Most of TomKat's acquisition activities were orchestrated from Minnesota.

42.    To evidence a firm commitment to a museum and memorial honoring the Armenian Genocide, CFF entered into the Grant Agreement with the Assembly on November 1, 2003. (Exhibit D.) Pursuant to this Agreement, CFF agreed to make significant charitable contributions for the purpose of creating the AGM&M.

43.    CFF granted and pledged in excess of $15 million pursuant to the Grant Agreement. The bulk of the donations were expended to acquire the four properties that TomKat had secured.

44.    The property assembled for the museum and memorial could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees." (Exhibit D at § 3.1(A).)

45.    The Grant Agreement provides recourse in the event of Assembly non-performance. If the grant property is not developed by December 31, 2010, CFF is

entitled to terminate and at its "sole discretion" revert either the funds or property granted pursuant to the agreement. Further, "if the Assembly fails to satisfy any of the conditions of this Agreement, [CFF] is released from any remaining obligation under this Agreement to provide funds or property to the Assembly." (Exhibit D at § 3.9(A).)

46.     The Grant Agreement provides that D.C. law applies but is conspicuously silent regarding dispute resolution.

47.     After CFF was induced to enter into the Grant Agreement and the AGM&M was created as a separate entity, the Assembly executed the Transfer Agreement with AGM&M. (Exhibit E.) This agreement was executed "[i]n order to complete the building of the Armenian Genocide Museum & Memorial." (*Id.* at 1.) Pursuant to this agreement, the Assembly agreed to transfer to AGM&M "all of its rights, title, and interest in and to all cash, pledges, real property . . . and other assets contributed to the [Assembly] . . . for the development, renovation and construction of AGM&M." (*Id.* § 1.1(A).)

48.     The Assembly and AGM&M are the only parties to the Transfer Agreement. Waters, CFF, Cafesjian, and TomKat neither signed nor acquiesced to the Transfer Agreement.

49.     The Transfer Agreement provides that "[t]his Agreement and the rights and obligations of the parties hereunder are personal to the [Assembly] and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party." (*Id.* § 5.4.)

50.    Plaintiffs never assumed any obligation under the Transfer Agreement. As specified by the contract, defendants never transferred or assigned any Transfer Agreement obligation to plaintiffs.

51.    The Transfer Agreement specifies that D.C. law governs and that "[a]ny disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C." (*Id.* § 5.3.)

52.    Neither the Grant Agreement nor the Transfer Agreement incorporates the other by reference.

### E.    The Arbitration Demand

53.    On September 13, 2007, defendants submitted a demand for arbitration with the American Arbitration Association ("AAA"). (Exhibit F.)  This arbitration demand, No. 16 180 Y 00681 07, accuses plaintiffs of breaching fiduciary duties, breaching the Grant Agreement, breaching their obligation of good faith and fair dealing and misappropriating trade secrets. *Id.*

54.    The underlying acts and omissions about which defendants complain arise out of and relate to plaintiffs' performance, conduct and contacts in Minnesota.

55.    Specifically, the arbitration demand asserts fourteen claims:

(a)    Breach of Fiduciary Duty to AGM&M (Cafesjian and Waters);

(b)    Breach of Fiduciary Duty to the Assembly (Cafesjian and Waters);

(c)    Misappropriation of Trade Secrets (Cafesjian and Waters);

(d)    Breach of Contract (Cafesjian and CFF to the Assembly);

(e)    Breach of Contract (Waters/TomKat to AGM&M);

(f)    Breach of the Duty of Good Faith and Fair Dealing (TomKat and Waters to AGM&M);

(g)    Breach of the Duty of Good Faith and Fair Dealing (Cafesjian to the Assembly);

(h)    Violation of Conflict of Interest Provisions (Cafesjian and Waters);

(i)    Request for Declaratory Relief: Unenforceability of Reversion Provision in Grant Agreement;

(j)    Request for Declaratory Relief: Non-Application of Grant Agreement Reversion Provision to the "Second Grant" Properties;

(k)    Request for Declaratory Relief:  Permanent Removal of CFF as Trustee of AGM&M;

(l)    Request for Declaratory Relief:  Cafesjian and Waters Personally Liable for any Contracts or Obligations Incurred by AGM&M;

(m)    Request for Declaratory Relief: No Reversionary Rights Exist as to the Properties located at 619 14th Street, NW, and 1134-36, 1338, 1340 and 1342 G Street NW, Washington D.C.; and

(n)    Request for an accounting.  (*Id.*)

56.    The arbitration demand does not charge plaintiffs with breaching any term of the Transfer Agreement.   Nevertheless, defendants alleged that the Transfer Agreement somehow compelled plaintiffs to arbitrate disputes with parties with which there is no agreement to arbitrate. By that ploy, defendants sought to deprive plaintiffs of their constitutional right to a trial by jury.

57.    Plaintiffs objected to the demand for arbitration due to the lack of any agreement to arbitrate among the parties. On October 10, 2007, plaintiffs filed an action in this Court seeking declaratory and injunctive relief to enjoin the arbitration. The parties and the Court agreed to accelerated discovery and an expedited trial date. This action is currently pending before this Court in *Waters v. AGM&M*, 07-4212 (JNE/SRN). Despite that agreement, defendants have attempted to elude discovery and squelch disclosure.

58.    Defendants have since withdrawn their arbitration demand. As alleged in the arbitration demand, however, genuine disputes regarding the propriety of plaintiffs' conduct in Minnesota, AGM&M's Minnesota operations, the scope of the parties' contractual obligations, and the validity of the parties' contracts remain. And despite withdrawing the September 7, 2007 arbitration demand, defendants arbitration strategy is capable of repetition at any time by the mere resubmission of a demand for arbitration. If that were not enough, defendants' counsel, on behalf of defendants, has threatened to make the exact same claims asserted in the arbitration demand in litigation venued in an inconvenient forum.

59.    Plaintiffs have a real and immediate need for a judicial determination to resolve these live disputes.

## COUNT I

60.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter

documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

61.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

62.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

63.    As alleged in Counts I and II of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.    Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not breached any fiduciary duty to AGM&M or the Assembly.

## **COUNT II**

64.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

65.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

66.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

67.    As alleged in Count III of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not misappropriated any of defendants' trade secrets.

## COUNT III

68.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

69.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

70.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

71.    As alleged in Count IV of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and CFF have not breached any contract with the Assembly.

## COUNT IV

72.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards

defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

73.     This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

74.     Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

75.     As alleged in Count V of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Waters and TomKat have not breached any contract with AGM&M.

### COUNT V

76.     An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

77.     This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

78.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

79.    As alleged in Count VI of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment Waters and TomKat have not breached any duty of good faith and fair dealing to AGM&M and in fact have no duty of good faith and fair dealing to AGM&M.

## COUNT VI

80.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

81.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

82.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

83.    As alleged in Count VII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that

Cafesjian has not breached any duty of good faith and fair dealing to the Assembly and in fact has no duty of good faith and fair dealing to the Assembly.

## COUNT VII

84.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

85.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

86.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

87.    As alleged in Count VIII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not violated the Assembly's Conflict of Interest and Mailing List policies.

## COUNT VIII

88.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter

documents, the validity of these documents, and the operations and affairs of AGM&M and the Assembly.

89.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

90.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

91.    As alleged in Count XI of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that CFF is entitled to remain an AGM&M Trustee and, in fact, controls three Trustee votes.

## COUNT IX

92.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

93.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

94.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

95.     As alleged in Count IX of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that the Grant Agreement and the reversionary provisions are valid and enforceable and the time for the Assembly to perform its obligations under the Grant Agreement should not be extended.

## COUNT X

96.     An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

97.     This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

98.     Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

99.     As alleged in Count XII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that plaintiffs are not individually liable for any contracts or other obligations entered into on behalf of AGM&M and are, in fact, entitled to indemnity from AGM&M and the

Assembly for any claim made against plaintiffs in their capacities as corporate trustees, directors, officers, agents or representatives.

## COUNT XI

100.   An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

101.   This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

102.   Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

103.   As alleged in Counts X and XIII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that the reversionary interest attached to the Grant Agreement properties is valid and enforceable, applies to all of the "Second Grant" properties (as referenced in the arbitration demand), and has, in fact, been accelerated by virtue of defendants' breaches of their obligations and purported banishment of plaintiffs from corporate governance and affairs.

## COUNT XII

104.   An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

105.   This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

106.   Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

107.   As alleged in the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that neither the Assembly nor AGM&M has substantial damages by virtue of plaintiffs' conduct and that in fact plaintiffs have been damaged by defendants' conduct.

