**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC. and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GERARD L. CAFESJIAN, INDIVIDUALLY and as TRUSTEE and PRESIDENT (former) of THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and PRESIDENT and DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, INC., JOHN J. WATERS, JR., INDIVIDUALLY and as SECRETARY/TREASURER OF THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., PRESIDENT OF THE TOMKAT LIMITED PARTNERSHIP, and SECRETARY and DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, INC.; THE CAFESJIAN FAMILY FOUNDATION, INC.; and THE TOMKAT LIMITED PARTNERSHIP, <br><br> Defendants. | Civil File No. <u>08-255 (CKK)</u> |

**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE TO TRANSFER</u>**

The Armenian Assembly of America, Inc. ("the Assembly"), and the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") (hereinafter collectively "Plaintiffs"), by and through their undersigned counsel, respectfully submit the following Opposition to Defendants' Motion to Dismiss or in the Alternative to Transfer ("Motion to Dismiss") filed by Defendants Gerard L. Cafesjian, Individually and as (former) President and Trustee of AGM&M, Trustee of the Assembly (currently suspended), and President and Director of the Cafesjian Family Foundation, Inc. and affiliated entities; John J. Waters, Jr. Individually and as Trustee and (former) acting Secretary/Treasurer of AGM&M, Trustee of the Assembly (currently suspended), Secretary and Director of CFF and affiliated entities, and President of TomKat Limited Partnership; the

Cafesjian Family Foundation, Inc. ("CFF"); and TomKat Limited Partnership ("TomKat") (hereinafter collectively "Defendants" or "Cafesjian Interests").

## I.  __INTRODUCTION__

Defendants' Motion to Dismiss is the latest foray in an unremitting campaign by Defendants to halt Plaintiffs' recent major advancements toward building a museum and memorial to the victims and survivors of the Armenian Genocide.  This case arises out of disputes between Plaintiffs and Defendants regarding Defendants' mismanagement of the museum project and their efforts to prevent the museum from being built, despite the fact that the Assembly and the Armenian-American community have devoted a decade of planning and financial support to making the project a reality.  Plaintiffs attempted to resolve these disputes through various alternative dispute mechanisms, including filing an arbitration claim with the American Arbitration Association and participating in two mediations in this Court.  When Defendants rejected these efforts, refusing to participate in arbitration and failing to negotiate in good faith in the mediations, Plaintiffs notified Defendants of their intent to file this Complaint in order to expedite resolution of the underlying disputes on the merits.   In response, Defendants raced to Court in Minnesota to file a "pre-emptive" Complaint, and sought dismissal of this action, further demonstrating that Defendants' true agenda is to bring a halt to the museum project, dissolve AGM&M, and obtain distribution of substantially appreciated real estate from AGM&M.  The defendants' true goal, reversion of the properties, is apparent from the other litigation filed by Defendants, as well as the Motion to Dismiss to which this Opposition is directed.

As more fully set forth below, the Court should deny the Motion to Dismiss for the following reasons:

1. The "first-filed presumption" is not applicable to Defendants' pending Declaratory Judgment action in Minnesota (Civil File No. 08-373) ("Defendants' DJA Action"), which Defendants failed to inform the Court was filed only after Defendants learned of Plaintiffs' intention to file this action.   Defendants' brazen forum shopping and race to the courthouse in Minnesota prohibits this Court from dismissing or transferring this action to Minnesota.

2. Defendants' DJA action is unlikely to survive Plaintiffs' pending Motion to Dismiss that action, in light of the fact that Minnesota Courts have already found that the District of Minnesota lacks personal jurisdiction over AGM&M, a necessary and indispensable party to these proceedings.

3. The Promissory Note forum selection clause relied upon by Defendants is inapplicable to this action, as Plaintiffs' claims do not arise, under any legally acceptable theory, out of the relationship created by the Note, but rather arise out of fiduciary duties governed by District of Columbia non-profit law, as well as by contracts governed by District of Columbia law which neither contain nor incorporate any Minnesota forum selection provisions, and which expressly state that any prior agreements between the parties are superseded by those contracts.

4. Even if the forum selection clause could properly be applied, it is clear that the Defendants cannot meet their burden to rebut Plaintiffs' choice of forum and have not demonstrated that they are entitled to transfer the case under 28 U.S.C. § 1404.

## II.  <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>[1]

The Assembly is a District of Columbia non-profit corporation with its principal place of business in the District of Columbia.  Cmplt. ¶ 1.  The Assembly has no offices or employees in Minnesota.  <u>See</u> Affidavit of Robert A. Kaloosdian (hereinafter "Kaloosdian Aff.") ¶ 4, attached as <u>Exhibit 2</u> to Affidavit of Naoka E. Carey ("2nd Carey Aff.") filed herewith.

AGM&M is a District of Columbia non-profit corporation with its principal place of business located in the District of Columbia.  Cmplt. ¶ 2; <u>see also</u> Affidavit of Rouben Adalian (hereinafter "Adalian Aff.") ¶ 2, attached as <u>Exhibit 2</u> to 2nd Carey Aff.  The AGM&M has no offices or employees in Minnesota and maintains its corporate records in the District of Columbia.  <u>See id</u>.  AGM&M does not conduct business in Minnesota, has never been registered to do business in Minnesota, and has never established an office in Minnesota.  <u>Id.</u> ¶ 3.

### A.    Inception and Formation of the AGM&M

The museum project is the result of years of organizational effort by the Assembly. Kaloosdian Aff. ¶¶ 4 - 8.  The former National Bank of Washington Building at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. ("the Bank site"), was identified by the Assembly as an appropriate site for the museum, <u>see</u> Cmplt. ¶ 13, and purchased in 2000 with donations from Anoush Mathevosian and Plaintiff Cafesjian (through his personal foundation, CFF).  <u>Id.</u> at ¶¶ 13-15, Kaloosdian Aff. ¶ 8.  The funds provided by CFF were in the form of a $3,500,000 grant and a $500,000 Promissory Note.  Cmplt. ¶¶ 15-16; see also Promissory Note, Ex. 1 to previously filed Affidavit of Naoka E. Carey ("Carey Aff.") (hereinafter "Note").

---

[1] As the Plaintiffs have previously set forth a detailed factual background for this action in their Complaint, this factual background is abbreviated to address only those facts that are most relevant to the arguments raised in the Motion to Dismiss.

As the Defendants' own pleadings confirm, the relationship between the parties with respect to the development of the museum project predated the purchase of the Bank site or the issuance of the Note.  See Memorandum and Points of Authorities in Support of Defendants' Motion to Dismiss, Or in the Alternative to Transfer ("Memorandum") at 4; Affidavit of John J. Waters ("Waters Aff.") at ¶¶ 17-20.

By its terms, the Note was interest free and "payable in full on May 16, 2000."  The Note further states as follows:

> AT THE OPTION OF THE PAYEE [CAFESJIAN FAMILY FOUNDATION], THIS NOTE MAY BE ENFORCED IN ANY FEDERAL COURT OR MINNESOTA STATE COURT SITTING IN HENNEPIN COUNTY, MINNESOTA, AND THE [ASSEMBLY] CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT.  **IF THE [ASSEMBLY] COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, THE PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR, IF SUCH TRANSFER CANNOT BE ACCOMPLISHED, UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE**.

See Note, Ex. 1 to Carey Aff. (emphasis supplied).

While the Assembly initially took the lead in developing the project, Cafesjian gradually became more involved in the project.  See Kaloosdian Aff. ¶ 10; Memorandum ¶¶ 4-10. Cafesjian eventually demanded that a new non-profit organization be created, the AGM&M, to which Cafesjian would provide funding and which he hoped to control.  Kaloosdian Aff. ¶ 10. Thus, in October 2003, the AGM&M was incorporated as a District of Columbia not-for-profit corporation.  Cmplt. ¶ 29.  The Articles of Incorporation, By-Laws and other organizing

documents of AGM&M, including the Grant Agreement and the Transfer Agreement, are governed by District of Columbia law.  See Exs. 2, 4, 5 and 6 to Carey Aff., respectively.

### 1.    The Grant and Transfer Agreements

On November 1, 2003, at Cafesjian's insistence, the Assembly entered into a related series of Agreements designed to memorialize Cafesjian's donations and pledges to the museum project and his conditions associated with the project.  See Cmplt. ¶¶ 38 - 47.  The first Agreement (the "Grant Agreement") was executed on November 1, 2003, by and among the Assembly, Cafesjian and CFF.  See Grant Agreement, Exhibit 6 to Carey Aff. ("Grant Agmt.");  Cmplt. ¶ 43.  The parties agreed that the Grant Agreement was to be "governed and construed in accordance with the laws of the District of Columbia . . . applicable to contracts to be fully performed within the District."  See Grant Agmt. § 7.2.  The Grant Agreement was executed by Cafesjian, a Florida resident, individually and on behalf of CFF, a Florida entity.  See id.

Under the terms of the Grant Agreement, there is a reversionary provision regarding the "Grant Property" donated by CFF and Cafesjian.  The reversionary clause is critical to understanding Defendants' true purpose in these cases, which is to delay the development of the museum long enough to compel the return of all of the grant property to CFF or Cafesjian.  The Grant Agreement provides as follows:

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.      in the event any portion of the Grants has not been funded, this Agreement terminates; and**
>
> **ii.     to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall**

> **return to the Grantor the Grant funds or transfer to the
> Grantor the Grant property.**

<u>See</u> Grant Agmt. § 3.1(B).  This provision clearly put Cafesjian, who was in control of the

operations of AGM&M for many years, in the position of being able to force the reversion of his

donations simply by doing nothing to establish the museum on a timely basis or by creating a

conflict with the other members of the Board of Trustees, while still enjoying the tax benefit of a

"donation."  Moreover, as the AGM&M, and not Cafesjian or CFF, will have borne the taxes and

other costs associated with the properties during the interim, and as the properties have

appreciated in value during the intervening time period, if the time requirement is not met, CFF

will receive a significant windfall at the direct expense of AGM&M.[2]

Finally, the Grant Agreement contains the following provision:

> **This Agreement represents the entire agreement between the
> Grantor and the Assembly concerning the Grants and all
> previous agreements, whether written or oral, are superseded
> by it.**

Grant Agmt. ¶ 7.5.

On the same date the Grant Agreement was executed, November 1, 2003, at the

insistence of Cafesjian, the Assembly executed a Transfer Agreement with AGM&M.

Kaloosdian Aff. ¶ 14; Cmplt. ¶ 38.  The Transfer Agreement was signed by Waters on behalf of

AGM&M and required the Assembly to transfer all of the cash and pledges it had received to

develop the museum to the AGM&M.  <u>See</u> Transfer Agreement, attached at <u>Exhibit 5</u> to Carey

Aff.  Like the Grant Agreement, the Transfer Agreement provides that it will be governed by

District of Columbia law.  Transfer Agmt. §5.3.  The Transfer Agreement also contains an

arbitration clause which requires that "<u>any disputes</u> arising under [the Transfer Agreement] <u>must</u>

---

[2] The only exception to the bearing of costs by the AGM&M is that CFF pays a mortgage
payment of $150,000 per year on the 1340 G Street, N.W., property.

be settled exclusively by binding arbitration in Washington, D.C. in accordance with the

Commercial Arbitration Rules of the American Arbitration Association then in force."  Id.

Finally, as with the Grant Agreement, the Transfer Agreement provides that "this Agreement

represents the entire agreement between [the Assembly] and AGM&M, Inc. concerning the

Grant and all previous agreements, whether written or oral, are superseded by it."  Transfer

Agmt. § 5.6.

After the incorporation of the AGM&M and between 2003 and 2006, Cafesjian and

Waters, in their capacities as President and Acting Secretary-Treasurer, respectively, took

primary responsibility for managing AGM&M.  Kaloosdian Aff. ¶ 16.  Rouben Adalian acted as

the project coordinator.  Adalian Aff. ¶ 1.  As Waters resided in Minnesota, he unilaterally

elected to conduct some of these activities from his home or from the offices of Cafesjian-owned

entities for his own convenience. Adalian Aff. ¶ 5-6.  Per Defendants' allegations, Cafesjian, a

resident of Florida, CFF, a Florida corporation, and TomKat LP, a South Dakota limited

partnership, also maintained office space in Minnesota, and carried out some business for

AGM&M, for their own convenience, in Minnesota.  See Memorandum at 2-3.

Other than Waters and Cafesjian, none of the other Trustees, officers, or employees of

AGM&M conducted any day-to-day business for AGM&M in Minnesota.  Adalian Aff. ¶ 4.  No

Trustee meetings or other corporate actions were taken in Minnesota, nor were authorizations

requested or provided to Defendants to conduct AGM&M business in or from Minnesota. Id. ¶ 5.

As reflected on the AGM&M's tax returns for 2003, 2004, and 2005, all of the officers and

Trustees of AGM&M maintained business offices in the District of Columbia for their official

capacities.  See id. ¶ 7, see also AGM&M Form 990s, Part V(A), attached as Exhibit 4 to 2nd

Carey Aff.

On September 13, 2006, Cafesjian sent a letter to the other Trustees of AGM&M from his home in Florida, which letter stated that he (Cafesjian) was resigning as President and Chairman of the Board of Trustees of AGM&M (but not as the CFF delegate to the Board of Trustees). See Letter of Gerard Cafesjian dated September 13, 2006, attached as Ex. 21 to Carey Aff.; Cmplt. ¶ 103. In his letter, Cafesjian indicated that Waters also intended to resign as (acting) secretary and treasurer of AGM&M and to transfer all administrative functions to the Board of Trustees. Id. Waters subsequently, and without proper authorization from the AGM&M Board of Trustees, executed and recorded a "Memorandum of Agreement Reserving Rights" in the office of the District of Columbia Recorder of Deeds, which created a cloud on all of the real property belonging to AGM&M. Kaloosdian Aff. ¶ 24; Cmplt. ¶ 104; Carey Aff. at Ex. 22.

### B. Procedural History

On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Complaint, Cafesjian v. Armenian Assembly of America, Inc., (Civil File No. 07-cv-2079), ¶ 3, attached as Ex. 23 to Carey Aff.). That Complaint sought, *inter alia*, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement. After offers by the other Trustees to compromise were summarily rejected by Cafesjian, the Assembly moved to dismiss the action as Cafesjian had failed to name AGM&M as a necessary party, and jurisdiction over AGM&M was not permissible. The Motion to Dismiss was preliminarily granted pursuant to the Report and Recommendation of Magistrate Judge Jeanne J. Graham (see Slip Copy, 2008 WL 906194, Exhibit 5 to 2nd Carey Aff, hereinafter "R&R").

The R&R was adopted by the United States District Court for the District of Minnesota on March 31, 2008 (see Order, Docket No. 63, 07-cv-2079, at ¶ 3, Exhibit 6 to 2nd Carey Aff.,

hereinafter "Order Adopting R&R").  The Defendants have filed a claim of appeal of that ruling in the 8th Circuit Court of Appeals.

On September 13, 2007, in accordance with the arbitration provision in the Transfer Agreement, Plaintiffs filed an Arbitration Demand with the American Arbitration Association ("AAA"), seeking to resolve all the disputes that had arisen regarding Defendants' involvement in the museum project and the donations and pledges for same.  After a noticed hearing, in which Defendants declined to participate, the AAA independently decided that the case could proceed to arbitration with an arbitrator.

On September 27, 2007, Defendant CFF filed a lawsuit in the United States District Court, District of Columbia (Civil File No. 1:07-cv-01746) against AGM&M and the non-CFF Trustees of AGM&M, alleging that the non-CFF Trustees had breached their fiduciary duty by proceeding with a plan to make the museum project a reality.  See Carey Aff. at Ex. 24.

On October 10, 2007, Defendants filed a Complaint for Declaratory and Injunctive Relief in the United States District Court for the District of Minnesota, seeking to have the Arbitration proceedings halted.  On November 16, 2007, Plaintiffs filed a Motion to Dismiss the action on jurisdictional and substantive grounds, or, in the alternative, seeking to Transfer the case to the District of Columbia, the site of three other pending actions (hereinafter "Motion to Dismiss or Transfer").   Although the Motion to Dismiss or Transfer was originally scheduled for hearing on January 9, 2008, it was subsequently rescheduled to February 1, 2008 at the Court's request, and was stayed at the request of the parties due to ongoing settlement negotiations in January, February, and March 2008.  It has now been marked for hearing on June 27, 2008.

On January 7, 2008, representatives of the parties and their counsel attended a mediation before the Hon. Magistrate Judge Alan Kay in the District of Columbia.  It was agreed at the

outset of the mediation that it would cover all pending matters in both the District of Columbia and Minnesota.  See Affidavit of Arnold R. Rosenfeld, ¶ 2, attached as Exhibit 1 to 2nd Carey Aff (hereinafter "Rosenfeld Aff.").  Based on the representations made at the mediation, Plaintiffs believed that a negotiated resolution of all of the pending disputes was possible.  Rosenfeld Aff. ¶ 3.  Accordingly, Plaintiffs engaged in further settlement discussions with the Defendants, executing a Settlement Protocol on January 15, 2008 and agreeing to defer a hearing on their Motion to Dismiss or Transfer until after February 6, 2008 in order to permit the parties to focus on settlement negotiations.  Id.

Unfortunately, Plaintiffs' hopes for a global settlement of all matters proved premature, primarily because of Defendants' failure to negotiate with Plaintiffs in good faith.  Indeed, it appeared that Defendants were simply abusing the resources of the Court and the good will of the Plaintiffs to further their goal of unduly delaying the proceedings in the hopes of triggering the Grant Agreement's reversionary clause.  Accordingly, in the interests of resolving the underlying disputes between the parties as expeditiously as possible and therefore ensuring that the museum project becomes a reality, Plaintiffs elected to voluntarily withdraw their Arbitration Demand and proceed with this action on the underlying claims in the District Court for the District of Columbia.  Rosenfeld Aff. ¶ 4.

Prior to initiating the instant Complaint, Plaintiffs' counsel orally notified Defendants' counsel prior to February 12, 2008, that if the settlement discussions were not successful, it was Plaintiffs' intention to withdraw the Arbitration Demand and file a complaint with the same claims in the U.S. District Court for the District of Columbia.  Rosenfeld Aff. ¶ 5.  Subsequently, Plaintiffs' counsel notified Defendants' counsel of their Withdrawal of the Demand and requested that Defendants agree to a voluntary withdrawal of the second Minnesota action in

order to avoid the time and expense of a hearing on a Motion to Dismiss.  Rosenfeld Aff. ¶ 6.

Plaintiffs also filed the instant Complaint in the District of Columbia.

In an apparent attempt to preempt this Complaint, Defendants on February 13, 2008 filed

the Minnesota DJA Action.  See Complaint, Civil File No. 08-373, Docket No. 1, Exhibit 7 to

2nd Carey Aff.  Defendants also indicated that they would not withdraw the Minnesota injunctive

action unless Plaintiffs agreed to pay for Defendants' attorneys fees, further confirming that

Defendants have no interest in the efficient or timely resolution of the disputes between the

parties.  Rosenfeld Aff. ¶ 6.  Accordingly, Plaintiffs filed a second Motion to Dismiss in the

second Minnesota action, seeking a formal determination by the Court that the Defendants'

motion to enjoin arbitration is moot in light of the withdrawal of the Arbitration Demand and the

filing of the Plaintiffs' underlying claims in the District Court for the District of Columbia.

Plaintiffs are also seeking to dismiss the preemptive Minnesota Declaratory Judgment

Action, which is precluded by (1) a prior ruling that Minnesota lacks jurisdiction over AGM&M,

and (2) the existence of this pending proceeding in the District Court of the District of Columbia

which addresses the very disputes on which Defendants seek declaratory relief.  See

Memorandum of Law in Support of Defendants' Motion to Dismiss or Transfer Pursuant to

Fed.R.Civ.P. 12(b)(2) and 28 U.S.C. 2201(a), Civil File No. 08-373, Document No. 8, attached

as Exhibit 8 to 2nd Carey Aff. (hereinafter "Plaintiffs' Motion to Dismiss Minnesota DJA

Action").

## III.    LEGAL ARGUMENT

Defendants' Motion to Dismiss must be denied.  Defendants are prohibited from

asserting the "first-filed" rule in light of their own forum shopping efforts.  Defendants are also

precluded from asserting that Minnesota is an appropriate forum in which to litigate these

disputes, in light of the District of Minnesota Court's judgment that it lacks jurisdiction over one

of the necessary parties, AGM&M, to this dispute.  Finally, Defendants cannot rely on the

Promissory Note's forum selection clause to assert that the case should be transferred, as the

forum selection clause does not apply to this action, and as Defendants have failed to meet their

burden to show that the Plaintiffs' choice of forum in the District of Columbia should not

control.

      **A.**    **Defendants' "Preemptive Strike" Minnesota Declaratory Judgment Action Does Not Require Dismissal or Transfer of this Action**

Defendants' initial assertion, that Plaintiffs' Complaint must be dismissed due to the

existence of Defendants' pending Declaratory Judgment Action in Minnesota ("Minnesota DJA

Action"), ignores the repeated, unequivocal instruction of this Court that Defendants who misuse

the judicial process by attempting to forum shop or thwart the natural Plaintiffs' choice of forum

will not be afforded the protection of the "first-filed" rule.

As noted above, prior to the filing of the Minnesota DJA Action, Plaintiffs' counsel

informed Defendants' counsel that, to the extent settlement efforts were unsuccessful, Plaintiffs

would be withdrawing the Arbitration Demand and filing this action in the District of Columbia

in order to expedite a resolution of these disputes on the merits.  Rosenfeld Aff. ¶ 5.  Indeed,

Plaintiffs' counsel proceeded to withdraw the Arbitration Demand, promptly providing notice of

same to Defendants and requesting that they therefore withdraw their injunctive action seeking to

halt the arbitration proceedings.  Rosenfeld Aff. ¶ 6.

This proposed course of action should have satisfied Defendants, as their purported

opposition to the arbitration proceedings was their inability to secure a jury trial.  However,

Defendants instead elected to further multiply the already burdensome proceedings, causing even

more unnecessary expense and duplicative litigation.  Not only did they refuse to withdraw their

now moot Complaint to enjoin arbitration, but they filed the Minnesota DJA Action knowing full

well that Plaintiffs were in the process of asserting the same claims in the District of Columbia.

Notably, the Defendants' Memorandum fails to inform this Court of the circumstances

surrounding the filing of these two actions in the District of Columbia and Minnesota.  <u>See</u>

Memorandum at 13.

 Defendants' actions have necessitated wasteful and duplicative Motions to Dismiss in

two jurisdictions.  Defendants' proposed Minnesota forum is inconvenient, has no substantial

interest in the subject of this litigation, and lacks jurisdiction over one of the necessary and

indispensable parties to the case.

 Defendants' "race to the courthouse" action in Minnesota has all the hallmarks of a

preemptive strike and forum shopping – tactics that have been specifically rejected by this Court.

<u>See</u> <u>Thayer/ Patricof Educ. Funding, L.L.C. v. Pryor Resources, Inc.</u>, 196 F. Supp. 2d 21, 29-31

(D.D.C. 2002) (declining to dismiss or transfer case in favor of declaratory judgment in Kansas,

which defendants filed two weeks earlier after receiving notice of plaintiffs' intent to sue, when

no substantial proceedings had transpired in either action other than reciprocal motions to

dismiss).  <u>See also</u> <u>F.D.I.C. v. Bank of New York</u>, 479 F. Supp. 2d 1, 12-13 (D.D.C. 2007)

(declining to apply "first-filed" rule in favor of interpleader action filed one day earlier, when

Court was already familiar with issues and parties).

 The procedural posture of this case is nearly identical to the facts in <u>Lewis v. National</u>

<u>Football League</u>, 813 F. Supp. 1 (D.D.C. 1992), where this Court declined to dismiss, transfer or

stay its proceedings in favor of a declaratory judgment action that was filed in the District of

Minnesota two days earlier.  The Court recognized that the "first-filed" rule is not applied

mechanically, and is instead subject to equitable considerations.  <u>Id.</u> at 4 (citing <u>Columbia Plaza</u>

<u>Corp. v. Security Nat'l Bank</u>, 525 F.2d 620 (D.C. Cir. 1975) and noting that where it appears that

the declaratory judgment action was filed in anticipation of litigation by another party, the preemptive litigation should be disregarded in selecting the proper forum);  see also Thayer / Patricof Educ. Funding, 196 F. Supp. 2d at 30 (characterizing earlier-filed action for declaratory relief and damages as "dressed up defenses in anticipation of [plaintiff's] suit" and a "suit about a suit").[3]

In Lewis, the Court found that the defendant was on notice of litigation and filed its declaratory judgment in order to secure a more "friendly jurisdiction."  813 F. Supp. at 4.  Other equitable considerations weighed in the plaintiffs' favor including (1) the existence of the coercive litigation in the District of Columbia that could render moot the declaratory judgment action in Minnesota; and (2) the first-filed court had discretion to refuse to entertain a declaratory judgment when another proceeding in another jurisdiction could resolve the issue in its entirety. Id. at 5-6.[4]  Even though Lewis was decided by the "second-filed" Court, the plaintiffs' choice of this forum was afforded considerable weight.

> **Finally, and perhaps most importantly, the plaintiffs have made the District of Columbia their choice of forum for this action in which they litigate harms allegedly done to them by the NFL defendants.  That choice must be afforded proper weight and cannot be dismissed merely because defendants opt for a different forum.**

---

[3] The Minnesota forum where Defendants are fighting to stay also disapproves of preemptive strike tactics. See Anheuser-Busch, Inc. v. Supreme Int'l Corp., 167 F.3d 417, 419 (8th Cir. 1999) (holding that first-filed action may be dismissed based on the following "red flags": (1) when the party is on notice that the opponent is considering filing suit against him; and (2) when the first-filed suit is for declaratory relief rather than damages or equitable relief).  Plaintiffs have filed a motion to dismiss the Minnesota Declaratory Judgment Action because both "red flags" are present.

[4] Plaintiffs, in their Motion to Dismiss the Minnesota DJA Action, have also asked that Court to exercise its discretion under the Declaratory Judgment Act and decline to hear the matter in light of Defendants' forum shopping.  See BASF Corp. v. Symington, 50 F.3d 555, 557-58 (8th Cir. 1995) ("A suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed").  See Ex. 8 to 2nd Carey Aff.

Id. at 5.  See also Thayer, 196 F. Supp. 2d at 31 (holding that moving party bears a "heavy

burden" to show plaintiff's choice of forum was inappropriate in order to obtain transfer of case

under 28 U.S.C. §1404(a)).

Defendants' reliance on Columbia Plaza Corp. v. Security Nat'l Bank is unavailing, as

Columbia Plaza stands for the proposition that equitable considerations must determine which of

the two courts should hear the case.[5]  Columbia Plaza Corp. v. Security Nat'l Bank, 525 F.2d 620

(D.C. Cir. 1975).  In Columbia Plaza, the D.C. Circuit considered a number of factors that

favored litigation in the District of Columbia, where all parties to a construction loan transaction

were before the Court.[6]  These same factors all lead to an inexorable conclusion in favor of the

District of Columbia retaining jurisdiction in this case, as all parties to the museum transaction

are before the court (in contrast to Minnesota where jurisdiction is lacking).[7]  Moreover, as none

of the cases in Minnesota have progressed beyond the Motion to Dismiss stage, judicial economy

and the equities also favor litigation in the District of Columbia.

> **B.    Even if Defendants Could Permissibly Assert the "First-Filed" Rule, Venue
> in the District of Minnesota is Improper in Light of the District of
> Minnesota's Prior Judgment that the District Lacks Personal Jurisdiction
> over AGM&M**

Even if Defendants could permissibly raise the "first-filed" rule to argue in favor of

dismissal of this action, dismissal of the action in favor of resolution of the case in Minnesota is

---

[5] Defendants' arguments regarding compulsory counterclaims are irrelevant, as it is undisputed
that the instant Complaint and the Minnesota DJA Action involve the same transaction or
occurrence.

[6] In Columbia Plaza, the D.C. Circuit considered (1) the fact that all parties were before the court
in the District of Columbia and not in the other litigation in New York; (2) witnesses were in or
near the District of Columbia and were not subject to subpoena in New York; (3) it was unfair to
force plaintiffs to engage New York counsel; and (4) extensive proceedings had taken place in
District of Columbia.  525 F.2d at 627-629.

[7] See discussion, infra, Section II.B.

improper, as the District of Minnesota courts have already concluded that they lack personal jurisdiction over AGM&M, a necessary and indispensable party to these proceedings.

As noted above, the United States District Court for the District of Minnesota has already established in a final judgment that (1) Minnesota lacks personal jurisdiction over AGM&M, and (2) AGM&M is a necessary and indispensable party to litigation regarding the museum project and the museum properties.  See R&R at 15-20, and Order Adopting R&R, Exs. 5, 6 to 2nd Carey Aff., respectively.  Accordingly, Defendants are collaterally estopped from relitigating the issue of personal jurisdiction over AGM&M in this action.

Issue preclusion may apply when "(1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness."  Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 31-32 (D.D.C. 2007).  Courts have repeatedly applied the doctrine to judgments or decisions pertaining to personal jurisdiction, holding that a judgment that dismisses an action for lack of personal jurisdiction will preclude relitigation of the jurisdictional issue that led to the dismissal.  See Rurhgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999) (personal jurisdiction ruling has issue-preclusive effect); Matosantos Comm. Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1208 (10th Cir. 2001) (issue necessary to prior determination that personal jurisdiction was lacking could not be relitigated in subsequent action); United States v. Euge, 691 F.2d 379, 382 (8th Cir. 1982) (precluding party from relitigating issue of personal jurisdiction decided in prior action); see also 18A Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE, § 4436 (2d ed. 2002); 18 James Wm. Moore, MOORE'S FEDERAL PRACTICE, §132.03[5][c] (3d ed. 2007).

Here, the issue of whether or not personal jurisdiction can be asserted over AGM&M in Minnesota was fully and finally litigated in the first Minnesota action initiated by the Defendants.  In that action, the United States District Court for the District of Minnesota fully adopted the reasoning of the magistrate judge's report and recommendation, which recommended that the Court grant the Assembly's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join AGM&M as a necessary and indispensable party under Fed. R. Civ. P. 19.  See R&R at 15-20.  An essential and dispositive component of the magistrate judge's recommendation was that joinder was impossible because AGM&M was not subject to personal jurisdiction in the District of Minnesota.  Id. at 17-19.  The magistrate judge conducted a detailed jurisdictional analysis, expressly rejecting an argument that personal jurisdiction could be based on Defendants' voluntary decision to work in Minnesota.  Id. at 18.  The United Stated District Court for the District of Minnesota conducted a *de novo* review and adopted the magistrate's report in full.  See Order Adopting R&R ¶ 3.  The jurisdictional issue was fully briefed in the prior proceedings, the Defendants had an opportunity to be heard at a hearing that addressed precisely this issue, and the ruling on the issue was essential to the prior judgment.[8]

In deliberate defiance of the Minnesota Court's findings and Judgment, Defendants proffer the same flawed argument that was previously rejected by the United States District Court for the District of Minnesota – that personal jurisdiction over AGM&M (a *Defendant* in the Minnesota action), can somehow be established through the unilateral activities in Minnesota by Cafesjian, Waters and others (who are *Plaintiffs* in Minnesota).  See Defendants' Memorandum at 21-22.  The jurisdictional issue to be precluded is the same that was "actually

---

[8] In fact, Defendants argue in their Memorandum that the magistrate's prior ruling is "res judicata" to establish personal jurisdiction over the Assembly.  See Memorandum at 19-20. Defendants cannot rely on the R&R for this finding while denying the clearly preclusive effect of the Minnesota Court's Judgment that there is no jurisdiction over AGM&M in Minnesota.

and necessarily determined" in the prior action.  <u>Hurst</u>, 474 F. Supp. 2d at 31-32.[9]  As the

Minnesota Court's determination that it lacked personal jurisdiction over AGM&M was essential

to the earlier judgment, it cannot be re-litigated.  <u>See</u> <u>Matosantos</u>, 245 F.3d at 1208.  As the

Minnesota courts cannot assert personal jurisdiction over AGM&M, this Court should not

dismiss the instant Complaint in favor of the Minnesota forum.  Defendants' attempts to re-

litigate the same issues that were previously decided by the United States District Court for the

District of Minnesota are impermissible and must be rejected.

> **C.    Even if the Minnesota Court's Jurisdiction Ruling Did Not Have *Res Judicata* Effect, Defendants Cannot Demonstrate that Jurisdiction Over Plaintiffs in Minnesota Is Proper, or that Minnesota is an Appropriate Forum in which to Resolve these Disputes**

Even assuming *arguendo* that the prior jurisdictional ruling by the District Court for the

District of Minnesota was not required to be given preclusive effect, this Court cannot dismiss

the action in favor of the Minnesota DJA Action in light of the lack of evidence of jurisdiction

over Plaintiffs in Minnesota, as well as the impropriety of selecting that venue as the forum in

which to resolve these disputes.

Plaintiffs' contacts with Minnesota, to the extent they exist at all, are insufficient to

permit the assertion of personal jurisdiction, as the cause of action does not arise out of

Plaintiffs' contacts, and the contacts are not continuous and systematic enough to permit the

assertion of "general" jurisdiction.  Moreover, Minnesota lacks a meaningful interest in

providing a forum for the Declaratory Judgment Action, which involves only one Minnesota

citizen and is duplicative of this proceeding pending between the parties in the District of

---

[9] As previously recognized by the United States District Court for the District of Minnesota, AGM&M would be a necessary and indispensable party to the Minnesota Declaratory Judgment Action because any relief awarded to the Defendants would substantially prejudice AGM&M, as its future ability to develop the museum, or to even function, would be jeopardized.  <u>See</u> <u>In re U.S. ex rel. Hall</u>, 825 F. Supp. 1422, 1428-1429 (D. Minn. 1993).

Columbia. Finally, resolution of the claims giving rise to the Minnesota DJA Action in Minnesota is neither convenient nor appropriate, as the true situs of the dispute is the District of Columbia.[10]

Neither the instant Complaint nor the Minnesota Declaratory Judgment Action arises out of the Plaintiffs' alleged contacts with Minnesota. The organizing documents of AGM&M, as well as the Grant Agreement and the Transfer Agreement, were prepared in the District of Columbia by District of Columbia attorneys and are governed by District of Columbia law. The Agreements were not executed in Minnesota, and pertain to property and organizations which are located exclusively in the District of Columbia. Defendants have not alleged that the Plaintiffs have committed any act in Minnesota causing injury or property damage in Minnesota, or that they have committed any act outside of Minnesota causing injury or property damage in Minnesota.

Defendants also have not shown either that Minnesota has a substantial interest in providing a forum for its residents or that Minnesota is a convenient forum in which to resolve the dispute. Only one of the Defendants (Plaintiffs in the Minnesota DJA Action), John Waters, is a citizen of Minnesota. Moreover, there is another forum to resolve the disputes, as this action will fully resolve the disputes which Defendants seek to resolve in the Minnesota DJA Action. In light of Defendants' earlier filing of their own lawsuit in the District of Columbia, Defendants cannot possibly assert that the District of Columbia is an inconvenient forum in which to litigate. Finally, the convenience of the parties weighs heavily against resolving this case in Minnesota, as the locus of the disputes is the District of Columbia and the majority of the records of both the

---

[10] Plaintiffs' arguments regarding the existence (or lack thereof) of jurisdiction over the Plaintiffs in Minnesota are extensively addressed in Plaintiffs' Motion to Dismiss the Minnesota DJA Action, Exhibit 8 to 2nd Carey Aff. As the issue is already pending before the appropriate District Court in Minnesota, they are not restated in detail here.

AGM&M and the Assembly are located in the District of Columbia.  The Plaintiffs, both of whom are charitable, non-profit organizations, should not be compelled to bear the burden and expense of litigation in a remote jurisdiction simply because one of their major donors would prefer to litigate in the state where he has a summer house.

