UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC. and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., <br><br>     Plaintiffs, <br><br>v. <br><br>GERARD L. CAFESJIAN *et al.*, <br><br>     Defendants. | Civil File No. 08-255 (CKK) |
| GERARD L. CAFESJIAN, JOHN J. WATERS, JR., THE CAFESJIAN FAMILY FOUNDATION, INC., and THE TOMKAT LIMITED PARTNERSHIP, <br><br>     Counterclaim Plaintiffs, <br><br>v. <br><br>THE ARMENIAN ASSEMBLY OF AMERICA, INC., THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and HIRAIR HOVNANIAN, <br><br>     Counterclaim Defendants. | |

**MEMORANDUM IN SUPPORT OF
PARTIAL MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Defendants in Counterclaims, Hirair Hovnanian ("Hovnanian"), the Armenian Assembly of America, Inc. ("the Assembly"), and the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") (hereinafter collectively referred to as "Plaintiffs"[1]) hereby submit their Memorandum of Law in Support of

---

[1] Although Hovnanian is not a Plaintiff to the original Complaint, the Defendants in Counterclaims are referred to herein as Plaintiffs for the sake of clarity.

their Partial Motion to Dismiss John J. Waters ("Waters"), Gerard L. Cafesjian ("Cafesjian"), The Cafesjian Family Foundation ("CFF"), and TomKat LP's ("TomKat") (hereinafter collectively "Defendants") Counterclaims ("the Counterclaims").  As discussed below, Defendants' claims for unjust enrichment, constructive trust and defamation (Counts VI, VII, VIII, and IX of the Counterclaims) must be dismissed as a matter of law.

Defendants' claims for unjust enrichment and constructive trust are barred by the existence of a Grant Agreement and a Transfer Agreement that were executed by CFF, Cafesjian, Waters, the Assembly and AGM&M in 2003.  By their own admissions, these contracts provide Defendants with an adequate remedy at law, and a review of Defendants' claims reveals that all of the rights that Defendants assert give them grounds for an unjust enrichment claim arise out of these contracts.  Accordingly, Defendants are barred from asserting either claims for unjust enrichment or constructive trust.

The Defendants' defamation claims are equally without merit.  First, the claims lack sufficient specificity to meet notice pleading requirements, as Defendants fail to identify the third persons to whom the material was allegedly published.  Second, the allegedly defamatory statements are either protected by privilege or are non-defamatory opinions.  Finally, and most importantly, the allegedly defamatory statements are, on their face, not reasonably capable of a defamatory meaning.

As Counts VI, VII, VIII, and IX of the Counterclaims fail to state forth claims upon which relief may be granted they should be dismissed with prejudice.

I. **RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

    A. *The Inception of the Armenian Genocide Museum and Memorial Project*

The Assembly has been in existence since 1972 and is the premier Armenian-American advocacy group in the United States.  In the 1990s, the Assembly decided to construct a

permanent museum to the victims and survivors of the Armenian Genocide ("the museum"). The Assembly began exploring possible sites for the museum in Washington, D.C. and solicited donations from the Armenian-American community for the purpose of establishing and constructing the museum. See Affidavit of Robert A. Kaloosdian ("Kaloosdian Aff.") ¶ 5, attached at <u>Exhibit 1</u> to the Affidavit of Naoka E. Carey (Carey Aff.), filed herewith.

In or around 1999, the Assembly identified a possible site for the museum at the former National Bank of Washington Building, a historical landmark building located at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. ("the Bank site"). See Counterclaims ¶ 24, 27. In order to fund the purchase of the Bank site, the Assembly sought specific major donations and pledges from various sources. In addition to funds previously pledged by another donor, Anoush Mathevosian, it successfully raised the bulk of the remainder of the purchase price through donations from two Cafesjian charitable corporations, CFF and the Vanguard Charitable Endowment Program-Cafesjian Family Foundation Charitable Trust, which provided the project with a $3,500,000 grant and a $500,000 loan. Counterclaims ¶¶ 24, 27.

Subsequent to the Assembly's acquisition of the Bank site, Cafesjian began acquiring properties adjacent to the site through another entity in which he had an interest, TomKat LP. Counterclaims ¶ 36.

