UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC. and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,<br><br>             Plaintiffs,<br><br>v.<br><br>GERARD L. CAFESJIAN *et al.*,<br><br>             Defendants. | Civil File No. 08-255 (CKK) |
| GERARD L. CAFESJIAN, JOHN J. WATERS, JR., THE CAFESJIAN FAMILY FOUNDATION, INC., and THE TOMKAT LIMITED PARTNERSHIP,<br><br>             Counterclaim Plaintiffs,<br><br>v.<br><br>THE ARMENIAN ASSEMBLY OF AMERICA, INC., THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and HIRAIR HOVNANIAN,<br><br>             Counterclaim Defendants. | |

## AFFIDAVIT OF NAOKA E. CAREY, ESQ.

I, NAOKA E. CAREY, hereby state under the penalties of perjury, as follows:

    1.    I am a member of the Massachusetts bar; an associate attorney in the law firm of K&L Gates LLP; and counsel for the Defendants in Counterclaims in the above-captioned action, Hirair Hovnanian ("Hovnanian"), the Armenian Assembly of America, Inc. ("the Assembly"), and the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") (hereinafter

BOS-1233893 v1

collectively referred to as "Plaintiffs"[1]). I make this affidavit in support of the Plaintiffs' Partial Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). The documents introduced herein were provided to me by the Plaintiffs in this action or were personally received and/or prepared or filed by me, and are believed to be authentic documents prepared or kept in the ordinary course of business.

2. Exhibit 1 is a true and accurate copy of an Affidavit of Robert A. Kaloosdian, dated September 11, 2007, originally filed in support of Plaintiffs' Arbitration Demand filed with the American Arbitration Association.

3. Exhibit 2 is a true and accurate copy of a December 8, 2007 article published in Gerald Cafesjian's newspaper, *The Armenian Reporter*.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF AUGUST, 2008.

Naoka E. Carey
Mass. Bar No. # 655312
K&L Gates LLP
One Lincoln Street
Boston, MA. 02111
Tel.: 617-261-3100
Email: naoka.carey@klgates.com

---

[1] Although Hovnanian is not a Plaintiff to the original Complaint, the Defendants in Counterclaims are referred to as Plaintiffs herein for the sake of clarity.

# EXHIBIT 1

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| ARMENIAN ASSEMBLY OF AMERICA, INC. and THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.<br><br>*Claimants*<br><br>v.<br><br>GERARD L. CAFESJIAN, INDIVIDUALLY and as TRUSTEE and PRESIDENT (former) of THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC., and PRESIDENT AND DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, JOHN J. WATERS, JR., INDIVIDUALLY and as SECRETARY/TREASURER OF THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, PRESIDENT OF TOMKAT LP, and SECRETARY AND DIRECTOR OF THE CAFESJIAN FAMILY FOUNDATION, THE CAFESJIAN FAMILY FOUNDATION, INC.; and TOMKAT LP,<br><br>*Respondents* | Case No. _____ |

### AFFIDAVIT OF ROBERT A. KALOOSDIAN

I, Robert A. Kaloosdian, being duly sworn, hereby depose and state as follows:

1. I have been an active member of the bar of Massachusetts, in good standing, since 1957. My current office address is 43 Mt. Auburn St., Watertwon, Massachusetts, 02472.

2. I am a founding member of the Armenian Assembly of America, Inc. ("the Assembly"), which was formed in 1972. In addition to being a member, I have also held the following positions and titles: Steering Committee member, Vice-Chairman, Co-Chairman or Chairman (for over ten years), and I currently serve as Counselor to the Board of Trustees. I also am currently the Chairman of the Armenian National Institute, which was formed as a subsidiary of the Assembly. From October 2003 until early 2007, I served on the Board of Trustees of the Armenian Genocide Museum and Memorial Inc.(AGM&M), as the designee member of the Assembly.

- 2 -

3. The Assembly is a District of Columbia non-profit corporation with its principal place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036. To the best of my knowledge, the Assembly has no offices or employees in the state of Minnesota and is not qualified to do business in Minnesota.

