# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Armenian Assembly of America, Inc., *et al.*, <br><br>    *Plaintiffs* <br><br>      *v.* <br><br> Gerard L. Cafesjian, *et al.*, <br><br>    *Defendants* <br><br> ----------------------------------- <br><br> Gerard L. Cafesjian, John J. Waters, Jr., The Cafesjian Family Foundation; and The TomKat Limited Partnership, <br><br>    *Counterclaim Plaintiffs* <br><br>      *v.* <br><br> The Armenian Assembly of America, Inc., Hirair Hovnanian, and the Armenian Genocide Museum and Memorial, Inc., <br><br>    *Counterclaim Defendants* | Civil File No. 1:08-cv-00255 (CKK) <br><br> **<u>ORAL ARGUMENT REQUESTED</u>** <br><br> Status Hearing: Aug. 27, 2008 (10:30 am) |

## <u>COUNTERCLAIM PLAINTIFFS' OPPOSITION TO COUNTERCLAIM DEFENDANTS' AUGUST 15, 2008 MOTION TO DISMISS IN PART</u>

Dated:  August 25, 2008

Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
Nancy Berardinelli-Krantz (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
tfcullen@jonesday.com
nbkrantz@jonesday.com

*Counsel for Counterclaim Plaintiffs / Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

I.     UNJUST ENRICHMENT AND OTHER EQUITABLE REMEDIES MAY
       BE PLED IN THE ALTERNATIVE WHERE, AS HERE, DEFENDANTS'
       ANSWER FAILS TO ADMIT THAT A VALID CONTRACTUAL
       OBLIGATIONS GOVERNS THE RELATIONSHIP BETWEEN PARTIES .......... 1

II.    THE COUNTERCLAIMS STATE VALID CLAIMS FOR DEFAMATION ........... 4

       A.     The Allegation that the Assembly, AGM&M, or Hovnanian Issued a Press
              Release or Letter to Third Parties, Along With Attached Copies of the
              Offending Documents, is Sufficient to Plead Publication ................................. 5

       B.     The Facts as Alleged Do Not Support a Defense of "Consent" ....................... 7

       C.     The Privileges Asserted Are Either Facially Inapplicable Or Else Cannot
              Be Resolved Absent Fact Finding, and thus May Not Be Dismissed
              at This Stage. ...................................................................................................... 9

              1.     The "Common Interest" Privilege is Qualified, and Is
                     Defeated By Proof of "Excessive Publication" or Common-Law
                     "Actual Malice," Both of Which Are Questions of Fact Which Cannot
                     Be Adjudicated Here ................................................................................. 10

              2.     The Judicial Privilege Only Protects Statements Made In the Context
                     of a Judicial Proceeding, And Does Not Protect A Party or Attorney
                     Engaging in "Litigation in the Press" ....................................................... 13

       D.     The Defamation Counterclaims Contain Actionable Statements of Fact
              Which Are Reasonably Susceptible of a Defamatory Meaning ...................... 14

              1.     The July 18, 2007 Hovnanian / Assembly Letter ..................................... 17

              2.     The October 4, 2007 Press Release ........................................................... 18

              3.     The October 31, 2007 and April 11, 2008 Press Releases. ....................... 19

CONCLUSION ............................................................................................ 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*3D Global Solutions, Inc. v. MVM, Inc.*,
    552 F. Supp. 2d 1 (D.D.C. 2008) ...................................................................3

*Chemical-Met Co. v. Metaland Intern., Inc.*,
    No. Civ. A. 96-2548, 1997 WL 74541 (D.D.C. Feb. 19, 1997) .......................10

**Classen Immunotherapies, Inc. v. King Pharm., Inc.*,
    403 F. Supp. 2d 451 (D. Md. 2005) .................................................................7

*Covad Commc'ns Co. v. Revonet, Inc.*,
    250 F.R.D. 14 (D.D.C. 2008)..................................................................6, 10

**Jack Tyler Engineering Co. v. TLV Corp.*,
    No. 07-2580, 2008 WL 2998840 (W.D. Tenn. July 31, 2008).........................2

*Jolevare v. Alpha Kappa Sorority, Inc.*,
    521 F. Supp. 2d 1 (D.D.C. 2007) ...................................................................15

**Kalantar v. Lufthansa German Airlines*,
    402 F. Supp. 2d 130 (D.D.C. 2005) ................................................................5

**Marsh v. Hollander*,
    339 F. Supp. 2d 1 (D.D.C. 2004) ...................................................8, 15, 18, 19

**Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)...........................................................................................16

*Miller v. Holzmann*,
    240 F.R.D. 1 (D.D.C. 2006).............................................................................3

**Munafo v. Helfand*,
    140 F. Supp. 234 (S.D.N.Y. 1956)...................................................................7

**Philadelphia Housing Authority v. CedarCrestone, Inc.*,
    No. 08-1192, 2008 WL 2523152 (E.D. Pa. June 25, 2008)...........................2, 4

*State Farm Mutual Automobile Insurance Co. v. Riley*,
    199 F.R.D. 276 (N.D. Ill. 2001).......................................................................3

*Shanahan v. City of Chicago*,
    82 F.3d 776 (7th Cir. 1996) .............................................................................4

*So. Pan Services Co. v. S.B. Ballard Const. Co.*,
    No. 3:07-cv-592-J-33, 2008 WL 3200236 (M.D. Fla. Aug. 6, 2008)............................2, 4

*Torres v. CBS News*,
    879 F. Supp. 309 (S.D.N.Y. 1995),
    *aff'd*, 71 F.3d 406 (2d Cir. 1995) ......................................................................................7

## STATE CASES

*Blodgett v. University Club*,
    930 A.2d 210 (D.C. 2007) .............................................................................................11

