UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF AMERICA, INC. and
THE ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.,

                    Plaintiffs,

v.

GERARD L. CAFESJIAN *et al.*,

                    Defendants.

Civil File No. 08-255 (CKK)

GERARD L. CAFESJIAN, JOHN J. WATERS, JR., THE
CAFESJIAN FAMILY FOUNDATION, INC., and THE
TOMKAT LIMITED PARTNERSHIP,

                    Counterclaim Plaintiffs,

v.

THE ARMENIAN ASSEMBLY OF AMERICA, INC., THE
ARMENIAN GENOCIDE MUSEUM AND MEMORIAL,
INC., and HIRAIR HOVNANIAN,

                    Counterclaim Defendants.

## REPLY MEMORANDUM IN RESPONSE TO COUNTERCLAIM PLAINITFFS' OPPOSITION TO COUNTERCLAIM DEFENDANTS' PARTIAL MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)

       The Defendants in Counterclaims, Hirair Hovnanian ("Hovnanian"), the Armenian

Assembly of America, Inc. ("the Assembly"), and the Armenian Genocide Museum &

Memorial, Inc. ("AGM&M") (hereinafter collectively referred to as "Plaintiffs"[1]) hereby submit

their Reply Memorandum to John J. Waters ("Waters"), Gerard L. Cafesjian ("Cafesjian"), The

---

[1] Although Hovnanian is not a Plaintiff to the original Complaint, the Defendants in
Counterclaims are referred to herein as Plaintiffs for the sake of clarity.

Cafesjian Family Foundation ("CFF"), and TomKat LP's ("TomKat") (hereinafter collectively "Defendants") Opposition to Plaintiff's Partial Motion to Dismiss ("Motion to Dismiss") Defendants' Counterclaims ("the Counterclaims").

The United States Supreme Court recently clarified that the mandate to allege the grounds on which a claim for relief rests "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1959 (2007). Thus, while it is axiomatic that a court must accept the allegations of a complaint as true for purposes of deciding a motion to dismiss, "[c]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Id. at 1965, citing Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court held that a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. In the event that a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." Id. As Defendants have not "nudged" their claims set forth at Counts VI, VII, VIII, and IX into the realm of plausible, the Counterclaims fail to state forth claims upon which relief may be granted and should be dismissed with prejudice.

I.  **DEFENDANTS' COUNTERCLAIMS FOR UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST ARE BARRED BY THE EXISTENCE OF EXPRESS OR IMPLIED CONTRACTS BETWEEN THE PARTIES**

Defendants' Opposition first asserts that Defendants' counterclaims for unjust enrichment and constructive trust should be permitted to survive, despite the existence of two express contracts governing the relationship between the parties (the Grant and Transfer Agreements, hereinafter "the agreements"), because of Plaintiffs' alleged denial of the contractual relationships set forth in the contracts. Defendants point to no real support for this assertion either in their own Counterclaims, Plaintiffs' pleadings, or District of Columbia law.

The Counterclaims themselves describe, in detail, the formation and execution of the agreements, and do not assert that there is any dispute as to the existence or validity of <u>either</u> the Grant Agreement or the Transfer Agreement.  Counterclaims ("Countercl.") ¶¶ 29-30, 34-35, 38, 41.  In both ¶¶ 29 and 41 of the Counterclaims, the plaintiffs specifically admit the allegation that both the Grant Agreement and the Transfer Agreement were written contracts between the parties to those contracts.  Thus, the core of the claim by the Defendants that the Plaintiffs deny the existence of a contract is wholly undermined.  Where, as here, "the existence of two express contracts . .. . can be determined from the allegations in the complaint . . . there can be no claim of unjust enrichment."  <u>Schiff v. Am. Ass'n of Ret'd Pers.</u>, 697 A.2d 1193, 1194 n.2 (D.C. App.1997).  This reasoning was echoed in <u>Philadelphia Hous. Auth. v. CedarCrestone, Inc.</u>, No. 08-1192, 2008 WL 2523152 * 2-3 (E.D. Pa. June 25, 2008), cited by Defendants in support of their Opposition, in which the Court confirmed that any initial inquiry into the existence of a contract requires the court to review the allegations set forth in the support of the underlying claims.  In <u>CedarCrestone</u>, the Court considered the "relevant allegations of the counterclaim" and determined that, based on the allegations, which specifically plead the existence of two contracts, no claim for *quantum meruit* existed.  <u>Id.</u> at *3.  The Court went on to emphasize that CedarCrestone's subsequent attempt to allege that the unjust enrichment recovery sought related to terms beyond the scope of the contract (because of purported disputes regarding the scope) were unavailing, as CedarCrestone had failed to include these allegations in the Complaint itself. <u>Id.</u>

