# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF
AMERICA, INC., *et al.*,

      Plaintiffs / Counterclaim-Defendants,

      v.

GERALD L. CAFESJIAN, *et al.*,

      Defendants / Counterclaim-Plaintiffs.

Civil Action No. 08-255 (CKK)

## MEMORANDUM OPINION
(February 19, 2009)

This case represents another chapter in the very bitter and very unfortunate dispute between Plaintiffs The Armenian Assembly of America, Inc. ("the Assembly") and The Armenian Genocide Museum and Memorial, Inc. ("AGM&M") (collectively "Plaintiffs") and Defendants Gerald L. Cafesjian ("Cafesjian"), John J. Waters, Jr. ("Waters, Jr."), The Cafesjian Family Foundation, Inc. ("CFF"), and The Tomkat Limited Partnership ("Tomkat") (collectively, "Defendants"). The parties have asserted numerous claims against one another in this and other cases filed in this District.

Currently pending before the Court is Plaintiffs' [25] Partial Motion to Dismiss four counterclaims asserted by Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). After thoroughly reviewing the parties' submissions, applicable case law, statutory authority, and the entire record of the case as a whole, the Court shall DENY Plaintiffs' Partial Motion to Dismiss for the reasons that follow.

## I. BACKGROUND

The following facts are drawn from Defendants' Counterclaims and are not based on any findings of fact made by the Court. On Plaintiffs' Motion to Dismiss, the Court must accept as true all well-pleaded factual allegations set forth in Defendants' Counterclaims. *See Scandinavian Satellite Sys. v. Prime TV Ltd.*, 291 F.3d 839, 844 (D.C. Cir. 2002); *Ellipso, Inc. v. Mann*, No. 05-1186, 2006 U.S. Dist. LEXIS 23710 at *3 (D.D.C. Apr. 27, 2006).[1]

From 2000 to 2003, the Assembly and CFF cooperated to promote and develop a museum and memorial to commemorate the Armenian Genocide. Counterclaims ¶ 10. Pursuant to that cooperation, an independent entity, AGM&M, was incorporated in 2003 to own, operate, and maintain the museum and memorial and to engage in various other related activities. *Id.* ¶ 11. AGM&M is governed by a Board of Trustees who serve as the Board of Directors of AGM&M. *Id.* ¶ 12. Defendant Waters, Jr. is CFF's representative member on AGM&M's Board of Trustees. *Id.* ¶¶ 16, 17, 19.

On November 1, 2003, Cafesjian, CFF, and the Assembly entered into a written contract called the "Grant Agreement." *Id.* ¶ 29. The Grant Agreement required Cafesjian and CFF to transmit funds to the Assembly to establish AGM&M and to purchase properties where the museum and memorial would be located (the "Grant properties"). *Id.* ¶ 30. On November 1, 2003, the Assembly and AGM&M also entered into a written contract called the "Transfer Agreement." *Id.* ¶ 34. This agreement required AGM&M to honor all of the Assembly's donor requirements, among other obligations. *Id.* ¶ 35.

---

[1] The Court shall limit its review of the facts to only those related to Plaintiffs' Motion to Dismiss.

Pursuant to these agreements, Cafesjian and CFF initially donated $2,500,000 and loaned $500,000 to the Assembly for the purchase of land in Washington D.C. for the site of the museum and memorial. *Id.* ¶ 24. Cafesjian and CFF later donated $12,850,000 for the purchase of four adjacent properties. *Id.* ¶ 25. In exchange for these donations, the Assembly and AGM&M were required to "permit CFF to participate in all material decisions regarding the memorial." *Id. See also id.* ¶ 40 (stating that AGM&M agreed that CFF, through its Board of Trustee member, could "participate in all material decisions relating to the museum and memorial"). Finally, the Grant Agreement contained a conditional reversionary interest provision relating to Cafesjian and CFF's donations. In the event that the Grant properties were not developed prior to December 31, 2010, or if properties were not developed in substantial compliance with the plans to be approved by the AGM&M Board of Trustees, Cafesjian and CFF were entitled to the return of their donations (either in the form of the Grant property or the donated funds). *Id.* ¶¶ 30, 31.

Defendants allege that they were "excluded" from participating in the planning, design, and development of the museum. *Id.* ¶ 23. They also allege that on May 7, 2007, a portion of AGM&M's board of Trustees prevented CFF, through Waters Jr., from participating in the entirety of the Board of Trustees meeting. *Id.* ¶ 42. According to Defendants,

> AGM&M has failed to honor the Assembly's donor requirements as required by the Transfer Agreement, including its failure to comply with the Assembly's obligations relating to Mr. Cafesjian and CFF's rights pertaining to the museum and memorial as provided by the Grant Agreement between the Assembly, Mr. Cafesjian, and CFF.

