# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF
AMERICA, INC., *et al.*,

    Plaintiffs,

      v.

GERARD L. CAFESJIAN, *et al.*,

    Defendants.

Civil Action No. 08-255 (CKK)

## MEMORANDUM OPINION
(March 9, 2010)

This is the second of three related cases pending before this Court that arises out of a very bitter and very unfortunate dispute between Plaintiffs The Armenian Assembly of America, Inc. (the "Assembly") and The Armenian Genocide Museum & Memorial, Inc. ("AGM&M") (collectively, "Plaintiffs") and Defendants Gerard L. Cafesjian ("Cafesjian"), John J. Waters Jr. ("Waters Jr."), The Cafesjian Family Foundation, Inc. ("CFF"), and the TomKat Limited Partnership ("TomKat") (collectively, "Defendants"), relating to the construction of an Armenian genocide museum and memorial in Washington, D.C. In the above-captioned case, Plaintiffs have asserted eleven separate claims against Defendants, including breach of fiduciary duty, misappropriation of trade secrets, and breach of contract. Defendants have asserted nine separate counterclaims against Plaintiffs and Counterdefendant Hirair Hovnanian ("Hovnanian"), including breach of contract and defamation. On February 19, 2009, the Court denied Plaintiffs' partial motion to dismiss the counterclaims for unjust enrichment, constructive trust, and defamation. *See* [43] Mem. Op. (Feb. 19, 2009).

Currently pending before the Court in this action are the parties' motions for summary judgment. Plaintiffs/Counterdefendants have filed a [66] Motion for Partial Summary Judgment regarding AGM&M's claim for breach of fiduciary duty against Waters Jr. and Cafesjian (Claim I) and Defendants' counterclaim for defamation against the Assembly and Hovnanian (Counterclaim VIII). Defendants have filed a [68] Motion for Summary Judgment regarding all eleven of Plaintiffs' claims. Also pending before the Court is a [71] Motion to Compel the Production of Documents, filed by Plaintiffs-Counterdefendants against Defendants-Counterplaintiffs in this and the related actions, which were consolidated for purposes of discovery only.[1] The Court shall address that motion herein.

For the reasons explained below, the Court shall GRANT Defendants' motion for summary judgment with respect to Claims IV and V for breach of contract and breach of duty of good faith and fair dealing by TomKat and Waters Jr. and GRANT-IN-PART Defendants' motion as to Claim I for breach of fiduciary duty to AGM&M with respect to actions occurring before February 15, 2005, on the ground that they are time-barred. The Court shall DENY the motion in all other respects. The Court shall also GRANT Plaintiffs' motion for summary judgment with respect to Counterclaim VIII for defamation and DENY the motion in all other respects. The Court shall also GRANT-IN-PART Plaintiffs' motion to compel with respect to certain documents relating to the formation of the United States-Armenia Public Affairs Committee ("USAPAC"), the organizational structure and finances of CFF and GLC Enterprises,

---

[1] The related cases pending before this Court are *Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Foundation*, C.A. No. 07-1259, and *Waters v. Armenian Genocide Museum & Memorial, Inc.*, C.A. No. 08-1254. The issues raised in these related cases shall be addressed separately by the Court.

Inc., and the use of mailing lists and other databases by the Armenian Reporter newspaper. The Court shall deny Plaintiffs' motion to compel in all other respects.

## I. BACKGROUND

The following facts are drawn from the summary judgment record assembled by the parties and the parties' statements of material facts that are not in dispute.[2]

A.     *The Armenian Assembly of America and the Origins of the AGM&M*

The Armenian Assembly of America (the "Assembly") is an Armenian-American advocacy group that is incorporated in the District of Columbia as a non-profit corporation. Pls.' Stmt. ¶ 6. In the mid-1990s, the Assembly received a pledge from Anoush Mathevosian, an Armenian-American philanthropist, for the purpose of constructing a permanent museum to the victims and survivors of the Armenian genocide.[3] Pls.' Stmt. ¶ 7. Ms. Mathevosian's pledge was initially for $3.0 million but was subsequently raised to $3.5 million. Defs.' Resp. Stmt. ¶ 7. Encouraged by Ms. Mathevosian's generosity, the Assembly began exploring possible sites for

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment). *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [67] Order at 2 (Feb. 6, 2009). Thus, in many instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by an opposing party, in which case the Court may cite the opposing party's response to the statement ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

[3] According to Plaintiffs, "[t]he Armenian genocide refers to the more than one and one half million Armenians who perished as a result of the deliberate and systematic destruction of the Armenian population by the Ottoman Turkish government between 1915 and 1923." Pls.' Opp'n at 1. Plaintiffs claim that the Armenian genocide "is the single most important event that defines the identity of the Armenian people, including Armenian-Americans." *Id.* at 1-2.

the museum in Washington, D.C., and solicited donations from the Armenian-American community for the purpose of establishing and constructing the museum. Pls.' Stmt. ¶ 8. In 2000, the Assembly identified a possible site for the museum at the National Bank of Washington building (the "Bank Building") at 14th and G Streets, N.W. (619 14th Street, N.W.), Washington, D.C., located just a few blocks away from the White House. Pls.' Stmt. ¶ 9.

At some point in the late 1990s, Cafesjian became involved with the Assembly's efforts to create an Armenian genocide museum.[4] With the help of donations from Cafesjian (through CFF), the Assembly purchased the Bank Building in early 2000. Pls.' Stmt. ¶ 9. As part of the Bank Building transaction, which involved both grants and loans from CFF, the Assembly executed a promissory note to CFF for $500,000.[5] See Defs.' Br., Ex. 71 (3/23/00 Letter from Assembly to Cafesjian) at 1; Pls.' Br., Ex. 5 (R. Kaloosdian Aff.) ¶ 9. According to Robert Kaloosdian, a founding member and long-time officer and Trustee of the Assembly, the Assembly eventually came to understand that this note would be forgiven. See Pls.' Br., Ex. 5 (R. Kaloosdian Aff.) ¶ 9. Defendants, however, dispute this. See Defs.' Br., Ex. 1 (Waters Jr. Aff.) ¶ 86. CFF and the Assembly also agreed to include a memorial named after Cafesjian as part of the museum project. See Defs.' Br., Ex. 71 (filed under seal).

Subsequent to the purchase of the Bank Building, Cafesjian, through an affiliated entity

---

[4] Nearly all of the facts surrounding Cafesjian's subsequent involvement with the Assembly are disputed by the parties.

[5] Although Ms. Mathevosian had pledged $3.5 million for the Bank Building, she was unable to tender the money at the time of the purchase. To effectuate the purchase, Cafesjian/CFF gave the Assembly a $4 million interest-free bridge loan. When Ms. Mathevosian came through with her pledge, the Assembly repaid Cafesjian $3.5 million and issued a promissory note for the remaining $500,000. See Waters Sr.'s Stmt. ¶ 6; Pls.' Resp. Stmt. ¶ 6; Cafesjian Defs.' Br., Ex. 71 (filed under seal).

called The TomKat Limited Parternship ("TomKat LP"), acquired several lots adjacent to the Bank Building. Pls.' Stmt. ¶ 10. Cafesjian ultimately decided to donate these lots to the museum project.[6] Cafesjian wanted the museum project to be run by an independent entity, and the Assembly eventually decided to create one. Pls.' Stmt. ¶ 11; Cafesjian Defs.' Resp. Stmt. ¶ 11.[7] In October 2003, the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") was incorporated as a District of Columbia nonprofit corporation. Pls.' Stmt. ¶ 12. The AGM&M was established for the purpose of constructing, owning, operating, and maintaining a permanent museum and memorial to the victims and survivors of the Armenian genocide. Pls.' Stmt. ¶ 2.

The Articles of Incorporation and By-Laws of AGM&M were ratified and adopted, respectively, pursuant to a Unanimous Written Consent of the Initial Trustees of AGM&M executed on October 30, 2003. Pls.' Stmt. ¶ 13. The parties agree that these three documents—the Articles, the By-Laws, and the Unanimous Written Consent—govern the operation of and organization of AGM&M. Pls.' Stmt. ¶ 14. Pursuant to the By-Laws and Articles, AGM&M has no members. Defs.' Br., Ex. 3 (By-Laws) § 2.17. The Articles provide

---

[6] Plaintiffs contend that Cafesjian initially intended to use these sites for his own contemporary art museum. *See* Pls.' Stmt. ¶ 10. Cafesjian conceded at deposition that he briefly considered creating an art museum as part of the museum project in order to attract more people, but he testified that the purpose of acquiring the properties was to give the museum a larger footprint. *See* Pls.' Br., Ex. 6 (G. Cafesjian Dep. Tr.) at 148-52.

[7] There is a dispute in the record as to the origin of the idea for an independent entity came from. Defendants argue that Mr. Hirair Hovnanian, Chairman of the Assembly's Board of Trustees, rather than Cafesjian, proposed that the museum be run by an independent entity. *See* Cafesjian Defs.' Resp. Stmt. ¶ 11. Regardless of where the idea came from, however, the record clearly shows that Cafesjian ultimately favored an independent entity and, as explained below, conditioned his gifts on the creation of such an independent entity. *See* Pls.' Br., Ex. 6 (G. Cafesjian Dep. Tr.) at 168 ("Yes, I wanted independent strcuture, not connected or affiliated with any political or politically oriented group, advocacy group.")

that AGM&M's "affairs shall be managed and controlled by the Board of Trustees." Pls.' Stmt. ¶ 15. The Board of Trustees serves as the Board of Directors for purposes of the D.C. Non-Profit Corporations Act. Defs.' Br., Ex. 3 (By-Laws) § 2.2.

Under the Articles of Incorporation, there were four initial Trustees: Cafesjian, Hirair Hovnanian, Anoush Mathevosian, and Robert Kaloosdian. *See* Pls.' Br., Ex. 1 (Articles of Incorporation of AGM&M) (hereinafter, "Articles"). Each initial Trustee was designated as a representative of one of the four major donors to AGM&M: CFF (designating Cafesjian), Hirair Hovnanian (designating himself), Anoush Mathevosian (designating herself), and the Assembly (designating Kaloosdian). *See* Defs.' Br., Ex. 4 (Unanimous Written Consent) (hereinafter, "UWC") at 1-2. Pursuant to the By-Laws, the terms of these initial Trustees is perpetual, and each initial donor may appoint successor Trustees in the event that the initial Trustees are no longer able to serve. *See* Defs.' Br., Ex. 3 (By-Laws) § 2.4. A donor may elect one Trustee for every $5 million contributed to AGM&M (or elect a single Trustee to control as many votes as the donor has contributed in multiples of $5 million). *Id.* § 2.5. Unless otherwise provided in the By-Laws or the Articles, all questions are to be decided by an 80% vote of the Trustees at a meeting where a quorum is present. *Id.* § 2.7. Persons representing one-half of the aggregate eligible votes constitute a quorum at a duly-called meeting of the Board of Trustees. *Id.* § 2.6. The By-Laws also establish notice requirements that must be followed to properly convene a Board meeting: Trustees much each be given personal notice of the time and place of the meeting at least five, and no more than thirty, days in advance. Pls.' Stmt. ¶ 17.

As of October 31, 2003, Cafesjian became the Chairman and President of AGM&M and Waters Jr. became the Secretary and Treasurer of AGM&M. Pls.' Stmt. ¶¶ 20-21. Hirair

Hovnanian became Vice Chairman of AGM&M. *See* UWC at 2.

B.      *The Grant Agreement & Transfer Agreement*

On November 1, 2003, the Assembly executed a Grant Agreement with CFF and Cafesjian.[8]  Pls.' Stmt. ¶ 22; *see* Pls.' Br., Ex. 12 (Grant Agreement).  The Grant Agreement is signed by Hirair Hovnanian and Peter Voskibian on behalf of the Assembly and by Cafesjian on behalf of himself and CFF.  *See* Grant Agreement at 11.  The Grant Agreement memorialized CFF/Cafesjian's $3.5 million donation to the Assembly in 2000 for the purchase of the Bank Building (the "First Grant").  It states that the Assembly shall use the First Grant funds solely to purchase the Bank Building, pay any related transaction costs, and construct the "Gerard L. Cafesjian Memorial," which is described in section 3.2 of the Grant Agreement.  *See* Grant Agreement §§ 1.2, 3.2.  The Grant Agreement also memorialized a second donation (the "Second Grant") of $12.85 million for the purchase of four parcels of real estate surrounding the Bank Building: 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (the "Adjacent Properties").  *See id.* § 2.2.  These are the properties that Cafesjian had purchased through TomKat LP.  *See* Defs.' Br. at 10.  Collectively, the Bank Building and the Adjacent Properties shall be referred to as the "Grant Property" or "the Properties."

