# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF
AMERICA, INC., *et al.*,

    Plaintiffs/Counter-Defendants,

      v.

GERARD L. CAFESJIAN, *et al.*,

    Defendants/Counter-Plaintiffs.

**Civil Action Nos. 07-1259, 08-255, 08-1254
(CKK)**

## MEMORANDUM OPINION
(February 20, 2013)

In the mid to late 1990s, several individuals set about to construct a museum in Washington, D.C., dedicated to the Armenian Genocide.[1]  Over a decade later, no such museum exists.  The parties, through the three consolidated actions pending before the Court, have spent as much if not more time litigating who is to blame for the museum's failure as they spent attempting to make the museum a reality.  Just shy of one year after the Court entered final judgment, Plaintiffs the Armenian Assembly of America, Inc. ("the Assembly") and the Armenian Genocide Museum & Memorial, Inc. ("AGM&M"), filed their second motion for a new trial.  Pls.' Mot. for New Trial ("Pls.' Mot."), ECF No. [275].[2]  In short, the Plaintiffs argue that Defendant John J. Waters, Jr., perjured himself during the bench trial by failing to disclose that Defendant Gerard Cafesjian agreed to pay Waters a significant "bonus" if Cafesjian was successful in this litigation and further agreed to reimburse Waters for expenses incurred in

---

[1]  As the Court previously noted, the use of the term "genocide" to describe the atrocities that befell the Armenians between 1915 and 1923 is not without controversy.  The Court employs the term used as by the parties, and the Court expresses no opinion on the propriety of that label.

[2]  All docket numbers refer to Civil Action No. 08-1254.

connection with the litigation.  For the reasons stated below, the Court finds the Plaintiffs had a full and fair opportunity to present their case during the bench trial, therefore there no grounds on which to vacate the entry of final judgment.[3]  Accordingly, the Plaintiffs' [275] Motion for New Trial is DENIED.

## I. BACKGROUND

The Court set forth its findings of fact and conclusions of law resolving the parties' claims in its January 26, 2011, Memorandum Opinion.  *Armenian Assembly of Am., Inc. v. Cafesjian* ("*Armenian Assembly I*"), 772 F. Supp. 2d 20 (D.D.C. 2011); *see also Armenian Assembly of Am., Inc. v. Cafesjian* ("*Armenian Assembly II*"), 772 F. Supp. 2d 29 (D.D.C. 2011).  The Court incorporates the factual discussion set forth in that opinion by reference herein, and presumes familiarity with the background of this case as well as the Court's findings.  The Court briefly sets forth the procedural history of the case following the January 2011 Memorandum Opinion, as well as the new factual allegations on which the Plaintiffs' present motion is based.

Following a bench trial, on January 26, 2011, the Court entered a Memorandum Opinion and Order resolving all of the parties' claims, save certain discrete remedial issues.  *See generally Armenian Assembly I*; 1/26/11 Order, ECF No. [192].  After further briefing, on May 9, 2011, the Court resolved the outstanding remedial issues and the parties' post-trial motions, and referred Defendants Waters and Cafesjian's motion for attorney's fees to Magistrate Judge

---

[3]  The Court's decision is based on the record as a whole, but the Court's analysis focused on the following submissions from the parties:  Pls.' Mot. for New Trial, ECF No. [275]; Cafesjian Defs.' Opp'n, ECF No. [284]; Def. Waters' Opp'n, ECF No. [283]; and Pls.' Reply, ECF No. [287]. Following the submission of the Plaintiffs' Reply, the Cafesjian Defendants sought leave to file a surreply. Cafesjian Defs.' Mot. for Leave to File Surreply, ECF No. [288]. Neither the Plaintiffs nor Defendant Waters filed an opposition to the motion. Accordingly, the Court grants the Cafesjian Defendants' motion and considered the Cafesjian Defendants' Surreply as part of the record for purposes of resolving the Plaintiffs' motion.

Alan Kay for resolution.[4]  *See generally Armenian Assembly II*; 5/9/11 Order, ECF No. [240].

On April 30, 2012, the Plaintiffs filed their present motion.  The basis for their motion is the *pro se*, unverified complaint filed by Defendant Waters against Defendant Cafesjian, G.L.C. Enterprises, and the Cafesjian Family Foundation in the United States District Court for the District of Minnesota on March 13, 2012.  Pls.' Ex. A (Minn. Compl.); *accord Waters v. The Cafesjian Family Found., Inc.*, No. 12-648 (D. Minn. filed Mar. 13, 2012).  In relevant part, Waters alleges that Cafesjian owes Waters (1) approximately $4,305,000 is deferred base compensation, deferred incentive compensation, and accrued, unused vacation, holiday, and sick leave, Minn. Compl. ¶ 85; (2) approximately $400,000 to $800,000 as a "special bonus" for Waters' work in securing a positive outcome in connection with this litigation, *id.*; and (3) indemnification of costs and expenses related to this litigation, totaling approximately $511,000, *id.* at ¶ 98.

In response to Waters' Complaint, Cafesjian filed a counterclaim against Waters alleging, among other things, that Waters embezzled several million dollars from Cafesjian since 1998. *See generally Waters v. The Cafesjian Family Found., Inc.*, No. 12-648, Answer & Counterclaim (D. Minn. filed April 9, 2012).  Waters denied the allegations in the counterclaim, asserting that Cafesjian knew of and authorized the withdrawal of all funds at issue.  *See generally Waters v. The Cafesjian Family Found., Inc.*, No. 12-648, Answer to Counterclaim (D. Minn. filed Apr. 30, 2012).  As of the date of this opinion, the parties to the Minnesota action were still engaged in discovery, and the court has yet to rule on Cafesjian's motion for summary judgment.  *See Waters v. The Cafesjian Family Found., Inc.*, No. 12-648, Defs.' Mot. for Summ. J. (D. Minn.

---

[4]  On the same day, the Court also denied the Plaintiffs' (first) Motion for a New Trial, ECF No. [208].  *Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d 78 (D.D.C. 2011).

filed Oct. 19, 2012).

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 62.1(a), if a timely motion is made for relief before the District Court that the Court lacks authority to grant because of a pending (or docketed) appeal, the Court may "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  The Plaintiffs filed notices of appeal on May 25, 2011. Assembly's Notice of Appeal, ECF No. [244]; AGM&M's Notice of Appeal, ECF No. [245]. The parties' consolidated appeals have been held in abeyance pending the Court's resolution of this motion.  5/25/12 Order, ECF No. [282].

The Plaintiffs seek relief under Federal Rule of Civil Procedure 60(b), which provides that the Court "may relieve a party . . . from a final judgment, order, or proceeding" for one of six reasons.  In their initial motion, the Plaintiffs argue that relief is warranted because of (a) surprise, Fed. R. Civ. P. 60(b)(1); (b) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b), Fed. R. Civ. P. 60(b)(2); (c) fraud, misrepresentation, or misconduct by an opposing party, Fed. R. Civ. P. 60(b)(3); and (d) any other reason that justifies relief, Fed. R. Civ. P. 60(b)(6).  The Defendants argue that the Plaintiffs' motion, which seeks relief on the grounds of purported perjury by Waters, should be considered only under Rule 60(b)(3), which the Plaintiffs fail to dispute in their Reply.  Therefore, the Court shall evaluate the Plaintiffs' motion only under the rubric of Rule 60(b)(3).  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).