WHEREFORE, plaintiffs request the following relief:

1.   A declaration, pursuant to Federal Rule of Civil Procedure 57, that:

(a)   Cafesjian and Waters have not breached any fiduciary duty to AGM&M or the Assembly;

(b)   Cafesjian and Waters have not misappropriated any of defendants' trade secrets;

(c)    Cafesjian and CFF have not breached any contract with the Assembly;

(d)    Waters and TomKat have not breached any contract with AGM&M and that no such contracts exist;

(e)    Waters and TomKat have not breached any duty of good faith and fair dealing to AGM&M and that no such duties are owed;

(f)    Cafesjian has not breached any duty of good faith and fair dealing to the Assembly and that no such duty is owed;

(g)    Cafesjian and Waters have not violated the Assembly's Conflict of Interest and Mailing List policies;

(h)    CFF is entitled to remain an AGM&M Trustee and entitled to cast those trustee votes;

(i)    The Grant Agreement and the reversionary provisions are valid and enforceable and that the time for defendants to perform the obligations under the Grant Agreement should not be extended;

(j)    Plaintiffs are not individually liable for any contracts or other obligations entered into on behalf of AGM&M and that plaintiffs are entitled to indemnification from AGM&M and the Assembly for claims made against plaintiffs in their capacities as corporate trustees, directors, officers, agents or representatives;

(k)    The reversionary interest attached to the Grant Agreement properties is valid and enforceable, applies to all of the "Second Grant" properties, and has been accelerated;

(l)     Defendants have not been damaged by any of plaintiffs' alleged conduct and that plaintiffs have been damaged.

2.     All other relief the Court deems just and equitable.

Dated: February 14, 2008                    **BRIGGS AND MORGAN, P.A.**


By:  s/ Timothy R. Thornton
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS**

Jc

Sear

About  |  Take Action  |  For Hill Staff  |  Issues Center  |  Press Center  |  U.S. - Armenia Relations  |  Students/Interns  |  Resources

**Newsletter Subscriptions**

**Press Releases**

**Assembly Publications**

**Key Legislation**

**Make A Donation**

**Events**

**Home**

# Press Release - November 14, 2007

Home >> Press Center >> Press Releases >> 2007 >> Press Release - November 14, 2007

FOR IMMEDIATE RELEASE
CONTACT: Christine Kojoian
E-mail: ckojoian@aaainc.org

Arn

Nat




### ARMENIAN ASSEMBLY CELEBRATES 35 YEARS OF ADVOCACY AT NATIONAL GALA IN CALIFORNIA

### Marks 30th Anniversary of Washington Intern Program



Beverly Hills, CA – With old friends and new, the Armenian Assembly of America celebrated 35 years of Armenian-American advocacy and 30 years of the Terjenian-Thomas Assembly Internship Program at the 2007 National Gala on November 3rd in Beverly Hills, California.

The Gala evening began with a warm welcome from National Gala Co-Chairs Albert Cabraloff and Paul Kalemkiarian, who organized the event with their wives, Co-Chairs Diane Cabraloff and Sandra Kalemkiarian, along with an energetic planning committee.

Board of Trustees Treasurer Edele Hovnanian conveyed Board Chairman Hirair Hovnanian's appreciation to all those who have supported the Assembly since its inception.

Hovnanian explained her father's request that she address the Gala, saying "he felt that it was only appropriate that his words be given by one of the next generation of leaders."

While reflecting on the Assembly's past and current accomplishments, Hovnanian also looked to the future.

"In the face of a changing world that is moving ever faster...it takes great confidence and courage for the leaders of any institution to actively promote change and prepare for the future that lays ahead," Hovnanian said.

AGMA
Histor
Revie
Arme
Muse
Propo
comp
imagi
buildi

ARME
PARTI
JEWI
TO SI
DARK
Explo
Geno

ARME
HOLD
TRUS
Hono

Ne

05/

...



A
Co

Exhibit 3

California State Assemblyman Greg Aghazarian (R-Stockton), who served as master of ceremonies, presented the Assembly with a resolution honoring the organization for its commitment to Armenians and Armenian causes over the past three decades. The resolution, which was spearheaded by Aghazarian, State Senator Joe Simitian (D-Palo Alto) and State Assembly Member Paul Krekorian (D-Burbank), was presented to Edele Hovnanian on behalf of the organization.

The event also paid tribute to Armenian-Turkish editor and civil rights advocate Hrant Dink, who was assassinated earlier this year by a Turkish nationalist who labeled him a "traitor" for his public statements on the Armenian Genocide. Board of Trustees President Carolyn Mugar presented Dink's widow Rakel with the Assembly's Distinguished Humanitarian Award, honoring the slain editor's life and work. The award was designed and gifted by California-based artist Ani Kupelian.

Mrs. Dink, who traveled from Turkey to accept the honor, delivered a passionate speech recalling her husband's dedication to creating peace and understanding between Turks and Armenians. [Click here for the English and Armenian text of Mrs. Dink speech.]

Board of Trustees Counselor Van Z. Krikorian, in his remarks, expressed the privilege of having known Dink, calling him a "great man," and someone who "gives us all reason to continue with what we have to do."



In his capacity as Chairman of the Armenian Genocide Museum of America Building and Operations Committee, Krikorian also noted recent positive developments in the Museum planning project and credited Committee Members Denise Darmanian, Edele Hovnanian, Richard Papalian and Zaven Tachdjian who have "gone above and beyond the call of duty."

The Museum project was displayed during a powerful video presentation which included designs of the future museum and featured the principal planners sharing their vision with the public.



Among the dignitaries and special guests at the event were Chairman of the Constitutional Court Gagik Harutyunyan, Consul General of the Republic of Armenia Armen Liloyan, Massachusetts State Rep. Rachel Kaprielian (D-Watertown), Glendale Mayor Ara Najarian, Father Anton Seradarian of St. Gregory Armenian Catholic Church, Reverend Joseph Matossian of the Armenian Evangelical Union of North America and Very Rev. Fr. Dajad Yardemian of the Western Diocese of the Armenian Church.

Board of Trustees Public Affairs Chairman Anthony Barsamian and Secretary Lisa Kalustian closed the program, after which guests enjoyed an evening of music and dancing with entertainment provided by Khatchig Jingirian and

Ensemble.

The National Gala was a two-day event which also included an Assembly breakfast briefing, a Major Donors Dinner and a mixer for Assembly intern alumni and young professionals. The Assembly's Board of Trustees also held a meeting to review the organization's current and long-term initiatives.

Established in 1972, the Armenian Assembly is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues.  It is a 501(c)(3) tax-exempt membership organization.

### 

NR#2007-129

*Photographs from the Assembly's National Gala, November 2-3, 2007:*

*1. Caption: Rakel Dink flanked by Anna and Hirair Hovnanian, Chairman of the Board of Trustees, at the Armenian Assembly's 35th Anniversary Gala on November 3rd at the Beverly Hilton Hotel.*

*2. Caption: Rakel Dink flanked by California State Assemblyman Greg Aghazarian (R-Stockton) and Massachusetts State Representative Rachel Kaprielian (D-Watertown).*

*3. Caption: L to R: Longtime Assembly Supporters and National Gala Committee Members Elizabeth Agbabian, Savey Tufenkian and Flora Dunalans at the 35th Anniversary Gala at the Beverly Hilton Hotel.*

*4. Caption: L to R: Assembly Fellow Trustee and Dink family friend Antranik Zorayan with Rakel Dink at the Major Donors Dinner at Mastro's Steakhouse.*

*5. Caption: Led by Chairman Hirair Hovnanian, the Armenian Assembly Board of Trustees convened on November 2 at the Beverly Hilton Hotel to review operations in the Washington, Los Angeles and Yerevan offices. L to R (top row): Executive Director Bryan Ardouny with Board Members Richard Mushegain, Peter Vosbikian, Anthony Barsamian, Van Krikorian, (bottom row) Lu Ann Ohanian, Lisa Kalustian, Hirair Hovnanian, Carolyn Mugar and Edele Hovnanian.*

*6. Caption: In celebration of the 30th Anniversary Terjenian-Thomas Assembly Internship Program, Intern Alumni came together for a special reunion at Trader Vic's Lounge in the Beverly Hilton Hotel. L to R: Zohrab Ghanimian, Karoon Panosyan, Tania Sahakian, Levon Kevorkian, Nareeneh Sohbatian, Joseph Piatt, Talene Hachigian and Shant Norhadian.*

*7. Caption: L to R: Gala Committee Member Savey Tufenkian, Sue Garabedian, Annie Balikian, Board of Trustees President Carolyn Mugar and Gala Committee Co-Chair Sandra Kalemkiarian at the Breakfast Briefing on November 3rd.*

*8. Caption: L to R: Life Trustee Gail O'Reilly, Affiliate Member Adrienne Krikorian, and Gala Committee Member Lily Ring Balian enjoyed a wine presentation at The Wine Merchant before attending the Major Donors Dinner.*

*9. Caption: L to R: National Gala Co-Chair Sandra Kalemkiarian, Associate Trustee Ralph Tufenkian, Kosti and Marian Shirvanian and Mina and Hacop Shirvanian.*

*10. Caption: L to R: Gala Committee Member Sosy Hachigian, Gala Committee Co-Chair Diane Cabraloff, Gala Committee Member Diane Barsam-Keligian, Martin Felikian, Argine Kelegian and Gala Committee Member Michelle Shrikian heading to the Major Donors Dinner on November 2nd.*

*11. Caption: L to R: Assembly Associate Trustee Ani and Raffi Krikorian, Board of Trustees Treasurer Edele Hovnanian and National Gala Co-Chair Albert Cabraloff.*

Copyright 2007 Armenian Assembly of America

HOME | RESOURCES | CONTACT US | MEMBERS AREA | SITE MAP

The Armenian Assembly of America is the largest Washington-based nationwide organization promoting public understanding and awareness of Armenian issues. : membership organization.