### D.    The Note's Forum Selection Clause Is Inapplicable to this Action

In their final argument for proceeding in Minnesota rather than the District of Columbia, Defendants grasp onto a forum selection clause contained in the Promissory Note that the Assembly made in favor of CFF in March of 2000.  As discussed below, the clause is inapplicable to this action, which does not concern any obligation under the Note, any dispute arising from the Note, or any "relationship" created by the Note.

This Court has held that "a forum selection clause is only relevant to the Court's transfer analysis to the extent that the 'clause applies to the type of claims asserted in the lawsuit.'" Navajo Nation v. Peabody Holding Co., Inc., 209 F. Supp. 2d 269, 277-78 (D.D.C. 2002) (quoting Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 692 (8th Cir. 1997)).  In other words, "if the substance of the plaintiffs['] claims stripped of their labels, does not fall within the scope of the clause, the clause cannot apply."  Smith v. Lucent Technologies, Inc., No. Civ. A. 02-0481, 2004 WL 515769, at *7 (E.D. La. March 16, 2004) (quoting Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993)).  Thus, the starting point for the Court's analysis – and in this case, the ending point – is whether the present litigation is "arising directly or indirectly from the relationship created by [the] Note."

The Note in this case contains the following forum selection clause:

> **At the option of the payee [CFF], this note may be enforced in any federal court or Minnesota state court sitting in Hennepin County, Minnesota, and the maker [Assembly] consents to the jurisdiction and venue of any such court and waives any argument that the venue in such forums is not convenient.  If**

> **the maker [Assembly] commences any action in another
> jurisdiction or venue under any tort or contract theory arising
> directly or indirectly from the relationship <u>created by this note</u>,
> the payee [CFF] at its option shall be entitled to have the case
> transferred to one of the jurisdictions and venues above
> described, or, if such transfer cannot be accomplished under
> applicable law, to have such case dismissed without prejudice.**

<u>See</u> Note, Carey Aff. at Exhibit 1 (emphasis supplied).

By its terms, the Note's forum selection clause applies solely to an action arising directly

or indirectly from the <u>relationship between CFF and the Assembly with regard to the Note</u>, the

only relationship that was uniquely created by the Note.  This relationship, per the terms of the

Note, expired on May 16, 2000.

As noted above and throughout the pleadings, the relationship between the parties in this

action predated the creation of the Note, and gave rise to numerous obligations and relationships

which have nothing whatsoever to do with the Note.  <u>See</u> Memorandum at 4; Waters Aff. ¶¶ 17-

20.  More importantly, Plaintiffs' claims in this action arise from fiduciary and contractual

relationships between the Cafesjian Interests and Plaintiffs which have nothing to do with the

Note.  Plaintiffs' claims arise from Defendants' duties as trustees, officers or volunteers of

AGM&M and the Assembly, as well as their obligations under the Grant and Transfer

Agreements.  For example, Plaintiffs allege that Cafesjian and Waters engaged in self-dealing,

failed to secure a realistic development plan, failed to use reasonable efforts to secure funding,

failed to address carrying costs or obtain tax exemptions for real estate, failed to maintain

adequate records, and were responsible other wrongful acts or omissions.  <u>See</u> Cmplt. ¶¶121-124.

Plaintiffs further allege that Cafesjian wrongfully spent down the assets of AGM&M and

obstructed the organization's development efforts.  <u>See</u> Cmplt. ¶ 141.  Plaintiffs also allege that

Cafesjian and Waters misappropriated trade secrets belonging to the Assembly, and violated the

Assembly's conflict of interest policies.  <u>See</u> Cmplt. at ¶¶ 129-133.  Plaintiffs further allege that

Waters and TomKat breached contractual duties to AGM&M by clouding title to the "adjacent lots." See Cmplt. at ¶¶ 134-139. Plaintiffs' requests for declaratory relief relate only to the Reversion Provision in the Grant, CFF's authority to designate trustees of AGM&M, and Cafesjian's and Waters' liability on contracts with a third party. See Cmplt. at ¶¶ 147-150. Finally, Plaintiffs seeks an accounting. See Cmplt. at ¶ 151.

The disputes set forth above clearly arise out of the fiduciary obligations imposed on Defendants via the By-Laws of AGM&M and the D.C. Non-Profit Corporations statute, as well as certain provisions of the Grant and Transfer Agreements, both of which are expressly governed by D.C. law. Nothing in these claims relates to or arises out of the unique relationship "created" by the Note. Indeed, the AGM&M was not created until two years after the Note's execution.[11]

Plaintiffs' assertion that the Grant or Transfer Agreement somehow incorporates by reference or requires application of the forum selection clause is both unconvincing and indefensible. First, a quick review of both documents reveals that there are no forum selection provisions, or even any statements which expressly incorporate the terms of the Note into those contracts. As noted above, both the Grant and Transfer Agreements expressly state that they are to be governed by District of Columbia law, and further state that they contain the entirety of the Agreement of the parties with respect to the grant properties, and that they supersede any prior agreements. See Transfer Agmt. at §§ 5.2, 5.6; Grant Agmt. at §§ 7.2, 7.5.

---

[11] Indeed, Defendants themselves have asserted that AGM&M lacks sufficient "privity" to the Note and that Defendants could not have asserted a contractual cause of action against AGM&M for the Assembly's allege failure to issue a Replacement Note. See Plaintiff's Objections to Magistrate Judge's Report and Recommendation, Case No. 07-2079 (JNE/JJG) (D. Minn.), attached as Exhibit 9 to 2nd Carey Aff.

Where, as here, Plaintiffs' claims do not implicate the precise contractual relationship or subject-matter embodied in an agreement containing a forum selection clause, and the relationship which gave rise to the claims precedes the creation of the forum selection clause, courts have found that the clause is inapplicable.   See, e.g., Navajo Nation, 209 F. Supp. 2d at 277-279 (plaintiffs' claims based on RICO and trust law were not subject to parties' lease agreement's forum selection clause); Farmland Indus., Inc. v. Frazier-Parrott Commodities, Inc., 806 F.2d 848, 852 (8th Cir. 1986), *abrogated on other grounds by* Lauro Lines S.R.L. v. Chasser, 490 U.S. 495 (1989) (where causes of action do not all arise directly or indirectly from the agreement containing the forum selection clause and plaintiff could not have anticipated having to litigate these claims in the selected forum, clause was unenforceable); Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. United Transp. Union Ins. Ass'n, No. Civ. A. H-05-4159, 2006 WL 456267, at *2 (S.D. Tex. Feb. 23, 2006) (forum selection clause in undertaking agreement did not apply in action on separate insurance policy contract); Smith v. Lucent Technologies, 2004 WL 515769 at *1-4 (forum selection clause contained in a loan and security agreement held inapplicable to broader dispute between parties regarding performance of equipment purchased via agreement).[12]   Accordingly, Defendants' request to have this case transferred under the forum selection clause must be denied.

> **E.    Even Assuming *Arguendo* that the Forum Selection Clause is Applicable to These Proceedings, Considerations of Fairness and Convenience Weigh Against Application of the Clause in this Action**

---

[12] The forum selection clause in the Note was also not written in a way to encompass all relationships between the parties.  Cf. Nova Ribbon Prods. v. Lincoln Ribbon, Inc., No. 89-4340, 1992 WL 211544, at *2 (E.D. La. Aug. 24, 1992) (applying clause that gave Israeli court jurisdiction "over all and any matters, connected in any way, directly or indirectly, with this Agreement and/or over all matters relating to the legal relations between the parties, whether these matters precede this Agreement, arise out of it, or postdate it").

Even if the forum selection clause applied to Plaintiffs' claims in this case (which it does not), the Court must still evaluate a motion to dismiss or transfer pursuant to 28 U.S.C. 1404(a) by considering such issues such as the "convenience" and "fairness of transfer in light of the forum-selection clause and the parties' relative bargaining power." Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988). The Court must give deference to the Plaintiffs' choice of forum, see Lewis, 813 F. Supp. At 5, and Defendants have the burden to establish that transfer of the action to another federal district is proper. Shenandoah Assocs. L.P. v. Tirana, 182 F. Supp. 2d 14, 25 (D.D.C. 2001). Finally, the court "must weigh in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" Id. at 30. See also 14D Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE, § 3803.1 (3d ed. 2007) (federal court sitting in diversity treats a request to enforce a forum selection clause that permits venue in another federal district as a motion to transfer venue under 28 U.S.C. §1404(a)).

As noted above, it is clear that Minnesota was never a convenient forum for the parties – it is simply the forum where Defendants want to litigate. As Magistrate Judge Graham observed "Minnesota does not have a strong interest in providing a forum here." See R&R at 18-19 (observing that Cafesjian and CFF are both Florida residents and "it does not appear to be particularly convenient for anyone else involved in the litigation, many, if not most of who are in Washington, D.C."). Furthermore, the District of Columbia is evidently a convenient enough forum for the Defendants when it suits them, as they have brought their own lawsuit in this forum. In contrast, it would be unfair to force the Plaintiffs, which are non-profit charitable organizations, to litigate in Minnesota. This is particularly true for AGM&M, which was not even a signatory to the Note and which never consented at any time to be subject to the forum

selection clause in the Note.  Judicial economy also favors litigation in the District of Columbia, where two other related cases are pending.[13]  Finally, and most importantly, Defendants have not met their burden to show that the Plaintiffs' choice of forum should not be given dispositive weight, in light of the inapplicability of the forum selection clause, as well as the other factors noted herein.

### F.    The Court Should Not Stay This Action

For reasons previously stated, the present action is superior to the Minnesota Declaratory Judgment Action, and as such, there is no reason to stay this lawsuit.  As this Court concluded in Lewis, "a stay would only serve to postpone, potentially to plaintiffs' detriment, an inevitable resolution of this case."  813 F. Supp. at 7.  The possibility of a detriment to Plaintiffs is particularly true in this case, because a stay would only reward Defendants' efforts to further obstruct and delay the museum project.  A stay of the present lawsuit would serve no purpose and Defendants' motion should be denied.

### IV.    <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

---

[13] As noted above, the only remaining actions in Minnesota are the DJA Action and Defendants' now mooted injunctive action to halt arbitration proceedings which are no longer pending. Plaintiffs have filed Motions to Dismiss both actions, which are scheduled for hearing on June 27, 2008.

Respectfully submitted,

Dated: April 18, 2008

**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**

By:      /s/ David T. Case
David T. Case (D.C. Bar No. 384062)
1601 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 778-9000
Fax: (202) 778-9100

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE ARMENIAN ASSEMBLY OF AMERICA, INC. and
THE ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.,

                Plaintiffs,

v.

GERARD L. CAFESJIAN, INDIVIDUALLY and as
TRUSTEE and PRESIDENT (former) of THE ARMENIAN
GENOCIDE MUSEUM AND MEMORIAL, INC., and
PRESIDENT and DIRECTOR OF THE CAFESJIAN
FAMILY FOUNDATION, INC., JOHN J. WATERS, JR.,
INDIVIDUALLY and as SECRETARY/TREASURER OF
THE ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC., PRESIDENT OF THE TOMKAT
LIMITED PARTNERSHIP, and SECRETARY and
DIRECTOR OF THE CAFESJIAN FAMILY
FOUNDATION, INC.; THE CAFESJIAN FAMILY
FOUNDATION, INC.; and THE TOMKAT LIMITED
PARTNERSHIP,

                Defendants.

Civil File No. 08-255(CKK)
(D.D.C.)

**AFFIDAVIT OF NAOKA E. CAREY, ESQ.**

I, NAOKA E. CAREY, hereby state under the penalties of perjury, as follows:

    1.    I am a member of the Massachusetts bar; an associate attorney in the law firm of

Kirkpatrick & Lockhart Preston Gates Ellis, LLP; and counsel for the Plaintiffs in the above-

captioned action, the Armenian Genocide Museum and Memorial, Inc. (AGM&M) and the

Armenian Assembly of America, Inc. ("the Assembly") (hereinafter "Plaintiffs").  I make this

affidavit in support of the Plaintiffs' Opposition to Defendants' Motion to Dismiss or in the

Alternative to Transfer.  The documents introduced herein were provided to me by the Plaintiffs

in this action or were personally received and/or prepared or filed by me, and are believed to be

authentic documents prepared or kept in the ordinary course of business.

2.      Exhibit 1 is a true and accurate copy of an Affidavit filed by Arnold R. Rosenfeld, Esq. dated April 7, 2008, originally filed in a matter pending before the United States District Court for the District of Minnesota (Civil File No. 1:08-cv-373).

3.      Exhibit 2 is a true and accurate copy of the Affidavit of Robert Kaloosdian dated September 11, 2007, originally filed in support of Plaintiffs' Arbitration Demand filed with the American Arbitration Association.

4.      Exhibit 3 is a true and accurate copy of the Affidavit of Rouben Adalian dated November 15, 2007, originally filed in a matter pending before the United States District Court for the District of Minnesota (Civil File No. 1:07-cv-4212).

5.      Exhibit 4 are true and accurate copies of the IRS Form 990s filed on behalf of the AGM&M by Plaintiff John J. Waters for the years 2003, 2004, and 2005.

6.      Exhibit 5 is a true and accurate copy of the Report and Recommendation issued by Magistrate Judge Jeanne G. Graham in the above-noted action (Civil File No. 1:07-cv-2079) on October 23, 2007.

7.      Exhibit 6 is a true and accurate copy of the District Court for the District of Minnesota's Order dated March 31, 2008, adopting the Report and Recommendation issued by Magistrate Judge Jeanne G. Graham.

8.      Exhibit 7 is a true and accurate copy of the Amended Complaint filed by Defendants in this action on February 14, 2008 in the District Court of the District of Minnesota on April 7, 2008 (Civil File No. 08-cv-373).

9.      Exhibit 8 is a true and accurate copy of the Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(2) and 28 U.S.C. 2201(a), filed

by the Plaintiffs in this action in the District Court of the District of Minnesota on April 7, 2008

(Civil File No. 08-cv-373).

  10. Exhibit 9 is a true and accurate copy of "Plaintiffs' Objections to Magistrate

Judge's Report and Recommendation" filed by the Defendants in this action in the District Court

of the District of Minnesota on November 5, 2007 (Civil File No. 1:07-cv-2079).


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF APRIL,
2008.

       Naoka E. Carey
       Mass. Bar No. # 655312
       Kirkpatrick & Lockhart Preston Gates Ellis LLP
       One Lincoln Street
       Boston, MA. 02111
       Tel.: 617-261-3100
       Email: naoka.carey@klgates.com

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation, and TomKat LP,<br><br>               Plaintiffs,<br><br>vs.<br><br>The Armenian Genocide Museum and Memorial, Inc. and the Armenian Assembly of America,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil File No. 08-373 (JNE)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ARNOLD R. ROSENFELD, ESQ.

I, ARNOLD R. ROSENFELD, hereby depose and state as follows:

1.      I am a member of the Massachusetts bar; Of Counsel in the law firm of Kirkpatrick & Lockhart Preston Gates Ellis, LLP; and counsel for the Defendants in the above-captioned action,[1] the Armenian Assembly of America, Inc. ("the Assembly") and the Armenian Genocide Museum & Memorial, Inc. (AGM&M) (hereinafter "the Defendants"). I make this affidavit in support of the Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) and 28 U.S.C. § 2201(a), and in order to introduce true and accurate copies of documents that support the Defendants' request that the case be dismissed.

---

[1] Applications for admission *pro hac vice* are being filed contemporaneously with this Affidavit.

BOS-1184773 v1

2.      On January 7, 2008, representatives of the Defendants, the Plaintiffs, and their counsel attended a mediation before the Hon. Magistrate Judge Alan Kay in the District of Columbia.  It was agreed at the outset of the mediation that it would cover all pending matters in both the District of Columbia and Minnesota.

3.      Based on the representations made at the mediation, Defendants believed that a negotiated resolution of all of the pending disputes was possible.  Accordingly, Defendants, in good faith, engaged in further settlement discussions with the Plaintiffs, executing a Settlement Protocol on January 15, 2008 and agreeing to defer hearings on their previously filed pleadings in order to permit the parties to focus on settlement negotiations.

4.      Unfortunately, the settlement efforts in late January and early February were unsuccessful.  Accordingly, in the interests of resolving the underlying disputes between the parties as expeditiously as possible and therefore ensuring that the museum project becomes a reality, Defendants elected to voluntary withdraw their Arbitration Demand and proceed with an action on the underlying claims in the District Court for the District of Columbia.

5.      Prior to initiating the new Complaint, I spoke with Plaintiffs' counsel, Timothy Thornton, Esq., sometime before February 12, 2008, and informed him that if the settlement discussions were not successful, it was Defendants' intention to withdraw the Arbitration Demand and file a complaint with essentially the same claims in the U.S. District Court for the District of Columbia.

6. Subsequently, on February 13, 2008, my office notified Plaintiffs' counsel of our Withdrawal of the Arbitration Demand and requested that Plaintiffs agree to a voluntary withdrawal of the Plaintiffs' injunctive action in Minnesota in order to avoid the time and expense of a hearing on a Motion to Dismiss. In response, Plaintiffs initiated this action via the filing of a Complaint, and also indicated that they would not withdraw the earlier Minnesota action unless Defendants' agreed to pay for Plaintiffs' attorneys fees.

7. Defendants subsequently filed their Complaint, as they had advised they would, in the District Court for the District of Columbia on February 15, 2008.

8. The delay in the filing of the Complaint was due nearly entirely to (a) the ongoing settlement negotiations between the parties, which Defendants genuinely hoped would resolve all of the disputes between the parties; (b) the necessity, caused by Plaintiffs, of filing a Motion to Dismiss as Moot Plaintiffs' Complaint for Declaratory and Injunctive Relief, as well as a request for a Stay of Discovery pending the resolution of that Motion.

9. The documents introduced herein were provided to me by the Defendant in this action, and are believed to be authentic documents prepared or kept in the ordinary course of business.

10. Exhibit 1 is a true and accurate copy of the Affidavit of Robert Kaloosdian dated September 11, 2007, originally filed in support of Defendants' Arbitration Demand filed with the American Arbitration Association.

11.     Exhibit 2 is a true and accurate copy of the Affidavit of Rouben Adalian dated November 15, 2007, originally filed in another matter pending before this Court (Case No. 1:07-cv-4212).

12.     Exhibit 3 is a true and accurate copy of a November 1, 2003 email from an attorney at Caplin & Drysdale, Lloyd Meyer, to Plaintiff John J. Waters, along with true and accurate copies of the attachments to such email.

13.     Exhibit 4 are true and accurate copies of the IRS Form 990s filed on behalf of the AGM&M by Plaintiff John J. Waters for the years 2003, 2004, and 2005.

14.     Exhibit 5 is a true and accurate copy of a September 13, 2006 Letter of Gerard Cafesjian to Hirair Hovnanian, Robert Kaloosdian, and Anoush Mathevosian, Trustees of the AGM&M.

15.     Exhibit 6 is a true and accurate copy of the Complaint filed in the District Court for the District of Minnesota by Gerard Cafesjian and the Cafesjian Family Foundation against the Assembly on April 26, 2007 (Docket No. 1:07 cv 2079).

16.     Exhibit 7 is a true and accurate copy of the Report and Recommendation issued by Magistrate Judge Jeanne G. Graham in the above-noted action (Docket No. 1:07 cv 2079) on October 23, 2007.

17.     Exhibit 8 is a true and accurate copy of the Court's Order dated March 31, 2008, adopting the Report and Recommendation issued by Magistrate Judge Jeanne G. Graham.

- 4 -

18.     Exhibit 9 is a true and accurate copy of the Defendants' Complaint filed in the District Court of the District of Columbia on February 15, 2008 (Docket No. 08-cv-255).

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF APRIL 2008.

_____
Arnold R. Rosenfeld
BBO # 428860
Kirkpatrick & Lockhart Preston Gates Ellis LLP
One Lincoln Street
Boston, MA. 02111
Tel.: 617-951-9125
Email: arnie.rosenfeld@klgates.com

# Exhibit 2

**AMERICAN ARBITRATION ASSOCIATION**

| |
|---|
| ARMENIAN ASSEMBLY OF AMERICA, INC. and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. |
| *Claimants* |
| v. |
| GERARD L. CAFESJIAN, INDIVIDUALLY and as TRUSTEE and PRESIDENT (former) of THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and PRESIDENT AND DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, JOHN J. WATERS, JR., INDIVIDUALLY and as SECRETARY/TREASURER OF THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, PRESIDENT OF TOMKAT LP, and SECRETARY AND DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, THE CAFESJIAN FAMILY FOUNDATION, INC.; and TOMKAT LP, |
| *Respondents* |

Case No. _____

## AFFIDAVIT OF ROBERT A. KALOOSDIAN

I, Robert A. Kaloosdian, being duly sworn, hereby depose and state as follows:

1.      I have been an active member of the bar of Massachusetts, in good standing, since 1957.  My current office address is 43 Mt. Auburn St., Watertwon, Massachusetts, 02472.

2.      I am a founding member of the Armenian Assembly of America, Inc. ("the Assembly"), which was formed in 1972.  In addition to being a member, I have also held the following positions and titles:  Steering Committee member, Vice-Chairman, Co-Chairman or Chairman (for over ten years), and I currently serve as Counselor to the Board of Trustees.  I also am currently the Chairman of the Armenian National Institute, which was formed as a subsidiary of the Assembly.  From October 2003 until early 2007, I served on the Board of Trustees of the Armenian Genocide Museum and Memorial Inc.(AGM&M), as the designee member of the Assembly.

3.      The Assembly is a District of Columbia non-profit corporation with its principal

place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036.  To the best of my

knowledge, the Assembly has no offices or employees in the state of Minnesota and is not

qualified to do business in Minnesota.

4.      The Assembly is the foremost Armenian-American advocacy group in the United

States and has several missions including, but not limited to, acting as a sponsor for Armenian-

American interests to public policy makers and the public in the United States, providing

resources and opportunities for Armenian-Americans in the American democratic process,

undertaking research, education and advocacy for universal affirmation of the Armenian

Genocide, enhancing relationships between the United States and Armenia, and securing

effective collaboration among Armenian-American organizations to accomplish its articulated

goals.  I have been intimately involved with the Assembly in seeking these goals since 1972.

5.      In order to preserve and establish a location where Americans could learn from

the lessons of the Armenian Genocide, in the 1990s, the Assembly began investigating the idea

of constructing a permanent museum to the victims and survivors of the Armenian Genocide

("the museum").   The Assembly explored many possible sites for the museum in Washington,

D.C. and solicited and received donations from the Armenian-American community for the

purpose of establishing and constructing the museum, including a significant donation from Ms.

Anoush Mathevosian, who pledged over three (3) million dollars to the endeavour at a critical

early stage.

6.      Through my role as a member and officer of the Assembly, I was involved in the

discussions regarding the development of the museum.  I have personal knowledge of the

transactions surrounding the development of the museum and the funding of same, as further described herein.

7.    One of the persons the Assembly approached regarding the funding of the museum project was Gerard Cafesjian ("Cafesjian").  I, along with other representatives of the Assembly, approached Cafesjian at his home in 1997.  At the time, he was interested in developing his own museum or a similar project, but not in Washington, D.C.  Upon information and belief, Cafesjian was not, at the time we approached him, a member of the Assembly, nor, to my knowledge, was he actively involved in the Armenian-American community.

8.    In or around 2000, the Assembly identified a possible site for the museum at the National Bank of Washington Building at 14th and G Streets, N.W., Washington, D.C. ("the National Bank site").  This site was located near the White House and, in my opinion, offered an opportunity for a major historical and educational attraction that would enhance worldwide understanding of the Armenian Genocide, which is the most elemental event in Armenian history and which is one of the principal missions of the Assembly.  The site was purchased with the funds that had been previously pledged by Ms. Mathevosian, as well as funds Cafesjian donated through the Cafesjian Family Foundation (CFF).

9.    In order to finalize the funding needed for the purchase of the National Bank site, it was also agreed that CFF would issue a Promissory Note to the Assembly in the amount of $500,000 ("the Note").  Based on subsequent discussions with Cafesjian and CFF, myself, and other members of the Assembly, it was our understanding that this Note was to be forgiven.

10.    Cafesjian conditioned his financial support for the purchase of the National Bank site on the inclusion of a "Gerard L. Cafesjian Memorial" at the museum site.  Cafesjian actively encouraged the Assembly to expand the scope of the museum project.  While acknowledging

that his stated goals for the project would be costly, Cafesjian repeatedly assured the Assembly (which he eventually joined) that he was committed to providing or securing funding for the expanded project. Cafesjian also acquired four additional lots adjacent to the National Bank site through his company, TomKat, which were eventually donated to the AGM&M project. Cafesjian eventually proposed, and then adamantly insisted, that not the Assembly, but a new non-profit organization, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M"), be created to handle the construction, development, and operation of the museum and memorial.

11.    In October of 2003, the AGM&M was incorporated as a District of Columbia not-for-profit corporation and the first Trustees of AGM&M were selected: Cafesjian, Mathevosian, Hirair Hovnanian, another significant donor to the project who is presently the Chair of the Board of Trustees of the Assembly, and myself[1] (hereinafter collectively referred to as "the AGM&M Trustees").

12.    AGM&M is and has always been a District of Columbia non-profit corporation with its official place of business in the District of Columbia.

13.    On November 1, 2003, again at Cafesjian's insistence, the Assembly executed a "Grant Agreement" with Cafesjian. The Grant Agreement was drafted by Cafesjian's attorneys and purported to confirm various gifts to be made by Cafesjian to the Assembly for the purpose of constructing the museum. In the case of the Note and the donations made to purchase the National Bank site, the donations had, in fact, been made prior to the execution of the Agreement. In the case of the land transfers from TomKat, the land had actually never been

---

[1] Under the By-Laws enacted by the AGM&M Trustees, the Assembly has one permanent Trustee appointed to the Board of Trustees of AGM&M. As one of the founders of the Assembly, I served as the representative of the Assembly on the AGMM Trustees from 2003-2007. I have since been replaced by Van Krikorian as the Assembly's representative.

donated or titled in the name of the Assembly, but were, in fact, directly transferred to the AGM&M by TomKat.

14.     Under the terms of the Grant Agreement, the Assembly was also required to execute a Transfer Agreement with the AGM&M to confirm the transfer of the donations made by Cafesjian. The Transfer Agreement, which was also drafted by Cafesjian's attorneys, was executed on November 1, 2003, as required by the Grant Agreement.  Pursuant to the Transfer Agreement, the Assembly transferred all of the real property, cash, and pledges it had received to develop the museum project to the AGM&M.

15.     In addition to the real property, cash, and pledges noted above, the Assembly also agreed to transfer ANI, along with all of its assets, to the AGM&M, as under Cafesjian's proposed terms, ANI was to become a subsidiary of AGM&M.  The transfer of ANI and all of its assets represented an invaluable contribution to the museum enterprise, both financially and otherwise.  Not only did ANI have an established reputation as a leading research organization dedicated to preserving and studying Armenian history and artifacts, it also owned an extensive collection of rare historical documents and other precious items which make up the "collection" of works to be displayed at the museum.  In addition to holding extensive records and tangible property, ANI had an excellent reputation and enormous good-will in the community, lending significant credibility to the enterprise.

16.     Between November 1, 2003 and the fall of 2006, the AGM&M was effectively operated, managed, and in fact, controlled by Cafesjian and John J. Waters, Jr. ("Waters"), an employee of Cafesjian, who was an officer in his various companies and to whom he delegated substantial responsibility in all his dealings with the Assembly and the AGM&M.   Cafesjian and Waters acted as President and Secretary/Treasurer of AGM&M, respectively.  Cafesjian and

Waters hired consultants, searched for and selected an architect and a design plan for the AGM&M, and advised us they were contacting potential donors for the museum.

17.     In the winter of 2006, the other Trustees and I inquired of Cafesjian and Waters whether the unusual and potentially controversial design proposal for the museum would be feasible in light of the District of Columbia's stringent zoning and permitting requirements.

18.     As a result of these and other inquiries regarding his role and plans for the museum, Cafesjian became contemptuous of the other members of the Board of Trustees of the AGM&M.

19.     On May 24, 2006, Cafesjian's then current attorney, William J. Brody ("Brody"), sent a certified letter to myself and the other Trustees asserting, on behalf of Cafesjian, that there were two competing visions of the AGM&M among the AGM&M Trustees and that these visions were irreconcilable.  Brody suggested that Cafesjian proposed to end his involvement with AGM&M, resign his trustee position, and prospectively renounce his rights to appoint trustees or to serve as a trustee.  In this letter, Brody referred to the $500,000 Note, and stated that if Cafesjian terminated his involvement in AGMM, he would expect the Note to be repaid by AGM&M.  He further noted that the Grant Agreement provided that if the various properties had not been developed by 2010, as contemplated in the agreement, then any obligation by Cafesjian and CFF would terminate and the properties or the funds to acquire the properties "are to be returned to CFF" and that he would expect the return of the non-bank buildings and property.

20.     In response to the Brody letter, Hovanian and I sent communications to Cafesjian and Waters requesting copies of financial reports, minutes of meetings, and legal documents including deeds and contractual obligations.  Upon receipt of the limited financial records

Cafesjian and Waters provided to us, it became apparent to me and the other Trustees that little progress had been made on the museum's development plan and that Cafesjian had not consulted with, or even informed, the other Trustees and officers of numerous actions he and Waters had taken on behalf of AGMM.

21.    On August 2, 2006, I formally responded to the May 24, 2006 Brody letter on behalf of myself, Hovanian, and Mathevosian. After denyng that there were two competing visions, we asked Cafesjian to continue with the project with his vision and our support of that vision, with the hope that he would follow through on the commitment he had made to the AGM&M, the Assembly, and the Armenian community.

22.    In a subsequent teleconference on August 8, 2006, Cafesjian again confirmed to me, via counsel, his wish to disassociate himself from the project and to receive all of the non-bank properties owned by the AGM&M. As the properties had appreciated in value significantly during the intervening time period, Hovanian, Mathevosian and I realized that Cafesjian could now profit by his involvement in the museum project, at the expense of the AGM&M and the Assembly and to the great detriment of the museum and memorial project.

23.    This teleconference was followed by another Brody letter, on August 29, 2006, which letter essentially demanded the dissolution of the AGM&M in order to permit Cafesjian to reacquire the donated properties at substantial profit to himself.

24.    In the winter of 2007, I learned from my counsel that on or around October 23, 2006, without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Waters executed, purportedly as an authorized officer of both the AGM&M and CFF, a Memorandum of Agreement Reserving Rights ("Memorandum") purportedly

- 7 -

between AGM&M and CFF.   Waters also caused the Memorandum to be filed and recorded in

the official records of the Recorder of Deeds for the District of Columbia on or about October

27, 2006, again without a meeting of the Board of Trustees having been properly noticed, <u>and</u>

without a properly noticed meeting of the Board of Trustees having been held at which the

matter could have been discussed or the Trustees advised of the CFF's intent.

25.     To the best of my knowledge, Waters never consulted with or informed any of the

Trustees (with the exception of Cafesjian) of his recording of the Memorandum.

26.     Waters' recording of the Memorandum was without notice to or authorization

from the Trustees of AGM&M.

27.     The above information is true and accurate to the best of my knowledge and

belief.

Sworn to under the penalties of perjury:

_Robert A. Kaloosdian_
Robert A. Kaloosdian

Dated:  September ___11___, 2007

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation, and TomKat LP, <br><br> Plaintiffs, <br><br> vs. <br><br> The Armenian Genocide Museum and Memorial, Inc. and the Armenian Assembly of America, <br><br> Defendants. | Civil File No. 07-4212 (JNE/SRN) |

## AFFIDAVIT OF ROUBEN ADALIAN

I, ROUBEN ADALIAN, being duly sworn under oath, hereby depose and state, as follows:

1.      I am the Director of the Armenian National Institute, a District of Columbia non-profit organization whose governing board is appointed by the Armenian Genocide Museum and Memorial, Inc. (AGM&M).  I act as the Project Coordinator of the AGM&M's museum project, and have been the most senior staff member assigned to lead the AGM&M museum project since the AGM&M was incorporated in October, 2003.  I was also involved in the museum project prior to AGM&M's incorporation.  I work closely with the Chair of the Board of Trustees of AGM&M and the Chair of AGM&M's Building and Operations Committee.  I have worked closely with the officers

AGM&M since its creation in 2003.  I am personally familiar with the day-to-day operations of the AGM&M.

2.      The AGM&M is a District of Columbia non-profit corporation with its principal and <u>only</u> place of business in the District of Columbia.  The AGM&M has no offices or employees in Minnesota and maintains its corporate records in the District of Columbia.  A copy of AGM&M's letterhead is attached hereto at <u>Exhibit A.</u>

3.      To the best of my knowledge, the AGM&M does not conduct business in the State of Minnesota, nor has AGM&M ever been registered to do business in Minnesota or established an office in Minnesota.

4.      In November of 2003, John J. Waters, Jr. became the acting Treasurer/Secretary of AGM&M and Gerard Cafesjian became the President of AGM&M.  I reported directly to Waters while he was acting as an officer of AGM&M. While I am aware that Waters and Cafesjian have alleged that they conducted some of their duties as officers of AGM&M in Minnesota, at no time did anyone at AGM&M ever require that they conduct their activities in or from Minnesota, nor was such activity authorized to occur in Minnesota by any other officer or Trustee of AGM&M.  Other than Waters and Cafesjian, none of the other Trustees or officers of AGM&M conducted any business for AGM&M from Minnesota.

5.      None of the AGM&M Trustee Meetings, Committee meetings, and planning meetings occurred in the State of Minnesota.  While Mr. Waters has elected to participate in phone calls from Minnesota on occasion, he did so for his own convenience, and not at the request of the AGM&M.

6.    At no time has AGM&M ever maintained an office in Minnesota. While Waters did, for his own convenience, have some AGM&M records forwarded to his workplace in Minnesota (a Cafesjian owned entity), to my knowledge, he never took steps to change the business address of AGM&M to an address in Minnesota, nor did he ever seek authorization from the Board of Trustees of AGM&M to change AGM&M's business address.

7.    I have personally reviewed the tax returns filed on behalf of AGM&M for 2003, 2004, and 2005. In each year, AGM&M's place of business was identified as located in the District of Columbia, as were the addresses of all of its officers and Trustees, including Waters and Cafesjian.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF NOVEMBER, 2007.

Rouben Adalian

**EXHIBIT A**

# Armenian Genocide Museum and Memorial, Inc.

**1140 19th Street, NW, Suite 600, Washington, D.C. 20036**
**Phone: 202-383-9009; E-mail: ani@agmm.org; Web: www.armenian-genocide.org**
**www.armeniangenocidemuseum.org**

# Exhibit 4

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2003**

Open to Public Inspection

**A** For the 2003 calendar year, or tax year beginning OCT 29, 2003 and ending DEC 31, 2003

**B** Check if applicable
- [ ] Address change
- [ ] Name change
- [X] Initial return
- [ ] Final return
- [ ] Amended return
- [ ] Application pending

Please use IRS label or print or type. See Specific Instructions.