In October of 2003, at Cafesjian's insistence, the AGM&M was incorporated as a District of Columbia not-for-profit corporation. Counterclaims ¶ 24. Pursuant to the Articles of Incorporation and the By-Laws (attached at <u>Exhibit 1</u> and <u>Exhibit 4</u> to Counterclaims, respectively), the purpose of AGM&M is as follows:

> **[AGM&M] will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian**

> **Genocide; to commemorate, remember, study and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.**

See Articles of Incorporation ("Articles") at IV-A, Counterclaims ¶ 11.

On November 1, 2003, subsequent to AGM&M's formation, the Assembly executed a Grant Agreement with Cafesjian and CFF. See Grant Agreement, Exhibit 2 to Counterclaims. One purpose of the Grant Agreement was to document the terms and obligations of the parties with respect to certain donations to be made by Cafesjian and CFF to the Assembly, which donations the Assembly was to use to assist the AGM&M in purchasing additional property for the museum project, including the property now owned by TomKat.

Under the terms of the Grant Agreement, there is a reversionary provision regarding the "Grant Property" that was purchased, in part, with funds provided to the Assembly by CFF and Cafesjian. Id., see also Counterclaims ¶ 30-31. The reversionary clause is critical to understanding Defendants' current agenda, which is to delay the development of the museum long enough to compel the return of all of the grant property to CFF or Cafesjian. The Grant Agreement provides as follows:

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.      in the event any portion of the Grants has not been funded, this Agreement terminates; and**

> ii.      to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.

See Grant Agreement at Section 3.1(B), Counterclaims ¶ 31.  This provision clearly put Cafesjian, who was in control of the operations of AGM&M for the first three years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees, while still enjoying the tax benefit of a "donation."  Moreover, as the AGM&M, and not Cafesjian or CFF, will have borne the taxes and other costs associated with the properties during the interim, and as the properties have appreciated in value significantly during the intervening time period, if the time requirement is not met, CFF will receive a significant windfall at the direct expense of AGM&M.  In addition to the already noted tax benefits, Cafesjian and CFF have received favorable publicity, as well as other intangible benefits, as a result of their donations to the museum project.

On November 1, 2003, the Assembly also executed, with AGM&M, a "Transfer Agreement" for the purpose of transferring "all of its real property, pledges, cash, and other assets acquired for the purpose of building AGM&M."  See Transfer Agreement at Exhibit 3 to Counterclaims.  The Transfer Agreement was signed by Waters on behalf of AGM&M, id., and Defendants have admitted, in their Counterclaims, that they are a third-party beneficiary to the Transfer Agreement.  Counterclaims at ¶¶ 74-77.  Per the Transfer Agreement, the Assembly transferred to AGM&M the National Bank site, as well as cash and pledges that it had received over the preceding six years for the support of the museum project.  Counterclaims ¶ 37.

### B. Inception of the Instant Dispute

Between November 1, 2003 and the fall of 2006, the AGM&M was operated, managed, and in fact, controlled by Cafesjian and Waters, acting as President and acting Secretary/Treasurer, respectively. Kaloosdian Aff. ¶ 16. Due to the activities of Cafesjian and Waters during this time, as detailed in Plaintiffs' Complaint ("Complaint"), disputes arose between the parties regarding Cafesjian and Waters' failure to secure a feasible design for the museum, to otherwise meaningfully forwardly progress on the project, as well as with regard to the uncontrolled spending by Cafesjian and Waters during the tenure as the officers of AGM&M (spending that did nothing to meaningfully further the museum's development). Id. at ¶¶ 16-18; Complaint.

In response to inquiries by the other members of the Board of Trustees relating to these issues, Cafesjian became contemptuous of the other Trustees and, via letters from his then counsel, indicated that he intended to abandon the museum project. Id. at ¶¶ 19-23. He also demanded immediate return of his donations and pledges, including the now significantly appreciated real estate. Id. at ¶ 22. When the other Trustees refused to comply, Cafesjian initiated a lawsuit against the Assembly in the District Court for the District of Minnesota, which lawsuit sought, *inter alia*, rescission of the Grant Agreement and return of all of the donations.[2] Additional lawsuits initiated by Cafesjian followed, as set forth in greater detail in the Complaint, as well as a hostile publicity war by Cafesjian, who now owned the *Armenian Reporter*, a widely circulated Armenian American newspaper. In the face of these attacks, the Plaintiffs issued a letter and several press releases, attached as Exhibits 5 – 8 to the

---

[2] This suit was dismissed in June 2008 pursuant to a Joint Stipulation of the parties.