4. The Assembly is the foremost Armenian-American advocacy group in the United States and has several missions including, but not limited to, acting as a sponsor for Armenian-American interests to public policy makers and the public in the United States, providing resources and opportunities for Armenian-Americans in the American democratic process, undertaking research, education and advocacy for universal affirmation of the Armenian Genocide, enhancing relationships between the United States and Armenia, and securing effective collaboration among Armenian-American organizations to accomplish its articulated goals. I have been intimately involved with the Assembly in seeking these goals since 1972.

5. In order to preserve and establish a location where Americans could learn from the lessons of the Armenian Genocide, in the 1990s, the Assembly began investigating the idea of constructing a permanent museum to the victims and survivors of the Armenian Genocide ("the museum"). The Assembly explored many possible sites for the museum in Washington, D.C. and solicited and received donations from the Armenian-American community for the purpose of establishing and constructing the museum, including a significant donation from Ms. Anoush Mathevosian, who pledged over three (3) million dollars to the endeavour at a critical early stage.

6. Through my role as a member and officer of the Assembly, I was involved in the discussions regarding the development of the museum. I have personal knowledge of the

transactions surrounding the development of the museum and the funding of same, as further described herein.

7. One of the persons the Assembly approached regarding the funding of the museum project was Gerard Cafesjian ("Cafesjian"). I, along with other representatives of the Assembly, approached Cafesjian at his home in 1997. At the time, he was interested in developing his own museum or a similar project, but not in Washington, D.C. Upon information and belief, Cafesjian was not, at the time we approached him, a member of the Assembly, nor, to my knowledge, was he actively involved in the Armenian-American community.

8. In or around 2000, the Assembly identified a possible site for the museum at the National Bank of Washington Building at 14th and G Streets, N.W., Washington, D.C. ("the National Bank site"). This site was located near the White House and, in my opinion, offered an opportunity for a major historical and educational attraction that would enhance worldwide understanding of the Armenian Genocide, which is the most elemental event in Armenian history and which is one of the principal missions of the Assembly. The site was purchased with the funds that had been previously pledged by Ms. Mathevosian, as well as funds Cafesjian donated through the Cafesjian Family Foundation (CFF).

9. In order to finalize the funding needed for the purchase of the National Bank site, it was also agreed that CFF would issue a Promissory Note to the Assembly in the amount of $500,000 ("the Note"). Based on subsequent discussions with Cafesjian and CFF, myself, and other members of the Assembly, it was our understanding that this Note was to be forgiven.

10. Cafesjian conditioned his financial support for the purchase of the National Bank site on the inclusion of a "Gerard L. Cafesjian Memorial" at the museum site. Cafesjian actively encouraged the Assembly to expand the scope of the museum project. While acknowledging

that his stated goals for the project would be costly, Cafesjian repeatedly assured the Assembly (which he eventually joined) that he was committed to providing or securing funding for the expanded project. Cafesjian also acquired four additional lots adjacent to the National Bank site through his company, TomKat, which were eventually donated to the AGM&M project. Cafesjian eventually proposed, and then adamantly insisted, that not the Assembly, but a new non-profit organization, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M"), be created to handle the construction, development, and operation of the museum and memorial.

11. In October of 2003, the AGM&M was incorporated as a District of Columbia not-for-profit corporation and the first Trustees of AGM&M were selected: Cafesjian, Mathevosian, Hirair Hovnanian, another significant donor to the project who is presently the Chair of the Board of Trustees of the Assembly, and myself[1] (hereinafter collectively referred to as "the AGM&M Trustees").

12. AGM&M is and has always been a District of Columbia non-profit corporation with its official place of business in the District of Columbia.