*Brach v. Congregation Yetev Lev D'Satmar, Inc.*,
    265 A.D.2d 360 (N.Y. App. Div. 1999) ........................................................................16

*Brush-Moore Newspapers, Inc. v. Pollitt*,
    151 A.2d 530 (Md. 1959) ................................................................................................5

*Farrington v. Bureau of National Affairs, Inc.*,
    596 A.2d 58 (D.C. 1991) .................................................................................................8

*Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*,
    774 A.2d 332 (D.C. 2001) .............................................................................................13

*Food Lion, Inc. v. Melton*,
    458 S.E.2d 580 (Va. 1995)...............................................................................................5

*Gilford Transport Industrial, Inc. v. Wilner*,
    760 A.2d 580 (D.C. 2000) .......................................................................................15, 16

*Green Acres Trust v. London*,
    688 P.2d 617 (Ariz. 1984)..................................................................................11, 12, 13

*Howard University v. Best*,
    484 A.2d 958 (D.C. 1984) .............................................................................................15

*Ingber v. Ross*,
    479 A.2d 1256 (D.C. 1984) .............................................................................................8

*Kanaga v. Gannett Co., Inc.*,
    687 A.2d 173 (Del. 1996) ..............................................................................................18

*Kennedy v. Cannon*,
    182 A.2d 54 (Md. 1962) ................................................................................................14

*Klayman v. Segal*,
    783 A.2d 607 (D.C. 2001) .................................................................................15, 19, 20

*Lubin v. Kunin,
  17 P.3d 422 (Nev. 2001) ................................................................16

*Moss v. Stockard,
  580 A.2d 1011 (D.C. 1990) ......................................................11, 12

*Oparaugo v. Watts,
  884 A.2d 63 (D.C. 2005) ............................................................5, 7

*Pease v. International Union of Operating Engineers Local 150,
  567 N.E.2d 614 (Ill. App. 1991) ..................................................16

Rancho La Costa, Inc. v. Superior Court,
  106 Cal.App.3d 646 (1980) ...........................................................12

Schiff v. America Association of Retired Persons,
  697 A.2d 1193 (D.C. 1997) .............................................................2

Tocker v. Great Atlantic & Pac. Tea Co.,
  190 A.2d 822 (D.C. 1963) ...............................................................5

*Wallace v. Skadden, Arps, Slate, Meagher & Flom,
  715 A.2d 873 (D.C. 1998) .........................................................15, 19

## FEDERAL RULES

Fed. R. Civ. P. 8(d)(2), (3) ..................................................................2

Fed. R. Civ. P. 36 ...............................................................................3

## MISCELLANEOUS

5 Charles Alan Wright et al., Federal Practice and Procedure § 1276 (2d ed. 1990) ..................10

*2 Rodney A. Smolla, Law of Defamation § 8.17 (2d ed. 2008) ....................................14

D.C. Rules of Professional Conduct 3.6 ......................................................13

*Restatement (Second) of Torts § 577 cmt. b ..................................................5

Restatement (Second) of Torts § 578 ...........................................................8

Restatement (Second) of Torts § 583, cmt. d ..................................................8

XII The Oxford English Dictionary 412 (2d ed. 1989) .........................................7

## OPPOSITION TO THE COUNTERCLAIM DEFENDANTS' AUGUST 15, 2008
## MOTION TO DISMISS IN PART

On July 17, the Cafesjian Family Foundation, Gerard L. Cafesjian, John J. Waters, Jr., and TomKat Limited Partnership (collectively, "CFF") filed nine counterclaims against the Armenian Assembly of America, ("the Assembly"), the Armenian Genocide Museum & Memorial, Inc. ("AGM&M"), and Hirair Hovnanian for various causes of action, including breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, and defamation. (Dkt. No. 23.) The Counterclaim Defendants have now responded, opting only to attempt to dismiss Counterclaim VI (Unjust Enrichment), VII (Imposition of Constructive Trust), and IX (Defamation). The alleged grounds for such dismissal, however, are baseless.

As shown below, the equitable claims of unjust enrichment and the asserted remedy of constructive trust are both validly pled as alternatives to contractual claims—contracts which the Assembly and AGM&M refuse to admit are valid and binding in their Answer. As such, there are no grounds to dismiss them at this time. Likewise, the defamation claims are sufficient, as they challenge false assertions of fact which have defamatory meaning as a matter of law; by contrast, the privileges asserted by Counterclaim Defendants are inapplicable or inappropriate for a motion to dismiss. The motion to dismiss the defamation counts must therefore be rejected.

## I.    UNJUST ENRICHMENT AND OTHER EQUITABLE REMEDIES MAY BE PLED IN THE ALTERNATIVE WHERE, AS HERE, DEFENDANTS' ANSWER FAILS TO ADMIT THAT A VALID CONTRACTUAL OBLIGATIONS GOVERNS THE RELATIONSHIP BETWEEN PARTIES.

AGM&M and the Assembly first seek to dismiss CFF's unjust enrichment claim and its request for imposition of a constructive trust based on the fact that CFF also seeks relief on a theory that the Assembly and AGM&M breached obligations under two express contracts: the Grant Agreement and Transfer Agreement. (Memorandum in Support of Partial Motion to Dismiss ("Mem.") at 7-8.) As shown below, however, this argument belies the reality that, in

their Answer, (1) both parties effectively deny that the Grant and Transfer Agreements govern this dispute, and (2) AGM&M denies that it has an express contractual relationship with CFF. These facts are fatal to the Assembly and AGM&M's motion to dismiss, for as long as these parties dispute the existence of valid, binding contractual obligations, CFF is entitled to plead quasi-contractual relief in the alternative.