As noted above, Defendants' Counterclaims do not assert that there is any dispute as to the existence, scope or validity of the agreements, nor do they assert that the agreements do not govern exclusively the obligations or rights of the parties at issue.  Accordingly, their claims for

unjust enrichment and constructive trust fail as a matter of law.  See Albrecht v. Comm. on Emp.
Benefits of Fed. Reserve Employee Benefits Sys., 357 F.3d 62, 69 (D.C. Cir. 2004) ("there can
be no claim for unjust enrichment when an express contract exists between the parties"); Schiff,
697 A.2d at 1194 n.2; 3D Global Solutions, Inc. v. MVM, Inc., 552 F. Supp. 2d 1, 10 (D.D.C.
2008) (an unjust enrichment claim could not stand where the court found that the contract
expressly governed the issues); accord Tolliver v. Christina School Dist., No. 06-796, 2008 WL
2726191 *3 (D. Del . July 14, 2008)(unjust enrichment claim may only be brought where
contract does not govern exclusively the obligations or rights of the parties at issue).

Any attempt by Defendants to amend their Counterclaims would be futile, as no dispute
exists as to the existence (emphasis added) of agreements which govern the parties' dispute, only
as to the construction and application of the terms set forth therein.  In other words, the disputes
that exist, and that are relevant to Defendants' unjust enrichment argument, are contract
interpretation disputes, not disputes regarding the existence of the contracts.

Defendants' unjust enrichment claims arise directly out of Defendants' interpretation of
the underlying agreement.  Specifically, Defendants allege that:

> **The Assembly and AGM&M have been unjustly enriched by
> retaining both Counterclaim Plaintiff's donated money and
> property while refusing to permit Mr. Cafesjian and CFF to
> exercise their ongoing right to participate in and approve the
> planning and design of the museum and memorial, including
> the right to participate in all material decisions regarding the
> memorial.**

Countercl. ¶ 80.  The relevant portion of the Agreement states as follows:

> **The [Grant Property] may only be used as part of the
> AGM&M, subject to plans for the AGM&M approved by the
> Board of Trustees of Armenian Genocide Museum &
> Memorial, Inc. (the "Plans") . . .**
>
> **. . .**

> **The Assembly shall :**
>
> **(A)    make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial) . . .**
>
> **(B)    cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;**
>
> **(C)    permit the Foundation to participate in all material decisions regarding the Memorial.**

Grant Agreement at §§ 3.1(A), 3.2, attached at Exhibit 2 to Countercl.

Nowhere in their pleadings have Plaintiffs ever disputed that the terms of the Agreement referenced above exist, or asserted that they are unenforceable. Plaintiffs' statement in their Answer to the Counterclaims that the Agreements speak for themselves cannot reasonably be construed as a denial of either the existence or the validity of the contracts themselves. Indeed, Plaintiffs' Answer to the Counterclaims confirms that, as to Defendants' claim for unjust enrichment, Plaintiffs have admitted that the donations made by Cafesjian and CFF were donated "pursuant to express contracts." Answer to Counterclaims ¶ 79. The issue is not whether the contracts exist, but how they are to be enforced.[2]

Plaintiffs do not agree with Defendants that the relevant provisions (1) prohibit the AGM&M Board of Trustees from delegating day-to-day planning authority to a duly-authorized sub-committee; (2) give Cafesjian or CFF, as opposed to the persons who properly constitute the

---

[2] Plaintiffs have asserted, in the underlying Complaint as well as in their Answer to the Counterclaims, that due to Defendants' misconduct, and in particular their breaches of fiduciary duty and failure to act in good faith with respect to the agreements, a separate reversionary provision of the Grant Agreement is either unenforceable or should be tolled in order to account for the delay in the development of the museum caused by Cafesjian and his agents. However, the dispute as to the reversionary provision cannot give rise to an unjust enrichment claim for Cafesjian, as Cafesjian has no current rights under the reversionary provision, and will not have any until, at the earliest, December 31, 2010. The only existing rights and obligations which Cafesjian can assert arise under other provisions of the Agreements, the enforceability of which is not disputed, as discussed above.