*Id.* ¶ 45.

After the disputes between the parties began to manifest themselves, Defendants allege

that Plaintiffs and Hirair Hovnanian ("Hovnanian"), the Chairman of the Assembly, defamed

Defendants on four separate occasions.[2]  First, Hovnanian and non-party Carolyn Mugar wrote a

letter addressed to "Armenian Assembly Member," which contains the allegedly false statements

that:

> [a]t no point did the Assembly reject Mr. Cafesjian's vision for the museum,
> which is his stated reason for abandoning the project and filing suit against the
> Assembly.  Rather, the [AGM&M] Board asked Mr. Cafesjian to proceed with his
> vision for the museum, only to be informed that he no longer was interested in the
> project.  In addition, the [Assembly] has sought an accounting.

*Id.* ¶ 46 & Ex. 5 at 1-2 (7/18/07 Assembly Letter).

Second, AGM&M issued a press release dated October 4, 2007, containing the allegedly

false statements that:

> (1) Cafesjian had filed a "frivolous" lawsuit that was "intended to scuttle the
> building of a genocide museum in Washington, D.C.";
>
> (2) the lawsuit "has no basis in fact or law";
>
> (3) the lawsuit is "a desperate attempt by Mr. Cafesjian to block the recent
> progress made by the trustees to restart the process of building [the] museum";
> and
>
> (4) AGM&M's actions with regard to Waters Jr. were proper.

*Id.* ¶ 47 & Ex. 6 at 1 (10/4/07 Press Release).

Third, AGM&M issued a press release dated October 31, 2007, containing the allegedly

false statements that:

> (1) Cafesjian "left the other trustees with serious problems, including unpaid
> taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the

---

[2] Although Hirair Hovnanian is not a Plaintiff to the original Complaint, the Court refers
to the Counterclaim-Defendants (which includes Hovnanian) as "Plaintiffs" for the sake of
clarity.

properties, no audits, and compliance problems with other donors' gifts, all of which left in tatters a project that the Armenian-American community strongly endorsed and wants completed";

(2) "In early 2007, after flat-out non-compliance with the Assembly's 501(c)(3) conflict of interest policy and after legal review, Cafesjian and John Waters were suspended from the Assembly board";

(3) "Cafesjian's formation of his personal lobbying organization, USAPAC, has caused additional damage"; and

(4) "Taking control of [AGM&M], [Cafesjian] failed to fund the project, mismanaged development, resigned, and abandoned the properties and project in 2006."

*Id.* ¶ 48 & Ex. 7, at 1 (10/31/07 Press Release).

Fourth, AGM&M issued a press release dated April 11, 2008, containing the allegedly false statements that:

The lawsuit filed by Cafesjian in April 2007 sought to rescind the grant agreement [CFF] had made with the [Assembly] with respect to the Armenian Genocide Museum project, so that Cafesjian could recover substantially appreciated real estate.  Subsequent filings and press attacks by Cafesjian were similarly intended to scuttle the building of a genocide museum.

Cafesjian formally abandoned the project demanding return of appreciated real estate, leaving behind unpaid taxes, an unpaid mortgage, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts, all of which left the project in tatters.

*Id.* ¶ 49 & Ex. 8 at 1 (4/11/08 Press Release).

Although Defendants assert nine counterclaims, only four are subject to Plaintiffs' Partial Motion to Dismiss:  Count VI (unjust enrichment), Count VII (constructive trust), Count VIII (defamation), and Count IX (defamation).  Plaintiffs filed their Motion to Dismiss on August 15, 2008, which was brought against Plaintiffs and Hovnanian.  Defendants filed an Opposition on

August 25, 2008, and Plaintiffs filed a Reply on September 2, 2008.  At the request of Magistrate

Judge Alan Kay on behalf of the parties, the Court held in abeyance its ruling on this motion

during the parties' settlement negotiations.  The parties have since notified the Court that the

settlement negotiations were unsuccessful.  Plaintiffs' Motion to Dismiss is therefore fully

briefed and now ripe for decision.