The Grant Agreement also describes several conditions imposed on the use of the grant funds.  First, the Grant Agreement provides that the Grant Property "may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the 'Plans') . . . ."  *See* Grant Agreement § 3.1.  Second,

---

[8] Although AGM&M disputes some of the circumstances under which the Grant Agreement arose, it is significant that AGM&M does not dispute the fact that it executed the agreement.  *See* Pls.' Stmt. ¶ 22.

the Grant Agreement contains a termination and reversion clause:

> If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:
>
> (i)   in the event any portion of the Grants has not been funded, this Agreement terminates; and
>
> (ii)  to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.[9]

Grant Agreement § 3.1(B). The Agreement states that the Assembly is in breach if it fails to use the Grants solely for the purposes set out in the Agreement or if it fails to satisfy any of the conditions set forth in the Agreement. *Id.* § 3.9. One of the conditions related to the Assembly was that it must have received "actual grants or firm pledges to support the AGM&M, including the Grants [from CFF/Cafesjian], totaling at least $20,000,000." *Id.* § 4.1.

In addition, the Grant Agreement conditions the gift of funds on the creation of AGM&M, Inc. as a separate entity. *See* Grant Agreement § 5.1. The Grant Agreement calls for the Assembly to enter into a "Transfer Agreement" with AGM&M, Inc. whereby the Assembly would transfer to AGM&M all of its "right, title, and interest" in assets and pledges contributed for the museum and memorial project. *Id.* § 5.3. The Grant Agreement calls for the Transfer Agreement to oblige AGM&M to honor all of the existing donor requirements at the time of transfer and to assume and agree to comply with the Assembly's obligations relating to the construction of the Cafesjian memorial. *Id.*

---

[9] The Grant Agreement defines the "Grantor" as Cafesjian and CFF, collectively. *See* Grant Agreement at 1.

The Grant Agreement also provides that the Assembly "must issue a new promissory note . . . to replace the promissory note issued on March 17, 2000 by the Assembly in favor of [CFF] in the amount of $500,000."  Grant Agreement § 5.4(A).  If the promissory note is still outstanding when the Transfer Agreement is executed, the Agreement requires it to be transferred to AGM&M as part of the transfer of the Assembly's assets.  *Id.* § 5.4(C).  The Grant Agreement also contains a merger clause stating that the Grant Agreement represents the entire agreement between CFF/Cafesjian and the Assembly.  *See id.* § 7.5.

On November 1, 2003, the Assembly and AGM&M entered into the Transfer Agreement.  *See* Pls.' Br., Ex. 13 (Transfer Agreement).  The Transfer Agreement provides that the Assembly shall contribute to AGM&M all of its rights, title, and interest to all assets contributed to the Assembly or held by the Assembly for the development, renovation, and construction of the museum and memorial project—valued at approximately $28 million.  *See* Transfer Agreement § 1.1.  As part of the Transfer, AGM&M must honor all of the Assembly's donor requirements existing at the time of transfer (or obtain donor consent to modification of any terms).  *Id.* § 1.2(A).  The Transfer Agreement explicitly states that AGM&M "assumes and agrees to comply with the [Assembly's] obligations relating to the memorial commemorating the Armenian Genocide under the [Grant Agreement]," which was attached as an exhibit.  *Id.* § 1.2(B).  The AGM&M also agreed to use the assets "solely to develop, construct, and operate the AGM&M."  *Id.* § 1.3.

Subsequent to the execution of the Grant and Transfer Agreements, AGM&M entered into various agreements with TomKat LP, the Assembly, and a third party seller to obtain title to the Adjacent Properties.  Pls.' Stmt. ¶ 29.

C.       *Governance of AGM&M by Cafesjian*

The AGM&M Board of Trustees held its first meeting in New York on June 9, 2004. Defs.' Stmt. ¶ 28.  The meeting was attended by Messrs. Hovnanian, Cafesjian, Kaloosdian, Waters Jr., and Mr. Rouben Adalian (on behalf of Ms. Mathevosian).  *Id.*  At the meeting, there was a review of the Museum formation documents, a property and financial report, and two proposals: (1) the selection of an architect, and (2) the selection of an executive director.  *Id.*  The parties dispute what happened at this meeting, although it is clear that no architect or executive director was selected by the Board.  *See* Defs.' Stmt. ¶ 29; Pls.' Resp. Stmt. ¶ 29.  Messrs. Hovnanian and Kaloosdian expressed some skepticism about the architect proposals that were put forward at the meeting, but Plaintiffs contend that the proposals were never put up for a vote. *See* Cafesjian Defs.' Stmt. ¶ 29; Pls.' Resp. Stmt. ¶ 29.

The second AGM&M Board of Trustees meeting was held in New York on February 10, 2005.  Defs.' Stmt. ¶ 30.  This meeting had the same attendees as the first meeting, and the agenda for the meeting was: (1) a financial and property status report; (2) selection of an executive director; (3) selection of an architect; and (4) an ANI status report[10] by Mr. Adalian. *Id.*  The parties also dispute what transpired at this meeting, although the record indicates that Edgar Papazian, a young Armenian architect, gave a presentation to the Board about his vision for the project.  *See* Defs.' Stmt. ¶ 31; Pls.' Resp. Stmt. ¶ 31.  Some of the Board members were critical of Mr. Papazian's proposals for the museum.  *See* Defs.' Stmt. ¶ 31; Pls.' Resp. Stmt.

---

[10] "ANI" refers to the Armenian National Institute.  ANI was formed as a subsidiary of the Assembly.  *See* Pls.' Br., Ex. 5 (R. Kaloosdian Aff.) ¶ 2.  Pursuant to the Grant Agreement, the Assembly assigned its right to appoint ANI's Trustees to AGM&M.  *See* Grant Agreement § 5.5.  ANI thus became a subsidiary of AGM&M, and all of the assets of ANI were transferred from the Assembly to AGM&M.  Pls.' Br., Ex. 5 (R. Kaloosdian Aff.) ¶ 15.

¶ 31. Mr. Kaloosdian suggested that the proposed design was too aggressive and might not satisfy zoning or historic preservation regulations, saying "it looked as if a dirigible had crashed into a building." *See* Pls.' Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 93-95. There is a dispute as to whether the Board also discussed the possibility of having a competition to select a world-class architect. *See* Stmt. ¶ 32; Pls.' Resp. Stmt. ¶ 32. No architect was selected by the Board at this meeting. The Board did approve retaining the services of one executive director candidate, Ms. Deborah Devedjian, although the details about her engagement and what was disclosed to the Board about it are disputed by the parties. *See* Defs.' Stmt. ¶ 33; Pls.' Resp. Stmt. ¶ 33.

A third Board meeting was held on July 26, 2005. Defs.' Stmt. ¶ 34. Ms. Devedjian gave a presentation to the Board regarding her business plan for the Museum, in which she proposed calling it "The Bank of Moral Courage." *See* Defs.' Br., Ex. 26 (Business Plan). Several Trustees were put off by the name proposed by Ms. Devedjian as well as her proposed budget. *See* Pls.' Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 103-08; Pls.' Opp'n, Ex. 6 (G. Cafesjian Dep. Tr.) at 255 ("I would be embarrassed by a name like that."). The parties dispute whether Ms. Devedjian was re-engaged to continue her consulting. *See* Defs.' Stmt. ¶ 36; Pls.' Resp. Stmt. ¶ 36. However, the record shows that Ms. Devedjian ultimately billed AGM&M for additional work performed after the July 2005 meeting. *See* Pls.' Opp'n, Ex. 22 (filed under seal) (Letter from Devedjian to AGM&M Re: Outstanding Payments).

On September 9, 2005, Waters Jr. emailed the Board of Trustees requesting a meeting at the end of September to reach agreement on the scope, budget, management, and timing for the next phase of development. Defs.' Stmt. ¶ 35. Mr. Hovnanian replied that he did not believe it was necessary to attend a meeting to discuss these details: "I have not been involved in those

things up to this point and have expressed a desire not to be involved with them. I continue my support and belief in this project." Defs.' Stmt. ¶ 36; Defs.' Br., Ex. 27 (9/12/2005 Email from H. Hovnanian). Mr. Hovnanian has testified that his involvement in the museum project was limited to approving or disapproving the final concept and then soliciting a large donation from a multi-billionaire. Defs.' Stmt. ¶ 37. No Board meeting was held in the fall of 2005. *Id.* ¶ 36.

In February 2006, Cafesjian sent a memo to Messrs. Hovnanian, Kaloosdian, and Adalian stating that his goal was to push the project forward. Defs.' Stmt. ¶ 38. Cafesjian proposed to start by approaching targeted major donors and endorsed the selection of Papazian as the project design architect. *Id.* Cafesjian called for the Board to have its fourth meeting on April 25, 2006. *Id.* ¶ 39. The proposed agenda for the meeting included: (1) a fundraising campaign consisting of a "Phase I" $75 million "quiet" campaign from major donors and then a "Phase II" $75 million worldwide public fundraising campaign; (2) a proposed structure for AGM&M during its development phase; an "Honorary Committee Prospect List"; (4) a senior staff recruiting plan; and (5) the selection of Mr. Papazian as the design architect. *Id.* Waters Jr. circulated this agenda with accompanying materials, including a financial overview for 2005 and 2006. *Id.*

During the April 2006 meeting, the Board discussed Ms. Devedjian's demand for payment for additional work that she had performed regarding the business plan for the Museum. *Id.* ¶ 40. The Board also discussed Mr. Papazian's proposed design: Messrs. Hovnanian and Kaloosdian criticized the plans and thought they would turn off potential donors. *Id.* ¶ 41. Cafesjian responded by noting that Messrs. Hovnanian and Kaloosdian had the votes to block the selection of Papazian, and that if they were against it, it would not happen. *Id.* There was no decision taken on how to proceed in selecting an architect. *Id.* During the meeting, Mr.

12

Hovnanian "inquired about a likely fallback position in the event Phase I targets were not reached." *Id.* ¶ 42. Mr. Kaloosdian "proposed considering the renovation of the bank building as one option." *Id.* Testimony in the record indicates that there was an "impasse" between Cafesjian and the other Trustees regarding the proper budget for the Museum. *Id.*

Mr. Adalian testified that by May 2006 "it was becoming apparent that there were issues at the Board level." Defs.' Stmt. ¶ 50. Mr. Kaloosdian testified that in the summer of 2006, the relationship among the Board members was "disintegrating." *Id.* Ms. Mathevosian testified that there were arguments between Cafesjian on the one hand and Messrs. Hovnanian and Kaloosdian on the other. *Id.* On May 24, 2006, Cafesjian sent a letter, through counsel, to the other three Board members stating that

> the problem has been one of two competing visions for AGM&M neither of which has commanded a consensus among the Trustees. His [Cafesjian's] has been a more ambitious, more expensive and, almost certainly, a more controversial vision. It is certainly a vision more difficult to achieve. The other, and doubtless more readily attainable solution, is to confine the effort to the existing National Bank of Washington building with the view that the purposes of AGM&M are best accomplished by the opening of the Museum sooner rather than later.

*See* Pls.' Opp'n, Ex. 15 (5/24/2006 Letter from William J. Brody to Trustees) at 1. The letter goes on to state that the problem of competing visions has been exacerbated by the voting arrangements on the Board which require an 80% affirmative vote before taking action. *See id.* at 2. The letter proposes that Cafesjian end his involvement with AGM&M, resigning as a Trustee and renouncing his right to appoint future Trustees. *See id.* The letter further suggests that if Cafesjian were to resign, he would expect AGM&M to repay the $500,000 debt that is outstanding and that the Adjacent Properties would revert to him since they would not be needed for the scaled-back Museum. *Id.* The provisions in the Grant Agreement regarding the Bank

Building would remain unchanged, but Cafesjian would eliminate any requirement that AGM&M build a memorial.  *See id.* at 2-3.

On August 2, 2006, Robert Kaloosdian responded to Cafesjian's counsel on behalf of the other Trustees.  *See* Pls.' Br., Ex. 16 (8/2/2006 Letter from R. Kaloosdian to William J. Brody). In the letter, Mr. Kaloosdian states that "[i]n all candor, we were quite surprised to receive the letter and Mr. Cafesjian's assertion of two competing visions for AGM&M.  There have not been two competing visions."  *Id.* at 1.  The letter asserts that Cafesjian has acted as the chief executive officer of the Museum project and that the other Trustees encouraged that.  *Id.*  The letter asserts that the other Trustees did not object to Mr. Cafesjian's engagement of an architect or other plans and "at no time stood in the way of any of his decisions."  *Id.*  The letter expressed support for Cafesjian's vision, despite some concerns about its cost, and urged Cafesjian to withdraw his attempt to separate from AGM&M.  *Id.* at 1-2.  On August 26, 2006, Cafesjian's counsel responded.  *See* Pls.' Br., Ex. 17 (8/26/2006 Letter from W. Brody to the other Trustees). The letter disagreed with many of the facts stated by the Trustees and reaffirmed Cafesjian's desire to part ways with AGM&M.  *Id.*  The letter restated the terms proposed in the earlier letter for Cafesjian's departure, and proposed as an alternative that AGM&M simply be liquidated.  *Id.* at 2.  The letter also stated that because of AGM&M's financial situation, Cafesjian would no longer be advancing AGM&M funds to cover expenses.  *Id.*

Cafesjian resigned his position as President and Chairman of AGM&M on September 13, 2006.  Pls.' Stmt. ¶ 19.  However, he remained a Trustee until May 2, 2007.  *Id.*  Cafesjian's resignation letter indicated that Waters Jr. intended to resign as Secretary/Treasurer as soon as the Board of Trustees identified a successor.  *See* Pls.' Br., Ex. 10 (9/13/2006 Letter from

Cafesjian to the other Trustees) at 1.