Rule 60(b)(3) permits a court to relieve a party from a final judgment because of "fraud,"

"misrepresentation," or "other misconduct" of an adverse party. "[O]ther misconduct" includes an adverse party's failure to disclose or produce materials requested during discovery. *Summers v. Howard Univ.*, 374 F.3d 1188, 1993 (D.C. Cir. 2004). It is "well-settled" that a party seeking relief under Rule 60(b)(3) must prove any purported fraud or misconduct by "clear and convincing evidence." *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995); *accord Martin v. Howard Univ.*, 275 F. App'x 2, 5 (D.C. Cir. 2008). Additionally,

> Misconduct alone, however, is not sufficient to justify the setting aside of a final judgment. Under Rule 60(b), a court must balance the interest in justice with the interest in protecting the finality of judgments. That balance is effectuated in part by the requirement that the victim of misconduct (or of fraud or misrepresentation) demonstrate actual prejudice. This is often worded as a requirement that the movant show that the misconduct foreclosed full and fair preparation or presentation of its case.

*Summers*, 374 F.3d at 1993 (citations omitted).[5]

## III. DISCUSSION

The Plaintiffs seek relief from the final judgment in this case on four grounds arising out of the allegations in the Minnesota Complaint: (1) alleged perjury by Waters at trial; (2) the Court's reliance on Waters' trial testimony as credible without knowledge of the purported compensation arrangement between Waters and Cafesjian; (3) the Defendants' breach of fiduciary duty to AGM&M based on the "special bonus" from Cafesjian; and (4) Defendant Cafesjian's destruction of documents in April 2009. As explained in detail below, none of these contentions support disturbing the finality of the judgment in this matter. The Plaintiffs fail to show by clear and convincing evidence that Waters committed perjury or otherwise committed fraud or misconduct by not disclosing the compensation purportedly owed and/or promised by

_____

[5] As outlined below, the disposition of the Plaintiffs' motion would not change even if considered under the rubric of the other subsections of Rule 60(b) because the Plaintiffs failed to demonstrate actual prejudice from Defendant Waters' conduct.

Cafesjian.  The Court did not rely on Waters' credibility in rejecting the Plaintiffs' claims at trial, meaning the Plaintiffs cannot show actual prejudice from any alleged perjury or other misconduct by Waters.  The Plaintiffs fail to show by clear and convincing evidence that Cafesjian actually promised Waters the litigation bonus, and in any case the existence of the agreement would not alter the legal conclusion that the Defendants did not breach any duty by filing the initial suit in this litigation.  Finally, the Plaintiffs fail to show by clear and convincing evidence that the Defendants destroyed documents relevant to this litigation or otherwise engaged in discovery misconduct sufficient to set aside the final judgment under Rule 60(b)(3).

      A.     *Alleged Perjury by Defendant Waters*

First, the Plaintiffs contend Waters committed perjury by failing to disclose the compensation at issue in the Minnesota Complaint when asked at trial.  The initial issue with this contention is that no final judgment has been entered in the Minnesota case.  The Plaintiffs' claim of perjury relies entirely on the allegations in Waters' unverified Complaint.  The Cafesjian Defendants contend that the Minnesota Complaint is an attempt by Waters to establish a defense to the claims by the Cafesjian Defendants that Waters embezzled funds from Cafesjian, allegations that the Cafesjian Defendants indicate are currently under investigation by the FBI.  Cafesjian Defs.' Opp'n at 16-17.  The Plaintiffs argue in their Reply that Waters offered a plausible explanation for the conduct underlying the embezzlement allegation in his Answer to the Minnesota Defendants' counterclaim.  Pls.' Mot. at 6-8.  Regardless of what explanation of Waters' actions sounds more plausible, the Court has—with limited exceptions noted below— nothing more than the Minnesota parties' competing *allegations* from which to evaluate the Plaintiffs' allegations of fraud, misrepresentation, and misconduct.  *See* Pls.' Reply at 6 ("It is clear that Cafesjian and Waters have markedly differing accounts of the financial dealings

between them."). Faced with dueling pleadings from the Minnesota litigation, the Court cannot find by clear and convincing evidence that (1) Cafesjian in fact promised a litigation bonus to Waters or otherwise owes Waters compensation as set forth in the Minnesota Complaint; or (2) that Waters *believed* he was entitled to the relief sought, and thus should have disclosed it during the litigation in this case. For this reason alone, the Court will deny the Plaintiffs' motion. Nevertheless, the Court shall address each of the Plaintiffs' grounds for relief.

The Plaintiffs' motion does not identify any specific false statements made by Waters, choosing instead to generally assert that Waters testified at trial that "he was not being paid by Cafesjian to appear at trial or to participate in the litigation," while the Minnesota Complaint sets forth "another version" of Waters' compensation agreement with Cafesjian. Pls.' Mot. at 16, 17. The Court shall examine the relevant portions of Waters' trial testimony (as identified by the parties) compared to the relevant compensation claims in the Minnesota litigation. For context, the relevant portion of the Plaintiffs' cross-examination of Waters regarding his compensation is as follows:

Q:      Now, are you being paid to be here today?

A:      No.

Q:      Have you been paid by Mr. Cafesjian since you departed his employ?

A:      I guess –- yes, would be the short answer.

Q:      How much have you been paid?

A:      My compensation is generally in the form of reimbursement of minor expenses.

Q:      So whatever travel expense and accommodations?

A:      Some.

Q:      But not all?

A:      No, most of them I pay on my own?

7

Q:      And you receive no other compensation from him?

A:      No.

****

Q:      And so that we're clear, you have an arrangement with Mr. Cafesjian, do you not, that he will indemnify you for any *losses* sustained as a result of this litigation, correct?

A:      Not to the best of my knowledge.

Q:      You don't have an indemnity agreement with Mr. Cafesjian?

A:      No.

Q:      And there's no promise from the Cafesjian interests that you will be indemnified for any *damages* that may be assessed against you in this case?

A:      No.

Q:      What about legal fees?

A:      The best answer is Mr. Cafesjian has been paying the legal fees, but not based on any understanding, just because---

Q:      You haven't paid any of your legal fees?

A:      No.

Q:      Have you received a bill for legal fees?

A:      All the legal bills for this action have been directed to Mr. Cafesjian, and so no.

****

Q:      Have you paid anything from your own pocket in connection with the litigation expense in this case?

A:      No.

11/15/10 AM Tr. 34:25-37:20 (emphasis added).

1.      <u>Deferred Base and Incentive Compensation</u>

At various points in their motion and reply brief, the Plaintiffs refer to Waters' claim in the Minnesota Litigation that he is owed in excess of $3 million in deferred base and incentive

compensation from Cafesjian, but at no point do the Plaintiffs explain how this purported compensation arrangement was implicated by the questions asked of Waters during the trial. The Plaintiffs fail to cite to any portion of the trial record indicating that Waters was even asked about his salary or other compensation as an employee of Cafesjian unrelated to this litigation, much less that Waters' response to any such question was less than truthful.   Accordingly, the allegations in the Minnesota Complaint regarding the deferred base and incentive compensation allegedly owed to Waters by Cafesjian are insufficient to show Waters committed perjury, or otherwise warrant vacating the final judgment in this matter.