Exhibit 4

ARMENIAN GENOCIDE
MUSEUM of AMERICA

WASHINGTON, DC

Armenian Genocide Museum of America.
Armenian Genocide Museum and Memorial, Inc.
(202) 383-9009
1140 19th Street, NW, Suite 600
Washington, DC 20036
www.ArmenianGenocideMuseum.org

"I am confident that the whole history of the human race contains no such horrible episode as this. The great massacres and persecutions of the past seem almost insignificant when compared with the sufferings of the Armenian race in 1915."

— Henry Morgenthau, U.S. Ambassador to the Ottoman Empire (1913-1916)

It was my grandfather's lone voice that alerted the world to the premeditated atrocities of the Young Turk leaders and the complicity of their German allies. As a man of conscience and an early champion of human rights, he consistently stepped over the line of diplomatic propriety and directly confronted top Turkish officials.

Ambassador Henry Morgenthau would have welcomed this new and daring project to raise a museum in the heart of our nation's capital dedicated to the purpose of informing about the Armenian Genocide and educating the public about the need to prevent such crimes against humanity.

I had the distinction of making a symbolic donation of $1915.00 to start the capital campaign for this magnificent project. I urge you to share in the privilege of participating in this undertaking.

As he sought ways to save the Armenians, Ambassador Morgenthau envisioned a home for them in America. I am certain he would have felt his mission fulfilled to see the Armenian people celebrate their resilience in their adopted country.

Henry Morgenthau III,
Massachusetts

## MILLION ARMENIANS KILLED OR IN EXILE

## TURKS REMOVING...

## TLE PLAIN STREWN BY ARMENIAN MODE...

### POLICY OF EXTERMINATION

# CREATING *a* PERMANENT VOICE *in the* NATION'S CAPITAL

*The Museum is strategically located two blocks from the White House, walking distance from the Smithsonian Institution, and down the street from the U.S. Holocaust Memorial Museum—to ensure that Armenian-American issues and concerns, past and present, are never again ignored.*



Rendering of the Armenian Identity Multi-Media Experience



Rendering of the Human Rights and Genocide Exhibit Area

# REMEMBRANCE, RESPONSIBILITY, REDRESS, *and* PREVENTION

*Located in Washington, DC, the Armenian Genocide Museum of America (AGMA) will be the premier institution in the United States dedicated to educating American and international audiences about the Armenian Genocide and its continuing consequences. Visitors to the Museum will come to understand the Armenian Genocide as the prototype for modern crimes against humanity, including the Holocaust, Cambodia, Rwanda, and Darfur.*

Visitors will learn about the ultimate failure of the international community to hold the perpetrators accountable for their crimes and hence why a living monument to the quest for justice is vitally necessary, and why the story of the Armenians and all other peoples who have suffered similar fates must be told.

This place of gathering—this center for Americans and Armenians alike—will be a World-Class Museum among World-Class Institutions committed to bringing justice to the memory of the victims of the 20th century's first genocide. AGMA aspires to do so by also highlighting the historic identity of the Armenian people, their culture and creativity, their art and artistry, and their perseverance in the face of adversity.

# IN THE MUSEUM: RECALLING *the* PAST SAFE- GUARDING *the* FUTURE



Rendering of the Survivors Theater



Rendering of the Taking Action Center

An important part of the Armenian Genocide Museum of America will be its *Taking Action Center*, which will assemble scholarly resources and expertise to promote the free exchange of ideas among those determined to bring justice to all parts of the world. The *Taking Action Center* will support people of conscience, equipping them with the tools necessary to establish the facts and to answer the universal question: "What can I do?"

The National Bank of Washington building at 14th & G Streets will be totally renovated, restored and expanded to serve as the home of the Museum.

# INTERACTION
# INSPIRATION
# PREVENTION

*Powerful presentations are instrumental for prompting action and discussion. AGMA interactive exhibits and educational programs will incorporate the latest scholarship with state-of-the-art technology. An online version will offer much the same resonant content to visitors anywhere in the world. Exhibits will focus on the Armenian Genocide to reinforce the universal message of our common humanity and collective responsibility.*

*The Armenian Genocide Museum of America will offer a place for reflection, where memories and emotions can be confronted in an environment filled with hope, inspiration and a commitment to eradicating the scourge of genocide and stopping other atrocities against humankind.*

*Knowing the evil that has been done in the past can stimulate good people to take an early stand to prevent the injustices of our time. You are invited to stand with those who embrace this noble purpose by pledging your support for the Armenian Genocide Museum of America.*

*There is war in the world. Destroy Armenia. See if you can do it. Send them from their homes into the desert. Let them have neither bread nor water. Burn their houses and their churches. See if the race will not live again.... for when two of them meet anywhere in the world, see if they will not create a new Armenia!"*

— William Saroyan

" *I should like to see any power of the world destroy this race, this small tribe of unimportant people, whose history is ended, whose wars have all been fought and lost, whose structures have crumbled, whose literature is unread, whose music is unheard, whose prayers are no longer uttered. Go ahead, destroy this race. Let us say that it is again 1915.*

The Armenian Genocide Museum of America is a project of the
Armenian Genocide Museum and Memorial, Inc.

*AGMA Founders:*
Anoush Mathevosian
Hirair Hovnanian
Armenian Assembly of America
Cafesjian Family Foundation

*AGMA Visionaries:*
Sarkis and Nishan Kechejian
James Keshishian

*AGMA Building & Operations Committee:*
Van Z. Krikorian, Chairman
Denise Darmanian
Edele Hovnanian
Richard Papalian
Zaven Tachdjian

*Project Coordinator:*
Dr. Rouben Adalian, Director
Armenian National Institute

*Museum Planner:*
Gallagher & Associates

*Museum Architect:*
Martinez & Johnson Architecture

The Armenian Genocide Museum of America will recognize
donors in a prominent location within the facility.

| | |
|---|---|
| Founder | $ 5,000,000 and up |
| Visionary | $ 1,000,000 and up |
| Humanitarian | $ 500,000 and up |
| Philanthropist | $ 250,000 and up |
| Benefactor | $ 100,000 and up |
| Patron | $ 50,000 and up |
| Steward | $ 25,000 and up |
| Sponsor | $ 10,000 and up |
| Supporter | $ 5,000 and up |
| Friend | $ 1,000 and up |

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian and The Cafesjian
Family Foundation, Inc.,

           Plaintiffs,

    v.

Armenian Assembly of America, Inc.,

           Defendant.

Civil File No. 07-2079 (JNE/JJG)

**STIPULATION TO STAY
LITIGATION PENDING
SETTLEMENT NEGOTIATIONS**

Plaintiffs Gerard L. Cafesjian and The Cafesjian Family Foundation and Defendant Armenian Assembly of America, Inc., by and through their respective counsel, request that the Court stay all proceedings in this matter to allow the parties time to conduct settlement discussions before expending additional time and resources litigating this action. In support of this joint request, the parties state as follows:

A.    The parties are currently engaging in settlement negotiations and have agreed to continue these settlement negotiations through February 6, 2008.

B.    Plaintiffs' Objections to Magistrate Judge Graham's Report and Recommendation are currently pending. To further settlement negotiations, the parties agree and request that the Court refrain from ruling on the Report and Recommendation until after February 6, 2008.

C.    This Court also presides over a related matter, *Waters et al. v. Armenian Genocide Museum and Memorial, Inc.*, Civil File No. 07-4212 (JNE/SRN). The parties have filed a similar stipulation in that action.

Exhibit 5

D.    None of the parties waive any of their rights in this litigation or the related

matter, *Waters et al. v. Armenian Genocide Museum and Memorial, Inc.*, Civil File No.

07-4212 (JNE/SRN), as a result of this stipulation.