**C** Name of organization
ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

Number and street (or P.O. box if mail is not delivered to street address)
122 C STREET NW | Room/suite 350

City or town, state or country, and ZIP + 4
WASHINGTON, DC 20001

**D** Employer identification number
20-0344096

**E** Telephone number
612-359-8991

**F** Accounting method [ ] Cash [X] Accrual
[ ] Other (specify) ▶

• Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**G** Website: ▶ WWW.AGMM.ORG

**J** Organization type (check only one) ▶ [X] 501(c) ( 3 ) ◀ (insert no.) [ ] 4947(a)(1) or [ ] 527

**K** Check here ▶ [ ] if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. **Some states require a complete return.**

**H** and **I** are not applicable to section 527 organizations.
**H(a)** Is this a group return for affiliates? [ ] Yes [X] No
**H(b)** If "Yes," enter number of affiliates ▶
**H(c)** Are all affiliates included? N/A [ ] Yes [ ] No (If "No," attach a list.)
**H(d)** Is this a separate return filed by an organization covered by a group ruling? [ ] Yes [X] No

**I** Group Exemption Number ▶

**M** Check ▶ [ ] if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ 20,343,036.

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| a | Direct public support | 1a | 20,342,881. | |
| b | Indirect public support | 1b | | |
| c | Government contributions (grants) | 1c | | |
| d | **Total** (add lines 1a through 1c) (cash $ 12,968,813. noncash $ 7,374,068. ) | | 1d | 20,342,881. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | 2 | |
| 3 | Membership dues and assessments | | 3 | |
| 4 | Interest on savings and temporary cash investments | | 4 | 155. |
| 5 | Dividends and interest from securities | | 5 | |
| 6 a | Gross rents | 6a | | |
| b | Less: rental expenses | 6b | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | 6c | |
| 7 | Other investment income (describe ▶ ) | | 7 | |
| 8 a | Gross amount from sales of assets other than inventory | (A) Securities 8a | (B) Other | |
| b | Less: cost or other basis and sales expenses | 8b | | |
| c | Gain or (loss) (attach schedule) | 8c | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | 8d | |
| 9 | Special events and activities (attach schedule). If any amount is from **gaming,** check here ▶ [ ] | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) | 9a | | |
| b | Less: direct expenses other than fundraising expenses | 9b | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | | |
| b | Less: cost of goods sold | 10b | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | 11 | |
| 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | 12 | 20,343,036. |
| 13 | Program services (from line 44, column (B)) | | 13 | |
| 14 | Management and general (from line 44, column (C)) | | 14 | 11,085. |
| 15 | Fundraising (from line 44, column (D)) | | 15 | |
| 16 | Payments to affiliates (attach schedule) | | 16 | |
| 17 | **Total expenses** (add lines 16 and 44, column (A)) | | 17 | 11,085. |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | 18 | 20,331,951. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | 19 | 0. |
| 20 | Other changes in net assets or fund balances (attach explanation) | | 20 | 0. |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | 21 | 20,331,951. |

*Revenue* (margin label)
*Expenses* (margin label)
*Net Assets* (margin label)

RECEIVED NOV 18 2004 OGDEN, UT IRS - OSC 493

SCANNED DEC 03 2004

323001 12-17-03    **LHA** For Paperwork Reduction Act Notice, see the separate instructions.

Form **990** (2003)

8-13



| Part II | Statement of Functional Expenses | All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. | | | Page 2 |

| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) | 22 | | | | |
| cash $_____ noncash $_____ | | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | | | | |
| 32 Legal fees | 32 | 6,653. | | 6,653. | |
| 33 Supplies | 33 | 66. | | 66. | |
| 34 Telephone | 34 | 109. | | 109. | |
| 35 Postage and shipping | 35 | 8. | | 8. | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | 4,217. | | 4,217. | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a MISC. EXPENSES | 43a | 32. | | 32. | |
| b _____ | 43b | | | | |
| c _____ | 43c | | | | |
| d _____ | 43d | | | | |
| e _____ | 43e | | | | |
| 44 Total functional expenses (add lines 22 through 43). Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 11,085. | 0. | 11,085. | 0. |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in **(B)** Program services?     ▶ ☐ Yes ☒ No

If "Yes," enter **(i)** the aggregate amount of these joint costs $_____ ; **(ii)** the amount allocated to Program services $_____ ;
**(iii)** the amount allocated to Management and general $_____ ; and **(iv)** the amount allocated to Fundraising $_____ .

| Part III | Statement of Program Service Accomplishments | |

What is the organization's primary exempt purpose? ▶ _____

SEE STATEMENT 1

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

**Program Service Expenses**
(Required for 501(c)(3) and (4) orgs., and 4947(a)(1) trusts, but optional for others.)

**a** SEE STATEMENT 1
_____
_____
_____
(Grants and allocations $               0.)              0.

**b** _____
_____
_____
(Grants and allocations $                    )

**c** _____
_____
_____
(Grants and allocations $                    )

**d** _____
_____
_____
(Grants and allocations $                    )

**e** Other program services (attach schedule)    (Grants and allocations $          )

**f** Total of Program Service Expenses (should equal line 44, column (B), Program services)     ▶              0.

323011
12-17-03
Form **990** (2003)

Form 990 (2003)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.                                                    20-0344096    Page 3

## Part IV | Balance Sheets

**Note:** *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only*

| | | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| Assets | 45 | Cash - non-interest-bearing | | | 45 | 864,349. |
| | 46 | Savings and temporary cash investments | | | 46 | |
| | 47 a | Accounts receivable | 47a  5,200. | | | |
| | b | Less: allowance for doubtful accounts | 47b | | 47c | 5,200. |
| | 48 a | Pledges receivable | 48a  3,342,838. | | | |
| | b | Less: allowance for doubtful accounts | 48b  1,119,976. | | 48c | 2,222,862. |
| | 49 | Grants receivable | | | 49 | |
| | 50 | Receivables from officers, directors, trustees, and key employees | | | 50 | |
| | 51 a | Other notes and loans receivable | 51a | | | |
| | b | Less: allowance for doubtful accounts | 51b | | 51c | |
| | 52 | Inventories for sale or use | | | 52 | |
| | 53 | Prepaid expenses and deferred charges | | | 53 | |
| | 54 | Investments - securities ▶ ☐ Cost ☐ FMV | | | 54 | |
| | 55 a | Investments - land, buildings, and equipment: basis | 55a | | | |
| | b | Less: accumulated depreciation | 55b | | 55c | |
| | 56 | Investments - other | | | 56 | |
| | 57 a | Land, buildings, and equipment: basis | 57a  19,934,540. | | | |
| | b | Less: accumulated depreciation | 57b | | 57c | 19,934,540. |
| | 58 | Other assets (describe ▶ _____ ) | | | 58 | 0. |
| | 59 | **Total assets** (add lines 45 through 58) (must equal line 74) | | 0. | 59 | 23,026,951. |
| Liabilities | 60 | Accounts payable and accrued expenses | | | 60 | 764,976. |
| | 61 | Grants payable | | | 61 | |
| | 62 | Deferred revenue | | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees | STMT 3 | | 63 | 500,000. |
| | 64 a | Tax-exempt bond liabilities | | | 64a | |
| | b | Mortgages and other notes payable | | | 64b | 1,430,024. |
| | 65 | Other liabilities (describe ▶ _____ ) | | | 65 | 0. |
| | 66 | **Total liabilities** (add lines 60 through 65) | | 0. | 66 | 2,695,000. |
| Net Assets or Fund Balances | | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| | 67 | Unrestricted | | | 67 | 822,893. |
| | 68 | Temporarily restricted | | | 68 | 19,499,058. |
| | 69 | Permanently restricted | | | 69 | 10,000. |
| | | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | | |
| | 70 | Capital stock, trust principal, or current funds | | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund | | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds | | | 72 | |
| | 73 | **Total net assets or fund balances** (add lines 67 through 69 or lines 70 through 72; column (A) **must** equal line 19; column (B) **must** equal line 21) | | 0. | 73 | 20,331,951. |
| | 74 | **Total liabilities and net assets / fund balances** (add lines 66 and 73) | | 0. | 74 | 23,026,951. |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

323021
12-17-03

Form 990 (2003)

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**                    20-0344096                    Page **4**

| **Part IV-A** | **Reconciliation of Revenue per Audited Financial Statements with Revenue per Return** | **Part IV-B** | **Reconciliation of Expenses per Audited Financial Statements with Expenses per Return** |
|---|---|---|---|

| | | |
|---|---|---|
| **a** | Total revenue, gains, and other support per audited financial statements ▶ | **a** N/A |
| **b** | Amounts included on line **a** but not on line 12, Form 990: | |
| **(1)** | Net unrealized gains on investments $_____ | |
| **(2)** | Donated services and use of facilities $_____ | |
| **(3)** | Recoveries of prior year grants $_____ | |
| **(4)** | Other (specify): $_____ | |
| | Add amounts on lines **(1)** through **(4)** ▶ | **b** |
| **c** | Line **a** minus line **b** ▶ | **c** |
| **d** | Amounts included on line 12, Form 990 but not on line **a**: | |
| **(1)** | Investment expenses not included on line 6b, Form 990 $_____ | |
| **(2)** | Other (specify): $_____ | |
| | Add amounts on lines **(1)** and **(2)** ▶ | **d** |
| **e** | Total revenue per line 12, Form 990 (line **c** plus line **d**) ▶ | **e** |

| | | |
|---|---|---|
| **a** | Total expenses and losses per audited financial statements ▶ | **a** N/A |
| **b** | Amounts included on line **a** but not on line 17, Form 990: | |
| **(1)** | Donated services and use of facilities $_____ | |
| **(2)** | Prior year adjustments reported on line 20, Form 990 $_____ | |
| **(3)** | Losses reported on line 20, Form 990 $_____ | |
| **(4)** | Other (specify): $_____ | |
| | Add amounts on lines **(1)** through **(4)** ▶ | **b** |
| **c** | Line **a** minus line **b** ▶ | **c** |
| **d** | Amounts included on line 17, Form 990 but not on line **a**: | |
| **(1)** | Investment expenses not included on line 6b, Form 990 $_____ | |
| **(2)** | Other (specify): $_____ | |
| | Add amounts on lines **(1)** and **(2)** ▶ | **d** |
| **e** | Total expenses per line 17, Form 990 (line **c** plus line **d**) ▶ | **e** |

| **Part V** | **List of Officers, Directors, Trustees, and Key Employees** (List each one even if not compensated.) |
|---|---|

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| GERARD L. CAFESJIAN 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | CHAIRMAN/PRESIDENT AS NEEDED | 0. | 0. | 0. |
| HIRAIR S. HOVNANIAN 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | VICE CHAIRMAN AS NEEDED | 0. | 0. | 0. |
| ANOUSH MATHEVOSIAN 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | TRUSTEE AS NEEDED | 0. | 0. | 0. |
| ROBERT A. KALOOSDIAN 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | TRUSTEE AS NEEDED | 0. | 0. | 0. |
| PETER VOSBIKIAN 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | TRUSTEE AS NEEDED | 0. | 0. | 0. |
| JOHN WATERS JR. 122 C STREET, SUITE 360 WASHINGTON, DC  20001 | SECRETARY/TREASURER AS NEEDED | 0. | 0. | 0. |
| | | | | |
| | | | | |
| | | | | |

**75** Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? If "Yes," attach schedule. ▶ ☐ Yes ☒ No

323031 12-17-03                    Form 990 (2003)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2003)      20-0344096    Page 5

| Part VI | Other Information | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | 76 | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? | 77 | | X |
| | If "Yes," attach a conformed copy of the changes. | | | |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | 78a | | X |
| b | If "Yes," has it filed a tax return on Form 990-T for this year?     N/A | 78b | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? | 79 | | X |
| | If "Yes," attach a statement | | | |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | 80a | X | |
| b | If "Yes," enter the name of the organization ▶ ARMENIAN NATIONAL INSTITUTE, INC. and check whether it is [X] exempt or ☐ nonexempt. | | | |
| 81 a | Enter direct or indirect political expenditures. See line 81 instructions | 81a | 0. | |
| b | Did the organization file Form 1120-POL for this year? | 81b | | X |
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | 82a | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) | 82b | N/A | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | 83b | X | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | 84a | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible?    N/A | 84b | | |
| 85 | 501(c)(4), (5), or (6) organizations. a Were substantially all dues nondeductible by members?    N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less?    N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, do not complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| c | Dues, assessments, and similar amounts from members     85c   N/A | | | |
| d | Section 162(e) lobbying and political expenditures     85d   N/A | | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices     85e   N/A | | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e)     85f   N/A | | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f?    N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year?    N/A | 85h | | |
| 86 | 501(c)(7) organizations. Enter: a Initiation fees and capital contributions included on line 12     86a   N/A | | | |
| b | Gross receipts, included on line 12, for public use of club facilities     86b   N/A | | | |
| 87 | 501(c)(12) organizations. Enter: a Gross income from members or shareholders     87a   N/A | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.)     87b   N/A | | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX | 88 | | X |
| 89 a | 501(c)(3) organizations. Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ 0. ; section 4912 ▶ 0. ; section 4955 ▶ 0. | | | |
| b | 501(c)(3) and 501(c)(4) organizations. Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ 0. | | | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization ▶ 0. | | | |
| 90 a | List the states with which a copy of this return is filed ▶ WASHINGTON, D.C. | | | |
| b | Number of employees employed in the pay period that includes March 12, 2003     90b | | 0 | |
| 91 | The books are in care of ▶ JOHN WATERS JR.      Telephone no. ▶ 612-359-8991 | | | |
| | Located at ▶ 15 SOUTH FIFTH STREET, STE 900, MINNEAPOLIS, MN    ZIP + 4 ▶ 55402 | | | |
| 92 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of Form 1041- Check here ▶ ☐ and enter the amount of tax-exempt interest received or accrued during the tax year ▶ 92   N/A | | | |

323041
12-17-03                                       Form 990 (2003)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2003)                                                20-0344096    Page 6

## Part VII | Analysis of Income-Producing Activities (See page 33 of the instructions.)

Note: Enter gross amounts unless otherwise indicated.

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | (E) Related or exempt function income |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 155. | |
| 96 Dividends and interest from securities | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | | | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | | | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 155. | 0. |
| 105 Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 155. |

Note: Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.

## Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes (See page 34 of the instructions.)

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| | N/A |
| | |
| | |
| | |

## Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| | % | | | |
| N/A | % | | | |
| | % | | | |
| | % | | | |

## Part X | Information Regarding Transfers Associated with Personal Benefit Contracts (See page 34 of the instructions.)

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?    ☐ Yes  ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?    ☐ Yes  ☒ No

Note: If "Yes" to (b), file Form 8870 and Form 4720 (see instructions)

...mpanying schedules and statements, and to the best of my knowledge and belief, it is true, ...rmation of which preparer has any knowledge

9/04    ▶ JOHN J. WATERS, JR    SECRETARY
                  Type or print name and title.

| Date | Check if | Preparer's SSN or PTIN |
|---|---|---|
| | | |

**SCHEDULE A**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or Section 4947(a)(1) Nonexempt Charitable Trust
**Supplementary Information-(See separate instructions.)**
▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

# 2003

| Name of the organization | Employer identification number |
|---|---|
| ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | 20 0344096 |

**Part I** | **Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees**

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total number of other employees paid over $50,000 ▶ | 0 | | | |

**Part II** | **Compensation of the Five Highest Paid Independent Contractors for Professional Services**

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total number of others receiving over $50,000 for professional services ▶ | 0 | |

323101/12-05-03    LHA    **For Paperwork Reduction Act Notice, see the Instructions for Form 990 and Form 990-EZ**    **Schedule A (Form 990 or 990-EZ) 2003**

ARMENIAN GENOCIDE MUSEUM AND
Schedule A (Form 990 or 990-EZ) 2003 MEMORIAL, INC.                                    20-0344096   Page 2

| **Part III** | **Statements About Activities** (See page 2 of the instructions.) | | Yes | No |
|---|---|---|---|---|
| 1 | During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶  $ _____   $ _____   (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.) | 1 | | X |
| | Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | | | |
| 2 | During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is "Yes," attach a detailed statement explaining the transactions.)* | | | |
| a | Sale, exchange, or leasing of property?     STMT 2 | 2a | X | |
| b | Lending of money or other extension of credit? | 2b | | X |
| c | Furnishing of goods, services, or facilities? | 2c | | X |
| d | Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | | X |
| e | Transfer of any part of its income or assets? | 2e | | X |
| 3 a | Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| b | Do you have a section 403(b) annuity plan for your employees? | 3b | | X |
| 4 | Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4 | | X |

| **Part IV** | **Reason for Non-Private Foundation Status** (See pages 3 through 6 of the instructions.) |
|---|---|

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state ▶** _____

10 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 ☐ An organization that normally receives: **(1) more than 33 1/3%** of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above; or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)
Provide the following information about the supported organizations. (See page 5 of the instructions.)

| (a) Name(s) of supported organization(s) | (b) Line number from above |
|---|---|
| | |
| | |
| | |

14 ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See page 6 of the instructions.)

Schedule A (Form 990 or 990-EZ) 2003

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2003   MEMORIAL, INC.                    20-0344096    Page 3

**Part IV-A**   **Support Schedule** (Complete only if you checked a box on line 10, 11, or 12.) **Use** cash method of accounting.

Note: *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting.*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2002 | (b) 2001 | (c) 2000 | (d) 1999 | (e) Total |
|---|---|---|---|---|---|
| **15** Gifts, grants, and contributions received. (Do not include any unusual grants. See line 28.) | | | | | |
| **16** Membership fees received | | | | | |
| **17** Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | INITIAL YEAR | | |
| **18** Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | | | | | |
| **19** Net income from unrelated business activities not included in line 18 | | | | | |
| **20** Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| **21** The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| **22** Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| **23** Total of lines 15 through 22 | 0. | 0. | 0. | 0. | 0. |
| **24** Line 23 minus line 17 | | | | | |
| **25** Enter 1% of line 23 | | | | | |

**26 Organizations described on lines 10 or 11: a** Enter 2% of amount in column (e), line 24  ▶ | **26a** |

**b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 1999 through 2002 exceeded the amount shown in line 26a. **Do not file this list with your return.** Enter the total of all these excess amounts  ▶ | **26b** | 0. |

**c** Total support for section 509(a)(1) test: Enter line 24, column (e)  ▶ | **26c** |

**d** Add: Amounts from column (e) for lines:   18 _____ 19 _____   22 _____ 26b _____  ▶ | **26d** |

**e** Public support (line 26c minus line 26d total)  ▶ | **26e** |

**f** **Public support percentage (line 26e (numerator) divided by line 26c (denominator))**  ▶ | **26f** | % |

**27 Organizations described on line 12: a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year:   **N/A**
(2002) _____ (2001) _____ (2000) _____ (1999) _____

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger of (1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) **Do not file this list with your return.** After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year:   **N/A**
(2002) _____ (2001) _____ (2000) _____ (1999) _____

**c** Add: Amounts from column (e) for lines:   15 _____ 16 _____   17 _____ 20 _____ 21 _____  ▶ | **27c** | N/A |

**d** Add: Line 27a total _____ and line 27b total _____  ▶ | **27d** | N/A |

**e** Public support (line 27c total minus line 27d total)  ▶ | **27e** | N/A |

**f** Total support for section 509(a)(2) test: Enter amount on line 23, column (e)  ▶ | **27f** | N/A |

**g** **Public support percentage (line 27e (numerator) divided by line 27f (denominator))**  ▶ | **27g** | N/A % |

**h** **Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator))**  ▶ | **27h** | N/A % |

**28 Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 1999 through 2002, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return.** Do not include these grants in line 15.

323121  12-05-03                          **NONE**                       Schedule A (Form 990 or 990-EZ) 2003

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2003 MEMORIAL, INC.                                                    20-0344096    Page 4

| Part V | Private School Questionnaire (See page 7 of the instructions.) | N/A |
|---|---|---|
|  | (To be completed ONLY by schools that checked the box on line 6 in Part IV) | |

|  |  |  | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? | 31 | | |
|  | If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
|  | If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
|  | If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
|  | If you answered "Yes" to either 34a or b, please explain using an attached statement. | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2003

323131
12-05-03

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Schedule A (Form 990 or 990-EZ) 2003                                      20-0344096      Page 5

**Part VI-A** - **Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.)

(To be completed ONLY by an eligible organization that filed Form 5768)

Check ▶ a ☐  if the organization belongs to an affiliated group.       Check ▶ b ☐  if you checked "a" and "limited control" provisions apply.

| Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | | (a) Affiliated group totals | (b) To be completed for ALL electing organizations |
|---|---|---|---|
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | 11,085. |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | 11,085. |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | 41 | | 2,217. |
| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | 554. |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

If the amount on line 40 is -          The lobbying nontaxable amount is -
Not over $500,000                      20% of the amount on line 40
Over $500,000 but not over $1,000,000  $100,000 plus 15% of the excess over $500,000
Over $1,000,000 but not over $1,500,000  $175,000 plus 10% of the excess over $1,000,000
Over $1,500,000 but not over $17,000,000  $225,000 plus 5% of the excess over $1,500,000
Over $17,000,000                       $1,000,000

**Caution:** *If there is an amount on either line 43 or line 44, you must file Form 4720*

**4-Year Averaging Period Under Section 501(h)**

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
|---|---|---|---|---|---|
| 45 Lobbying nontaxable amount | 2,217. | | | | 2,217. |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 3,326. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | 554. | | | | 554. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 831. |
| 50 Grassroots lobbying expenditures | | | | | 0. |

**Part VI-B** **Lobbying Activity by Nonelecting Public Charities**

(For reporting only by organizations that did not complete Part VI-A) (See page 12 of the instructions.)      N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a  Volunteers | | | |
| b  Paid staff or management (Include compensation in expenses reported on lines c through h.) | | | |
| c  Media advertisements | | | |
| d  Mailings to members, legislators, or the public | | | |
| e  Publications, or published or broadcast statements | | | |
| f  Grants to other organizations for lobbying purposes | | | |
| g  Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h  Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i  Total lobbying expenditures (Add lines c through h.) | | | 0. |
| If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities. | | | |

323141
12-05-03                                                        Schedule A (Form 990 or 990-EZ) 2003

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2003 MEMORIAL, INC.                    20-0344096    Page 6

| Part VII | Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations (See page 12 of the instructions.) |

51    Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

|  |  |  | Yes | No |
|---|---|---|---|---|
| a | Transfers from the reporting organization to a noncharitable exempt organization of: | | | |
| | (i) Cash | **51a(i)** | | **X** |
| | (ii) Other assets | **a(ii)** | | **X** |
| b | Other transactions: | | | |
| | (i) Sales or exchanges of assets with a noncharitable exempt organization | **b(i)** | | **X** |
| | (ii) Purchases of assets from a noncharitable exempt organization | **b(ii)** | | **X** |
| | (iii) Rental of facilities, equipment, or other assets | **b(iii)** | | **X** |
| | (iv) Reimbursement arrangements | **b(iv)** | | **X** |
| | (v) Loans or loan guarantees | **b(v)** | | **X** |
| | (vi) Performance of services or membership or fundraising solicitations | **b(vi)** | | **X** |
| c | Sharing of facilities, equipment, mailing lists, other assets, or paid employees | **c** | | **X** |

d    If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received:        **N/A**

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

52 a    Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527?    ▶ ☐ Yes    ☒ No

b    If "Yes," complete the following schedule:        **N/A**

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

323151
12-05-03

Schedule A (Form 990 or 990-EZ) 2003

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN:  20-0344096**
**YEAR ENDED 12/31/2003**

STATEMENT OF PROGRAM SERVICE ACCOMPLISHMENTS

Armenian Genocide Museum and Memorial , Inc. ("AGMM") was formed to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these programs.

STATEMENT 1

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2003**

<u>Form 990, Schedule A, Part III – Sale, exchange, or leasing of property</u>

The Armenian Genocide Museum and Memorial, Inc. ("AGMM") purchased several buildings from Tomkat, LP, which is owned in part by Mr. Cafesjian, a substantial contributor. In addition to purchasing several buildings, AGMM assumed liabilities associated with those buildings. The sales transaction was completed at cost and without profit to Mr. Cafesjian.

Statement 2

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2003**

<u>Form 990, Part IV, Line 63 – Loans from officers, directors, trustees, and key employees</u>

On November 1, 2003, Mr. Cafesjian, a board member of the Armenian Genocide Museum and Memorial, Inc. ("AGMM"), advanced funds to AGMM for its establishment and organization. The original amount of the note was $500,000. $500,000 is still outstanding, and will be paid back with 0% interest.

Statement 3

Form 8868 (12-2000) | | Page **2**

- If you are filing for an **Additional (not automatic) 3-Month Extension,** complete only Part II and check this box . . . . . . ▶ ☒
**Note:** *Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.*
- If you are filing for an **Automatic 3-Month Extension,** complete only Part I (on page 1).

| Part II | Additional (not automatic) 3-Month Extension of Time — Must File Original and One Copy. |
|---|---|

| **Type or print** | Name of Exempt Organization | | **Employer identification number** |
|---|---|---|---|
| File by the extended due date for filing the return See Instructions | ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | | 20-0344096 |
| | Number, street, and room or suite no. If a P.O. box, see instructions. | | For IRS use only |
| | 122 C STREET NW | | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. | | |
| | WASHINGTON, DC 20001 | | |

**Check type of return to be filed** (File a separate application for each return):

☒ Form 990 ☐ Form 990-EZ ☐ Form 990-T (sec. 401(a) or 408(a) trust) ☐ Form 1041-A ☐ Form 5227 ☐ Form 8870
☐ Form 990-BL ☐ Form 990-PF ☐ Form 990-T (trust other than above) ☐ Form 4720 ☐ Form 6069

**STOP: Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . . . . . . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box ▶ ☐. If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

**4** I request an additional 3-month extension of time until _____ NOVEMBER 15 _____ , 20 04 .

**5** For calendar year _____ , or other tax year beginning OCTOBER 29 , 20 03 and ending DECEMBER 31 , 20 03 .

**6** If this tax year is for less than 12 months, check reason: ☒ Initial return ☐ Final return ☐ Change in accounting period

**7** State in detail why you need the extension ADDITIONAL TIME IS NECESSARY IN ORDER TO GATHER THE INFORMATION FOR A COMPLETE AND ACCURATE RETURN. THEREFORE, AN EXTENSION OF TIME TO FILE IS RESPECTFULLY REQUESTED.

**8a** If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | NONE

 **b** If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | NONE

 **c** **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | NONE

### Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form

Signature ▶ *Kristin K. Grubb*  Title ▶ CPA  Date ▶ 8/16/04

### Notice to Applicant — To Be Completed by the IRS

☐ We have approved this application. Please attach this form to the organization's return.
☐ We have not approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.
☐ We have not approved this application. After considering the reasons stated in item 7, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.
☐ We cannot consider this application because it was filed after the due date of the return for which an extension was requested.
☐ Other _____

_____ By _____ _____
Director | | Date

**Alternate Mailing Address** — Enter the address if you want the copy of this application for an additional 3-month extension returned to an address different than the one entered above.

| **Type or print** | Name | KRISTEN GRUBB |
|---|---|---|
| | | DELOITTE & TOUCHE LLP |
| | Number and street (Include suite, room, or apt. no.) Or a P.O. box number | |
| | | 120 SOUTH SIXTH STREET, SUITE 400 |
| | City or town, province or state, and country (including postal or ZIP code) | |
| | | MINNEAPOLIS, MN 55402 |

Form **8868** (12-2000)

| Form **8868** | **Application for Extension of Time To File an** | |
|---|---|---|
| (December 2000) | **Exempt Organization Return** | |
| Department of the Treasury<br>Internal Revenue Service | ▶ File a separate application for each return. | OMB No 1545-1709 |

- If you are filing for an **Automatic 3-Month Extension**, complete only Part I and check this box ................... ▶ ☒
- If you are filing for an **Additional (not automatic) 3-Month Extension**, complete only Part II (on page 2 of this form).

**Note:** *Do not complete Part II unless you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

**Part I**  **Automatic 3-Month Extension of Time** — Only submit original (no copies needed)

**Note:** *Form 990-T corporations* requesting an automatic 6-month extension — check this box and complete Part I only .... ▶ ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

| Type or<br>print | Name of Exempt Organization<br>ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | Employer identification number<br>20-0344096 |
|---|---|---|
| File by the<br>due date for<br>filing your<br>return. See<br>Instructions. | Number, street, and room or suite no. If a P.O. box, see instructions.<br>122 C STREET NW | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>WASHINGTON, DC  20001 | |

Check type of return to be filed (file a separate application for each return):

| ☒ Form 990 | ☐ Form 990-T (corporation) | ☐ Form 4720 |
|---|---|---|
| ☐ Form 990-BL | ☐ Form 990-T (sec. 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-EZ | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-PF | ☐ Form 1041-A | ☐ Form 8870 |

- If the organization does **not** have an office or place of business in the United States, check this box .................. ▶ ☐
- If this is for a **Group Return**, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the **whole** group, check this box ▶ ☐ . If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension will cover.

**1** I request an automatic 3-month (6-month, for **990-T corporation**) extension of time until ___AUGUST 16___ , 20 04 , to file the exempt organization return for the organization named above. The extension is for the organization's return for:

   ▶ ☐ calendar year 20 ____ or

   ▶ ☒ tax year beginning ___OCTOBER 29___ , 20 03 , and ending ___DECEMBER 31___ , 20 03 .

**2** If this tax year is for less than 12 months, check reason: ☒ Initial return ☐ Final return ☐ Change in accounting period

**3a** If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions ....................................................... $    NONE

**b** If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit .................................... $    NONE

**c** **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions ...................................................................................... $    NONE

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ _[signature]_  Title ▶ CPA  Date ▶ 5/17/04

For Paperwork Reduction Act Notice, see Instruction  Form **8868** (12-2000)

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No. 1545-0047

**2004**

Open to Public Inspection

**A** For the 2004 calendar year, or tax year beginning _____ and ending _____

| B Check if applicable | | C Name of organization | | | D Employer identification number |
|---|---|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | | | 20-0344096 |
| ☐ Name change | | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | | E Telephone number |
| ☐ Initial return | | 122 C STREET NW | 350 | | 612-359-8991 |
| ☐ Final return | | City or town, state or country, and ZIP + 4 | | | F Accounting method ☐ Cash ☒ Accrual |
| ☐ Amended return | | WASHINGTON, DC 20001 | | | ☐ Other (specify) ▶ |
| ☐ Application pending | | | | | |

• Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**H and I are not applicable to section 527 organizations.**

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No

**G** Website: ▶ WWW.AGMM.ORG

**H(b)** If "Yes," enter number of affiliates ▶ _____

**J** Organization type (check only one) ▶ ☒ 501(c) ( 3 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**H(c)** Are all affiliates included? N/A ☐ Yes ☐ No
(If "No," attach a list.)

**K** Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. **Some states require a complete return.**

**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**I** Group Exemption Number ▶ _____

**M** Check ▶ ☐ if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ **685,510.**

### Part I — Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| a | Direct public support | 1a | 181,985. | |
| b | Indirect public support | 1b | | |
| c | Government contributions (grants) | 1c | | |
| d | Total (add lines 1a through 1c) (cash $ 181,985.  noncash $ _____ ) | | | 1d  181,985. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 |
| 3 | Membership dues and assessments | | | 3 |
| 4 | Interest on savings and temporary cash investments | | | 4  503,525. |
| 5 | Dividends and interest from securities | | | 5 |
| 6 a | Gross rents | 6a | | |
| b | Less: rental expenses | 6b | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c |
| 7 | Other investment income (describe ▶ _____ ) | | | 7 |
| 8 a | Gross amount from sales of assets other than inventory | (A) Securities 8a | (B) Other | |
| b | Less: cost or other basis and sales expenses | 8b | | |
| c | Gain or (loss) (attach schedule) | 8c | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | | 8d |
| 9 | Special events and activities (attach schedule). If any amount is from **gaming**, check here ▶ ☐ | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) | 9a | | |
| b | Less: direct expenses other than fundraising expenses | 9b | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | | |
| b | Less: cost of goods sold | 10b | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c |
| 11 | Other revenue (from Part VII, line 103) | | | 11 |
| 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12  685,510. |
| 13 | Program services (from line 44, column (B)) | | | 13 |
| 14 | Management and general (from line 44, column (C)) | | | 14  325,106. |
| 15 | Fundraising (from line 44, column (D)) | | | 15 |
| 16 | Payments to affiliates (attach schedule) | | | 16 |
| 17 | **Total expenses** (add lines 16 and 44, column (A)) | | | 17  325,106. |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18  360,404. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19  20,331,951. |
| 20 | Other changes in net assets or fund balances (attach explanation) | | | 20  0. |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21  20,692,355. |

423001 01-13-05   LHA   **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**   Form **990** (2004)

SCANNED NOV 03 2005   RECEIVED   OCT 1 9 2005

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

20-0344096

| Part II | Statement of Functional Expenses | | All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. | | | Page 2 |
|---|---|---|---|---|---|---|
| | Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
| 22 | Grants and allocations (attach schedule) | 22 | | | | |
| | (cash $_____ noncash $_____) | | | | | |
| 23 | Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 | Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 | Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 | Other salaries and wages | 26 | | | | |
| 27 | Pension plan contributions | 27 | | | | |
| 28 | Other employee benefits | 28 | | | | |
| 29 | Payroll taxes | 29 | | | | |
| 30 | Professional fundraising fees | 30 | | | | |
| 31 | Accounting fees | 31 | 15,255. | | 15,255. | |
| 32 | Legal fees | 32 | 12,408. | | 12,408. | |
| 33 | Supplies | 33 | 583. | | 583. | |
| 34 | Telephone | 34 | 1,254. | | 1,254. | |
| 35 | Postage and shipping | 35 | 80. | | 80. | |
| 36 | Occupancy | 36 | | | | |
| 37 | Equipment rental and maintenance | 37 | | | | |
| 38 | Printing and publications | 38 | 57. | | 57. | |
| 39 | Travel | 39 | | | | |
| 40 | Conferences, conventions, and meetings | 40 | 660. | | 660. | |
| 41 | Interest | 41 | | | | |
| 42 | Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 | Other expenses not covered above (itemize): | | | | | |
| a | _____ | 43a | | | | |
| b | _____ | 43b | | | | |
| c | _____ | 43c | | | | |
| d | _____ | 43d | | | | |
| e | SEE STATEMENT 1 | 43e | 294,809. | | 294,809. | |
| 44 | Total functional expenses (add lines 22 through 43). Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 325,106. | 0. | 325,106. | 0. |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services?   ▶ ☐ Yes  ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $_____ ; (ii) the amount allocated to Program services $_____ ;
(iii) the amount allocated to Management and general $_____ ; and (iv) the amount allocated to Fundraising $_____

| Part III | Statement of Program Service Accomplishments | |
|---|---|---|

What is the organization's primary exempt purpose? ▶ _____

SEE STATEMENT 2

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

**Program Service Expenses**
(Required for 501(c)(3) and (4) orgs., and 4947(a)(1) trusts, but optional for others.)

a  SEE STATEMENT 2
_____
_____
_____
(Grants and allocations $          0. )                                    0.

b  _____
_____
_____
_____
(Grants and allocations $            )

c  _____
_____
_____
_____
(Grants and allocations $            )

d  _____
_____
_____
_____
(Grants and allocations $            )

e  Other program services (attach schedule)         (Grants and allocations $            )

f  **Total of Program Service Expenses** (should equal line 44, column (B), Program services)   ▶                  0.