Counterclaims, in order to advise their membership, and other interested parties, about the status of the project and the ongoing litigation.[3]

## II. LEGAL ARGUMENT

Counts VI, VII, VIII, and IX of the Counterclaims must be dismissed, as the Defendants have failed to allege either facts or law which establish claims upon which relief may be granted. As discussed below, Defendants' claims for unjust enrichment and constructive trust are barred as a matter of law, as the terms under which the benefit alleged to have been unjustly retained was conferred are set forth in written contracts. Defendants' defamation claims are similarly barred as a matter of law, as the Defendants have failed to plead with specificity the persons to whom the material was allegedly published. In addition, the allegedly defamatory statements are privileged or else non-defamatory statements of opinion. Finally, the allegedly defamatory statements cannot reasonably be construed as defamatory, particularly in the context of the documents as a whole.

### A. *Defendants Have Failed to Allege Facts That, If Proven, Would Constitute Unjust Enrichment (Claim VI) or Constructive Trust (Claim VII)*

Under District of Columbia law, a claim of unjust enrichment may be asserted when: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." News World Communic., Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005); see also Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co., 870 A.2d 58, 63 (D.C. 2005). As a claim for

---

[3] Indeed, Cafesjian's own newspaper, *The Armenian Reporter*, published at least one of the allegedly defamatory press releases, along with extensive commentary regarding same. None of the commentary took issue with the allegedly defamatory statements. See article in *Armenian Reporter*, attached at Exhibit 2 to Carey Aff. While this issue is arguably beyond the scope of a Motion to Dismiss, Plaintiffs anticipate that, to the extent any or all of Defendants' defamation claims survive, Plaintiffs will establish that Cafesjian, through his own publication of the material, consented to its publication, barring any recovery.

unjust enrichment is, in fact, a claim in quasi-contract, "there can be no claim for unjust enrichment when an express contract exists between the parties." Schiff v. American Ass'n of Retired Persons, 697 A.2d 1193, 1194 (D.C. App.1997); see also Jordan Keys, 870 A.2d at 64 ("One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement."). An unjust enrichment claim arises from equitable principles, and is "an obligation which the law creates, in the absence of any agreement . . ." Jordan Keys, 870 A.2d at 64.

As Defendants concede, here there are two written agreements which detail the rights and obligations conferred on the parties as a result of the donations made by Cafesjian and CFF: the Grant Agreement and the Transfer Agreement. These agreements govern the relationship between the parties in this case, including the circumstances under which Cafesjian or CFF could potentially seek return of their donations. The Counterclaim allegations confirm that the unjust enrichment claim rests upon "right[s] to participate in and approve" and "obligations attached to the donations," see Counterclaims ¶¶ 80, 81, rights and obligations which arise directly out of the Grant Agreement and the Transfer Agreement. As Defendants have a more than adequate remedy at law, namely the breach of contract and other claims asserted at Claims I-V, Defendants' unjust enrichment claims are barred as a matter of law. See Emerine v. Yancey, 680 A.2d 1380, 1384 (D.C. 1996)("where the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties.").

For the reasons set forth above, Defendants claim for constructive trust is also precluded as a matter of law. "A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly

enriched if permitted to retain it." Heck v. Adamson, 941 A.2d 1028, 1029 (D.C. 2008) (internal quotations and citations omitted). In short, the fundamental purpose of a constructive trust is to provide a remedy for unjust enrichment. See Bolle v. Hume, 619 A.2d 1192, 1196 (D.C. 1993); Duggan v. Keto, 554 A.2d 1126, 1134 (D.C. 1989) ("A constructive trust is fundamentally a remedy to prevent unjust enrichment."); Stern v. J. Nichols Produce Co., Inc., 486 A.2d 84, 89 (D.C. 1984) ("Constructive trusts and equitable liens, however, are equitable remedies designed to prevent fraud or unjust enrichment."). As Defendants cannot assert an unjust enrichment claim in light of the existence of the Grant and Transfer Agreements, they are also precluded from asserting that they have a right to a constructive trust, the equitable remedy that accompanies a finding of unjust enrichment.

For the foregoing reasons, Claims VI and VII of the Counterclaims should be dismissed with prejudice.

  **B.** ***Because the Statements in the Letter and Press Releases are Not Defamatory as a Matter of Law, Counts VIII and IX Must Be Dismissed***

To establish a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that the defendant[s] made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."[4] Clawson v. St. Louis Post-Dispatch, L.L.C., 906 A.2d 308, 312-13 (D.C. 2006) (internal quotations and citation omitted). A statement is considered defamatory if "it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." Id. The allegations in support of the defamation

---

[4] Counterclaim Plaintiffs do not allege any special harm. Counterclaims ¶¶ 89, 99.

claim must be sufficiently specific to satisfy notice pleading requirements, and must include allegations sufficient to apprise the defendant of the persons to whom the allegedly defamatory material was published. Oparaugo v. Watts, 884 A.2d 63, 78 (D.C. 2005).