13. On November 1, 2003, again at Cafesjian's insistence, the Assembly executed a "Grant Agreement" with Cafesjian. The Grant Agreement was drafted by Cafesjian's attorneys and purported to confirm various gifts to be made by Cafesjian to the Assembly for the purpose of constructing the museum. In the case of the Note and the donations made to purchase the National Bank site, the donations had, in fact, been made prior to the execution of the Agreement. In the case of the land transfers from TomKat, the land had actually never been

---

[1] Under the By-Laws enacted by the AGM&M Trustees, the Assembly has one permanent Trustee appointed to the Board of Trustees of AGM&M. As one of the founders of the Assembly, I served as the representative of the Assembly on the AGMM Trustees from 2003-2007. I have since been replaced by Van Krikorian as the Assembly's representative.

donated or titled in the name of the Assembly, but were, in fact, directly transferred to the AGM&M by TomKat.

14. Under the terms of the Grant Agreement, the Assembly was also required to execute a Transfer Agreement with the AGM&M to confirm the transfer of the donations made by Cafesjian. The Transfer Agreement, which was also drafted by Cafesjian's attorneys, was executed on November 1, 2003, as required by the Grant Agreement. Pursuant to the Transfer Agreement, the Assembly transferred all of the real property, cash, and pledges it had received to develop the museum project to the AGM&M.

15. In addition to the real property, cash, and pledges noted above, the Assembly also agreed to transfer ANI, along with all of its assets, to the AGM&M, as under Cafesjian's proposed terms, ANI was to become a subsidiary of AGM&M. The transfer of ANI and all of its assets represented an invaluable contribution to the museum enterprise, both financially and otherwise. Not only did ANI have an established reputation as a leading research organization dedicated to preserving and studying Armenian history and artifacts, it also owned an extensive collection of rare historical documents and other precious items which make up the "collection" of works to be displayed at the museum. In addition to holding extensive records and tangible property, ANI had an excellent reputation and enormous good-will in the community, lending significant credibility to the enterprise.

16. Between November 1, 2003 and the fall of 2006, the AGM&M was effectively operated, managed, and in fact, controlled by Cafesjian and John J. Waters, Jr. ("Waters"), an employee of Cafesjian, who was an officer in his various companies and to whom he delegated substantial responsibility in all his dealings with the Assembly and the AGM&M. Cafesjian and Waters acted as President and Secretary/Treasurer of AGM&M, respectively. Cafesjian and

Waters hired consultants, searched for and selected an architect and a design plan for the AGM&M, and advised us they were contacting potential donors for the museum.

17.    In the winter of 2006, the other Trustees and I inquired of Cafesjian and Waters whether the unusual and potentially controversial design proposal for the museum would be feasible in light of the District of Columbia's stringent zoning and permitting requirements.

18.    As a result of these and other inquiries regarding his role and plans for the museum, Cafesjian became contemptuous of the other members of the Board of Trustees of the AGM&M.

19.    On May 24, 2006, Cafesjian's then current attorney, William J. Brody ("Brody"), sent a certified letter to myself and the other Trustees asserting, on behalf of Cafesjian, that there were two competing visions of the AGM&M among the AGM&M Trustees and that these visions were irreconcilable. Brody suggested that Cafesjian proposed to end his involvement with AGM&M, resign his trustee position, and prospectively renounce his rights to appoint trustees or to serve as a trustee. In this letter, Brody referred to the $500,000 Note, and stated that if Cafesjian terminated his involvement in AGMM, he would expect the Note to be repaid by AGM&M. He further noted that the Grant Agreement provided that if the various properties had not been developed by 2010, as contemplated in the agreement, then any obligation by Cafesjian and CFF would terminate and the properties or the funds to acquire the properties "are to be returned to CFF" and that he would expect the return of the non-bank buildings and property.

20.    In response to the Brody letter, Hovanian and I sent communications to Cafesjian and Waters requesting copies of financial reports, minutes of meetings, and legal documents including deeds and contractual obligations. Upon receipt of the limited financial records

Cafesjian and Waters provided to us, it became apparent to me and the other Trustees that little progress had been made on the museum's development plan and that Cafesjian had not consulted with, or even informed, the other Trustees and officers of numerous actions he and Waters had taken on behalf of AGMM.