At the pleading stage, a party is expressly entitled to "set out 2 or more statements of a claim or defense alternatively" and "may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2), (3). Thus, while in the District of Columbia, there can be "no claim for unjust enrichment when an express contract exists between the parties," *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997), "when the validity of the contract is in doubt or uncertain" or when "an express contract exists that does not govern exclusively the obligations or rights of the parties," a quasi-contractual remedy may be appropriate. *See, e.g.*, *Tolliver v. Christina Sch. Dist.*, -- F. Supp. 2d --, 2008 WL 2726191, at *3 (D. Del. July 14, 2008). As such, "[u]ntil an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment on these grounds is premature." *So. Pan Servs. Co. v. S.B. Ballard Const. Co.*, No. 3:07-cv-592-J-33, 2008 WL 3200236, at *5 (M.D. Fla. Aug. 6, 2008).

Thus, at the motion-to-dismiss stage, a Court should not dismiss an unjust enrichment claim until it has "inquire[d]" as to "whether there is any dispute as to the existence of the express contract, and whether the scope of the contract includes the transaction that is the basis for the" quasi-contractual claim. *Phila. Housing Auth. v. CedarCrestone, Inc.*, -- F. Supp. 2d --, No. 08-1192, 2008 WL 2523152, at *1-2 (E.D. Pa. June 25, 2008). Only if there is no dispute, or where the contract is plainly valid and controlling, should the unjust enrichment claim be dismissed. *See, e.g.*, *Jack Tyler Eng'g Co. v. TLV Corp.*, No. 07-2580, 2008 WL 2998840, at *1-

2 (W.D. Tenn. July 31, 2008) (noting that dismissal of unjust enrichment claim proper only where the parties "admit that [an express] agreement controls" and defendants do not "dispute in any way that the [express] agreement controls or is enforceable"); *cf. 3D Global Solutions, Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 10 (D.D.C. 2008) (dismissing unjust enrichment claim only where "parties do not dispute the existence of a valid contract" and Court found that contract "expressly govern[ed]" the dispute).  Here, the Assembly and AGM&M's own answer demonstrates that it would be premature to dismiss CFF's unjust enrichment claim and constructive trust remedy.

**The Assembly.**  While the Assembly admits that it entered into the Grant Agreement with CFF (Dkt. No. 24 ¶ 29), it refuses to admit that the conditions of the Grant Agreement are applicable to this suit, or even to admit what the conditions of the Grant Agreement *are*.  Instead, the Assembly resorts to the ultimate non-committal non-answer: that the Grant Agreement "speaks for itself."  (*See id.* ¶¶ 30-31, 51.)  Such a response hardly rises to the level of a binding concession by the Assembly that the Grant Agreement is valid, binding, and applicable to the claims at hand.  *See State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 279 (N.D. Ill. 2001) (noting that a party's claim that "the document 'speaks for itself'" is an "unacceptable device, used by lawyers who would prefer not to admit something that is alleged about a document in a complaint"); *cf. Miller v. Holzmann*, 240 F.R.D. 1, 4 (D.D.C. 2006) (noting, in related context of Fed. R. Civ. P. 36, that a party's claim that "'the document speaks for itself' . . . [is] an evasion of the responsibility to either admit or deny").

Nor is the Assembly's statement that the "[Grant and Transfer] agreements govern the relationship between the parties" (Opp. at 8) sufficient to defeat CFF's unjust enrichment claim. Notably, the Assembly does *not* concede these Agreements' validity, and thus a dismissal would allow the Assembly to attack the Agreements while depriving CFF of any alternative, quasi-

contractual relief.[1]  This should not be allowed.  Until the Assembly offers a concession that the Grant and Transfer Agreements are valid and binding, or until this Court determines the same, CFF should be permitted to maintain its unjust enrichment claim against the Assembly.

**AGM&M.**  AGM&M's claim for dismissal of the unjust enrichment claim and constructive trust remedy is even more baseless than the Assembly's.  As an initial matter, and contrary to the insinuation made in AGM&M's motion to dismiss, CFF and AGM&M did *not* sign any express contractual agreement; rather, as AGM&M previously admitted in its Answer, the Transfer Agreement was signed only by the Assembly and AGM&M.  (*Compare* Mem. at 8 *with* Dkt. No. 24 ¶ 34.).  Second, AGM&M has also failed to admit, in its Answer, that it is contractually liable to CFF on either an assignment-of-rights or third-party beneficiary theory, but, like the Assembly, pleaded that the terms of the Transfer Agreement "speak for themselves." (Dkt. No. 24 ¶¶ 56-57, 75.)  Third, AGM&M takes the additional step of affirmatively *denying* that CFF is entitled to bring suit under the Transfer Agreement.  (*Id.* ¶¶ 38 & n.2, 41).  Given its refusal to admit that the Transfer Agreement applies to this dispute, and its challenge to the validity of CFF's asserted contractual rights under that agreement, AGM&M's motion to dismiss the unjust enrichment claim is premature and should be denied.  *See So. Pan Servs. Co.*, 2008 WL 3200236, at *5; *Phila. Housing Auth.*, 2008 WL 2523152, at *1-2.

## II.    THE COUNTERCLAIMS STATE VALID CLAIMS FOR DEFAMATION.

The Assembly, AGM&M, and Hovnanian also challenge the defamation claims on various grounds; however, as shown below, CFF has adequately pled the elements of defamation, and the privileges asserted in the motion to dismiss are either facially inapplicable or plainly premature.  The defamation claims should not be dismissed.