"Board of Trustees of AGM&M," an unfettered right to "approve" all decisions regarding the museum. The Counterclaims do not even allege that space has not been put aside in the AGM&M for a memorial, that any "material" decisions regarding the memorial have occurred, or that the Foundation has made any effort to propose designs for such a memorial.

Simply put, nothing in the agreements requires the AGM&M to allow Trustees to vote on decisions on issues as to which they have repeatedly demonstrated not just an active conflict of interest, but a willingness to use whatever means they can to achieve the opposite result. The inherent conflict of interest in their position undermines their claim of a right to prohibit the other Trustees from delegating authority and to give them a right to approve all decisions on issues that fall within the scope of the conflict. See <u>Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries</u>, 381 F. Supp. 1003 (D.D.C. 1974).

The "approval" argument is, in any event, a "red herring." Per the allegations in Plaintiffs' Complaint, it is apparent that Defendants have no serious interest in seeing the museum project come to fruition. Cafesjian has repeatedly confirmed, through letters from counsel as well as the pleadings filed in the District Court of Minnesota beginning in April, 2007, that he wishes to void the agreements, recover all of his donations immediately (at <u>current</u> fair market value, a substantial windfall)– in direct contravention of the terms of the agreements – and liquidate the museum project in its entirety. The Defendants merely make the approval argument to create a diversion and draw attention away from the central issues of this case.

## II.     DEFENDANTS' COUNTERCLAIMS FOR DEFAMATION FAIL AS A MATTER OF LAW

### A.     *The Allegedly Defamatory Statements Set Forth in the Complaint Are Not, As a Matter of Law, Reasonably Susceptible to a Defamatory Meaning*

Defendants concede that, in order to survive a Motion to Dismiss, a statement must "be more than unpleasant or offensive; the language must make the plaintiff appear odious,

infamous, or ridiculous." <u>Clawson v. St. Louis Post-Dispatch, L.L.C.</u>, 906 A.2d 308, 313 (D.C. 2006) (internal quotations and citation omitted).  "The court should not . . . indulge far-fetched interpretations of the challenged publication. The statements  . . . should be construed as the average or common mind would naturally understand them." <u>Guilford Transp. Industries, Inc. v. Wilner</u>, 760 A.2d 580, 594 (D.C. 2000).  As discussed below, Defendants' protestations to the contrary, no reasonable person reviewing the statements described in the Counterclaims could conclude that they are defamatory.

    1. <u>Many of the Statements Alleged to Be Defamatory are Non-Defamatory Opinion</u>

   Where, as here, the allegedly defamatory statements are made in the context of a vigorous dispute between parties regarding a matter of public interest, one which "realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy." <u>Guilford</u>, 760 A.2d. at 598.  Parties on one side or the other of such a dispute are not required to "be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight." <u>Id</u>.  (statements that a party had been "unfair," or that they had "bolted" from negotiations, was not grounds for liable suit).  Thus, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." <u>Weyrich v. New Republic, Inc.</u>, 235 F.3d 617, 624 (D.C. Cir. 2001)(internal citation omitted).  "In deciding whether a reasonable fact finder could conclude that a statement expressed or implied a verifiably false fact about appellant, the court must consider the statement in context. . .  This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole'

which has traditionally added much to the discourse of our Nation." <u>Id.</u> (internal citations omitted).

Here, a large percentage of the allegedly defamatory statements clearly fall within the ambit of non-defamatory opinion and do not, as a matter of law, rise to the level of defamatory statements.  Thus, just by way of example, Plaintiffs' statements that Cafesjian "abandoned" the project, that his litigation was a "desperate attempt" or "scuttled" efforts to build the museum, or that the cases were without legal merit, all clearly fall within the ambit of non-defamatory opinion. <u>See</u> <u>Guilford</u> at 598 (holding that statement that a party "bolted" from negotiations was not sufficient, as a matter of law, to make out defamation claim); <u>Weyrich,</u> 235 F.3d at 624 (statement that a commentator was "paranoid" was non-defamatory opinion in context of article).[3]  As "it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the[se] statement [are] not actionable." <u>Guilford</u> at 597.