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain

statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 550 U.S. 544, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v.*

*Gibson*, 355 U.S. 41, 47 (1957)).  In evaluating a Rule 12(b)(6) motion to dismiss for failure to

state a claim, the court must construe the complaint in a light most favorable to the non-moving

party and must accept as true all reasonable factual inferences drawn from well-pleaded factual

allegations.  *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914,

915 (D.D.C. 1994).  While the court must construe the Complaint in the non-moving party's

favor, it "need not accept inferences drawn by the [non-moving party] if such inferences are

unsupported by the facts set out in the complaint."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d

1271, 1276 (D.C. Cir. 1994).  Moreover, the court is not bound to accept the legal conclusions of

the non-moving party.  *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).  A court is

limited to considering facts alleged in the complaint, any documents attached to or incorporated

in the complaint, matters of which the court may take judicial notice, and matters of public

record.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997);

*Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  The

same standards govern a motion to dismiss with respect to an opposing party's counterclaims.

*See Ellipso, Inc.*, 2006 U.S. Dist. LEXIS 23710 at *3.

### III.  DISCUSSION

The Court shall combine its discussion of Counts VI (unjust enrichment) and VII

(constructive trust) because the applicable legal analysis is the same.  The Court shall then

consider Counts VIII and IX, both of which raise claims for defamation.  Because the Court does

not find, as a matter of law, that Defendants have failed to state a claim for relief on any of these

counts, the Court shall deny Plaintiffs' motion in its entirety.

> A.      *Count VI (Unjust Enrichment) and Count VII (Constructive Trust)*

Count VI of Defendants' Counterclaims alleges that Plaintiffs "have been unjustly

enriched by retaining CFF and Cafesjian's donations while simultaneously refusing to permit

CFF and Cafesjian from exercising their ongoing right to participate in and approve the planning

and design of the museum and memorial . . . ."  Counterclaims ¶ 80.  Count VII of Defendants'

Counterclaims alleges that Plaintiffs' conduct should give rise to a constructive trust placed on

"all money paid and all properties acquired with Mr. Cafesjian and CFF's donated funds" to be

held for "Mr. Cafesjian and CFF's benefit."  *Id.* ¶ 83.

Under District of Columbia law, a plaintiff states a legally cognizable unjust enrichment

claim when (1) the plaintiff confers a benefit on the defendant; (2) the defendant retains the

benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust.  *News

World Commc'ns, Inc. v. Thompson*, 878 A.2d 1218, 1222 (D.C. 2005) (citing *4934, Inc. v.

District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992)).  Relatedly, a

7

claim for a constructive trust is appropriate "'where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it.'"  *Heck v. Adamson*, 941 A.2d 1028, 1029 (D.C. 2008) (quoting *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C. 1980)).[3]

Plaintiffs seek dismissal of Defendants' unjust enrichment and constructive trust counterclaims because "'there can be no claim for unjust enrichment when an express contract exists between the parties.'"  Pls.' Mot. at 8 (quoting *Schiff v. Amer. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997)).  According to Plaintiffs, there are two written agreements "which detail the rights and obligations conferred on the parties as a result of the donations made by Cafesjian and CFF:  the Grant Agreement and the Transfer Agreement."  *Id.*  Because these agreements concern Defendants' rights to participate in the activities relating to the Grant properties and set forth how Defendants' donations are to be used, Plaintiffs argue that "Defendants have a more than adequate remedy at law, namely the breach of contract and other claims" that prevent Defendants' assertion of an unjust enrichment claim.  *Id.*  Finally, Plaintiffs argue that, because Defendants cannot assert a claim for unjust enrichment, it follows that they cannot assert the equitable remedy of a constructive trust.  *Id.* at 9.

Defendants do not dispute Plaintiffs' legal analysis, *see* Defs.' Opp'n at 2, but emphasize that a party may advance quasi-contractual claims when the validity or coverage of an express contract is in doubt.  *See, e.g.*, *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*,

---

[3] The Court applies District of Columbia law to Defendants' unjust enrichment and constructive trust counterclaims, which both parties have assumed without discussion to be the applicable body of law.  District of Columbia law is appropriately applied because the District is the site of the real properties in dispute and where most (if not all) of the material events relating to these claims appear to have occurred.

870 A.2d 58, 65 (D.C. 2005) (explaining that an unjust enrichment claim is cognizable absent an actual and valid contract); *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315-16 (D. Del. 2008) ("[a] claim of unjust enrichment may survive a motion to dismiss . . . when the validity of the contract is in doubt or uncertain" or "where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue").  Federal Rules of Civil Procedure also expressly authorize a party to plead alternative and even inconsistent claims, such as contractual and quasi-contractual claims for relief.  *See* Fed. R. Civ. P. 8(d)(3) ("[a] party may state as many separate claims or defenses as it has, regardless of consistency").