       *D.*      *The Memorandum of Agreement and the* Lis Pendens

On October 23, 2006, Waters Jr. executed a Memorandum of Agreement Reserving

Rights ("MOA") between AGM&M and CFF. *See* Pls.' Br., Ex. 18 ("MOA"). The MOA

explains that pursuant to the Grant Agreement, "the Assembly agreed, among other things, to

undertake the development of certain real properties situated in the District of Columbia

('Development Obligations') which properties are described in Exhibit A attached hereto . . . ."

MOA at 1. The properties listed in Exhibit A are the Bank Building and the Adjacent Properties.

MOA at 3-4. The MOA further explains that the Grant Agreement "provided for the reservation

of certain reversionary rights in the CFF in the event that the Assembly failed to perform the

Development Obligations." MOA at 1. The MOA goes on to explain that pursuant to the

Transfer Agreement, "AGM&M agreed, among other things, to undertake the Development

Obligations of the Assembly." *Id.* The MOA states that "the AGM&M and the CFF desire to

execute this memorandum and record it among the land records of the District of Columbia, in

order to provide notice of the Development Obligations contained in the Transfer Agreement."

*Id.* Waters Jr. signed the MOA for both parties, in his capacity as Secretary/Treasurer for

AGM&M and in his capacity as Vice President of CFF. *See id.* at 2. Waters Jr. sent the

executed MOA to the District of Columbia Recorder of Deeds on October 23, 2006, and it was

recorded on October 27, 2006. *See id.* at 3; Pls.' Stmt. ¶ 40.

Cafesjian testified that he had directed Waters Jr. execute the MOA and record it. *See*

Pls.' Br., Ex. 6 (G. Cafesjian Dep. Tr.) at 303. The day after Waters Jr. executed the MOA, he

attended a meeting of the Board of Trustees. Pls.' Stmt. ¶ 45. Waters Jr. never informed the

other members of the Board of his actions regarding the MOA. *Id.* ¶ 46.

On April 26, 2007, Cafeesjian and CFF filed a complaint against the Assembly in the United States District Court for the District of Minnesota seeking, *inter alia*, rescission of the Grant Agreement and restitution of all donations made. Pls.' Stmt. ¶ 54. Cafesjian and CFF sought a declaration that the Assembly had breached the Grant Agreement and sought damages for the failure to reissue the promissory note or repay the $500,000 loan as required by the Grant Agreement. Defs.' Resp. Stmt. ¶ 54. This case was ultimately dismissed by the court for failure to join a necessary party, AGM&M. *See* Pls.' Opp'n, Ex. 45 (Order of Dismissal).

On May 2, 2007, Cafesjian tendered his resignation from the AGM&M Board of Trustees and appointed Waters Jr. to act as CFF's designated Trustee in his place. On May 7, 2007, the Board of Trustees convened a meeting, with Waters Jr. present by telephone. Defs.' Stmt. ¶ 60. At the meeting, a discussion occurred regarding whether or not Cafesjian and CFF's conduct in filing the action against the Assembly in Minnesota, as well as Waters Jr.'s actions in executing and recording the MOA, had created a conflict of interest and breach of fiduciary duty which prohibited Waters Jr. and/or CFF from participating in the discussions or voting on proposals for going forward with the development of the museum. *See* Defs.' Br., Ex. 32 (filed under seal) (5/7/2007 Meeting Draft Transcript) at 1-13. Waters Jr. declined to answer many questions about this subject. *Id.* The details surrounding what occurred at this meeting are hotly disputed by the parties. However, it is clear that at some point during the meeting, Waters Jr. disconnected the phone, and the remaining Trustees proceeded with the meeting without him. *See id.* at 13-14.

In addition to the April 26, 2007, lawsuit filed by Cafesjian and CFF in the District of

Minnesota against the Assembly regarding the $500,000 promissory note, *see* Pls.' Opp'n, Ex. 44, the record indicates that there have been five other lawsuits filed arising out of disputes over the museum. On June 7, 2007, AGM&M filed the first of three related actions now pending before this Court; the lawsuit was filed in the Superior Court of the District of Columbia and removed to this Court on July 16, 2007. Among other things, AGM&M claimed that Cafesjian and Waters Jr. had breached their fiduciary duty by filing the MOA. On September 28, 2007, CFF filed a derivative lawsuit in this District against AGM&M, the Assembly, and the other Trustees to enjoin AGM&M from developing the museum without participation by trustees from CFF. *See* Pls.' Opp'n, Ex. 47. On October 10, 2007, the Cafesjian Defendants and TomKat LP filed a lawsuit in the District of Minnesota against AGM&M and the Assembly to enjoin arbitration of the parties' disputes. *See* Pls.' Opp'n, Ex. 48. On February 15, 2008, the Assembly and AGM&M filed this action. A third related action now pending before this Court was filed by the Cafesjian Defendants and TomKat LP against AGM&M and the Assembly on February 13, 2008, in federal court in Minnesota and subsequently transferred to this Court.

On March 19, 2009, the AGM&M Board called a special meeting by telephone to consider the removal of Waters Jr. as the CFF Trustee and to remove any other CFF-designated successor Trustees as well as CFF's right to act as a Trustee or appoint Trustees. *See* Defs.' Ex. 36 (3/19/2009 Meeting Minutes). Notice of this meeting was not provided to CFF. *See* Defs.' Stmt. ¶ 66; Pls.' Resp. Stmt. ¶ 66. The Trustees present at the meeting discussed issues relating to conflicts of interest between CFF and the business of AGM&M. *See* Pls.' Resp. Stmt. ¶ 66. Ultimately, the Board of Trustees voted to remove Waters Jr. as a Trustee and to terminate CFF's rights as an initial donor. *Id.*

Cafesjian and Waters Jr. became Trustees of the Assembly in the late 1990s.  Defs.' Stmt.

¶ 72.  During their time as Trustees, they received a copy of the 2003 Assembly Trustee

Directory, which was sent to all Assembly Trustees.  *Id.*  In January 2007, Mr. Hovnanian and the

Assembly suspended Cafesjian and Waters Jr. from the Assembly Board of Trustees.  Defs.'

Stmt. ¶ 56.  The meeting minutes from the Assembly's Board meeting indicate that Cafesjian and

Waters Jr. were suspended "while the conflicts of interest/AGMM matters remain unresolved."

*See* Defs.' Br., Ex. 58 (filed under seal) (1/12/2007 Assembly Board of Trustees meeting

minutes) at 1.

On June 18, 2007, the Assembly sent out a letter to its membership regarding the status of

the museum project and the lawsuit filed by Cafesjian and CFF against the Assembly in April

2007.  *See* Counterclaim, Ex. 5 (6/18/2007 Letter).  The letter was signed by Hirair Hovnanian as

Assembly Chairman and Carolyn Mugar as President of the Assembly.  *See id.*  The letter stated

that "[t]he Assembly led the initial three-year effort to locate an appropriate site for an Armenian

Genocide museum" and that "Cafesjian joined the Assembly and other donors in making the

purchase of the National Bank of Washington a reality."  *Id.*  The letter went on to describe

Cafesjian's subsequent purchase of the adjacent lots, the creation of AGM&M, and explained

how the Assembly has transferred its title to the Bank Building to AGM&M.  The sixth

paragraph of the letter contains the following text:

> Messrs. Cafesjian and John Waters (Vice President of the Cafesjian Family
> Foundation) controlled the museum project over the past several years.  At no point
> did the Assembly reject Mr. Cafesjian's vision for the museum, which is his stated
> reason for abandoning the project and filing suit against the Assembly.  Rather, the
> [AGM&M] Board asked Mr. Cafesjian to proceed with his vision for the museum,

only to be informed that he no longer was interested in the project.

*Id.* The letter stated that "[w]e regret that Mr. Cafesjian has chosen to pursue this matter in the courts" and concluded by expressing a renewed commitment to establishing the museum. *Id.*

Two days after the letter was sent out, the Assembly's Executive Director sent a confidential memorandum to Assembly staff regarding dissemination of the information in the June 18 letter. *See* Defs.' Opp'n, Ex. GG (7/20/2007 Memo. from B. Ardouny to "All Staff"). The memorandum explained that the letter had been sent to the membership only but that it was expected that news would travel. *See id.* at 1. The letter stated that any inquiries from the media about the lawsuit should be directed to the Assembly's legal counsel and explained that "[s]taff is not authorized to make on or off the record comments to the media" about the matter. *See id.* at 1-2. The memorandum went on to say:

> Additionally, it is only human nature that family and friends will ask questions as well. To the extent that occurs, the following is acceptable: "I am not authorized to speak about this matter, but as the letter to the membership indicated, the Assembly is committed to the project." Additionally, any language within the letter is also ok to recite. What is not authorized is any statement, speculation, opinion, etc, [sic] which goes beyond the text of the letter signed by the Chairman and the President of our organization.

*Id.* at 2.

## II.  LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory assertions offered without any factual basis for

support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

## III. DISCUSSION

In their Complaint, Plaintiffs assert eleven separate claims against Defendants arising out of Defendants' management and development of the Armenian genocide museum project. First, Plaintiffs assert claims against Cafesjian and Waters Jr. for breach of fiduciary duty to AGM&M (Claim I) and the Assembly (Claim II) and misappropriation of the Assembly's trade secrets (Claim III). AGM&M also asserts claims for breach of contract (Claim IV) and breach of the duty of good faith and fair dealing (Claim V) against TomKat and Waters Jr. in his capacity as TomKat's president. The Assembly asserts claims against Cafesjian for breach of the duty of good faith and fair dealing (Claim VI) and against Cafesjian and Waters Jr. for violation of the Assembly's conflict of interest provisions (Claim VII). Plaintiffs also seek a declaration that the reversion clause in the Grant Agreement is unenforceable (Claim VIII), a declaration that CFF is no longer authorized to designate members of the Board of Trustees of AGM&M (Claim IX), a declaration that Cafesjian and Waters Jr. are personally liable for any contracts entered by them on AGM&M's behalf without approval from the Board of Trustees (Claim X), and a request for an accounting (Claim XI). Defendants have moved for summary judgment on each of these claims, and Plaintiffs have moved for summary judgment regarding Claim I. In addition, Plaintiffs have moved for summary judgment regarding Counterclaim VIII, which alleges that Hovnanian and the Assembly defamed Cafesjian. The Court shall evaluate each of these claims in turn.

*A.     Claim I: Breach of Fiduciary Duty to AGM&M by Cafesjian and Waters Jr.*

The parties have cross-moved for summary judgment on AGM&M's claim for breach of fiduciary duty against Cafesjian and Waters Jr.  In Count I of the Complaint, Plaintiffs allege that Cafesjian and Waters Jr., as officers and Trustees of AGM&M, mismanaged the corporation by engaging in acts of self-dealing, failing to diligently represent AGM&M in real estate transactions with TomKat, failing to secure a realistic development plan, secure funding, control spending, keep adequate financial and corporate records, and engaged in numerous ultra vires acts and acts of self-dealing, including the recording of the MOA and the filing of lawsuits adverse to AGM&M's interests, all causing injury to AGM&M.  *See* Compl. ¶¶ 121-24.  In their motion for partial summary judgment, Plaintiffs argue that the facts clearly show that certain of these actions—the filing of the MOA and of the lawsuits seeking rescission of the Grant Agreement and an injunction against further development of the Museum without input from CFF—constitute a breach of fiduciary duty by Waters Jr. and Cafesjian.  Defendants argue that there are no facts in the record that support a finding that their actions breached any fiduciary duty owed to AGM&M.  The Court shall evaluate each of these contentions.