### 2.   AGM&M Litigation "Bonus"

Waters alleges in the Minnesota Complaint that Cafesjian promised to pay Waters a "significant bonus" of 1% to 2% of the value of assets recovered in the event of a "positive outcome" in this litigation, meaning either Cafesjian gaining control over AGM&M or AGM&M transferring assets back to the Cafesjian Defendants.   *See* Minn. Compl. ¶¶ 78-80.   The Plaintiffs' motion does not explain why this bonus was implicated by the questions asked of Waters on November 15, 2010.   Instead, for the first time in their Reply, the Plaintiffs point to Waters' testimony on November 24, 2010:

> Q:   I think you told us last week that you were no longer employed by Cafesjian, correct?
>
> A:   Yes.
>
> Q:   And you're no longer on the CFF[6] board?
>
> A:   That is correct.
>
> Q:   And forgive me, but you did tell us when you actually departed Cafesjian, but

---

[6] The acronym "CFF" refers to the Cafesjian Family Foundation.   *Armenian Assembly I*, 772 F. Supp. 2d at 26; *see id.* at 31 (describing the purpose and structure of CFF).

could you tell us for the record today, when did you leave Cafesjian?

A:      I resigned as of March 31st, 2009.

Q:      And I take it you have been, as a named defendant in the case, you have also been active in connection with the preparation and defense of the case that was brought against you?

A:      Yes.

Q:      You were also working in connection with the litigation that continued on after your departure from Cafesjian with regard to the claims against them?

A:      Yes.

Q:      And you have an arrangement or some sort of agreement to continue on as a representative or consultant with the litigation against them?

A:      Yes.

Q:      And what is the –– can you just tell us what the arrangement is, other than to cooperate and assist?

A:      Basically, I'm volunteering my time and effort to Mr. Cafesjian, but obviously expending time and energy on my own behalf.

11/24/10 AM Tr. 23:4-24:5.  The Plaintiffs contend that Waters committed perjury by failing to

disclose the promised "special bonus" in response to the question regarding his agreement to

continue on as a representative of Cafesjian after March 30, 2009.  The Plaintiffs forfeited this

argument by failing to raise it in their initial motion.  *See Baloch v. Norton*, 517 F. Supp. 2d 345,

348 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008); *see

also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider

this argument because plaintiffs ... raised it for the first time in their reply brief.").

Regardless, to the extent the allegations in the Minnesota Complaint are true (or Waters

believed them to be true), Cafesjian promised the bonus to Waters in 2007, when the initial suit

regarding the museum was initiated in Minnesota.  Minn. Compl. ¶ 78.  If Cafesjian promised

the bonus in 2007, by definition it was not an agreement negotiated to keep Waters on as a

consultant after he resigned.  By its plain language, the question sought any agreements negotiated to *retain* Waters' involvement in the case after he stopped working for Cafesjian; a promise made by Cafesjian years before that situation arose clearly would not fall within the scope of this inquiry.  Waters did not commit perjury by failing to disclose the "special bonus" promised by Cafesjian.

        3.    <u>Indemnification for Expenses</u>

In the Minnesota Complaint, Waters further alleges that "[a]s an employee of Cafesjian and an officer and director of the CFF," Waters is indemnified by Cafesjian "from and against any costs and expenses Waters incurred related to any actions undertaken by Waters at the direction of Cafesjian and/or for the benefit of Cafesjian or the CFF," including actions undertaken in connection with the AGM&M litigation.  Minn. Compl. ¶ 95.  Waters contends that he provided a number of "services" to Cafesjian in connection with the AGM&M litigation, including: (a) attending depositions, assisting counsel in preparing for depositions, and preparing summaries and analyses of depositions for Cafesjian and his counsel; (b) assisting with motions and pleadings; (c) assisting with the development of litigation strategy and the review and analysis of evidence; (d) "[s]pending over four weeks in Washington, D.C., working with Cafesjian's counsel on trial preparation and participating in every day of the trial"; and (e) "[t]estifying in full support of the Cafesjian causes."  *Id.* at ¶ 97.  Waters estimates the value of these services to be approximately $511,000.00, but asserts that neither Cafesjian nor CFF has reimbursed Waters for the cost of these services.  *Id.* at ¶¶ 98-99.

The Plaintiffs contend that Waters committed perjury at trial by "den[ying] the possibility of receiving any compensation from Cafesjian for his trial testimony," yet claiming in the Minnesota litigation that Cafesjian must indemnify Waters for "testifying in full support of the

Cafesjian causes," at trial.  Pls.' Reply at 13.  There are several flaws in this assertion.  First, the Plaintiffs did *not* ask Waters whether he was receiving *any* compensation for his appearance at trial, which arguably would have required Waters to disclose any indemnification for time spent in connection with the AGM&M litigation.  The Plaintiffs simply did not ask the broader question that would have required Waters to disclose his belief that Cafesjian was required to indemnify him for certain expenses.  Second, according to the Minnesota Complaint, Cafesjian and CFF have thus far failed to reimburse Waters for the time he spent working on this litigation, making his assertion that he was not "*being paid*" at that time accurate.

Third, as Waters notes in his Opposition, the question of whether Waters was "being paid to be here," could reasonably be interpreted to inquire whether Waters was being compensated for the content of his testimony, rather than being compensated for time spent on the stand.  Def. Waters' Opp'n at 5.  The Minnesota Complaint contends that Waters is entitled to indemnification for his time and expenses, not for providing specific testimony.  The Plaintiffs fail to respond to Waters' admittedly self-serving deposition in a related matter pending in the Southern District of Florida, in which Waters explains that he believed he was accurately responding to the questions asked.  Cafesjian Defs.' Ex. B at 239:9-242:11.  On this record, the Court cannot conclude that the Plaintiffs have shown by clear and convincing evidence that Waters knowingly and willfully made a false statement during his trial testimony.  *See* 18 U.S.C. § 1001.

For the first time in their Reply, the Plaintiffs point to Waters' November 24, 2010 testimony to argue that Waters' claim for reimbursement for the $511,000 in services expended on this litigation is "completely at odds with his prior characterization that he was 'volunteering.'"  Pls.' Reply at 13.  The Plaintiffs forfeited this argument by failing to raise it in

their initial motion.  *See Baloch*, 517 F. Supp. 2d at 348; *see also Am. Wildlands*, 530 F.3d at 1001.  Assuming the argument has not been forfeited, even if the allegations in the Minnesota Complaint are true, Waters' responses to the questions asked on November 24 were not false.  The Minnesota Complaint does not claim that Cafesjian agreed to indemnify Waters; it contends that because he was an employee of Cafesjian and officer and director of the Cafesjian Family Foundation, he is *entitled* to indemnification of certain expenses.  The Plaintiffs never asked Waters if he thought he was entitled to indemnification because of his employment relationship with Cafesjian, but rather inquired only as to *agreements* between Cafesjian and the Defendant.  Moreover, the only question posed to Waters regarding the issue of indemnification concerned indemnification for *damages* or *losses*, not expenses.  11/15/10 AM Tr. 36:7-17.  The Plaintiffs have not met their burden to show by clear and convincing evidence that Waters committed perjury.