**BRIGGS AND MORGAN, P.A.**

Dated: January 16, 2008        By:  s/ Molly M. Borg
                                    Timothy R. Thornton (License #109630)
                                    Molly M. Borg (License #0331922)
                                  2200 IDS Center
                                  80 South Eighth Street
                                  Minneapolis, MN 55402-2157
                                  (612) 977-8400

**Attorneys for Plaintiffs**

**BASSFORD REMELE**
*A Professional Association*

Dated:  January 16, 2008        By:  s/ Charles E. Lundberg
                                    Charles E. Lundberg (License #6502X)
                                  33 South Sixth Street, Suite 3800
                                  Minneapolis, Minnesota  55402-3707
                                  (612) 333-3000

                               And

                               Kirkpatrick & Lockhart Preston Gates Ellis LLP
                               Arnold R. Rosenfeld (Mass. License #428860)
                               State Street Financial Center
                               One Lincoln Street
                               Boston, Massachusetts  02111
                               (617) 951-9125

**Attorneys for Defendant**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation, and TomKat LP | Civil File No. 07-4212 (JNE/SRN) |
| Plaintiffs, | |
| v. | **STIPULATION TO STAY LITIGATION PENDING SETTLEMENT NEGOTIATIONS** |
| The Armenian Genocide Museum and Memorial, Inc. and the Armenian Assembly of America, | |
| Defendants. | |

Plaintiffs John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation and TomKat LP and Defendants Armenian Genocide Museum and Memorial, Inc. and Armenian Assembly of America, Inc., by and through their respective counsel, request that the Court stay all proceedings in this matter to allow the parties time to conduct settlement discussions before expending additional time and resources litigating this action. In support of this joint request, the parties state as follows:

A.      The parties are currently engaging in settlement negotiations and have agreed to continue these settlement negotiations through February 6, 2008.

B.      Defendants have filed a Motion to Dismiss which is scheduled for oral argument on February 1, 2008. The Court has also scheduled this matter for an expedited trial beginning on March 25, 2008. In an effort to facilitate continued settlement negotiations, the parties request that the Court stay these proceedings and continue these scheduled dates. If settlement negotiations are unsuccessful, the parties agree to jointly

2132852v1

Exhibit 6

contact the Court to schedule new motion and trial dates that are acceptable to the parties and the Court.

C.    This Court also presides over a related matter, *Cafesjian et al. v. Armenian Assembly of America, Inc.*, Civil File No. 07-2079 (JNE/JJG).  Plaintiffs' Objections to Magistrate Judge Graham's Report and Recommendation are currently pending.   To further settlement negotiations, the parties agree and request that the Court refrain from ruling on the Report and Recommendation until after February 6, 2008.  The parties have filed a similar stipulation in that matter.

D.    None of the parties waive any of their rights in this litigation or the related matter, *Cafesjian et al. v. Armenian Assembly of America, Inc.*, Civil File No. 07-2079 (JNE/JJG), as a result of this stipulation.

2132852v1

**BRIGGS AND MORGAN, P.A.**

Dated: January 16, 2008

By:  s/ Molly M. Borg
    Timothy R. Thornton (License #109630)
    Molly M. Borg (License #0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157
(612) 977-8400

**Attorneys for Plaintiffs**

BASSFORD REMELE
*A Professional Association*

Dated:  January 16, 2008

By:  s/ Charles E. Lundberg
    Charles E. Lundberg (License #6502X)
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota  55402-3707
(612) 333-3000

And

Kirkpatrick & Lockhart Preston Gates Ellis LLP
Arnold R. Rosenfeld (Mass. License #428860)
State Street Financial Center
One Lincoln Street
Boston, Massachusetts  02111
(617) 951-9125

**Attorneys for Defendants**

2132852v1

## Borg, Molly

| | |
|---|---|
| **From:** | Carey, Naoka E. [Naoka.Carey@klgates.com] |
| **Sent:** | Wednesday, February 13, 2008 12:25 PM |
| **To:** | Borg, Molly; Volk, Paula |
| **Cc:** | Rosenfeld, Arnold R. |
| **Subject:** | Withdrawal of Arbitration Demand |
| **Attachments:** | 16_180_Y_681_7_CC10B_7445134.pdf |

Dear Tim and Molly:

Please be advised that the Assembly and the AGM&M have withdrawn the Arbitration Demand and Claims that were filed with the American Arbitration Association in September. Attached please find a letter from the American Arbitration Association confirming that the case has been withdrawn.

In light of the withdrawal, the second Minnesota action (1:07-cv-4212) is moot. Accordingly, I am writing to inquire as to whether or not you will agree to voluntarily withdraw the case. If not, we will go ahead with filing a formal Motion to Dismiss, but as an agreed upon dismissal would save time and expense for everyone, I am hopeful that we can proceed on an uncontested basis.

Please let me know by close of business today. Thank you.

Sincerely,

<<16_180_Y_681_7_CC10B_7445134.pdf>>
**Naoka E. Carey**
**K&L Gates**
**State Street Financial Center**
**One Lincoln Street**
**Boston, MA 02111-2950**
**tel: 617.261.3155**
**fax: 617.261.3175**
**email: naoka.carey@klgates.com**
**www.klgates.com**

This electronic message contains information from the law firm of Kirkpatrick & Lockhart Preston Gates Ellis LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Naoka.Carey@klgates.com.

This email has been scanned for all viruses by the MessageLabs SkyScan service. (http://www.messagelabs.com)

Exhibit 7

4/4/2008

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Southeast Case Management Center*
John M. Bishop
Vice President
Linda Beyea
Assistant Vice President

February 13, 2008

2200 Century Parkway, Suite 300, Atlanta, GA 30345
telephone: 404-325-0101 facsimile: 404-325-8034
internet: http://www.adr.org/

Via E-Mail

Arnold R. Rosenfeld
Kirkpatrick & Lockhart Preston Gates Elllis LLP
One Lincoln Sreet
Boston, MA 02111

Timothy R. Thornton, Esq.
Paula Volk
Briggs and Morgan
2200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402

Re: 16 180 Y 00681 07
   Armenian Assembly of America, Inc. and
   The Armenian Genocide Museum
   and Memorial, Inc.
   and
   Gerard L. Cafesjian, Individually and as
   Trustee and President (former) of The
   Armenian Genocide Museum and Memorial
   Inc., and President and Director of The
   Cafesjian Family Foundation, John J.
   Waters, Jr., Individually and as Secretary/
   Treasure of The Armenian Genocide Museum
   and Memorial, President of Tomkat LP, and
   Secretary and Director of The Cafesjian
   Family Foundation, The Cafesjian Family
   Foundation, Inc.; and Tomkat LP

Dear Parties:

This will confirm receipt of a letter from Claimant dated February 12, 2008, withdrawing their claim in this matter.

We are this date closing our files. Please note that the case file will be destroyed six (6) months after the date of this letter.

We appreciate the opportunity to assist the parties in the resolution of this matter.

Sincerely,

Thomas Jenkins
Case Manager
800 256 0389
JenkinsT@adr.org

*Supervisor Information: Linda L. Beyea, 678 686 6024, Beyeal@adr.org*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Gerard L. Cafesjian, et al.,

     Plaintiffs,

v.

Armenian Assembly of America, Inc.,

     Defendant.

Civil No. 07-cv-2079 (JNE/JJG)

**REPORT
AND
RECOMMENDATION**

---

     This is a breach of contract case brought by a benefactor seeking the return of his donations. It is before the Court on the Defendant's Motions to Dismiss based on: 1) lack of personal jurisdiction (Fed. R. Civ. P. 12(b)(2)); 2) improper venue (Rule 12(b)(3)); 3) failure to state a claim (Rule 12(b)(6)); and 4) failure to join a party under Rule 19 (Rule 12(b)(7)).[1] It was referred to this Court pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. *See* Docket No. 17. For the reasons set forth below, the Court recommends dismissal of this matter without prejudice for nonjoinder pursuant to Fed. R. Civ. P. 12(b)(7).

## I.    BACKGROUND

### A.    The Parties

     Plaintiff Gerard L. Cafesjian ("Cafesjian") is a World War II veteran, former Minnesota resident, and retired West Publishing executive. Cafesjian now lives in Naples, Florida, and maintains a home in Minnesota. *See Complaint*, ¶ 1; *Affidavit of John J. Waters, Jr.*, ¶ 5.

     Cafesjian is a significant contributor to Armenian causes. In 1996, he established the Cafesjian

---

[1] Defendant brought two motions. Its first motion (Doc. No. 11) is based on its failure to state a claim (12(b)(6)) and failure to join (12(b)(7)) arguments. The second motion (Doc. No. 14) is based on its personal jurisdiction (12(b)(2)) and venue (12(b)(3)) arguments.