Form 990 (2004)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2004)                                                          20-0344096    Page 3

## Part IV    Balance Sheets

Note: *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only.*

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| Assets | 45 | Cash - non-interest-bearing | | 45 | |
| | 46 | Savings and temporary cash investments | 864,349. | 46 | 119,810. |
| | 47 a | Accounts receivable | 47a | 684,583. | | | |
| | b | Less: allowance for doubtful accounts | 47b | | 5,200. | 47c | 684,583. |
| | 48 a | Pledges receivable | 48a | 2,400,000. | | | |
| | b | Less: allowance for doubtful accounts | 48b | 636,301. | 2,222,862. | 48c | 1,763,699. |
| | 49 | Grants receivable | | 49 | |
| | 50 | Receivables from officers, directors, trustees, and key employees | | 50 | |
| | 51 a | Other notes and loans receivable | 51a | | | | |
| | b | Less: allowance for doubtful accounts | 51b | | | 51c | |
| | 52 | Inventories for sale or use | | 52 | |
| | 53 | Prepaid expenses and deferred charges | | 53 | |
| | 54 | Investments - securities ▶ ☐ Cost ☐ FMV | | 54 | |
| | 55 a | Investments - land, buildings, and equipment basis | 55a | | | | |
| | b | Less: accumulated depreciation | 55b | | | 55c | |
| | 56 | Investments - other | | 56 | |
| | 57 a | Land, buildings, and equipment basis | 57a | 20,421,671. | | | |
| | b | Less: accumulated depreciation | 57b | | 19,934,540. | 57c | 20,421,671. |
| | 58 | Other assets (describe ▶                      ) | | 58 | |
| | 59 | **Total assets** (add lines 45 through 58) (must equal line 74) | 23,026,951. | 59 | 22,989,763. |
| Liabilities | 60 | Accounts payable and accrued expenses | 764,976. | 60 | 33,709. |
| | 61 | Grants payable | | 61 | |
| | 62 | Deferred revenue | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees   STMT 3 | 500,000. | 63 | 500,000. |
| | 64 a | Tax-exempt bond liabilities | | 64a | |
| | b | Mortgages and other notes payable | 1,430,024. | 64b | 1,763,699. |
| | 65 | Other liabilities (describe ▶                      ) | | 65 | |
| | 66 | **Total liabilities** (add lines 60 through 65) | 2,695,000. | 66 | 2,297,408. |
| Net Assets or Fund Balances | | Organizations that follow SFAS 117, check here ▶ [X] and complete lines 67 through 69 and lines 73 and 74. | | | |
| | 67 | Unrestricted | 822,893. | 67 | 697,893. |
| | 68 | Temporarily restricted | 19,499,058. | 68 | 19,984,462. |
| | 69 | Permanently restricted | 10,000. | 69 | 10,000. |
| | | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | |
| | 70 | Capital stock, trust principal, or current funds | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds | | 72 | |
| | 73 | **Total net assets or fund balances** (add lines 67 through 69 or lines 70 through 72; column (A) **must** equal line 19; column (B) **must** equal line 21) | 20,331,951. | 73 | 20,692,355. |
| | 74 | **Total liabilities and net assets / fund balances** (add lines 66 and 73) | 23,026,951. | 74 | 22,989,763. |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

423021
01-13-05

Form 990 (2004)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

20-0344096   Page 4

| Part IV-A | Reconciliation of Revenue per Audited Financial Statements with Revenue per Return | | | Part IV-B | Reconciliation of Expenses per Audited Financial Statements with Expenses per Return | | |
|---|---|---|---|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements ▶ | a | N/A | a | Total expenses and losses per audited financial statements ▶ | a | N/A |
| b | Amounts included on line a but not on line 12, Form 990: | | | b | Amounts included on line a but not on line 17, Form 990: | | |
| (1) | Net unrealized gains on investments | $ | | (1) | Donated services and use of facilities | $ | |
| (2) | Donated services and use of facilities | $ | | (2) | Prior year adjustments reported on line 20, Form 990 | $ | |
| (3) | Recoveries of prior year grants | $ | | (3) | Losses reported on line 20, Form 990 | $ | |
| (4) | Other (specify): | $ | | (4) | Other (specify): | $ | |
| | Add amounts on lines (1) through (4) ▶ | b | | | Add amounts on lines (1) through (4) ▶ | b | |
| c | Line a minus line b ▶ | c | | c | Line a minus line b ▶ | c | |
| d | Amounts included on line 12, Form 990 but not on line a: | | | d | Amounts included on line 17, Form 990 but not on line a: | | |
| (1) | Investment expenses not included on line 6b, Form 990 | $ | | (1) | Investment expenses not included on line 6b, Form 990 | $ | |
| (2) | Other (specify): | $ | | (2) | Other (specify): | $ | |
| | Add amounts on lines (1) and (2) ▶ | d | | | Add amounts on lines (1) and (2) ▶ | d | |
| e | Total revenue per line 12, Form 990 (line c plus line d) ▶ | e | | e | Total expenses per line 17, Form 990 (line c plus line d) ▶ | e | |

| Part V | List of Officers, Directors, Trustees, and Key Employees (List each one even if not compensated.) | | | | |
|---|---|---|---|---|---|
| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
| GERARD L. CAFESJIAN<br>122 C STREET, SUITE 360<br>WASHINGTON, DC  20001 | CHAIRMAN/PRESIDENT<br><br>40 HRS/YR | 0. | 0. | 0. |
| HIRAIR S. HOVNANIAN<br>122 C STREET, SUITE 360<br>WASHINGTON, DC  20001 | VICE CHAIRMAN<br><br>40 HRS/YR | 0. | 0. | 0. |
| ANOUSH MATHEVOSIAN<br>122 C STREET, SUITE 360<br>WASHINGTON, DC  20001 | TRUSTEE<br><br>40 HRS/YR | 0. | 0. | 0. |
| ROBERT A. KALOOSDIAN<br>122 C STREET, SUITE 360<br>WASHINGTON, DC  20001 | TRUSTEE<br><br>40 HRS/YR | 0. | 0. | 0. |
| JOHN WATERS JR.<br>122 C STREET, SUITE 360<br>WASHINGTON, DC  20001 | SECRETARY/TREASURER<br><br>200 HRS/YR | 0. | 0. | 0. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

75  Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? If "Yes," attach schedule. ▶ ☐ Yes ☒ No

423031 01-13-05

Form 990 (2004)

Form 990 (2004)   ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.                                         20-0344096      Page 5

| Part VI | Other Information | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | 76 | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? | 77 | | X |
| | If "Yes," attach a conformed copy of the changes. | | | |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | 78a | | X |
| b | If "Yes," has it filed a tax return on **Form 990-T** for this year?                              N/A | 78b | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? | 79 | | X |
| | If "Yes," attach a statement | | | |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | 80a | X | |
| b | If "Yes," enter the name of the organization ▶ ARMENIAN NATIONAL INSTITUTE, INC. | | | |
| | _____ and check whether it is [X] exempt or [ ] nonexempt. | | | |
| 81 a | Enter direct or indirect political expenditures. See line 81 instructions | 81a | 0. | |
| b | Did the organization file **Form 1120-POL** for this year? | 81b | | X |
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | 82a | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) | 82b | N/A | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | 83b | X | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | 84a | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible?                              N/A | 84b | | |
| 85 | *501(c)(4), (5), or (6) organizations.* **a** Were substantially all dues nondeductible by members?   N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less?   N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| c | Dues, assessments, and similar amounts from members | 85c | N/A | |
| d | Section 162(e) lobbying and political expenditures | 85d | N/A | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices | 85e | N/A | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) | 85f | N/A | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f?   N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year?   N/A | 85h | | |
| 86 | *501(c)(7) organizations.* Enter: **a** Initiation fees and capital contributions included on line 12 | 86a | N/A | |
| b | Gross receipts, included on line 12, for public use of club facilities | 86b | N/A | |
| 87 | *501(c)(12) organizations* Enter: **a** Gross income from members or shareholders | 87a | N/A | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) | 87b | N/A | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? | | | |
| | If "Yes," complete Part IX | 88 | | X |
| 89 a | *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ 0. ; section 4912 ▶ 0. ; section 4955 ▶ 0. | | | |
| b | *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? | | | |
| | If "Yes," attach a statement explaining each transaction | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958                              ▶ | | 0. | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization                              ▶ | | 0. | |
| 90 a | List the states with which a copy of this return is filed ▶ WASHINGTON, D.C. | | | |
| b | Number of employees employed in the pay period that includes March 12, 2004 | 90b | | 0 |
| 91 | The books are in care of ▶ JOHN WATERS JR.                Telephone no. ▶ 612-359-8991 | | | |
| | Located at ▶ 15 SOUTH FIFTH STREET, STE 900, MINNEAPOLIS, MN    ZIP + 4 ▶ 55402 | | | |
| 92 | *Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of* **Form 1041**- Check here ▶ [ ] | | | |
| | and enter the amount of tax-exempt interest received or accrued during the tax year | 92 | N/A | |

423041
01-13-05

Form 990 (2004)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2004)                                                                                      20-0344096         Page 6

## Part VII | Analysis of Income-Producing Activities (See page 33 of the instructions.)

Note: Enter gross amounts unless otherwise indicated.

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | Related or exempt function income |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 503,525. | |
| 96 Dividends and interest from securities | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | | | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | | | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 503,525. | 0. |
| 105 Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 503,525. |

Note: Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.

## Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes (See page 34 of the instructions.)

Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes).

## Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| | % | | | |
| N/A | % | | | |
| | % | | | |
| | % | | | |

## Part X | Information Regarding Transfers Associated with Personal Benefit Contracts (See page 34 of the instructions.)

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?    ☐ Yes  ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?    ☐ Yes  ☒ No

Note: If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).

accompanying schedules and statements, and to the best of my knowledge and belief, it is true, nformation of which preparer has any knowledge

1/30/05 ▶ JOHN J. WATERS, JR  SEC/TREAS
te                    Type or print name and title.

| | Date | | Check if | | Preparer's SSN or PTIN |

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or Section 4947(a)(1) Nonexempt Charitable Trust
**Supplementary Information–(See separate instructions.)**
► MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

# 2004

| Name of the organization | Employer identification number |
|---|---|
| ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | 20 0344096 |

| Part I | Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees |
|---|---|

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total number of other employees paid
over $50,000                                ►          0

| Part II | Compensation of the Five Highest Paid Independent Contractors for Professional Services |
|---|---|

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total number of others receiving over
$50,000 for professional services           ►          0

423101/11-24-04    LHA   For Paperwork Reduction Act Notice, see the Instructions for Form 990 and Form 990-EZ.        Schedule A (Form 990 or 990-EZ) 2004

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2004   MEMORIAL, INC.                               20-0344096   Page 2

| Part III | Statements About Activities (See page 2 of the instructions.) | | Yes | No |
|---|---|---|---|---|

1  During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ _____ $ _____ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.)

| | | 1 | | X |

Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities.

2  During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is "Yes," attach a detailed statement explaining the transactions.)*

| a Sale, exchange, or leasing of property? | | 2a | | X |
| b Lending of money or other extension of credit? | | 2b | | X |
| c Furnishing of goods, services, or facilities?        STMT 4 | | 2c | X | |
| d Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | | 2d | | X |
| e Transfer of any part of its income or assets? | | 2e | | X |
| 3 a Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | | 3a | | X |
| b Do you have a section 403(b) annuity plan for your employees? | | 3b | | X |
| 4 a Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | | 4a | | X |
| b Do you provide credit counseling, debt management, credit repair, or debt negotiation services? | | 4b | | X |

| Part IV | Reason for Non-Private Foundation Status (See pages 3 through 6 of the instructions.) |
|---|---|

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5  ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6  ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7  ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8  ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9  ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state** ▶ _____

10  ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a  ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b  ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12  ☐ An organization that normally receives: **(1)** more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13  ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above; or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See page 5 of the instructions.)

| **(a)** Name(s) of supported organization(s) | **(b)** Line number from above |
|---|---|
| | |
| | |
| | |

14  ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See page 5 of the instructions.)

423111
12-03-04

Schedule A (Form 990 or 990-EZ) 2004  ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.                                    20-0344096    Page 3

| **Part IV-A** | Support Schedule (Complete only if you checked a box on line 10, 11, or 12.) Use cash method of accounting. |

**Note:** *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | 20342881. | | | | 20,342,881. |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 155. | | | | 155. |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| 22 Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22 | 20343036. | 0. | 0. | 0. | 20,343,036. |
| 24 Line 23 minus line 17 | 20343036. | | | | 20,343,036. |
| 25 Enter 1% of line 23 | 203,430. | | | | |

26  Organizations described on lines 10 or 11:  **a**  Enter 2% of amount in column (e), line 24 ▶ | 26a | 406,861.

**b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 2000 through 2003 exceeded the amount shown in line 26a.

**Do not file this list with your return.** Enter the total of all these excess amounts ▶ | 26b | 19529159.

**c** Total support for section 509(a)(1) test: Enter line 24, column (e) ▶ | 26c | 20,343,036.

**d** Add: Amounts from column (e) for lines:  18 _155._  19 ____
22 ____  26b _19,529,159._ ▶ | 26d | 19,529,314.

**e** Public support (line 26c minus line 26d total) ▶ | 26e | 813,722.

**f** Public support percentage (line 26e (numerator) divided by line 26c (denominator)) ▶ | 26f | 4.0000%

27  Organizations described on line 12: **a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year, from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year:  N/A

(2003) ____  (2002) ____  (2001) ____  (2000) ____

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger of (1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) **Do not file this list with your return.** After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year:  N/A

(2003) ____  (2002) ____  (2001) ____  (2000) ____

**c** Add: Amounts from column (e) for lines:  15 ____  16 ____
17 ____  20 ____  21 ____ ▶ | 27c | N/A

**d** Add: Line 27a total ____ and line 27b total ____ ▶ | 27d | N/A

**e** Public support (line 27c total minus line 27d total) ▶ | 27e | N/A

**f** Total support for section 509(a)(2) test: Enter amount on line 23, column (e) ▶ | 27f | N/A

**g** Public support percentage (line 27e (numerator) divided by line 27f (denominator)) ▶ | 27g | N/A %

**h** Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator)) ▶ | 27h | N/A %

28  **Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 2000 through 2003, prepare a list for your records to show, for each grant, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return.** Do not include these grants in line 15.

423121  12-03-04                        NONE                   Schedule A (Form 990 or 990-EZ) 2004

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Schedule A (Form 990 or 990-EZ) 2004                                                   20-0344096    Page 4

| Part V | Private School Questionnaire (See page 7 of the instructions.) | N/A |

**(To be completed ONLY by schools that checked the box on line 6 in Part IV)**

|  |  |  | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? | 31 | | |
| | If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | | |

_____

_____

_____

_____

| 32 | Does the organization maintain the following: | | | |
|---|---|---|---|---|
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
| | If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |

_____

_____

| 33 | Does the organization discriminate by race in any way with respect to: | | | |
|---|---|---|---|---|
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
| | If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |

_____

_____

_____

| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
|---|---|---|---|---|
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
| | If you answered "Yes" to either 34a or b, please explain using an attached statement. | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2004

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Schedule A (Form 990 or 990-EZ) 2004                                    20-0344096    Page 5

| **Part VI-A** | **Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.) |
|---|---|

(To be completed **ONLY** by an eligible organization that filed Form 5768)

Check ▶ **a** ☐ if the organization belongs to an affiliated group.    Check ▶ **b** ☐ if you checked "a" and "limited control" provisions apply.

| **Limits on Lobbying Expenditures**<br>(The term "expenditures" means amounts paid or incurred.) | | **(a)**<br>Affiliated group<br>totals | **(b)**<br>To be completed for ALL<br>electing organizations |
|---|---|---|---|
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | 325,106. |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | 325,106. |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | | | |

| If the amount on line 40 is - | The lobbying nontaxable amount is - | | |
|---|---|---|---|
| Not over $500,000 | 20% of the amount on line 40 | | |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 | | |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 | 41 | 65,021. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 | | |
| Over $17,000,000 | $1,000,000 | | |

| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | 16,255. |
|---|---|---|---|
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

**Caution:** *If there is an amount on either line 43 or line 44, you must file Form 4720.*

## 4-Year Averaging Period Under Section 501(h)

(Some organizations that made a section 501(h) election do not have to complete all of the five columns
below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

| | | **Lobbying Expenditures During 4-Year Averaging Period** | | | |
|---|---|---|---|---|---|
| Calendar year (or<br>fiscal year beginning in) ▶ | **(a)**<br>2004 | **(b)**<br>2003 | **(c)**<br>2002 | **(d)**<br>2001 | **(e)**<br>Total |
| 45 Lobbying nontaxable<br>amount | 65,021. | 2,217. | | | 67,238. |
| 46 Lobbying ceiling amount<br>(150% of line 45(e)) | | | | | 100,857. |
| 47 Total lobbying<br>expenditures | | | | | 0. |
| 48 Grassroots nontaxable<br>amount | 16,255. | 554. | | | 16,809. |
| 49 Grassroots ceiling amount<br>(150% of line 48(e)) | | | | | 25,214. |
| 50 Grassroots lobbying<br>expenditures | | | | | 0. |

| **Part VI-B** | **Lobbying Activity by Nonelecting Public Charities** | | | N/A |
|---|---|---|---|---|

(For reporting only by organizations that did not complete Part VI-A) (See page 11 of the instructions.)

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to<br>influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers | | | |
| b Paid staff or management (Include compensation in expenses reported on lines **c** through **h**.) | | | |
| c Media advertisements | | | |
| d Mailings to members, legislators, or the public | | | |
| e Publications, or published or broadcast statements | | | |
| f Grants to other organizations for lobbying purposes | | | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i Total lobbying expenditures (Add lines **c** through **h**.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

423141
11-24-04

Schedule A (Form 990 or 990-EZ) 2004

Schedule A (Form 990 or 990-EZ) 2004  **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**                     20-0344096    Page 6

| Part VII | Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations (See page 11 of the instructions.) |

51   Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

|  |  | Yes | No |
|---|---|---|---|
| a | Transfers from the reporting organization to a noncharitable exempt organization of: |  |  |
| (i) Cash | **51a(i)** |  | X |
| (ii) Other assets | **a(ii)** |  | X |
| b | Other transactions: |  |  |
| (i) Sales or exchanges of assets with a noncharitable exempt organization | **b(i)** |  | X |
| (ii) Purchases of assets from a noncharitable exempt organization | **b(ii)** |  | X |
| (iii) Rental of facilities, equipment, or other assets | **b(iii)** |  | X |
| (iv) Reimbursement arrangements | **b(iv)** |  | X |
| (v) Loans or loan guarantees | **b(v)** |  | X |
| (vi) Performance of services or membership or fundraising solicitations | **b(vi)** |  | X |
| c | Sharing of facilities, equipment, mailing lists, other assets, or paid employees | **c** |  | X |

d   If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received:              **N/A**

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

52 a   Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527?      ▶ ☐ Yes  ☒ No

b   If "Yes," complete the following schedule:        **N/A**

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

423151
11-24-04

FORM 990                          OTHER EXPENSES                    STATEMENT     1

| DESCRIPTION | (A) TOTAL | (B) PROGRAM SERVICES | (C) MANAGEMENT AND GENERAL | (D) FUNDRAISING |
|---|---|---|---|---|
| MISC. EXPENSES | 457. | | 457. | |
| OTHER PROFESSIONAL FEES | 2,932. | | 2,932. | |
| BOOKS & PUBLICATIONS | 352. | | 352. | |
| PARKING | 12. | | 12. | |
| SECURITY | 372. | | 372. | |
| MAINTENANCE & REPAIRS | 1,724. | | 1,724. | |
| UTILITIES | 3,538. | | 3,538. | |
| REAL ESTATE TAXES | 242,042. | | 242,042. | |
| INSURANCE | 40,090. | | 40,090. | |
| DUES & MEMBERSHIPS | 40. | | 40. | |
| ADVERTISING | 2,837. | | 2,837. | |
| OTHER TAXES | 75. | | 75. | |
| ORGANIZATIONAL EXPENSES | 338. | | 338. | |
| TOTAL TO FM 990, LN 43 | 294,809. | | 294,809. | |

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2004**

STATEMENT OF PROGRAM SERVICE ACCOMPLISHMENTS

Armenian Genocide Museum and Memorial , Inc. ("AGMM") was formed to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these programs.

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2004**

Form 990, Part IV, Line 63 – Loans from officers, directors, trustees, and key employees

On November 1, 2003, Mr. Cafesjian, a board member of the Armenian Genocide Museum and Memorial, Inc. ("AGMM"), advanced funds to AGMM for its establishment and organization.  The original amount of the note was $500,000. $500,000 is still outstanding, and will be paid back with 0% interest.

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2004**

Form 990, Schedule A, Part III – Furnishing of goods, services, or facilities

The Armenian Genocide Museum and Memorial, Inc. ("AGMM") receives accounting and management services at no charge from GLC Enterprises, a taxable entity with which Gerard Cafesjian, a substantial contributor and board member, is affiliated with.

Form **8868**
(Rev. December 2004)
Department of the Treasury
Internal Revenue Service

# Application for Extension of Time To File an Exempt Organization Return

OMB No. 1545-1709

▶ File a separate application for each return.

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box . . . . . . . . . . . . . . ▶ ☒
- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

*Do not complete Part II unless* you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I**    Automatic 3-Month Extension of Time—Only submit original (no copies needed)

**Form 990-T corporations** requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . ▶ ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs, and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

**Electronic Filing (e-file).** Form 8868 can be filed electronically if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for corporate Form 990-T filers). However, you cannot file it electronically if you want the additional (not automatic) 3-month extension, instead you must submit the fully completed signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs.gov/efile* .

| Type or print | Name of Exempt Organization<br>ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | Employer identification number<br>20-0344096 |
|---|---|---|
| File by the due date for filing your return. See instructions. | Number, street, and room or suite no. If a P.O. box, see instructions.<br>122 C STREET, NW | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>WASHINGTON, DC  20001 | |

Check type of return to be filed (file a separate application for each return):

☒ Form 990    ☐ Form 990-T (corporation)    ☐ Form 4720
☐ Form 990-BL    ☐ Form 990-T (sec. 401(a) or 408(a) trust)    ☐ Form 5227
☐ Form 990-EZ    ☐ Form 990-T (trust other than above)    ☐ Form 6069
☐ Form 990-PF    ☐ Form 1041-A    ☐ Form 8870

- The books are in the care of ▶ JOHN WATERS JR.

Telephone No. ▶ 612-359-8991        FAX No. ▶

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN)_____ . If this is for the **whole** group, check this box ▶☐ . If it is for part of the group, check this box ▶ ☐    and attach a list with the names and EINs of all members the extension will cover.

**1**  I request an automatic 3-month (6-months for a **Form 990-T corporation**) extension of time until  AUGUST 15  , 20 05
to file the exempt organization return for the organization named above. The extension is for the organization's return for:
  ▶ ☒ calendar year 20 04 or
  ▶ ☐ tax year beginning _____ , 20 __, and ending _____ , 20 __.

**2**  If this tax year is for less than 12 months, check reason: ☐ Initial return  ☐ Final return  ☐ Change in accounting period

**3a** If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any
  nonrefundable credits. See instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $    NONE

  **b** If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments
  made. Include any prior year overpayment allowed as a credit . . . . . . . . . . . . . . . . . . . . . . . . . .  $    NONE

  **c** **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit
  with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See
  instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $    NONE

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**        Form **8868** (Rev. 12-2004)

Form 8868 (Rev. 12-2004)                                                                                    Page **2**

- If you are filing for an **Additional (not automatic) 3-Month Extension,** complete only Part II and check this box . . . . ▶ ☒
  **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

| **Part II** | **Additional (not automatic) 3-Month Extension of Time—Must File Original and One Copy.** |

| **Type or print** | Name of Exempt Organization<br>ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | **Employer Identification number**<br>20-0344096 |
| File by the extended due date for filing the return See instructions | Number, street, and room or suite no. If a P.O. box, see instructions.<br>122 C STREET, NW | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>WASHINGTON, DC 20001 | |

**Check type of return to be filed** (File a separate application for each return):

| | | |
|---|---|---|
| ☒ Form 990 | ☐ Form 990-T (sec. 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-BL | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-EZ | ☐ Form 1041-A | ☐ Form 8870 |
| ☐ Form 990-PF | ☐ Form 4720 | |

**STOP: Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- The books are in the care of ▶ JOHN WATERS JR.
  Telephone No. ▶  612-359-8991            FAX No. ▶
- If the organization does not have an office or place of business in the United States, check this box . . . . . . . . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) _____ If this is for the **whole** group, check this box ▶ ☐. If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

**4**   I request an additional 3-month extension of time until _____NOVEMBER 15_____ , 20 05 .

**5**   For calendar year 2004 , or other tax year beginning _____ , 20___ , and ending _____ , 20___ .

**6**   If this tax year is for less than 12 months, check reason:  ☐ Initial return  ☐ Final return  ☐ Change in accounting period

**7**   State in detail why you need the extension  ADDITIONAL TIME IS NEEDED IN ORDER TO GATHER
THE INFORMATION NECESSARY FOR A COMPLETE AND ACCURATE RETURN. THEREFORE, AN
EXTENSION OF TIME TO FILE IS RESPECTFULLY REQUESTED.

**8a**  If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $            NONE

  **b**  If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 . . . . . . . . . . . . 0 8 1 9 0 5 . . . . . . . . . . . . . . . . . . . . . . . . $            NONE

  **c**  **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. $            NONE

### Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ *Kristen K. Grubb*    Title ▶ CPA            Date ▶ 8/15/05

### Notice to Applicant—To Be Completed by the IRS

☒  We **have** approved this application. Please attach this form to the organization's return.

☐  We **have not** approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.

☐  We **have not** approved this application. After considering the reasons stated in item 7, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.

☐  We **cannot consider** this application because it was filed after the extended due date of the return for which an extension was requested.

☐  Other _____

            By _____
Director _____            Date _____

**Alternate Mailing Address —** Enter the address if you want the copy of this application for an additional 3-month extension returned to an address different than the one entered above.

~~EXTENSION APPROVED~~

| **Type or print** | Name   KRISTEN GRUBB<br>DELOITTE TAX LLP | SEP 0 9 2005 |
| | Number and street (include suite, room, or apt. no.) or a P.O. box number<br>120 SOUTH SIXTH STREET, SUITE 400 | FIELD DIRECTOR, |
| | City or town, province or state, and country (including postal or ZIP code)<br>MINNEAPOLIS, MN 55402 | SUBMISSION PROCESSING OGDEN |

Form **8868** (Rev 12-2004)

STF FED9056F 2

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2005**

Open to Public Inspection

**A** For the 2005 calendar year, or tax year beginning _____ and ending _____

| B Check if applicable | Please use IRS label or print or type See Specific Instructions | C Name of organization **ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.** | D Employer identification number **20-0344096** |
|---|---|---|---|
| [X] Address change | | | |
| [ ] Name change | | Number and street (or P.O. box if mail is not delivered to street address) **1518 K STREET NW** / Room/suite **M** | E Telephone number **612-359-8991** |
| [ ] Initial return | | | |
| [ ] Final return | | City or town, state or country, and ZIP + 4 **WASHINGTON, DC  20005** | F Accounting method [ ] Cash [X] Accrual [ ] Other (specify) ▶ |
| [ ] Amended return | | | |
| [ ] Application pending | | | |

● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).**

**G** Website: ▶ **WWW.AGMM.ORG**

**J Organization type** (check only one) ▶ [X] 501(c)( **3** ) ◀ (insert no ) [ ] 4947(a)(1) or [ ] 527

**K Check here** ▶ [ ] if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization chooses to file a return, be sure to file a complete return. Some states require a complete return.

**H and I are not applicable to section 527 organizations.**

**H(a)** Is this a group return for affiliates? [ ] Yes [X] No
**H(b)** If "Yes," enter number of affiliates ▶ **N/A**
**H(c)** Are all affiliates included? **N/A** [ ] Yes [ ] No (If "No," attach a list.)
**H(d)** Is this a separate return filed by an organization covered by a group ruling? [ ] Yes [X] No

**I** Group Exemption Number ▶ **N/A**

**M** Check ▶ [ ] if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ **563,954.**

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | |
|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | |
| **a** | Direct public support | 1a | 248,375. |
| **b** | Indirect public support | 1b | |
| **c** | Government contributions (grants) | 1c | |
| **d** | **Total** (add lines 1a through 1c) (cash $ **248,375.** noncash $ _____ ) | 1d | 248,375. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | 2 | |
| 3 | Membership dues and assessments | 3 | |
| 4 | Interest on savings and temporary cash investments | 4 | 285,579. |
| 5 | Dividends and interest from securities | 5 | |
| **6 a** | Gross rents   **SEE STATEMENT 1** | 6a | 30,000. |
| **b** | Less: rental expenses | 6b | |
| **c** | Net rental income or (loss) (subtract line 6b from line 6a) | 6c | 30,000. |
| 7 | Other investment income (describe ▶ _____ ) | 7 | |

| 8 a | Gross amount from sales of assets other than inventory | (A) Securities | (B) Other |
|---|---|---|---|
| | | 8a | |
| **b** | Less: cost or other basis and sales expenses | 8b | |
| **c** | Gain or (loss) (attach schedule) | 8c | |

| | | | |
|---|---|---|---|
| **d** | Net gain or (loss) (combine line 8c, columns (A) and (B)) | 8d | |
| 9 | Special events and activities (attach schedule). If any amount is from *gaming*, check here ▶ [ ] | | |
| **a** | Gross revenue (not including $ _____ of contributions reported on line 1a) | 9a | |
| **b** | Less: direct expenses other than fundraising expenses | 9b | |
| **c** | Net income or (loss) from special events (subtract line 9b from line 9a) | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | |
| **b** | Less: cost of goods sold | 10b | |
| **c** | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | 10c | |
| 11 | Other revenue (from Part VII, line 103) | 11 | |
| 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | 12 | 563,954. |

| | | | |
|---|---|---|---|
| 13 | Program services (from line 44, column (B)) | 13 | |
| 14 | Management and general (from line 44, column (C)) | 14 | 625,853. |
| 15 | Fundraising (from line 44, column (D)) | 15 | |
| 16 | Payments to affiliates (attach schedule) | 16 | |
| 17 | **Total expenses** (add lines 16 and 44, column (A)) | 17 | 625,853. |

RECEIVED
MAY 23 2006
OGDEN UT

| | | | |
|---|---|---|---|
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | 18 | <61,899.> |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | 19 | 20,692,355. |
| 20 | Other changes in net assets or fund balances (attach explanation) | 20 | 0. |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | 21 | 20,630,456. |

523001
02-03-06    LHA    **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**    Form **990** (2005)

Form 990 (2005)

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**

20-0344096    Page **2**

| **Part II** | **Statement of Functional Expenses** | All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. |

| *Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I* | | **(A)** Total | **(B)** Program services | **(C)** Management and general | **(D)** Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) (cash $ 0 . noncash $ 0 . If this amount includes foreign grants, check here ▶ ☐ | 22 | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 3,952. | | 3,952. | |
| 32 Legal fees | 32 | | | | |
| 33 Supplies | 33 | | | | |
| 34 Telephone | 34 | 3,041. | | 3,041. | |
| 35 Postage and shipping | 35 | 427. | | 427. | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | 84. | | 84. | |
| 39 Travel | 39 | 354. | | 354. | |
| 40 Conferences, conventions, and meetings | 40 | <1,040.> | | <1,040.> | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a | 43a | | | | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| f | 43f | | | | |
| g  SEE STATEMENT 2 | 43g | 619,035. | | 619,035. | |
| 44 **Total functional expenses.** Add lines 22 through 43. (Organizations completing columns (B)-(D), carry these totals to lines 13-15) | 44 | 625,853. | 0. | 625,853. | 0. |

**Joint Costs.** Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $    N/A    ; (ii) the amount allocated to Program services $    N/A    ;

(iii) the amount allocated to Management and general $    N/A    ; and (iv) the amount allocated to Fundraising $    N/A

Form **990** (2005)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2005)                                                                                          20-0344096    Page **3**

| **Part III** | **Statement of Program Service Accomplishments** *(See the instructions.)* |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization.
How the public perceives an organization in such cases may be determined by the information presented on its return  Therefore, please make sure the
return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments

What is the organization's primary exempt purpose? ▶ _____

SEE STATEMENT 4

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of
clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4)
organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

**Program Service
Expenses**
(Required for 501(c)(3)
and (4) orgs., and
4947(a)(1) trusts; but
optional for others.)

**a**  SEE STATEMENT 4

_____
_____
_____
_____
_____

(Grants and allocations        $                        )  If this amount includes foreign grants, check here    ▶ ☐

**b**  _____
_____
_____
_____
_____

(Grants and allocations        $                        )  If this amount includes foreign grants, check here    ▶ ☐

**c**  _____
_____
_____
_____
_____

(Grants and allocations        $                        )  If this amount includes foreign grants, check here    ▶ ☐

**d**  _____
_____
_____
_____
_____

(Grants and allocations        $                        )  If this amount includes foreign grants, check here    ▶ ☐

**e**  Other program services (attach schedule)
(Grants and allocations        $                        )  If this amount includes foreign grants, check here    ▶ ☐

**f**  **Total of Program Service Expenses** (should equal line 44, column (B), Program services)              ▶            0.

Form **990** (2005)

ARMENIAN GENOCIDE MUSEUM AND
Form 990 (2005)  MEMORIAL, INC.                                    20-0344096    Page **4**

**Part IV**  **Balance Sheets** *(See the instructions.)*

Note: *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only*

| | | | **(A)** Beginning of year | **(B)** End of year |
|---|---|---|---|---|
| **45** | Cash - non-interest-bearing | **45** | | |
| **46** | Savings and temporary cash investments | **46** | 119,810. | 185,067. |
| **47 a** | Accounts receivable  *Stmt 7* | **47a** 897,995. | | |
| **b** | Less: allowance for doubtful accounts | **47b** | 684,583. **47c** | 897,995. |
| **48 a** | Pledges receivable | **48a** 1,725,000. | | |
| **b** | Less: allowance for doubtful accounts | **48b** 501,060. | 1,763,699. **48c** | 1,223,940. |
| **49** | Grants receivable | **49** | | |
| **50** | Receivables from officers, directors, trustees, and key employees | **50** | | |
| **51 a** | Other notes and loans receivable | **51a** | | |
| **b** | Less: allowance for doubtful accounts | **51b** | **51c** | |
| **52** | Inventories for sale or use | **52** | | |
| **53** | Prepaid expenses and deferred charges | **53** | | |
| **54** | Investments - securities  ▶ ☐ Cost ☐ FMV | **54** | | |
| **55 a** | Investments - land, buildings, and equipment: basis | **55a** | | |
| **b** | Less: accumulated depreciation | **55b** | **55c** | |
| **56** | Investments - other | **56** | | |
| **57 a** | Land, buildings, and equipment: basis *Stmt 6* | **57a** 20,751,744. | | |
| **b** | Less: accumulated depreciation  *Stmt 6* | **57b** | 20,421,671. **57c** | 20,751,744. |
| **58** | Other assets (describe ▶ _____ ) | **58** | | |
| **59** | **Total assets** (must equal line 74)  Add lines 45 through 58 | **59** | 22,989,763. | 23,058,746. |
| **60** | Accounts payable and accrued expenses | **60** | 33,709. | 29,349. |
| **61** | Grants payable | **61** | | |
| **62** | Deferred revenue | **62** | | |
| **63** | Loans from officers, directors, trustees, and key employees *Stmt 3* | **63** | 500,000. | 500,000. |
| **64 a** | Tax-exempt bond liabilities | **64a** | | |
| **b** | Mortgages and other notes payable | **64b** | 1,763,699. | 1,898,941. |
| **65** | Other liabilities (describe ▶ _____ ) | **65** | | |
| **66** | **Total liabilities.** Add lines 60 through 65 | **66** | 2,297,408. | 2,428,290. |
| | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74 | | | |
| **67** | Unrestricted | **67** | 697,893. | 574,622. |
| **68** | Temporarily restricted | **68** | 19,984,462. | 20,045,834. |
| **69** | Permanently restricted | **69** | 10,000. | 10,000. |
| | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74 | | | |
| **70** | Capital stock, trust principal, or current funds | **70** | | |
| **71** | Paid-in or capital surplus, or land, building, and equipment fund | **71** | | |
| **72** | Retained earnings, endowment, accumulated income, or other funds | **72** | | |
| **73** | **Total net assets or fund balances** (add lines 67 through 69 or lines 70 through 72; column (A) must equal line 19; column (B) must equal line 21) | **73** | 20,692,355. | 20,630,456. |
| **74** | **Total liabilities and net assets/fund balances.** Add lines 66 and 73 | **74** | 22,989,763. | 23,058,746. |

Form **990** (2005)

Form 990 (2005)

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**

20-0344096    Page 5

| Part IV-A | Reconciliation of Revenue per Audited Financial Statements With Revenue per Return *(See the instructions.)* | | | |
|---|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements | | a | N/A |
| b | Amounts included on line a but not on Part I, line 12: | | | |
| 1 | Net unrealized gains on investments | b1 | | |
| 2 | Donated services and use of facilities | b2 | | |
| 3 | Recoveries of prior year grants | b3 | | |
| 4 | Other (specify): | b4 | | |
| | Add lines b1 through b4 | | b | |
| c | Subtract line b from line a | | c | |
| d | Amounts included on Part I, line 12, but not on line a: | | | |
| 1 | Investment expenses not included on Part I, line 6b | d1 | | |
| 2 | Other (specify): | d2 | | |
| | Add lines d1 and d2 | | d | |
| e | **Total revenue** (Part I, line 12). Add lines c and d ▶ | | e | |

| Part IV-B | Reconciliation of Expenses per Audited Financial Statements With Expenses per Return | | | |
|---|---|---|---|---|
| a | Total expenses and losses per audited financial statements | | a | N/A |
| b | Amounts included on line a but not on Part I, line 17: | | | |
| 1 | Donated services and use of facilities | b1 | | |
| 2 | Prior year adjustments reported on Part I, line 20 | b2 | | |
| 3 | Losses reported on Part I, line 20 | b3 | | |
| 4 | Other (specify): | b4 | | |
| | Add lines b1 through b4 | | b | |
| c | Subtract line b from line a | | c | |
| d | Amounts included on Part I, line 17, but not on line a: | | | |
| 1 | Investment expenses not included on Part I, line 6b | d1 | | |
| 2 | Other (specify): | d2 | | |
| | Add lines d1 and d2 | | d | |
| e | **Total expenses** (Part I, line 17). Add lines c and d ▶ | | e | |

| Part V-A | Current Officers, Directors, Trustees, and Key Employees (List each person who was an officer, director, trustee, or key employee at any time during the year even if they were not compensated.) *(See the instructions.)* |

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| GERARD L. CAFESJIAN 122 C STREET, SUITE 360 WASHINGTON, DC 20001 | CHAIRMAN/PRESIDENT 1.00 | 0. | 0. | 0. |
| HIRAIR S. HOVNANIAN 122 C STREET, SUITE 360 WASHINGTON, DC 20001 | VICE CHAIRMAN 1.00 | 0. | 0. | 0. |
| ANOUSH MATHEVOSIAN 122 C STREET, SUITE 360 WASHINGTON, DC 20001 | TRUSTEE 1.00 | 0. | 0. | 0. |
| ROBERT A. KALOOSDIAN 122 C STREET, SUITE 360 WASHINGTON, DC 20001 | TRUSTEE 1.00 | 0. | 0. | 0. |
| JOHN WATERS JR. 122 C STREET, SUITE 360 WASHINGTON, DC 20001 | SECRETARY/TREASURER 5.00 | 0. | 0. | 0. |
| BOARD MEMBERS SERVE WITH NO COMPENSATION, PAYMENTS TO EMPLOYEE BENEFIT PLANS, OR EXPENSE ACCOUNT ALLOWANCES. ALSO, NO BUSINESS TRANSACTIONS ARE DONE WITH ANY ORGANIZATIONS OWNED OR CONTROLLED BY THE ABOVE BOARD MEMBERS. | | | | |

Form **990** (2005)

523041 02-03-06

Form 990 (2005)

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**                    20-0344096    Page **6**

| Part V-A | Current Officers, Directors, Trustees, and Key Employees *(continued)* | | Yes | No |
|---|---|---|---|---|

75 a  Enter the total number of officers, directors, and trustees permitted to vote on organization business at board
   meetings ▶ _____ 4

   b  Are any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees
   listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A,
   Part II-A or II-B, related to each other through family or business relationships? If "Yes," attach a statement that identifies
   the individuals and explains the relationship(s) .................................................... | **75b** | | **X**

   c  Do any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees
   listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A,
   Part II-A or II-B, receive compensation from any other organizations, whether tax exempt or taxable, that are related to this
   organization through common supervision or common control? ........................................ | **75c** | | **X**

   **Note.** Related organizations include section 509(a)(3) supporting organizations.
   If "Yes," attach a statement that identifies the individuals, explains the relationship between this organization and the other organization(s), and
   describes the compensation arrangements, including amounts paid to each individual by each related organization.

   d  Does the organization have a written conflict of interest policy? ...................................... | **75d** | | **X**

| Part V-B | Former Officers, Directors, Trustees, and Key Employees That Received Compensation or Other Benefits *(If any former officer, director, trustee, or key employee received compensation or other benefits (described below) during the year, list that person below and enter the amount of compensation or other benefits in the appropriate column. See the instructions.)* |

| (A) Name and address NONE | (B) Loans and Advances | (C) Compensation | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |
| ------------------------------ ------------------------------ | | | | |

| Part VI | Other Information *(See the instructions.)* | | Yes | No |
|---|---|---|---|---|

76  Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed
   description of each activity .......................................................... | **76** | | **X**

77  Were any changes made in the organizing or governing documents but not reported to the IRS? .......... | **77** | | **X**
   If "Yes," attach a conformed copy of the changes.