A defamation claim can survive a motion to dismiss only if "the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning." Klayman v. Segal, 783 A.2d 607, 612 (D.C. 2001) (internal quotations and citation omitted). The "publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." Klayman, 783 A.2d at 613.

 1. The Defamation Allegations Are Deficient, As a Matter of Law, as they Fail to State with Specificity the Persons to Whom the Allegedly Defamatory Material Was Published

As an initial matter, the allegations set forth in the Counterclaims fail to satisfy basic pleading requirements, as they fail to include any information regarding the persons to whom the allegedly defamatory material was published. See Counterclaims at ¶¶ 84-100. For this reason alone, both the defamation claims are facially deficient and should be dismissed as a matter of law. See Oparaugo v. Watts, 884 A.2d 63, 78 (D.C. 2005) (allegations must be "sufficient to apprise [defendants] of the persons to whom the letter was published, at least by category"). As discussed below, however, even assuming, *arguendo*, that the Counterclaims set forth sufficient facts to make out claims for defamation, and that the allegedly defamatory statements are false, such statements are either privileged, non-defamatory opinion, or, as a matter of law, not reasonably susceptible of a defamatory meaning.

 2. The Allegedly Defamatory Statements in the July 18, 2007 Letter and Press Releases are Protected by Privilege

As discussed below, each of the allegedly defamatory statements cited in the Counterclaims are privileged, either under the "common interest" privilege or the privilege

applicable to statements made during the course of or related to judicial proceedings. "Whether a statement is protected by a privilege is a question of law." Carter v. Hahn, 821 A.2d 890, 894 (D.C. 2003) (internal citations omitted).

The Counterclaims do not dispute that the allegedly defamatory statements were privileged (or assert that they were not privileged), nor do they assert that the statements were made with "express malice or malice in fact," the standard that would need to be met in order for Defendants to prevail on this claim. See Blodgett v. University Club, 930 A.2d 210, 224 (D.C. 2007) (internal citations omitted). Defendants have failed to allege facts which would, in light of the privilege, entitle Defendants to relief on Claim VIII or Claim IX.

The July 18, 2007 letter which forms the basis for the Counterclaim Plaintiff's first defamation claim (Claim VIII) is a letter addressed to the Armenian Assembly membership from the Assembly's Chairman, Hirair Hovnanian, and President, Carolyn Mugar.[5] See Exhibit 5 to Counterclaims. The letter addresses the status of the museum project, and updates the Assembly membership on recent events pertaining to the development of the museum, a project of considerably interest to the Armenian community. The letter clearly falls within the scope of the "common interest privilege," which protects statements "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." Blodgett, 930 A.2d at 224.

The press releases (attached as Exhibits 6 to 8 of the Counterclaims) are similarly protected under with the "common interest" privilege, as they contain the information regarding the status of the project and the management of it, or under the "judicial privilege" that extends

---

[5] Ms. Mugar is not named as a Defendant in the Counterclaims.

to "statements made preliminary to, or in the course of, a judicial proceeding." Oparaugo, 884 A.2d at 79. The "judicial privilege" applies to "judges, court officers, attorneys, parties, grand and petit jurors performing those functions, witnesses and participants in judicial proceedings." Id. The privilege extends to the statements regarding the merits of Cafesjian, CFF, and Waters' claims, including the quotations from the Assembly and AGM&M's attorney, Arnold R. Rosenfeld, in the October 4, 2007 press release.

Finally, even if the allegedly defamatory statements in the press releases were not covered by either the common interest or judicial privileges, the statements as to the merits of Defendants' claims are statements of opinion, which are "actionable only if [they] has an explicit or implicit factual foundation and [are] therefore objectively verifiable." Guilford Transp. Industries, Inc. v. Wilner, 760 A.2d 580, 597 (D.C. 2000). As Plaintiffs' counsel's opinion as to the merits of Defendants claims are based on fundamentally subjective measures, these statements are not actionable as a matter of law.

As Defendants have failed to allege and cannot show that the allegedly defamatory statements are not privileged, Claims VIII and IX should be dismissed as a matter of law.