21. On August 2, 2006, I formally responded to the May 24, 2006 Brody letter on behalf of myself, Hovanian, and Mathevosian. After denyng that there were two competing visions, we asked Cafesjian to continue with the project with his vision and our support of that vision, with the hope that he would follow through on the commitment he had made to the AGM&M, the Assembly, and the Armenian community.

22. In a subsequent teleconference on August 8, 2006, Cafesjian again confirmed to me, via counsel, his wish to disassociate himself from the project and to receive all of the non-bank properties owned by the AGM&M. As the properties had appreciated in value significantly during the intervening time period, Hovanian, Mathevosian and I realized that Cafesjian could now profit by his involvement in the museum project, at the expense of the AGM&M and the Assembly and to the great detriment of the museum and memorial project.

23. This teleconference was followed by another Brody letter, on August 29, 2006, which letter essentially demanded the dissolution of the AGM&M in order to permit Cafesjian to reacquire the donated properties at substantial profit to himself.

24. In the winter of 2007, I learned from my counsel that on or around October 23, 2006, without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Waters executed, purportedly as an authorized officer of both the AGM&M and CFF, a Memorandum of Agreement Reserving Rights ("Memorandum") purportedly

- 8 -

between AGM&M and CFF. Waters also caused the Memorandum to be filed and recorded in the official records of the Recorder of Deeds for the District of Columbia on or about October 27, 2006, again without a meeting of the Board of Trustees having been properly noticed, <u>and</u> without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed or the Trustees advised of the CFF's intent.

25. To the best of my knowledge, Waters never consulted with or informed any of the Trustees (with the exception of Cafesjian) of his recording of the Memorandum.

26. Waters' recording of the Memorandum was without notice to or authorization from the Trustees of AGM&M.

27. The above information is true and accurate to the best of my knowledge and belief.

Sworn to under the penalties of perjury:

*/s/ Robert A. Kaloosdian*
Robert A. Kaloosdian

Dated: September 11, 2007

# EXHIBIT 2

Case 1:08-cv-00255-CKK    Document 27-3    Filed 08/15/2008    Page 1 of 3

## Editorial

# The other side of the Genocide museum story

In our October 26 and November 3, 10, and 17 editions, we published a four-part history of the Armenian Genocide Museum and Memorial (AGMM), written by John Waters, vice president of the Cafesjian Family Foundation and a trustee of the AGMM, Inc.

In a letter to the editor (see page A11), a reader demands that the *Armenian Reporter* provide the Armenian Assembly of America an opportunity to tell its side of the AGMM story.

Our problem: We cannot disseminate information we know to be untrue. And even the most basic journalistic research shows that much of the information disseminated by the Armenian Assembly on this matter is incontrovertibly false.

This news release from October 31 is a prime example of the problem we all face.

### 1. A bald-faced lie
The headline of the press release tells a bald-faced lie!

The orders of the U.S. District Court for Minnesota are a matter of public record. As of October 31, the date of the press release, the district court had not yet issued a final ruling on the Assembly's motion to dismiss. And it has not done so to this day, over a month later.

### 2. Blatant misrepresentation
This news release purports to be from the Armenian Genocide Museum and Memorial, Inc. But is it?

The trustee designated by the Cafesjian Family Foundation (CFF) has veto power over decisions of the AGMM. That's under the bylaws of the AGMM and by virtue of the significant donations of the CFF and its founder, Gerard L. Cafesjian. Moreover, by contract, AGMM is obliged to allow a Cafesjian representative to participate in all AGMM decisions. (These documents are part of the court record.)

The Cafesjian Family Foundation and its representative have been excluded from all AGMM decision-making processes since May 7, 2007. Thus the issuance of this news release cannot be an authorized act of the AGMM.

The news release misrepresents its provenance.