---

[1] Moreover, this statement, self-servingly tucked into a motion to dismiss, does not serve to amend the Answer itself.  *Cf. Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

**A.    The Allegation that the Assembly, AGM&M, or Hovnanian Issued a Press Release or Letter to Third Parties, Along With Attached Copies of the Offending Documents, is Sufficient to Plead Publication.**

The Assembly, AGM&M, and Hovnanian first make a perfunctory, nonsensical, and self-contradictory argument: that the defamation counterclaims are insufficiently pled because they do not "apprise [them] of the persons to whom the [defamation] was published, at least by category."  Mem. at 10 (citing *Oparaugo v. Watts*, 884 A.2d 63, 78 (D.C. 2005).  This contention can, and should be, summarily rejected.

The element of "publication" is a low bar, and is established by a simple showing that the defamatory statement was "communicated to some person other than the one defamed."  *Tocker v. Great Atl. & Pac. Tea Co.*, 190 A.2d 822, 823 (D.C. 1963); *see also* Restatement (Second) of Torts § 577 cmt. b ("It is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons. It is enough that it is communicated to *a single individual* other than the one defamed.") (emphasis added).  Moreover, publication may be established through circumstantial evidence, and "a plaintiff is not required to present testimony from a third party regarding what that person heard and understood, or to identify the person to whom the defamatory words were published."  *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 148 (D.D.C. 2005) (quoting *Food Lion, Inc. v. Melton*, 458 S.E.2d 580, 585 (Va. 1995)); *see also, e.g.*, *Brush-Moore Newspapers, Inc. v. Pollitt*, 151 A.2d 530, 532-33 (Md. 1959) (rejecting argument that plaintiff had not established "publication" of defamation contained in newspaper, noting that "distribution to newsstands . . . would also tend to support an inference that some of the [defamation] came into the hands of readers.").  And, of course, at the pleading stage, the counterclaims need only "give the defendant fair notice of what the [] claim is and the grounds upon which it rests," with enough factual allegations to "raise a right to relief above the

speculative level." *Covad Commc'ns Co. v. Revonet, Inc.*, 250 F.R.D. 14, 18 (D.D.C. 2008) (citation omitted).  The allegations of the counterclaims plainly give such notice of publication.

The defamatory statements alleged in the counterclaims, all of which are attached as exhibits to the counterclaims, come in two forms.  *First*, there is a letter from Defendant Hirair Hovnanian, on the Assembly's letterhead, with the salutation of "Dear Armenian Assembly Member," the text of which explains the letter as the Assembly's attempt "to inform its membership about the current status of the Armenian Genocide Museum and Memorial." (Countercl. ¶ 85 & Ex. 5).  *Second*, there are three press releases from AGM&M, providing AGM&M's address, phone number, web site address, and a specific AGM&M-based email address, the first two of which are captioned "FOR IMMEDIATE RELEASE," and the third of which was e-mailed to third-party "Armenian News Network."  (Countercl. ¶¶ 93-95 & Exs. 6-8).

It should go without saying that these documents provide circumstantial evidence of publication.  Indeed, the Assembly, AGM&M, and Hovnanian expressly *acknowledge* that they "issued [the] letter and [the] press releases . . . *in order to advise their membership, and other interested parties*, about the status of the project and the ongoing litigation."  (Mem. at 6-7.) That concession should defeat their challenge to the sufficiency of the "publication" allegations. But even without the concession, the pleadings and attached exhibits plainly satisfy the standard touted by the Counterclaim Defendants, as the allegations of the counterclaims plainly identify, "at least by category," the third-parties to whom the defamation was published: the individual members of the Armenian Assembly, and members of the press, respectively.

As to the letter, there can be no doubt that, by attaching to the counterclaim a signed letter addressed to the members of the Assembly, CFF has sufficiently raised a plausible factual inference that the letter was sent to at least one such member, and thus "published" as a matter of

defamation law. *See Oparaugo*, 884 A.2d at 78 (holding that allegation that "letter was given to Nigerian authorities who were considering [a] complaint" was "sufficient to apprise [plaintiff] of the persons to whom the letter was published, at least by category.")

The same is true for AGM&M's press releases. By its very use of the phrase "press release," CFF has alleged that the attached documents were "official statement[s] offered to newspapers." *See* XII *The Oxford English Dictionary* 412 (2d ed. 1989) (defining term "press release"). It defies common sense for AGM&M to argue that CFF has not raised at least a factual inference of publication, by alleging that defamation appeared in a press release. Indeed, as one Court stated in rejecting a similar claim, "[o]f course the delivery of the release to the newspapermen was publication in and of itself," and that "[o]ne must be naive not to understand that a person who deliberately prepares and issues a release to press representatives does not intend thereby to obtain the widest circulation of its contents." *Munafo v. Helfand*, 140 F. Supp. 234, 237 (S.D.N.Y. 1956); *see also Classen Immunotherapies, Inc. v. King Pharm., Inc.*, 403 F. Supp. 2d 451, 459-60 & n.3 (D. Md. 2005) (holding that party sufficiently alleged defamation by "attach[ing] to its counterclaim a press release" containing allegedly defamatory material); *Torres v. CBS News*, 879 F. Supp. 309, 316-18 & n.7 (S.D.N.Y. 1995) (holding that press release was "published" on date indicated on face of release, and rejecting "novel" claims that the "mass of people who receive press releases" are not "third persons" for publication purposes), *aff'd*, 71 F.3d 406 (2d Cir. 1995). CFF has plainly alleged publication of the press releases.