      2.    <u>To the Extent Any of the Statements Imply the Existence of Facts, Such Statements Are Not Reasonably Construed As Defamatory</u>

Even assuming, arguendo, that the allegedly defamatory statements set forth in the letter and press are not privileged or non-defamatory opinion, those statements are simply not, as a matter of law, reasonably construed as defamatory.  As a matter of law, "perceived unpleasantness and offensiveness [by the plaintiff] are not sufficient to sustain an allegation that material is reasonably capable of defamatory meaning."  <u>Klayman v. Segal,</u> 783 A.2d 607, 618

---

[3] Defendants repeatedly, without any citation to the relevant documents, assert or imply that Plaintiffs referred to Cafesjian or CFF as "liars" or imputed that they committed perjury.  A quick review of the relevant documents reveals that Plaintiffs have done nothing of the sort. Defendants' blatant efforts to misconstrue the record or misstate what is actually contained in the relevant documents simply confirms the facial insufficiency, as well as the ineffectuality, of their claims.

(D.C. 2001).  Rather, the statements must, in a reasonable person's mind, make the Defendants "appear odious, infamous, or ridiculous."  Here, the allegedly fact-infused portions of the allegedly defamatory statements simply would not make Defendant CFF or Cafesjian appear odious, infamous, or ridiculous in any reasonable person's view of the documents as a whole. As stated in Marsh v. Hollander, 339 F. Supp. 2d 1 (D.D.C. 2004), "context is key to determining whether, as a matter of law, a statement is capable of bearing a defamatory meaning."  Id at 10.  Thus, "even if one or two sentences were offensive to the plaintiff, the article was focused on something that could not be construed as defamatory."  Id. (citing Klayman, 783 A.2d at 617).

Here, in the context of the letter and press releases as a whole, it is apparent that the purpose of the documents was not to make any of the Defendants "appear odious, infamous, or ridiculous," but to explain the reason for the litigation and to reassure donors, potential donors, and other interested members of the community that the project was nevertheless moving forward.  Plaintiffs did not, as Defendants suggest, state, let alone imply, that Cafesjian was a traitor to his community, or that he had lied.  Indeed, none of the statements even come close to rising to the level of being defamatory.  See Howard University v. Best, 484 A.2d 958, 989 (D.C. 1984)(statements that professor did not get along well with Dean and was leaving university before she, in fact, had left, were not defamatory on their face); Levy v. American Mutual Liability Ins., 196 A.2d 475, 476-77 (D.C. 1964)(allegedly false statement that insurer had declined to renew policy of plaintiff due to "loss frequency," while suggesting plaintiff was accident prone and hence a bad insurance risk, not reasonably capable of defamatory meaning). As none of the statements are reasonably susceptible to a defamatory meaning, the defamation claims should be dismissed.

**B.** *The Allegations Set Forth in Defendants' Counterclaims Are Insufficient as a Matter of Law*

Despite their protestations to the contrary, Defendants have also not sufficiently pled the publication element of defamation. Allegations pled in support of a defamation claim must be sufficiently specific to apprise the defendant of the persons to whom the allegedly defamatory material was published. Oparaugo v. Watts, 884 A.2d 63, 78 (D.C. 2005). Thus, in Oparaugo, the allegations specifically stated that the letter in question had been "given to Nigerian authorities." Id. at 78. While circumstantial evidence of publication is permitted, Defendants' allegations, which simply state that the letter and press release were "published to third parties", are still insufficient as a matter of law, as the allegations do not assert who individual or categories of third parties were or that anyone either heard or read the allegedly defamatory statements. See Tocker v. Great Atl. & Pac. Tea Co., 190 A.2d 822, 823 (D.C. 1963)(holding publication element not established where plaintiff testified only that there were other people around to hear the allegedly defamatory statement, not that they, in fact, overheard the statements).