The parties' central disagreement is whether the Grant and Transfer Agreements constitute valid express contracts that govern the parties' disputes, such that Defendants are precluded from asserting equitable in addition to their contractual claims.  On this point, Defendants offer two reasons why the validity of the agreements remain in question.  First, Defendants explain that "the Assembly admits that it entered into the Grant Agreement with CFF, [but] it refuses to admit that the conditions of the Grant Agreement are applicable to this suit, or even to admit what the conditions of the Grant Agreement *are*."  Defs.' Opp'n at 3 (citation omitted, emphasis in original).  When Defendants alleged in their Counterclaims that the Grant Agreement required the parties to engage in certain conduct, *see* Counterclaims ¶ 30, Plaintiffs responded that "the Grant Agreement speaks for itself," but did not admit or deny that the Grant Agreement set forth the obligations identified by Defendants.  *See* Pls.' Answer ¶ 30. According to Defendants, dismissal of its unjust enrichment and constructive trust claims against the Assembly is inappropriate prior to a finding that the agreements are "valid and binding." Defs.' Opp'n at 3-4.

9

Second, Defendants explain that CFF and AGM&M "did not sign any express contractual agreement; rather, the Transfer Agreement was signed only by the Assembly and AGM&M." *Id.* at 4 (emphasis in original omitted). When Defendants alleged in their Counterclaims that "[t]he Grant Agreement is a valid and binding contract and requires AGM&M to fulfill the contractual obligations set forth in the Grant Agreement," Counterclaims ¶ 57, Plaintiffs again responded that the agreement "speaks for itself." Pls.' Answer ¶ 57. Because Defendants did not sign an express contract with AGM&M, and because Plaintiffs refuse to admit that AGM&M's conduct is governed by the terms stated in the agreements signed by the Assembly, Defendants argue that their equitable claims against AGM&M should likewise not be dismissed.

Plaintiffs concede (as they must) that they failed to admit these allegations in Defendants' Counterclaims, but insist that the response, "it speaks for itself," cannot be construed "as a denial of either the existence or the validity of the contract themselves." Pls.' Reply at 5. Rather, Plaintiffs argue that "the disputes that exist, and that are relevant to Defendants' unjust enrichment argument, are contract interpretation disputes, not disputes regarding the existence of the contracts." Pls.' Reply at 4. *See also id.* at 5 ("[t]he issue is not whether the contracts exist, but how they are to be enforced").

The Court finds that, on this record, dismissal of Defendants' unjust enrichment and constructive trust counterclaims is not appropriate. Plaintiffs' responses in its Answer to Defendants' Counterclaims that the agreements "speak for themselves" is not an admission of their validity and applicability to the present dispute. Magistrate Judge John Facciola has adeptly observed in a different case that "[t]he tautological 'objection' that the finder of fact can read the document for itself to see if [a] quote is accurate is not a legitimate objection but an evasion of

10

the responsibility to either admit or deny a request for admission." *Miller v. Holzmann*, 240 F.R.D. 1, 4 (D.D.C. 2006). This case demonstrates the consequences of failing to admit an allegation through the use of the phrase it "speaks for itself," because that phrase does not foreclose Plaintiffs from subsequently attacking the validity and applicability of the Grant and Transfer Agreements. In fact, one of the claims in Plaintiffs' Complaint seeks to invalidate the portion of the Grant Agreement providing Cafesjian and CFF with a conditional reversionary interest in the Grant properties (which Plaintiffs concede in a footnote). *See* Pls.' Reply at 5 n.2. Moreover, because AGM&M did not execute a contract with Defendants, Plaintiffs' failure to admit AGM&M's obligations under its agreement with the Assembly makes dismissal of Defendants' equitable counterclaims particularly inappropriate at this stage of the proceedings.

The Federal Rules of Civil Procedure expressly provide that a party may assert alternative theories of liability, and it does not appear that Defendants' assertion of both contractual and equitable claims for relief will require the parties to undertake any additional discovery that would not otherwise have been contemplated. Although Defendants may ultimately have to decide whether to pursue their contractual or equitable claims for relief, Defendants need not do so at the pleading stage. On the present record, the Court shall deny Plaintiffs' Motion to Dismiss Counts VI and VII of Defendants' Counterclaims.

      B.    *Counts VIII (Defamation) and IX (Defamation)*

Counts VIII and IX of Defendants' Counterclaims allege that Plaintiffs have defamed Defendants on four separate occasions. *See* Counterclaims ¶¶ 85, 93-95. To state a cause of action for defamation, a plaintiff must allege and prove: "'(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement

without privilege to a third-party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997) (citation and internal quotation marks omitted ).[4] On a motion brought under Federal Rule of Civil Procedure 12(b)(6), the Court must assume the falsity of any express or implied factual statements. *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001). Plaintiffs advance four arguments to support their Motion to Dismiss Defendants' defamation counterclaims, which the Court shall address in turn.