1.     Filing the MOA

First, with respect to Plaintiffs' argument that Cafesjian and Waters Jr. breached their fiduciary duties to AGM&M by filing the MOA, their arguments are identical to those raised by AGM&M in its motion for summary judgment in the first of the three related cases pending before this Court.  *See Arm. Genocide Museum & Memorial, Inc. v. Cafesjian Fam. Found.*, No. 07-1259 (D.D.C. Mar. 9, 2010) ("*Cafesjian I*") (denying in part motion for summary judgment).  In *Cafesjian I*, this Court denied AGM&M's motion for summary judgment on this ground,

holding that the mere act of filing the MOA itself by Cafesjian and Waters Jr. did not constitute a breach of fiduciary duty as a matter of law but that there were genuine issues of material fact relating to whether Cafesjian's and Waters Jr.'s conduct was undertaken in bad faith. *See Cafesjian I*, slip op. at 20-33. AGM&M relies on the same facts and arguments here as it did in *Cafesjian I*, and therefore the Court incorporates the relevant parts of its opinion in *Cafesjian I* in denying Plaintiffs' motion in this case. The record shows that the MOA merely reflected existing obligations from the Grant and Transfer Agreements, and a reasonable jury could conclude that Waters Jr. and Cafesjian acted in good faith in recording those obligations to ensure that the Properties would be developed into the Museum contemplated by the Grant and Transfer Agreements. *See, e.g.*, Pls.' Br., Ex. 6 (G. Cafesjian Dep. Tr.) at 308 ("[T]he whole idea of [the MOA], after all, was to save the museum, the whole project. If something was sold out from under that big footprint that we had agreed to, then it ruins everything." Ultimately, a jury must decide whether Waters Jr. and Cafesjian acted in good or bad faith.[11]

2. Filing the April 2007 and September 2007 Lawsuits

Plaintiffs contend that Cafesjian and Waters Jr. breached their duties to AGM&M by filing lawsuits to rescind the Grant Agreement and to prevent AGM&M from continuing to develop the museum without input from CFF. *See* Pls.' Br. at 12-13. Plaintiffs argue that the true motive behind these lawsuits was to delay any development of the museum project and trigger Cafesjian/CFF's reversionary interest in the Properties. *See id.* at 13. However, there are

---

[11] Defendants do not specifically address the MOA in their motion for summary judgment. However, because there are disputed issues of material fact regarding whether Cafesjian and Waters Jr. acted in bad faith, Defendants are not entitled to summary judgment on this claim.

no undisputed facts in the record to support that contention.  Cafesjian testified that he filed the first lawsuit in April 2007 because the Assembly had violated the Grant Agreement, and he explicitly denies ever seeking to delay the Museum project.  *See* Defs.' Resp. Stmt. ¶ 56; Defs.' Opp'n, Ex. P (G. Cafesjian Dep. Tr.) at 176; Defs.' Opp'n, Ex. II (G. Cafesjian Aff.) ¶ 12.

A trustee may file a lawsuit against a corporation in order to protect his own interests without breaching his fiduciary duty.  *See Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2007) ("[A] fiduciary may enforce validly obtained legal rights against his or her firm, even if that transaction results in a profit for the fiduciary at the firm's expense.")  However, the trustee must properly balance his own interests with the interests of the corporation.  *See Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 994, 1004, 1008 (Md. 2007) (holding that a director did not breach his fiduciary duties by, among other things, filing a lawsuit against the corporation and seeking summary judgment by default, but explaining that the director had to strike "the proper balance between [his] claimed legal right . . . [and] fulfill[ing] his fiduciary obligation to act in [the corporation's] best interests," which he did in part by giving notice that the litigation was imminent and advising the corporation on how it could avoid the litigation).  As Plaintiffs recognize, "the pertinent question is . . . whether or not the Defendants filed the lawsuits in an effort to actively undermine the ability of AGM&M to operate as it was intended."  Pl.'s Opp'n at 22.  Plaintiffs argue that "the pattern of behavior engaged in by Defendants from May 2006 through the present leaves little doubt as to their malevolent intentions."  *Id.*  But "little doubt" is sufficient to preclude the award of summary judgment if there are facts in the record that would permit a reasonable finder of fact to conclude that Defendants acted honestly and in good faith.  Here, Cafesjian's testimony regarding his intentions may or may not be credited by a jury, and a

jury may conclude that he was justified in filing the lawsuits to protect the interests he had

contracted with AGM&M.[12]

Defendants claim they are entitled to summary judgment regarding the filing of the

lawsuits because they have a legal right to protect their interests in a court of law, even if their

interests are adverse to those of the corporation. *See* Defs.' Br. at 31-32. Defendants cite

precedents involving general corporate law for the principle that filing a lawsuit to protect one's

interests cannot itself give rise to liability. *See id.*[13] However, there is an exception to this

principle when a party files a lawsuit in bad faith or out of spite. *See Clancy v. King*, 954 A.2d at

1108-09. Contrary to Defendants' suggestion that bad faith has not been alleged here, Plaintiffs

have claimed that Defendants filed these lawsuits in bad faith. *See* Pl.'s Opp'n at 22-23, 31-32.

Whether Defendants acted in bad faith depends in part on determinations of credibility that

cannot be made by the court on a motion for summary judgment.[14]

---

[12] Plaintiffs claim, citing *Storetrax.com*, that Defendants' failure to notify AGM&M of their intention to file a lawsuit or otherwise give AGM&M an opportunity to avoid litigation constitutes a breach of fiduciary duty. *See* Pl.'s Opp'n at 23. However, *Storetrax.com* is not binding authority, and Plaintiffs have provided no District of Columbia authority to support a rule requiring such notification. Moreover, there is evidence in the record that AGM&M was aware of Cafesjian's position regarding the promissory note, which was the basis for the April 2007 lawsuit. *See* Pl.'s Opp'n, Ex. 26 (5/24/2006 Letter from W. Brody to AGM&M Trustees) at 2; Defs.' Stmt. ¶ 57. Therefore, the Court declines, at this stage in the litigation, to apply such a rule in this case.

[13] Defendants also cite the *Noerr-Pennington* doctrine, which is derived from the field of antitrust law and generally immunizes the filing of lawsuits from antitrust liability. However, the Court is not persuaded that the *Noerr-Pennington* doctrine should apply in this case, which is otherwise governed by ordinary principles of corporate law.

[14] Defendants argue that Plaintiffs' theory that Cafesjian deliberately thwarted progress on the museum to enable him to invoke his reversionary interest makes no economic sense because Cafesjian would not have donated expensive real estate to the museum in 2003 with the intent to possibly recover the same real estate seven years later. *See* Defs.' Opp'n at 29; Defs.' Reply at 1-

Defendants also argue that neither Cafesjian nor Waters Jr. owed a duty when these lawsuits were filed because AGM&M was not a party to the April 2007 suit, Cafesjian resigned as a Trustee in May 2007 prior to the filing of the September 2007 lawsuit, and Waters Jr. was effectively shut out as a Trustee after the May 7, 2007, Board of Trustees meeting. *See* Defs.' Br. at 30-31. However, the filing of the lawsuit against the Assembly may have adversely affected AGM&M's interests because AGM&M accepted obligations with respect to the promissory note when it signed the Transfer Agreement. *See* Transfer Agreement § 1.2. Therefore, Cafesjian had a duty as an AGM&M Trustee not to file the April 2007 lawsuit if it was done in bad faith. With respect to Waters Jr., the Court explained in its opinion in *Cafesjian I* that there are disputed issues of fact in the record as to whether Waters Jr. continued to act as a Trustee after May 2007. *See Cafesjian I*, slip op. at 22-23 (Mar. 9, 2010). Accordingly, the Court shall deny both parties' motions for summary judgment with respect to the filing of lawsuits in April 2007 and September 2007.

### 3. Mismanagement of AGM&M

Defendants argue they are entitled to summary judgment regarding Plaintiffs' claim that they breached their fiduciary duties through mismanagement of AGM&M. Defendants maintain that there is no factual support in the record for such a claim and that any failure to make progress in the development of the Museum was caused not by their mismanagement but by disagreements on the Board of Trustees as to how to proceed. In addition, Defendants claim that the business judgment rule protects their management decisions from judicial scrutiny. *See*

---

3, 9. However, there are disputed facts in the record regarding Cafesjian's motivations, and it is for the jury to decide whether Plaintiffs' theory of the case is plausible based on the evidentiary record.

Defs.' Br. at 33-34. And with respect to actions occurring before February 15, 2005, Defendants

contend that the statute of limitations bars any claim for breach of fiduciary duty. *See id.* at 35.

However, Plaintiffs have come forward with evidence in the record to support their claim

as to mismanagement. For example, the By-Laws state that Board meetings are governed by

Robert's Rules of Order, *see* By-Laws § 3.1, and there is testimony that Cafesjian never put any

agenda item or decision up for a vote. *See* Pl.'s Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 125,

129-30. Defendants do not appear to dispute that Cafesjian did not call for votes, but they

contend that this was an unnecessary formality because it was clear that the other Trustees would

vote down any proposals put forward. *See* Defs.' Reply at 4-5. Defendants cite a colloquy from

the April 26, 2006, meeting in which, after Messrs. Hovnanian and Kaloosdian voiced skepticism

about proposed architectural plans, Cafesjian stated "You have the votes to block it," to which

Mr. Kaloosdian responded "I do not want to block anything" and Cafesjian answered "That's not

what I mean. I mean the two of you are against it. [It's] not going to happen." *Id.*; Defs.' Br.,

Ex. 35 (filed under seal) (notes from 4/26/2006 meeting). Contrary to Defendants' view,

however, that colloquy actually demonstrates that if Cafesjian had put the proposal up for a vote,

Mr. Kaloosdian might not have voted "to block anything."

There is also some evidence in the record to suggest that Defendants entered into

contracts without notice to the Board, moved significant funds between CFF and AGM&M

without an adequate paper trail, left AGM&M in a position in September 2006 where it had no

cash on hand and over $200,000 in debt, and left the Properties in a state of disrepair. *See* Pls.'

Resp. Stmt. ¶¶ 24, 67-68; Pls.' Add'l Stmt. ¶¶ 77, 81, 104; Pls.' Opp'n, Ex. 3 (filed under seal)

(E. Hovnanian Dep. Tr.) at 45-71. Moreover, Cafesjian testified at deposition that he had no idea

if he served as the president and chairman of AGM&M during the period 2003 to 2006, which Plaintiffs argue shows that he totally abandoned the project. *See* Pls.' Opp'n, Ex. 5 (G. Cafesjian Dep. Tr.) at 230-331. This evidence in the record creates a genuine issue of material fact as to Defendants' alleged mismanagement of AGM&M.

Defendants argue that the business judgment rule prohibits a court from finding a breach of fiduciary duty based on mismanagement. However, the business judgment rule will not apply where there is a breach of the duty of loyalty. *Willens v. 2720 Wis. Ave. Co-Op. Ass'n, Inc.*, 844 A.2d 1126, 1137 (D.C. 2004); *see also Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006) (finding presumption of business judgment rule rebutted where there are allegations that directors acted based on personal financial interests). Moreover, the business judgment rule does not protect "total abdication" of management responsibilities. *See Stern v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries*, 381 F. Supp. 1003, 1013-14 (D.D.C. 1974); *In re Tower Air, Inc.*, 416 F.3d 229, 239 (3d Cir. 1995) (applying Delaware law) ("[the rule] has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.") Plaintiffs have produced evidence sufficient to create an issue for a jury as to whether Cafesjian and Waters Jr. engaged in transactions in which they had a personal financial interest or failed to take appropriate actions necessary to manage AGM&M. Therefore, the business judgment rule does not compel the award of summary judgment.

Next, Defendants argue that the statute of limitations precludes any claims pertaining to conduct occurring before February 15, 2005, three years before this lawsuit was filed. *See* D.C. Code § 12-301(8) (providing that statute of limitations is three years). Plaintiffs respond to this argument only in a footnote, claiming that Defendants mismanaged AGM&M throughout their

tenure as managing officers, from 2003 to 2006, and therefore this mismanagement is a "continuing violation" that accrued in 2006. *See* Pl.'s Opp'n at 27 n.19. Plaintiffs provide no authority for this proposition, however, and they do not contest the fact that the statute of limitations is three years. Therefore, to the extent that Plaintiffs rely on any acts that occurred entirely before February 15, 2005, their claims are time-barred. Accordingly, the Court shall grant-in-part Defendants' motion on statute of limitations grounds with respect to events that occurred prior to February 15, 2005.

### 4.    Damages

Finally, Defendants argue that Plaintiffs have suffered no damages as a proximate result of the alleged breaches. "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Convit v. Wilson*, 980 A.2d 1104, 1125 (D.C. 2009). Proximate cause is ordinarily a question of fact for the jury. *Id.* at 1126. "[I]n order to survive a motion for summary judgment based on the asserted insufficiency of proof of damages, 'a plaintiff need not, at this stage, show the amount of damages; he is obligated only to show that they exist and are not entirely speculative.'" *Cormier v. D.C. Water & Sewer Auth.*, 959 A.3d 658, 667 (D.C. 2008) (quoting *Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 331 n.26 (D.D.C. 1990)). Damages are speculative if the uncertainty concerns the fact of damages rather than the amount. *Id.* (citing *Carroll v. Phila. Hous. Auth.*, 650 A.2d 1097, 1100 (Pa. Commw. Ct. 1994)). Plaintiffs contend that as a result of Defendants' conduct, (1) they have suffered significant delays in the development of the museum, creating a substantial risk that development may not be completed

by the December 2010 deadline in the reversion clause; (2) funds and resources have been diverted to deal with the ongoing litigation; (3) potential donors have decided against giving to AGM&M; (4) AGM&M has been unable to secure financing for renovations and has had difficulty securing insurance on the buildings; and (5) Plaintiffs face potential tax consequences due to Defendants' non-action and mismanagement. *See* Pls.' Opp'n at 27-28.