### 4.    The Plaintiffs Were Not Prejudiced by Any Purported Perjury by Waters

Assuming *arguendo* that any of Waters' statements or omissions during trial amounted to perjury, the Plaintiffs failed to show any actual prejudice as required by Rule 60(b).  The Plaintiffs contend that Waters' failure to disclose his (1) deferred compensation; (2) litigation bonus; and (3) claim for indemnification for expenses with Cafesjian impeded the Court's ability to properly evaluate Waters' credibility.  As set forth *infra*, even discounting all of Waters' testimony, the Court would still reach the same legal conclusions with respect to the Plaintiffs' claims and the enforceability of the reversion clause in the Grant Agreement.  Absent any actual prejudice, alleged perjury on the part of Waters is not a basis for setting aside the final judgment.

### B.    *Court's Purported Reliance on Waters' Testimony as Credible*

The thrust of the Plaintiffs' motion is that because Waters failed to disclose the promise

13

of a "special bonus" from Cafesjian based on the outcome of the litigation, the Court was unable to adequately evaluate Waters' credibility. As indicated above, Waters was never asked a question at trial that required him to disclose any of the alleged compensation at issue in the Minnesota Complaint. In order to succeed on this claim, the Plaintiffs must show that apart from the allegations of perjury, Waters committed fraud, misrepresentation, or misconduct under Rule 60(b)(3), either by (1) failing to disclose the compensation at issue in the Minnesota Complaint, or (2) agreeing to the special bonus payment at all. Furthermore, the Plaintiffs must show they were actually prejudiced by the fact Waters agreed to the bonus or failed to disclose the compensation. The Plaintiffs' motion falls short on all counts.

        1.    <u>Obligation to Disclose Compensation</u>

The threshold question for any inquiry under Rule 60(b)(3) is whether there is clear and convincing evidence that the adverse party actually committed fraud, misrepresentation, or misconduct. The entirety of the Plaintiffs' motion is framed in terms of Waters' obligation to *disclose* the arrangement, but for the reasons stated above, Waters did not commit perjury by failing to disclose any of the compensation he claims to be owed in the Minnesota Complaint. The Plaintiffs have not identified anything else that required Waters to disclose the alleged arrangements with Cafesjian to the Court or to the Plaintiffs.

Nor do any of the cases cited by the Plaintiffs support the notion that Waters should have affirmatively disclosed any purported agreement with Cafesjian when not required to do so in a truthful answer to a question posed during his testimony. *See Hamilton v. Gen. Motors Corp.*, 490 F.2d 223, 229 (7th Cir. 1973) (analyzing when a fact witness' claim for reimbursement of expenses from a party accrues); *Hare v. McGue*, 178 Cal. 740, 741-42 (Cal. 1918) (enforcing contract to locate witnesses and gather evidence in connection with divorce proceedings); *Reffett*

*v. Comm'r*, 39 T.C. 869, 878 (1963) (declining to determine whether public policy prevented a taxpayer from deducting from his gross income portions of an award paid to fact witnesses that testified as part of the lawsuit leading to the award).  To be clear, the cases the Plaintiffs cite note that promises to make certain types of payments to fact witnesses in exchange for their testimony may be void for public policy reasons, but each case was decided in the context of an attempt to *enforce* those agreements or deduct payments made under such agreements, not in the underlying lawsuits in which the testimony was offered.  *E.g.*, *Alexander v. Watson*, 128 F.2d 627, 629-31 (4th Cir. 1942) (finding fact witnesses could not enforce agreement for 10% of attorney's fees awarded).

The only exception is *State of New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284 (W.D.N.Y. 1996).  In *Solvent Chemical*, during a deposition of a fact witness, Mr. Beu, the witness was specifically asked whether he had entered into any consulting arrangements with any party to the litigation.  *Id.* at 287.  Mr. Beu, a former employee of defendant ICC, responded by disclosing his consulting agreement with ICC.  The district court held that the terms of Mr. Beu's agreement with ICC and the scope of his work under the agreement was not protected by work product privilege.  *Id.* at 288-89.  As set forth above, in this case Waters was never asked a question that required him to disclose any aspect of his compensation arrangement with Cafesjian, or Cafesjian's alleged promise of a litigation bonus.  None of the cases cited by the Plaintiffs are relevant to the question of whether Waters was under any obligation to *disclose* his agreement(s) with Cafesjian.  Therefore, the Court finds the Plaintiffs failed to show by clear and convincing evidence that Waters committed fraud, misrepresentation, or misconduct by failing to disclose the compensation at issue in the Minnesota Complaint.

2.      Existence of the AGM&M Litigation Bonus

Although the Plaintiffs' motion does not explicitly raise this issue, their legal arguments imply that the existence of Cafesjian's alleged promise to Waters of a bonus based on the outcome of the AGM&M litigation is itself misconduct under Rule 60(b)(3).  The Plaintiff relies primarily on 18 U.S.C. § 201(c)(3), which provides that whoever

> directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom[] shall be fined under this title or imprisoned for not more than two years, or both.

The record is far from clear and convincing that the promise allegedly made by Cafesjian, if made, violated Section 201(c)(3) or the public policy rule against compensating fact witnesses for their testimony.  Cafesjian promised his employee, who also happened to be an attorney, that the employee would receive a bonus if the litigation was successful.  Several of the cases cited by the Plaintiffs indicate that parties are free to pay individuals, including fact witnesses, for providing information and assisting with litigation, so long as the payment is not for their testimony.  *Solvent Chemical*, 166 F.R.D. at 289-90 ("Of course, the court finds nothing improper in the reimbursement of expenses incurred by Mr. Beu in travelling to New York to provide ICC with factual information, or in the payment of a reasonable hourly fee for Mr. Beu's time. But in providing Mr. Beu with protection from liability in the Dover litigation, and in this action, as a means of obtaining his cooperation as a fact witness, ICC and Solvent went too far."); *Hare*, 178 Cal. at 742 ("Anyone has a right when threatened with litigation, or desiring himself to sue, to employ assistance with a view of ascertaining facts as they exist, and to hunt up and procure the presence of witnesses who know of facts and will testify to them, and this is true whether the action be one of divorce or of any other character."); *see Golden Door Jewelry*

16

*Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 865 F. Supp. 1516, 1521 (S.D. Fla. 1994).

The *Solvent Chemical* case is particularly relevant to this issue.   The trial court recognized that it was not improper for a defendant corporation to compensate a fact witness for expenses, including a reasonable hourly fee, for providing factual information.   166 F. R.D. at 289-90.   The consulting agreement was problematic because (1) it indemnified the witness from claims made against him by other parties to the litigation; and (2) despite knowing the witness was "an extremely important fact witness," the defendant did not "move[] to acquire" his services as a consultant until after he was subpoenaed.   *Id.*   The effect of the agreement was to make a potentially adverse witness "sympathetic" to the defendant.   *Id.*

In this case, Waters did more than simply testify.   According to the Minnesota Complaint, he spent countless hours assisting Cafesjian's counsel in preparing for depositions, summarizing the depositions for Cafesjian, reviewing pleadings, and assisting with the trial. Moreover, unlike the witness in *Solvent Chemical*, Cafesjian purportedly made the promise in 2007 when Waters was still employed by Cafesjian, and nearly two years before Waters resigned.   Absent any evidence Cafesjian paid Waters *for his testimony*, the Plaintiffs' reliance on Section 201(c)(3) and the general public policy against compensating fact witnesses for their testimony is unavailing.[7]   Accordingly, the Plaintiffs failed to satisfy the threshold requirement

_____

[7] Additionally, two of the cases cited by the Plaintiffs, *United States v. Blaszak*, 349 F.3d 881 (6th Cir. 2003), and Golden Door, reflect a Circuit split as to whether Section 201(c)(3) prohibits all payments for testimony, or simply payments intending to procure false testimony. *Blaszak*, 349 F.3d at 886; *Golden Door*, 865 F. Supp. at 1523-24.   In fact, the *Golden Door* court determined the payments did not violate Section 201(c)(3), but struck the testimony because the Court determined the attorneys involved violated the Florida Rules of Professional Responsibility.   Therefore, even if the Plaintiffs were able to prove Cafesjian promised the litigation bonus in exchange for Waters' testimony, it is not clear that the promise would violate

for vacating a judgment for misconduct under Rule 60(b)(3).