Exhibit 8

Family Foundation ("CFF"), also a Plaintiff in this action. *See Waters Aff.*, ¶ 3. The CFF is a Florida non-profit with its principal place of business in Naples, Florida. *Complaint*, ¶ 2. The CFF also has an office in Minneapolis, Minnesota. *Affidavit of Lou Ann Mattosian*, ¶ 1. The CFF is dedicated to the advancement of Armenian causes. *Waters Aff.*, ¶¶ 3, 10.

Defendant Armenian Assembly of America, Inc. (the "Assembly") is a District of Columbia non-profit, with its principal place of business in Washington D.C. *Complaint*, ¶ 3. The Assembly has no offices or employees in Minnesota. *Affidavit of Robert A. Kaloosdian*, ¶ 3.[2] The Assembly describes itself as the foremost Armenian-American advocacy group in the United States. *Id.*, ¶ 4. Its missions include interacting with public policymakers; enhancing relations between the United States and Armenia; and research, education, and advocacy for universal affirmation of the Armenian Genocide. *Id.*[3]

### B.    The Museum Project

In the 1990's the Assembly began exploring the idea of creating a museum dedicated to the victims and survivors of the Armenian Genocide. *Kaloosdian Aff.*, ¶ 5. This required the Assembly to seek substantial donations towards the construction of the museum, and eventually it contacted Cafesjian. *Id.*, ¶ 7. The initial meeting between Cafesjian and the Assembly occurred in 1997 at Cafesjian's Minnesota residence. *Id.*; *Waters Aff.*, ¶ 15.

Cafesjian, CFF, and the Assembly subsequently worked together to develop the museum idea. *Waters Aff.*, ¶ 16. In March 1999, Cafesjian pledged over $1 million to support the Assembly's museum

---

[2]The Kaloosdian Affidavit is attached as Exhibit 1 to the Affidavit of Arnold R. Rosenfeld.

[3]As described by the Armenian National Institute, the Armenian Genocide refers to atrocities committed against Armenians during the government of the Young Turks from 1915 to 1918 in the Ottoman Empire. *See* <http://www.armenian-genocide.org/genocidefaq.html>.

endowment campaign. *Id.*, ¶ 18.

In 2000, the Assembly identified a historic location in Washington D.C., the National Bank of Washington Building located near the nation's Capitol, as a possible site for the museum. *Kaloosdian Aff.*, ¶ 8. Cafesjian contributed $3,500,000 to the Assembly to help purchase the building and loaned an additional $500,000 to assist with the purchase. *Waters Aff.*, ¶ 19. The $500,000 loan was evidenced by a promissory note executed by the Assembly in favor of CFF. *Complaint*, Ex. A.

Cafesjian and CFF then became increasingly more involved in the museum's development. Cafesjian purchased four additional parcels of property adjacent to the National Bank site to expand the project. *Kaloosdian Aff.*, ¶ 10. He also made additional donations to the museum project. All told, Cafesjian's donations to the project totaled more than $14 million. *Complaint*, ¶ 12.

Some of Cafesjian's contributions are encompassed by a November 1, 2003 Grant Agreement between the Assembly, Cafesjian, and the CFF. *Complaint*, Ex. B.

### C.    Armenian Genocide Museum and Memorial, Inc.

Cafesjian's interest in the museum project did not end with his donations. Eventually he requested the organization of a new entity dedicated to the development and construction of the museum. Thus, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") was born as a D.C. nonprofit corporation. *Kaloosdian Aff.*, ¶¶ 10-11. Cafesjian was one of the trustees of the new corporation. *Id.*

On November 1, 2003, the same date the Grant Agreement between Cafesjian, CFF, and the Assembly was executed, a Transfer Agreement was executed between the Assembly and AGM&M for the purpose of transferring the Assembly's assets with respect to the museum project to the AGM&M. *Rosenfeld Aff.*, Ex. 4.

3

**D.    The Legal Agreements**

Three legal documents underpin the parties' obligations in this case: 1) the March 17, 2000 Promissory Note between CFF and the Assembly; 2) the November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly; and 3) the November 1, 2003 Transfer Agreement between AGM&M and the Assembly.

### 1.    The Promissory Note

The March 17, 2000 Promissory Note between CFF and the Assembly states that it shall be payable in full on May 16, 2000, just two months after it was executed. *Complaint*, Ex. A. It contains a Minnesota forum selection clause stating:

> At the option of the payee [CFF], this note may be enforced in any federal court or Minnesota state court sitting in Hennepin County, Minnesota, and the maker [Assembly] consents to the jurisdiction and venue of any such court and waives any argument that the venue in such forums is not convenient. If the maker [Assembly] commences any action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions and venues above described, or, if such transfer cannot be accomplished under applicable law, to have such case dismissed without prejudice.

*Id.* (original in allcaps).

### 2.    The Grant Agreement

The November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly states that it governs various donations Cafesjian and CFF made to the Assembly. It specifically addresses the Promissory Note between CFF and the Assembly, stating:

4

5.4     Promissory Note.

(A)     The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)     The new note must be interest free and mature on December 31, 2005.

(C)     If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to the AGM&M, Inc. as part of the transfer of the Assembly's assets.

*Complaint*, Ex. B, p. 7.

The Grant Agreement references the Transfer Agreement, stating, inter alia:

On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

*Id.*

The Grant Agreement contains a choice of law provision stating:

7.2     Governing Law.     This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

*Rosenfeld Aff.*, Ex. 5, p. 9.[4]

### 3.     The Transfer Agreement

The November 1, 2003 Transfer Agreement between AGM&M and the Assembly (but not

-------------------

[4]The Grant Agreement attached to the Complaint is missing pages 9 and 10. The complete Grant Agreement can be found at Rosenfeld Affidavit, Exhibit 5.

5

Cafesjian or CFF) generally requires the Assembly to transfer its assets held for the development and construction of the museum to AGM&M.

With regard to the March 17, 2000 Promissory Note between CFF and the Assembly, the Transfer Agreement states:

> If at the time this Agreement is executed the promissory note executed by Grantor [the Assembly] in favor of The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

*Rosenfeld Aff.*, Ex. 4, p. 2.

The Transfer Agreement contains a District of Columbia choice of law provision identical to the one in the Grant Agreement. *Id.*, p. 6.

It also contains an arbitration provision stating:

> 5.3    <u>Dispute Resolution</u>.  Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

*Id.*

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(2) - Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir.1996). When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings. *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir.1998)

(quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)) ("the court may inquire, by affidavits or otherwise, into the facts as they exist"). When determining whether the plaintiff has made a prima facie showing of personal jurisdiction, the Court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in her favor. *See Digi-Tel*, 89 F.3d at 522.

### B.     Rule 12(b)(6) - Failure to State a Claim

When considering a Rule 12(b)(6) motion, the Court assumes all facts alleged in the complaint as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996), *cert. denied*, 519 U.S. 1149 (1997). While the complaint need not contain "detailed factual allegations," *see* Fed R. Civ. P. 8(a)(2), it must supply "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007) (citation omitted). Rather, the facts set forth in the complaint must be sufficient to "nudge ... claims across the line from conceivable to plausible." *Id.* at 1974. While the complaint's factual allegations must, therefore, rise above speculation and suspicion, a court should not dismiss for failure to state a claim merely because it disbelieves those allegations or considers them doubtful. *Id.* at 1965.

### C.     Rule 12(b)(7) - Failure to Join a Rule 19 Party

In analyzing a Rule 12(b)(7) motion to dismiss for failure to join a party under Rule 19, courts accept as true all of the pleader's well-pleaded factual allegations and draw all reasonable inferences in her favor. *See* Baicker-McKee, Janssen, Corr, FEDERAL CIVIL RULES HANDBOOK, Rule 12(b)(7), p. 381 (2007) (citation omitted). The court may rely on affidavits and other evidence outside the pleadings in making its determination. Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1359, vol.

5C, p. 68 (2004) ("The district judge is not limited to the pleadings.") (citing *Young v. Garrett*, 149 F.2d

223, 225 n.1 (8th Cir. 1945); *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir.

2001)) (other citations omitted).

## III.    ANALYSIS

The Assembly asserts a raft of Rule 12 legal arguments in support of dismissal.  As further

discussed below, only the Rule 12(b)(7) failure to join a party argument survives.

### A.    Personal Jurisdiction (Rule 12(b)(2))

The Assembly argues under Fed. R. Civ. P. 12(b)(2) that the Court lacks personal jurisdiction over

it, a non-profit incorporated under the laws of, and with its principal place of business in, the District of

Columbia.

#### 1.    Promissory note forum selection clause

Cafesjian maintains that the Minnesota forum selection clause contained in the promissory note

between CFF and the Assembly evidences the Assembly's consent to Minnesota jurisdiction.  A party's

valid consent to jurisdiction obviates the need to engage in further personal jurisdiction analysis. *Dominium*

*Austin Partners, LLC v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001); *ELA Med., Inc. v. Arrhythmia*

*Mgmt. Assocs, Inc.*, No. 06-3580 (JNE/SRN), 2007 WL 892517, *3 (D. Minn. Mar. 21, 2007).