78 a  Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | **78a** | | **X**
   b  If "Yes," has it filed a tax return on **Form 990-T** for this year? ............................ N/A | **78b** | | |

79  Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement | **79** | | **X**

80 a  Is the organization related (other than by association with a statewide or nationwide organization) through common
   membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? ...... | **80a** | **X** | |
   b  If "Yes," enter the name of the organization▶ **ARMENIAN NATIONAL INSTITUTE, INC.** _____
   and check whether it is ☒ exempt or ☐ nonexempt

81 a  Enter direct or indirect political expenditures. (See line 81 instructions.) | **81a** | NONE |
   b  Did the organization file **Form 1120-POL** for this year? ...................................... | **81b** | | **X**

523161/02-03-06

Form **990** (2005)

Form 990 (2005)　ARMENIAN GENOCIDE MUSEUM AND
　　　　　　　　　　MEMORIAL, INC.　　　　　　　　　　　20-0344096　Page 7

| Part VI | Other Information *(continued)* | | Yes | No |
|---|---|---|---|---|

**82 a** Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | **82a** | | X

**b** If "Yes," you may indicate the value of these items here. Do not include this
amount as revenue in Part I or as an expense in Part II.
(See instructions in Part III.) | **82b** | N/A

**83 a** Did the organization comply with the public inspection requirements for returns and exemption applications? | **83a** | X |

**b** Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | **83b** | X |

**84 a** Did the organization solicit any contributions or gifts that were not tax deductible? | **84a** | | X

**b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not
tax deductible? | N/A | **84b** |

**85** *501(c)(4), (5), or (6) organizations.* **a** Were substantially all dues nondeductible by members? | N/A | **85a** |

**b** Did the organization make only in-house lobbying expenditures of $2,000 or less? | N/A | **85b** |

If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a
waiver for proxy tax owed for the prior year.

**c** Dues, assessments, and similar amounts from members | **85c** | N/A

**d** Section 162(e) lobbying and political expenditures | **85d** | N/A

**e** Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices | **85e** | N/A

**f** Taxable amount of lobbying and political expenditures (line 85d less 85e) | **85f** | N/A

**g** Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? | N/A | **85g** |

**h** If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f
to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the
following tax year? | N/A | **85h** |

**86** *501(c)(7) organizations.* Enter: **a** Initiation fees and capital contributions included on
line 12 | **86a** | N/A

**b** Gross receipts, included on line 12, for public use of club facilities | **86b** | N/A

**87** *501(c)(12) organizations* Enter: **a** Gross income from members or shareholders | **87a** | N/A

**b** Gross income from other sources. (Do not net amounts due or paid to other sources
against amounts due or received from them.) | **87b** | N/A

**88** At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership,
or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3?
If "Yes," complete Part IX | **88** | | X

**89 a** *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under:
section 4911 ▶　*NONE*　; section 4912 ▶　*NONE*　; section 4955 ▶　*NONE*

**b** *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit
transaction during the year or did it become aware of an excess benefit transaction from a prior year?
If "Yes," attach a statement explaining each transaction | **89b** | | X

**c** Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under
sections 4912, 4955, and 4958 ▶ *NONE*

**d** Enter: Amount of tax on line 89c, above, reimbursed by the organization ▶ *NONE*

**90 a** List the states with which a copy of this return is filed ▶ DC

**b** Number of employees employed in the pay period that includes March 12, 2005 | **90b** | 0

**91 a** The books are in care of ▶ JOHN WATERS JR.　Telephone no. ▶ 612-359-8991
Located at ▶ 15 SOUTH FIFTH STREET, STE 900, MINNEAPOLIS, MN　ZIP + 4 ▶ 55402

**b** At any time during the calendar year, did the organization have an interest in or a signature or other authority
over a financial account in a foreign country (such as a bank account, securities account, or other financial
account)? | **91b** | | X
If "Yes," enter the name of the foreign country ▶ N/A
See the instructions for exceptions and filing requirements for **Form TD F 90-22.1**, Report of Foreign Bank
and Financial Accounts.

**c** At any time during the calendar year, did the organization maintain an office outside of the United States? | **91c** | | X
If "Yes," enter the name of the foreign country ▶ N/A

**92** *Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of Form 1041-* Check here ▶ ☐
and enter the amount of tax-exempt interest received or accrued during the tax year ▶ | **92** | | N/A

Form **990** (2005)

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.

Form 990 (2005)  20-0344096  Page **8**

## Part VII | Analysis of Income-Producing Activities *(See the instructions.)*

**Note:** *Enter gross amounts unless otherwise indicated*

| | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) Related or exempt function income |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | |
| 93 Program service revenue: | | | | | |
| a _____ | | | | | |
| b _____ | | | | | |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 285,579. | |
| 96 Dividends and interest from securities | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | 16 | 30,000. | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | | | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a _____ | | | | | |
| b _____ | | | | | |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 315,579. | 0. |
| 105 Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 315,579. |

**Note:** *Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

## Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes *(See the instructions.)*

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| | N/A |
| | |
| | |
| | |

## Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities *(See the instructions.)*

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| | % | | | |
| N/A | % | | | |
| | % | | | |
| | % | | | |

## Part X | Information Regarding Transfers Associated with Personal Benefit Contracts *(See the instructions.)*

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?  ☐ Yes  ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?  ☐ Yes  ☒ No

**Note:** *If "Yes" to (b), file Form 8870 and Form 4720 (see instructions)*

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

▶ Signature of officer _____  Date 5-15-06  ▶ Type or print name and title. JOHN J. WAYNE JR. SECRETARY

**Paid Preparer's Use Only**

| Preparer's signature ▶ Kristen K. Gerbb, CPA | Date 5/12/06 | Check if self-employed ▶ ☐ | Preparer's SSN or PTIN P00318553 |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 | DELOITTE TAX LLP  120 SOUTH SIXTH STREET, SUITE 400  MINNEAPOLIS, MN 55402 | EIN ▶ 86-1065772 | Phone no. ▶ 612-397-4000 |

523163 02-03-06

Form **990** (2005)

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or 4947(a)(1) Nonexempt Charitable Trust
## Supplementary Information-(See separate instructions.)
▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

## 2005

| Name of the organization | Employer identification number |
|---|---|
| ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. | 20 0344096 |

**Part I**  **Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees**
(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Total number of other employees paid over $50,000 ▶ | 0 | | | |
|---|---|---|---|---|

**Part II-A**  **Compensation of the Five Highest Paid Independent Contractors for Professional Services**
(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |

| Total number of others receiving over $50,000 for professional services ▶ | 0 | |
|---|---|---|

**Part II-B**  **Compensation of the Five Highest Paid Independent Contractors for Other Services**
(List each contractor who performed services other than professional services, whether individuals or firms. If there are none, enter "None." See page 2 of the instructions.)

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |

| Total number of other contractors receiving over $50,000 for other services ▶ | 0 | |
|---|---|---|

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2005 **MEMORIAL, INC.**                                    20-0344096   Page 2

| **Part III** | **Statements About Activities** (See page 2 of the instructions.) | | **Yes** | **No** |
|---|---|---|---|---|
| 1 | During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ _____ $ _____ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.) | 1 | | X |
| | Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes" must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | | | |
| 2 | During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? (If the answer to any question is "Yes," attach a detailed statement explaining the transactions.) | | | |
| **a** | Sale, exchange, or leasing of property? | 2a | | X |
| **b** | Lending of money or other extension of credit? | 2b | | X |
| **c** | Furnishing of goods, services, or facilities?        *Stmt 5* | 2c | X | |
| **d** | Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | | X |
| **e** | Transfer of any part of its income or assets? | 2e | | X |
| 3 **a** | Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| **b** | Do you have a section 403(b) annuity plan for your employees? | 3b | | X |
| **c** | During the year, did the organization receive a contribution of qualified real property interest under section 170(h)? | 3c | | X |
| 4 **a** | Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4a | | X |
| **b** | Do you provide credit counseling, debt management, credit repair, or debt negotiation services? | 4b | | X |

| **Part IV** | **Reason for Non-Private Foundation Status** (See pages 3 through 6 of the instructions.) |
|---|---|

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city,**
   **and state** ▶ _____

10 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv).
   (Also complete the **Support Schedule** in Part IV-A.)

11a ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public.
   Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 ☐ An organization that normally receives: **(1) more than 33 1/3%** of its support from contributions, membership fees, and gross
   receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of
   its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired
   by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in:
   **(1)** lines 5 through 12 above; or **(2)** sections 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). Check the box that describes
   the type of supporting organization: ▶       ☐ Type 1       ☐ Type 2       ☐ Type 3

Provide the following information about the supported organizations. (See page 6 of the instructions.)

| **(a)** Name(s) of supported organization(s) | **(b)** Line number from above |
|---|---|
| | |
| | |
| | |

14 ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See page 6 of the instructions.)

523111
02-03-06

**Schedule A (Form 990 or 990-EZ) 2005**

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2005 MEMORIAL, INC.                                            20-0344096    Page 3

**Part IV-A**  Support Schedule (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting.**
Note: You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting

| Calendar year (or fiscal year beginning in) ▶ | (a) 2004 | (b) 2003 | (c) 2002 | (d) 2001 | (e) Total |
|---|---|---|---|---|---|
| **15** Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | 181,985. | 20342881. | | | 20,524,866. |
| **16** Membership fees received | | | | | |
| **17** Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| **18** Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 503,525. | 155. | | | 503,680. |
| **19** Net income from unrelated business activities not included in line 18 | | | | | |
| **20** Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| **21** The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| **22** Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| **23** Total of lines 15 through 22 | 685,510. | 20343036. | 0. | 0. | 21,028,546. |
| **24** Line 23 minus line 17 | 685,510. | 20343036. | | | 21,028,546. |
| **25** Enter 1% of line 23 | 6,855. | 203,430. | | | |

**26** Organizations described on lines 10 or 11:  a  Enter 2% of amount in column (e), line 24 ▶ | **26a** | 420,571.
  b Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 2001 through 2004 exceeded the amount shown in line 26a.
  Do not file this list with your return. Enter the total of all these excess amounts ▶ | **26b** | 19501739.
  c Total support for section 509(a)(1) test: Enter line 24, column (e) ▶ | **26c** | 21,028,546.
  d Add: Amounts from column (e) for lines:  18  503,680.  19 _____
     22 _____   26b  19,501,739. ▶ | **26d** | 20,005,419.
  e Public support (line 26c minus line 26d total) ▶ | **26e** | 1,023,127.
  f Public support percentage (line 26e (numerator) divided by line 26c (denominator)) ▶ | **26f** | 4.8654%

**27** Organizations described on line 12: a For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year:    **N/A**
  (2004) _____ (2003) _____ (2002) _____ (2001) _____
  b For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger of (1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11b, as well as individuals.) **Do not file this list with your return.** After computing the difference between the amount received and the larger amount described in (1) or (2), enter the sum of these differences (the excess amounts) for each year:    **N/A**
  (2004) _____ (2003) _____ (2002) _____ (2001) _____
  c Add: Amounts from column (e) for lines:  15 _____  16 _____
     17 _____  20 _____  21 _____ ▶ | **27c** | N/A
  d Add: Line 27a total _____ and line 27b total _____ ▶ | **27d** | N/A
  e Public support (line 27c total minus line 27d total) ▶ | **27e** | N/A
  f Total support for section 509(a)(2) test: Enter amount on line 23, column (e) ▶ | **27f** | N/A
  g Public support percentage (line 27e (numerator) divided by line 27f (denominator)) ▶ | **27g** | N/A %
  h Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator)) ▶ | **27h** | N/A %

**28** Unusual Grants: For an organization described in line 10, 11, or 12 that received any unusual grants during 2001 through 2004, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return.** Do not include these grants in line 15.

523121 02-03-06                                      **NONE**                           Schedule A (Form 990 or 990-EZ) 2005

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2005 MEMORIAL, INC.                                    20-0344096    Page 4

| | | | Yes | No |
|---|---|---|---|---|
| **Part V** | **Private School Questionnaire** (See page 7 of the instructions.) **(To be completed ONLY by schools that checked the box on line 6 in Part IV)** | N/A | | |

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? | 31 | | |
| | If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
| | If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
| | If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
| | If you answered "Yes" to either 34a or b, please explain using an attached statement. | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2005

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2005 MEMORIAL, INC.                                      20-0344096      Page 5

| Part VI-A | Lobbying Expenditures by Electing Public Charities (See page 9 of the instructions.) |

(To be completed **ONLY** by an eligible organization that filed Form 5768)

Check ▶ a ☐ if the organization belongs to an affiliated group.     Check ▶ b ☐ if you checked "a" and "limited control" provisions apply.

| Limits on Lobbying Expenditures<br>(The term "expenditures" means amounts paid or incurred.) | | (a)<br>Affiliated group<br>totals | (b)<br>To be completed for ALL<br>electing organizations |
|---|---|---|---|
| | | **N/A** | |
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | 625,853. |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | 625,853. |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | | | |
| **If the amount on line 40 is -**    **The lobbying nontaxable amount is -** | | | |
| Not over $500,000    20% of the amount on line 40 | | | |
| Over $500,000 but not over $1,000,000    $100,000 plus 15% of the excess over $500,000 | | | |
| Over $1,000,000 but not over $1,500,000    $175,000 plus 10% of the excess over $1,000,000 | 41 | | 118,878. |
| Over $1,500,000 but not over $17,000,000    $225,000 plus 5% of the excess over $1,500,000 | | | |
| Over $17,000,000    $1,000,000 | | | |
| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | 29,720. |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

**Caution:** If there is an amount on either line 43 or line 44, you must file Form 4720.

### 4-Year Averaging Period Under Section 501(h)

(Some organizations that made a section 501(h) election do not have to complete all of the five columns
below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

| Calendar year (or<br>fiscal year beginning in) ▶ | Lobbying Expenditures During 4-Year Averaging Period | | | | |
|---|---|---|---|---|---|
| | (a)<br>2005 | (b)<br>2004 | (c)<br>2003 | (d)<br>2002 | (e)<br>Total |
| 45 Lobbying nontaxable amount | 118,878. | 65,021. | 2,217. | | 186,116. |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 279,174. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | 29,720. | 16,255. | 554. | | 46,529. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 69,794. |
| 50 Grassroots lobbying expenditures | | | | | 0. |

| Part VI-B | Lobbying Activity by Nonelecting Public Charities                                      N/A |

(For reporting only by organizations that did not complete Part VI-A) (See page 11 of the instructions.)

During the year, did the organization attempt to influence national, state or local legislation, including any attempt to
influence public opinion on a legislative matter or referendum, through the use of:

| | | Yes | No | Amount |
|---|---|---|---|---|
| a | Volunteers | | | |
| b | Paid staff or management (Include compensation in expenses reported on lines c through h.) | | | |
| c | Media advertisements | | | |
| d | Mailings to members, legislators, or the public | | | |
| e | Publications, or published or broadcast statements | | | |
| f | Grants to other organizations for lobbying purposes | | | |
| g | Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i | Total lobbying expenditures (Add lines c through h.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

523141
02-03-06

ARMENIAN GENOCIDE MUSEUM AND

Schedule A (Form 990 or 990-EZ) 2005 MEMORIAL, INC.    20-0344096 Page 6

| Part VII | Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations (See page 12 of the instructions.) |

51  Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

|  |  | Yes | No |
|---|---|---|---|
| a  Transfers from the reporting organization to a noncharitable exempt organization of: |  |  |  |
| (i) Cash | 51a(i) |  | X |
| (ii) Other assets | a(ii) |  | X |
| b  Other transactions: |  |  |  |
| (i) Sales or exchanges of assets with a noncharitable exempt organization | b(i) |  | X |
| (ii) Purchases of assets from a noncharitable exempt organization | b(ii) |  | X |
| (iii) Rental of facilities, equipment, or other assets | b(iii) |  | X |
| (iv) Reimbursement arrangements | b(iv) |  | X |
| (v) Loans or loan guarantees | b(v) |  | X |
| (vi) Performance of services or membership or fundraising solicitations | b(vi) |  | X |
| c  Sharing of facilities, equipment, mailing lists, other assets, or paid employees | c |  | X |

d  If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received:    **N/A**

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

52 a  Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527?    ▶ ☐ Yes  ☒ No

b  If "Yes," complete the following schedule:    **N/A**

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

523151
02-03-06

Schedule A (Form 990 or 990-EZ) 2005

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, I                    20-0344096

---

| FORM 990 | RENTAL INCOME | STATEMENT    1 |
|---|---|---|

| KIND AND LOCATION OF PROPERTY | ACTIVITY NUMBER | GROSS RENTAL INCOME |
|---|---|---|
|  | 1 | 30,000. |
| TOTAL TO FORM 990, PART I, LINE 6A |  | 30,000. |

---

| FORM 990 | OTHER EXPENSES | | STATEMENT    2 |
|---|---|---|---|

| DESCRIPTION | (A) TOTAL | (B) PROGRAM SERVICES | (C) MANAGEMENT AND GENERAL | (D) FUNDRAISING |
|---|---|---|---|---|
| MISC. EXPENSES | 199. | | 199. | |
| OTHER PROFESSIONAL FEES | 185,620. | | 185,620. | |
| SECURITY | 374. | | 374. | |
| MAINTENANCE & REPAIRS | 3,633. | | 3,633. | |
| UTILITIES | 13,002. | | 13,002. | |
| REAL ESTATE TAXES | 368,975. | | 368,975. | |
| INSURANCE | 36,732. | | 36,732. | |
| ORGANIZATIONAL EXPENSES | 75. | | 75. | |
| OTHER TAXES | 425. | | 425. | |
| PHOTOGRAPHY PROJECT | 10,000. | | 10,000. | |
| TOTAL TO FM 990, LN 43 | 619,035. | | 619,035. | |

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2005**

Form 990, Part IV, Line 63 – Loans from officers, directors, trustees, and key employees

On November 1, 2003, Mr. Cafesjian, a board member of the Armenian Genocide
Museum and Memorial, Inc. ("AGMM"), advanced funds to AGMM for its
establishment and organization. The original amount of the note was $500,000.
$500,000 is still outstanding, and will be paid back with 0% interest.

Statement 3

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2005**

STATEMENT OF PROGRAM SERVICE ACCOMPLISHMENTS

Armenian Genocide Museum and Memorial , Inc. ("AGMM") was formed to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these programs.

STATEMENT 4

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2005**

Form 990, Schedule A, Part III – Furnishing of goods, services, or facilities

The Armenian Genocide Museum and Memorial, Inc. ("AGMM") receives accounting and management services at no charge from GLC Enterprises, a taxable entity with which Gerard Cafesjian, a substantial contributor and board member, is affiliated with.

Statement 5

# ARMENIAN GENOCIDE MUSEUM & MEMORIAL, INC.
## EIN: 20-0344096

### A STATEMENT ATTACHED TO AND MADE PART OF
### RETURN OF ORGANIZATION EXEMPT FROM INCOME TAX (FORM 990)
### FOR THE YEAR ENDED DECEMBER 31, 2005


**Part IV, Lines 57a, 57b - Land, buildings, and equipment:**

Line 57a - Land, buildings , and equipment, basis - End of year:

Buildings                                                                    $ 20,751,744

Line 57b - Less accumulated depreciation - End of year:

Buildings                                                                    $              -

STATEMENT 6

**ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.**
**EIN: 20-0344096**
**YEAR ENDED 12/31/2005**

Form 990, Page 4, Part IV – Balance Sheet

    Accounts Receivable

| | |
|---|---|
| Due to/from Armenian National Institute | $341,231 |
| Due to/from Armenian Assembly of America | $556,764 |
| Total Accounts Receivable | $897,995 |

# Exhibit 5

(

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Gerard L. Cafesjian, et al.,

Civil No. 07-cv-2079 (JNE/JJG)

Plaintiffs,

**REPORT**
**AND**
**RECOMMENDATION**

v.

Armenian Assembly of America, Inc.,

Defendant.

This is a breach of contract case brought by a benefactor seeking the return of his donations. It is before the Court on the Defendant's Motions to Dismiss based on: 1) lack of personal jurisdiction (Fed. R. Civ. P. 12(b)(2)); 2) improper venue (Rule 12(b)(3)); 3) failure to state a claim (Rule 12(b)(6)); and 4) failure to join a party under Rule 19 (Rule 12(b)(7)).[1] It was referred to this Court pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. *See* Docket No. 17. For the reasons set forth below, the Court recommends dismissal of this matter without prejudice for nonjoinder pursuant to Fed. R. Civ. P. 12(b)(7).

## I. BACKGROUND

### A. The Parties

Plaintiff Gerard L. Cafesjian ("Cafesjian") is a World War II veteran, former Minnesota resident, and retired West Publishing executive. Cafesjian now lives in Naples, Florida, and maintains a home in Minnesota. *See Complaint*, ¶ 1; *Affidavit of John J. Waters, Jr.*, ¶ 5.

Cafesjian is a significant contributor to Armenian causes. In 1996, he established the Cafesjian

---

[1] Defendant brought two motions. Its first motion (Doc. No. 11) is based on its failure to state a claim (12(b)(6)) and failure to join (12(b)(7)) arguments. The second motion (Doc. No. 14) is based on its personal jurisdiction (12(b)(2)) and venue (12(b)(3)) arguments.

Family Foundation ("CFF"), also a Plaintiff in this action. *See Waters Aff.*, ¶ 3. The CFF is a Florida non-profit with its principal place of business in Naples, Florida. *Complaint*, ¶ 2. The CFF also has an office in Minneapolis, Minnesota. *Affidavit of Lou Ann Mattosian,* ¶ 1. The CFF is dedicated to the advancement of Armenian causes. *Waters Aff.*, ¶¶ 3, 10.

Defendant Armenian Assembly of America, Inc. (the "Assembly") is a District of Columbia non-profit, with its principal place of business in Washington D.C. *Complaint*, ¶ 3. The Assembly has no offices or employees in Minnesota. *Affidavit of Robert A. Kaloosdian,* ¶ 3.[2] The Assembly describes itself as the foremost Armenian-American advocacy group in the United States. *Id.*, ¶ 4. Its missions include interacting with public policymakers; enhancing relations between the United States and Armenia; and research, education, and advocacy for universal affirmation of the Armenian Genocide. *Id.*[3]

## B. The Museum Project

In the 1990's the Assembly began exploring the idea of creating a museum dedicated to the victims and survivors of the Armenian Genocide. *Kaloosdian Aff.*, ¶ 5. This required the Assembly to seek substantial donations towards the construction of the museum, and eventually it contacted Cafesjian. *Id.*, ¶ 7. The initial meeting between Cafesjian and the Assembly occurred in 1997 at Cafesjian's Minnesota residence. *Id.*; *Waters Aff.*, ¶ 15.

Cafesjian, CFF, and the Assembly subsequently worked together to develop the museum idea. *Waters Aff.*, ¶ 16. In March 1999, Cafesjian pledged over $1 million to support the Assembly's museum

---

[2]The Kaloosdian Affidavit is attached as Exhibit 1 to the Affidavit of Arnold R. Rosenfeld.

[3]As described by the Armenian National Institute, the Armenian Genocide refers to atrocities committed against Armenians during the government of the Young Turks from 1915 to 1918 in the Ottoman Empire. *See* <http://www.armenian-genocide.org/genocidefaq.html>.

endowment campaign. *Id.*, ¶ 18.

In 2000, the Assembly identified a historic location in Washington D.C., the National Bank of Washington Building located near the nation's Capitol, as a possible site for the museum. *Kaloosdian Aff.*, ¶ 8. Cafesjian contributed $3,500,000 to the Assembly to help purchase the building and loaned an additional $500,000 to assist with the purchase. *Waters Aff.*, ¶ 19. The $500,000 loan was evidenced by a promissory note executed by the Assembly in favor of CFF. *Complaint*, Ex. A.

Cafesjian and CFF then became increasingly more involved in the museum's development. Cafesjian purchased four additional parcels of property adjacent to the National Bank site to expand the project. *Kaloosdian Aff.*, ¶ 10. He also made additional donations to the museum project. All told, Cafesjian's donations to the project totaled more than $14 million. *Complaint*, ¶ 12.

Some of Cafesjian's contributions are encompassed by a November 1, 2003 Grant Agreement between the Assembly, Cafesjian, and the CFF. *Complaint*, Ex. B.

### C. Armenian Genocide Museum and Memorial, Inc.

Cafesjian's interest in the museum project did not end with his donations. Eventually he requested the organization of a new entity dedicated to the development and construction of the museum. Thus, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") was born as a D.C. nonprofit corporation. *Kaloosdian Aff.*, ¶¶ 10-11. Cafesjian was one of the trustees of the new corporation. *Id.*

On November 1, 2003, the same date the Grant Agreement between Cafesjian, CFF, and the Assembly was executed, a Transfer Agreement was executed between the Assembly and AGM&M for the purpose of transferring the Assembly's assets with respect to the museum project to the AGM&M. *Rosenfeld Aff.*, Ex. 4.

3

**D.     The Legal Agreements**

Three legal documents underpin the parties' obligations in this case: 1) the March 17, 2000 Promissory Note between CFF and the Assembly; 2) the November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly; and 3) the November 1, 2003 Transfer Agreement between AGM&M and the Assembly.

**1.     <u>The Promissory Note</u>**

The March 17, 2000 Promissory Note between CFF and the Assembly states that it shall be payable in full on May 16, 2000, just two months after it was executed. *Complaint*, Ex. A. It contains a Minnesota forum selection clause stating:

> At the option of the payee [CFF], this note may be enforced in any federal court or Minnesota state court sitting in Hennepin County, Minnesota, and the maker [Assembly] consents to the jurisdiction and venue of any such court and waives any argument that the venue in such forums is not convenient. If the maker [Assembly] commences any action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions and venues above described, or, if such transfer cannot be accomplished under applicable law, to have such case dismissed without prejudice.

*Id.* (original in allcaps).

**2.     <u>The Grant Agreement</u>**

The November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly states that it governs various donations Cafesjian and CFF made to the Assembly. It specifically addresses the Promissory Note between CFF and the Assembly, stating:

5.4   Promissory Note.

(A)   The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)   The new note must be interest free and mature on December 31, 2005.

(C)   If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to the AGM&M, Inc. as part of the transfer of the Assembly's assets.

*Complaint*, Ex. B, p. 7.

The Grant Agreement references the Transfer Agreement, stating, inter alia:

On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

*Id.*

The Grant Agreement contains a choice of law provision stating:

7.2   Governing Law.   This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

*Rosenfeld Aff.*, Ex. 5, p. 9.[4]

### 3.   **The Transfer Agreement**

The November 1, 2003 Transfer Agreement between AGM&M and the Assembly (but not

---

[4]The Grant Agreement attached to the Complaint is missing pages 9 and 10.  The complete Grant Agreement can be found at Rosenfeld Affidavit, Exhibit 5.

5

Cafesjian or CFF) generally requires the Assembly to transfer its assets held for the development and construction of the museum to AGM&M.

With regard to the March 17, 2000 Promissory Note between CFF and the Assembly, the Transfer Agreement states:

> If at the time this Agreement is executed the promissory note executed by Grantor [the Assembly] in favor of The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

*Rosenfeld Aff.*, Ex. 4, p. 2.

The Transfer Agreement contains a District of Columbia choice of law provision identical to the one in the Grant Agreement. *Id.*, p. 6.

It also contains an arbitration provision stating:

> 5.3   <u>Dispute Resolution</u>.  Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

*Id.*

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(2) – Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir.1996). When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings. *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir.1998)

(quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)) ("the court may inquire, by affidavits or otherwise, into the facts as they exist"). When determining whether the plaintiff has made a prima facie showing of personal jurisdiction, the Court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in her favor. *See Digi-Tel*, 89 F.3d at 522.

### B. Rule 12(b)(6) - Failure to State a Claim

When considering a Rule 12(b)(6) motion, the Court assumes all facts alleged in the complaint as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996), *cert. denied*, 519 U.S. 1149 (1997). While the complaint need not contain "detailed factual allegations," *see* Fed R. Civ. P. 8(a)(2), it must supply "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007) (citation omitted). Rather, the facts set forth in the complaint must be sufficient to "nudge ... claims across the line from conceivable to plausible." *Id*. at 1974. While the complaint's factual allegations must, therefore, rise above speculation and suspicion, a court should not dismiss for failure to state a claim merely because it disbelieves those allegations or considers them doubtful. *Id*. at 1965.

### C. Rule 12(b)(7) - Failure to Join a Rule 19 Party

In analyzing a Rule 12(b)(7) motion to dismiss for failure to join a party under Rule 19, courts accept as true all of the pleader's well-pleaded factual allegations and draw all reasonable inferences in her favor. *See* Baicker-McKee, Janssen, Corr, Federal Civil Rules Handbook, Rule 12(b)(7), p. 381 (2007) (citation omitted). The court may rely on affidavits and other evidence outside the pleadings in making its determination. Wright & Miller, Federal Practice and Procedure: Civil 3d § 1359, vol.

7

5C, p. 68 (2004) ("The district judge is not limited to the pleadings.") (citing *Young v. Garrett*, 149 F.2d 223, 225 n.1 (8th Cir. 1945); *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir. 2001)) (other citations omitted).

## III.    ANALYSIS

The Assembly asserts a raft of Rule 12 legal arguments in support of dismissal.  As further discussed below, only the Rule 12(b)(7) failure to join a party argument survives.

### A.    Personal Jurisdiction (Rule 12(b)(2))

The Assembly argues under Fed. R. Civ. P. 12(b)(2) that the Court lacks personal jurisdiction over it, a non-profit incorporated under the laws of, and with its principal place of business in, the District of Columbia.

#### 1.    Promissory note forum selection clause

Cafesjian maintains that the Minnesota forum selection clause contained in the promissory note between CFF and the Assembly evidences the Assembly's consent to Minnesota jurisdiction.  A party's valid consent to jurisdiction obviates the need to engage in further personal jurisdiction analysis. *Dominium Austin Partners, LLC v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001); *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs, Inc.*, No. 06-3580 (JNE/SRN), 2007 WL 892517, *3 (D. Minn. Mar. 21, 2007).

While the Minnesota forum selection clause clearly reflects the Assembly's consent to Minnesota jurisdiction for a suit enforcing the promissory note, this is not such a suit.  The Complaint seeks redress for breach of the Grant Agreement, not the promissory note.  While the Complaint references the promissory note, both of its two counts are expressly predicated on breach of the Grant Agreement.  Specifically, Cafesjian and CFF allege that the Assembly breached the Grant Agreement, not the

8

promissory note, by failing to issue a replacement promissory note as the Grant Agreement requires. *See Complaint*, ¶¶ 16-18, 22 ("The November 1, 2003 Grant Agreement obligated the Assembly to issue a new promissory note.... The Assembly has yet to issue the replacement note. This non-performance materially breached the Grant Agreement.") ("The Assembly violated this implied duty of good faith and fair dealing by failing to issue a replacement promissory note to Cafesjian.").

The Grant Agreement contains no forum selection clause, but only a choice of law (District of Columbia) clause. Because this is not a suit to enforce the note, the note's forum selection clause does not apply. *Dunne v. Libbra*, 330 F.3d 1062, 1064 (8th Cir. 2003) (following "cardinal rule" of contract interpretation that contract's plain language must be given its ordinary meaning to find forum selection clause inapplicable).

Cafesjian argues that this action is, minimally, indirectly related to the promissory note, triggering language in the note's forum selection clause stating that actions "arising directly or indirectly from the relationship created by this note," are encompassed by the clause. However, Cafesjian's selective parsing of the clause's language is unpersuasive. A full reading of the clause indicates that it is triggered only when the note's *maker* (the Assembly) commences action. It states:

> If the *maker* [Assembly] commences action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions or venues above described....

*Complaint*, Ex. A (emphasis added). This is not an action by the note's maker. This language is,

9

therefore, inapplicable.[5]

## 2. **Minimum contacts**

Cafesjian argues that Assembly has subjected itself to both specific and general Minnesota personal jurisdiction by visiting Minnesota, soliciting donations in Minnesota, and recruiting and maintaining Minnesota members.