    3.    The Statements Set forth in the Counterclaims are Not Reasonably Susceptible to a Defamatory Meeting

Even if the allegedly defamatory statements were not privileged or non-defamatory opinion, in the context of the entire publication, none of the statements alleged to be defamatory by the Defendants are reasonably susceptible of a defamatory meaning. In order for a statement to qualify as defamatory, it must "be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." Clawson, 906 A.2d at 313 (internal quotations and citation omitted). "The court should not . . . indulge far-fetched interpretations of the challenged publication. The statements . . . should be construed as the average or common

mind would naturally understand them." <u>Guilford Transp. Industries, Inc. v. Wilner</u>, 760 A.2d 580, 594 (D.C. 2000) (internal quotations and citation omitted). "The average or common mind would naturally understand 'odious' to mean 'arousing or deserving hatred or loathing,' 'infamous' as 'notorious' or 'in disgrace or dishonor,' and 'ridiculous' as 'absurd' or 'deserving of ridicule,' that is, 'the act of making someone or something the object of scornful laughter by joking, mocking, etc.'" <u>Klayman</u>, 783 A.2d at 618. If an allegedly defamatory statement is part of a larger publication, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." <u>Klayman</u>, 783 A.2d at 613; see also <u>Shipe v. Schenk</u>, 158 A.2d 910, 911 (D.C. 1960)(phrases "'damn liar' and 'dead beat' are not slanderous *per se*").

The allegedly defamatory portions of the July 18, 2007 letter would not, in any reasonable person's mind, make the Defendants "appear odious, infamous, or ridiculous." In context, the selected portions describe an interaction between the AGM&M, the Assembly and Cafesjian which, even assuming it to be false, at worst describe a difference of opinion which resulted in Cafesjian dissociating himself from the project and bringing suit against the Assembly. While the description of events could "perhaps be viewed as unpleasant and offensive from [plaintiff's] perspective, such perceived unpleasantness and offensiveness are not sufficient to sustain an allegation that material is reasonably capable of defamatory meaning." <u>Klayman</u>, 783 A.2d. at 618. Moreover, in the context of the letter as a whole, it is apparent that the purpose of the letter was not to make Cafesjian (or the other Defendants) "appear odious, infamous, or ridiculous," but to explain the reason for the litigation and to reassure donors and other interested members of the community that the project was nevertheless moving forward. "Any reasonable reader . . . would understand that [Plaintiff] took certain actions, [and] that

[Defendant] was apparently unenthusiastic about those actions . . . This is not the stuff of which successful libel suits are made." Guilford, 760 A.2d at 599.

The press releases are equally unsusceptible to a defamatory meaning, as they also do not make the Defendants "appear odious, infamous, or ridiculous" and, like the letter, simply reflect that disputes have arisen between the parties involved in this case, which disputes the Plaintiffs believe arise out of Defendants' conduct.  The first press release, dated October 4, 2007, extensively quotes Plaintiffs' attorney's opinion regarding the merits of a lawsuit filed by the Defendants against AGM&M.  The second October 31, 2007 release, while more detailed, again describes the AGM&M's opinion as to the merits of Defendants' various lawsuits, the procedural status of the lawsuits, as well as information regarding the status of the project and the AGM&M's efforts to move the project forward.  While it is possible that Defendants may find the characterizations of the lawsuits or their management of the museum project offensive or unpleasant, the characterizations set forth in the press release fall far below the standard for libel, as a reasonable reader of the statements would not believe such statements would subject Defendants to ridicule, hatred, or disgrace.

As none of the statements alleged to be defamatory are reasonably capable of a defamatory meaning, Claims VIII and IX of the Counterclaims should be dismissed with prejudice.

### III.     CONCLUSION

For the foregoing reasons, the AGM&M, the Assembly, and Hirair Hovnanian, respectfully request that Claims VI, VII, VIII, and IX of the Counterclaims be dismissed with prejudice.

Respectfully submitted,

Dated:  August 15, 2008

**K&L GATES LLP**

By: _____
David T. Case (D.C. Bar No. 384062)
Bruce H. Nielson (D.C. Bar No. 414440)
1601 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 778-9000
Fax:  (202) 778-9100

AND

 /s/    Arnold R. Rosenfeld
Arnold R. Rosenfeld (MA Bar No. 428860)
Naoka E. Carey (MA Bar No. 655312)
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3155
Fax: (617) 261-3175

**COUNSEL FOR PLAINTIFFS**