### 3. A well-timed lie to deceive members?
This news release was issued three days before the Armenian Assembly's gala fund raiser. In considering why anyone would announce news that hasn't happened, the timing may offer a clue.

### 4. A shell game
Court records show that the lawsuit was filed on April 26, 2007, by Gerard L. Cafesjian and the Cafesjian Family Foundation against the Armenian Assembly of America, Inc. Contrary to what the press release says, the AGMM is *not* a defendant in the case.

The lawsuit is for breach of contract. According to the complaint, the Assembly declared its intention to renege on its obligation to repay the Cafesjian Family Foundation $500,000 – money that the Assembly borrowed from CFF in

---

Armenian Genocide Museum and Memorial, Inc.
1140 19th Street, NW, Suite 600, Washington, DC 20036
Phone: 202-383-9009; Web: www.armenian-genocide.org

FOR IMMEDIATE RELEASE
October 31, 2007

MINNESOTA COURT RULES AGAINST CAFESJIAN AND IN FAVOR OF THE ARMENIAN ASSEMBLY AND THE ARMENIAN GENOCIDE MUSEUM

Armenian Genocide Museum Proceeds to Phase Two Contracts
New Plans to Be Unveiled at Armenian Assembly Gala in Los Angeles

Washington, October 31, 2007. The U.S. District Court in Minnesota has granted a motion to dismiss the lawsuit filed by Gerard Cafesjian and the Cafesjian Family Foundation against the Armenian Assembly of America and the Armenian Genocide Museum and Memorial (AGMM). The lawsuit sought to rescind the grant agreement the Foundation had made with the Assembly with respect to the Armenian Genocide Museum project, so that Cafesjian could recover the substantially appreciated real estate.

At the same time, AGMM announced the signing of Phase Two contracts with the architectural firm of Martinez & Johnson (www.mjarchitecture.com) and the museum planning firm of Gallagher & Associates (www.gallagher-design.com). Architectural and exhibit planning are proceeding on schedule and the museum is slated to open before 2011.

In a statement issued today, the Armenian Assembly and the AGMM said: "We regret that Gerard Cafesjian has filed these lawsuits and is now attempting to try the case in the press. We appreciate the Minnesota court's ruling in our favor to dismiss the lawsuit, and do not expect any court to accept the misrepresentations promoted to stop or cloud the completion of the museum."

Cafesjian formally abandoned the project in 2006 demanding return of appreciated real estate. This left the other trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left in tatters a project that the Armenian-American community strongly endorsed and wants completed. Unbeknownst to the other trustees, the District of Columbia had reclassified the properties. In early 2007, after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were

ment and to enforce the remedies of that contract.

Remedies would include the return of the $500,000 loaned by CFF to the Assembly and, possibly, the full rescission of the CFF grant agreement. A rescission of the grant agreement could trigger a return to CFF of all the grant properties, including the site of the former National Bank of Washington. The court record does *not* support the allegation here that Mr. Cafesjian himself would recover the real estate he and the foundation donated.

(What do the Assembly's leaders intend to do with the "substantially appreciated real estate" that does not belong to the Assembly? The Assembly lawyer told the *Minneapolis Star Tribune* that they intend to sell the parcels off and use the proceeds, contrary to the donors' intent.)

## 5. Half truth equals deception

A transcript of the recording of the May 7 board meeting shows that the only business transacted in the presence of Mr. Waters was an interrogation of Mr. Waters by attorney Van Krikorian of the Assembly and an unsuccessful motion by Mr. Krikorian, seconded by Hirair Hovnanian of the Assembly, to eject Cafesjian interests from the board. Neither the interrogation nor the motion was on the announced agenda.