**B.     The Facts as Alleged Do Not Support a Defense of "Consent."**

AGM&M also claims that CFF cannot recover for damages related to one of the press releases because it "consented" to the defamation by republishing that press release in Mr. Cafesjian's newspaper for the purpose of explaining its falsity. (Mem. at 7 n.3 & Dkt. No. 27-3.) (stating that AGM&M's press release contained, *inter alia*, a "blatant misrepresentation," a

"well-timed lie," a "bald-faced lie," and a "pattern of falsehoods").  Based on the perfunctory nature in which AGM&M raised this argument, and its apparent concession that this claim is "arguably beyond the scope of a Motion to Dismiss," (*id.*), the Court could choose not to address the issue at this time.  Nonetheless, AGM&M's argument is plainly wrong, for while Mr. Cafesjian might have consented to the second, *republication* of the defamation in his newspaper, he did not consent to the *initial* publication in AGM&M's press release, and it is the initial publication which supports the defamation claim here.

In the District of Columbia, as elsewhere, "each publication of a defamatory statement, including each republication, is a separate tort; each republisher is responsible for the effects of his republication."  *Ingber v. Ross*,  479 A.2d 1256, 1269 (D.C. 1984) (internal quotation marks and citation omitted); *see also* Restatement (Second) of Torts § 578 ("one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it").  This concept—that separate publications are separate acts of defamation—is plainly relevant when considering the defense of consent, which requires proof of "express or implied consent *to the publication*."  *Farrington v. Bureau of Nat. Affairs, Inc.*, 596 A.2d 58, 59 (D.C. 1991) (emphasis added).  Moreover, a "consent may be limited to a publication to a particular person or at a particular time or for a particular purpose.  If so, the publication is privileged only if made within those limitations."  *Marsh v. Hollander*, 339 F. Supp. 2d 1, 12 & n.13 (D.D.C. 2004) (quoting Restatement (Second) of Torts § 583, cmt. d.)  Taken together, these authorities amply demonstrate why "consent" cannot possibly be a defense here.

First, AGM&M seemingly fails to recognize that there are *two* publications at issue here: AGM&M's initial publication of the press release on October 31, 2007, and the reprint of the press release in the December 8, 2007 edition of the *Armenian Reporter*, in which an editorial

piece rebutted the release's falsehoods. Only the first of these publications—by AGM&M—is challenged in the counterclaims, and it is plain that this initial publication was *not* consented to. (Countercl. ¶¶ 93-101.) AGM&M cites no law, nor could it, which holds that the victim's consent to the *repetition* of an already-published defamation, for the express purpose of rebutting it, somehow constitutes an automatic retroactive consent to the initial publication of the defamation. Indeed, to permit a defamer to raise the defense of "consent" under such circumstances would be disastrous as a policy matter, as it would effectively place defamation victims in the untenable position of keeping silent in the face of defamation, thus lending additional credence to the lies, or else speaking out in defense, but thereby losing the right to recover for the damage already caused. This is not, and should not be, the law.

Moreover, even were retroactive consent permissible under certain circumstances, any consent here was "limited to . . . a particular purpose"—namely, for the purpose of discrediting AGM&M's already-published lies. AGM&M's initial press release was not issued for that purpose, but rather was wrongfully presented as the truth. Given the tenor of the editorial in the *Armenian Reporter*, it would defy common sense to suggest that Mr. Cafesjian was attempting to absolve AGM&M of the consequences of its prior defamation, or that he otherwise consented to any publication that did not likewise expose the press release for what the newspaper said it was: "incontrovertibly false." (Dkt. No. 27-3 at 1.) Given that there is no allegation that Mr. Cafesjian consented to the publication upon which this action was actually brought, AGM&M's invocation of the consent defense is misplaced, and should be rejected.

### C.   The Privileges Asserted Are Either Facially Inapplicable Or Else Cannot Be Resolved Absent Fact Finding, and thus May Not Be Dismissed at This Stage.

The Assembly, AGM&M, and Hovnanian also raise two privileges in an effort to justify their defamation: the "judicial privilege" and the "common interest" privilege. As an initial

matter, the counterclaim defendants appear to imply that the counterclaims should be dismissed because CFF did not pre-emptively assert facts which would defeat the privileges. (Mem. at 11.) But Federal Rule of Civil Procedure 8(a) "do[es] not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant," and in fact, "the practice of pleading facts in a complaint to defeat anticipated affirmative defenses is disfavored." *Chem-Met Co. v. Metaland Intern., Inc.*, No. Civ. A. 96-2548, 1997 WL 74541, at * 2 (D.D.C. Feb. 19, 1997); *see also* 5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1276 (2d ed. 1990).

Moreover, to paraphrase the rule, even if a counterclaim was required to contain factual allegations sufficient to raise the question of the defeat of potential affirmative defenses "above the speculative level, on the assumption that all the allegations in the [counterclaim] are true," *see Covad Commc'ns*, 250 F.R.D. at 18, that standard is met here. The facts alleged are sufficient to raise the question of (1) whether the common-interest privilege is inapplicable to the press releases because, by the very fact they were released to the media, they were "excessively published"; (2) whether any common-interest privilege as to the letter and press releases was abrogated because the counterclaim defendants held "ill will" towards Mr. Cafesjian, as can be inferred from the fact that they *knew* that their allegations against Mr. Cafesjian were untrue, yet published them anyway; and (3) whether the judicial privilege is inapplicable to the press releases because press releases are not statements made "in the course of a judicial proceeding" as a matter of law. As the privileges are either facially inapplicable or else require fact-finding before they can be resolved, the motion to dismiss based on these privileges should be denied.

> 1.    The "Common Interest" Privilege is Qualified, and Is Defeated By Proof of "Excessive Publication" or Common-Law "Actual Malice," Both of <u>Which Are Questions of Fact Which Cannot Be Adjudicated Here.</u>

The Assembly, AGM&M, and Hovnanian first allege that the "common interest" privilege applies to all of their defamatory statements. (Mem. at 11-12.) As shown below,

however, this assertion is specious with respect to the press releases; and even assuming, arguendo, that the letter is conditionally qualified by the privilege, CFF is entitled to prove that Mr. Hovnanian and the Assembly held actual malice towards Mr. Cafesjian, thus defeating the privilege. In all events, the Motion to Dismiss should be denied.