The other, non-District of Columbia cases relied on by Defendants confirm that, in order to sustain a claim for defamation, allegations must, at a minimum, confirm that the allegedly defamatory material was, in fact, published to and received by others. Thus, in Kalantar v. Lufthansa German Airlines, 402 F. Supp. 2d 130, 148 (D.D.C. 2005), applying Virginia law, the court held that publication element established where plaintiff testified that the allegedly defamatory statement was heard by the persons who were near-by when they were said. In Brush-Moore Newspapers, Inc. v. Pollitt, 151 A.2d 530, 532 (Md. 1959), it was established that the materials had been "distributed to newsstands" and undisputed that other publication had occurred. Defendants radically distort the holding of Torres v. CBS News, 879 F. Supp. 309

(S.D.N.Y. 1995), which did not, as Defendants suggest, hold or even imply, that people in receipt of press releases are always third persons for the purposes of publication.  Rather, the Court, for purposes of a statute of limitations argument, rejected plaintiff's assertion that publication did not take place until a third person being exposed to the defamatory statement knows or understands it to be defamatory.  879 F. Supp. at 317-18.

Here, Defendants have made <u>no</u> allegations in the Complaint regarding the identities of the persons who received the material, or even alleged the material was, in fact, received by third parties.  Moreover, the documents themselves do not confirm that any material was actually published, heard or read.  The letter and first two press releases, on their face, do not provide <u>any</u> evidence that the material was distributed, let alone read.  The fact that the last press release is incorporated into an email is insufficient, by itself, to demonstrate any evidence of publication, at least in the absence of at least some minimal allegations regarding the identities of the entities sending and receiving the publication, and the manner in which the publication was received.

### C.    *The Privileges Asserted by Defendants Permit the Allowance of the Motion to Dismiss*

Contrary to Defendants' assertion, the Court may, under certain circumstances, dismiss defamation claims in light of the existence of a privilege which bars the complaining party's recovery.  The question of whether a statement is protected by a privilege is a question of law. <u>See</u> <u>Blodgett v. University Club</u>, 930 A.2d 210, 224 (D.C. 2007) (citing <u>Columbia First Bank v. Ferguson</u>, 665 A.2d 650, 655 (D.C.1995)).  Here, at least two privileges potentially apply at this stage in the proceedings:  (1) the judicial proceeding privilege; and (2) the common interest privilege.

    1.    <u>The Judicial Proceeding Privilege is Absolute and Is Applicable to Many of the Allegedly Defamatory Statements</u>

As asserted in Plaintiffs' Motion to Dismiss, to the extent that the allegedly defamatory statements in the four documents pertain to or address the pending litigation between the parties, those statements are protected by an absolute privilege protecting statements made preliminary to or in the course of judicial proceedings, including the statements in the October 4, 2007 press release and many of the allegedly defamatory statements in the April 11, 2008 press release.   As the privilege is absolute, the Court's finding that such a privilege exists will warrant the entry of dismissal as to those claims.  See <u>Owen v. Kronheim</u>, 304 F.2d 957, 958 -959 (D.C. Cir. 1962) (because statements made by judge during course of judicial proceedings were protected by absolute privilege, dismissal of claims upon a motion to dismiss was appropriate).

Defendants cite to no District of Columbia law in support of their broad assertion that an attorney's comments regarding pending litigation are not protected by the judicial proceeding privilege.   Indeed, District of Columbia law indicates that the privilege is far broader than Defendants would have the Court believe.  The Court's discussion in <u>Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc</u>., 774 A.2d 332 (D.C. 2001), cited by Defendants, is instructive.  In <u>Finkelstein</u>, the Court explained that:

> **the privilege is absolute rather than qualified: it protects the attorney from liability in an action for defamation <u>irrespective of his purpose in publishing the defamatory matter</u>, his belief in its truth, or even his knowledge of its falsity. The intent of the privilege is not, of course, to encourage lawyers to defame, . . . Rather, the intent of the privilege is to free honorable lawyers to render candid and zealous advice and representation to their clients without fear of retaliatory harassment from their adversaries.**

774 A.2d at 338 -339 (emphasis supplied) (internal citations omitted).  The Court went on to hold that conferences and letters to prospective clients and the adversaries regarding a case that

had not yet been initiated were protected.   Contrary to Defendants' assertions, <u>Finkelstein</u> expressly indicates that the purpose of the publication of the allegedly defamatory material is irrelevant to the question of whether the statements fall within the scope of the privilege.