1.   Publication

Plaintiffs' Motion to Dismiss contains a three-sentence argument that Defendants' counterclaims fail to sufficiently allege the publication of the July 18, 2007 Letter and each of the three Press Releases. *See* Pls.' Mot. at 10. Relying on *Oparaugo v. Watts*, 884 A.2d 63, 78 (D.C. 2005), Plaintiffs argue that the defamation claims are facially deficient because they "fail to include any information regarding the persons to whom the allegedly defamatory material was published." *Id.*

On a motion to dismiss, Defendants need not allege–and certainly need not *prove*– the identity of one or more persons who read the allegedly defamatory statements. Instead,

---

[4] Both parties rely on District of Columbia law to assess Defendants' defamation counterclaims. Although the parties have not fully briefed the issue, the Court concludes that applying the District of Columbia's governmental interest analysis test leads to the application of District of Columbia law. *See Weyrich*, 235 F.3d at 626 (citing *Klaxon*, 313 U.S. at 496, 61 S. Ct. 1020). The Assembly and AGM&M are located in the District of Columbia and each of the allegedly defamatory statements appears to have been issued from the District of Columbia. *See* Counterclaims, Exs. 5-8 (July 17, 2008 Letter and three Press Releases).

Defendants need only allege enough information "to apprise" Plaintiffs of the persons or category

of persons to whom the July 18, 2007 Letter or the three Press Releases were published.  *See*

*Oparaugo*, 884 A.2d at 78 (finding that publication was sufficiently alleged when plaintiff

claimed that statements were published to "Nigerian authorities," without providing any further

detail).  It is sufficient that the communication be made to just "a single individual" and need not

have been made to "a large or even a substantial group of persons."  Restatement (Second) of

Torts § 577 cmt. b.

In this case, the July 18, 2007 Letter was sent by Hirair Hovnanian, the Assembly's

Chairman, and non-party Carol Mugar, the Assembly's President, on the Assembly's letterhead,

to "Armenian Assembly Member."  *See* Counterclaims, Ex. 5 at 1-2 (7/18/07 Letter).  The text of

the letter indicates that its purpose is to "inform [the Assembly's] membership about the current

status of the Armenian Genocide Museum and Memorial."  *Id.* at 1.  The Court finds that these

facts provide Plaintiffs with sufficient notice of alleged publication because they raise the

inference that the letter was published to the Assembly's membership.  As Defendants assert,

these facts "plainly give [] notice of publication" and even "provide circumstantial evidence of

publication."  Defs.' Opp'n at 6.

Similarly, Plaintiffs argue that Defendants have not pled sufficient facts supporting

publication of the three *Press Releases*.  Setting aside the question of whether a party necessarily

pleads sufficient facts supporting "publication" where an allegedly defamatory statement is

contained within a press release, *Cf. Classen Immunotherapies, Inc. v. King Pharms., Inc.*, 403 F.

Supp. 2d 451, 460 (D. Md. 2005) (assuming publication of a statement where it was contained in

a press release), in this case, two of the three Press Releases are captioned "FOR IMMEDIATE

RELEASE." *See* Counterclaims, Ex. 6 (10/4/07 Press Release); *id.*, Ex. 7 (10/31/07 Press

Release).  The third Press Release contains email information indicating that it was sent to the

"Armenian News Network" on April 12, 2008.  *Id.*, Ex. 8 (4/11/08 Press Release).  Contrary to

Plaintiffs' argument that these facts do not "demonstrate evidence of publication," Pls.' Reply at

11, Defendants need not produce *evidence* to survive a motion to dismiss.  Instead, as stated

above, Defendants need only *allege* enough information "to apprise" Plaintiffs of the persons or

category of persons to whom the alleged defamatory statements were published.  In this case,

Defendants have pled sufficient facts to raise the inference that the Press Releases were

published to the press and to the Armenian News Network.  Accordingly, upon review of

Defendants' Counterclaims and the alleged defamatory materials attached to their Counterclaims

as exhibits, the Court finds that Defendants have pled sufficient facts supporting publication.