There is factual support in the record for at least some of these categories of damages. For example, there is evidence that some donors decided not to give or delay their donations because of concerns about, among other things, the litigation between the Cafesjian parties and AGM&M. *See, e.g.*, Pl.'s Opp'n, Ex. 3 (filed under seal) (E. Hovnanian Dep. Tr.) at 229-30 (discussing possible donations); Pl.'s Br., Ex. 23 (filed under seal) (V. Krikorian Dep. Tr.) at 270-71, 278-79 (same). To the extent that the alleged mismanagement by Defendants caused AGM&M to improperly enter contracts or delayed development of the Museum, there are costs associated with those contracts or delays that could be determined by a jury. Additionally, Plaintiffs cite to evidence in the record that Defendants' mismanagement jeopardized the tax status of both AGM&M and the Assembly of public charities. *See* Pls.' Br., Ex. 20 (V. Krikorian 30(b)(6) Dep. Tr.) at 191; Pls.' Opp'n, Ex. 33 (letters from D.C. Office of Tax and Revenue). At this preliminary stage, Plaintiffs have identified evidence in the record sufficient for a jury to determine whether or not Defendants' conduct proximately caused some injury to AGM&M, resulting in damages. Accordingly, Defendants' motion for summary judgment shall be denied as to the alleged insufficiency of damages as to Claim I.

B.      *Claim II: Breach of Fiduciary Duty to the Assembly by Cafesjian and Waters Jr.*

In Claim II of their Complaint, Plaintiffs allege that Cafesjian and Waters Jr. breached

their fiduciary duties as Trustees of the Assembly by filing the April 2007 lawsuit, founding a competing organization in December 2006, and misappropriating proprietary information and other documents belonging to the Assembly. Defendants move for summary judgment with respect to each of these allegations.

1.     The April 2007 Lawsuit

Defendants first claim that they owed no duty to the Assembly in April 2007 because they were suspended from the Board of Trustees by the Assembly in January 2007. Plaintiffs do not dispute that Cafesjian and Waters Jr. were suspended from the Board. *See* Pls.' Resp. Stmt. ¶ 72. However, they argue that despite their suspension, they remain as Trustees of the Assembly and have never resigned their positions as such, although there is no factual support for that proposition in the record. *See* Pl.'s Opp'n at 29; Pls.' Resp. Stmt. ¶ 72. Plaintiffs thus argue that Cafesjian and Waters Jr. had continuing fiduciary duties as Trustees. Defendants do not address this point in their reply brief, and they offer no legal authority in support of their view that being suspended from the Assembly's Board of Trustees terminates their fiduciary obligations. Accordingly, based on the present record, the Court shall deny Defendants' motion for summary judgment as to the lack of duty owed the Assembly in April 2007.

Defendants next claim, as they did with respect to Claim I, that their filing of a lawsuit to protect their own contractual interest is protected activity that cannot constitute a breach of fiduciary duty. As stated above, however, the filing of a lawsuit is not protected if it is done in bad faith, and Plaintiffs have produced a genuine issue of material fact as to whether the April 2007 was filed in bad faith. Accordingly, summary judgment shall not be awarded on this basis.

2.   <u>Founding a Competing Organization</u>

In December 2006, Cafesjian founded the U.S.-Armenia Public Affairs Committee ("USAPAC"), which Defendants argue was created to engage in advocacy on Armenian issues and to assist Cafesjian in pursuing his own philanthropic causes.  According to the Press Release announcing USAPAC's creation, USAPAC is "a new Armenian-American advocacy organization dedicated to promoting and defending Armenian-American interests."  *See* Pls.' Opp'n, Ex. 50 (12/8/2006 Press Release).  Plaintiffs argue that Defendants created USAPAC "with no regard to its effect on the Assembly and without even the respect to notify the Assembly Board of their plans."  Pls.' Opp'n at 33.  Defendants argue simply that "[t]he fact that Mr. Cafesjian wanted to expand the scope of Armenian-American advocacy cannot possibly translate into a breach of a duty to the Assembly."  Defs.' Br. at 35.  However, Defendants fail to provide any legal authority for this proposition.   "Multiple loyalties or apparent conflicts are insufficient in themselves to establish a breach of loyalty."  3 William Meade Fletcher, Fletcher Cyclopedia of Corporations § 837.60.  There is no breach of loyalty unless the director somehow "uses his or her corporate office to promote, advance or effectuate" an interest that is unfair to the corporation.  *See Willens*, 844 A.2d at 1136 n.13 (quoting Fletcher Cyc. Corp. § 837.60 at p. 184).  Thus, the fiduciary duty of loyalty prohibits a Trustee from actively undermining the Assembly by forming a competing organization.  If there is evidence that Cafesjian or Waters Jr. took advantage of their position as Assembly Trustees to start a competing organization, a jury may conclude that they breached their fiduciary duty to the Assembly.  "[W]hether a director or officer has properly discharged his or her duty of loyalty is a question of fact to be determined in each case in view of all of the circumstances."  *Id.* at 1136.

32

The evidence in the record regarding USAPAC is extremely limited. The only evidence suggesting that USAPAC was a "competing organization" is the written summary of the Assembly's January 12, 2007, Board of Trustees meeting, which indicates that "Assembly officials were informed by a legislator that USAPAC personnel were speaking ill of the Assembly in the legislative channels." *See* Pls.' Opp'n at 32; Defs.' Br., Ex. 58 (filed under seal) (1/12/2007 Assembly Board of Trustees meeting minutes) at 1-2. That evidence, however, is inadmissible hearsay that may not be considered at the summary judgment stage. The only other evidence of possible impropriety is Cafesjian's testimony that he did not report the formation of USAPAC under the Assembly's conflict of interest rules because he did not think it created a conflict. *See* Pl.'s Opp'n, Ex. 5 (G. Cafesjian Dep. Tr.) at 72.

However, Plaintiffs claim that Defendants have refused to turn over documents pertaining to USAPAC, and they have filed a motion to compel the production of these documents. *See* [71] Mot. to Compel at 4-5. Among other things, Plaintiffs seek documents concerning the formation of USAPAC, communications between USAPAC and the Assembly, and "any and all documents concerning or supporting [Defendants'] position that USAPAC was an is intended to be . . . an organization that supports the purposes and objectives of the Assembly and its initiatives." *See id.* at 5. Defendants contend that they have produced communications between Cafesjian and Hovnanian regarding the launch of USAPAC, documents related to the official launch of USAPAC, and documents describing USAPAC's organizational structure, and they have also made Ross Vartian, USAPAC's executive director, available for deposition. *See* Defs.' Opp'n to Mot. to Compel at 14-15. Plaintiffs contend that Defendants have not provided them with internal communications between Defendants and USAPAC employees regarding the

formation of USAPAC or documents to support Defendants' argument that USAPAC supports, rather than competes with, the Assembly.  Pls.' Reply Supp. Mot. to Compel at 7.  Defendants claim that the production of additional documents is unreasonably burdensome and/or cumulative.

Many of Plaintiffs' discovery requests are reasonably calculated to lead to the discovery of admissible evidence regarding Plaintiffs' claim that Defendants breached their fiduciary duties to the Assembly by founding USAPAC as a competing organization.  However, certain of Plaintiffs' requests, such as the request for "any and all documents concerning [USAPAC]," are overbroad.  Defendants should not be required to turn over every document relating to USAPAC when Plaintiffs' claim concerns only the founding of the organization.  Accordingly, the Court shall grant Plaintiffs' motion to compel only insofar as it pertains to documents likely to reveal information about the founding of USAPAC.  Because the Assembly apparently realized that USAPAC might pose a conflict of interest by January 2007, Defendants should not be required to produce any documents beyond this time period unless they specifically relate to the formation of the organization.  Specifically, the Court shall order Defendants to produce the following, modified from Plaintiffs' discovery requests: (1) any and all documents concerning the formation of USAPAC, including without limitation any correspondence with any person or entity regarding same, including internal communications[15]; (2) any and all communications between

---

[15] Modified from Plaintiffs' First Request for Production of Documents ("First Request"), Request No. 24: "Any and all documents concerning the United States-Armenia Public Affairs Committee (USAPAC), including without limitation all documents pertaining to its formation, including without limitation any correspondence with any person or entity regarding same."  *See* Pls.' Mot. to Compel, Ex. A (CFF et al.'s Response to Pls.' First Request) at 15.

USAPAC and the Assembly, the AGM&M, or ANI before February 2007[16]; and (3) any and all documents concerning or supporting Defendants' position that USAPAC was and is intended to be, and was and is in practice, an organization that supports the purposes and objectives of the Assembly and its initiatives.[17]  Defendants need not produce additional copies of these documents if they have already been produced in this litigation, but the Court shall require Defendants to certify that they made a complete production with respect to these categories of documents.

### 3.     Misappropriation of Proprietary Information

The parties appear to agree that this aspect of Claim II is subsumed by Plaintiffs' third claim, for misappropriation of trade secrets.  *See* Defs.' Br. at 35; Pls.' Opp'n at 33. Accordingly, the Court shall address this issue in part C below.

### 4.     Damages

As with AGM&M, Defendants claim that the Assembly has suffered no damages as a result of Defendants' alleged breach.  At this preliminary stage, however, Plaintiffs need only show the existence of some damages, not specific proof as to their extent.  Plaintiffs contend that as a result of Defendants' conduct, the Assembly's membership has dropped and approximately $500,000 in donations have been lost.  *See* Pls.' Add'l Stmt. ¶ 103.  Defendants do not dispute

---

[16] Modified from Plaintiffs' Third Request for Production of Documents ("Third Request"), No. 1: "Any and all communications between the United States-Armenia Public Affairs Committee ("USAPAC") and the Assembly, the AGM&M, or ANI."  *See* Pls.' Mot. to Compel, Ex. B (CFF et al.'s Response to Pls.' Third Request) at 6.

[17] Modified from Plaintiffs' Third Request, No. 2: "Any and all documents concerning or supporting your position that USAPAC was and is intended to be, and was and is in practice, an organization that supports the purposes and objectives of the Assembly and its initiatives."  *See* Pls.' Mot. to Compel, Ex. B (CFF et al.'s Response to Pls.' Third Request) at 6.

that the Assembly's membership and revenues have declined since 2005. *See* Defs.' Resp. Stmt.

¶ 103. Whether these losses were proximately caused by Defendants' conduct is a question of

fact, so summary judgment on this basis is inappropriate.

     C.     *Claim III: Misappropriation of the Assembly's Trade Secrets*

     In Claim III of the Complaint, Plaintiffs allege that Cafesjian and Waters Jr.

misappropriated the Assembly's confidential, proprietary business information and trade secrets,

including mailing lists, legislative policy documents, and other databases. "To establish a trade

secret misappropriation claim, [a plaintiff] must demonstrate (1) the existence of a trade secret;

and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one

under a duty not to disclose." *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C.

2007). Defendants contend that there is no evidence that the Assembly's mailing lists and other

data constitute a "trade secret" or that such information was improperly used or disclosed.

     To be protected as a trade secret under D.C. law, "(1) the 'information must be secret';

(2) 'its value must derive from its secrecy'; and (3) its owner must use reasonable efforts to

safeguard its secrecy." *DSMC*, 479 F. Supp. 2d at 77-78 (quoting *Catalyst & Chem. Serv., Inc. v.

Global Ground Support*, 350 F. Supp. 2d 1 at 8 (D.D.C. 2004)). Whether information is a trade

secret is generally a question of fact. *Id.* at 78. Here, Plaintiffs have produced evidence in the

record that the Assembly restricted public access to its membership list and other database lists

and considered use by third parties to be a serious problem. *See* Pls.' Opp'n, Ex. 36 (Assembly

policy regarding distribution of membership list and other database lists); Pls.' Opp'n, Ex. 35

(filed under seal) (R. Vartian Dep. Tr.) at 206-08. Because the question of whether a trade secret

exists is "best resolved by a fact finder after full presentation of evidence from each side," 479 F.

Supp. 2d at 79 (quotation marks omitted), there is at least a material dispute of fact as to whether the Assembly's directories constitute trade secrets. Plaintiffs have provided no evidence, however, relating to "legislative policy documents" or other information beyond membership and database lists. Therefore, the trade secrets claim must be limited to membership lists and database lists.