   3. <u>Prejudice</u>

   Assuming for the sake of argument that the Plaintiffs demonstrated by clear and convincing evidence that Waters committed fraud or misconduct by entering into and/or failing to disclose the purported compensation arrangements with Cafesjian, the Plaintiffs failed to show they were actually prejudiced by Waters' conduct. The only prejudice identified by the Plaintiffs' with respect to Waters' perjury and/or failure to disclose the compensation in question is that the Court could not adequately evaluate Waters' credibility absent this evidence demonstrating he had a personal financial stake in the outcome of the case.

   Contrary to the Plaintiffs' assertion, the underlying theme of the Court's opinion was not that AGM&M's witnesses lacked credibility, "especially when matched up to the testimony of Waters." Pls.' Mot. at 2. The Court noted from the outset that "most of the witnesses who testified at trial are biased in some manner, either because they have a financial stake in the outcome of the trial or because their reputation has been called into question by the allegations raised in this litigation." *Armenian Assembly I*, 772 F. Supp. 2d at 28; *see id.* ("The Court considers all of this as a factor in assessing the credibility of the witnesses."). Accordingly, the Court relied heavily on the admitted exhibits in making factual determinations. *Id.*; *see also id.* at 29 ("Although there are some minor inconsistencies and a few major ones in the documentary evidence submitted, the Court finds that the exhibits are generally the best evidence of what occurred because most of them were created at the same time as the events they describe or shortly thereafter. Therefore, in the face of a conflict between the exhibits and witness testimony, the Court has sided more often with the story told by the exhibits. With a few exceptions,

---

Section 201(c)(3) absent proof Waters testified falsely during the trial.

however, the inconsistencies are not great, and more often the testimony corroborates the other evidence in the record.").

The fact that Waters' name appears numerous times in the Court's January 2011 Memorandum Opinion is not indicative of whether or not the Court credited any particular testimony offered by Waters.   The Court's January 2011 Memorandum Opinion contains a narrative recitation of "the story underlying the claims in this litigation," *Armenian Assembly I*, 772 F. Supp. 2d at 29, meaning that not all of the testimony or evidence cited in the factual findings, or each finding of fact itself, was necessary or even relevant to the legal conclusions drawn by the Court.   This notion is important to keep in mind when reviewing the Plaintiffs' motion, which focuses on particular purported factual findings by the Court, but makes no attempt to connect those facts to the legal conclusion relevant to or dispositive of the parties' claims.   Unless the factual findings were necessary to the Court's disposition of a particular claim or request for relief, and the Court actually relied on Waters' testimony in making that finding, the fact that the Court mentioned Waters' testimony in any given factual discussion is irrelevant and does not support setting aside the final judgment.

Most importantly, the Court analyzed the initial trial record knowing that Waters had a personal financial stake in the outcome of the case.   Waters was a party to the lawsuit, facing personal liability for allegedly breaching his fiduciary duties to AGM&M and the Assembly, as well as misappropriating trade secrets from the Assembly.   *See* Pls.' Consol. Compl., ECF No. [110], Counts I, II, & IV.   Waters faced potentially millions of dollars in damages, and truthfully testified that Cafesjian had not agreed to indemnify Waters for any damages entered against Waters.   *See* Cafesjian Defs.' Ex. D (Pls.' Answers to Interrogatories) at 5 (estimating quantifiable damages in excess of $15 million).   If true, the fact that Cafesjian promised Waters

$400,000 to $800,000 in the event Cafesjian was successful in the litigation is consistent with the bias the Court (and the parties) knew Waters possessed when he took the stand. With this in mind, the Court turns to the specific factual findings the Plaintiffs take issue with in their motion.

a.      Enforceability of the Reversion Clause in the Grant Agreement

The Plaintiffs contend that the Court relied heavily on Waters' testimony to conclude that the reversion clause in the Grant Agreement was enforceable. The Plaintiffs identify six purported factual findings they claim were important to the Court's holding that the reversion clause was enforceable. None of the Plaintiffs' contentions have merit.

i.      Restrictions on Grant from Anoush Mathevosian

First, the Plaintiffs argue that the decision to uphold the reversion clause in the Grant Agreement was based on the finding that the terms of the gift from Anoush Mathevosian did not preclude enforcement of the reversion clause (and thus return of the grant properties to Cafesjian), a finding that was in turn based on Waters' testimony. In February 2000, Mathevosian pledged $3.5 million for the purchase of the Bank Building, one of the properties at issue in this case. *Armenian Assembly I*, 772 F. Supp. 2d at 34. After closing on the purchase of the Bank Building, Mathevosian wrote a letter to the Assembly dedicating her pledge to her parents, and expressing her desire that the Bank Building be used solely for the Assembly, the museum, and specific related purposes. *Id.* at 35. During her deposition,

> Mathevosian explained that she wanted to ensure that they paid for the property in full so that it would not be mortgaged or sold in the future. Mathevosian Dep. Tr. at 14–15. Mathevosian asked that these understandings be incorporated into the permanent records of the organization. PX–110. However, there is no evidence that Mathevosian's expressed desires were ever formally incorporated by the Assembly into a binding obligation. Mathevosian testified that Hovnanian agreed to her conditions, but she did not recall whether he had done so orally or in writing. Mathevosian Dep. Tr. at 16–17. John Waters testified that he did not see Mathevosian's letter until several years later, in late 2003. 11/15 AM Tr. at 49.

*Id.* at 35.  The Plaintiffs cite to the Court's reference to Waters' testimony that he did not see the letter from Mathevosian until 2003, and argue that "[b]y implication," Waters' testimony "undercut the effectiveness of Hovnanian's acknowledgment of the restrictions imposed by Mathevosian in making her donation.  This enabled the Court to determine that the conditions were not binding upon Cafesjian."  Pls.' Mot. at 20.  According to the Plaintiffs, "[i]f Waters's testimony was untrue, the Court could easily have enforced the conditions, thereby excluding the Bank Building from the properties returned to Cafesjian."  *Id.*

This argument ignores the Court's legal conclusions regarding the enforceability of the reversion clause.  The Court did not rely on Waters' testimony that he did not see the letter until 2003 in order to enforce the reversion clause.  Rather, the Court found that based on the order of events, to the extent Mathevosian's condition was binding on AGM&M despite never being formally acknowledged by the Assembly, "Mathevosian ratified and approved the Grant Agreement through the Unanimous Written Consent agreement, so Cafesjian's reversionary interest cannot be said to violate her condition that the Bank Building not be encumbered."  *Armenian Assembly I*, 720 F. Supp. 2d at 114 (citation omitted).  Legally, it is irrelevant when Waters claims to have seen the letter.  Mathevosian ratified the Grant Agreement, thus the reversion clause did not violate the conditions on Mathevosian's pledge of funds towards the purchase of the Bank Building.  Waters' testimony had no bearing on the Court's conclusion on this issue.