While the Minnesota forum selection clause clearly reflects the Assembly's consent to Minnesota

jurisdiction for a suit enforcing the promissory note, this is not such a suit.  The Complaint seeks redress

for breach of the Grant Agreement, not the promissory note.  While the Complaint references the

promissory note, both of its two counts are expressly predicated on breach of the Grant Agreement.

Specifically, Cafesjian and CFF allege that the Assembly breached the Grant Agreement, not the

promissory note, by failing to issue a replacement promissory note as the Grant Agreement requires. *See Complaint*, ¶¶ 16-18, 22 ("The November 1, 2003 Grant Agreement obligated the Assembly to issue a new promissory note.... The Assembly has yet to issue the replacement note. This non-performance materially breached the Grant Agreement.") ("The Assembly violated this implied duty of good faith and fair dealing by failing to issue a replacement promissory note to Cafesjian.").

The Grant Agreement contains no forum selection clause, but only a choice of law (District of Columbia) clause. Because this is not a suit to enforce the note, the note's forum selection clause does not apply. *Dunne v. Libbra*, 330 F.3d 1062, 1064 (8th Cir. 2003) (following "cardinal rule" of contract interpretation that contract's plain language must be given its ordinary meaning to find forum selection clause inapplicable).

Cafesjian argues that this action is, minimally, indirectly related to the promissory note, triggering language in the note's forum selection clause stating that actions "arising directly or indirectly from the relationship created by this note," are encompassed by the clause. However, Cafesjian's selective parsing of the clause's language is unpersuasive. A full reading of the clause indicates that it is triggered only when the note's *maker* (the Assembly) commences action. It states:

> If the *maker* [Assembly] commences action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions or venues above described....

*Complaint*, Ex. A (emphasis added). This is not an action by the note's maker. This language is,

9

therefore, inapplicable.[5]

### 2. **Minimum contacts**

Cafesjian argues that Assembly has subjected itself to both specific and general Minnesota personal jurisdiction by visiting Minnesota, soliciting donations in Minnesota, and recruiting and maintaining Minnesota members.

Cafesjian's allegations do not support the exercise of specific personal jurisdiction, even when viewed in a light most favorable to him. The Grant Agreement, the Complaint's basis, has at its core property and donations located in Washington D.C. *Complaint*, Ex. B.[6] The museum that was the goal of the Grant Agreement was to be located in Washington D.C. *Id.* The Grant Agreement is expressly controlled by District of Columbia law. *Id.*, p. 9. Assembly is a District of Columbia resident. *Id.*, ¶ 3. Cafesjian is a Florida resident and CFF's primary place of business is in Florida. *Complaint*, ¶¶ 1, 2. The Court, therefore, finds little, if any, Minnesota connection to the Grant Agreement underlying this lawsuit.

Although the parties first met in Minnesota, and Cafesjian vaguely states through Mr. Waters' Affidavit that some of his pledge activity was "orchestrated from the Foundation's Minnesota office,"

---

[5]The Court recognizes the disharmony between allowing Minnesota jurisdiction where Assembly commences suit in another jurisdiction arising indirectly from the note and disallowing Minnesota jurisdiction where CFF brings an action arising indirectly from the note. This, however, is how the parties struck their bargain, and the Court must hold them to it. Moreover, it is possible that Cafesjian opted not to sue directly on the note, which matured in May 2000, because of statute of limitations concerns. Any such strategic choice does not entitle him to the benefit of the forum selection clause in an agreement he is not suing to enforce.

[6]Assembly states that the Grant Agreement was also executed in the District of Columbia. *Memorandum of Points and Authorities in Support of Defendant the Armenian Assembly of America's Motion To Dismiss for Lack of Personal Jurisdiction and Improper Venue*, p. 17. It does not, however, support this statement with affidavit testimony, so the Court has not relied on it in its personal jurisdiction analysis.

10

*Waters Aff.*, ¶ 18, the record contains no detail regarding any Minnesota connection to the pledges underlying the Grant Agreement. Cafesjian, therefore, has not shown a prima facie case of sufficient Minnesota contact with respect to the transactions at issue in the Complaint. *See Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir.), *cert. denied*, 127 S. Ct. 217 (2006) (party cannot establish prima facie case of personal jurisdiction through conclusory allegations).

The existence of general personal jurisdiction over the Assembly is a closer question. Assembly members traveled to Minnesota on numerous occasions to solicit funds, Assembly has Minnesota members and volunteers, and Assembly targets Minnesotans for solicitations. *See Matossian Aff.*, ¶¶ 4, 5, 6, 8; *Waters Aff.*, ¶¶ 10, 11, 15. Cafesjian's affidavits regarding this activity are not particularly detailed. For example, the Court does not know how many visits Assembly members made to Minnesota, the percentage of its members that are Minnesotans, how often and in what way it solicits Minnesota members, and whether it has held fund-raising events in Minnesota. However, given that all doubts must be resolved in Cafesjian's favor in this procedural posture, the Court finds that he has made a prima facie case of general personal jurisdiction over Assembly. *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (exercise of personal jurisdiction appropriate where foreign nonprofit conducted fund-raising and held two fund-raising events in forum state); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 931 F. Supp. 592, 595-595 (N.D. Ill. 1996) (exercising personal jurisdiction over foreign nonprofits based, in part, on fund-raising activities in forum state).

**B.    Venue (Rule 12(b)(3))**

Assembly also moves to dismiss for improper venue under 28 U.S.C. § 1391. If personal jurisdiction exists at the commencement of an action, venue is proper under Section 1391. 28 U.S.C. §

11

1391(c).    Because Cafesjian has made a prima facie showing of personal jurisdiction, venue is proper in

Minnesota.  *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1392 (8th Cir. 1991)

(where prima facie showing of Minnesota personal jurisdiction made, venue proper in Minnesota);

*Raymedica, Inc. v. Stoy*, Civ. No. 01-1841 (JRT/FLN), 2002 WL 31185916, *6 (D. Minn. Sep. 30,

2002) (same).

### C.    Failure to State a Claim (Rule 12(b)(6))

Assembly makes three arguments that Cafesjian's suit should be dismissed for failure to state a

claim upon which relief can be granted.  None of them warrants dismissal.

#### 1.    Arbitration clause

Assembly asserts that the Transfer Agreement's arbitration clause requires that this dispute be

arbitrated, rather than litigated.

As a threshold matter, a Rule 12(b)(6) analysis is confined to the pleadings, materials embraced

by the Complaint or exhibits thereto, matters of public record, and orders.  *Porous Media Corp. v. Pall

Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  The Transfer Agreement is none of these things.  The

Complaint is based on the Grant Agreement, references the promissory note, and attaches both as exhibits.

It is not, however, based on, nor does it mention or attach, the Transfer Agreement.  The Court, therefore,

cannot interpret the Transfer Agreement's provisions, including its arbitration clause,  in this procedural

posture.  *Id.*

Even if the Court could consider the merits of the arbitration clause's applicability, it would not

warrant dismissal.  Cafesjian and CFF are not parties to the Transfer Agreement, which is between

Assembly and the AGM&M.  Additionally, the Transfer Agreement's arbitration clause expressly states

12

that it governs "disputes arising under this Agreement." Cafesjian's suit arises under the Grant Agreement, not the Transfer Agreement. This makes sense, as Cafesjian is a not a party to it.

Although arbitration of disputes is generally favored, a party who is not a signatory to an arbitration agreement cannot be compelled to arbitrate. *Air Line Pilots Assoc. v. Miller*, 523 U.S. 866, 876 (1998); *Nitro Dist., Inc. v. Alticor, Inc.* 453 F.3d 995, 999 (8th Cir. 2006); *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 28 (D.D.C. 2002). *See also Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999) ("[A]rbitration is a matter of consent, not of coercion."). Cafesjian and CFF are not parties to the Transfer Agreement, and, therefore, cannot be forced to arbitrate under its terms.[7]

## 2. Statute of limitations

Assembly also seeks a ruling that Cafesjian's suit is time-barred. It argues that Cafesjian's cause of action seeking issuance of a replacement promissory note accrued on or before November 1, 2003. It reasons that the Grant Agreement required Assembly to issue a replacement note before the execution of the Transfer Agreement on November 1, 2003. Using this date, Assembly argues the action is time-barred under the applicable District of Columbia statute of limitations. *See* D.C. Stat. § 12-301(7) (actions on a "simple contract" must be brought within three years).[8]

---

[7] Assembly's argument that the Grant Agreement incorporates the terms of the Transfer Agreement by reference is unpersuasive. Although the Grant Agreement references the Transfer Agreement, it does not expressly incorporate it by reference. *See Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 973 (8th Cir. 1999) (merely mentioning another agreement does not constitute incorporation by reference); *Air Line Pilots Assoc., Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 94 (D.C. Cir. 1988) (same).