Cafesjian's allegations do not support the exercise of specific personal jurisdiction, even when viewed in a light most favorable to him. The Grant Agreement, the Complaint's basis, has at its core property and donations located in Washington D.C. *Complaint*, Ex. B.[6] The museum that was the goal of the Grant Agreement was to be located in Washington D.C. *Id.* The Grant Agreement is expressly controlled by District of Columbia law. *Id.*, p. 9. Assembly is a District of Columbia resident. *Id.*, ¶ 3. Cafesjian is a Florida resident and CFF's primary place of business is in Florida. *Complaint*, ¶¶ 1, 2. The Court, therefore, finds little, if any, Minnesota connection to the Grant Agreement underlying this lawsuit.

Although the parties first met in Minnesota, and Cafesjian vaguely states through Mr. Waters' Affidavit that some of his pledge activity was "orchestrated from the Foundation's Minnesota office,"

_____

[5]The Court recognizes the disharmony between allowing Minnesota jurisdiction where Assembly commences suit in another jurisdiction arising indirectly from the note and disallowing Minnesota jurisdiction where CFF brings an action arising indirectly from the note. This, however, is how the parties struck their bargain, and the Court must hold them to it. Moreover, it is possible that Cafesjian opted not to sue directly on the note, which matured in May 2000, because of statute of limitations concerns. Any such strategic choice does not entitle him to the benefit of the forum selection clause in an agreement he is not suing to enforce.

[6]Assembly states that the Grant Agreement was also executed in the District of Columbia. *Memorandum of Points and Authorities in Support of Defendant the Armenian Assembly of America's Motion To Dismiss for Lack of Personal Jurisdiction and Improper Venue*, p. 17. It does not, however, support this statement with affidavit testimony, so the Court has not relied on it in its personal jurisdiction analysis.

*Waters Aff.*, ¶ 18, the record contains no detail regarding any Minnesota connection to the pledges underlying the Grant Agreement. Cafesjian, therefore, has not shown a prima facie case of sufficient Minnesota contact with respect to the transactions at issue in the Complaint. *See Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir.), *cert. denied*, 127 S. Ct. 217 (2006) (party cannot establish prima facie case of personal jurisdiction through conclusory allegations).

The existence of general personal jurisdiction over the Assembly is a closer question. Assembly members traveled to Minnesota on numerous occasions to solicit funds, Assembly has Minnesota members and volunteers, and Assembly targets Minnesotans for solicitations. *See Matossian Aff.*, ¶¶ 4, 5, 6, 8; *Waters Aff.*, ¶¶ 10, 11, 15. Cafesjian's affidavits regarding this activity are not particularly detailed. For example, the Court does not know how many visits Assembly members made to Minnesota, the percentage of its members that are Minnesotans, how often and in what way it solicits Minnesota members, and whether it has held fund-raising events in Minnesota. However, given that all doubts must be resolved in Cafesjian's favor in this procedural posture, the Court finds that he has made a prima facie case of general personal jurisdiction over Assembly. *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (exercise of personal jurisdiction appropriate where foreign nonprofit conducted fund-raising and held two fund-raising events in forum state); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 931 F. Supp. 592, 595-595 (N.D. Ill. 1996) (exercising personal jurisdiction over foreign nonprofits based, in part, on fund-raising activities in forum state).

### B. Venue (Rule 12(b)(3))

Assembly also moves to dismiss for improper venue under 28 U.S.C. § 1391. If personal jurisdiction exists at the commencement of an action, venue is proper under Section 1391. 28 U.S.C. §

11

1391(c).  Because Cafesjian has made a prima facie showing of personal jurisdiction, venue is proper in

Minnesota.  *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1392 (8th Cir. 1991)

(where prima facie showing of Minnesota personal jurisdiction made, venue proper in Minnesota);

*Raymedica, Inc. v. Stoy*, Civ. No. 01-1841 (JRT/FLN), 2002 WL 31185916, *6 (D. Minn. Sep. 30,

2002) (same).

### C.      Failure to State a Claim (Rule 12(b)(6))

Assembly makes three arguments that Cafesjian's suit should be dismissed for failure to state a

claim upon which relief can be granted.  None of them warrants dismissal.

#### 1.      Arbitration clause

Assembly asserts that the Transfer Agreement's arbitration clause requires that this dispute be

arbitrated, rather than litigated.

As a threshold matter, a Rule 12(b)(6) analysis is confined to the pleadings, materials embraced

by the Complaint or exhibits thereto, matters of public record, and orders.  *Porous Media Corp. v. Pall

Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  The Transfer Agreement is none of these things.  The

Complaint is based on the Grant Agreement, references the promissory note, and attaches both as exhibits.

It is not, however, based on, nor does it mention or attach, the Transfer Agreement.  The Court, therefore,

cannot interpret the Transfer Agreement's provisions, including its arbitration clause,  in this procedural

posture.  *Id.*

Even if the Court could consider the merits of the arbitration clause's applicability, it would not

warrant dismissal.  Cafesjian and CFF are not parties to the Transfer Agreement, which is between

Assembly and the AGM&M.  Additionally, the Transfer Agreement's arbitration clause expressly states

12

that it governs "disputes arising under this Agreement." Cafesjian's suit arises under the Grant Agreement, not the Transfer Agreement. This makes sense, as Cafesjian is a not a party to it.

Although arbitration of disputes is generally favored, a party who is not a signatory to an arbitration agreement cannot be compelled to arbitrate. *Air Line Pilots Assoc. v. Miller*, 523 U.S. 866, 876 (1998); *Nitro Dist., Inc. v. Alticor, Inc.* 453 F.3d 995, 999 (8th Cir. 2006); *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 28 (D.D.C. 2002). *See also Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999) ("[A]rbitration is a matter of consent, not of coercion."). Cafesjian and CFF are not parties to the Transfer Agreement, and, therefore, cannot be forced to arbitrate under its terms.[7]

### 2. Statute of limitations

Assembly also seeks a ruling that Cafesjian's suit is time-barred. It argues that Cafesjian's cause of action seeking issuance of a replacement promissory note accrued on or before November 1, 2003. It reasons that the Grant Agreement required Assembly to issue a replacement note before the execution of the Transfer Agreement on November 1, 2003. Using this date, Assembly argues the action is time-barred under the applicable District of Columbia statute of limitations. *See* D.C. Stat. § 12-301(7) (actions on a "simple contract" must be brought within three years).[8]

---

[7]Assembly's argument that the Grant Agreement incorporates the terms of the Transfer Agreement by reference is unpersuasive. Although the Grant Agreement references the Transfer Agreement, it does not expressly incorporate it by reference. *See Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 973 (8th Cir. 1999) (merely mentioning another agreement does not constitute incorporation by reference); *Air Line Pilots Assoc., Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 94 (D.C. Cir. 1988) (same).

[8]The parties agreed in the Grant Agreement that District of Columbia law governs the interpretation of that Agreement, and it is, therefore, appropriate to apply that law. *See Schwan's Sales Enterprises., Inc. v. SIG Pack, Inc.,* 476 F.3d 594, 596 (8th Cir. 2007) ("Minnesota courts generally recognize and apply choice-of-law clauses in contracts requiring the application of a foreign state's law.").

This argument fails.  The Grant Agreement did not require the replacement note to be issued on or before November 1, 2003.  Rather, it does not specify a date for the issuance of the replacement note. Thus, a fact issue exists regarding when the cause of action accrued making dismissal inappropriate at this early stage.  *See R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.*, 663 F.2d 168, 175-76, n.57 (D.C. Cir. 1980); *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 770-71 (D.C. 1998).

The Assembly also argues that any action to enforce the promissory note is time-barred.  The Court need not reach this argument as this action is one to enforce the Grant Agreement, not the note.

### 3.    Merits

The Assembly seeks dismissal of Cafesjian's Complaint on the merits based on its argument that the Transfer Agreement transferred the promissory note to AGM&M, discharging the Assembly's obligation under the Grant Agreement to issue a replacement note.  Resolution of this argument is premature.

The Grant Agreement requires the Assembly to issue a "new promissory note (the *"Promissory Note"*) to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000."  *Complaint*, Ex. B, p. 7.  (emphasis added).    The Grant Agreement then addresses only the transfer of any new promissory note, not the original note, stating: "If the *Promissory Note* [i.e. the new promissory note] is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets."  *Id.*

Thus, the Grant Agreement indicates only that any *new* promissory note was subject to transfer via the Transfer Agreement.   Since Assembly never issued a new note, no note could have transferred to AGM&M under the Grant Agreement's plain language.

14

The Transfer Agreement, unlike the Grant Agreement, clearly states that either the original note or a new note would transfer:

> If at the time this Agreement is executed the promissory note executed by Grantor in favor of the Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

*Rosenberg Aff*., Ex. 4, p. 2. Thus, the Grant Agreement and the Transfer Agreement are at odds with respect to the transfer of the original promissory note.

Reconciliation of the ambiguities created by these two contracts is inappropriate at this early juncture. *E.g., Bennett Enterprises, Inc. v. Domino's Pizza, Inc*., 794 F. Supp. 434, 435 (D.D.C. 1993); *Swift & Co. v. Elias Farms*, Civil Nos. 05-2775, 05-2776, 05-2777 (PAM/JJG), 2007 WL 1364691, *7 (D. Minn. May 9, 2007) (slip op.) (citing *Housing and Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005); *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn. 1990)). This is particularly so because the Transfer Agreement is not even embraced by the four corners of the Complaint, and is thus not properly considered on this motion.

### D. Failure to Join a Party Under Rule 19 (Rule 12(b)(7))

Assembly argues that the lawsuit should be dismissed because Cafesjian failed to join AGM&M, a necessary party under Rule 19. It further argues that because AGM&M is not subject to personal jurisdiction in Minnesota, this suit should be dismissed without prejudice.

Rule 19 provides the relevant framework for analyzing a Rule 12(b)(7) motion to dismiss. Rule 19(a) asks two questions: 1) whether joinder of the absent party is required; and, if so; 2) whether the party

is subject to service of process and can be joined without defeating the court's jurisdiction.

## 1.     Whether joinder is required

Rule 19(a) sets forth the factors to be considered in determining whether an absent party's

presence is required, stating:

> **Persons to be joined if feasible.**  A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

AGM&M's joinder is required under Rule 19(a) because, in its absence, complete relief cannot

be accorded among those already parties.  Cafesjian seeks "[r]escission of the Grant Agreement and

restitution of all donations made pursuant to that agreement." *Complaint*, ¶ 27.  In other words, he wants

the money he donated returned.  Pursuant to the Transfer Agreement, AGM&M now possesses that

money. *Kaloosdian Aff.*, ¶ 14.  The Court cannot order the complete relief Cafesjian seeks, therefore,

without AGM&M in the litigation.

Persons or entities such as AGM&M that possess disputed fruits of a contract must be joined

under Rule 19(a).  For example, in *Denkmann Associates v. International Paper Co.*, 132 F.R.D. 168,

172 (M.D. La. 1990), the court held that complete relief could not be provided to the parties before the

court where the plaintiff sought contract rescission which included restoration of timberland owned by a

non-party.  Similarly, in *In re U.S. ex rel. Hall*, 825 F. Supp. 1422, 1429-1430 (D. Minn. 1993), the

court dismissed an Indian tribe action seeking rescission of a contract with outside vendors where non-party

Indian tribes could not be joined. The court stated, "No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." (quotation omitted). *Id.* at 1430.

This case differs from contract cases where courts have held that an entity that is not a party to a contract underlying the litigation, but is merely affected by it, need not be joined under Rule 19. Although the absent parties in such cases were impacted by the litigation, they did not possess property or money directly implicated by the litigated contract as AGM&M does here. *See e.g., Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 819-820 (8th Cir. 1977); *Davis Cos.,* 268 F.3d at 484.

If Cafesjian's suit sought only to force Assembly to execute a replacement promissory note, rather than rescission of his donations, a different Rule 19(a) determination may have been warranted. Arguably that type of a suit would affect AGM&M, but not require its presence. Here, however, where AGM&M actually holds the money Cafesjian seeks, the suit cannot go forward without it.

### 2. Personal and subject matter jurisdiction

Because AGM&M should be part of the action, the Court can order its joinder if it is subject to service of process and if its presence will not defeat the Court's subject matter jurisdiction. Fed. R. Civ. P. 19(a). This Court's diversity jurisdiction would not be defeated by AGM&M's joinder. It is a District of Columbia corporation with its principal place of business in Washington D.C. As such, its presence in the suit as a defendant would not defeat complete diversity, and the parties do not argue otherwise.

The parties do, however, dispute whether AGM&M is subject to personal jurisdiction in Minnesota. Assembly argues that AGM&M, a District of Columbia corporation, has no significant ties to

Minnesota and that the donations and museum activities giving rise to the Complaint all took place in Washington D.C. Cafesjian responds that John Waters, an AGM&M Trustee, lives in Minnesota and transacted some of AGM&M's business from Minnesota.

While Waters lives in and sometimes transacts business from Minnesota, the record does not reflect that the transactions at issue in the Complaint, i.e. the alleged breach of the Grant Agreement by failure to issue a replacement promissory note, took place here such that the exercise of specific jurisdiction is appropriate. The record does not reflect that Waters was connected in any way to the Grant Agreement or Assembly's alleged failure to abide by it.

Waters' performance of some of AGM&M's work from his Minnesota home does not confer general personal jurisdiction. An agent's decision to work from home in the forum state generally does not bind an entity to personal jurisdiction in that state where the purpose of the arrangement is merely for the agent's personal convenience. *See Lucachick v. NDS Americas, Inc.*, 169 F. Supp. 2d 1103, 1107 (D. Minn. 2001) (holding that personal jurisdiction in Minnesota was lacking where Minnesota home office was employee's "personal choice"); *Adams v. Riverview Healthcare Ass'n*, No. A3-02-135, 2003 WL 1456442, *3 (D.N.D. March 17, 2003) (employee's personal choice to work from home insufficient basis for assertion of personal jurisdiction).

Moreover, unlike Assembly, the record does not reflect any AGM&M fundraising or membership activity occurring in Minnesota. Thus, the basis for finding a prima facie case of general personal jurisdiction over Assembly is simply not present with AGM&M.

Minnesota does not have a strong interest in providing a forum here. *See Stanton v. St. Jude Medical, Inc.*, 340 F.3d 690, 694 (8th Cir. 2003) (discussing five-factor personal jurisdiction test,

including the fourth factor, the interest of the forum state in providing relief for its residents).  The parties

seeking the forum, Cafesjian and CFF, are both Florida residents.  Additionally, it does not appear to be

particularly convenient for anyone else involved in the litigation, many, if not most, of whom are in

Washington, D.C.  *See id.* (also discussing fifth factor in personal jurisdiction analysis, the convenience of

the parties).

The Court, therefore, concludes that Cafesjian has not made a prima facie showing of personal

jurisdiction over AGM&M, precluding its joinder under Rule 19(a).

### 3.     Whether this action should proceed without AGM&M

Because the Court has determined  that AGM&M cannot be joined, Rule 19(b) requires an

analysis of whether the litigation can continue in its absence.  Four factors are relevant to this analysis: "first,

to what extent a judgment rendered in the person's absence might be prejudicial to the person or those

already parties; second, the extent to which by protective provisions in the judgment, by the shaping of relief

or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the

person's absence will be adequate; and fourth, whether the plaintiff will have an adequate remedy if the

action is dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).

Application of these factors here dictates dismissal of this action for AGM&M's nonjoinder.

AGM&M holds the money underlying this dispute.  The relief Cafesjian seeks cannot be ordered without

AGM&M in the lawsuit.  A judgment cannot be shaped to lessen this prejudice.  Moreover, Cafesjian can

bring this suit elsewhere, as dismissal is without prejudice.  The Court is aware that CFF has already filed

suit in the United States District Court for the District of Columbia against Assembly and AGM&M based

on the same relationships at issue here.  *See Cafesjian Family Foundation, Inc. v. Armenian Genocide*

*Museum and Memorial, Inc., et al.*, 1:07-cv-01746-RWR (D.D.C. filed Sep. 28, 2007). Moreover, AGM&M has filed its own District of Columbia suit against CFF also arising out of the same issues present here. *See Armenian Genocide Museum and Memorial, Inc. v. Cafesjian Family Foundation, Inc.*, 1:07-cv-1259-CKK (D.D.C. filed July 16, 2007). Cafesjian's ability to seek a remedy in another forum, therefore, is not foreclosed by this Court's recommendation that the action be dismissed without prejudice for nonjoinder.

## IV. CONCLUSION

Cafesjian and CFF bring this action seeking the return of money originally donated to the Assembly and later transferred to AGM&M. Because AGM&M holds the money the Plaintiffs seek, this action cannot go forward without it. AGM&M is not subject to personal jurisdiction in Minnesota. The Court, therefore, recommends dismissal of this action without prejudice for nonjoinder pursuant to Fed. R. Civ. P. 12(b)(7).

## V. RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

A.   Assembly's Motion to Dismiss based on lack of personal jurisdiction (Rule 12(b)(2)) and improper venue (Rule 12(b)(3)) (Doc. No. 14) be DENIED.

B.   Assembly's Motion to Dismiss based on failure to state a claim (Rule 12(b)(6)) and failure to join a party under Fed. R. Civ. P. 19 (Rule 12(b)(7)) (Doc. No. 11) be DENIED IN PART as to the portion of its motion based on Rule 12(b)(6) and GRANTED IN PART as to the portion of its motion based on Rule 12(b)(7).

C.      This action be DISMISSED WITHOUT PREJUDICE.

Dated this 23rd day of October 2007.

                                                s/ Jeanne J. Graham

                                        _____
                                        JEANNE J. GRAHAM
                                        United States Magistrate Judge


## NOTICE

        Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **November 5, 2007**. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit. Unless the parties stipulate that the District Court is not required, under 28 U.S.C. § 636, to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.

Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian, et al.,

       Plaintiffs,

v.                                       Civ. No. 07-2079 (JNE/JJG)
                                       ORDER

Armenian Assembly of America, Inc.,

       Defendant.

This case is before the Court on a Report and Recommendation issued by the Honorable Jeanne J. Graham, United States Magistrate Judge, on December 23, 2007. The Magistrate Judge recommended that Defendant's motions to dismiss be granted to the extent they are based on failure to join a necessary and indispensable party under Fed. R. Civ. P. 19 and denied to the extent they are based on other grounds. Plaintiffs objected to the recommendation, and Defendant has responded to their objections. The Court has conducted a de novo review of the record. *See* D. Minn. LR 72.2(b). Based on that review, the Court adopts the Report and Recommendation. Therefore, IT IS ORDERED THAT:

1.    Plaintiff's request for leave to file a motion for an evidentiary hearing [Docket No. 60] is DENIED.

2.    Defendant's Motion to Dismiss based on lack of personal jurisdiction and improper venue [Docket No. 14] is DENIED.

3.    Defendant's Motion to Dismiss based on failure to state a claim and failure to join a necessary and indispensable party [Docket No. 11] is DENIED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(6) and GRANTED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(7).

1

4.      This action is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 31, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

# Exhibit 7



**BRIGGS**

BRIGGS AND MORGAN

2200 IDS Center
80 South 8th Street
Minneapolis MN 55402-2157
tel 612.977.8400
fax 612.977.8650

# FAX COVER SHEET

### February 14, 2008

*Please deliver the following* _30_ *page(s)  (This includes this cover sheet)*

## RECIPIENTS

| Name | Firm | Phone Number | Fax Number |
|------|------|--------------|------------|
| Arnold Rosenfeld, Esq.<br>Naoka Carey | Kirkpatrick & Lockhart | 617-951-9125 | 617-261-3175 |
| Charles Lundberg<br>Dong Wook Kim | Bassford Remele | 612-333-3000 | 612-333-8829 |

**FROM**      **Molly M. Borg**
**PHONE**      612.977.8726

## INSTRUCTIONS OR COMMENTS

If you have problems receiving these pages, please contact us at 612-977-8520

CONFIDENTIAL FAX

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the
individual or entity named on the cover sheet. If the reader of this message is not the intended recipient, or the employee or agent responsible to
deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at
the address listed on the cover sheet via the U.S. Postal Service. Thank you.

2143957v1

**Briggs and Morgan, Professional Association**
Minneapolis I St. Paul I www.briggs.com
Member - Lex Mundi, a Global Association of Independent Law Firms



2200 IDS Center
80 South 8th Street
Minneapolis MN 55402-2157
tel 612.977.8400
fax 612.977.8650

February 14, 2008

**Molly M. Borg**
612.977.8726
mborg@briggs.com

## VIA FACSIMILE AND U.S. MAIL

Arnold R. Rosenfeld                    Charles E. Lundberg
Naoka E. Carey                         Dong Wook Kim
Kirkpatrick & Lockhart Preston Gates Ellis    Bassford Remele
LLP                                    33 South Sixth Street
State Street Financial Center          Suite 3800
One Lincoln Street                     Minneapolis, MN 55402-3707
Boston, MA 02111

Re:    *John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation*
       *and TomKat LP v. Armenian Genocide Museum & Memorial, Inc. and*
       *Armenian Assembly of America, Inc.*
       **Court File Number:  08-373 (DWF/AJB)**

Counsel:

Enclosed and served on you is the Amended Complaint for Declaratory Relief that was filed today via ECF in the above-entitled action.

Very truly yours,

*Molly M Borg*

Molly M. Borg

MMB/wf
Enclosures
cc:    T. Thornton

**Briggs and Morgan, Professional Association**
Minneapolis  |  St. Paul  |  www.briggs.com
Member - Lex Mundi, a Global Association of Independent Law Firms

2143397v1

02/14/2008  19:36     +                      BRIGGS MORGAN MPLS                    PAGE  03/30
Case 1:08-cv-00255-CKK   Document 13-9   Filed 04/18/2008   Page 4 of 31
Case 0:08-cv-00373-DWF-AJB   Document 2   Filed 02/14/2008   Page 1 of 24

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

John J. Waters, Jr., Gerard L. Cafesjian,
The Cafesjian Family Foundation and
TomKat LP,

Civil File No. 08-373 (DWF/AJB)

Plaintiffs,

v.

Armenian Genocide Museum & Memorial,
Inc. and Armenian Assembly of America,
Inc.,

**AMENDED COMPLAINT FOR
DECLARATORY RELIEF**

Defendants.

---

John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation ("CFF"), and TomKat LP ("TomKat") complain against the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") and Armenian Assembly of America ("Assembly") (collectively, "defendants") as follows:

## PARTIES

1.   Waters is a citizen of Minnesota.

2.   Cafesjian is a citizen of Florida.

3.   CFF is a Florida non-profit corporation with a principal place of business at 4001 Tamiami Trail, Suite 425, Naples, Florida, 34103. CFF conducts substantially all of its business operations, especially its dealings with and on behalf of AGM&M and the Assembly, at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

4.   TomKat is a South Dakota limited partnership.    TomKat performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis,

02/14/2008 19:36  +                          BRIGGS MORGAN MPLS                    PAGE  04/30

Case 1:08-cv-00255-CKK   Document 13-9   Filed 04/18/2008   Page 5 of 31
Case 0:08-cv-00373-DWF-AJB   Document 2   Filed 02/14/2008   Page 2 of 24

Minnesota 55402. TomKat, Inc., a South Dakota corporation, is the sole general partner of TomKat. TomKat, Inc. performs substantial business operations at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

5.     The Assembly is a District of Columbia non-profit corporation with a principal place of business at 1140 19th Street NW, Suite 600, Washington D.C., 20036.

6.     AGM&M is a District of Columbia non-profit corporation with a principal place of business at 1140 19th Street NW, Suite 600, Washington D.C., 20036. From its inception until 2006, the day to day affairs of AGM&M were conducted from 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse and the amount in controversy exceeds $75,000.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201: this is a declaratory judgment action arising out of an actual controversy among the parties.

9.     This Court has personal jurisdiction over each defendant because they have entered this state to bring claims against plaintiffs -- who include Minnesota residents. Further, the claims, contracts and conduct at issue necessarily implicate contacts with and conduct in Minnesota sufficient to subject defendants to the personal jurisdiction of this Court.

02/14/2008  19:36    +                    BRIGGS MORGAN MPLS                    PAGE  05/30

Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 6 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 3 of 24

10.    Venue is proper in this district under 28 U.S.C. § 1391: there is a genuine dispute regarding plaintiffs' actions or omissions, that substantially occurred in Minnesota.

## BACKGROUND

### A.    Waters, Cafesjian, CFF and TomKat

11.    Waters is an officer and director of CFF. He also serves as CFF's Secretary and Treasurer and Vice President. His principal duties include the supervision of the daily activities, personnel, programs, and investments of CFF.  Waters is the sole officer and director of TomKat, Inc., TomKat's general partner.  Waters performs nearly all of his CFF and TomKat duties from Minnesota.

12.    Cafesjian is a Florida resident who maintains a second residence in Minnesota. Before retiring to Florida, Cafesjian lived in Ramsey County and worked for West Publishing Company.  The donated monies that form the substantial basis for this dispute were derived from Cafesjian's employment with West. Cafesjian is President of CFF.

13.    CFF is a non-profit corporation that was established to engage in, assist with, and contribute to charitable, religious, scientific and educational activities and projects.  CFF is particularly dedicated to the support and promotion of the Armenian community.

14.    CFF conducts substantial business operations in Minneapolis.  Most CFF correspondence is directed to its Minnesota office.  Approximately seven people, who reside in Minnesota, perform work on behalf of CFF in Minnesota.

02/14/2008   19:36   +                         BRIGGS MORGAN MPLS                    PAGE   06/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 7 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 4 of 24

15.     TomKat conducts substantial business operations in Minneapolis. TomKat holds investment assets on behalf of the Cafesjian family.

**B.     The Assembly**

16.     The Assembly is a non-profit organization whose stated purpose is the strengthening of relations between the United States and Armenia and the promotion of Armenia's democratic development and economic prosperity. The Assembly solicits donations and other charitable contributions from around the country and drums up support among national, state and local governments, organizations, and constituents.

17.     The Assembly conducts substantial fundraising activities in Minnesota. The Assembly's contributing members reside in almost every state, including Minnesota. Currently there are at least eight Minnesota Assembly Trustees and approximately 100 Minnesota affiliate members. New members are solicited through the Assembly's website, and by telephone, U.S. Mail, and in person.

18.     Assembly activists include Cafesjian and Waters. Cafesjian and CFF have been significant financial supporters of the Assembly. Besides soliciting contributions, the Assembly has conducted extensive lobbying and public relations activities in Minnesota.

19.     Cafesjian has been a long time Assembly officer and board member. Waters has also served on the Assembly board for years. Both Cafesjian and Waters performed many of their Assembly board member duties from Minnesota.

20.     Two Minnesota residents, Aram Desteian and Lou Ann Matossian, have been the Minnesota state chairs for the Assembly's lobbying arm, the Armenian

2143075v2                                    4

02/14/2008  19:36    +                         BRIGGS MORGAN MPLS                    PAGE  07/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 8 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 5 of 24

American Action Committee. Desteian and Matossian promote Assembly causes by organizing and attending meetings, soliciting members and participating in phone calls and other Assembly activities. Desteian and Matossian do work for CFF and perform most of their Assembly duties from CFF's offices in Minnesota.

21.    The Assembly aggressively solicits support from Minnesota residents and has had extensive dealings with Cafesjian and CFF in Minnesota. Assembly representatives have traveled to Minnesota to meet with and influence Cafesjian, Waters, CFF, Minnesota lawmakers, and other Assembly members.

22.    The Assembly has frequently corresponded with Cafesjian and Waters and CFF's Minnesota office about donations and other events. These communications were by email, fax, mail, telephone, and other written and oral means. CFF has corporate records that confirm these communications, donations and dealings. Exchanges between the Assembly and CFF's Minnesota office were often on a daily basis.

23.    In a related transaction, the Assembly consented to jurisdiction in Minnesota for disputes relating to Cafesjian's charitable activities.

## C.    AGM&M

24.    AGM&M is a non-profit corporation that was incorporated on October 24, 2003. AGM&M was created to develop a museum and memorial dedicated to the Armenian Genocide.

25.    AGM&M is governed by a Board of Trustees ("Trustees"). Articles of Incorporation Art. VII (Exhibit A). The Trustees serve as the Board of Directors of

02/14/2008  19:36    +                          BRIGGS MORGAN MPLS                        PAGE  08/30
Case 1:08-cv-00255-CKK     Document 13-9     Filed 04/18/2008     Page 9 of 31
Case 0:08-cv-00373-DWF-AJB     Document 2     Filed 02/14/2008     Page 6 of 24

AGM&M for purposes of the District of Columbia Nonprofit Corporation Act. By-Laws § 2.2 (Exhibit B); Articles of Incorporation Art. VI.

26.     AGM&M has no members. By-Laws § 2.1; Articles of Incorporation Art. V.

27.     The Trustees are appointed by individuals and organizations that contribute or pledge $5,000,000 or more to AGM&M. By-Laws § 2.1; Grant Agreement § 5.2 (Exhibit D). Currently the Trustees exercise a total of six votes.

28.     Pursuant to the charter documents, the Grant Agreement, and by virtue of significant donations and pledges for the benefit of AGM&M, CFF is entitled to appoint Trustees and controls three of the six Trustee votes. By-Laws §§ 2.4, 2.5; Articles of Incorporation Art. IX; Grant Agreement § 5.2(G). CFF has pledged in excess of $17.5 million and has contributed in excess of $14.5 million and loaned $500,000, which has yet to be repaid, for the benefit of AGM&M.

29.     AGM&M's By-Laws provide that "[p]ersons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called." By-Laws § 2.6. To convene the Trustees, notice of the time and place of meetings must be provided. By-Laws § 2.14.

30.     The By-Laws further require that "all [AGM&M] questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present." *Id.* § 2.7.

31. Waters is currently the CFF-designated Trustee who exercises CFF's votes. From Minnesota, Waters participates in meetings, telephone calls and other AGM&M activities. He performs most of his AGM&M Trustee duties in Minnesota.

32. Waters was also the Secretary and Treasurer of AGM&M. In that capacity, Waters essentially functioned as the executive director of AGM&M, conducting its day to day affairs and administering its business and financial functions. He performed most of his AGM&M officer duties from Minnesota.

33. Cafesjian is the former chairman of AGM&M. Cafesjian performed many of his chairman duties from Minnesota.

34. From October 2003 through September 2006, AGM&M's corporate records were maintained and stored at AGM&M's business office located in Minnesota. During this period, the day to day activities of AGM&M were directed or completed from its business office located in Minneapolis, located at 15 South Fifth Street, Suite 900, Minneapolis, Minnesota 55402. For example, AGM&M mail, bills and other correspondence were forwarded to the Minneapolis office for processing and payment. The accounting and business needs of AGM&M were completed in Minnesota by Minnesota residents. This included accounts payable, tax and financial preparation, and banking. In fact, even before AGM&M was incorporated, accounting and budget work for the museum and memorial project were performed in Minnesota.

35. Virtually all AGM&M bank statements, insurance documents and accounts payable were sent to AGM&M's Minneapolis office and processed in Minnesota. For example, AGM&M insurance policies were negotiated and purchased from Minnesota by

02/14/2008  19:36      +                    BRIGGS MORGAN MPLS                        PAGE  10/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 11 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 8 of 24

Cafesjian's employees. AGM&M donations and other checks were forwarded to the Minneapolis office for deposit into AGM&M's bank account. Waters was a signatory on AGM&M checks. And, AGM&M expenses were forwarded to Minnesota for approval and disbursement.

36.    Mike Shapiro, Dennis Koland, Waters and other Minnesotans performing work for CFF provided this organizational and administrative support to AGM&M. CFF provided these services at no cost to AGM&M. The Assembly, Hirair Hovnanian and Anoush Mathevosian ("non-CFF trustees") never objected to the administrative and organizational support that CFF representatives provided to AGM&M in Minnesota.

## D.    The pursuit of a project to commemorate the Armenian Genocide

37.    In more amicable times, the Assembly and Cafesjian engaged in a series of charitable transactions to promote Armenian causes and remember the Armenian Genocide.

38.    The Assembly and Cafesjian first became acquainted in 1997 when Assembly Trustees Hirair Hovnanian and Robert Kaloosdian traveled from Washington D.C. to Minnesota. They met at Cafesjian's Minnesota home to induce him to support the Assembly and Armenian museum and memorial.

39.    Following this meeting, the Assembly, Cafesjian and CFF began planning the development of the project. They worked together to assess potential locations and financing strategies.

40.    In January 2000, the Assembly called Minnesota to advise Cafesjian and CFF about a potential museum site. The property was the former National Bank of

Washington. To secure the land, Cafesjian, through CFF, contributed $3,500,000 and loaned an additional $500,000; with these donations, the Assembly acquired the property. In the $500,000 promissory note, the Assembly consented to the jurisdiction of this Court. (Exhibit C.)

41.    After this parcel was acquired, the museum project was professionally studied. The parties realized that the bank building site alone would not be sufficient for a museum and memorial appropriate to recognize the atrocities the Armenian people endured. In order to acquire the real estate necessary for a proper development, TomKat purchased and contracted to purchase four parcels near the bank building. Most of TomKat's acquisition activities were orchestrated from Minnesota.

42.    To evidence a firm commitment to a museum and memorial honoring the Armenian Genocide, CFF entered into the Grant Agreement with the Assembly on November 1, 2003. (Exhibit D.) Pursuant to this Agreement, CFF agreed to make significant charitable contributions for the purpose of creating the AGM&M.

43.    CFF granted and pledged in excess of $15 million pursuant to the Grant Agreement. The bulk of the donations were expended to acquire the four properties that TomKat had secured.

44.    The property assembled for the museum and memorial could "only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees." (Exhibit D at § 3.1(A).)

45.    The Grant Agreement provides recourse in the event of Assembly non-performance. If the grant property is not developed by December 31, 2010, CFF is

02/14/2008  19:36    +                              BRIGGS MORGAN MPLS                      PAGE  12/30
Case 1:08-cv-00255-CKK     Document 13-9      Filed 04/18/2008     Page 13 of 31
Case 0:08-cv-00373-DWF-AJB     Document 2       Filed 02/14/2008     Page 10 of 24

entitled to terminate and at its "sole discretion" revert either the funds or property granted

pursuant to the agreement. Further, "if the Assembly fails to satisfy any of the conditions

of this Agreement, [CFF] is released from any remaining obligation under this

Agreement to provide funds or property to the Assembly." (Exhibit D at § 3.9(A).)

46.     The Grant Agreement provides that D.C. law applies but is conspicuously

silent regarding dispute resolution.

47.     After CFF was induced to enter into the Grant Agreement and the

AGM&M was created as a separate entity, the Assembly executed the Transfer

Agreement with AGM&M. (Exhibit E.) This agreement was executed "[i]n order to

complete the building of the Armenian Genocide Museum & Memorial." (*Id.* at 1.)

Pursuant to this agreement, the Assembly agreed to transfer to AGM&M "all of its rights,

title, and interest in and to all cash, pledges, real property . . . and other assets contributed

to the [Assembly] . . . for the development, renovation and construction of AGM&M."

(*Id.* § 1.1(A).)

48.     The Assembly and AGM&M are the only parties to the Transfer

Agreement. Waters, CFF, Cafesjian, and TomKat neither signed nor acquiesced to the

Transfer Agreement.

49.     The Transfer Agreement provides that "[t]his Agreement and the rights and

obligations of the parties hereunder are personal to the [Assembly] and AGM&M, Inc.

and are not assignable or transferable to any other person, firm or corporation without the

consent of the other party." (*Id.* § 5.4.)

10

50.    Plaintiffs never assumed any obligation under the Transfer Agreement. As specified by the contract, defendants never transferred or assigned any Transfer Agreement obligation to plaintiffs.

51.    The Transfer Agreement specifies that D.C. law governs and that "[a]ny disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C." (*Id.* § 5.3.)

52.    Neither the Grant Agreement nor the Transfer Agreement incorporates the other by reference.

**E.    The Arbitration Demand**

53.    On September 13, 2007, defendants submitted a demand for arbitration with the American Arbitration Association ("AAA"). (Exhibit F.) This arbitration demand, No. 16 180 Y 00681 07, accuses plaintiffs of breaching fiduciary duties, breaching the Grant Agreement, breaching their obligation of good faith and fair dealing and misappropriating trade secrets. *Id.*

54.    The underlying acts and omissions about which defendants complain arise out of and relate to plaintiffs' performance, conduct and contacts in Minnesota.