## 6. Pattern of falsehoods

We have focused here only on assertions that any observer can see are false. The news release contains many additional assertions that strain credulity – and are disputed by the Cafesjian side. It's hard to believe, for example, that an individual and a foundation that contributed time, energy, and over $14.4 million (see scoreboard below right) to a project would simply abandon it, as claimed here. Or that Mr. Cafesjian's interest in building an art museum was a secret.

peditiously. Cafesjian's appointed trustee and long-time employee, John Waters, attended the meeting despite his conflict of interest, but refused to account or report on basic corporate and financial matters, in a clear breach of fiduciary duties, interested only in Cafesjian's attempts to extract the appreciated real estate. Waters voluntarily left when he could not get his way, leaving the meeting with a quorum and the authority to proceed. According to the recording (made without objection) of the meeting and the transcript, Waters stated the following as he departed:

"Anything that you do from this point forward, you can consider it to be a quorum if you like, because it says that it is. Anything you vote on, you can do whatever you want, but ... anyway." My participation in this meeting is over.

"In a series of front page stories in The Armenian Reporter, a newspaper which he controls, Cafesjian and his staff have spared no effort in disparaging the project, the Assembly, and other community members, with no regard to journalistic ethics. Cafesjian has filed legal proceedings characterized as frivolous, including one against the museum, and the other trustees, Anoush Mathevosian, Hirair Hovnanian, and Van Krikorian, personally. Yet the facts confirmed by records made available after Cafesjian abandoned the project are that Cafesjian acquired the properties adjacent to the intended museum building to construct a monument to himself in the form of a "Cafesjian Museum," which would dwarf the Armenian Genocide Museum. (See the attached drawing commissioned in secret). Only when his attention turned elsewhere, he transferred the properties to AGMM. Taking control of AGMM, he failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006.

"The Armenian Reporter also failed to inform the public that the Assembly and AGMM have filed papers with the American Arbitration Association in a good faith effort to reach an amicable conclusion without making a public spectacle. Cafesjian has rejected this offer of mediation and filed in court to stop the American Arbitration Association from proceeding. Upon the Minnesota District Court's decision to dismiss, the AGMM and Assembly renewed the offer for mediation to Cafesjian attorneys and again was rebuffed.

"Once more we want to thank the people who have supported our efforts to date and who continue to express

## 7. Tragic comedy

A note of levity: It *is* true that the lawsuits have been characterized as "frivolous" – but by whom? Not by the court, but by an October 4 news release from the same source!

## 8. Blatant mischaracterization

The papers filed with the American Arbitration Association – also part of the court record – ask for binding arbitration, not mediation. Is there no end to the blatant mischaracterizations in one news release?

We are saddened that the principals of a venerable community institution, the Armenian Assembly, would set out to use the Armenian press to mislead the public.

*The bottom line is simple:* Mr. Cafesjian and CFF conditionally donated the lion's share of the funds for the museum and memorial; the conditions are being flouted. That won't do.

An independent newspaper, published by Armenian Reporter LLC

Gerard L. Cafesjian, President and CEO

Publisher Sylva A. Boghossian

Office manager Lisa Kopooshian

Western U.S. operations manager
Nyree Derderian

Copyright © 2007
by Armenian Reporter LLC.
All Rights Reserved

Armenian Reporter P.O. Box 129
Paramus, N.J. 07652

Editor Vincent Lima

Managing editor Christopher Zakian

Features editor Paul Chaderjian

Washington editor Emil Sanamyan

Associate editor Maria Titizian

Assistant to the Editor Seda Stepanyan

Art director Grigor Hakobyan

Layout assistant Nareh Balian

The views expressed, except in the editorial, are not necessarily those of the publishers.

## CONTRIBUTIONS

| | |
|---|---|
| GERARD CAFESJIAN AND CFF | $14,400,000 |
| ANOUSH MATHEVOSIAN | 3,500,000 |
| HIRAIR HOVNANIAN | 1,500,000 |
| JOHN WATERS | 25,000 |
| ROBERT KALOOSDIAN | 100 |
| VAN KRIKORIAN | 0 |
| TOTAL BOARD OF TRUSTEE MEMBER CONTRIBUTIONS | $19,425,100 |

Financial contributions by former and current members of the Board of Trustees of AGMM for the benefit of the AGMM as of September 2006.