In the District of Columbia, the common-interest privilege requires a showing that:

> the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.

*Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990). Under this rubric, statements made among common members of business, professional, or social organizations are qualifiedly privileged. *See Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007) (applying privilege to statements regarding party's conduct within private club). This privilege may be defeated, however, by proof of common-law malice, defined as "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss*, 580 A.2d at 1025. This standard may be established by showing that a defendant published a statement while subjectively *knowing* it was false, or else "when the nature of the statement makes reputational injury likely and the defendant is aware of its probable falsity." *Id.* at 1026.

The common interest privilege may also be defeated by showing "excessive publication," defined as publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest." *Id.* at 1024. Publication to the media regarding ongoing litigation—and not just among the parties affiliated with the lawsuit—plainly falls outside of the realm of a shared interest, and well within the realm of excessive publication. *See*, *e.g.*, *Green Acres Trust v. London*, 688 P.2d 617, 626 (Ariz. 1984)

(holding that "[w]e fail to see how the lawyer defendants enjoyed any special relationship with the newspaper reporter" for statements made about lawsuit during press conference, and denying assertion of common-interest privilege); *Rancho La Costa, Inc. v. Superior Court*, 106 Cal.App.3d 646, 664-65 (1980) (holding that "common interest" for privilege refers to a "concern . . . other than mere general or idle curiosity of the general readership of newspapers and magazines" and refusing to extend privilege when publication made to such groups).  Here, all of the defamatory statements either fall outside of the common-interest privilege, or at least require factual development on the issues of malice and/or excessive publication.

*First*, AGM&M's press releases were excessively published, as should be apparent from the fact that they were issued to the press, and not to AGM&M's membership.  *See Green Acres Trust*, 688 P.2d at 626; *Rancho La Costa, Inc. v. Superior Court*, 106 Cal.App.3d at 665.  Indeed, AGM&M makes no effort *at all* to explain how the elements of the privilege apply here; it does not, for instance, assert that the news media has a "common interest" with AGM&M.  Moreover, discovery will also potentially uncover evidence that AGM&M knew its press releases were false, which would likewise defeat any privilege which might exist.  In all events, the assertion of a "common interest" privilege gives no basis to dismiss the defamation counterclaims.

*Second*, it is too early to determine whether a "common interest" privilege applies to the letter from Hovnanian to the Assembly membership.  While such a letter may conceivably implicate the common interest privilege, that privilege is qualified and may be defeated by evidence of malice—such as evidence that the Assembly and Hovnanian knew the letter's claims to be false when publishing it.  *See Moss*, 580 A.2d at 1025-26.  CFF is thus entitled to discovery on these claims before an adjudication of the privilege; indeed, such discovery could further

show that the letter was excessively published beyond the Assembly's membership, or uncover

other grounds to defeat privilege.  Again, dismissal based on this privilege would be premature.

> 2.    The Judicial Privilege Only Protects Statements Made In the Context of a
> Judicial Proceeding, And Does Not Protect A Party or Attorney Engaging
> in "Litigation in the Press."

AGM&M also claims, with little analysis, that the press releases are covered by the

judicial proceedings privilege because they discuss "the merits of Cafesjian, CFF, and Waters'

claims."  (Mem. at 12.)  But this too is an inaccurate assessment of the judicial proceedings

privilege, which applies only to "statements made preliminary to, or *in the course of, a judicial*

*proceeding*, so long as the statements bear some relation to the proceeding."  *Finkelstein,*

*Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001)

(emphasis added).  The purpose for the rule, in the District, is "based upon a public policy of

securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice

for their clients,' *id.*, and as such, the District requires "a reasonable nexus between the

publication in question and the litigation under consideration," and thus the privilege does not

apply to statements "published to persons not having an interest or connection to the litigation."

*Id.* at 342 (citations omitted).  As such, so-called "litigation in the press"—extrajudicial, self-

serving statements made by a party and its attorney to the media—do not have any sufficient

connection to the litigation itself and is not shielded by the judicial proceedings privilege.

This view is widely accepted.  For instance, in *Green Acres Trust v. London*, 688 P.2d

617, 623 (Ariz. 1984), the Arizona Supreme Court noted that ethically, "a lawyer may not make

or participate in making an extra-judicial statement which he expects will be disseminated by

means of public communication which will likely interfere with the fairness of an adjudicative

proceeding."  *Id.* at 623; *compare* D.C. Rules of Prof'l Conduct 3.6.  As such, the Court noted

that "defaming the adversary during a press conference cannot be considered as legitimately

advancing a client's interest," and thus, "by denying the absolute privilege in this case, we do not curtail zealous representation. We simply decide that an attorney who wishes to litigate his case in the press will do so at his own risk." *Id.* at 623 (internal quotations and citations omitted). Likewise, in *Kennedy v. Cannon*, 182 A.2d 54, 59 (Md. 1962), the Maryland Supreme Court reviewed numerous authorities and concluded that a criminal attorney's statement to a newspaper reporter regarding evidence he intended to present that would cast the victim as a liar, was not covered by the judicial proceedings privilege. The Court noted that the press was not "a party having a corresponding interest or duty in the matter," nor was the attorney's "action within the scope of his professional acts as an attorney in a pending case." *Id.* Further, the Court noted that to allow the privilege would "open the door to the universally condemned 'trial by press,' a procedure forbidden to counsel and subversive of the fair and orderly conduct of judicial proceedings." *Id.*; *see also generally* 2 Rodney A. Smolla, *Law of Defamation* § 8.17 (2d ed. 2008) (noting that "[s]tatements made at press conferences or in other circumstances not related to the proceeding are not covered by the [judicial proceedings] privilege.") (citing authorities).