Here, the commentary by Plaintiffs regarding the merits of Defendants litigation[4] fall within the scope of the privilege, as the statements were made for the purpose of "render[ing] candid and zealous advice and representation to [his] clients" and indeed were made in defense of the clients in the face of numerous articles written and published by Defendants in a newspaper which they own.   Indeed, the commentary to the District of Columbia Rules of Professional Conduct expressly states that: "litigants have a right to present their side of a dispute to the public, and the public has an interest in receiving information about matters that are in litigation. Often a lawyer involved in litigation is in the best position to assist in furthering these legitimate objectives."  D.C. Rules of Prof'l Conduct 3.6, cmt.1; <u>accord</u> <u>Green Acres Trust v. London</u>, 688 P.2d 617, 623 (Ariz. 1984) (referencing model and local rules of professional conduct to assess scope of judicial privilege).  Defendants' assertion that the statements were published to persons whom do not have an interest or connection to the litigation, Opp. At 13, is unsupported by any allegation in the Complaint, and is belied by the documents themselves, which are addressed to the members of the Armenian Assembly, the Armenian American community and those interested in the construction of the museum.

> 2.    <u>As Defendants' Own Allegations Confirm the Existence of the Common Interest Privilege, These Claims Should Be Dismissed</u>

In addition to the judicial proceeding privilege asserted above, the allegedly defamatory statements are also subject to a qualified privilege for comments made in good faith "on a subject

---

[4] The October 4, 2007 press release, in fact, referred to litigation brought by Cafesjian and CFF in Minnesota in April 2007, which specifically sought to void the Grant Agreement and demanded return of all of the properties on which the museum was to be built.

in which the party communicating has an interest . . . to a person who has such a corresponding interest." <u>Moss v. Stockard</u>, 580 A2.d 1011, 1024 (D.C. 1990). In order to defeat the privilege, the Defendants are required to "(1) provide "extrinsic proof" that the [Plaintiffs] who produced and used the report acted with express malice, or (2) demonstrate that it is so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the [Plaintiffs] were actuated by express malice." <u>Blodgett</u>, 930 A.2d at 224.

Contrary to Defendants' suggestion, where, as here, the applicability of an asserted qualified defense is apparent from the express allegations set forth in the Complaint as well as the documents attached thereto, and no allegations whatsoever of malice have been asserted, let alone those required to defeat the privilege asserted here, courts have elected to dismiss defamation claims upon a Motion to Dismiss. Thus, in <u>In re Spikes</u>, the Court noted that the Federal District Court, applying District of Columbia law, had dismissed respondent's complaint, "recognize[ing] that the letter to the U.S. Attorney was subject to a qualified privilege, and implicitly determine[ing] that malice had not been sufficiently alleged in respondent's defamation complaint." <u>In re Spikes</u>, 881 A.2d 1118, 1124 (D.C. 2005); <u>see also</u> <u>Kronheim</u>, 304 F.2d at 958 -959 (where affirmative allegations of the motion to dismiss merely stated precisely what was substantially revealed by the complaint itself, dismissal was appropriate).

Here, the express allegations set forth in the Counterclaims confirm that the letter and press releases were published by persons with an interest in the material being published. Indeed, Defendants do not meaningfully dispute that the common interest privilege is applicable here. Defendants have <u>not</u> alleged that any malice existed on the part of Plaintiffs when they published the material. Nor have they asserted anywhere in the Counterclaims that the material was even received by third-persons, let alone that any third persons who received the material

did not have an interest in the subject matter of the material being published.  Simply put,

Plaintiffs have not asserted sufficient facts, particularly under the standard set forth in <u>Bell

Atlantic v. Twombly</u>, to survive a Motion to Dismiss.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the AGM&M, the Assembly, and Hirair Hovnanian,

respectfully request that Claims VI, VII, VIII, and IX of the Counterclaims be dismissed with

prejudice.

Respectfully submitted,

**K&L GATES LLP**

By:    _____
David T. Case (D.C. Bar No. 384062)
Bruce H. Nielson (D.C. Bar No. 414440)
1601 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 778-9000
Fax:  (202) 778-9100

AND

  /s/    Arnold R. Rosenfeld_____
Arnold R. Rosenfeld (MA Bar No. 428860)
Naoka E. Carey (MA Bar No. 655312)
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3155
Fax: (617) 261-3175

Dated:  September 2, 2008                **COUNSEL FOR PLAINTIFFS**