          2.          Common Interest Privilege

     Plaintiffs next argue that the July 18, 2007 Letter and the three Press Releases are subject

to a "common interest" privilege.  Pls.' Mot. at 11.  The common interest privilege protects

otherwise defamatory statements made (1) in good faith, (2) on a subject in which the party

communicating has an interest, or in reference to which he has, or honestly believes he has, a

duty to a person having a corresponding interest or duty, (3) to a person who has a such a

corresponding interest.  *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990).  Assertion of this

qualified privilege is foreclosed in two circumstances: "first, excessive publication, defined as

'publication to those with no common interest in the information communicated, or publication

not reasonably calculated to protect or further the interest,' and, second, publication with malice,

which, within the context of the common interest privilege, is 'the equivalent of bad faith.'"

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Moss*, 580

A.2d at 1024-25).

"Where the facts surrounding publication are undisputed," whether a statement is

protected by the common interest privilege is a question of law. *Moss*, 580 A.2d at 1024. It

follows that, where questions of fact are in dispute concerning the publication of a statement, a

Court cannot determine on a motion to dismiss whether the privilege has been properly invoked.

*See Caudle v. Thomason*, 942 F. Supp. 635, 640 (D.D.C. 1996) (denying a motion to dismiss

because the common interest privilege is a qualified privilege and "the facts alleged in the

complaint [which included the allegation of malice, which would defeat the assertion of the

privilege] must be taken to be true at this stage in the proceedings").

Here, disputed questions of fact preclude the Court from considering the applicability of

this qualified privilege. For example, the fact that the three Press Releases may have been issued

to the press and the Armenian News Network as opposed to the Assembly's membership (and,

therefore, to those who may not have shared a common interest), may implicate the doctrine of

"excessive publication" which defeats the assertion of this privilege. *See* Defs.' Opp'n at 12.

There is similarly no agreement between the parties as to whom the July 18, 2007 Letter was

published. *Compare* Pls.' Mot. at 10 (arguing that Defendants failed to allege the letter was

published to anyone) *with* Defs.' Opp'n at 12 (asserting that the letter was published, at a

minimum, to the Assembly's membership). Additionally, although Defendants' Counterclaims

do not allege that Plaintiffs' statements were made with "malice," they do allege that the

statements were published despite AGM&M's knowledge that "there was no truth to the[]

statements," and that the statements were "particularly harmful to Mr. Cafesjian" because he "is

15

active within the close-knit Armenian-American community" and his "reputation is of the utmost

importance to his business dealings."  Counterclaims ¶¶ 98, 100.  Defendants emphasize that it

would be premature to foreclose their opportunity to prove, following discovery, that the

allegedly defamatory statements were made with malice, which would also defeat the common

interest privilege.  Defs.' Opp'n at 12-13.  At this stage of the proceedings, the Court finds that

the disputed issues of fact preclude a determination as to the applicability of the common interest

privilege.

> 3.    Judicial proceedings privilege

Plaintiffs' Motion to Dismiss also includes a three-sentence argument that the three Press

Releases are subject to a "judicial proceedings" privilege.  Pls.' Mot. at 11-12.  According to

Plaintiffs, this privilege "extends to the statements regarding the merits of Cafesjian, CFF, and

[Waters, Jr.'s] claims, including the quotations from the Assembly and AGM&M's attorney,

Arnold R. Rosenfeld, in the October 4, 2007 press release."  *Id.* at 12.

Statements made in the course of judicial proceedings are protected by absolute immunity

from defamation suits.  Under District of Columbia defamation law, statements made for the

purpose of preparing for litigation, or to attempting to settle issues prior to commencing

litigation, are covered by this absolute privilege.  *See, e.g., Finkelstein, Thompson & Loughran v.

Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001) ("Along with the overwhelming

majority of the States, the District of Columbia has long recognized an absolute privilege for

statements made preliminary to, or in the course of, a judicial proceeding, so long as the

statements bear some relation to the proceeding").

The District of Columbia has adopted the version of the judicial proceedings privilege set

forth in § 586 of the Restatement (Second) of Torts, which provides that:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

*Messina v. Krakower*, 439 F.3d 755, 760 (D.C. 2006) (quoting Restatement (Second) of Torts § 586 (1977)).[5]  To find the judicial proceedings privilege applicable to a statement, two requirements must be met: "(1) the statement must have been made in the course of, or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding."  *Id.* (quoting *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988)). Significantly, the District of Columbia Court of Appeals has held that, "as a corollary of the relatedness requirement," the judicial proceedings privilege is inapplicable when it is "'published to persons not having an interest [in] or connection to the litigation.'" *Id.* (quoting *Finkelstein*, 774 A.2d at 342).