With respect to allegations of improper use, Defendants contend that there is no evidence that they improperly used the Assembly's directories. Indeed, Defendants asserted in their statement of material facts that "[i]n 2004, the Assembly authorized Mr. Cafesjian, Mr. Waters, Jr. and others to incorporate the [2003 Assembly Trustee Directory] into their own databases." Defs.' Stmt. ¶ 72 (citing Defs.' Br., Ex. 1 (J. Waters Jr. Aff.) ¶ 102. Plaintiffs failed to controvert this statement with evidence to the contrary, and therefore the Court may, in its discretion, deem this fact admitted pursuant to LCvR 7(h). However, Waters Jr.'s affidavit states only that the Assembly authorized him, Cafesjian, and others to use the Assembly Trustee Directory as part of the "Armenians for Kerry" campaign in 2004. *See* Defs.' Br., Ex. 1 (J. Waters Jr. Aff.) ¶ 102. Plaintiffs cite testimony by Ross Vartian indicating that he may have e-mailed himself Assembly mailing lists and kept hard copies of the Assembly's directories at his home unrelated to the Kerry campaign. *See* Pls.' Opp'n, Ex. 35 (filed under seal) (R. Vartian Dep. Tr.) at 206-08. A reasonable jury might conclude at trial that Defendants' use of the Assembly's directory exceeded the scope of any authorization.

Moreover, Plaintiffs contend that they have not received discovery relating to the use of Assembly mailing lists by the Armenian Reporter, another of Cafesjian's business ventures. *See* Pls.' Mot. to Compel at 11. Specifically, Plaintiffs seek "any and all documents concerning

mailing lists, database lists, or equivalent material used by the Armenian Reporter newspaper during the relevant time period . . . ." *See id.* Defendants have refused to turn over these documents on the grounds that they are not relevant and unreasonably burdensome. *See* Defs.' Opp'n to Mot. to Compel at 13-14. The Court agrees with Plaintiffs that discovery relating to the Armenian Reporter's mailing lists are relevant to Plaintiffs' claims of misappropriation. There is evidence in the record that the Assembly's mailing lists included dummy names that would let the Assembly know when its lists were being used by third parties. *See* Pls.' Opp'n, Ex. 35 (filed under seal) (R. Vartian Dep. Tr.) at 208. Accordingly, Plaintiffs are entitled to discovery relating to the Armenian Reporter's mailing lists, dating back at least to 2003, to enable them to determine whether any of the Assembly's lists have been misappropriated. The Court shall therefore grant Plaintiffs' motion to compel with respect to this limited request.[18]

Because the factual record does not clearly show that Defendants are entitled to summary judgment on the misappropriation of trade secrets, the Court shall deny Defendants' motion with respect to Claim III.

D.    *Claims IV-V: Breach of Contract and Duty of Good Faith & Fair Dealing by Waters Jr. and TomKat*

In Claim IV of the Complaint, Plaintiffs allege that TomKat and Waters Jr., as President of TomKat, breached various Purchase and Transfer Agreements with AGM&M and violated their duty of good faith and fair dealing by clouding title to the Properties and attempting to

---

[18] The specific request is Plaintiffs' Third Request for Production of Documents, Request No. 3: "Any and all documents concerning mailing lists, database lists, or equivalent material used by the Armenian Reporter newspaper during the relevant time period, including without limitation all such lists, proposed lists, and draft lists, regardless of state of completion, and correspondence regarding same." *See* Pls.' Mot. to Compel, Ex. B. at 6.

reacquire the Adjacent Properties. Defendants dispute that TomKat or Waters Jr. have ever attempted to reacquire any of the Properties or assert an interest in them, and they further contend that the any cloud on the title was created by the Grant and Transfer Agreements signed by AGM&M, not by Waters Jr. or TomKat.

With respect to the claim for breach of contract, Plaintiffs contend that it is clear that Defendants breached the Grant Agreement by failing to make a timely mortgage payment. *See* Pls.' Opp'n at 36. However, TomKat was not a party to the Grant Agreement, and there is no evidence in the record that TomKat had any obligations to make mortgage payments. The evidence cited by Plaintiffs indicates only that Cafesjian may have missed a mortgage payment on the Properties after they were acquired by AGM&M. Therefore, Plaintiffs have failed to identify any evidence in the record supporting their breach of contract claim against TomKat and Waters Jr. as President of TomKat.

With respect to the breach of the duty of good faith and fair dealing, which is implied in every contractual relationship, Plaintiffs contend that Waters Jr. violated the "common purpose" of the property transfer agreements by executing and recording the MOA in 2006. *See* Pls.' Opp'n at 37. However, as the Court explained in *Cafesjian I* in granting summary judgment in favor of John Waters Sr., the agreements between TomKat and AGM&M to transfer property to AGM&M were separate and distinct from the Grant and Transfer Agreements, pursuant to which AGM&M agreed to give Cafesjian and CFF a reversionary interest in the properties acquired. TomKat was not a party to the Grant and Transfer Agreements, and there is no evidence in the record that TomKat promised AGM&M that it would transfer title free and clear of any restrictions imposed by the Grant and Transfer Agreements. The record shows that AGM&M

obtained title to the Properties in late 2003. Pls.' Stmt. ¶ 29. AGM&M simply cannot claim that

the recordation of preexisting obligations, three years later, constituted a breach of the duty of

good faith and fair dealing with respect to the property transfers. That duty requires that "neither

party shall do anything which will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract." *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C.

2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)). AGM&M received the fruits of

the contract in late 2003 when it acquired title to the Properties. Those fruits were not spoiled by

the recordation of obligations AGM&M voluntarily agreed to before it acquired title. Moreover,

there is no evidence to suggest that Waters Jr. was acting in his capacity as President of TomKat

when he filed the MOA.

Accordingly, the Court shall grant Defendants' motion for summary judgment with

respect to Claims IV and V of the Complaint for breach of contract and duty of good faith & fair

dealing by Waters Jr. and TomKat.

> E.      *Claim VI: Breach of the Duty of Good Faith and Fair Dealing by Cafesjian*

Plaintiffs' sixth claim is that Cafesjian, as a party to the Grant Agreement with the

Assembly, breached his implied duty of good faith and fair dealing by, among other things,

mismanaging AGM&M, hindering the progress of the Museum, and suing the Assembly to

rescind the Grant Agreement. As the Court explained above, there are disputed issues of material

fact relating to whether Cafesjian managed AGM&M in good faith or whether he took steps to

delay progress of the Museum in order to increase the likelihood that he would reacquire title to

the Properties at the end of 2010. Although Cafesjian certainly has a right to enforce the

reversionary interest contained in the Grant Agreement, the duty of good faith and fair dealing

precludes him from taking steps to undermine the development of the Museum. Because these issues must be decided by the finder of fact, the Court shall deny the parties' motions for summary judgment on this Claim.[19]

    *F.    Claim VII: Violation of the Assembly's Conflict of Interest Provisions by Cafesjian and Waters Jr.*

Plaintiffs' seventh claim is that Cafesjain and Waters Jr., as members of the Assembly's Board of Trustees, violated the Assembly's policies on conflicts of interest and distribution of membership lists "[b]y misappropriating confidential business information belonging to the Assembly." *See* Compl. ¶¶ 143-46. Defendants did not separately address this claim in their motion for summary judgment but contend that Claim VII is effectively duplicative of Plaintiffs' claim for misappropriation of trade secrets, Claim III. *See* Defs.' Reply at 20-21. Plaintiffs did not address this claim in their opposition. Because the Court denies Defendants' motion for summary judgment on Claim III, the Court shall also deny Defendants' motion with respect to Claim VII.

    *G.    Claim VIII: Declaration that Reversion Clause Is Unenforceable*

Plaintiffs' eighth claim is for equitable relief declaring the reversion clause in the Grant Agreement unenforceable as a matter of law, or in the alternative, reforming the contract by extending the reversion deadline by three years to correct for Defendants' misconduct. *See* Compl. ¶¶ 147-48. Defendants move for summary judgment on this claim on the basis that (1) the facts show that there is no inherent conflict between the reversion and the Museum; (2) Defendants have not thwarted the progress of the Museum; (3) reformation is an improper

---

[19] Plaintiffs indicate in their opposition that they believe they are entitled to summary judgment as to Claim VI. *See* Pls.' Opp'n at 38-39.

remedy; and (4) Plaintiffs are estopped from challenging the reversion clause because they have unclean hands. *See* Defs.' Br. at 39-43.

Claim VIII in this action is nearly identical to the third claim asserted by AGM&M in *Cafesjian I.* This Court denied summary judgment with respect to that claim because it found that there are genuine issues of material fact in dispute relating to Defendants' conduct and their equitable defenses, and therefore the Court could not rule on the propriety of equitable relief at the summary judgment stage. *See Cafesjian I*, slip op. at 43-47. The Court reaches the same conclusion with respect to the issues in this case and incorporates the relevant parts of its opinion in *Cafesjian I.* Accordingly, the Court shall deny Defendants' motion for summary judgment with respect to Claim VIII.

### H. Claim IX: Declaration Removing CFF As Donor Authorized to Designate Trustees of AGM&M

Plaintiffs' ninth claim is for a declaration removing CFF as one of the initial donors of AGM&M entitled to appoint Trustees based on conflicts of interest between CFF and AGM&M. *See* Compl. ¶ 149. After this lawsuit was filed, the AGM&M Board of Trustees voted to remove Waters Jr. as a Trustee and terminate CFF's rights as an initial donor entitled to appoint successor Trustees. Defendants argue that CFF's removal is contrary to the By-Laws and that Plaintiffs' claim for declaratory relief should fail because Plaintiffs have adequate remedies at law for any conflict of interest or breach of fiduciary duty by CFF agents.

In response to Defendants' motion, Plaintiffs argue that CFF was properly removed as an initial donor during the March 19, 2009 meeting. *See* Pls.' Opp'n at 41-42. AGM&M's By-Laws state that "[a]ny Trustee may be removed without cause by the unanimous affirmative vote

of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote." By-Laws § 2.17. However, while this provision may have authorized the removal of Waters Jr. as a Trustee, it does not permit the Board to remove all successor Trustees or terminate CFF's rights as an initial donor to appoint Trustees. The Court notes that the By-Laws may be amended by a unanimous vote of the Trustees, *see* By-Laws § 3.2, but Plaintiffs have not pointed to any evidence in the record to indicate that the By-Laws were in fact amended so as to remove CFF as an initial donor entitled to appoint Trustees in perpetuity. Accordingly, it appears that the By-Laws did not authorize the purported removal of CFF as an initial donor.

Plaintiffs also argue that the business judgment rule protects the Board's decision to remove CFF as a donor on conflict of interest grounds. The business judgment rule operates as "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action was in the best interests of the company." *Willens*, 844 A.2d at 1137 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). "Absent an abuse of direction, that judgment will be respected by the courts." *Id.*; *see also Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co.*, 496 N.E.2d 959, 964 (Ohio 1986) (applying Delaware law) (explaining that business judgment doctrine protects decisions as well as decision makers). However, as the name implies, the business judgment rule protects only *business* decisions, not decisions about how to interpret and apply the corporation's by-laws. *See Lake Monticell Owners' Ass'n v. Lake*, 463 S.E.2d 652, 656 (Va. 1995). Plaintiffs have not persuaded the Court that the vote to remove CFF's rights as a Trustee was a business

decision that falls within the ambit of the rule.

Based on the present record, it appears that Plaintiffs are not entitled to the requested declaratory relief. However, there are disputed issues of fact to be resolved at trial that are material to the Court's determination of whether declaratory relief should ultimately be awarded. Accordingly, the Court shall deny Defendants' motion for summary judgment on Claim IX.

I. *Claim X: Declaration that Cafesjian and Waters Jr. Are Personally Liable for Contracts Not Approved by AGM&M's Board of Trustees*

Claim X of the Complaint seeks a declaration that Cafesjian and Waters Jr. are personally liable for any contracts or debts incurred by AGM&M during their tenure as managing officers that were not approved by the Board. *See* Compl. ¶ 150. Plaintiffs have shown that there are genuine issues of material fact in dispute regarding this claim. For example, there is evidence that the Board members were not informed of the terms of Ms. Devedjian's engagement and that she continued to perform work for AGM&M even after Board members expressed a desire to terminate her services in April 2006. *See* Defs.' Br., Ex. 35 (filed under seal) (4/26/2006 meeting notes); Pls.' Opp'n, Ex. 22 (filed under seal) (Letter from Devedjian to AGM&M Re: Outstanding Payments). There is also testimony suggesting that Ms. Devedjian was hired personally by Cafesjian or by CFF without authority from the Board. *See* Defs.' Br., Ex. 110 (filed under seal) (V. Krikorian Dep. Tr.) at 291-92. And there is evidence to suggest that the Board never took any votes to approve contracts entered into by Cafesjian or Waters Jr. on behalf of the corporation. *See* Pls.' Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 125, 129-30. Based on this record, the Court shall deny Defendants' motion for summary judgment on Claim X.