### ii.      *Other Trustees' Knowledge of the Reversion Clause*

Second, the Plaintiffs contend that the Court "accepted Waters' testimony respecting the terms and entry into the Grant Agreement while rejecting the testimony of Aram Kaloosdian, Hirair Hovnanian, and Peter Vosbikian that they were not aware of the reversion clause in the

Grant Agreement." Pls.' Mot. at 20. The Court criticized Kaloosdian's, Hovnanian's and Vosbikian's testimony that they were not aware the reversion clause was included in the Grant Agreement, but not on the basis of Waters' testimony. The record indicated that Waters emailed a draft of the Grant Agreement, which included the reversion clause, to all three individuals. *Armenian Assembly I*, 772 F. Supp. 2d at 50 (citing PX-330 at 1, 3). Additionally, the Court cited to Ross Vartian's notes of the October 28, 2003 conference call regarding the founding documents for AGM&M, which specifically referenced the fact that during the call "[r]egarding the use of property, dissolution & right of reversion, A. Kaloosdian proposed that the term 'develop' be more fully defined so that failure and success would be better understood." *See id.* (citing DX-94 at 2). Not only were they participants on the call, Ross Vartian also emailed a copy of his notes to Kaloosdian, Hovnanian, and Vosbikian. DX-94. Waters' trial testimony on this issue simply confirmed what was reflected in PX-330 and DX-94. *Armenian Assembly I*, 772 F. Supp. 2d at 50. The Court relied on the documentary evidence rather than witness testimony to find the other trustees knew the reversion clause was included in the Grant Agreement.

*iii.*     *Terms of the Grant from Hirair Hovnanian*

Third, AGM&M claims that the Court "accepted Waters testimony that Hovnanian asked that a reversion clause be included in his own grant agreement." Pls.' Mot. at 20-21. However, the Plaintiffs fail to explain how this testimony regarding Hovnanian's $5 million pledge to AGM&M was relevant to the disposition of *any* of the parties' claims or to the enforcement of the reversion clause.

Without citation to the record, the Plaintiffs elsewhere contend that "the Court's reliance upon Waters's testimony with respect to the Hovnanian donation and Waters's use of the

donation funds while he served as AGM&M's treasurer" "directly impacted" the Court's findings.  Pls.' Mot. at 34.  The Court understands this argument to refer to the $500,000 Hovnanian gave to AGM&M in December 2004 to be used towards his $5 million pledge. *Armenian Assembly I*, 772 F. Supp. 2d at 62.  "The letter accompanying the donation stated that the contribution 'shall not be used for operating costs but be set aside to earn interest and be reserved for use in future capital improvements.'"  *Id.*  The Court did credit Waters' testimony that Hovnanian released the restriction on the $500,000 donation.  *Id.* at 109.  However, the Court further concluded that

> Even if Hovnanian's donation had remained restricted, however, the record shows that the Board (including Hovnanian) would have had notice that Waters and Cafesjian were spending those funds.  Waters presented financial reports and discussed the budget at AGM&M Board meetings, and Cafesjian or Waters repeatedly warned the Board that the corporate account balances were low.  If the other trustees were unaware that Hovnanian's donation was being spent, it was because they chose to be ignorant.

*Id.*  Thus, the Court would have reached the same conclusion with respect to the use of the Hovnanian donation even if it had wholly ignored Waters' testimony on this issue.

### iv.    Observation of Corporate Formalities

Fourth, the Plaintiffs contend that "[r]elying upon the testimony of Waters, and despite the absence of any memorializing paper trial [sic], the Court accepted the Waters position that they acted with reasonable diligence in the timeframe that they controlled AGM&M," referring specifically to Waters' failure to observe corporate formalities for AGM&M.  Pls.' Mot. at 21.  This argument once again misrepresents the Court's findings.  The Court did not credit Waters' testimony that he actually observed the appropriate corporate formalities, despite the lack of documentary evidence to support his testimony.  Rather, the Court found that:

> As for the failure to call for formal votes, the record shows that AGM&M meetings were routinely conducted on an informal basis with a preference for consensus decision-making.   The 80% vote requirement in the By-Laws reinforced this practice.   Although formal voting is generally good corporate practice, the Court is not persuaded that any of the AGM&M proceedings during Cafesjian and Waters's tenure as officers would have turned out differently if formal votes had been taken.   The record shows that there was significant disagreement over how to advance the museum project, and on a board of only four trustees, a vote would not be needed in order to determine the level of agreement.   Had a vote been necessary, any trustee could have called for one, so it does not make sense to blame Cafesjian for the lack of formality.

*Armenian Assembly I*, 772 F. Supp.2d at 108; *see also id.* at 70, n.38 (citing testimony of Rouben Adalian that the AGM&M tried to operate as a consensus and thus often did not have formal votes during board meetings).   The Court did not rely on Waters' testimony regarding this issue.

### v.   Interaction of AGM&M Board Members

Fifth, the Plaintiffs assert that "Waters's testimony also provided the basis of the Court's conclusion that the delay in completing the museum and memorial stemmed from an inability of the trustees to agree on a plan, rather than the deliberatively obstructionist conduct of Cafesjian and Waters."   Pls.' Mot. at 21-22.   The Plaintiffs specifically point to the Court's treatment of Waters' testimony that any decision that was approved by Hovnanian was adopted and any decision he did not agree with did not move forward, in contrast to Hovnanian's own testimony that he had a limited role in the planning committee.   *Id.* at 22.

The Plaintiffs' citation to the Court's January 2011 Memorandum Opinion is entirely misleading.   The Court did not reject Hovnanian's testimony because John Waters testified otherwise.   The Court explicitly rejected Hovnanian's assertion that "prior to November 2003, he had 'nothing to do with this project,'" because of "the extensive evidence in the record of Hovnanian's involvement during this period."   *Armenian Assembly I*, 772 F. Supp. 2d at 37.   The Court discussed in detail the factual history of the development of the museum prior to 2003,

citing to specific documents in the record and testimony from witnesses other than Waters

demonstrating Hovnanian's involvement in the project.  *E.g.*, *id.* at 37-39.

<em>vi.</em>    <em>Pace of Development of the Museum</em>

Sixth, the Plaintiffs propound that the Court "credited Waters's testimony that he was

dismayed at the sluggishness with which the project had evolved."  Pls.' Mot. at 22.  In context,

the Court found that during a March 1, 2003 meeting to discuss the project,

> Waters briefly described the history of the project and expressed his appreciation
> for the hard work of those involved, saying, "I am happy at how well this project
> is moving along and moving forward."  [DX-82 at 9.]  Those words were mostly
> tactful; the truth was that Waters and Cafesjian were dismayed at the sluggishness
> with which the project had evolved over the previous three years. 11/15 AM Tr. at
> 52-53; 11/19 AM Tr. at 82.  At this point, however, it was clear that the project
> was entering a new phase.  While the details still had to be finalized, everyone
> was optimistic that the creation of AGM&M would finally enable the project to
> become a reality.

*Armenian Assembly I*, 772 F. Supp. 2d at 50.  Contrary to the Plaintiffs' assertion, the Court did

not rely on this testimony in finding that the lack of progress towards development of the

museum was not the fault of Cafesjian or Waters.