[8] The parties agreed in the Grant Agreement that District of Columbia law governs the interpretation of that Agreement, and it is, therefore, appropriate to apply that law. *See Schwan's Sales Enterprises., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007) ("Minnesota courts generally recognize and apply choice-of-law clauses in contracts requiring the application of a foreign state's law.").

This argument fails. The Grant Agreement did not require the replacement note to be issued on or before November 1, 2003. Rather, it does not specify a date for the issuance of the replacement note. Thus, a fact issue exists regarding when the cause of action accrued making dismissal inappropriate at this early stage. *See R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.*, 663 F.2d 168, 175-76, n.57 (D.C. Cir. 1980); *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 770-71 (D.C. 1998).

The Assembly also argues that any action to enforce the promissory note is time-barred. The Court need not reach this argument as this action is one to enforce the Grant Agreement, not the note.

### 3.    Merits

The Assembly seeks dismissal of Cafesjian's Complaint on the merits based on its argument that the Transfer Agreement transferred the promissory note to AGM&M, discharging the Assembly's obligation under the Grant Agreement to issue a replacement note. Resolution of this argument is premature.

The Grant Agreement requires the Assembly to issue a "new promissory note (the *"Promissory Note"*) to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000." *Complaint*, Ex. B, p. 7. (emphasis added). The Grant Agreement then addresses only the transfer of any new promissory note, not the original note, stating: "If the *Promissory Note* [i.e. the new promissory note] is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets." *Id.*

Thus, the Grant Agreement indicates only that any *new* promissory note was subject to transfer via the Transfer Agreement. Since Assembly never issued a new note, no note could have transferred to AGM&M under the Grant Agreement's plain language.

14

The Transfer Agreement, unlike the Grant Agreement, clearly states that either the original note or

a new note would transfer:

> If at the time this Agreement is executed the promissory note executed by Grantor in favor of the Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

*Rosenberg Aff.*, Ex. 4, p. 2. Thus, the Grant Agreement and the Transfer Agreement are at odds with

respect to the transfer of the original promissory note.

Reconciliation of the ambiguities created by these two contracts is inappropriate at this early

juncture. *E.g., Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 794 F. Supp. 434, 435 (D.D.C.

1993); *Swift & Co. v. Elias Farms*, Civil Nos. 05-2775, 05-2776, 05-2777 (PAM/JJG), 2007 WL

1364691, *7 (D. Minn. May 9, 2007) (slip op.) (citing *Housing and Redev. Auth. of Chisholm v.

Norman*, 696 N.W.2d 329, 337 (Minn. 2005); *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn.

1990)). This is particularly so because the Transfer Agreement is not even embraced by the four corners

of the Complaint, and is thus not properly considered on this motion.

**D.    Failure to Join a Party Under Rule 19 (Rule 12(b)(7))**

Assembly argues that the lawsuit should be dismissed because Cafesjian failed to join AGM&M,

a necessary party under Rule 19. It further argues that because AGM&M is not subject to personal

jurisdiction in Minnesota, this suit should be dismissed without prejudice.

Rule 19 provides the relevant framework for analyzing a Rule 12(b)(7) motion to dismiss. Rule

19(a) asks two questions: 1) whether joinder of the absent party is required; and, if so; 2) whether the party

15

is subject to service of process and can be joined without defeating the court's jurisdiction.

### 1.    Whether joinder is required

Rule 19(a) sets forth the factors to be considered in determining whether an absent party's

presence is required, stating:

> **Persons to be joined if feasible.** A person who is subject to service of process and
> whose joinder will not deprive the court of jurisdiction over the subject matter of the action
> shall be joined as a party in the action if (1) in the person's absence complete relief cannot
> be accorded among those already parties, or (2) the person claims an interest relating to
> the subject of the action and is so situated that the disposition of the action in the person's
> absence may (i) as a practical matter impair or impede the person's ability to protect that
> interest or (ii) leave any of the persons already parties subject to a substantial risk of
> incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed
> interest.

AGM&M's joinder is required under Rule 19(a) because, in its absence, complete relief cannot

be accorded among those already parties. Cafesjian seeks "[r]escission of the Grant Agreement and

restitution of all donations made pursuant to that agreement." *Complaint*, ¶ 27. In other words, he wants

the money he donated returned. Pursuant to the Transfer Agreement, AGM&M now possesses that

money. *Kaloosdian Aff.*, ¶ 14. The Court cannot order the complete relief Cafesjian seeks, therefore,

without AGM&M in the litigation.

Persons or entities such as AGM&M that possess disputed fruits of a contract must be joined

under Rule 19(a). For example, in *Denkmann Associates v. International Paper Co.*, 132 F.R.D. 168,

172 (M.D. La. 1990), the court held that complete relief could not be provided to the parties before the

court where the plaintiff sought contract rescission which included restoration of timberland owned by a

non-party. Similarly, in *In re U.S. ex rel. Hall*, 825 F. Supp. 1422, 1429-1430 (D. Minn. 1993), the

court dismissed an Indian tribe action seeking rescission of a contract with outside vendors where non-party

Indian tribes could not be joined.  The court stated, "No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." (quotation omitted).  *Id.* at 1430.

This case differs from contract cases where courts have held that an entity that is not a party to a contract underlying the litigation, but is merely affected by it, need not be joined under Rule 19.  Although the absent parties in such cases were impacted by the litigation, they did not possess property or money directly implicated by the litigated contract as AGM&M does here.  *See e.g., Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 819-820 (8th Cir. 1977); *Davis Cos.*, 268 F.3d at 484.

If Cafesjian's suit sought only to force Assembly to execute a replacement promissory note, rather than rescission of his donations, a different Rule 19(a) determination may have been warranted.  Arguably that type of a suit would affect AGM&M, but not require its presence.  Here, however, where AGM&M actually holds the money Cafesjian seeks, the suit cannot go forward without it.

## 2.    **Personal and subject matter jurisdiction**

Because AGM&M should be part of the action, the Court can order its joinder if it is subject to service of process and if its presence will not defeat the Court's subject matter jurisdiction.  Fed. R. Civ. P. 19(a).  This Court's diversity jurisdiction would not be defeated by AGM&M's joinder.  It is a District of Columbia corporation with its principal place of business in Washington D.C.  As such, its presence in the suit as a defendant would not defeat complete diversity, and the parties do not argue otherwise.

The parties do, however, dispute whether AGM&M is subject to personal jurisdiction in Minnesota.  Assembly argues that AGM&M, a District of Columbia corporation, has no significant ties to

Minnesota and that the donations and museum activities giving rise to the Complaint all took place in Washington D.C. Cafesjian responds that John Waters, an AGM&M Trustee, lives in Minnesota and transacted some of AGM&M's business from Minnesota.

While Waters lives in and sometimes transacts business from Minnesota, the record does not reflect that the transactions at issue in the Complaint, i.e. the alleged breach of the Grant Agreement by failure to issue a replacement promissory note, took place here such that the exercise of specific jurisdiction is appropriate. The record does not reflect that Waters was connected in any way to the Grant Agreement or Assembly's alleged failure to abide by it.

Waters' performance of some of AGM&M's work from his Minnesota home does not confer general personal jurisdiction. An agent's decision to work from home in the forum state generally does not bind an entity to personal jurisdiction in that state where the purpose of the arrangement is merely for the agent's personal convenience. *See Lucachick v. NDS Americas, Inc.*, 169 F. Supp. 2d 1103, 1107 (D. Minn. 2001) (holding that personal jurisdiction in Minnesota was lacking where Minnesota home office was employee's "personal choice"); *Adams v. Riverview Healthcare Ass'n*, No. A3-02-135, 2003 WL 1456442, *3 (D.N.D. March 17, 2003) (employee's personal choice to work from home insufficient basis for assertion of personal jurisdiction).

Moreover, unlike Assembly, the record does not reflect any AGM&M fundraising or membership activity occurring in Minnesota. Thus, the basis for finding a prima facie case of general personal jurisdiction over Assembly is simply not present with AGM&M.

Minnesota does not have a strong interest in providing a forum here. *See Stanton v. St. Jude Medical, Inc.*, 340 F.3d 690, 694 (8th Cir. 2003) (discussing five-factor personal jurisdiction test,

including the fourth factor, the interest of the forum state in providing relief for its residents). The parties

seeking the forum, Cafesjian and CFF, are both Florida residents. Additionally, it does not appear to be

particularly convenient for anyone else involved in the litigation, many, if not most, of whom are in

Washington, D.C. *See id.* (also discussing fifth factor in personal jurisdiction analysis, the convenience of

the parties).