55.    Specifically, the arbitration demand asserts fourteen claims:

    (a)    Breach of Fiduciary Duty to AGM&M (Cafesjian and Waters);

    (b)    Breach of Fiduciary Duty to the Assembly (Cafesjian and Waters);

    (c)    Misappropriation of Trade Secrets (Cafesjian and Waters);

    (d)    Breach of Contract (Cafesjian and CFF to the Assembly);

    (e)    Breach of Contract (Waters/TomKat to AGM&M);

   (f) Breach of the Duty of Good Faith and Fair Dealing (TomKat and Waters to AGM&M);

   (g) Breach of the Duty of Good Faith and Fair Dealing (Cafesjian to the Assembly);

   (h) Violation of Conflict of Interest Provisions (Cafesjian and Waters);

   (i) Request for Declaratory Relief: Unenforceability of Reversion Provision in Grant Agreement;

   (j) Request for Declaratory Relief: Non-Application of Grant Agreement Reversion Provision to the "Second Grant" Properties;

   (k) Request for Declaratory Relief: Permanent Removal of CFF as Trustee of AGM&M;

   (l) Request for Declaratory Relief: Cafesjian and Waters Personally Liable for any Contracts or Obligations Incurred by AGM&M;

   (m) Request for Declaratory Relief: No Reversionary Rights Exist as to the Properties located at 619 14th Street, NW, and 1134-36, 1338, 1340 and 1342 G Street NW, Washington D.C.; and

   (n) Request for an accounting. (*Id.*)

56. The arbitration demand does not charge plaintiffs with breaching any term of the Transfer Agreement. Nevertheless, defendants alleged that the Transfer Agreement somehow compelled plaintiffs to arbitrate disputes with parties with which there is no agreement to arbitrate. By that ploy, defendants sought to deprive plaintiffs of their constitutional right to a trial by jury.

57. Plaintiffs objected to the demand for arbitration due to the lack of any agreement to arbitrate among the parties. On October 10, 2007, plaintiffs filed an action in this Court seeking declaratory and injunctive relief to enjoin the arbitration. The parties and the Court agreed to accelerated discovery and an expedited trial date. This action is currently pending before this Court in *Waters v. AGM&M*, 07-4212 (JNE/SRN). Despite that agreement, defendants have attempted to elude discovery and squelch disclosure.

58. Defendants have since withdrawn their arbitration demand. As alleged in the arbitration demand, however, genuine disputes regarding the propriety of plaintiffs' conduct in Minnesota, AGM&M's Minnesota operations, the scope of the parties' contractual obligations, and the validity of the parties' contracts remain. And despite withdrawing the September 7, 2007 arbitration demand, defendants arbitration strategy is capable of repetition at any time by the mere resubmission of a demand for arbitration. If that were not enough, defendants' counsel, on behalf of defendants, has threatened to make the exact same claims asserted in the arbitration demand in litigation venued in an inconvenient forum.

59. Plaintiffs have a real and immediate need for a judicial determination to resolve these live disputes.

## COUNT I

60. An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter

2143075v2                                    13

02/14/2008  19:36    +                              BRIGGS MORGAN MPLS                    PAGE  16/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 17 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 14 of 24

documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

61.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

62.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

63.    As alleged in Counts I and II of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not breached any fiduciary duty to AGM&M or the Assembly.

## COUNT II

64.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

65.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

66.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

67.    As alleged in Count III of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not misappropriated any of defendants' trade secrets.

## COUNT III

68.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

69.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

70.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

71.    As alleged in Count IV of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and CFF have not breached any contract with the Assembly.

## COUNT IV

72.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards

02/14/2008  19:36    +                           BRIGGS MORGAN MPLS                    PAGE  18/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 19 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 16 of 24

defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

73.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

74.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

75.    As alleged in Count V of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Waters and TomKat have not breached any contract with AGM&M.

## COUNT V

76.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

77.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

02/14/2008  19:36    +                           BRIGGS MORGAN MPLS                        PAGE   19/30
Case 1:08-cv-00255-CKK    Document 13-9    Filed 04/18/2008    Page 20 of 31
Case 0:08-cv-00373-DWF-AJB    Document 2    Filed 02/14/2008    Page 17 of 24

78.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

79.    As alleged in Count VI of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment Waters and TomKat have not breached any duty of good faith and fair dealing to AGM&M and in fact have no duty of good faith and fair dealing to AGM&M.

## COUNT VI

80.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

81.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

82.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

83.    As alleged in Count VII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that

2143075v2                                    17

Cafesjian has not breached any duty of good faith and fair dealing to the Assembly and in fact has no duty of good faith and fair dealing to the Assembly.

## COUNT VII

84.     An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

85.     This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

86.     Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

87.     As alleged in Count VIII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties.  Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that Cafesjian and Waters have not violated the Assembly's Conflict of Interest and Mailing List policies.

## COUNT VIII

88.     An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter

02/14/2008  19:36    +                                BRIGGS MORGAN MPLS                    PAGE  21/30
Case 1:08-cv-00255-CKK     Document 13-9     Filed 04/18/2008     Page 22 of 31
Case 0:08-cv-00373-DWF-AJB     Document 2     Filed 02/14/2008     Page 19 of 24

documents, the validity of these documents, and the operations and affairs of AGM&M and the Assembly.

89.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

90.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

91.    As alleged in Count XI of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that CFF is entitled to remain an AGM&M Trustee and, in fact, controls three Trustee votes.

**COUNT IX**

92.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

93.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

94.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

95.    As alleged in Count IX of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that the Grant Agreement and the reversionary provisions are valid and enforceable and the time for the Assembly to perform its obligations under the Grant Agreement should not be extended.

## COUNT X

96.    An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

97.    This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

98.    Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

99.    As alleged in Count XII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that plaintiffs are not individually liable for any contracts or other obligations entered into on behalf of AGM&M and are, in fact, entitled to indemnity from AGM&M and the

Assembly for any claim made against plaintiffs in their capacities as corporate trustees, directors, officers, agents or representatives.

## COUNT XI

100.  An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

101.  This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

102.  Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

103.  As alleged in Counts X and XIII of the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that the reversionary interest attached to the Grant Agreement properties is valid and enforceable, applies to all of the "Second Grant" properties (as referenced in the arbitration demand), and has, in fact, been accelerated by virtue of defendants' breaches of their obligations and purported banishment of plaintiffs from corporate governance and affairs.

## COUNT XII

104. An actual, justiciable and continuing dispute and controversy exists between plaintiffs and defendants regarding the propriety of plaintiffs' conduct towards defendants, the parties' rights and obligations under the contracts and corporate charter documents, the validity of these documents and the operations and affairs of AGM&M and the Assembly.

105. This Court is empowered and obligated to declare the rights and liabilities of the contracting parties and to give further relief as may be necessary to preserve the benefit of plaintiffs' bargain.

106. Declaratory relief from this Court would resolve these controversies and limit the uncertainties.

107. As alleged in the arbitration demand, a real, substantial and immediate controversy is presented regarding the rights, duties and liabilities of the parties. Pursuant to Rule 57 plaintiffs therefore request a declaratory judgment that neither the Assembly nor AGM&M has substantial damages by virtue of plaintiffs' conduct and that in fact plaintiffs have been damaged by defendants' conduct.

WHEREFORE, plaintiffs request the following relief:

1. A declaration, pursuant to Federal Rule of Civil Procedure 57, that:

    (a) Cafesjian and Waters have not breached any fiduciary duty to AGM&M or the Assembly;

    (b) Cafesjian and Waters have not misappropriated any of defendants' trade secrets;

(c)    Cafesjian and CFF have not breached any contract with the
Assembly;

(d)    Waters and TomKat have not breached any contract with AGM&M
and that no such contracts exist;

(e)    Waters and TomKat have not breached any duty of good faith and
fair dealing to AGM&M and that no such duties are owed;

(f)    Cafesjian has not breached any duty of good faith and fair dealing to
the Assembly and that no such duty is owed;

(g)    Cafesjian and Waters have not violated the Assembly's Conflict of
Interest and Mailing List policies;

(h)    CFF is entitled to remain an AGM&M Trustee and entitled to cast
those trustee votes;

(i)    The Grant Agreement and the reversionary provisions are valid and
enforceable and that the time for defendants to perform the obligations under the Grant
Agreement should not be extended;

(j)    Plaintiffs are not individually liable for any contracts or other
obligations entered into on behalf of AGM&M and that plaintiffs are entitled to
indemnification from AGM&M and the Assembly for claims made against plaintiffs in
their capacities as corporate trustees, directors, officers, agents or representatives;

(k)    The reversionary interest attached to the Grant Agreement properties
is valid and enforceable, applies to all of the "Second Grant" properties, and has been
accelerated;

(1)     Defendants have not been damaged by any of plaintiffs' alleged

conduct and that plaintiffs have been damaged.

2.      All other relief the Court deems just and equitable.

Dated: February 14, 2008            **BRIGGS AND MORGAN, P.A.**

By:  s/ Timothy R. Thornton
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
    2200 IDS Center
    80 South Eighth Street
    Minneapolis, MN  55402-2157
    (612) 977-8400

**ATTORNEYS FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation and TomKat LP, | Civil File No. 08-373 (DWF/AJB) |
| Plaintiffs, | |
| v. | **CERTIFICATE OF SERVICE** |
| Armenian Genocide Museum & Memorial, Inc. and Armenian Assembly of America, Inc., | |
| Defendants. | |

I, Molly M. Borg, certify that on February 14, 2008, I caused Plaintiffs' Amended

Complaint for Declaratory Relief to be filed electronically via ECF and that I caused a

copy of the same, along with the Notice of Electronic Filing, to be served on counsel for

defendants at via fax and mail, at:

> Arnold R. Rosenfeld and Naoka E. Carey
> Kirkpatrick & Lockhart Preston Gates Ellis LLP
> State Street Financial Center
> One Lincoln Street
> Boston, MA 02111
> Fax No. (617) 261-3175
>
> Charles E. Lundberg and Dong Wook Kim
> BASSFORD REMELE
> 33 South Sixth Street, Suite 3800
> Minneapolis, MN 55402-3707
> Fax: (612) 333-8829

Dated: February 14, 2008                **BRIGGS AND MORGAN, P.A.**


By:   s/ Molly M. Borg
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS**

## Complaints and Other Initiating Documents

<u>0:08-cv-00373-DWF-AJB Waters et al v. Armenian Genocide Museum & Memorial, Inc. et al</u>

CV

### U.S. District Court

### U.S. District Court Minnesota

### Notice of Electronic Filing

The following transaction was entered by Borg, Molly on 2/14/2008 at 7:20 PM CST and filed on 2/14/2008

**Case Name:**      Waters et al v. Armenian Genocide Museum & Memorial, Inc. et al
**Case Number:**   <u>0:08-cv-373</u>
**Filer:**              Gerard L. Cafesjian
                     John J Waters, Jr
                     TomKat LP
                     Cafesjian Family Foundation, The

**Document Number:** <u>2</u>

**Docket Text:**
**AMENDED COMPLAINT against Armenian Genocide Museum & Memorial, Inc., Armenian Assembly of America, Inc., filed by John J Waters, Jr, Gerard L. Cafesjian, Cafesjian Family Foundation, The, TomKat LP. (Attachments: # (1) Certificate of Service) (Borg, Molly)**

**0:08-cv-373 Notice has been electronically mailed to:**

Molly M Borg    mborg@briggs.com, bmcnabb@briggs.com

Timothy R Thornton    pvolk@briggs.com, eanderson@briggs.com, sknudson@briggs.com

**0:08-cv-373 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1051215216 [Date=2/14/2008] [FileNumber=1730368-0
] [346bbe8537b7c235139ee35b0561fa2e26558ed91c099d5b2ec171a1e9e7f47c48e
851e318424204aad12dd6d515b0d8a49da2c37e9dbddeae55e56e0663af62]]
**Document description:** Certificate of Service
**Original filename:** n/a
**Electronic document Stamp:**

STAMP dcecfStamp_ID=1051215216 [Date=2/14/2008] [FileNumber=1730368-1
 [307926e7599fe63f5bf3523a9d07d2298b3230765a0eda448ba32291bea56bc480f
 3a2e59c95000300a4ac63b29e23059884286043409d916bcf80a0d27888a1]]

# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| John J. Waters, Jr., Gerard L. Cafesjian, The Cafesjian Family Foundation, and TomKat LP,<br><br>Plaintiffs,<br><br>vs.<br><br>The Armenian Genocide Museum and Memorial, Inc. and the Armenian Assembly of America,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil File No. 08-373 (JNE)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) and 28 U.S.C. 2201(a)

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201(a), Defendants, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") and the Armenian Assembly of America ("the Assembly")  (collectively referred to as "Defendants"), hereby submit their Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs John J. Waters ("Waters"), Gerard L. Cafesjian ("Cafesjian"), The Cafesjian Family Foundation ("CFF"), and TomKat LP's ("TomKat") (hereinafter collectively "Plaintiffs") Amended Complaint for Declaratory Relief ("the Complaint").

## I.    INTRODUCTION

This particular Complaint for Declaratory Relief is part of a series of lawsuits brought by Plaintiffs seeking to halt or, in the alternative, delay, Defendants' progress in

building a museum and memorial to the victims and survivors of the Armenian Genocide.

Besides this case, there presently are four other pending matters,[1] including (1) a case

filed by Defendant AGM&M, pending in the U.S. District Court, District of Columbia

(Civ. File No. 1:07-cv-1259), seeking to remove an unauthorized and illegal cloud,

placed by the Plaintiff Waters, on the title of properties transferred to AGM&M; (2) a

case seeking declaratory and injunctive relief, filed by Plaintiffs in this Court (Civ. File

No. 1:07-cv-4212), to halt an arbitration proceeding initiated by Defendants which has

since been withdrawn ("second Minnesota action");[2] (3) a case filed by Plaintiffs CFF

and Waters, in U.S. District Court, District of Columbia (Civ. File No. 1:07-cv-01746),

alleging that the non-Plaintiff Trustees of the AGM&M acted improperly in moving

forward with the building of the museum; and (4) a case filed by Defendants in the U.S.

District Court, District of Columbia (Civ. File No. 1:08-cv-255), which case directly

addresses the underlying disputes between the parties which gave rise to this action.

---

[1] A fifth case initiated by Plaintiffs in April 2007, Civ. File No. 07-cv-2079, was dismissed by this Court on March 31, 2008 based on this Court's finding that the Court lacked personal jurisdiction over Defendant AGM&M.  See Order attached as Exhibit 8 to Affidavit of Arnold R. Rosenfeld ("Rosenfeld Aff.") filed herewith. Plaintiffs have filed an appeal of the dismissal to the 8th Circuit Court of Appeals.

[2] On February 12, 2008, Defendants voluntary withdrew their Arbitration Demand in order to expedite a resolution of their underlying claims against Plaintiffs on the merits. Defendants have filed two Motions to Dismiss Plaintiffs' second Minnesota action, asserting, inter alia, that this Court lacks personal jurisdiction over AGM&M and the Assembly, as well as subject matter jurisdiction over the case as a result of the withdrawal of the Arbitration Demand.  Those Motions are currently pending before the Court.

This action, the <u>fourth</u> proceeding brought by Plaintiffs against the Defendants in less than a year, exemplifies Plaintiffs' true agenda in these cases: to force Defendants to incur unnecessary expense while delaying the development of the museum long enough to ensure that Cafesjian receives an improper windfall from his prior charitable activities. Plaintiffs were aware at the time they filed this action that Defendants were in the process of bringing a lawsuit to resolve the underlying disputes between the parties, as Defendants had explicitly notified them of it.[3]  Upon learning that their efforts to delay a meaningful resolution of these disputes were in danger of being thwarted, Plaintiffs rushed to file this lawsuit, apparently hoping to avoid having the disputes resolved in the proper forum for these cases, the District of Columbia.  Plaintiffs filed this action despite their knowledge that a Magistrate Judge of this Court had already found that the District of Minnesota lacked jurisdiction over an indispensable party to this action, AGM&M, a decision which was subsequently affirmed by this Court.

As discussed below, Plaintiffs' unnecessary and vexatious Complaint must be dismissed, as the action is precluded by this Court's March 31, 2008 Judgment, which fully and finally resolved that the District of Minnesota cannot assert jurisdiction over AGM&M, and that there is no personal jurisdiction in Minnesota over AGM&M. Moreover, even if the Court could somehow assert jurisdiction over Defendants, this Court should exercise its discretion to decline jurisdiction under the Declaratory

---

[3] Defendants' lawsuit was made necessary by Plaintiffs' failure to engage in good faith settlement negotiations with Defendants and Plaintiffs' lack of interest in other alternative dispute mechanisms, namely arbitration.

Judgment Act, as the choice of forum of the Defendants, the "natural" Plaintiffs in this action, should control.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Assembly is a District of Columbia non-profit corporation with its principal place of business in the District of Columbia.  Compl. ¶ 5.  The Assembly has no offices or employees in Minnesota.   <u>See</u> Affidavit of Robert A. Kaloosdian (hereinafter "Kaloosdian Aff.") ¶ 4, attached as <u>Exhibit 1</u> to Rosenfeld Aff.

AGM&M is a District of Columbia non-profit corporation with its principal place of business located in the District of Columbia.  Compl. ¶ 6; <u>see also</u> Affidavit of Rouben Adalian (hereinafter "Adalian Aff.") ¶ 2, attached as <u>Exhibit 2</u> to Rosenfeld Aff.   The AGM&M has no offices or employees in Minnesota and maintains its corporate records in the District of Columbia.  <u>See</u> <u>id</u>.  AGM&M does not conduct business in Minnesota, has never been registered to do business in Minnesota, and has never established an office in Minnesota.  <u>Id.</u> ¶ 3.

### A.     <u>Inception and Formation of the AGM&M</u>

The museum project is the result of years of organizational effort by the Assembly.  Kaloosdian Aff. ¶¶ 4 - 8.  The former National Bank of Washington Building at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. ("the Bank site"), was identified by the Assembly as an appropriate site for the museum, <u>see</u> Compl. ¶ 40, and purchased in 2000 with donations from Anoush Mathevosian and Plaintiff Cafesjian (through his personal foundation CFF).  <u>Id.</u>, Kaloosdian Aff. ¶ 8.  As the Complaint confirms, the Assembly took the lead in developing the project initially, while Cafesjian

- 4 -

gradually became more involved in the project. See Kaloosdian Aff. ¶ 10; see also Compl. ¶ 38. Cafesjian eventually demanded that a new non-profit organization be created, the AGM&M, to which Cafesjian would provide funding and which he hoped to control. Kaloosdian Aff. ¶ 10.

In October 2003, the AGM&M was incorporated as a District of Columbia not-for-profit corporation. Compl. ¶ 24. The Articles of Incorporation, By-Laws and other organizing documents of AGM&M, including the Grant Agreement and the Transfer Agreement, which are described below, were drafted by District of Columbia attorneys at Caplin & Drysdale at Plaintiff Waters' direction and were not negotiated in Minnesota. See November 1, 2003 Email from Lloyd Meyer to John J. Waters, attached as Exhibit 3 to Rosenfeld Aff.

Cafesjian and Kaloosdian were appointed as Trustees on behalf of CFF and the Assembly respectively, two of the four named "Initial Donors" of the Corporation (the other two Initial Donors, Anoush Mathevosian and Hirair Hovnanian, are also Trustees). The initial officers of AGM&M were as follows: Cafesjian (President), Hovnanian (Vice-President), and Waters (Secretary and Treasurer).[4]

On November 1, 2003, at Cafesjian's insistence, the Assembly entered into a related series of Agreements designed to memorialize Cafesjian's donations and pledges to the museum project and his conditions associated with same. See Compl. ¶¶ 42-52.

---

[4] Under the AGM&M By-Laws, only Trustees can hold office as Secretary or Treasurer. At Cafesjian's insistence, Waters, a long time employee and agent of Cafesjian, was appointed as Secretary and Treasurer even though it was contrary to AGM&M's By-Laws. See By-Laws, Exhibit B to Compl.

The Agreements constituted a unified, single transaction, the purpose of which was to define the relationships between the parties, including the Assembly, AGM&M, Cafesjian and CFF.

The first Agreement ("the Grant Agreement") was executed on November 1, 2003, by and among the Assembly, Cafesjian and CFF. See Grant Agreement, Exhibit D to Compl. ("Grant Agmt."); Compl. ¶ 42. The parties agreed that the Grant Agreement would be governed and construed under District of Columbia law. See id. § 7.2, Compl. ¶ 46. The Grant Agreement was executed by Cafesjian, a Florida resident, individually and on behalf of CFF, a Florida entity. See id., Compl. ¶¶ 2,3, 12.

Under the terms of the Grant Agreement, there is a reversionary provision regarding certain "Grant Property" donated by CFF and Cafesjian. The reversionary clause is critical to understanding Plaintiffs' true purpose in these cases, which is to delay the development of the museum long enough to compel the return of all of the grant property to CFF or Cafesjian. The Grant Agreement provides as follows:

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.      in the event any portion of the Grants has not been funded, this Agreement terminates; and**
>
> **ii.      to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.**

- 6 -

See Grant Agmt. § 3.1(B).  This provision clearly put Cafesjian, who was in control of the operations of AGM&M for many years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees, while still enjoying the tax benefit of a "donation."  Moreover, as the AGM&M, and not Cafesjian or CFF, will have borne the taxes and other costs associated with the properties during the interim, and as the properties have appreciated in value during the intervening time period, if the time requirement is not met, CFF will receive a significant windfall at the direct expense of AGM&M.[5]

Under the Grant Agreement, the Assembly was *required* to execute a Transfer Agreement with the AGM&M for the purpose of transferring all of the donations and pledges it had received for the museum project to AGM&M.  Grant Agmt § 5.3. Accordingly, on November 1, 2003, the Assembly executed the Transfer Agreement with AGM&M.  Kaloosdian Aff. ¶ 14; Compl. ¶ 47.  The Transfer Agreement was signed <u>by Waters</u> on behalf of AGM&M and, per the Grant Agreement, required the Assembly to transfer all of the cash and pledges it had received to develop the museum to the AGM&M.  <u>See</u> Transfer Agreement, attached at <u>Exhibit E</u> to Compl.  Like the Grant Agreement, the Transfer Agreement provides that it will be governed by District of Columbia law.  Transfer Agmt. §5.3; Compl. ¶ 51.  The Transfer Agreement also

_____

[5] The only exception to the bearing of costs by the AGM&M is that CFF pays a mortgage payment of $150,000 per year on the 1340 G Street, N.W., property.

contains an arbitration clause which requires that "any disputes arising under [the Transfer Agreement] must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force." Id.

Upon information and belief, the Agreements and organizing documents of AGM&M were all signed at an Assembly event in California.

After the incorporation of the AGM&M and between 2003 and 2006, Cafesjian and Waters, in their capacities as President and Acting Secretary-Treasurer, respectively, took primary responsibility for managing AGM&M. Kaloosdian Aff. ¶ 16. Rouben Adalian acted as the project coordinator. Adalian Aff. ¶ 1. As Waters resided in Minnesota, he apparently unilaterally elected to conduct some of these activities from his home or from the offices of Cafesjian owned entities for his own convenience. Adalian Aff. ¶ 5-6. Per Plaintiffs' allegations, Cafesjian, a resident of Florida, CFF, a Florida corporation, and TomKat LP, a South Dakota limited partnership, also maintained office space in Minnesota, and carried out some business for AGM&M, for their own convenience, in Minnesota. See Compl. ¶¶12-15.

Other than Waters and Cafesjian, none of the other Trustees, officers, or employees of AGM&M conducted any day-to-day business for AGM&M in Minnesota. Adalian Aff. ¶ 4. No Trustee meetings or other corporate actions were taken in Minnesota, nor were authorizations requested or provided to Plaintiffs to conduct AGM&M business in or from Minnesota. Id. ¶ 5.

- 8 -

As reflected on the AGM&M's tax returns for 2003, 2004, and 2005, all of the officers and Trustees of AGM&M maintained business offices in the District of Columbia for their official capacities.  See id. ¶ 7, see also AGM&M Form 990s, Part V(A), attached as Exhibit 4 to Rosenfeld Aff.

On September 13, 2006, Cafesjian sent a letter to the other Trustees of AGM&M from his home in Florida, which letter stated that Cafesjian was resigning as President and Chairman of the Board of Trustees of AGM&M (but not as the CFF delegate to the Board of Trustees).  See Letter of Gerard Cafesjian dated September 13, 2006, attached as Exhibit 5 to Rosenfeld Aff.  In his letter, Cafesjian indicated that Waters also intended to resign as (acting) secretary and treasurer of AGM&M and to transfer all administrative functions to the Board of Trustees.  Id.  Waters subsequently, and without proper authorization from the AGM&M Board of Trustees, executed and recorded a "Memorandum of Agreement Reserving Rights" in the District of Columbia Registry of Deeds which created a cloud on all of the real property belonging to AGM&M. Kaloosdian Aff. ¶ 24.

### B.    Procedural History

On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Complaint, Cafesejian v. Armenian Assembly of America, Inc., 07-cv-2079 (hereinafter "07-cv-2079"), ¶ 3, attached as Exhibit 6 to Rosenfeld Aff.).  That Complaint sought, inter alia, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement. After offers by the other Trustees to compromise were summarily rejected by Cafesjian,

the Assembly moved to dismiss the action as Cafesjian had failed to name AGM&M as a necessary party, and jurisdiction over AGM&M was not permissible. The Motion to Dismiss was preliminarily granted pursuant to the Report and Recommendation of Magistrate Judge Jeanne J. Graham (see Report and Recommendation, Docket No. 48, 07-cv-2079, Exhibit 7 to Rosenfeld Aff, hereinafter "R&R"). The R&R was adopted by this Court on March 31, 2008 (see Order, Docket No. 63, 07-cv-2079, at ¶ 3, Exhibit 8 to Rosenfeld Aff., hereinafter "Order Adopting R&R"). The plaintiffs have filed a claim of appeal of that ruling in the 8th Circuit Court of Appeals.

On September 13, 2007, in accordance with the arbitration provision in the Transfer Agreement, Defendants filed an Arbitration Demand with the American Arbitration Association ("AAA"), seeking to resolve all the disputes that had arisen regarding Plaintiffs' involvement in the museum project and the donations and pledges for same. See Exhibit F to Compl. After a noticed hearing, in which Plaintiffs declined to participate, the AAA independently decided that the case could proceed to arbitration with an arbitrator.

On September 28, 2007, Plaintiff CFF filed a lawsuit in the United States District Court, District of Columbia (Civil File No. 1:07-cv-01746) against AGM&M and the non-CFF Trustees of AGM&M, alleging that the non-CFF Trustees had breached their fiduciary duty by proceeding with a plan to make the museum project a reality.

On October 10, 2007, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief in this Court, seeking to have the Arbitration proceedings halted. On November 16, 2007, Defendants filed a Motion to Dismiss the action on jurisdictional and

substantive grounds, or, in the alternative, seeking to Transfer the case to the District of Columbia, the site of three other pending actions (hereinafter "Motion to Dismiss or Transfer"). Although the Motion to Dismiss or Transfer was originally scheduled for hearing on January 9, 2008, it was subsequently rescheduled to February 1, 2008 at the Court's request, and was stayed at the request of the parties due to ongoing settlement negotiations in January, February, and March 2008.

On January 7, 2008, representatives of the parties and their counsel attended a mediation before the Hon. Magistrate Judge Alan Kay in the District of Columbia. It was agreed at the outset of the mediation that it would cover all pending matters in both the District of Columbia and Minnesota. Rosenfeld Aff. ¶ 2. Based on the representations made at the mediation, Defendants believed that a negotiated resolution of all of the pending disputes was possible. Rosenfeld Aff. ¶ 3. Accordingly, Defendants engaged in further settlement discussions with the Plaintiffs, executing a Settlement Protocol on January 15, 2008 and agreeing to defer a hearing on their Motion to Dismiss or Transfer until after February 6, 2008 in order to permit the parties to focus on settlement negotiations. Id.

Unfortunately, Defendants hopes for a global settlement of all matters proved premature, primarily because of Plaintiffs' failure to negotiate with Defendants in good faith. Indeed, it appeared that Plaintiffs were simply abusing the resources of the Court and the good will of the Defendants to further its goal of unduly delaying the proceedings in the hopes of triggering the Grant Agreement's reversionary clause. Accordingly, in the interests of resolving the underlying disputes between the parties as expeditiously as

possible and therefore ensuring that the museum project becomes a reality, Defendants elected to voluntarily withdraw their Arbitration Demand and proceed with an action on the underlying claims in the District Court for the District of Columbia.  Rosenfeld Aff. ¶ 4.

Prior to initiating the new Complaint, Defendants' counsel orally notified Plaintiffs' counsel prior to February 12, 2008, that if the settlement discussions were not successful, it was his clients intention to withdraw the Arbitration Demand and file a complaint with the same claims in the U.S. District Court for the District of Columbia. Rosenfeld Aff. ¶ 5.  Subsequently, Defendants' counsel notified Plaintiffs' counsel of their Withdrawal of the Demand and requested that Plaintiffs agree to a voluntary withdrawal of the second Minnesota action in order to avoid the time and expense of a hearing on a Motion to Dismiss.  Rosenfeld Aff. ¶ 6.   Defendants also filed their Complaint in the District of Columbia (Civil File No. 08-cv-255), attached at <u>Exhibit 9</u> to Rosenfeld Aff.  In response, Plaintiffs filed the instant action and also indicated that they would not withdraw the Minnesota injunctive action unless Defendants' agreed to pay for Plaintiffs' attorneys fees, further confirming that Plaintiffs have no interest in the efficient or timely resolution of the disputes between the parties.  Rosenfeld Aff. ¶ 6. Accordingly, Defendants filed a second Motion to Dismiss the second Minnesota action, seeking a formal determination by the Court that their motion for injunction of the arbitration is moot in light of the withdrawal of the Arbitration Demand and the filing of the Defendants' underlying claims in the District Court for the District of Columbia. Defendants also seek dismissal of this suit, which is precluded by this Court's prior ruling

finding that this Court lacks jurisdiction over AGM&M, as well as the existence of the pending proceeding in the District Court of the District of Columbia which addresses the very disputes on which Plaintiffs seek declaratory relief.

## III.    LEGAL ARGUMENT

Plaintiffs' Complaint should be dismissed as (1) Plaintiffs are collaterally estopped from asserting that there is personal jurisdiction over AGM&M in light of this Court's prior Judgment to the contrary; (2) even if the Court's prior Judgment did not have preclusive effect, there is no personal jurisdiction over Defendants; and (3) this Court should decline to exercise jurisdiction over this matter under the Declaratory Judgment Act ("DJA"), as (a) there is a pending proceeding in the District Court of the District of Columbia which directly addresses the controversies on which declaratory relief is sought, and (b) the District of Columbia is the proper venue for this dispute.

**A.    Plaintiffs Are Estopped From Relitigating the Issue of Jurisdiction in this Matter By this Court's March 31, 2008 Judgment in *Cafesjian et al. v. The Armenian Assembly of America* (Civil File No. 07-cv-2079)**

Plaintiffs are collaterally estopped from relitigating the issue of whether or not this Court has personal jurisdiction over AGM&M, as a prior judgment of this Court has already established that (1) this Court lacks personal jurisdiction over AGM&M, and (2) AGM&M is a necessary and indispensable party to litigation regarding the museum project and the museum properties.

Issue preclusion applies if the following criteria are met: "(1) the issue to be precluded is the same as that involved in the prior litigation; (2) the issue was actually litigated in the prior litigation; (3) the issue was determined by a valid, final judgment;

- 13 -

and (4) the determination was essential to the earlier judgment." Abbott Bank v. Armstrong, 44 F.3d 665, 666-67 (8th Cir. 1995). Courts have repeatedly applied the doctrine to judgments or decisions pertaining to personal jurisdiction, holding that a judgment that dismisses an action for lack of personal jurisdiction will preclude relitigation of the jurisdictional issue that led to the dismissal. See United States v. Euge, 691 F.2d 379, 382 (8th Cir. 1982); Zhang v. Equity Office Properties Trust, No. 06-2265 MJD/AJB, 2007 WL 26324, at *7 (D. Minn. Jan. 3, 2007); see also 18A Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE, § 4436 (2d ed. 2002); 18 James Wm. Moore, MOORE'S FEDERAL PRACTICE, §132.03[5][c] (3d ed. 2007).

Here, the issue of whether or not personal jurisdiction can be asserted over AGM&M in Minnesota has been fully and finally litigated in the first Minnesota action initiated by the Plaintiffs. In that action, this Court fully adopted the reasoning of the R&R, which recommended that the Court grant the Assembly's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join AGM&M as a necessary and indispensable party under Fed. R. Civ. P. 19. See R&R at 15-20. An essential and dispositive component of the magistrate judge's recommendation was that joinder was impossible because AGM&M was not subject to personal jurisdiction in the District of Minnesota. Id. at 17-19. Judge Graham conducted a detailed jurisdictional analysis, expressly rejecting Plaintiffs' argument that personal jurisdiction could be based on Plaintiffs' voluntary decision to work in Minnesota. Id. at 18. This Court conducted a *de novo* review and adopted Judge Graham's Report in full. See Order Adopting R&R ¶ 3. The jurisdictional issue was fully briefed in the prior proceedings, the Plaintiffs had an

opportunity to be heard at a hearing that addressed precisely this issue, and the ruling on the issue was essential to the prior judgment.

Plaintiffs' new Complaint, which alleges personal jurisdiction over AGM&M, would require re-litigation of the same issues that were decided by this Court in the prior action. Nevertheless, Plaintiffs now attempt to allege facts to demonstrate personal jurisdiction over the AGM&M so they can avoid another dismissal. Plaintiffs even repeat the same flawed argument that was previously rejected by this Court – that personal jurisdiction over the *Defendant*, AGM&M, can somehow be established through the *Plaintiffs'* unilateral activities in Minnesota. See Compl. ¶¶ 9, 32-33. The jurisdictional issue to be precluded is precisely "the same as that involved" in the prior action. Abbott Bank, 44 F.3d at 666. As the Court's determination that it lacked personal jurisdiction over AGM&M was essential to the earlier judgment, it cannot be re-litigated. See Matosantos, 245 F.2d at 1208. Inasmuch as no jurisdiction can be asserted over AGM&M, and AGM&M is a necessary and indispensable party to this action, the Amended Complaint must be dismissed as against all defendants. [6]

### B. The Complaint Must Be Dismissed as this Court Lacks Personal Jurisdiction Over Defendants

Even if this Court was not required to give preclusive effect to its prior Judgment, Plaintiffs' Complaint must be dismissed as the Court lacks personal jurisdiction over

---

[6] As this Court previously held, AGM&M is a necessary and indispensable party to this action because any relief awarded to the Plaintiffs in this action would substantially prejudice AGM&M, as its future ability to develop the museum, or to even function, would be jeopardized. See In re U.S. ex rel. Hall, 825 F.Supp. 1422, 1428-1429 (D.Minn. 1993).

Defendants.  Defendants' contacts with Minnesota, to the extent they exist at all, are insufficient to permit the assertion of personal jurisdiction, as the cause of action does not arise out of Defendants' contacts, and the contacts are not continuous and systematic enough to permit the assertion of "general" jurisdiction.  Moreover, Minnesota lacks a meaningful interest in providing a forum for this action, which involves only one Minnesota citizen and is duplicative of a proceeding already pending between the parties in the District of Columbia.  Finally, resolution of this case in Minnesota is neither convenient nor appropriate, as the true situs of the dispute is the District of Columbia.

### 1.    *Legal Standards for Personal Jurisdiction*

To satisfy the Due Process Clause, a plaintiff seeking to establish jurisdiction must show that a defendant has "minimum contacts" with a forum state such that maintaining jurisdiction there does not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 253 (1958).  Specific jurisdiction exists when the cause of action arises out of or is related to the defendant's contacts with the forum.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8-9 (1984).   General jurisdiction exists when a defendant has "continuous and systematic" contacts with the forum state.  Helicopteros, 466 U.S. at 415-16.