These authorities compel the rejection of AGM&M's asserted "judicial proceedings" privilege defense. The statements at issue were all made in press releases, and thus the statements were not made "in the course of a judicial proceeding." (Countercl. ¶¶ 93-95 & Ex. 6-8.) AGM&M's attempt to have the defamation counterclaims dismissed is thus baseless.

### D.  The Defamation Counterclaims Contain Actionable Statements of Fact Which Are Reasonably Susceptible of a Defamatory Meaning.

Finally, the Counterclaim Defendants argue that the defamation claims should be dismissed because they are "opinions," or else because they are not reasonably susceptible to a defamatory meaning. (Mem. at 12-13.) Again, however, these contentions do not hold up to scrutiny, and these arguments, too, should be rejected.

In the District of Columbia, a "defamatory" statement is one that "tends to injure a plaintiff in her trade, profession or community standing, or lower her in the estimation of the community." *Jolevare v. Alpha Kappa Sorority, Inc.*, 521 F. Supp. 2d 1, 12 (D.D.C. 2007). In order to be actionable, the statement "must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958, 988-89 (D.C. 1984). The D.C. Court of Appeals has held that "odious" means "arousing or deserving hatred or loathing"; "infamous" means "notorious or in disgrace or dishonor"; and "ridiculous" means "absurd or deserving ridicule." *Klayman v. Segal*, 783 A.2d 607, 618 (D.C. 2001) (internal punctuation omitted). Among the sorts of statements rising to the level of actionable defamation are those from which a "juror could reasonably impute a lack of professional integrity or competence from a statement made in a business context." *Marsh v. Hollander*, 339 F. Supp. 2d 1, 10-11 (D.D.C. 2004) (noting that allegations that Plaintiff had "overbill[ed]" or "knowingly and improperly retained an overpayment" could be defamatory). Indeed, in *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998), the District of Columbia Court of Appeals held that "[a]n allegation that an attorney is often out of the office during normal working hours" or a representation "that a client is sufficiently dissatisfied with an attorney's work to seek the attorney's removal from the client's matters" is sufficient to state a defamation claim.

Moreover, a party cannot escape the consequences of his or her defamation by merely labeling it an "opinion." Even an "opinion" is actionable if it "has an explicit or implicit factual foundation and is therefore objectively verifiable." *Gilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000). Thus, for instance, while the allegation that someone is "unfair to labor" may be protected opinion, "to charge one with unfair labor practices," such as the

violation of a rule or statute, implies a statement of fact, and thus "a provably false accusation of such conduct may be defamatory." *Id.* at 600.

   This reasoning naturally applies to allegations that a party filed false charges or otherwise lied with respect to legal proceedings. For instance, the Supreme Court has held that the implied assertion that the plaintiff perjured himself in a judicial proceeding was sufficiently factual to be susceptible of being proven true or false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 8-9 (1990). Likewise, in a case with obvious parallels to this one, the New York Appellate Division found a defendant was liable for defamation for publishing an article claiming that it had "attempted to persuade [the plaintiff] to settle their [property] dispute in a rabbinical court, and that [Plaintiff] refused, resulting in" a state court lawsuit which Plaintiff was accused to have won "by lies and deceit." *Brach v. Congregation Yetev Lev D'Satmar, Inc.*, 265 A.D.2d 360, 360-61 (N.Y. App. Div. 1999). The statement was not opinion, the Court held, as "the statements complained of imply that the speaker knows certain facts, unknown to his audience, which supports his opinion and are detrimental to the person about whom he is speaking." *Id.* The same reasoning applied in *Lubin v. Kunin*, 17 P.3d 422, 426 (Nev. 2001), where the Nevada Supreme Court held that Defendant's distribution of a flier claiming that its lawsuit was "not frivolous" and was "supported by abundant evidence" was actionable defamation, as the Defendant's statement "impl[ied] . . . the existence of factual information rather than opinion that would prove the allegations." *See also, e.g.*, *Pease v. Int'l Union of Operating Engineers Local 150*, 567 N.E.2d 614, 619 (Ill. App. 1991) (holding that statement was actionable defamation when Union president told a newspaper reporter that '[Plaintiff] lies a lot' when asked to respond to Plaintiff's allegation that the union was responsible for vandalism at Plaintiff's firm.)

In this case, the Assembly, AGM&M, and Hovnanian have issued many false statements and claims against Mr. Cafesjian and others during their campaign of litigation-in-the-press, but the four statements which comprise the defamation counterclaims are among the worst of the worst. These statements go beyond hyperbole, opinion and name-calling, and instead make or imply false factual assertions which impugn Mr. Cafesjian's status as a philanthropist and supporter of Armenian causes, and effectively accuse him of betraying the greater interests of the Armenian-American community for money. Based on the preceding authority, the Assembly, AGM&M, and Hovnanian cannot claim these statements are non-defamatory opinion.

1.     The July 18, 2007 Hovnanian / Assembly Letter

The July 18, 2007 letter facially purports to be a factual summary of "the current status" of the Museum project, which Hovnanian portrays as being threatened by Mr. Cafesjian. (Dkt. 23-6 at 2-3). As in *Brach*, Hovnanian condemns Mr. Cafesjian's lawsuit, and challenges his "stated reason for abandoning the project and filing suit against the Assembly," by claiming that, contrary to Mr. Cafesjian's legal assertions, that "[a]t no point did the Assembly reject Mr. Cafesjian's vision for the museum, which is his stated reason for abandoning the project and filing suit against the Assembly." (*Id.*) The letter then states that the Assembly "has sought an accounting" in connection with Mr. Cafesjian's "abandonment" of the project, raising the implication that Mr. Cafesjian's actions give it reason to analyze AGM&M's records for evidence of improprieties. (*Id.* at 3.)