It is appropriate for a court, in considering a 12(b)(6) motion, to decide any preliminary questions of absolute privilege such as the judicial proceedings privilege. *See, e.g., Finkelstein*, 774 A.2d at 340-41 (considering interlocutory appeal of trial courts denial of motion to dismiss which included absolute privilege argument); *Messina v. Fontana*, 260 F. Supp. 2d 173, 178 (D.D.C. 2003) (dismissing defamation claim at the motion to dismiss stage where the plaintiff showed that the communication was subject to the judicial proceedings privilege).  Nevertheless, the Court must still accept as true the well-pleaded allegations in Defendants' Counterclaims.

---

[5] Although the Restatement refers to an "attorney at law," the privilege also applies to parties, judicial officers, witnesses, and jurors. *Brown v. Collins*, 402 F.2d 209, 212 & n. 4 (D.C. Cir. 1968).

*See Klayman v. Judicial Watch, Inc.*, No. 06-670, 2007 U.S. Dist. LEXIS 3197 at \*53 n.9

(D.D.C. Jan. 17, 2007) (Kollar-Kotelly, J.) ("affirmative defenses, such as privilege, may be

raised on a motion made pursuant to Federal Rule of Civil Procedure 12(b)(6) 'when the facts

that give rise to the defense are clear from the face of the complaint.'") (quoting *Smith-Haynie v.*

*District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)).

In this case, the Court cannot find that the judicial proceedings privilege applies to the

three Press Releases because the parties dispute whether and to what extent the press releases

were published. *Compare* Pls.' Mot. at 10 (arguing that Defendants fail to allege that the Press

Releases were published to anyone) *with* Defs.' Opp'n at 6 (arguing that the Press Releases were

published to the press and the Armenian News Network). As set forth above, the judicial

proceedings privilege does not apply to statements "published to persons not having an interest in

or connection to the litigation." *Finklestein*, 774 A.2d at 338. Here, Defendants allege that the

Press Releases were broadcast to the press and were not conveyed to persons who necessarily had

an interest in or connection to the litigation. Taking Defendants' allegations as true for purposes

of Plaintiffs' Motion to Dismiss, the Court cannot find, as a matter of law, that the judicial

proceedings privilege applies to the three Press Releases. *Cf. Penobscot Indian Nation v. Key*

*Bank of Maine*, 112 F.3d 538, 560 (1st Cir. 1997) (although "allegations made in pleadings are

absolutely privileged," the same privilege does not apply to "defamatory statements made to the

media"). While Plaintiffs may seek to prove, following discovery, that the Press Releases were

issued only to those having an interest in the litigation, the Court cannot find on this record that

the judicial proceedings privilege applies to Plaintiffs' alleged defamatory statements.

        4.     <u>Defamatory meaning</u>

Plaintiffs' final argument is that the July 18, 2007 Letter and the three Press Releases are not reasonably susceptible to defamatory meaning.  *See* Pls.' Mot. at 13-14.  Plaintiffs acknowledge that "Defendants may find the characterizations of the lawsuits or their mismanagement of the museum project offensive or unpleasant," but argue that these characterizations "fall far below the standard for libel, as a reasonable reader of the statements would not believe such statements would subject Defendants to ridicule, hatred, or disgrace."  *Id.* at 14.

A statement is considered defamatory if it "tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."  *Moss*, 580 A.2d at 1023.  "'[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous."  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (quoting *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697 (D.C. 1970)).  On a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may only consider whether a statement *cannot* be reasonably capable of a defamatory meaning.  *Weyrich*, 235 F.3d at 627.  Accordingly, "[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous."  *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (citing *Levy v. American Mutual Ins. Co.,* 196 A.2d 475, 476 (D.C. 1964)).  Whether a reader actually understood a statement as being defamatory is a question for the jury.  *Klayman*, 783 A.2d at 613 n.6 (quoting Restatement 2nd of Torts § 614).

Context is key to determining whether, as a matter of law, a statement is capable of

bearing a defamatory meaning.  *Id.* at 614-19.  For example, in *Klayman*, the District of

Columbia Court of Appeals looked at context in upholding a trial court's 12(b)(6) dismissal of a

defamation claim, finding that a "detailed review of the whole article, and the challenged

material, in context" demonstrated that even if one or two sentences were offensive to the

plaintiff, the article was focused on something that could not be construed as defamatory.  *Id.* at

617.  In another case, a district court found that a newspaper article implying that the plaintiff

"use[d] her position in the media to meet and engage in romantic and sexual relations with

certain prestigious and powerful men" could, in the context of that article, be susceptible to

defamatory meaning.  *Benz v. The Washington Newspaper Publishing Co.*, No. 05-1760, 2006

U.S. Dist. LEXIS 71827 at *12 (D.D.C. Sept. 29, 2006).