*J.      Claim XI: Request for an Accounting*

Plaintiffs' final claim is a request for an accounting of Cafesjian and Waters Jr.'s financial activities, in light of their alleged wasting and dissipation of AGM&M assets during their tenure as managing officers. *See* Compl. ¶ 151. "An accounting is a detailed statement of debits and credits between parties arising out of a contract or a fiduciary relation." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 103 (D.D.C. 2006) (quotation marks omitted). "Such relief may be obtained *at the close of a litigation* . . . as long as the plaintiff is able to show that 'that the remedy at law is inadequate.'" *Id.* (quoting 1 *Am. Jur. 2d Accounts & Accounting* § 59) (emphasis added). Defendants argue that this claim is moot because they turned over all the corporate records of AGM&M more than five years ago and they have no further information. *See* Defs.' Br. at 45; Defs.' Br., Ex. 1 (Waters Jr. Aff.) ¶ 99. Plaintiffs dispute that they have received all the corporation's books and records, citing inconsistencies in the financial records that they have been unable to resolve. *See* Pls.' Opp'n at 45.

Because an accounting is "an extraordinary remedy" that is only appropriate, if at all, after liability has been determined, *see Bates*, 466 F. Supp. 2d at 103, the Court shall deny without prejudice Defendants' motion for summary judgment on this claim and consider the merits of Claim X, if appropriate, after liability has been determined.

*K.      Counterclaim VIII: Defamation of Cafesjian by the Assembly and Hovnanian*

Plaintiffs have moved for summary judgment on Defendants' eighth counterclaim against the Assembly and Hovnanian for defamation. Defendants allege that on July 18, 2007, in a letter signed on behalf of the Assembly, Hovnanian published false statements indicating that the Assembly never rejected Cafesjian's vision for the museum and that the AGM&M Board asked

Cafesjian to proceed with his vision for the museum, only be to be told that Cafesjian was no longer interested in the project. *See* Counterclaim ¶¶ 85-87 & Ex. 5. Plaintiffs argue they are entitled to summary judgment because (1) there is no evidence in the record that the statements were false; (2) the statements are protected by the common interest privilege; and (3) Hovnanian is immune from civil liability as an uncompensated Trustee under D.C. law.

Defendants argue that there are at least three false assertions in the letter: (1) that the Assembly never rejected Cafesjian's vision for the museum; (2) that Cafesjian abandoned the project; and (3) that Cafesjian lost interest in the project. There is some evidence in the record to support a finding that these assertions are false. For example, there is testimony that there were serious disagreements among the AGM&M Board members about the proper scope of the museum project. Moreover, Cafesjian explained in his resignation letter that he intended to continue serving directly or having his designees serve on AGM&M's Board of Trustees, and he has affirmed that he never lost interest in the project. *See* Pls.' Br., Ex. 10 (9/13/2006 Letter from Cafesjian to the other Trustees) at 1; Defs.' Opp'n, Ex. II (G. Cafesjian Aff.) ¶ 13. Accordingly, there is evidence sufficient to create a disputed issue of material fact as to the falsity of these three statements in the June 18, 2007, letter.

Even if a jury concluded that the statements were false, however, they do no provide a basis for liability if the common interest privilege applies. As the Court explained in its earlier opinion denying the motion to dismiss, "[t]he common interest privilege protects otherwise defamatory statements made (1) in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which [the publisher] has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding

46

interest." *Arm. Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 138 (D.D.C. 2009).

Plaintiffs argue that the common interest privilege applies here because the statements were made in good faith to the members of the Assembly regarding the status of litigation to which the Assembly was a party. Defendants argue that the statements were made with malice, i.e., bad faith, and/or excessively published, either of which will defeat the privilege. When the facts surrounding publication are undisputed, whether a statement is protected by privilege is a question of law for the court. *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990).

The common interest privilege does not apply if the statements were published with malice, which is the equivalent of bad faith. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006). Although the privilege will exist only if the publisher reasonably believes his statements are true, "failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others does not alone yield the bad faith or ill will necessary to overcome a qualified privilege." *Moss*, 580 A.2d at 1025. "Rather, the statement must be published at least with reckless or callous disregard for its effect on the reputation of the plaintiff." *Id.* Moreover, "even a showing of ill will toward the plaintiff . . . 'will not forfeit the privilege so long as the *primary* purpose is to further the interest which is entitled to protection." *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C. 1995) (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477-78 (D.C. 1983)). The presence or absence of malice is a question of fact for the jury, but the plaintiff (or in this case, counterplaintiff) has the burden of proof. *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 657 (D.D.C. 1998). The plaintiff must make "[a] substantial proffer" of evidence of malice in order "to meet this demanding standard." *Blodgett v. University Club*, 930 A.2d 210, 224 (D.C. 2007).

Defendants argue that Hovnanian could not have reasonably believed his statements were true. *See* Defs.' Opp'n at 26-27. Defendants point to the fact that when Hovnanian was asked at deposition to explain the basis for his statement that the Assembly never rejected Cafesjian's vision for the museum, he was unable to provide an explanation. *See* Defs.' Opp'n, Am. Ex. AA (H. Hovnanian Dep. Tr.) at 269-74. However, Hovnanian testified that he did not know what Cafesjian meant by "his vision" and that Hovnanian had sent Cafesjian a letter of saying "I am 100 percent with you. Do whatever the heck you want. Just go ahead and finish the museum." *Id.* at 270.[20] Indeed, the record shows that Hovnanian and the other Trustees encouraged Cafesjian to continue with his vision for the project in August 2006 after Cafesjian proposed to terminate his involvement with AGM&M. *See* Pl.'s Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 125, 129-30; Pls.' Br., Ex. 16 (8/2/2006 Letter from R. Kaloosdian to William J. Brody). There is also evidence in the record that suggests that the Assembly's designated Trustee never voted against any of Cafesjian's proposals (because Cafesjian never proposed any votes). Based on this evidence, Hovnanian had a reasonable basis for stating that the Assembly never rejected Cafesjian's vision for the museum. Moreover, the record shows that Cafesjian proposed to completely "terminate his involvement with AGM&M, . . . resign from his Trustee position and . . . renounce his rights to appoint Trustees," *see* Pls.' Br., Ex. 15 (5/24/2006 Letter from William J. Brody to Trustees), and that he reaffirmed this proposal after the other Trustees encouraged him to continue with his vision, *see* Pls.' Br., Ex. 17 (8/26/2006 Letter from W. Brody to the

---

[20] It is unclear from the deposition transcript whether Hovnanian was referring to the August 2006 letter sent by Kaloosdian to Cafesjian's attorney on behalf of the other Trustees or some other letter. In either case, the record indicates that Hovnanian and the Assembly expressed support for Cafesjian's continued involvement with the museum project.

other Trustees). By the time the statements were published, Cafesjian had resigned as Chairman and Trustee and filed a lawsuit seeking, *inter alia*, to rescind the Grant Agreement. This evidence provided Hovnanian with a sufficient basis for his statements that Cafesjian had abandoned the project and was "no longer interested in the project." Thus, no reasonable jury could conclude that Hovnanian lacked a reasonable basis for believing his statements to be true.

Defendants argue, however, that there is evidence in the record that might permit a jury to find that Hovnanian's statements were made with malice. Defendants point to testimony that Hovnanian was upset that Cafesjian had criticized his vision for the museum and told Waters Jr. in September 2006 that "he intended to destroy Mr. Cafesjian." *See* Defs.' Br., Ex. 1 (Waters Jr. Aff.) ¶ 81. Defendants also suggest that the suspension of Waters Jr. and Cafesjian from the Assembly's Board of Trustees in January 2007 and the purported ouster of Waters Jr. as a Trustee in May 2007 support a finding of malice. *See* Defs.' Opp'n at 27. Even if a jury were to conclude that these acts were committed in bad faith by Hovnanian and/or the Assembly, however, this evidence merely shows general ill will against Cafesjian and does not shed light on the specific motives behind the publication of the June 18, 2007, letter.

Evidence of ill will alone does not defeat the common interest privilege so long as the primary purpose of the statements was to further a protected interest. *Mosrie v. Trussell*, 467 A.2d 475, 477-78 (D.C. 1983). "The court looks to the primary motive by which the [publisher] is apparently inspired; and, the fact that he feels resentment and indignation towards the plaintiff and enjoys defaming him will *not* forfeit the privilege so long as the *primary purpose* is to further the interest which is entitled to protection." *Id.* The *Mosrie* court held that

if the language of the communication and the circumstances attending its publication

49

by the defendants are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

*Id.* at 478 (quoting *Nat'l Disabled Soldiers' League, Inc. v. Haan*, 4 F.2d 436, 441-42 (1925)).  It is evident from the face of the June 18, 2007, letter that its purpose was to inform the Assembly membership about the status of the museum project and the lawsuit filed against it by Cafesjian. *See* Answer & Counterclaim, Ex. 5 (7/18/2007 Letter).  The allegedly defamatory statements are contained in the sixth of eight paragraphs describing the Assembly's involvement with the museum and its future intentions.  *See id.*  Defendants' evidence of Hovnanian's or the Assembly's general ill will toward Cafesjian—statements and inferences from events occurring between two and ten months before the letter was published—does not show that the primary purpose in issuing the letter was anything other than to inform the Assembly about the litigation. Accordingly, Defendants have failed to satisfy the "difficult burden of showing malice." *Mastro*, 447 F.3d at 859.

Defendants also argue that the common interest privilege does not apply because there was excessive publication.  Excessive publication is defined as publication to persons with no common interest in the information, or publication not reasonably calculated to protect or further the common interest.  *Mastro*, 447 F.3d at 858.  Defendants contend that the July 18, 2007, letter was disseminated beyond the Assembly membership.  However, the only evidence they cite in support of this fact is a memorandum from the Executive Director of the Assembly to staff members indicating that "[w]hile the letter was issued to the membership only, we can expect that news will travel."  *See* Defs.' Opp'n, Ex. GG (7/20/2007 Memo. from B. Ardouny to "All Staff").  The memorandum explicitly states that staff members are not authorized to make

comments to the media, and that if friends or family make inquiries, staff members should state that they are not authorized to speak about the matter but that the Assembly is committed to completing the museum project. *See id.* The memorandum goes on to state that any language within the [July 18, 2007] letter is also ok to recite." *See id.*

This memorandum, however, does not constitute evidence of excessive publication. By its own terms, the memorandum states that staff should only make comments in response to inquiries from friends and family, and even then their primary message should be focused on the Assembly's continued commitment to the museum, not to any statements related to Cafesjian. The Assembly's recognition that "news will travel" is not proof that the Assembly or Hovnanian actually published the statements to any persons who lack a common interest in the litigation. Even if disclosure of the letter's contents to inquiring family members and friends constitutes excessive publication, the memorandum itself does not show that anyone from the Assembly actually passed along the statements to anyone. Defendants have failed to show that any non-Assembly members ever learned of the allegedly defamatory statements, and even that alone is insufficient evidence of excessive publication. *See Mastro*, 447 F.3d at 859 (holding that evidence of excessive publication failed to raise triable issue of fact where third parties who allegedly heard privileged information had not given testimony regarding the source of their knowledge). Thus, Defendants have failed to present evidence sufficient to permit a jury to find excessive publication.

Because the record clearly shows that Hovnanian had a reasonable basis for believing his statements were true and there is insufficient evidence of malice or excessive publication to defeat the common interest privilege, the Assembly and Hovnanian are entitled to summary

judgment on Counterclaim VIII.

     *L.     Plaintiffs' Motion to Compel*

The Court has already addressed several aspects of Plaintiffs' pending motion to compel

discovery from Defendants.  As explained above, the Court shall grant Plaintiffs' motion with

respect to documents related to the formation of USAPAC and the Armenian Reporter's use of

mailing lists.  Specifically, Defendants shall be required to produce:

- any and all documents concerning the formation of USAPAC, including without limitation any correspondence with any person or entity regarding same, including internal communications (Pls.' First Request, No. 24, as modified by the Court);

- any and all communications between USAPAC and the Assembly, the AGM&M, or ANI before February 2007 (Pls.' Third Request, No. 1, as modified by the Court);

- any and all documents concerning or supporting Defendants' position that USAPAC was and is intended to be, and was and is in practice, an organization that supports the purposes and objectives of the Assembly and its initiatives (Pls.' Third Request, No. 2);

- any and all documents concerning mailing lists, database lists, or equivalent material used by the Armenian Reporter newspaper during the relevant time period, including without limitation all such lists, proposed lists, and draft lists, regardless of state of completion, and correspondence regarding same (Pls.' Third Request, No. 3).

In addition to the above requests, Plaintiffs also seek documents pertaining to the organizational

structure and finances of CFF and GLC Enterprises, Inc., the business and political activities and

interests of CFF and Cafesjian, and other documents pertaining to the Armenian Reporter.  The

Court shall address each of these in turn.

     1.     <u>Organizational Structure and Finances of CFF and GLC Enterprises, Inc.</u>

Plaintiffs seek documents pertaining to the organizational structure and finances of CFF,

which is a party to this action, and GLC Enterprises, Inc. ("GLC"), an entity that provided certain services to AGM&M during the time that Cafesjian and Waters Jr. were managing officers of AGM&M. Specifically, Plaintiffs have requested: (1) copies of CFF's Articles of Organization, By-Laws, and Policies or Procedures, and documents describing its current officers and directors; (2) CFF's state and federal tax filings during the relevant time period; (3) "[a]ll documents concerning CFF's finances"; (4) "[a]ll documents concerning any transfer of funds from CFF . . . to the Armenian National Committee of America; and (5) all documents concerning GLC's finances. *See* Pls.' Mot. to Compel at 6. Plaintiffs contend that these requests are directly relevant to their claims for breach of fiduciary duty against AGM&M and the Assembly and violation of the Assembly's conflict of interest policy. Defendants dispute the relevance of these requests and argue that they are burdensome.