> [T]he lack of meaningful progress on the project from 2003 to 2006 was largely
> the product of a lack of funds and disagreement among the trustees over how to
> move forward. The record shows that Cafesjian and Waters tried to make progress
> on the museum by cultivating Papazian's designs and soliciting Deborah
> Devedjian to create a business plan. Moreover, Cafesjian and Waters did try to
> develop a fundraising plan in 2006, but Kaloosdian objected to the solicitation of
> donors using the Papazian designs. Therefore, the Board's inability to reach
> agreement over an architect prevented the implementation of any fundraising
> initiatives. In light of the infrequent Board meetings and Hovnanian's reluctance
> to get involved at even a basic level, it is hardly surprising that Cafesjian and
> Waters were unable to get the museum up and running during their three years at
> the helm.

*Id.* at 107-08.  The Court in no way relied on Waters' sentiments during the March 1, 2003,

meeting in finding Cafesjian and Waters were not at fault for the lack of progress in developing

the museum.  *See also id.* at 108 ("The record shows that there was significant disagreement over

25

how to advance the museum project, and on a board of only four trustees, a vote would not be needed in order to determine the level of agreement.  Had a vote been necessary, any trustee could have called for one, so it does not make sense to blame Cafesjian for the lack of formality.").

b.      Conflict Between Cafesjian and Hovnanian

The Plaintiffs further contend that the Court relied on Waters' testimony in articulating the conflicted relationship between Cafesjian and Hovnanian.  The Plaintiffs specifically allege that the Court "largely accepted the Cafesjian/Waters position that a personality conflict between Cafesjian and Hovnanian lay at the root of the failure of AGM&M to construct the museum and memorial," and in particular, the Court "accepted Waters's testimony that Hovnanian told him about Cafesjian 'No Johnny-come-lately Armenian is going to tell me he's more Armenian than I am' and that 'I'll spent every last nickel that I have to destroy him and his foundation.'"  Pls.' Mot. at 22-23.

The statements Waters attributed to Hovnanian were purportedly made by Hovnanian during a meeting of the Board of Trustees for the Assembly on September 8, 2006.  *Armenian Assembly I*, 772 F. Supp. 2d at 78.  The record was rife with evidence of the conflict between Cafesjian and Hovnanian prior to that date, including as far back as 2005 when Cafesjian hired Ross Vartian.  *E.g. id.* at 64.   The Court cited to numerous documents in the record demonstrating the conflict between Hovnanian and Cafesjian.   *Id.* at 64-66.   There was overwhelming evidence in the record demonstrating the conflict between Hovnanian and Cafesjian.  Wholly ignoring Waters' testimony regarding the September 8, 2006, meeting would not alter this conclusion.

c.       Promissory Note

The Plaintiffs also contend that the Court's finding that Cafesjian did not forgive the $500,000 promissory note from the Plaintiffs relied on Waters' testimony.  Pls.' Mot. at 23.  To be clear, the Court did not rely on Waters' credibility as a witness to find that the promissory note had not been forgiven.  Rather, the Court found that there was insufficient evidence in the record to establish it *had* been forgiven.  Hovnanian was the only person to testify that Cafesjian and Waters told him the note had been forgiven, but the Court did not credit Hovnanian's testimony on this point because he was "unable to remember any details about the circumstances under which these statements were allegedly made."  *Armenian Assembly I*, 772 F. Supp. 2d at 57.  Kaloosdian had no independent knowledge as to the status of the promissory note, but rather testified that he heard Hovnanian say that Hovnanian *expected* Cafesjian to forgive the note.  *Id.* In other words, even absent Waters' testimony, the record was devoid of any affirmative evidence that the promissory note had been forgiven, which was the basis for the Court's decision.   Moreover, the Court found that AGM&M failed to prove any injury from any purported breach of fiduciary duties by Waters and Cafesjian, meaning the Plaintiffs' claims would have failed even if the Court did not credit any of Waters' testimony, and thus Waters' conduct did not prejudice the Plaintiffs.  *Id.* at 116-17.

d.       Memorandum of Agreement

Next, the Plaintiffs argue that the Court "accepted Waters's testimony on the issue of the filing of the Memorandum of Agreement ["MOA"] and failed to find that Defendants' conduct in doing so resulted in damages or liability to AGM&M," but "this testimony is suspect now that it is known that Waters had a significant financial interest in filing the Memorandum of Agreement."  Pls.' Mot. at 23.  This argument grossly mischaracterizes the Court's opinion.

First, the Court did not rely on Waters' testimony, it specifically relied on *Cafesjian*'s testimony that he felt he needed to record the MOA in light of Kaloosdian's inquiries about the title to the properties. *Armenian Assembly I*, 772 F. Supp. 2d at 113. In any case, this issue was ultimately irrelevant because "[w]hether or not there was any pending risk of sale, Cafesjian and CFF had a right to ensure that the public had notice of their reversionary interest." *Id.* The Court concluded that "Cafesjian and Waters's failure to provide notice to the Board constituted a violation of their duty of candor to AGM&M." *Id.* However, the Court found this breach was not actionable for want of injury to the Plaintiffs. The Court noted that the Plaintiffs "failed to prove the MOA did anything other than record AGM&M's already existing obligations under the reversion clause in the Grant Agreement, made binding on AGM&M through the Transfer Agreement." *Id.* at 114.

Curiously, the Plaintiffs suggest that "[t]he Court must now consider anew the effect of the Memorandum, taken in a cumulative light with all of the other steps taken by Waters and Cafesjian to stop the construction of the museum and memorial," because "[w]hat previously appeared innocuous now appears suspicious given the motives of Waters to earn his bonus." Pls.' Mot. at 24. There is no basis on which to reconsider the Court's decision regarding the recordation of the MOA. The Court's conclusion that the recordation of the MOA did not injure AGM&M was *not* based on Waters' testimony. It was based entirely on the fact that the MOA simply reflected AGM&M's existing legal obligations. Waters' and Cafesjian's motives in recording the MOA were irrelevant because the MOA itself did not alter AGM&M obligations under the reversion clause.

The Plaintiffs further argue that "Waters's testimony that he was authorized to file the Memorandum of Agreement under the Unanimous Written Consent also lacks credibility in light

of the new information respecting Water's financial interest in securing a favorable result for Cafesjian." Pls.' Mot. at 24. The Court specifically *rejected* this testimony in the January 2011 Memorandum Opinion, for two reasons: (1) the Court was not persuaded that the Unanimous Written Consent agreement "authorized Waters to record the MOA three years after the Grant Agreement was executed"; and (2) "Regardless of whether there was authorization for the MOA, [] Cafesjian and Waters's failure to provide notice to the Board constituted a violation of their duty of candor to AGM&M." *Armenian Assembly I*, 772 F. Supp. 2d at 113. The Court did not rely on Waters' testimony or credibility in its conclusions regarding the MOA, therefore the allegations in the Minnesota Complaint are insufficient to set aside the final judgment with respect to this issue.

Waters' testimony and reliability as a witness was not dispositive of or critical to any of the Court's legal conclusions in this case. Even if the Plaintiffs could satisfy the threshold requirement of Rule 60(b)(3) to show Waters engaged in fraud, misrepresentation, or misconduct, the Plaintiffs were not actually prejudiced by Waters' conduct. Therefore, the Court declines to set aside the final judgment in this matter.

C.    *Breach of Fiduciary Duty Claim*

Without citation to the record, the Plaintiffs argue that apart from the issue of credibility, Waters breached his fiduciary duty to AGM&M by (1) recording the MOA; and (2) filing the initial lawsuit in Minnesota in light of his financial stake in the issues. Pls.' Mot. at 33. The first argument is nonsensical because the MOA was executed and recorded in October 2006, before Cafesjian allegedly even promised the litigation bonus to Waters. Furthermore, Waters' motivation was irrelevant at the point the Plaintiffs failed to prove any injury from the MOA, which merely provided public notice of AGM&M's existing legal obligations.

In terms of the second argument, the Court held that the filing of the initial lawsuit did not breach the Defendants' duties because Cafesjian filed the lawsuit to protect his legal rights with respect to the promissory note and the reversion clause.  The Court found that since the promissory note had not been forgiven and the MOA was enforceable, Cafesjian was entitled to file suit to protect his contractual rights.  *Armenian Assembly I*, 772 F. Supp. 2d at 114-15.  The fact that the promissory note and MOA were enforceable meant the Defendants had a good faith basis to file the suit.

The Plaintiffs attempt to claim in their Reply that the Defendants conceded this argument, which the Plaintiffs characterize as the "central" basis for granting a new trial.  It is difficult to discern where in their initial motion the Plaintiffs even asserted this argument, much less characterize it as the "central" contention in their motion.  At best, the Plaintiffs hinted at this argument in a single paragraph on page 33 of their motion, without citation to any legal standard or relevant portion of the record.  The extensive discussion of Waters' and Cafesjian's fiduciary duties on pages 14-18 is entirely new in the Plaintiffs' Reply, as is the assertion that Cafesjian somehow induced Waters' purported breach of fiduciary duties.  Ultimately, the decision to treat an argument as conceded is within the Court's discretion.  *Hopkins*, 284 F. Supp. 2d at 25.  Because the Plaintiffs failed to raise this argument fully in their initial motion and because the argument is meritless, the Court declines to treat this argument as conceded.

D.      *Document Destruction*

The Minnesota Complaint alleges that in April 2009, shortly after Waters resigned from GLC Enterprises, Waters learned that "Cafesjian had directed a significant and aggressive program of document destruction at the Cafesjian Family Office, starting with the records in Waters' former office."  Minn. Compl. ¶ 108.  Without elaboration, the Plaintiffs contend that

"[t]his allegation directly impacts Defendants' document production in this litigation and the evidence that was ultimately presented to the trial court."  Pls.' Mot. at 17.

The Cafesjian Defendants assert in their Opposition that Waters confirmed during his deposition that the Defendants had "done extensive document collection and production" for this litigation prior to April 2009, and Waters "didn't think that there was the possibility that there was anything" destroyed that was relevant to this litigation.  Cafesjian Ex. B at 254:18-255:25; *see id.* ("[I]t just didn't even come up as an issue that that had potential implications for AGM&M.").  In response, the Plaintiffs contend that "AGM&M and the Assembly cannot accept the proffered explanation that all relevant documents were disclosed.  Waters and Cafesjian should have disclosed the document destruction so that [the Plaintiffs] could depose all involved in the destruction to identify the documents with clarity."  Pls.' Reply at 5.

The Plaintiffs' argument on this issue reverses the burden under Rule 60(b).  As the moving party, the *Plaintiffs* must show by clear and convincing evidence that the Defendants committed misconduct by destroying or failing to disclose relevant documents during discovery. Initially, the Plaintiffs can only point to Waters' allegation that documents were destroyed, but Waters admitted during his deposition that he has no first-hand knowledge of purported "destruction."  Cafesjian Defs.' Ex. C at 254:1-255:25, 300:25-302:5.  Waters asserted during his deposition that he was told by two individuals that people were shredding documents from Waters' former office, but there is no indication as to whether these two individuals themselves had direct knowledge of the alleged shredding.  On this record, the Court cannot find by clear and convincing evidence that any purported "document destruction" took place.

Assuming any document destruction did take place, the Plaintiffs contend the Defendants should have disclosed this fact before trial so that the Plaintiffs could conduct discovery into the

issue.  However, the Plaintiffs failed to show that the Defendants purportedly destroyed any *relevant* documents.  The Court is cognizant of the fact this burden essentially asks the Plaintiffs to prove the content of documents that allegedly no longer exist.  But the Plaintiffs have not even attempted to make a showing that relevant documents were destroyed, for example by identifying the types of documents that should have been in the Defendants' possession but were not produced during discovery.  Absent evidence any relevant documents were destroyed, the Plaintiffs' motion provides no basis for finding the Defendants committed misconduct under Rule 60(b)(3) by not disclosing the destruction during discovery.

The only allegation from the Plaintiffs regarding the substance of the destroyed documents is that "Waters admitted that the documents that were destroyed included those that would have revealed the terms of his hidden compensation agreement."  Pls.' Reply at 5.  The Plaintiffs cite to paragraph 103 of Waters' answer to Cafesjian's counterclaim in the Minnesota litigation, which alleges that Cafesjian destroyed documents relevant to Waters' defense to the counterclaims.  Pls. Reply Ex. B.  The Plaintiffs then speculate that "this would include the documents that prove the compensation agreement between them."  Pls. Reply at 9.  This speculation is completely unsubstantiated by the record, including Waters' deposition testimony.[8]  Even if the Court were to credit the Plaintiffs' claim that documents evidencing the compensation at issue were destroyed, as explained above, the Plaintiffs were not prejudiced by Waters' failure to disclose the alleged promise of a special bonus or other compensation at issue in the Plaintiffs' motion.  By definition, the Plaintiffs cannot show that they were actually prejudiced by the Defendants' failure to produce documents evidencing an agreement that, if

---

[8]  This is particularly notable because if Cafesjian had destroyed documents evidencing the promise of a litigation bonus, Waters would have every incentive to make this claim during his deposition.

disclosed, would not have altered the outcome in this case.

The record before the Court does not demonstrate by clear and convincing evidence that Cafesjian destroyed any documents, much less any documents relevant to this litigation. Moreover, the Plaintiffs' speculation, if true, would be insufficient to support a finding that the Plaintiffs were actually prejudiced by any purported discovery misconduct. The allegations in the Minnesota Complaint regarding purported document destruction by Cafesjian are insufficient to warrant vacating the final judgment in this matter.

## IV.  CONCLUSION

The Plaintiffs rely on unverified allegations in a complaint filed in Minnesota to urge the Court to set aside the final judgment in this case. The Plaintiffs have not shown by clear and convincing evidence that Defendants entered into the agreements alleged in the complaint, or that Defendant Waters believed the allegations to be true, and thus the Plaintiffs' motion fails to satisfy the threshold requirements of Rule 60(b)(3). Additionally, the Court finds that Defendant Waters did not commit perjury, and the Plaintiffs failed to prove that he was required to disclose or refrain from entering into any of the alleged compensation agreements discussed in the Minnesota Complaint. Nor have the Plaintiffs shown the Defendants destroyed any documents or otherwise committed discovery misconduct. Ultimately, the Plaintiffs cannot show that they were actually prejudiced by any purported fraud, misrepresentation, or misconduct. The Plaintiffs had a full and fair opportunity to present their case during the initial bench trial, therefore the Court will not disturb the final judgment. Accordingly, the Plaintiffs' [275] Motion for New Trial is DENIED. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE

33