The Court, therefore, concludes that Cafesjian has not made a prima facie showing of personal

jurisdiction over AGM&M, precluding its joinder under Rule 19(a).

### 3.     Whether this action should proceed without AGM&M

Because the Court has determined that AGM&M cannot be joined, Rule 19(b) requires an

analysis of whether the litigation can continue in its absence. Four factors are relevant to this analysis: "first,

to what extent a judgment rendered in the person's absence might be prejudicial to the person or those

already parties; second, the extent to which by protective provisions in the judgment, by the shaping of relief

or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the

person's absence will be adequate; and fourth, whether the plaintiff will have an adequate remedy if the

action is dismissed for nonjoinder." Fed. R. Civ. P. 19(b).

Application of these factors here dictates dismissal of this action for AGM&M's nonjoinder.

AGM&M holds the money underlying this dispute. The relief Cafesjian seeks cannot be ordered without

AGM&M in the lawsuit. A judgment cannot be shaped to lessen this prejudice. Moreover, Cafesjian can

bring this suit elsewhere, as dismissal is without prejudice. The Court is aware that CFF has already filed

suit in the United States District Court for the District of Columbia against Assembly and AGM&M based

on the same relationships at issue here. *See Cafesjian Family Foundation, Inc. v. Armenian Genocide*

19

*Museum and Memorial, Inc., et al.*, 1:07-cv-01746-RWR (D.D.C. filed Sep. 28, 2007). Moreover,

AGM&M has filed its own District of Columbia suit against CFF also arising out of the same issues present

here. *See Armenian Genocide Museum and Memorial, Inc. v. Cafesjian Family Foundation, Inc.*,

1:07-cv-1259-CKK (D.D.C. filed July 16, 2007). Cafesjian's ability to seek a remedy in another forum,

therefore, is not foreclosed by this Court's recommendation that the action be dismissed without prejudice

for nonjoinder.

## IV.    CONCLUSION

Cafesjian and CFF bring this action seeking the return of money originally donated to the Assembly

and later transferred to AGM&M. Because AGM&M holds the money the Plaintiffs seek, this action

cannot go forward without it. AGM&M is not subject to personal jurisdiction in Minnesota. The Court,

therefore, recommends dismissal of this action without prejudice for nonjoinder pursuant to Fed. R. Civ.

P. 12(b)(7).

## V.    RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

A.    Assembly's Motion to Dismiss based on lack of personal jurisdiction (Rule 12(b)(2)) and

improper venue (Rule 12(b)(3)) (Doc. No. 14) be DENIED.

B.    Assembly's Motion to Dismiss based on failure to state a claim (Rule 12(b)(6)) and failure

to join a party under Fed. R. Civ. P. 19 (Rule 12(b)(7)) (Doc. No. 11) be DENIED IN

PART as to the portion of its motion based on Rule 12(b)(6) and GRANTED IN PART

as to the portion of its motion based on Rule 12(b)(7).

20

C.    This action be DISMISSED WITHOUT PREJUDICE.

Dated this 23rd day of October 2007.

s/ Jeanne J. Graham

_____

JEANNE J. GRAHAM
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **November 5, 2007**. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit. Unless the parties stipulate that the District Court is not required, under 28 U.S.C. § 636, to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian, et al.,

        Plaintiffs,

v.

                                        Civ. No. 07-2079 (JNE/JJG)
                                        ORDER

Armenian Assembly of America, Inc.,

        Defendant.

This case is before the Court on a Report and Recommendation issued by the Honorable

Jeanne J. Graham, United States Magistrate Judge, on December 23, 2007. The Magistrate

Judge recommended that Defendant's motions to dismiss be granted to the extent they are based

on failure to join a necessary and indispensable party under Fed. R. Civ. P. 19 and denied to the

extent they are based on other grounds. Plaintiffs objected to the recommendation, and

Defendant has responded to their objections. The Court has conducted a de novo review of the

record. *See* D. Minn. LR 72.2(b). Based on that review, the Court adopts the Report and

Recommendation. Therefore, IT IS ORDERED THAT:

1.     Plaintiff's request for leave to file a motion for an evidentiary hearing [Docket No. 60] is DENIED.

2.     Defendant's Motion to Dismiss based on lack of personal jurisdiction and improper venue [Docket No. 14] is DENIED.

3.     Defendant's Motion to Dismiss based on failure to state a claim and failure to join a necessary and indispensable party [Docket No. 11] is DENIED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(6) and GRANTED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(7).

Exhibit 9

4.     This action is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 31, 2008

                                        s/  Joan N. Ericksen
                                        JOAN N. ERICKSEN
                                        United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc., | Civil File No. 07-2079 (JNE/JJG) |
| Plaintiffs-Appellants, | |
| v. | **NOTICE OF APPEAL** |
| The Armenian Assembly of America, Inc., | |
| Defendant-Appellee. | |

---

Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc. appeals to the United States Court of Appeals for the Eighth Circuit from the district court's Order and Judgment dated March 31, 2008, which dismissed this case pursuant to Fed. R. Civ. P. 12(b)(7). Appeal is proper pursuant to 28 U.S.C. § 1291; notice is timely pursuant to Fed. R. App. P. 4(a)(1).

Dated: April 1, 2008

**BRIGGS AND MORGAN, P.A.**

By:  _s/ Timothy R. Thornton_
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
    Jonathan P. Schmidt (#0329022)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

2158817v1

Exhibit 10

U.S. COURT OF APPEALS - EIGHTH CIRCUIT

APPELLANT'S FORM A

Appeal Information Form

To be filed with the Notice of Appeal

Appeal Docket No.

_____

| STYLE OF CASE: | COUNSEL: NAME, ADDRESS, AND TELEPHONE NUMBER |
|---|---|
| Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc.<br><br>_Appellant/Appellee,_<br>vs. | Briggs and Morgan, P.A.<br>Timothy R. Thornton<br>Molly M. Borg<br>Jonathan P. Schmidt<br>2200 IDS Center, 80 South 8th Street<br>Minneapolis, MN 55402<br>612-977-8400 |
| The Armenian Assembly of America, Inc.<br><br>_Appellant/Appellee_ | COUNSEL: NAME, ADDRESS, AND TELEPHONE NUMBER<br>Kirkpatrick & Lockhart Preston Gates Ellis LLP<br>Arnold R. Rosenfeld<br>Naoka E. Carey<br>State Street Financial Center, One Lincoln Street<br>Boston, MA 02111<br>617-951-9125 |

LIST ISSUES ON APPEAL(For administrative purposes). You may indicate that this also serves as your statement of issues under FRAP 10(b)(3). ☐ Yes. ☑ No.

(1) Did the district court err in failing to join the Armenian Genocide Museum & Memorial, Inc. (AGM&M) pursuant to Fed. R. Civ. P. 19(a) by concluding there is no personal jurisdiction over AGM&M?

(2) Did the district court err in concluding that AGM&M was an indispensable party and this case could not continue without AGM&M's joinder?

FOR LEAD COUNSEL ONLY

I ☑ have (☐ have not) discussed settlement possibilities on appeal with my client.

This appeal ☐ is (☑ is not ) amenable to settlement.

Submitted by: s/ _____Timothy R. Thornton_____    4/1/08

Signature of Lead Counsel    Date

INSTRUCTIONS:

Filing of appellant's Form A is required to be submitted to the Clerk of the District Court with the Notice of Appeal (8 Cir. Rule 3B). If inadvertently omitted, appellant may file Form A directly with the Clerk of the Court of Appeals before appeal is docketed. Forms are available at the District Court Clerk's Office and may be obtained electronically at: www.ca8.uscourts.gov

    Copy 1 - Send to Appellee (together with an uncompleted Form B)
    Copy 2 & 3 - Send to Clerk, District Court with Notice of Appeal or Eighth Circuit (see above)
    Copy 4 - Retain

U.S. COURT OF APPEALS - EIGHTH CIRCUIT

Appeal Docket No.

_____

### APPELLEE'S FORM B
Appeal Information Form

CASE NAME (Underline name of Appellee):

IS THIS ALIGNMENT OF PARTIES, NAMES, ADDRESSES, AND TELEPHONE NUMBERS
CORRECT ON APPELLANT'S FORM A? [_____] Yes [_____] No If no, list corrections below.

FOR <u>LEAD COUNSEL</u> ONLY
I [_____] have ([_____] have not) discussed settlement possibilites on appeal with my client.
This appeal [_____] is ([_____] is not) amenable to settlement.

NAME, ADDRESS, AND TELEPHONE NUMBER OF LEAD COUNSEL:

Submitted by: s/ _____

Date: _____

Copy 1 - Send to Appellant
Copy 2 & 3 - Send to Clerk, Eighth Circuit Court of Appeals
Copy 4 - Retain