The Eighth Circuit Court of Appeals has established a five-factor test to determine whether the defendant's contacts with the forum state are sufficient to confer personal

jurisdiction, examining (1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Northwest Airlines, Inc. v. R&S Co. S.A., 176 F.Supp.2d 935, 940 (D. Minn. 2001). Of these factors, the first three are the most important. Id.

The party asserting personal jurisdiction has the burden of establishing a *prima facie* case that such jurisdiction exists. Epps v. Stewart Information Services Corp., 327 F.3d 642, 647 (8th Cir. 2003). "Mere conclusory statements [by the Plaintiff] devoid of a factual foundation do not suffice in this inquiry." Id. at 1073 (internal citations omitted). Where, as here, Defendants have raised a meritorious challenge to personal jurisdiction through affidavits and documentary evidence, Plaintiffs have the burden of proving the facts alleged in the Complaint. See Romak USA, Inc. v. Rich, 384 F.3d 979, 983 - 984 (8th Cir. 2004); see also Jet Charter Serv., Inc. v. W. Koeck, 907 F.2d 1110, 1112 (11th Cir. 1990) ("When a defendant raises through affidavits, documents or testimony a meritorious challenge to personal jurisdiction, the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents."). As Plaintiffs' Complaint is unverified and unsupported by Affidavit, there is currently no evidentiary proffer from Plaintiffs on the issue of jurisdiction.

**2.  *Plaintiffs' Allegations Fail to Establish that either AGM&M or the Assembly Have the Requisite Contacts with Minnesota to Confer Personal Jurisdiction***

The Complaint fails to set forth sufficient facts to permit this Court to assert personal jurisdiction over the AGM&M under the Due Process Clause, as the

Defendants' contacts with Minnesota are either non-existent or insufficient to confer jurisdiction, and the contacts alleged do not give rise to this action.

As a threshold matter, Plaintiffs' assertion that the Court has personal jurisdiction "over each defendant because they have entered this state to bring claims against plaintiffs – who include Minnesota residents," Compl. ¶ 9, is inaccurate, as only one of the Plaintiffs is a citizen of Minnesota. Compl. ¶¶ 1-4. This assertion also ignores the fact that Defendants have never initiated proceedings against any of the Plaintiffs in Minnesota, as the arbitration and other proceedings were commenced in the District of Columbia under applicable District of Columbia law.

Plaintiffs fail to proffer any allegations that show that Defendants have sufficient contacts with Minnesota to permit jurisdiction. The facts alleged in Plaintiffs' Complaint in support of jurisdiction over the AGM&M are limited to assertions regarding the voluntary activities of the Plaintiffs or their employees. See Compl. ¶¶ 31-36. Plaintiffs offer no factual allegations to demonstrate that AGM&M had any contacts with Minnesota independent of Plaintiffs' own voluntary and unilateral actions, let alone any documentation or other evidence to support such an assertion.[7] As noted above, the AGM&M is a District of Columbia not-for-profit corporations with its principal place of

---

[7] Plaintiffs have already engaged in discovery on the issue of personal jurisdiction through the second Minnesota action, in which Defendants responded to written discovery propounded by Plaintiffs regarding precisely this issue, producing over 10,000 pages of documents. Plaintiffs' assertion that Defendants have attempted to "elude discovery and squelch disclosure," Compl. ¶ 57, is false and highly misleading to this Court.

business in the District of Columbia.  See Compl. ¶ 6.  AGM&M has no offices or employees in Minnesota and does not conduct business there.  Adalian Aff. ¶ 2-3.

Plaintiffs concede that their entire jurisdictional argument revolves around, not the AGM&M's contacts with Minnesota, as required by the Due Process Clause, but their own contacts, stating that "the underlying acts and omissions about which defendants complain arise out of and relate to plaintiffs' performance, conduct and contacts in Minnesota." Compl. ¶ 54 (emphasis supplied).  This statement disregards the law of personal jurisdiction, which requires the Court to examine the defendants' contacts with Minnesota.  See Northwest Airlines, 176 F.Supp.2d at 940.  Plaintiffs have not alleged and cannot show that AGM&M as an entity has been a primary participant in the alleged Minnesota contacts, or that AGM&M purposefully directed those activities.  See Bell v. Fischer, 887 F.Supp. 1269, 1280 (N.D.Iowa,1995) ("The due process clause forecloses personal jurisdiction unless the actions of the 'defendant himself ... create[d] a substantial connection with the forum State.'" citing Dakota Indus. Inc. v. Dakota Sportswear Inc., 946 F.2d 1384, 1391 (8th Cir. 1991)); see also Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1361 (8th Cir. 1998) ("Contacts resulting from the unilateral activity of another party or third person are not attributable to a defendant.").  Plaintiffs offer no evidence that AGM&M purposefully directed any activity toward Minnesota, let alone enough to confer personal jurisdiction.

Common sense dictates that Plaintiffs' reliance on their own actions on behalf of one of the Defendants is forum shopping in its worst light.  Indeed, Magistrate Judge

- 19 -

Graham rejected precisely this kind of bootstrapping argument in the R&R, subsequently adopted by this Court, in which she found as follows:

> **Waters' performance of some of AGM&M's work from his Minnesota home does not confer general personal jurisdiction. An agent's decision to work from home in the forum state generally does not bind an entity to personal jurisdiction in that state where the purpose of the arrangement is merely for the agent's personal convenience.**

R&R at 18, <u>citing</u> <u>Lucachick v. NDS Americas, Inc.</u>, 169 F. Supp. 2d 1103, 1107 (D.Minn. 2001); <u>Adams v. Riverview Healthcare Ass'n</u>, No. A3-02-135, 2003 WL 1456442, *3 (D.N.D. March 17, 2003). Plaintiffs have not asserted and cannot show that Plaintiffs' performance of some work in Minnesota was dictated by anything other than their own personal convenience.

The allegations regarding the Assembly's alleged contacts with Minnesota, while slightly more substantial than the non-existent facts regarding AGM&M, are also insufficient as a matter of law to support the assertion of personal jurisdiction. The alleged contacts by the Assembly, which pertain to the fundraising and advocacy activities of the Assembly in Minnesota, do not give rise to this dispute, and are not continuous and substantial enough to confer general jurisdiction.

Plaintiffs' cause of action does not arise out of the Defendants alleged contacts with Minnesota. The organizing documents of AGM&M, as well as the Grant Agreement and the Transfer Agreement, were prepared in the District of Columbia by District of Columbia attorneys and are governed by District of Columbia law. <u>See</u> Exhibits A, B, D, and E to Compl., Exhibit 3 to Rosenfeld Aff. The Agreements were

not executed in Minnesota, and pertain to property and organizations which are located exclusively in the District of Columbia.  Plaintiffs do not allege that the Defendants have committed any act in Minnesota causing injury or property damage in Minnesota, or that they have committed any act outside of Minnesota causing injury or property damage in Minnesota.  See Compl. ¶¶ 7-24.

In short, Plaintiffs have not provided a sufficient factual foundation to support their assertion that these disputes arise out of or relate to any AGM&M or Assembly contacts with Minnesota such that there is specific personal jurisdiction in this case.  See Independent School Dist. No. 454 v. Marshall & Stevens Co., 337 F.Supp. 1278, 1287-1288 (D. Minn. 1971) (holding that "in order to exercise personal jurisdiction over a nonresident defendant, an action for breach of contract requires more contact with the forum State than does an action in tort" and finding no personal jurisdiction where parties (one of whom was a resident of Minnesota) had contract, but contract was not executed in Minnesota).  Accordingly, jurisdiction may only be asserted if Plaintiffs can demonstrate that Defendants' contacts with Minnesota are numerous and substantial enough to permit an exercise of general jurisdiction.

In order to establish general jurisdiction, "a much higher level of contacts is required; therefore, the exercise of general jurisdiction is typically limited to large companies doing a large amount of business [in the state] on a regular basis." Adams, 2003 WL 1456442, *2.  Any contacts by Defendants with Minnesota must be "voluntary, affirmative, economic activity of substance." Lucachick, 169 F.Supp.2d at 1108.  In other

words, there must be such extensive contact with the forum state that a defendant can reasonably foresee being sued there by any person and at any time.  Id.

Plaintiffs have not alleged or shown that either AGM&M or the Assembly has continuous and systematic contacts with Minnesota that are sufficient to confer general personal jurisdiction over this case.  See Lucachick, id.; Adams, 2003 WL 1456442, * 2. This is true even if one considers the fundraising and advocacy activities of the Assembly as alleged by Plaintiffs, as Plaintiffs have failed to assert any specific information regarding the quantity or quality of the alleged contacts, a necessary prerequisite to demonstrating that the activities are sufficiently substantive to warrant the assertion of general jurisdiction.  The Assembly has no offices or employees in the state of Minnesota and is also not qualified to do business there.  Kaloosdian Aff. ¶ 3.  While Plaintiffs allege that the Assembly conducts some fundraising and advocacy activities in Minnesota, Plaintiffs have not alleged sufficient facts to demonstrate that these activities are substantial and continuous enough to subject the Assembly to suit in Minnesota at any time, and for any reason.[8]

---

[8] Even assuming, *arguendo*, that jurisdiction can be asserted over the Assembly based on the Assembly's fundraising or other conduct in Minnesota, the case will still need to be dismissed, as the AGM&M is a necessary and indispensable party to this action.  See, supra, note 5.

### 3. Plaintiffs Have Failed to Show that Minnesota Has an Interest in Providing a Forum for this Dispute, or that Minnesota is an Appropriate or Convenient Forum in Which to Resolve This Dispute

The Complaint also fails to meet the last two factors set forth in <u>Northwest Airlines</u>, as Plaintiffs have not shown either that Minnesota has a substantial interest in providing a forum for its residents or that Minnesota is a convenient forum in which to resolve the dispute. Only one of the Plaintiffs, John Waters, is a citizen of Minnesota. Moreover, there is another forum to resolve the disputes, as there is an action pending in the District Court for the District of Columbia which will fully resolve the disputes which Plaintiffs seek to resolve in this declaratory judgment action. In light of Plaintiffs' filing of their own lawsuit in the District of Columbia, Plaintiffs cannot possibly assert that the District of Columbia is an inconvenient forum in which to litigate. Finally, the convenience of the parties weighs heavily against resolving this case in Minnesota, as the locus of the disputes is the District of Columbia and the majority of the records of both the AGM&M and the Assembly are located in the District of Columbia. The Defendants, both of whom are charitable, non-profit organizations, should not be compelled to bear the burden and expense of litigation in a remote jurisdiction simply because one of their major donors would prefer to litigate in the state where he has a summer house.

As Plaintiffs have failed to allege and cannot show that personal jurisdiction by the Minnesota District Court over the Defendants is proper, the Complaint should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

C.    **This Court Should Exercise its Discretion to Decline Jurisdiction under the Declaratory Judgment Act, In Light of the Existence of a Pending Lawsuit between the Parties in the District of Columbia Which Addresses the Same Underlying Disputes**

Even if this Court determines that it can assert jurisdiction over Defendants, the Court should exercise its discretion to decline jurisdiction under the Declaratory Judgment Act (DJA), as (1) Defendants are the natural Plaintiffs in this action, and therefore Defendants' choice of forum should control; and (2) Plaintiffs' blatant forum shopping and bad faith "race to the courthouse" weighs heavily against the exercise of jurisdiction.

Under the DJA, District Courts have discretion to decide whether to entertain declaratory judgment actions. Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) (quoting 28 U.S.C. § 2201(a)) (emphasis added). See also BASF Corp. v. Symington, 50 F.3d 555, 557 (8th Cir. 1995). Accordingly, a Court may decline to exercise jurisdiction if a declaratory judgment "will serve no useful purpose" or if "considerations of practicality and wise judicial administration" counsel against jurisdiction. Wilton, 515 U.S. at 288.

In this case, Defendants are the "natural" Plaintiffs, as the underlying claims asserted are against Plaintiffs, not Defendants. BASF, 50 F.3d at 557. "*Forum non conveniens* case law states that the natural plaintiff's choice of forum is controlling unless 'exceptional circumstances' exist." Id. No such exceptional circumstances exist in this case. Rather, in a good-faith attempt to settle this part of the litigation and satisfy Plaintiffs' demand for a judicial forum and jury trial, Defendants' counsel notified

Plaintiffs' counsel prior to February 12, 2008 that the arbitration demand would be withdrawn, and that the same claims would be asserted in a civil action filed in the District of Columbia. See Rosenfeld Aff. ¶ 5. Defendants followed through on this plan, notifying Plaintiffs promptly upon the withdrawal of the Demand and filing a Complaint several days later. See Rosenfeld Aff. ¶¶ 6-7. Indeed, Plaintiffs concede that they were aware of Defendant's imminent filing when the instant action was filed, but nevertheless chose to pursue litigation in Minnesota. Compl. ¶ 58.

Here Plaintiffs have engaged in brazen forum shopping, racing to the courthouse despite their knowledge of Defendants' imminent filing of a Complaint in the District of Columbia to address precisely the underlying disputes at issue here. It is in precisely such circumstances that Courts may take a "'closer look' to ensure that the plaintiff seeking declaratory relief is not motivated by forum-shopping concerns." BASF Corp., 50 F.3d at 558. If, as in this case, it is undisputed that forum shopping precipitated the suit for declaratory relief, the case must be dismissed. Id. ("A suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiffs will normally be dismissed.")

The fact that Plaintiffs' Complaint is "first-filed" by days is irrelevant where, as here, forum shopping concerns governed the filing of the Complaint. Courts have identified two "red flags" that signal when a first-filed action is improper: (1) when the plaintiff is on notice that the defendant is considering filing suit against him; and (2) when the first-filed suit is for declaratory relief rather than damages or equitable relief. Anheuser-Busch, Inc. v. Supreme Int'l Corp., 167 F.3d 417, 419 (8th Cir. 1999)

- 25 -

(affirming district court's dismissal of first-filed complaint where both "red flags" were present); ABC Teacher's Outlet, Inc. v. School Specialty, Inc., No. 07-159 (DWF/SRN), 2007 WL 2122660, at *3 (D. Minn. July 17, 2007) (transferring Minnesota action due to "red flags" of declaratory nature of first-filed action, and prior notice of intent to bring suit in Wisconsin). Both "red flags" are undisputedly present in this case, as well as other factors which weigh in favor of dismissing the action. Any delay by the defendants in filing the District of Columbia action was caused by efforts to resolve the dispute over the arbitration demand. See Rosenfeld Aff. ¶ 8; ABC Teacher's Outlet, 2007 WL 2122660, at *3 (delay in filing second action was attributable to party's efforts to settle dispute out of court). In addition, there was no doubt that defendants were planning to proceed with the civil action in the District of Columbia. Id.; Compl. ¶58. Courts will not "penalize the true plaintiff for filing second when it did so as a result of providing notice of its intent to sue and in an effort to avoid litigation." ABC Teacher's Outlet, 2007 WL 2122660, at *4. Furthermore, the short period of time between notification of the Defendants' imminent Complaint by the Defendants and the filing of this action confirms that Plaintiffs "raced to the courthouse to usurp [the Defendants'] forum choice." Anheuser-Busch, 167 F.3d at 419. Finally, for reasons discussed above, Minnesota is an inconvenient forum for this litigation.[9] For the foregoing reasons, the

---

[9] Another factor weighing in favor of allowing this case to proceed in the District of Columbia is Plaintiffs' own inconsistent positions in their Complaint. Plaintiffs claim that the arbitration demand was a "ploy" by which "defendants sought to deprive plaintiffs of their constitutional right to a trial by jury." See Compl. ¶ 56. Yet the

Court should dismiss this action and allow the dispute to be resolve through the pending District of Columbia proceedings.

## IV.  CONCLUSION

For the reasons set forth herein, the Defendants respectfully request that the Court dismiss the instant action pursuant to Fed .R. Civ. P. 12(b)(2) and/or 28 U.S.C. 2201(a).

**Bassford Remele,**
*A Professional Association*

Dated:  April 7, 2008

s/  DongWook Kim
Charles E. Lundberg (License #6502X)
DongWook Kim (License #0386811)
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota  55402-3707
Tel: (612) 333-3000
Email: chuckl@bassford.com
        dongwookk@bassford.com
And

Kirkpatrick & Lockhart Preston Gates Ellis LLP

Arnold R. Rosenfeld (Mass. #428860)
Naoka E. Carey (Mass. #655312)
State Street Financial Center
One Lincoln Street
Boston, MA  02111
Tel: (617) 951-9125
Email: arnie.rosenfeld@klgates.com
        naoka.carey@klgates.com

Attorneys for Defendants, The Armenian Genocide Museum and Memorial, Inc. and the Armenian Assembly of America

---

plaintiffs are now attempting to use this declaratory judgment action to preempt the civil action in the District of Columbia, which includes a jury demand.

- 27 -

# Exhibit 9

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc., | Civil File No. 07-2079 (JNE/JJG) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** |
| The Armenian Assembly of America, Inc., | |
| Defendant. | |

**INTRODUCTION**

Pursuant to Local Rule 72.2, Plaintiffs Gerard L. Cafesjian and the Cafesjian Family Foundation ("CFF") object to the October 23, 2007 Report and Recommendation ("R&R") of Magistrate Judge Jeanne Graham. Specifically, the R&R recommended dismissal pursuant to Fed. R. Civ. P. 19 for failure to join the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") as a necessary and indispensable party. R&R at 15-20. This conclusion is unsupported by the evidence and contrary to law.

**BACKGROUND**

A.    **This Lawsuit**

This dispute arises out of contractual obligations between the parties and the significant donations that Cafesjian and CFF made to the Armenian Assembly of America, Inc. ("Assembly").[1] Together, the parties had hoped to create and develop a

---

[1]    The facts of this case are detailed in Plaintiffs' Memorandum of Law in Opposition to Defendant's Motions to Dismiss. *See* Clerk Doc. No. 30.

museum and memorial for the benefit and commemoration of the Armenian people in Washington D.C.  To acquire the initial site for the project, Cafesjian donated $3.5 million and loaned an additional $500,000 – interest free – to the Assembly.  To memorialize the debt, the Assembly issued a promissory note to CFF and Cafesjian.

The parties' vision for a museum and memorial soon outgrew the boundaries of the single parcel, and development at that location was complicated by National Historic Register restrictions.  Cafesjian and CFF therefore committed to making other grants to acquire more real estate.  To that end, the parties executed the Grant Agreement.  (*See* Compl. Ex. B.)  This agreement conditions Cafesjian and CFF's performance on Assembly contractual compliance and provides recourse in the event of Assembly breach.

Specifically, "if the Assembly fails to satisfy any of the conditions of this Agreement, [CFF and Cafesjian are] released from any remaining obligation under this Agreement to provide funds or property to the Assembly." (*Id.* §3.9.)  Furthermore, if the grant property is not developed by December 31, 2010 pursuant to a plan approved by the AGM&M board of trustees, then CFF and Cafesjian are entitled to terminate the Grant Agreement and revert either the donated funds or the property purchased with these contributions. (*Id.* §3.1.)  Finally, the Grant Agreement conditioned Cafesjian and CFF's obligations upon the Assembly making a new note to evidence the $500,000 loan. (*Id.* §5.4.)  There is no dispute that the replacement note was never issued, and the original note was never repaid.

Because all concerned realized the Assembly was ill-suited to undertake a project of this nature, the Grant Agreement called for the creation of a separate entity, the

AGM&M, to establish and develop the museum and memorial. After securing Cafesjian and CFF's pledge – $16.85 million in total – the Assembly executed the Transfer Agreement with AGM&M. Pursuant to that agreement, the Assembly would transfer the real property, pledges, cash and other assets acquired for the benefit of the museum and memorial project to AGM&M. Neither Cafesjian nor CFF are parties to the Transfer Agreement or any other contract with AGM&M.

### B.     The R&R

The R&R recommends dismissal without prejudice pursuant to Rule 19. The Magistrate Judge reasoned that AGM&M is a necessary party because "property or money directly implicated by the litigated contract" was in AGM&M's possession and that joinder would not be feasible because personal jurisdiction over AGM&M is lacking. R&R at 17. The R&R went on to conclude that AGM&M was an indispensable party and that this litigation could not proceed in AGM&M's absence. *Id.* at 19-20.

## ARGUMENT

## I.     STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation, "[t]he district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b). The district judge must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made." *Id.*; *see also* D. Minn. L.R. 72.2(b). This Court should modify the R&R because AGM&M is not a necessary or indispensable party under Fed.

R. Civ. P. 19. And regardless, AGM&M can be joined because this Court has both subject matter and personal jurisdiction.

## II. AGM&M IS NOT A NECESSARY PARTY

A party is "necessary" if "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) a person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a). Magistrate Judge Graham failed to conduct a comprehensive Rule 19(a) analysis and instead surmised that because AGM&M may possess property or funds which were the subject of the Grant Agreement, complete relief could not be accorded in AGM&M's absence.

### A. Rule 19(a)(1)

AGM&M's non-joinder from this litigation would not prevent this Court from granting complete relief between the Cafesjian interests and the Assembly. Rule 19(a)(1) is only concerned with entities that are already parties to the lawsuit. Fed. R. Civ. P. 19(a)(1) (a party is necessary only if in that party's absence "complete relief cannot be accorded *among those already parties*") (emphasis added). Plaintiffs' claims against the Assembly are exclusively based on the specific contractual obligations between the two parties. Lacking privity, plaintiffs have not and could not assert a contractual cause of action against AGM&M for the Assembly's breach.

If plaintiffs prevail against the Assembly, the Assembly could only be required to pay monies owed or return real estate that can be conveyed. The Assembly could not be compelled to revert property over which the Assembly cannot exercise control. And the relief award by definition would not encompass assets that the Assembly could not deliver.[2] Although there could be further litigation or arbitration between the Assembly and AGM&M regarding possession of the Grant properties, Rule 19(a)(1) focuses only on the relief accorded among actual parties to the litigation. *See LLC Corp. v. Pension Benefits Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983) (Rule 19(a) focuses on the "relief between the parties and not on the speculative possibility of further litigation between a party and an absent person"); *see also Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377 (2d Cir. 2006). AGM&M is not a necessary party under Rule 19(a)(1).

### B.    Rule 19(a)(2)

AGM&M's interests will not be impaired by being absent from this lawsuit. *See* Fed. R. Civ. P. 19(a)(2)(i). "It is not enough under Rule 19(a)(2)(i) for a third party to have an interest, even a very strong interest, in the litigation. Nor it is enough for a third party to be adversely affected by the outcome of the litigation." *Mastercard Int'l Inc.*, 471 F.3d at 387. The harm the non-party suffers must be caused not by the pendency of the lawsuit but rather by the non-party's absence from the lawsuit. *Id.* Any purported

---

[2]    The Assembly has over $21 million in assets and an endowment fund in excess of $20 million. (*See* Waters Aff. Ex. A at 18-21.)

harm that AGM&M might suffer would be the result of the Assembly's failure to perform contractual obligations – <u>not</u> AGM&M's absence from this litigation.  Simply "because the outcome of this case may impact a separate contract involving a different party" does not make AGM&M a necessary party.  *See id.*; *see Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center*, 564 F.2d 816, 820 (8th Cir. 1977).

Proceeding without AGM&M would not impair or impede AGM&M from protecting its interests.  AGM&M's rights vis-à-vis the Assembly are defined by the Transfer Agreement.  These rights are derivative of the Assembly's obligations to the Cafesjian interests and thus closely aligned with the Assembly's interests.  AGM&M would not make arguments different from the Assembly to defend against plaintiffs' claims.

In fact, because of this alignment, AGM&M and the Assembly have joined forces by demanding arbitration in a related litigation against the Cafesjian interests.  *See*, *e.g.*, *Waters et al. v. AGM&M et al.*, Civil File No. 07-4212 JNE/SRN(D. Minn.).  The assertions and relief sought in the arbitration petition – as well as their chosen counsel – are identical for both entities.  Hence, the Assembly is already protecting the mutual interests of both parties.  *See Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir. 1984) (absent party's ability to protect its interests was not impaired in a medicare dispute between hospital and insurance company because absent party's interest paralleled hospital's interest).

The Assembly would not be subject to inconsistent obligations without AGM&M's joinder.  The critical Rule 19(a)(2)(ii) concern is the substantial risk of

inconsistent obligations caused <u>by the nonparty's absence</u>. Fed. R. Civ. P. 19(a)(2)(ii). The Assembly's purported risk of multiple obligations – to the Cafesjian interests and to AGM&M – is not the result of AGM&M's absence from the lawsuit. Rather, any peril in which the Assembly finds itself is the result of contractual non-compliance. AGM&M's presence in this lawsuit would not remedy the Assembly's undisputed failure to issue a replacement note.

Regardless of whether AGM&M is present in this lawsuit, AGM&M and the Assembly can litigate <u>their</u> dispute pursuant to <u>their</u> contract – an agreement to which neither CFF nor Cafesjian are parties – in the event the relief ultimately afforded implicates the Grant properties. AGM&M would not be able to relitigate a finding that the Assembly breached the Grant Agreement – that issue has nothing to do with AGM&M.

The R&R relies on *In re U.S. ex rel. Hall* to justify dismissal. 825 F. Supp. 1422, 1429-30 (D. Minn. 1993). The facts of *Hall* are clearly distinguishable. The *Hall* plaintiffs – non-parties to the contracts at issue – filed suit to challenge contracts between Indian tribes and outside merchants and vendors. *Id.* at 1424. The contracts were said to be void for failure to comply with federal law. *Id.* at 1424-25. "Because the absent Indian tribes [were] <u>parties to the challenged contracts,</u> their interest in the validity of the contracts would be directly affected by the judgment the plaintiffs seek." *Id.* at 1428 (emphasis added). Hence it was Indian tribes' status as parties to the contract being litigated that made the tribes necessary parties under Rule 19(a)(i). If there had been no

contractual privity the non-joinder of the tribes would not have had Rule 19(a) ramifications. This distinction renders *Hall* inapposite.

Reliance on *Denkmann Assoc. v. Int'l Paper Co.*, 132 F.R.D. 168 (M.D. La. 1990) is equally misplaced. In *Denkmann*, the original signatories assigned their contractual rights to other parties. The suit, between two assignees to the contract, accused a subsequent assignee of breach but did not name that assignee as a party. The nonparty assignee was deemed to be a necessary party. Unlike *Denkmann*, CFF's claims are against the Assembly for the Assembly's breach of the Grant Agreement. *Denkmann* is neither controlling nor probative.

AGM&M is neither a party to nor accused of breaching the Grant Agreement – the contract that is the subject matter of this litigation. Because AGM&M is not a necessary party under Rule 19(a), no further inquiry is required. *See Rochester Methodist Hosp.*, 728 F.2d at 1016.

### C. AGM&M is Subject to the Court's Jurisdiction

Even if AGM&M were a necessary party, this Court has personal jurisdiction. Due process allows jurisdiction to be exercised whenever a defendant has sufficient minimum contacts with the forum state so as not to offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). "Sufficient contacts exist when the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (quotation and citation omitted). A party must reasonably anticipate being haled into the forum state when there

is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  Plaintiffs need only establish a prima facie case of jurisdiction.  *Digi-Tel Holdings, Inc.*, 89 F.3d at 522.

As a threshold matter, this exact issue is before the Court in a related matter, *Waters et al. v. AGM&M et al.*, 07-4212(JNE/SRN).  That case is scheduled for an evidentiary hearing.  A front and center issue in that proceeding will be personal jurisdiction over AGM&M.  The evidence presented will demonstrate that the exercise of personal jurisdiction comports with due process.  Accordingly, plaintiffs request that the Court defer any ruling regarding personal jurisdiction until after the evidence regarding AGM&M's contacts with this forum has been vetted.

But regardless, the record already before the Court – much of it coming from Assembly submissions – demonstrates that jurisdiction lies.  AGM&M's contacts with Minnesota are both continuous and systematic and directly related to this dispute.

The Assembly and the Cafesjian interests cooperatively incorporated AGM&M. Following AGM&M's creation, Cafesjian was appointed Chairman and President and John Waters was appointed Secretary and Treasurer of AGM&M.  (*See* Rosenfeld Aff. Ex. 6 at 2.)  Both performed substantially all of their AGM&M officer duties in Minnesota.  (*See* Waters Aff. ¶¶21-22.)

In recognition of the significant donations to the Assembly for the benefit of the AGM&M – monies that were derived from Cafesjian's employment in Minnesota at West Publishing – CFF was designated as permanent AGM&M trustee.  (*See* Compl. Ex.

B §5.2(G).)   For three years Cafesjian served as the CFF-designated trustee on the AGM&M board.  Most of his CFF Trustee activities were performed from Minnesota.  In late 2006, John Waters, a longtime Minnesota resident, assumed the CFF-designated AGM&M trustee duties.  Waters performed nearly all of his AGM&M trustee duties from Minnesota – by participating in trustee meetings, telephone calls, and other activities.  (Waters Aff. ¶¶21-22.)

The Assembly's affidavits also assert that AGM&M's Minnesota contacts are systematic and continuous and related to this dispute.  "Between November 1, 2003 and the fall of 2006, the AGM&M was effectively operated, managed, and in fact, controlled by Cafesjian and John J. Waters, Jr.  (Rosenfeld Aff. Ex. 1 ¶15.)  "Cafesjian and Waters hired consultants, searched for and selected an architect and a design plan for the AGM&M, and advised us they were contacting potential donors for the museum."  (Id.)[3] The Kaloosdian Affidavit goes on to maintain that Waters, CFF and Cafesjian have taken "numerous actions . . . on behalf of [AGM&M]."  (Id. ¶19.)

Reflecting those undertakings on behalf of AGM&M, AGM&M's corporate records were stored in Minnesota, AGM&M's bookkeeping activities were performed in Minnesota by Minnesota residents, and correspondence to AGM&M was directed to Minnesota.  (Supplemental Waters Aff. ¶¶3, 6-7, 9.)  CFF's Minnesota staff provided administrative and organizational support to AGM&M.  (Id. ¶¶5, 8)  The leadership of AGM&M was directed by Cafesjian and Waters from Minnesota.  (Id. ¶4-5, 10.)  From

---

[3]     Plaintiffs deny that they selected an architect and design plan for AGM&M.

its incorporation until late 2006, AGM&M was managed, organized, and facilitated from CFF's Minnesota offices.  (*Id.*)  "[O]n behalf of AGM&M," Cafesjian and Waters performed substantially all of these AGM&M duties from Minnesota.  (*Id.*; Waters Aff. ¶¶21, 22.)

These continuous and systematic contacts – which are purportedly derived from the Grant Agreement – demonstrate that this Court has personal jurisdiction over AGM&M.[4]  A nonresident corporate entity has contacts with a forum state for purposes of personal jurisdiction through its authorized representatives – namely, its employees, agents, directors, and officers.  *Int'l Shoe, Inc.*, 326 U.S. at 316.

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . it is clear that unlike an individual its 'presence' . . . can be manifested only by activities carried on in its behalf by those who are authorized to act for it. . . . [T]he terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process.

*Id.* at 316-17; *see also Garber v. Jack's Corn Crib*, No. 4-86-740, 1988 WL 74280, * 7 (D. Minn. July 18, 1988) (an individual's actions performed as a corporate officer may be used to subject the corporation to jurisdiction).[5]

---

[4]    AGM&M's contacts with Minnesota arise from the transactions that gave rise to this lawsuit and from AGM&M's general business operations.  Both general and specific personal jurisdiction exists.

[5]    Both *Adams v. Riverview Healthcare Association* and *Lucachick v. NDS Americas, Inc.*, cited in the R&R, are distinguishable.  In *Adams*, North Dakota jurisdiction did not lie over a Minnesota employer simply because the employer allowed the plaintiff employee to work from North Dakota 20% of the time.  No. A3-02-135, 2003 WL

The actions of Cafesjian, Waters, and CFF in Minnesota – as officers, Trustees and agents who have acted "on behalf of" AGM&M – are sufficient to satisfy the requirements of due process. The Assembly's own evidence establishes those contacts. The Assembly cannot argue, on one hand that Cafesjian and Waters "controlled" AGM&M, and then maintain on the other hand that AGM&M's contacts with Minnesota are insufficient when the controlling activities, about which the Assembly complains, were performed on AGM&M's behalf in Minnesota. AGM&M is subject to this Court's jurisdiction.[6]

## III.  AGM&M IS NOT AN INDISPENSABLE PARTY

Even if AGM&M were a necessary party over which personal jurisdiction is lacking, AGM&M is not a Rule 19(b) indispensable party. Indispensable party turns on whether (1) AGM&M would be prejudiced as an absent party; (2) the court can afford protective provisions in the judgment to lessen any prejudice to AGM&M; (3) a

---

1456442 (D.N.D. Mar. 17, 2003). In *Lucachick*, jurisdiction was improper because the plaintiff employee's "residence was the only connection between the employment contract and Minnesota." 169 F. Supp. 2d 1103, 1106 (D. Minn. 2001). Unlike both of these cases, AGM&M's business was conducted from and AGM&M's headquarters were located at CFF's Minnesota office. Minnesota residents performed work for AGM&M, and the leadership and operation of AGM&M were directed from Minnesota. This is not incidental or sporadic contact with Minnesota like in *Adams* or *Lucachick*. Rather AGM&M's existence and function emanated from Minnesota for most of the entity's life.

[6]    Minnesota is a convenient forum. CFF operates substantial business operations in Minnesota, Waters lives in Minnesota and Cafesjian lives in Minnesota for five months of each year. (Waters Aff. ¶¶2, 5-8.) The Assembly travels to Minnesota. (*See id.* Exs. B-H.) Assembly volunteers reside in Minnesota. (*Id.* ¶¶6-8.) And, because AGM&M was managed and operated out of Minnesota for three years, many of the witnesses who performed these AGM&M activities are located in Minnesota. (*Id.*)

sufficient remedy can be awarded to CFF; and (4) CFF would have an adequate remedy if the action were dismissed for failure to join an indispensable party. Fed. R. Civ. P. 19(b).

AGM&M would not be prejudiced by being left out of this litigation – it has its own contractual rights and obligations vis-à-vis the Assembly pursuant to the Transfer Agreement. Cafesjian and CFF can be accorded a sufficient remedy; their recourse is defined by the terms of the Grant Agreement to which AGM&M is not a party. The Court can subject the Assembly to whatever redress is warranted by the contractual breach and is possible based upon the assets that the Assembly can control.

In contrast, if this action is dismissed, CFF would have no adequate remedy. The two actions pending in the District of Columbia are not related to the Assembly's obligations under the Grant Agreement or the promissory note. To the contrary, the lawsuit by AGM&M against CFF pertains to a lien on the property – not to the Assembly's obligations under the Grant Agreement. *See AGM&M v. The Cafesjian Family Foundation*, File No. 07-1259(D.D.C.).

The lawsuit filed by the Cafesjian interests on behalf of AGM&M is a derivative action alleging that some AGM&M trustees and the Assembly have breached their fiduciary duties. *See Cafesjian Family Foundation, Inc. v. Armenian Genocide Musuem & Memorial, Inc., et al.*, File No. 07-1746(D.D.C.). As a derivative action any recovery achieved would be for the benefit of AGM&M. Nothing in that litigation implicates the

Assembly's Grant Agreement obligations.[7]  In short, AGM&M is not an indispensable party under Rule 19(b).

## CONCLUSION

Magistrate Judge Graham erroneously concluded that AGM&M was a necessary and indispensable party that could not be joined.  AGM&M is neither necessary nor indispensable.  Regardless, AGM&M's extensive contacts with Minnesota through its agents, who, according to the Assembly controlled AGM&M, subject AGM&M to suit in this jurisdiction.  The Court must overrule the R&R and deny defendants' motions to dismiss.

Dated:  November 5, 2007 **BRIGGS AND MORGAN, P.A.**

By:   s/ Timothy R. Thornton
    Timothy R.  Thornton (#109630)
    Molly M.  Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS**

---

[7]     This case will undoubtedly wind up in this District even if it is dismissed.  If the complaint is transported to D.C. the Assembly and AGM&M will counterclaim which would invoke the forum selection clause of the promissory note, mandating transfer to this Court.  *See* R&R at 9-10, n. 5.