This letter plainly makes several assertions of fact, foremost of which is the claim that the Assembly and Hovnanian did not reject Mr. Cafesjian's vision for the museum; indeed, the Assembly's own complaint in this matter ridicules Mr. Cafesjian's proposed design and describes its rejection, showing that the letter's claim was false. (*See* Dkt. No. 1 ¶¶ 88-90.) Moreover, the letter is facially defamatory, as it directly suggests that Mr. Cafesjian is lying

about his dealings with the museum project and that Mr. Cafesjian filed a false complaint in federal court. Such an accusation plainly suggests "a lack of professional integrity or competence from a statement made in a business context," and is sufficiently defamatory to state a claim. *See, e.g.*, *Marsh v. Hollander*, 339 F. Supp. 2d at 10. This defamatory sting was only furthered by the mention of the "accounting," which reinforced the false insinuation that Mr. Cafesjian was dishonest in his business dealings and his motives for suing the Assembly. The statements in this letter are factual, are facially defamatory, and should not be dismissed.

     2.  The October 4, 2007 Press Release.

    The October 4, 2007 press release is likewise actionable. Like the letter, it claims that Mr. Cafesjian's lawsuit has "no basis in fact," and asserts that Mr. Cafesjian's true motivation in filing suit is a "desperate attempt" to "scuttle the building of a genocide museum in Washington, D.C. to honor the Armenian Genocide victims, survivors, and family members" and to "block" the "process of building a museum of which all Armenian-Americans can be proud." (Dkt. No. 23-7.) Again, these are both objectively verifiable claims. As to the lawsuit itself, either the facts alleged in Mr. Cafesjian's complaint have a factual basis, or they are not. Likewise, Mr. Cafesjian's alleged motivation is a question of fact; as this Court knows, juries make factual determinations as to a party's state of mind in myriad cases, and an assertion by one party as to another's motivation is capable of being proven true or false, and if false, it is defamatory. *See, e.g.*, *Manufactured Home Communities, Inc. v. County of San Diego*, -- F.3d --, 2008 WL 600974, at *3 (9th Cir. 2008); *Kanaga v. Gannett Co., Inc.*, 687 A.2d 173, 181 (Del. 1996).

    Likewise, there can be no question that the statements are capable of a defamatory meaning. AGM&M is asserting that Mr. Cafesjian—an Armenian-American well known in that community—filed a false complaint in federal court as a part of a scheme to destroy a highly-anticipated museum dedicated to Armenian genocide victims. Not only does this imply

dishonesty in his professional dealings, it accuses him of being a traitor to his community—an accusation of "odious" or "notorious" behavior under any sense of the word. *See Klayman*, 783 A.2d at 618. The defamation claim based on this press release should not be dismissed.

3.    <u>The October 31, 2007 and April 11, 2008 Press Releases.</u>

The final two press releases make largely the same false allegation, in largely the same words, and thus can be analyzed together. These two press releases claim, among other plainly false factual allegations, that Mr. Cafesjian "left the trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts," leaving a project "strongly endorsed" by the Armenian-American community "in tatters." (Dkt. No. 23-8 at 2; Dkt. No. 23-9 at 2-3.) Both releases likewise falsely claim that Mr. Cafesjian's motivation in filing his suits was to "recover the substantially appreciated real estate." Finally, the October 31, 2007 press release also made the false assertion that Mr. Cafesjian and Mr. Waters were suspended from the Assembly due to "flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy." On their face, these press releases plainly raise objectively-verifiable statements of fact, and indeed, it is hard to imagine how AGM&M can possibly claim otherwise in good faith.

Moreover, these statements are plainly defamatory. They unambiguously accuse Mr. Cafesjian of mismanagement in his business affairs, which is itself sufficient to state a defamation claim. *See Marsh*, 339 F. Supp. 2d at 10; *Wallace*, 715 A.2d at 878. The press releases go further, however, by claiming that Mr. Cafesjian's purpose in filing suit was to obtain "substantially appreciated" real estate, thus offering the unmistakable sting that Mr. Cafesjian was selling out the Armenian-American community and "scuttling" a community-supported museum due to personal greed. Again, it is hard to imagine a more "odious" assertion to make

-19-

about a man who has been a generous philanthropist to Armenian causes over the years.  *See Klayman*, 783 A.2d at 618.  The claims based on these press releases should not be dismissed.

## CONCLUSION

The unjust enrichment claims pled by CFF are validly pled, and will remain so until the Court holds or the Assembly and AGM&M concede that their actions are directly controlled by valid contractual obligations.  As such, the Counterclaim Defendants' motion to dismiss these claims should be denied.

Furthermore, the defamation claims all claim relief from false statements of fact which impute dishonesty and "infamous" behavior to Mr. Cafesjian, and thus state valid claims.  Moreover, the privileges asserted by the Counterclaim Defendants are either facially inapplicable or else cannot be resolved at the motion-to-dismiss stage of these proceedings, and offer no grounds for dismissal either.  The motion to dismiss in part should therefore be rejected.

In the alternative, should the Court dismiss the equitable claims, it should likewise hold, as a matter of law, that the Grant and Transfer Agreements are valid and binding on both the Assembly and AGM&M.  Should the Court dismiss the defamation counterclaims, it should permit amendment to allow CFF to plead additional facts in support thereof.

Dated:  August 25, 2008

Respectfully submitted,

/s/ Thomas F. Cullen, Jr.
Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
Nancy Berardinelli-Krantz (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
tfcullen@jonesday.com
nbkrantz@jonesday.com

*Counsel for Defendants / Counterclaim Plaintiffs*