> As set forth above, the July 18, 2007 Letter sent by the Assembly stated that
>
> [a]t no point did the Assembly reject Mr. Cafesjian's vision for the museum,
> which is his stated reason for abandoning the project and filing suit against the
> Assembly.  Rather, the [AGM&M] Board asked Mr. Cafesjian to proceed with his
> vision for the museum, only to be informed that he no longer was interested in the
> project.  In addition, the [Assembly] has sought an accounting.

Counterclaims ¶ 46 & Ex. 5 at 1-2 (7/18/07 Assembly Letter).  Defendants read these statements

to imply that Cafesjian is not only a liar, but also that he committed improprieties prior to

"abandoning" the museum project that now require Plaintiffs to undertake an "accounting."

Defs.' Opp'n at 17.  Courts have previously held that statements implying a lack of professional

integrity or competence in a business context may be considered defamatory.  *See Wallace v.

Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998) (finding the statement

that an attorney "was frequently out of the office during normal working hours" could have

defamatory meaning).  The same conclusion applies in this case, where Defendants allege that

Cafesjian's reputation "is of the utmost importance to his business dealings" and where he is "active within the close-knit Armenian-American community."  Counterclaims ¶ 100.  In this context, the implication that Cafesjian committed improprieties related to the non-profit corporation that exists to create a museum and memorial commemorating the victims and survivors of the Armenian Genocide is certainly susceptible to defamatory meaning.[6]  *See Howard Univ.*, 484 A.2d at 988 ("a statement is defamatory if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community").

A similar analysis applies to the three Press Releases issued by ARM&M.  The October 4, 2007 Press Release states that Cafesjian filed a "frivolous" lawsuit with "no basis in fact or law" that is a "desperate attempt" to prevent the building of a Armenian genocide museum and memorial in the District of Columbia.  Counterclaims, Ex. 6 (10/4/07 Press Release).  The October 31, 2007 and April 11, 2008 Press Releases build on these allegations and assert that Cafesjian "left the other trustees with serious problems, including unpaid taxes, leaking roofs, unpaid salaries, unpaid contractors, an illegal lien on the properties, no audits, and compliance problems with other donors' gifts," leaving the project "in tatters."  *Id.*, Ex. 7 (10/31/07 Press Release); *id.*, Ex. 8 (4/11/08 Press Release).  The Press Releases also state that Cafesjian violated the Assembly's non-profit conflict of interest policy, *id.*, Ex. 7, and assert that Cafesjian's actions

---

[6] In their Reply, Plaintiffs emphasize that this and several other statements could be considered non-defamatory *opinion* that is not ordinarily actionable.  *See* Pls.' Reply at 7-8; *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 596-97 (D.C. 2000) (holding that "'[a] statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore objectively verifiable.'" (quoting *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996). This argument fails because Cafesjian's stated reasons for his non-participation in the project, whether or not he committed improprieties necessitating an accounting, and whether the lawsuits he filed are frivolous, are all capable of being proven true or false.

were motivated by his desire to "recover the substantially appreciated real estate" on which the museum and memorial would be constructed.  *Id.*, Ex. 8.  Taking into account the entire text of the Press Releases, the Court finds that Cafesjian is portrayed as an individual who sought to personally gain from his involvement with Plaintiffs to the detriment of a museum and memorial meant to commemorate the victims and survivors of the Armenian Genocide.  The Court cannot say, as a matter of law, that such statements are not susceptible of defamatory meaning.[7] Accordingly, the Court shall deny Plaintiffs' Motion to Dismiss Defendants' defamation counterclaims.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall DENY Plaintiffs' [25] Partial Motion to Dismiss in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


Date:  February 19, 2009


                                        /s/                         
                              **COLLEEN KOLLAR-KOTELLY**
                              United States District Judge

---

[7] Plaintiffs raise the suggestion (in a footnote) that Defendants may have consented to publication of one of the Press Releases by republishing it along with an explanation of its alleged falsities in a newspaper owned or controlled by Cafesjian.  *See* Pls.' Mot. at 7 n.3.  As this argument was raised in a footnote and nowhere in the text of the motion, the Court need not consider it.  The Court would simply note, however, that printing the Press Release to explain away its statements is not the same as consenting to its initial publication.  The Court shall nevertheless refrain from rejecting this argument out of hand, and allow Plaintiffs to subsequently raise it, if they so choose, in the proper context of a fully briefed argument.