The Court agrees with Plaintiffs that certain of these requests are reasonably calculated to lead to admissible evidence related to the claims or defenses at issue in this case. The fact that Waters Jr. allegedly made transfers of funds between CFF and AGM&M and the fact that Plaintiffs have been unable to reconcile the books and records kept by Cafesjian and Waters Jr. during their tenure as AGM&M makes it likely that discovery of CFF's operations and finances would result in relevant evidence. Tax filings for CFF may provide admissible evidence relevant to the issue of whether Defendants jeopardized the tax status of AGM&M through inappropriate transfers of funds. However, Plaintiffs' request for *all* documents relating to CFF's finances generally is overbroad. Defendants should only be required to provide documents regarding transactions with AGM&M or the Assembly or documents in some way related to the Museum, and only documents during the relevant time period when Cafesjian and Waters Jr. were

managing AGM&M affairs, from 2003 to 2007.[21]  The Court shall therefore grant in part

Plaintiffs' motion to compel documents relating to CFF's organizational structure, tax filings,

and finances.  Specifically, Defendants shall be required to produce:

- Copies of the Articles of Organization, By-laws, and amendments thereto, and any Policies or Procedures (including Conflict of Interest provisions) for CFF, including all documents evidencing the current officers and directors of CFF (Pls.' First Request, No. 28);

- All state and federal tax filings for CFF with all accompanying schedules, worksheets, and other supporting documents from 2003 to 2007 (Pls.' First Request, No. 30, as modified by the Court); and

- All documents concerning CFF's finances relating to transactions with the Assembly, AGM&M, or any efforts to develop a museum devoted to the Armenian genocide, including, but not limited to, tax filings and all related documents, bank statements, books, records, deposit slips, checks, receipts, drafts, notes, financial instruments, bills, invoices, statements, or other financial documents, from 2003 to 2007 (Pls.' Second Request for Production of Documents ("Second Request"), No. 1, as modified by the Court).

Plaintiffs argue that their fourth request, for documents relating to the transfer of funds

from CFF to the Armenian National Committee of America ("ANCA"), may provide evidence

relevant to their claim that Defendants violated the Assembly's conflict of interest policy.  *See*

Pls.' Mot. to Compel at 7-8.  However, Plaintiffs allege in their Complaint only that Cafesjian

and Waters Jr. violated the conflict of interest policy by misappropriating confidential business

information belonging to the Assembly.  Plaintiffs fail to explain how any transfers of funds from

CFF to the ANCA would constitute such a misappropriation, nor have Plaintiffs alleged that the

Assembly had any transactions or arrangements with ANCA so as to trigger the conflict of

interest policy.  Accordingly, the Court shall deny Plaintiffs' motion with respect to documents

---

[21] Defendants maintain that they have already produced documents in this category that relate to the Museum or the Assembly.  *See* Defs.' Opp'n to Mot. to Compel at 11.

relating to ANCA.

With respect GLC, Plaintiffs assert that GLC employees managed AGM&M's finances for several years, and therefore its finances are relevant to this litigation. Defendants do not controvert this assertion but generally object to the production of documents related to GLC. As with Plaintiffs' request for CFF's finances, their request is overbroad. However, to the extent that GLC played a role in managing AGM&M's finances, Defendants have an obligation to produce any documents related to it. The Court shall therefore grant Plaintiffs' motion in part. Specifically, Defendants shall be required to produce:

- All documents concerning GLC's finances relating to transactions with the Assembly, AGM&M, or any efforts to develop a museum devoted to the Armenian genocide, including, but not limited to, tax filings and all related documents, bank statements, books, records, deposit slips, checks, receipts, drafts, notes, financial instruments, bills, invoices, statements, or other financial documents, from 2003 to 2007 (Pls.' Second Request, No. 3, as modified by the Court).

The Court shall deny Plaintiffs' motion to compel the production of documents relating to the organizational structure and finances of CFF and GLC beyond what has been specifically described above.

2.    Defendants' Business and Political Activities

Plaintiffs have made a variety of requests for documents pertaining to Cafesjian's business activities in Armenia, Defendants' contributions to foreign or domestic government officials, and Defendants' interests in or transactions with over a dozen different business entities. Plaintiffs argue that these documents are relevant for four reasons. First, these documents may show that Defendants failed to disclose these interests under the Assembly's conflict of interest policy. Second, they may show that Cafesjian was engaging in "secretive

55

business and political activities . . . without informing the Assembly" and thus breaching his fiduciary duty to the Assembly. Third, these documents may shed light on Cafesjian's conduct, which Plaintiffs suggest has been corrupt, which would also tend to show a breach of duty to the Assembly. Fourth, these documents may show whether CFF's relationship with any of these entities jeopardized CFF's status as a private foundation, which could possibly affect the tax status of the Assembly and AGM&M. The Court is not persuaded, however, that these requests are reasonably calculated to lead to the discovery of admissible evidence.

Plaintiffs argue that their conflict of interest claim justifies discovery of all of Cafesjian's business interests. However, the Assembly's conflict of interest policy does not require that Trustees disclose every business or entity in which they have an interest; rather, the duty to disclose only arises when the Assembly is considering a transaction or arrangement with the particular entity. *See* Compl., Ex. 25 (Conflict of Interests Policy) at 2. In addition, Plaintiffs' conflict of interest claim as pled in the Complaint is based on the misappropriation of trade secrets from the Assembly. Plaintiffs have not explained how the vast discovery they seek pertaining to Defendants' business interests in America and Armenia pertain to this particular claim.[22] Moreover, as explained above, the mere fact that Cafesjian had business interests other than the Assembly without disclosing them does not constitute a breach of his fiduciary duty. The mere allegation of a breach of fiduciary duty does not give Plaintiffs license to use the discovery process to investigate every aspect of Defendants' business operations, hoping to find

_____

[22] To the extent that Plaintiffs claim that failure to disclose a business relationship violates the conflict of interest policy, the existence of such relationships could have been easily discovered through interrogatories rather than expansive requests for all documents relating to such relationships.

something improper.

Plaintiffs' argument that these documents may show that CFF is improperly classified as a private foundation is also too far removed from the issues at stake in this litigation. Plaintiffs have received or will receive discovery pertaining to CFF's financial handling of affairs related to the Assembly or AGM&M. Plaintiffs do not need to conduct their own investigation into CFF's business relations in order to determine whether the Assembly's or AGM&M's tax status has been jeopardized as a result of Defendants' conduct.

Lastly, Plaintiffs argue that financial information related to these business entities is required in order to determine the damages that might be appropriate under a disgorgement theory. However, disgorgement is an equitable remedy, and should the Court determine it to be appropriate in this case, the Court may order further discovery after liability has been established. Accordingly, this does not provide a basis for compelling discovery at this stage of the litigation. Therefore, the Court shall deny Plaintiffs' motion to compel the production of documents relating to Defendants' business and political activities.

3.      Documents Pertaining to the Armenian Reporter

Plaintiffs seek several categories of documents relating to the Armenian Reporter, a newspaper owned by Cafesjian. As explained above, the Court shall grant Plaintiffs' motion to compel with respect to documents related to the Armenian Reporter's use of mailing lists during the relevant time period. In addition to those documents, however, Plaintiffs seek "[a]ny and all documents concerning the process by which the Armenian Reporter newspaper chooses, drafts, edits, and publishes content" and "[a]ny and all documents concerning the selection, drafting, editing, and publication of any material published in the Armenian Reporter newspaper

57

discussing, mentioning, or otherwise relating to the Assembly, ANI, the AGM&M, USAPAC" or its work or members. *See* Pls.' Mot. to Compel at 11. Plaintiffs assert that these two requests are relevant because (1) Defendants have relied on certain articles from the Armenian Reporter to support their factual assertions in their answers to interrogatories; (2) Defendants have pled two defamation claims against Defendants; and (3) "the Armenian Reporter has . . . waged a press war on Plaintiffs." *See id.* at 12. Defendants state that they have produced documents, including outlines and drafts, related to stories about this litigation that have appeared in the Armenian Reporter. *See* Defs.' Opp'n to Mot. to Compel at 13. In their reply brief, Plaintiffs contend that they "are entitled to explore the process behind the publication of those articles, and to see the comments and revisions that went into those articles . . . ."

The Court is not persuaded that Plaintiffs should be entitled to "explore the process behind" the Armenian Reporter's publication of articles relating to this litigation. Plaintiffs argue that this discovery will help them determine whether the allegedly defamatory statements are true. However, Plaintiffs' requests do not appear reasonably calculated to lead to admissible evidence regarding the truth or falsity of Plaintiffs' own statements. Defendants' only remaining defamation claim (Counterclaim IX) pertains to press releases issued by AGM&M that describe the litigation filed by Defendants and describe Cafesjian's and Waters Jr.'s management of AGM&M, creation of USAPAC, and suspension by the Assembly. *See* Counterclaim ¶¶ 93-95. Plaintiffs have obtained discovery relating to all of these issues directly from Defendants, and there is no indication that the Armenian Reporter had access to any additional information that

would be relevant to Plaintiffs' defenses.[23]  Indeed, the one article from the Armenian Reporter attached as an exhibit to Plaintiffs' reply brief consists largely of conclusions and arguments drawn from documents that are publicly available, suggesting that little, if any, factual investigation was conducted into Defendants' underlying conduct.  Therefore, Plaintiffs' broad requests for the journalistic work product of the Armenian Reporter are unwarranted.  The Court shall, however, require Defendants to certify that they have produced all articles published in the Armenian Reporter pertaining to this litigation or any of the issues raised therein.

        4.    <u>Timeliness</u>

Defendants contend that Plaintiffs' motion to compel should be denied in its entirety because it was filed on July 10, 2009, ten days after the close of discovery.  However, Plaintiffs indicate that they did not receive Defendants' response to Plaintiffs' third request for production of documents until June 29, 2009, the day before discovery closed, and therefore they were not able to assess the extent of Defendants' production and file their motion to compel until after the discovery deadline.  In light of Defendants' partial production of documents in some of the categories on which Plaintiffs have moved to compel, Plaintiffs were correct to wait until Defendants completed their final production and assess its sufficiency before seeking Court intervention in the discovery process.  The Court finds that Plaintiffs did not unduly delay filing their motion and that it was timely filed.

**IV.  CONCLUSION**

The Court finds that there are genuine issues of material fact with respect to Defendants'

---

[23] Plaintiffs have not identified any facts or assertions printed in the Armenian Reporter that suggest the existence of relevant evidence that has not been otherwise disclosed during discovery.

conduct that preclude the award of summary judgment with respect to Claims I and II for breach of fiduciary duty to AGM&M and the Assembly, Claim III for misappropriation of trade secrets, Claim VI for breach of the duty of good faith and fair dealing by Cafesjian, Claim VII for violation of the Assembly's conflict of interest rules, Claim VIII for a declaration that the reversion clause in the Grant Agreement is unenforceable, and Claim X for a declaration that Cafesjian and Waters Jr. are personally liable for contracts not approved by AGM&M's Board of Trustees. However, the statute of limitations bars Claim I for breach of fiduciary duty to the extent it relies on actions that occurred prior to February 15, 2005. The Court also finds that based on the present record, summary judgment is inappropriate on Claims IX and XI for equitable relief. With respect to Claims IV and V, the Court finds that no reasonable jury could conclude that TomKat or Waters Jr. breached their contractual duties to AGM&M through execution of the MOA. The Court also finds that the common interest privilege protects the statements alleged to be defamatory in Counterclaim IX.

For the foregoing reasons, the Court shall GRANT Plaintiffs' [66] Motion for Partial Summary Judgment with respect to Counterclaim VIII for defamation and DENY the motion in all other respects. The Court shall GRANT Defendants' [68] Motion for Summary Judgment with respect to Claims IV and V for breach of contract and breach of duty of good faith and fair dealing by TomKat and Waters Jr. and GRANT-IN-PART Defendants' motion with respect to Claim I for breach of fiduciary duty only insofar as it relies on actions occurring before February 15, 2005; the Court shall DENY the motion in all other respects. The Court shall also GRANT Plaintiffs' [71] Motion to Compel with respect to certain documents relating to the formation of the United States-Armenia Public Affairs Committee ("USAPAC"), the organizational structure and finances

of CFF and GLC Enterprises, Inc., and the use of mailing lists and other databases by the

Armenian Reporter newspaper; the Court shall DENY Plaintiffs' motion to compel in all other

respects.  An appropriate Order accompanies in this Memorandum Opinion.


Date: March 9, 2010


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge